**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------------- X

TRAVELERS CASUALTY AND SURETY COMPANY
as Administrator for RELIANCE INSURANCE
COMPANY,

                       Plaintiff,

         -against-

DORMITORY AUTHORITY - STATE OF NEW YORK,
TDX CONSTRUCTION CORP. and KOHN PEDERSEN
FOX ASSOCIATES, P.C.,

                    Defendants.

---------------------------------------------------------------------- X

:    07 Civ. 6915 (DLC)


## MEMORANDUM IN SUPPORT OF
## MOTION TO DISMISS COMPLAINT


ZETLIN & DE CHIARA, LLP
*Attorneys for Defendant*
    *Kohn Pedersen Fox Associates, P.C.*
801 Second Avenue
New York, New York 10017
(212) 682-6800

On the Memorandum,

    Michael K. De Chiara, Esq.
    David Abramovitz, Esq.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ i

PRELIMINARY STATEMENT ....................................................................................... 1

SUMMARY OF ARGUMENT ........................................................................................ 1

STATEMENT OF FACTS ............................................................................................... 2

    The Project.................................................................................................................. 2

    The Relevant Contracts ............................................................................................. 3

    Travelers' Claim against KPF ................................................................................... 4

ARGUMENT

    POINT I

    TRAVELERS FAILS TO ALLEGE FACTS SUFFICIENT TO
    STATE A CLAIM AS A THIRD-PARTY BENEFICIARY OF
    THE DASNY-KPF AGREEMENT ........................................................................ 5

        A. Only an Intended Third-Party Beneficiary May
           Sue for Breach of a Contract to which it is not a Party............................... 6

        B. Trataros was not an Intended Beneficiary
           Of the DASNY-KPF Agreement ................................................................. 6

    POINT II

    TRAVELERS' NEGLIGENCE CLAIM AGAINST KPF
    SHOULD BE DISMISSED BECAUSE TRATAROS LACKED
    PRIVITY OR THE FUNCTIONAL EQUIVALENT THEREOF WITH KPF ...................... 8

        A. A Plaintiff must be in Privity or the Functional Equivalent of Privity
           to Maintain a Negligence Action for Economic Damages under New York Law ..... 8

        B. There is no Privity between Trataros and KPF ........................................... 9

        C. Travelers cannot Establish the Functional Equivalent of Privity................................ 10

               1. Travelers cannot Allege that KPF was Retained
                  for the Specific Purpose of Making
                  Representations to Trataros .............................................................. 11

               2. Trataros was not a "Known Party" for the
                  Benefit of which DASNY Retained KPF's Services......................................... 12

3. Travelers cannot Establish the Requisite Linking Conduct.............................. 14

4. Travelers Fails to Establish the Functional Equivalent of Privity ................... 14

CONCLUSION................................................................................................................. 15

## TABLE OF AUTHORITIES

**Cases**

*Affordable Housing Foundation, Inc. v. Silva*, 469 F.3d 219 (2d Cir. 2006).........................6

*American Manufacturers Mutual Ins. Co. v. Payton Lane Nursing Home, Inc.*, 05 Civ. 5155, 2007, U.S. Dist. LEXIS 15160 (E.D.N.Y. Feb. 28, 2007) [1].................................................. 5, 11

*Burns Jackson Miller Summit & Spitzer v. Lindner*, 59 N.Y.2d 214, 464 N.Y.S.2d 712 (1983)... 6

*Castorino v. Unifast Building Products Corp.*, 161 A.D.2d 421, 555 N.Y.S.2d 350 (1st Dep't 1990).............................................................................................................. 6

*Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002)........................................ 2

*City School District of City of Newburgh v. Hugh Stubbins & Associates, Inc.*, 85 N.Y.2d 535, 626 N.Y.S.2d 741 (1995)........................................................................................ 9

*Credit Alliance Corp. v. Arthur Andersen & Co.*, 65 N.Y.2d 536, 493 N.Y.S.2d 435 (1985).....11

*Cromer Finance, Ltd. v. Berger*, 137 F. Supp. 2d 452 (S.D.N.Y. 2001).........................10, 11

*Dictograph Products Co. v. Sonotone Corp.*, 230 F.2d 131 (2d Cir. 1956)..........................5

*Dorking Genetics v. United States*, 76 F.3d 1261 (2d Cir. 1996).....................................11

*Dow Jones & Company, Inc. v. Int'l Securities Exchange, Inc.*, 451 F.3d 295 (2d Cir. 2006).......7

*GAF Corp. v. Circle Floor Co., Inc.*, 329 F. Supp. 823 (S.D.N.Y. 1971)..............................5

*Glanzer v. Shepard*, 233 N.Y. 236, 135 N.E. 275 (1922).......................................9, 11, 12

*In re September 11 Property Damage and Business Loss Litigation*, 468 F. Supp. 2d 508 (S.D.N.Y. 2006) ...................................................................................................... 9

*JP Morgan Chase Bank v. Cook*, 322 F. Supp. 2d 353 (S.D.N.Y. 2004)..............................5

*Lake Placid Club Attached Lodges v. Elizabethtown Builders, Inc.*, 131 A.D.2d 159, 521 N.Y.S.2d 165 (3rd Dep't 1987) ................................................................................ 7

*Lanaro v.Bosman*, 265 A.D.2d 623, 696 N.Y.S.2d 552 (3rd Dep't 1999)....................................... 9

*Melnick v. Parlato*, 296 A.D.2d 443, 745 N.Y.S.2d 68 (2nd Dep't 2002)....................................... 9

---

[1] Unpublished decisions that are cited herein are included as an Appendix at the end of the Memorandum in the order in which cited.

*Mergentime/White v. Metcalf & Eddy of New York, Inc.*, 89 Civ. 7188, 1993 U.S. Dist. LEXIS 2965 (Mar. 11, 1993) ................................................................................................................. 13

*Niagara Mohawk Power Corp. v. Stone & Webster Engineering Corp.*, 725 F. Supp. 656 (N.D.N.Y. 1989) ...................................................................................................................... 8

*Ossining Union Free School District v. Anderson LaRocca Anderson*, 73 N.Y.2d 417, 541 N.Y.S.2d 335 (1989) ............................................................................................. 1, 8, 9, 10, 15

*Oursler v. Women's Interart Center*, 170 A.D.2d 407, 566 N.Y.S.2d 295, (1st Dep't 1991) ........ 6

*Port Chester Electrical Constr. Corp. v. Atlas*, 40 N.Y.2d 655, 389 N.Y.S.2d 327 (1976) ...... 6, 7

*Prudential-Bache Securities, Inc. v. Resnick Water Street Dev. Co.*, 161 A.D.2d 456, 555 N.Y.S.2d 367 (1st Dep't 1990) ..................................................................................... 10

*Securities Investor Protection Corp. v. BDO Seidman, LLP*, 222 F. 2d 63 (2d Cir. 2000) ............................................................................................ 10, 12, 14

*Shah v. Meeker*, 435 F.3d 248 (2d Cir. 2006) ............................................................................ 2

*Synovus Bank of Tampa Bay v. Valley Nat'l Bank*, 487 F. Supp.2d 360 (S.D.N.Y. 2007) ............ 7

*Travelers Casualty & Surety Co. v. Dormitory Authority of New York*, 04 Civ. 5101, 2005 U.S. Dist. LEXIS 9415 (S.D.N.Y. May 19, 2005) ........................................................................... 5

*Ultramares Corp. v Touche*, 255 N.Y. 170 (1931) ................................................................. 1, 9

*White v. Guarente*, 43 N.Y.2d 356, 401 N.Y.S.2d 474 (1977) ........................................................ 12

*Williams and Sons Erectors, Inc. v. South Carolina Steel Corp.*, 983 F.2d 1176 (2d Cir. 1993) ............................................................................................ 10, 12, 14

**Statutes**

FRCP 12(b)(6) ................................................................................................................. 1

NY State Finance Law § 135 ................................................................................................. 3

Defendant Kohn Pedersen Fox Associates, P.C. ("KPF") respectfully submits this memorandum, together with the accompanying Declaration of Peter Catalano, dated September 27, 2007 (the "Catalano Decl.") and the exhibits annexed thereto, in support of its motion for an Order, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("FRCP"), dismissing the Complaint of the plaintiff, Travelers Casualty and Surety Company as Administrator for Reliance Insurance Company ("Travelers").

## PRELIMINARY STATEMENT

This motion presents the simple question whether, under New York law, a construction contractor may, based solely on its status as such, sue the owner's architect for purely economic damages. The contractors upon whose rights Travelers alleges standing to sue (i) were not intended third-party beneficiaries of KPF's agreement to provide professional design services to the New York State Dormitory Authority ("DASNY") and (ii) lacked privity or the functional equivalent of privity with KPF. Under New York law, Travelers therefore cannot maintain a claim against KPF.

## SUMMARY OF ARGUMENT

The New York Court of Appeals has consistently stated that the ambit of duty, and the related right to bring suit, "requires that the underlying relationship between the parties be one of contract or the bond between them *so close as to be the functional equivalent* of contractual privity." *Ossining Union Free Sch. Dist. v. Anderson LaRocca Anderson*, 73 N.Y.2d 417, 419, 541 N.Y.S.2d 335 (1989) (Emphasis added). In thus formulating the standard to be applied, the Court of Appeals specifically rejected arguments that the right to sue should be "determined simply by the class of persons who relied on the negligent misrepresentations." *Id.* at 423, 541 N.Y.S.2d at 338 (citing *Ultramares Corp. v Touche*, 255 N.Y. 170, 182-183 (1931)).

1

Because Travelers alleges a right to sue based solely upon Trataros' status as a contractor on the

Project, the Complaint fails to state a claim. and should be dismissed.

## STATEMENT OF FACTS[1]

This litigation arises from the design and construction of a monumental vertical

college campus for Baruch College (the "Project"). (*See* Complaint, a copy of which is annexed

to the accompanying Catalano Declaration as Exhibit A, ¶ 9).  Although Baruch College is part

of the CUNY system, DASNY was officially the "Owner" of the Project. (Complaint, ¶¶ 11-12).

### The Project

DASNY retained KPF to design the Project pursuant to a written agreement dated

September 15, 1995. (Complaint, ¶¶ 13, 88; *see also*, Catalano Decl. Exh. B (hereinafter the

"DASNY-KPF Agreement").[2]   None of the contractors, including those on whose behalf

Travelers purports to sue, had a contractual relationship with KPF. (*See* Complaint, ¶ 37, alleging

that only DASNY had privity with KPF).

As designed by KPF:

> The Project involved the design, site preparation, excavation,
> and construction of a 785,000 square foot mixed-use
> structure, with three below grade levels and 14 above-grade
> stories, occupying approximately ¾ of the city block
> bounded between 24th and 25th Streets and Lexington and
> Third Avenues in Manhattan.

(Complaint, ¶ 10).  To accommodate the many uses that CUNY sought to include in its vertical

campus, KPF's project design incorporated a number of unique and "ambitious design elements,

including interlocking atria in the interior spaces, multiple land uses within the building, a

---

[1] On a motion to dismiss, the Court must accept the facts alleged in the Complaint as true. *Shah v. Meeker*, 435 F.3d 244, 248 (2d Cir. 2006).  The facts are therefore set forth herein as alleged in the Complaint.

[2] When considering a motion to dismiss under Rule 12(b), a court may consider a contract that is referenced in the pleading. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002).  The KPF-DASNY Agreement is expressly referred to in the Complaint; indeed, Travelers purports to have rights arising from the contract. (*See* Complaint, ¶¶13, 88-89, 92).

2

complex curvilinear façade, and a variety of façade materials including glass curtainwall, masonry and aluminum paneling." (Complaint, ¶ 25).

The Relevant Contracts

To construct the Project, DASNY hired Defendant TDX Construction Corp. ("TDX") as its construction manager. (Complaint, ¶ 14). TDX acted as DASNY's representative and agent with respect to the Project. (Complaint, ¶¶ 14-15).

Because the Project was a public construction job, it was governed by the Wick's Law, which required that DASNY award multiple prime contracts for the construction of the Project.[3] DASNY eventually awarded at least thirteen (13) separate prime contracts, including the two prime contracts awarded to Trataros Construction, Inc. ("Trataros") that form the basis of this litigation. (Complaint, ¶¶ 16, 26).

DASNY and Trataros entered into Contract No. 15 on or about April 22, 1998 and Contract No. 16 several months later, on or about August 27, 1998. (Complaint, ¶¶ 17, 19). The two Trataros contracts were among the last awarded for the Project; by the time Trataros contracted to perform work on the Project, KPF had been under contract to DASNY for more than 2½ years and construction work was well underway. (*See* Complaint, ¶ 40, alleging that work under Contract No. 1 started on or about May 22, 1997, but that demolition and asbestos abatement activities were performed prior to that date).

---

[3] State Finance Law § 135, commonly known as the Wick's Law, requires separate bidding of the plumbing, electrical/gas, and heating, ventilation and air conditioning components of public construction projects exceeding $50,000.

3

Travelers' Claim against KPF

Based upon the foregoing, Travelers filed a Complaint on or about August 1, 2007. (Catalano Decl., Exh. "A").[4] The Complaint alleges six claims for relief. The "Sixth Count" is the only one asserted against KPF, (*see*, Complaint ¶¶ 87-93), and alleges professional malpractice. Travelers alleges that KPF owed a duty of care to Trataros and its subcontractors, based upon either the contractors' status as third-party beneficiaries of the DASNY-KPF Agreement or "as a result of the functional equivalent of privity existing between same and KPF". (Complaint, ¶ 89). The Complaint fails, however, to allege any facts supporting the conclusory claims that the contractors or Travelers were third-party beneficiaries of the DASNY-KPF Agreement or that the functional equivalent of privity existed between KPF and the contractors.

Travelers' Complaint alleges that KPF did not properly perform its contractual or professional responsibilities as the Project's architect (*id.*) and that such acts or omissions constitute negligence or professional negligence. (Complaint, ¶ 90). Finally, Travelers asserts that KPF's alleged negligence "contributed in a material respect" to Trataros' damages.[5] (Complaint, ¶ 91).

Travelers claims that KPF is liable for unspecified damages based upon alleged "impact claims" of contractors "resulting from, *inter alia*, extra work, inefficiencies, lost productivity, escalation costs, and individual and/or cumulative impacts caused by ... the

---

[4] Travelers previously filed an action alleging similar claims in or about May 2004. After third- and fourth-party actions were commenced and counter- and cross-claims filed, the nearly three dozen parties to that action stipulated to discontinue the action without prejudice.

[5] The terms "Travelers" and "Trataros" are sometimes used herein to refer collectively to Travelers, Trataros and Trataros' subcontractors.

Defendants", including KPF. (Complaint, ¶ 24). The Complaint contains no claims for damages other than for these fundamentally economic losses.

The allegations in the Complaint reveal that Travelers' claim against KPF is premised upon nothing more than Trataros' status as a contractor on the Project. Because, as discussed in greater detail below, the New York Court of Appeals has prohibited the assertion of a professional negligence claim in the absence of privity based solely upon being a member of a class, Travelers' Sixth Count fails to state a claim and should be dismissed.[6]

**ARGUMENT**

**POINT I**

**TRAVELERS FAILS TO ALLEGE FACTS SUFFICIENT TO
STATE A CLAIM AS A THIRD-PARTY BENEFICIARY
OF THE DASNY-KPF AGREEMENT**

The Complaint fails to allege any facts supporting Travelers' conclusory allegation of third-party beneficiary status under the DASNY-KPF Agreement and nothing in the language of the contract supports such a claim. To the extent that Travelers' claim against KPF is based upon the allegation that Trataros was a third-party beneficiary of the DASNY-KPF Agreement, it fails to state a claim and should be dismissed.

---

[6] Before the prior action was discontinued, KPF moved to dismiss on grounds similar to those presented here which was denied. *Travelers Casualty & Surety Co. v. Dormitory Authority of New York*, 04 Civ. 5101, 2005 U.S. Dist. LEXIS 9415 (S.D.N.Y. May 19, 2005) (Baer, J.). However, the denial of a motion to dismiss is not a final order and, therefore, is not *res judicata. See, GAF Corp. v. Circle Floor Co., Inc.*, 329 F. Supp. 823, 826 (S.D.N.Y. 1971). This Court is also not bound by a decision of another district court judge in a related, or even in the same case. *Dictograph Products Co. v. Sonotone Corp.*, 230 F. 2d 131 (2d Cir. 1956) (Hand, J.); *see also, JP Morgan Chase Bank v. Cook*, 322 F. Supp. 2d 353, 355 (S.D.N.Y. 2004) ("[C]ases from another judge of this Court or from...New York's Appellate Division do not constitute 'controlling authority' for this Court...."); *GAF Corp.*, 329 F. Supp. at 826-27 (holding that determinations by two other district court judges does not deprive the court "of power to come to [its] own conclusion; indeed the Court of Appeals for this Circuit recommends that course of action to District Judges"). In fact, the only reported decision citing Judge Baer's ruling found it to be inconsistent with the rulings of the New York Court of Appeals and declined to follow it. *See American Manufacturers Mutual Ins. Co. v. Payton Lane Nursing Home, Inc.*, 05 Civ. 5155, 2007 U.S. Dist. LEXIS 15160, *22 n. 5 (E.D.N.Y. Feb. 28, 2007) (Feuerstein, U.S.D.J.).

5

A.    **Only an Intended Third-Party Beneficiary May**
      **Sue for Breach of a Contract to which it is not a Party**

Under well settled principles of New York law, one who is not a party to an agreement may assert rights under the contract only if such person was an intended, and not merely an incidental beneficiary thereof. *Affordable Housing Foundation, Inc. v. Silva*, 469 F.3d 219, 251 (2d Cir. 2006); *Port Chester Electrical Constr. Corp. v. Atlas*, 40 N.Y.2d 655, 656, 389 N.Y.S.2d 327, 330 (1976) (holding that absent a showing that a construction contract was intended to benefit a third party, "the third party is merely an incidental beneficiary with no right to enforce" the contract).  This standard is not met by a *pro forma* pleading alleging that a plaintiff has status.

For a plaintiff to establish that it is an intended, and not merely an incidental third-party beneficiary of an agreement, the plaintiff must show that the contract was intended for its benefit and that the benefit to it was sufficiently immediate to indicate the assumption by the contracting parties of a duty to compensate the plaintiff if the benefit was lost. *Castorino v. Unifast Building Products Corp.*, 161 A.D.2d 421, 422, 555 N.Y.S.2d 350, 351 (1st Dep't 1990) (citing *Burns Jackson Miller Summit & Spitzer v. Lindner*, 59 N.Y.2d 314, 464 N.Y.S.2d 712 (1983)); *Oursler v. Women's Interart Center*, 170 A.D.2d 407, 408, 566 N.Y.S.2d 295, 296-97 (1st Dep't 1991) (holding that "to recover as [a] third-party beneficiar[y] it must appear that 'no one other than the third party can recover if the promisor breaches the contract...or that the language of the contract otherwise clearly evidences an intent to permit enforcement by the third-party.'") (Citations omitted).  Travelers fails to meet this standard.

B.    **Trataros was not an Intended Beneficiary of the DASNY-KPF Agreement**

Under New York law, an ordinary construction contract does not confer rights upon third-parties, who are considered mere incidental beneficiaries of the agreement. *Port*

6

*Chester Electrical Constr. Corp.*, 40 N.Y.2d at 656, 389 N.Y.S.2d at 330. Neither the terms of the DASNY-KPF Agreement nor any fact alleged in the Complaint warrants deviation from this long-standing principle. Travelers' conclusory and unsupported allegation to the contrary is insufficient to maintain a claim. *Dow Jones & Company, Inc. v. Int'l Securities Exchange, Inc.*, 451 F.3d 295, 307-08 (2d Cir. 2006) (holding that complaint consisting of conclusory assertions unsupported by facts fails to meet even the liberal standards governing a motion to dismiss under FRCP 12(b)(6)) (Citations omitted).

The DASNY-KPF Agreement contains no language whatsoever indicating that DASNY and KPF intended to benefit Trataros, its subcontractors or Travelers. Because New York law requires "that the parties' intent to benefit a third-party be shown on the face of the contract", *Synovus Bank of Tampa Bay v. Valley Nat'l Bank*, 487 F. Supp.2d 360, 368 (S.D.N.Y. 2007), this fact is alone sufficient to dismiss Travelers' third-party beneficiary claim.

The Complaint also fails to allege any other facts suggesting that DASNY and KPF intended to confer rights upon contractors or their bond sureties. Even assuming *arguendo* that the language of the DASNY-KPF Agreement was not determinative of the issue, the absence of any allegations of other facts manifesting such an intent warrants dismissal of Travelers' third-party beneficiary claim. *See, Lake Placid Club Attached Lodges v. Elizabethtown Builders, Inc.*, 131 A.D.2d 159, 161-62, 521 N.Y.S.2d 165, 166-67 (3rd Dep't 1987) (condominium unit owners were not intended third-party beneficiaries of contract between architect and developer absent contractual language or other circumstances manifesting a mutual intent to confer rights on the unit owners).

Nothing in the language of the DASNY-KPF Agreement or in the Complaint demonstrates that the Project contractors or their bond sureties were intended, and not merely

7

incidental beneficiaries of the contract. Insofar as the Complaint is based upon the conclusory allegation that Trataros, its subcontractors and Travelers were intended beneficiaries of the DASNY-KPF Agreement, it fails to state a claim as a matter of law and should be dismissed.

### POINT II

**TRAVELERS' NEGLIGENCE CLAIM AGAINST KPF
SHOULD BE DISMISSED BECAUSE TRATAROS LACKED PRIVITY
OR THE FUNCTIONAL EQUIVALENT THEREOF WITH KPF**

New York law does not allow a negligence claim for economic damages absent privity of contract or a relationship so close as to be the functional equivalent of privity. Trataros was not in privity with KPF nor did it have a relationship with KPF that remotely approaches its functional equivalent. Because the Complaint seeks only economic damages,[7] Travelers' claims against KPF are barred as a matter of law and should be dismissed.

**A.     A Plaintiff must be in Privity or the Functional Equivalent of Privity
to Maintain a Negligence Action for Economic Damages under New York law**

New York law, as a matter of policy, does not grant standing to sue to any person who claims to have suffered damages as a result of another person's negligence, even is such injury may have been objectively foreseeable. *Ossining*, 73 N.Y.2d at 421, 541 N.Y.S.2d at 337. "In reaching the policy judgment called 'duty', courts have … invoked a concept of privity of contract as a means of fixing fair, manageable bounds of liability". *Id.*

These same principles and policy considerations are applied by the New York courts in the context of design and construction. The Court of Appeals has held that a contractor, in order to state a claim against a design professional for negligence, must either be in privity of contract with the professional or must allege – and ultimately prove – facts showing a

---

[7] "Economic loss", as used in this context, refers to damages other than for injury to person or damage to property; in other words, to purely financial losses. *See, e.g., Niagara Mohawk Power Corp. v. Stone & Webster Engineering Corp.*, 725 F. Supp. 656, 659, 665 n. 6 (N.D.N.Y. 1989) (describing damages claims similar to those sought by Travelers and identifying them as purely economic losses).

relationship so close as to be the functional equivalent of privity.[8] *Ossining*, 73 N.Y.2d at 424, 541 N.Y.S.2d at 338; *City School District of Newburgh v. Hugh Stubbins & Assocs.*, 85 N.Y.2d 535, 539, 626 N.Y.S.2d 741, 743 (1995).

The *Ossining* Court specifically rejected basing the right to sue "simply by the class of persons who relied on the negligent misrepresentations." *Ossining*, 73 N.Y.2d at 423, 541 N.Y.S.2d at 338 (citing *Ultramares*, 255 N.Y. at 182-183). As another court in this Circuit recently explained, "merely participating in the design, construction, and supervision of construction of a structure is not enough to give rise to a duty of care" or to standing to sue. *See*, *In re September 11 Property Damage and Business Loss Litigation*, 468 F. Supp. 2d 508, 532 (S.D.N.Y. 2006) (*citing Melnick v. Parlato*, 296 A.D.2d 443, 745 N.Y.S.2d 68 (2nd Dep't 2002)); *see also*, *Lanaro v. Bosman*, 265 A.D.2d 623, 696 N.Y.S.2d 552, 553 (3rd Dep't 1999) (holding that subsequent owner could not sue professional that designed infrastructure on property, despite the design professional's knowledge that the party with which it contracted might sell lots to third parties).

Travelers' claims in this action seek economic damages only for increased costs allegedly incurred by Trataros on the Project. To give rise to a duty or to confer standing to sue for such damages under New York law, Travelers must demonstrate either contractual privity or a sufficiently close relationship between the parties. As discussed below, Travelers cannot meet either standard and therefore cannot bring these claims against KPF.

**B.**   **There is no Privity between Trataros and KPF**

Travelers admits that there was no privity of contract between Trataros and KPF. For example, paragraph 37 of the Complaint alleges that "DASNY was the **sole entity** to enjoy

---

[8] These principles of New York law and policy are longstanding. *See, e.g.*, *Ultramares*, 255 N.Y. at 182-83; *Glanzer v. Shepard*, 233 N.Y. 236, 135 N.E. 275 (1922).

privity of contract with...the architect/engineer of record, KPF...." (Emphasis added). Clearly, Travelers cannot rely upon privity as a basis to sue KPF.

**C.    Travelers cannot Establish the Functional Equivalent of Privity**

Absent a contractual relationship, Travelers can only assert a professional negligence claim against KPF if the relationship between KPF and Trataros was so close as to approximate privity. *Cromer Finance, Ltd. v. Berger*, 137 F. Supp. 2d 452, 495 (S.D.N.Y. 2001) (Citations omitted). To establish the functional equivalent of privity, Travelers must allege and prove three elements. First, it must show that KPF was aware its work product would be used for a particular purpose. Second, Travelers must demonstrate that a known party was intended to rely upon KPF's work product in furtherance of the particular purpose. Third, Travelers must allege some conduct by KPF "linking" it to the known party. *See, Securities Investor Protection Corp. v. BDO Seidman, LLP*, 222 F.2d 63, 73 (2d Cir. 2000); *Williams and Sons Erectors, Inc. v. Carolina Steel Corp.*, 983 F.2d 1176, 1182 (2d Cir. 1993); *Cromer Finance*, 137 F. Supp. 2d at 495-496 (S.D.N.Y. 2001).

In assessing whether these elements are met, the focus remains whether the facts alleged demonstrate that the relationship between the parties is sufficiently close and not whether circumstances can be shoehorned into each element. As the Court of Appeals has cautioned, the circumstances in which a relationship is held to be the functional equivalent of privity should be narrowly, not broadly, construed. *Ossining*, 73 N.Y.2d at 424-425, 541 N.Y.S.2d at 339; *see also, Prudential-Bache Sec., Inc. v. Resnick Water Street Development Co.*, 161 A.D.2d 456, 457, 555 N.Y.S.2d 367, 369 (1st Dep't 1990) ("The ambit of duty created by privity and relationships so close as to approach that of privity is narrowly defined in this State.").

10

In order to meet the required standard under New York law, Travelers must establish each of the *Ossining* elements. Travelers fails, however, to meet any of them.

**1.  Travelers cannot Allege that KPF was Retained by DASNY For the Specific Purpose of Making Representations to Trataros**

To establish the first element of the *Ossining* test, "the use of [KPF's work product] by the plaintiff cannot have been '*an indirect or collateral consequence*" of the services that DASNY retained KPF to perform. *Credit Alliance Corp. v. Arthur Andersen & Co.*, 65 N.Y.2d 536, 549, 493 N.Y.S.2d 435, 441 (1985) (citing *Glanzer*, 233 N.Y. at 238-39) (emphasis added by *Credit Alliance*). Rather, the consequence must have been "*the end and aim of the transaction.*" *Id.* (Same). Travelers cannot meet this standard, because KPF was not contracted by DASNY for the specific purpose of making representations to Trataros.

In those cases where the Court of Appeal has found constructive privity to exist, "the defendants were retained *for the specific purpose of making representations to the plaintiffs for them to rely on* before consummating a transaction with the retaining party." *American Manufacturers Mutual Ins. Co.*, 2007 U.S. Dist. LEXIS 15160, at *18 (emphasis added); *see also*, *Glanzer*, 233 N.Y. at 238-39 (allowing claim by purchaser of beans against third-party hired by seller to certify weight of beans, upon which price was based); *Dorking Genetics v. United States*, 76 F.3d 1261 (2d Cir. 1996) (allowing claim by a purchaser of cattle against a veterinarian who had been hired by the seller to certify, among other things, that the cattle were disease free).

The Complaint does not allege that Trataros' use of KPF's work product was the "end and aim" of DASNY's retention of KPF, nor could it make such an allegation. It is undisputed that when DASNY retained KPF to perform architectural services for the Project and, for more than 2 ½ years thereafter, Trataros was a complete stranger to the Project. (*See*

11

Complaint, ¶¶ 13, 17, 19) (DASNY retained KPF in 1995 and Trataros entered into prime contracts with DASNY in April and August 1998, respectively). Under the circumstances, KPF cannot possibly have been retained for the end and aim of making representations to Trataros.

> **2.    Trataros was not a "Known Party" for the**
> **Benefit of which DASNY Retained KPF's Services**

Travelers also cannot meet the second part of the *Ossining* test, because it was not a known party for whose purposes KPF was hired. Travelers admits that Trataros was not retained to perform construction services until more than 2 ½ years <u>after</u> DASNY retained KPF. *Compare* Complaint, ¶ 13 (DASNY-KPF Agreement executed in September 1995), *with* Complaint, ¶¶ 17, 19 (Trataros awarded contracts in April and August 1998, respectively). Because Trataros was only one of a universe of potential contractors that might be retained for the Project when KPF was hired and prepared its design documents, Travelers is not a "known party" as defined under New York law.

This second element of the *Ossining* analysis is not a subterfuge for allowing claims by any class that might reasonably foreseeably rely on a professional's work product. Rather, it requires a showing that plaintiffs are members of "a known group possessed of vested rights, marked by a definable limit and made up of certain components." *Securities Investor Protection Corp.*, 222 F.3d at 74 (citation omitted). A professional does not owe a duty to "a faceless or unresolved class of persons." *Id.* (quoting *White v. Guarente*, 43 N.Y.2d 356, 361, 401 N.Y.S.2d 474, 477 (1977)).

Simply being one of the generic class of contractors that might prospectively bid upon or be awarded a contract to perform construction services is not sufficient in this Circuit to constitute a "known party" under the *Ossining* analysis. *See, Williams and Sons Erectors, Inc.*, 983 F.2d at 1183. Where, as here, a contractor did not contract with the owner until after the

architect was hired and prepared its design documents, the contractor cannot meet the second *Ossining* element. *Mergentime/White v. Metcalf & Eddy, Inc.*, No. 89 Civ. 7188, 1993 U.S. Dist. LEXIS 2965 at * 14 (S.D.N.Y. Mar. 11, 1993) (Mukasey, U.S.D.J.).

In *Mergentime* an architect was retained by the City of New York in October 1981 to prepare plans and specifications for a two-phase construction project at the Croton Reservoir. *Mergentime*, 1993 U.S. Dist. LEXIS 2965, at *4. Several years later, in June 1985 and June 1987, respectively, the plaintiff contracted to perform each phase of the project. *Id.*, at *5. The contractor sued the architect, claiming that the architect's defective plans and specifications caused the contractor to incur substantial additional costs for the project and that the architect refused to acknowledge its errors during the project. *Id.*, at *2. The court held that a contractor cannot establish the functional equivalent of privity with an architect where the architect was retained by the owner "at a time when they do not know who the successful bidder will be ...." *Id.*, at *14.

DASNY retained KPF to perform architectural services for the Project in September 1995. (Complaint, ¶ 13). Trataros did not bid upon and was not awarded any contract to perform construction work on the Project until several years later, in April 1998 and August 1998 respectively. (Complaint, ¶¶ 17, 19). Like the architect and owner in *Mergentime*, KPF and DASNY did not know who the successful bidder would be on the various prime contracts for the Project. Trataros was nothing more than a part of the faceless and unresolved class of contractors that might or might not ever contract to perform services on the Project. Trataros was therefore not a "known party" and Travelers cannot meet the second *Ossining* element required to establish the functional equivalent of privity.

13

3.      **Travelers cannot Establish the Requisite Linking Conduct**

Travelers also fails to establish the third required element of the *Ossining* test, because the Complaint alleges no conduct by KPF beyond that which the DASNY-KPF Agreement required of it. The final element of the *Ossining* test requires affirmative conduct by the defendant linking it to the plaintiff. The courts have defined this as requiring "some sort of direct contact between the [professional] and the plaintiff, such as a face-to-face conversations, the sharing of documents, or other 'substantive communication' between the parties." *Securities Investor Protection Corp.*, 222 F.3d at 74 (citation omitted). Although an architect and a contractor will generally have those types of contacts during a project, that fact is not sufficient in this Circuit to demonstrate the requisite "linking conduct". On the contrary, where an architect's actions are undertaken at the owner's direction and are req uired pursuant to its agreement with the owner, such conduct does not establish the direct link required under the third part of the *Ossining* test. *Williams and Sons Erectors, Inc.*, 983 F.2d at 1183.

The Complaint here fails to allege any actions by KPF other than that which it was required to perform pursuant to the DASNY-KPF Agreement. *See, e.g.*, DASNY-KPF Agreement, at Appendix A, Section II.H., at pp. A-9-11 (setting forth services that KPF was required to perform during the Construction Phase of the Project). Because the Complaint alleges no conduct by KPF other than that which the DASNY-KPF Agreement required it to perform, Travelers cannot establish "linking conduct" for purposes of the *Ossining* analysis.

4.      **Travelers Fails to Establish the Functional Equivalent of Privity**

Not only does Travelers fail to establish all three elements required under *Ossining* and its progeny, it fails to meet any of them. Travelers cannot establish that KPF was retained by DASNY for the specific purpose of providing a design to Trataros, because Trataros

14

was a stranger to the Project for more than 2 ½ years after DASNY retained KPF's services. For the same reason, Trataros was not a known party for purposes of the *Ossining* analysis. Finally, the Complaint fails to allege the type of linking conduct between KPF and Trataros that could give rise to a claim. Instead, the Complaint alleges standing to sue based upon nothing more than that Trataros was a contractor on a Project on which KPF was the architect. New York's Court of Appeals has explicitly rejected Travelers' position. *Ossining*, 73 N.Y.2d at 423, 541 N.Y.S.2d at 338. Travelers has therefore failed to allege the functional equivalent of privity between KPF and Trataros.

## CONCLUSION

Travelers' claim is premised entirely upon the notion that Trataros, as a contractor on the Project, has an absolute right to sue the Project's architect, KPF. That is not the law in New York.

In the absence of contractual privity, which Travelers admitted does not exist, New York law requires Travelers to establish that the relationship between KPF and Trataros was so close as to be functionally equivalent to privity. The Complaint, however, fails to allege any facts that would establish such a relationship. In accordance with the clear principles set forth by the Court of Appeals in *Ossining* and similar cases, Travelers' allegations are insufficient to state a claim against KPF.

15

For these reasons, Defendant KPF respectfully requests that this Court issue an order pursuant to FRCP 12(b)(6) dismissing the Complaint, with prejudice, as against KPF, and awarding such other and further relief as to this Court shall seem just and proper.

Dated: New York, New York
      October 1, 2007

ZETLIN & DE CHIARA, LLP
*Attorneys for Defendant*
      *Kohn Pedersen Fox Associates, P.C.*
s/David Abramovitz
David Abramovitz, Esq. (DA-8214)
801 Second Avenue
New York, New York  10017
(212) 682-6800

# APPENDIX OF UNREPORTED DECISIONS

LEXSEE 2005 US DIST LEXIS 9415

**TRAVELERS CASUALTY & SURETY COMPANY as Administrator for Reliance Insurance Company, Plaintiffs, -against- THE DORMITORY AUTHORITY OF THE STATE OF NEW YORK, TDX CONSTRUCTION CORPORATION, and KOHN, PEDERSON, FOX & ASSOCIATES, P.C., Defendants. THE DORMITORY AUTHORITY OF THE STATE OF NEW YORK Third-Party Plaintiffs, -against- TRATAROS CONSTRUCTION, INC. and TRAVELERS CASUALTY AND SURETY COMPANY, Third-Party Defendants.**

**04 Civ. 5101 (HB)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2005 U.S. Dist. LEXIS 9415*

**May 19, 2005, Decided
May 19, 2005, Filed**

**COUNSEL:** [*1] For Travelers Casualty And Surety Company as administrator for Reliance Insurance Company, Plaintiffs: David Craig Dreifuss, Dreifuss Bonacci & Parker, LLP, Florham Park, NJ.

For Dormitory Authority of the State of New York, Defendant, Counter Claimant: Timothy B Froessel, Holland & Knight LLP, New York, NY.

For TDX Construction Corp., Defendant: Timothy B Froessel, Holland & Knight LLP, New York, NY; Gary L Rubin, Mazur, Carp & Rubin, P.C. (Broadway), New York, NY.

For Kohn, Pederson, Fox and Associates, P.C., Defendant: Thomas V. Giordano, Zeynel Karcioglu, Esq, New York, NY.

For specialty Construction Brands, Inc., t/a TEC, Defendant, FourthParty Defendant, Cross Claimant, Cross Defendant: Robert Richard Brooks-Rigolosi, Segal McCambridge Singer & Mahoney, Ltd., New York, NY.

For Trataros Construction, Inc., Third Party Defendant: David Craig Dreifuss, Dreifuss Bonacci & Parker, LLP, Florham Park, NJ.

For Trataros Construction, Inc., Travelers Casualty And Surety Company, Fourth Party Defendants: Guido Stefan Weber, Dreifuss Bonacci & Parker, LLP, Florham Park, NJ.

For Allied World Assurance Company (U.S.), Inc. f/k/a Commercial Underwriters Insurance [*2] Company, FourthParty Defendant, Cross Defendant: Diana Elaine Goldberg, Mound Cotton Wollan & Greengrass, New York, NY.

For Kemper Insurance Company, Fourth Party Defendant: Steven Alan Coploff, Steinberg & Cavaliere, LLP, White Plains, NY.

For National Union Fire Insurance Company of Pittsburgh, Pa., FourthParty Defendant, Cross Defendant: Martin Paul Lavelle, Law Offices of Martin P. Lavelle, New York, NY.

For Carolina Casualty Insurance Company, G.M. Crocetti, Inc., FourthParty Defendant: Gary Wirth, Robert Mark Wasko, Torre, Lentz, Gamell, Gary & Rittmaster LLP, Jericho, NY.

For Kohn, Pederson, Fox and Associates, P.C., Cross Defendant, Cross Claimant, Counter Claimant: Bill P. Chimos, Zeynel Karcioglu, Esq, New York, NY.

For Travelers Casualty And Surety Company as administrator for Reliance Insurance Company, ThirdParty Defendant: David Craig Dreifuss, Guido Stefan Weber, Dreifuss Bonacci & Parker, LLP, Florham Park, NJ.

For Trataros Construction, Inc., ThirdParty Defendant: Guido Stefan Weber, Dreifuss Bonacci & Parker, LLP, Florham Park, NJ.

For specialty Construction Brands, Inc., t/a TEC, Cross Claimant: Christian Holt Gannon, Segal McCambridge [*3] Singer & Mahoney, Ltd., New York, NY; Robert Richard Brooks-Rigolosi, Segal McCambridge Singer & Mahoney, Ltd., New York, NY.

For Dayton Superior Specialty Chemical Corp., Cross Claimant: Thomas Matthew DeSimone, Goldberg Segall LLP, White Plains, NY.

For Bartec Industries, Inc., Cross Claimant: Jeremy D. Platek, O'Bryan, Baun, Cohen & Kuebler, Birmingham, MI.

For Kohn, Pederson, Fox and Associates, P.C., Third-Party Plaintiff, Cross Claimant: David Abramovitz, Zeynel Karcioglu, Esq, New York, NY.

For LBL Skysystems (U.S.A.), Inc., ThirdParty Defendant: Richard P. Dyer, Thelen Reid & Priest LLP, New York, NY.

For Carolina Casualty Insurance Comapny, G.M. Crocetti, Inc., Counter Claimants: Steven Henry Rittmaster, Torre, Lentz, Gamell, Gary & Rittmaster LLP, Jericho, NY.

For Dormitory Authority of the State of New York, Kohn, Pederson, Fox and Associates, P.C., ThirdParty Plaintiff: Matthew S. Queen, Zetlin & De Chiara, NY, NY; David Abramovitz, Zeynel Karcioglu, Esq, New York, NY.

For Kohn, Pederson, Fox and Associates, P.C., Counter Claimant: Paul A. Winick, Thelen Reid & Priest LLP, New York, NY.

For Zurich American Insurance Company, Cross [*4] Claimant: S. Dwight Stephens, Melito & Adolfsen, P.C., New York, NY.

For Harleysville Mutual Insurance Company, Cross Defendant, Cross Claimant: Henry J. Cernitz, Jacobson & Schwartz, Rockville Centre, NY.

For American National Fire Insurance Company, Great American Insurance Company, Cross Claimants: Donald George Sweetman, Gennet, Kallmann, Antin & Robinson, P.C., New York, NY.

For United States Fire Insurance Company, Cross Claimant: Ann Odelson, Carroll, McNulty & Kull, New York, NY.

For Cosentini Associates, Inc., Cross Defendant: Marie Ann Hoenings, L'Abbate, Balkan, Colavita & Contini, LLP, Garden City, NY.

For Shen Milson & Wilke, Inc., Cross Claimant: Cheryl Lynette Davis, Menaker and Herrmann, New York, NY.

For Counsilman/Hunsaker & Associates, ENTEK Engineering, PLLC, Cross Claimants: Marc Shea Krieg, Krieg Associates, P.C., Dix Hills, NY.

For Weidlinger Associates Consulting Engineers, P.C., Counter Claimants: Stephen Paul Schreckinger, Gogick, Byrne & O'Neil, LLP, New York, NY.

JUDGES: Hon. HAROLD BAER, JR., District Judge.

OPINION BY: Hon. HAROLD BAER, JR.

OPINION

OPINION & ORDER

Hon. HAROLD BAER, JR., District Judge*:

> * Mychii Snape, a spring 2005 intern in my Chambers, and currently a second-year law student at Columbia University School of Law, provided substantial assistance in the research and drafting of this Opinion.

[*5] On June 28, 2004, Plaintiffs, Travelers Casualty & Surety Company ("Travelers"), as administrator for Reliance Insurance Company ("Reliance"), filed the instant action which alleged, inter alia, negligent misrepresentation against Defendant, Kohn, Pederson Fox & Associates, P.C. ("KPF") in connection with the Site B campus construction project at Baruch College. (See Tr. 2:11 - 17.) Pursuant to *Fed. R. Civ. P. 12(b)(6)*, KPF moves to dismiss the Complaint for lack of privity of contract, or its "functional equivalent," between Travelers and KPF. The Court heard oral arguments on the motion on May 4, 2005. For the foregoing reasons, Defendant's motion to dismiss is DENIED.

I. BACKGROUND

A. Pre-Building Relationship

The Dormitory Authority of the State of New York ("DASNY") contracted with KPF to perform "programming, design, and certain construction phase services for the construction of Baruch College - Site "B", consisting of a building of approximately 700,000 gross square feet,

Case 1:07-cv-06915-DLC    Document 12    Filed 10/02/2007    Page 25 of 47

Page 3
2005 U.S. Dist. LEXIS 9415, *

near the existing school site, to house classrooms, a theater, lecture halls, and other educational facilities." (Peter Catalano, [*6] Att'y for Def. KPF ("Catalano"), Aff. at P 3) ("the Project"). The terms of the contract define the nature of the relationship between DASNY and KPF as an "Owner-Architect" relationship:

> The relationship created by this Agreement between the OWNER and ARCHITECT is one of independent ARCHITECT and it is in no way to be construed as creating any agency relationship between the OWNER and the ARCHITECT nor is it to be construed as, in any way or under the circumstances, creating or appointing the ARCHITECT as an agent of the OWNER for any purpose whatsoever.

(Catalano Aff. Ex. A, KPF/DASNY Contract Agreement (herein, "Ex. A"), at App. D P 13.) KPF, or "Architect," was obligated to "prepare and supply the necessary set of Contract Documents for bidding, and eventual award of contracts, between the owner and the Contractors for approximately ten separate contract[] packages." (Catalano Aff. Ex. A at P G.1.) KPF was contractually obligated to "investigate questions posed by bidders or any other questions, and issue written replies to all bidders in the form of supplemental bulletins, addenda, or bid instructions." (Catalano Aff. Ex. A at P G.2.) The contract between KPF [*7] and DASNY included language to the effect that KPF:

> Shall assist the owner in reviewing and analyzing bids, including any investigation that may be required of qualifications and capabilities of low bidders [and] inspect on a bi-weekly basis, or as required by the OWNER, the Work in progress to determine compliance with the requirements of the contract drawings and specifications or approved shop drawings.

(Catalano Aff. Ex. A at P G.4.) As such, KPF was required to both review approved submissions from contractors and monitor the construction of the Project.

Throughout the bidding process, bidders were instructed that all communication regarding Project questions and concerns should be directed to KPF as a final decision-maker. Specifically, the document entitled "Information for Bidders" stated that before bidding, the prospective bidder "shall make written requests to the Architect, with a copy forwarded to the owner, for an interpretation or correction of any ambiguity, inconsis-

tency or error [in the bidding materials]." (David Dreifuss, Att'y for Pl. ("Dreifuss"), Aff. Ex. C, DASNY Notice to Bidders, at § 1A.) Furthermore, "only interpretations, corrections [*8] or additional Contract provisions made in writing by the Architect as addenda shall be binding." (Dreifuss Aff. Ex. C at § 1J.)

## B. Building the Project

Trataros Construction, Inc. ("Trataros") successfully bid on construction Contract No. 15 and Contract No. 16. (John Scarpellino, Att'y for Pl. ("Scarpellino"), Aff. at P 3 a - b.) In accordance with the terms of the construction contracts, Trataros' obtained four separate surety bonds from Reliance. [1] Each performance surety bond named Trataros as the principal and DASNY as the obligee or beneficiary. (Compl. at P 12.) Similarly, each labor surety bond named Trataros as the principal and their subcontractors as the obligee. (Scarpellino Aff. Ex. 2, P 1.) The surety bond for Contract No. 15 was valued at $ 50,222,000. (Scarpellino Aff. P 3a.) The surety bond for Contract No. 16 was valued at $ 24,140,000. (Scarpellino Aff. P 3b.) Subsequently, Travelers became surety for the bonds and, in this role, Travelers retained the right to act with power of attorney for Reliance on any matter relating to these bonds. (Compl. at P14.)

> [1]    A surety bond is a unique form of insurance. While insurance generally insures a principal for his own benefit; in a surety bond, the principal obtains insurance for the benefit of a third party, known as the obligee. "A surety guaranties to the project owner that if the contractor defaults, the project will be completed." *D.C.R. Trucking & Excavation, Inc. v. Aetna Cas. & Sur. Co., 2002 U.S. Dist. LEXIS 27788, No. 96 Civ. 3995, 2002 WL 32096594, at *5 (E.D.N.Y. Oct. 31, 2002)* (internal citation omitted).

[*9]    The Project commenced in 1998, but never stayed on schedule. Nonetheless, the entire Project has since been completed. (Compl. at P 17.) Travelers and DASNY, as a counterclaim defendant, both allege that KPF made considerable design errors which led to significant delays and increased costs during the course of construction. (Compl. at PP 52-56; see also DASNY Ans. PP 110-116.) As a result, according to DASNY's pleading, Travelers will incur substantial expense. In particular, DASNY alleged:

> KPF failed to exercise the required standard of care, competence and skill in the completion of its duties as architect of record for the Project. Among other things, KPF improperly and negligently (1) failed to complete and coordinate the Design Documents, (2) failed to properly

2005 U.S. Dist. LEXIS 9415, *

oversee and perform the professional services that were required to complete the Designed Documents, (3) failed to supervise and coordinate the work of its subcontractors and consultants and integrate their work into the Design Documents, (4) refused to acknowledge its Design Defects and/or implement the necessary remedial corrections in a timely or professionally competent fashion, and (5) failed to satisfy [*10] other elements of the required standard of care.

(Scarpellino Aff. P 10, citing to DASNY Counterclaims.)

According to Travelers, KPF may be responsible for some or all the losses.

## II. STANDARD OF REVIEW

When ruling on a motion to dismiss pursuant to *Fed. R. Civ. P. 12(b)(6)*, the Court must construe all factual allegations in the complaint in favor of the non-moving party. See *Krimstock v. Kelly, 306 F.3d 40, 47-48 (2d Cir. 2002)*. The Court's consideration is limited to facts stated on the face of the complaint and in documents appended to the complaint or incorporated in the complaint by reference, as well as to matters of which judicial notice may be taken. See *Allen v. WestPoint-Pepperell, Inc., 945 F.2d 40, 44 (2d Cir. 1991)*. Dismissal of a claim is proper only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Shakur v. Selsky, 391 F.3d 106, 112 (2d Cir. 2004)* (quoting *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957))*.

## III. CHOICE OF [*11] LAW

When a district court's jurisdiction is based upon diversity of citizenship, as it is here, the court applies the choice-of-law rules of the forum state. *Md. Cas. Co. v. Cont'l Cas. Co., 332 F.3d 145, 151 (2d Cir. 2003)* (citing to *Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496, 85 L. Ed. 1477, 61 S. Ct. 1020 (1941))*. Thus, pursuant to New York choice of law rules, I will apply a "'center of gravity' or 'grouping of contacts'" analysis to resolve conflicts of law. Id. Application of the center of gravity test in contract cases requires that the court consider the locus of contract negotiation, formation, performance and subject matter, as well as "the domicile or place of business of the contracting parties." Id. (internal citation omitted.)

Here, it is undisputed that the bidding process, contract award, and construction of the Project, occurred in New York. (Compl. at PP 9-13; PP 51-55.) In addition,

the defendant is domiciled in New York. (Compl. at P 5.) While Travelers and Reliance are out-of-state entities, their domicile cannot override the significant relationship of New York State to this dispute because alone it "is simply [*12] insufficient to outweigh the contacts to New York." *Gerling Am. Ins. Co. v. Steadfast Ins. Co., 2001 U.S. Dist. LEXIS 12154, No. 00 Civ. 7907, 2001 WL 936288, at *2 n.5 (S.D.N.Y. Aug. 17, 2001) (Baer, J.)*.

In accordance with *Maryland Casualty., 332 F.3d at 151*, and the center of gravity analysis, New York law governs the adjudication of this matter.

## IV. Discussion

KPF moves to dismiss the complaint on two grounds. First, KPF contends that Travelers, as insurer, lacks standing to vindicate the rights or pursue the claims of its principal, Trataros. Second, KPF asserts that, assuming Travelers has standing to pursue its claim, the KPF and Trataros relationship fails to manifest the "functional equivalent" to privity of contract. Therefore, Travelers lacks the requisite relationship to seek indemnity from KPF for economic losses incurred as a result of KPF's alleged negligent misrepresentations.

### A. Travelers Has Standing to Pursue its Claim Against KPF

Pursuant to New York law, a surety is bound by the obligations of its principal. *West-Fair Elec. Contractors v. Aetna Cas. & Sur. Co., 49 F.3d 48, 50 (2d Cir. 1995)* ("Under New [*13] York law a surety's duty generally is coextensive with that of the principal on the bond."). With permission of the principal, a surety has the right to assert any claim or defense of its principal. See *D.C.R. Trucking & Excavating, Inc. v. Aetna Cas. & Surety Co., 2002 U.S. Dist. LEXIS 27788, No. 96 Civ. 3995, 2002 WL 32096594 (E.D.N.Y. Oct. 31, 2002)* (citing cases); see also *Durable Group, Inc. v. De Benedetto, 85 A.D.2d 524, 444 N.Y.S.2d 662 (1st Dep't 1981)* (citing *Walcutt v. Clevite Corp., 13 N.Y. 2d 48, 56, 191 N.E.2d 894, 241 N.Y.S.2d 834 (1963)*.

Here, Travelers, as surety, is obligated to cover any unexpected economic loss related to Trataros's performance with regards to Contract No. 15 and Contract No. 16. Travelers' claim is brought on behalf of Trataros, which has standing to collect from KPF for damages resulting from KPF's alleged negligent misrepresentations. Trataros has consented to Travelers pursuing that claim on its behalf. (Compl. at P 38.)

Accordingly, Travelers has the right to present any claim and use any argument available to Trataros against KPF in this litigation.

2005 U.S. Dist. LEXIS 9415, *

## B. The Trataros - KPF Relationship is "Functionally Equivalent" to Privity [*14] of Contract

Travelers seeks indemnification for economic losses it has suffered, or will suffer, as a result of KPF's alleged negligent misrepresentations. "The long-standing rule is that recovery may be had for pecuniary loss arising from negligent misrepresentations where there is actual privity of contract between the parties, or a relationship so close as to approach that of privity." *Ossining Union Free Sch. Dist. v. Anderson LaRocca Anderson, 73 N.Y. 2d 417, 424, 539 N.E.2d 91, 541 N.Y.S.2d 335 (1989)*; see also *Bd. of Managers of Astor Terrace Condo. v. Schuman, Lichtenstein, Claman & Efron, 183 A.D.2d 488, 583 N.Y.S.2d 398, 400 (1st Dep't 1992)*. Such a broad test has the potential to create nearly unlimited liability for service providers.

In *Ossining*, the New York Court of Appeals defined the scope of a defendant's potential liability in the absence of a contract. *73 N.Y. 2d at 420.* There, a school district had brought a negligence and malpractice action against both an architectural firm with whom the school district contracted and two engineering firms with whom the architect had contracted. *Id.* While the district was unequivocally in contractual [*15] privity with the architect, the issue before the Court of Appeals was whether the school district could assert negligence and misrepresentation claims against the engineers, with whom the district lacked contractual privity. The Court of Appeals determined that a relationship will be "so close as to approach that of privity" if the plaintiff can demonstrate:

> (1) awareness that the reports were to be used for a particular purpose or purposes; (2) reliance by a known party or parties in furtherance of that purpose; and (3) some conduct by the defendants linking them to the party or parties and evincing defendant's understanding of their reliance.

*Id. at 425*; see also *Credit Alliance Corp. v. Arthur Andersen & Co., 65 N.Y.2d 536, 483 N.E.2d 110, 493 N.Y.S. 2d 435, 445 (1985)*. The Court of Appeals determined that because the engineers were aware that the reports they drafted for the architect would, in turn, be transmitted to, and relied upon by, the school district, the bond between the district and the engineers was the "functional equivalent of contractual privity." *Ossining, 73 N.Y. 2d at 419.*

*1. KPF's Awareness* [*16] *of Use for a Particular Purpose*

The first prong of the *Ossining* test requires that a defendant be on notice and that the only logical end for its services is a particular purpose. See *Doehla v. Wathne Ltd., 1999 U.S. Dist. LEXIS 11787, No. 98 Civ. 6087, 1999 WL 566311 (S.D.N.Y. Aug. 3, 1999)*. For example, New York courts have determined that professional distribution or submission of instructional material to a client, with the knowledge that the materials will be utilized by a third party (e.g., KPF's submission of material to DASNY with the knowledge that the materials will be utilized by Trataros), provides sufficient notice that such materials will be utilized for a particular purpose. See generally, *Prudential-Bache Sec., Inc. v. Resnick, 161 A.D.2d 456, 555 N.Y.S.2d 367 (1st Dep't 1990)* (law firm had sufficient notice); *Ossining, 73 N.Y. 2d at 426* (engineering firm had sufficient notice); *Credit Alliance Corp., 65 N.Y. 2d at 554* (accounting firm had sufficient notice).

This is not the first time that KPF has raised the lack of privity argument. In *Stratagem Dev. Corp. v. Heron Intern. N.V., 153 F.R.D. 535 (S.D.N.Y. 1994)*, [*17] Heron Properties, Inc. ("Heron"), and Stratagem Development Corporation ("Stratagem"), executed an agreement to develop two office towers. *Id. at 538.* As part of the agreement, Stratagem agreed to act as the "owner's representative" for the building project. In addition, Heron hired the architectural firm, KPF, to design one of the office towers. *Id. at 538.* Heron was ultimately dissatisfied with the services provided by Stratagem and commenced litigation. In the third party complaint, Stratagem alleged that KPF "was responsible for any miscalculations in the construction cost and square footage estimates, . . . delays in construction . . . [and that] Stratagem relied on KPF . . . to provide underlying data. . . ." *Id. at 540.* KPF moved to dismiss the complaint. As it does here, Stratagem argued that it did not enter into any contracts with Stratagem and, therefore, there was a lack of contractual privity between KPF and Stratagem. *Id. at 548.* There, in accordance with *Ossining*, the court held that Stratagem adequately demonstrated all three prongs of the *Ossining* test:

> First, KPF knew that its drawings [*18] were to be used for a particular purpose, namely, the construction of Heron Towers I and II. Second, [Stratagem] relied on figures provided by KPF in drafting the Viability Studies, and submitting construction cost and square footage estimates to Heron. Finally, [Stratagem] alleged facts establishing a sufficiently close relationship between themselves and KPF for the Court to find an equivalent of privity.

*Stratagem, 153 F.R.D. at 550.* As such, the court determined that Stratagem adequately pled the functional equivalent of privity and denied KPF's motion to dismiss. Id.

More recently, in *Marcellus Const. Co., Inc. v. Vill. of Broadalbin, 302 A.D.2d 640, 755 N.Y.S.2d 474 (3rd Dep't 2003)*, the Appellate Division expanded upon the concepts articulated in Stratagem and concluded that by its very nature, architects are put on notice that the designs which they create will be utilized by contractors or construction workers. *Id. at 476.* While the court ultimately determined that the plaintiff failed to demonstrate the functional equivalent of privity for other reasons, it concluded that since the "design of the project was part [*19] of the final bid package for all interested construction bidders . . . the first prong of the tripartite test" was satisfied. Id.

Here, KPF was employed to help achieve a common goal: the building of the Project. As in *Stratagem* and *Marcellus*, KPF's designs and obligations were intended to benefit Trataros. Beyond its design obligations, KPF was responsible for "inspect[ing] on a bi-weekly basis, or as required by the OWNER, the Work in progress to determine compliance with the requirements of the contract drawings and specifications or approved shop drawings" during construction. (Catalano Ex. A at P H.7.) In addition, KPF was obligated to review and oversee the construction to ensure that the contractors adhered to KPF's designs and parameters while building of the Project.

Accordingly, KPF was on sufficient notice that its designs, bid responses and cite management would be used for a particular purpose.

2. *Trataros's Reliance In Furtherance Of a Purpose*

In accordance with the second prong of the Ossining test, the court is required to limit potential liability to "known" parties. See *Ossining, 73 N.Y. 2d at 425.* The purpose [*20] of the second prong is "to protect a defendant from being subjected to liability for lawsuits brought over an indeterminate class by the members of an indeterminate class." *Vanguard Mun. Bond Fund, Inc. v. Cantor, 40 F. Supp. 2d 183, 191 (S.D.N.Y. 1999)* (internal citation omitted); see *Credit Alliance Corp., 65 N.Y. 2d at 548* (known party requirement was designed to ensure that defendant will not be liable to "any member of an indeterminate class . . . present and prospective, known and unknown"). A plaintiff is required to establish that the plaintiff relied upon that the materials produced by the defendant. See *Ossining, 73 N.Y. 2d at 424-425* (internal citation omitted) (emphasis added). In Ossining, the Court of Appeals held that if the defendants worked with the knowledge that it was for the sole

benefit of the school district, and represented to others that plaintiff was their employer, then a motion to dismiss should be denied. *Id. at 425-426.*

For instance, in *IT Corp. v. Ecology & Envtl. Eng'g, P.C., 275 A.D.2d 958, 713 N.Y.S.2d 633 (4th Dep't. 2000)*, a plaintiff sought [*21] damages for negligence and malpractice from defendant, an engineering firm retained by the New York State Department of Environmental Conservation (DEC) to design, prepare, and manage a project. Plaintiff alleged, inter alia, that they relied on the studies conducted by the defendant before it bid on the State Department of Environmental Conservation project. *Id. at 635.* The Appellate Division held that "while defendant may have known that potential bidders would rely upon its work to prepare their bid . . . plaintiff cannot be considered a known party merely because it was a potential bidder." *Id. at 636.* The defendant's interaction with plaintiff was insufficient and the Appellate Division refused to expand the functional equivalent of privity to an "indeterminate class of persons who, presently or in the future, might act in reliance on defendant's investigation." Id.

As opposed to the interaction between the parties in *IT Corp.*, KPF cannot maintain that Trataros was an unknown party. As part of KPF's relationship with DASNY, KPF was contractually obligated to interact with Trataros pre- and post-bid. Pre-bid, KPF maintained a list of the parties expected to [*22] bid on the contract and solicited such bids. During the bidding process, pursuant to the terms of the contract between DASNY and KPF, KPF was obligated to examine contract bids. Most importantly, and in stark contrast to IT Corp., KPF's contractual obligations to DASNY did not end with the bidding process. While in IT Corp. the engineering company's obligations to the State Department of Environmental Conversation appeared not to include communications between the plaintiff and engineering company, *Id. at 636*, here, KPF was required to inspect the progression of construction and ensure compliance with the designs created and submitted. (Catalano Ex. A at PP 1 - 12; Supp. Aff. Rogers Ex. A.) Trataros relied on both KPF's designs and calculations, as well as architectural expertise, as the Project unfolded. See *Dorking Genetics v. United States, 76 F.3d 1261, 1271 (2d Cir. 1996)* ("It is enough if the complaint shows reliance by the plaintiff that was the end and aim of the transaction.") (internal citation omitted). Indeed, Trataros's services were performed in concert with KPF's instructions regarding the building of the Project.

Accordingly, KPF's duties [*23] to oversee and instruct Trataros about the design of the Project clearly indicate that Trataros was not a "member[] of an indeterminate class," *Vanguard Mun. Bond Fund, 40 F.*

*Supp. 2d at 191*, and, therefore, the second factor of the *Ossining* test is satisfied.

### 3. Conduct Between KPF and Travelers

The third prong of the *Ossining* test requires "linking conduct," *Williams & Sons Erectors, Inc. v. South Carolina Steel Corp., 983 F.2d 1176, 1183*, and "courts have uniformly required more than phone calls, general communications or unacknowledged assertions of reliance in order to establish linking conduct." *BHC Interim Funding, L.P. v. Finantra Capital, Inc., 283 F. Supp. 2d 968, 986 (S.D.N.Y. 2003)*.

Relying on *Williams, 983 F.2d at 1183*, KPF argues that any contact or communications between KPF and Trataros occurred only at the direction of DASNY, and KPF only acted as a representative of DASNY. As such, according to KPF, the contact between Trataros and DASNY fails to establish a direct relationship of its own that would link it with Trataros. See Id.

In Williams, the Second Circuit noted that contacts made at the request of the owner do not [*24] establish liability because in such situations the defendant is acting as an agent of the owner, and not in their own capacity. Id. According to the Second Circuit, an architect's limited interaction at the direction of the owner "directed to all prospective bidders . . . is insufficient to establish the relationship required for the imposition of liability under New York law." Id.

However, in a post Williams decision, Dorking Genetics, the Second Circuit held that "direct dealings" is only one approach a party may employ to establish a sufficient nexus so as to demonstrate the "functional equivalent of privity." *Dorking Genetics, 76 F.3d at 1270*. In Dorking Genetics, The Second Circuit reversed a district court's decision to dismiss a Complaint "on the ground that Dorking could not prove a relationship sufficiently close to privity of contract." *Id. at 1263*. Relying on the New York Court of Appeals decision in Credit Alliance, a decision which preceded Ossining, the Second Circuit held that "direct dealings" were "one of several factors that might establish a relationship sufficiently close to privity" and "that an [*25] action could be brought by plaintiffs if the contract for services was tailored to the plaintiffs' requirements (thus demonstrating that the defendant understood the plaintiffs' reliance) even if the plaintiffs had never interacted directly with the defendant." Id. As a result, the Second Circuit held, if plaintiff's reliance on defendant's services was within the contemplation of the parties, the plaintiff was entitled to bring this cause of action. *Id. at 1271*.

Here, Trataros's reliance on KPF's services was well within the contemplation of the parties. Not only did KPF design the Project's plans and specifications, but

solicited bids, answered inquiries, reviewed submissions, amended plans and specifications from contractors such as Trataros, and most importantly, oversaw the actual construction of the Project by contractors such as Trataros. (Catalano Ex. A at PP G1 - G4, H; Supp. Aff. Rogers Ex. A.) Indeed, KPF's contractual obligations required KPF's continual communication and oversight of contractors such as Trataros. For example, among other construction phase obligations, KPF was required to:

> Review and approve or disapprove all shop drawings [*26] and samples submitted by the Contractor for adherence to the intent and requirements of the Contract Documents. . . . All submittals shall be reviewed promptly and completely. . . .
>
> Inspect on a bi-weekly basis, or as required by the OWNER, the Work in progress to determine compliance with the requirements of the contract drawings and specifications or approved shop drawings. A report shall be issued detailing the inspection. . . .
>
> Upon completion of each prime contract, make a final inspection of the Work and upon completion of each Phase of Work, represent to the OWNER, in writing, that the Work is complete and in accordance with the Contract Documents. . . .

(KPF Ex. A at PP H1, H7, H11.). Moreover, the plain language of KPF's contract with DASNY specifically reject KPF's claim that is acted as DASNY's agent: "the relationship created by this Agreement [is] in no way to be construed as creating any agency relationship between the OWNER and the ARCHITECT . . ." (Catalano Aff. Ex. A at P 13.). KPF's design of the Project, oversight obligations throughout the building phase of the Project, and involvement in the bidding process, clearly satisfy the linking requirement [*27] of the *Ossining* Test. Therefore, KPF's defense that it was merely acting as an agent of the owner becomes untenable.

In accordance with *Ossining* and its progeny, Travelers' has sufficiently pled the functional equivalent of privity.

## V. CONCLUSION

For the reasons set forth above, KPF's motion to dismiss for failure to state a claim upon which relief may be granted in DENIED and the Clerk of the Court is in-

2005 U.S. Dist. LEXIS 9415, *

structed to Close this motion and remove it from my docket.

    **IT IS SO ORDERED.**

**New York, New York**

**May 19, 2005**

**U.S.D.J.**

LEXSEE

**AMERICAN MANUFACTURERS MUTUAL INSURANCE COMPANY and AMERICAN MOTORISTS INSURANCE COMPANY, Plaintiffs, -against- PAYTON LANE NURSING HOME, INC., and PERKINS EASTMAN ARCHITECTS, P.C., Defendants.**

**CV-05-5155 (SJF)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

*2007 U.S. Dist. LEXIS 15160*

**February 28, 2007, Decided**
**February 28, 2007, Filed**

**COUNSEL:** [*1] For American Manufacturers Mutual Insurance Company, American Motorists Insurance Company, Plaintiffs: Steven H. Rittmaster, LEAD ATTORNEY, Torre, Lentz, Gamell, Gary & Rittmaster, LLP, Jericho, NY.

For Payton Lane Nursing Home, Inc., Defendant: James Irving McClammy, Davis Polk & Wardwell, New York, NY.

For Perkins Eastman Architects, P.C., Defendant: Stephen P. Schreckinger, LEAD ATTORNEY, Gogick, Byrne & O'Neill, LLP, New York, NY.

**JUDGES:** SANDRA J. FEUERSTEIN, United States District Judge.

**OPINION BY:** SANDRA J. FEUERSTEIN

**OPINION**

**OPINION & ORDER**

FEUERSTEIN, J.

Plaintiffs American Manufacturers Mutual Insurance Company ("AMMIC") and American Motorists Insurance Company ("AMIC") (collectively, the "Sureties") commenced this action against Payton Lane Nursing Home, Inc. ("Payton Lane") and Perkins Eastman Architects, P.C. ("Perkins") (collectively, "defendants") seeking damages for, *inter alia,* breach of contract and negligent misrepresentation. Defendants now separately move pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure* to dismiss the complaint. For the reasons

stated herein, Payton Lane's motion is denied and [*2] Perkins's motion is granted in part and denied in part.

I. Background

A. Factual Allegations

The action arises out of the construction of a seven hundred (700) room, two hundred-eighty (280) bed nursing home in Southampton, Suffolk County, New York known as the Payton Lane Nursing Home (the "Project"). (See Complaint, dated Nov. 3, 2005 ["Compl."], P 7). On November 16, 2001, IDI Construction Company ("IDI"), as contractor, entered into a contract with Payton Lane, as owner, for construction of the Project at a contract price of $ 29,717,385 (the "Construction Contract"). (Id. P 8). Prior to hiring IDI, Payton Lane and Perkins entered into a contract (the "Architectural Contract"), pursuant to which Perkins agreed, *inter alia,* to prepare the design and construction documents for the Project, to assist Payton Lane in obtaining bids and awarding contracts for construction of the Project, to administer the Construction Contract, to "endeavor to guard [Payton Lane] against defects and deficiencies in the Work of the Contractor," and to determine the amounts owing to the Contractor. (Architectural Contract Art. 1) [1]. The Architectural Contract specifically provided [*3] that although Perkins was to visit the site as appropriate "to become generally familiar with the progress and quality of the Work and to determine in general if the Work [was] proceeding in accordance with the Contract Documents," but it was not required "to make exhaustive or continuous on-site inspections to check the quality or quantity of the Work." (Id. at 1.4.4).

1   Although not attached to the complaint, the complaint repeatedly refers to the Takeover Agreement and to the Architectural Contract, and relies heavily upon the terms and effect thereof. (See Compl. PP 14-17, 77-78, 91-92). Accordingly, the Architectural Contract and Takeover Agreement may properly be considered on these motions to dismiss. See *Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006).*

On December 3, 2001, the Sureties issued a performance bond on behalf of IDI, as principal, in favor of Payton Lane and the U.S. Department of Housing and Urban Development ("HUD"), as dual obligees, in the penal sum [*4] of $ 29,717,385. (Compl. P 9). On December 13, 2001, PFC Corporation ("PFC") issued a mortgage loan in the amount of $ 37,523,000 to Payton Lane, guaranteed by HUD, which included an allocation of $ 29,717,385 to be paid to IDI in accordance with the provisions of the Construction Contract and in accordance with HUD's payment processing requirements and PFC's disbursement requirements. (Id. P 10).

After IDI commenced work under the Construction Contract, disputes arose between it and Payton Lane concerning performance of their respective obligations under the Construction Contract. (Compl. PP 11, 12). On May 11, 2004, Payton Lane declared IDI in default under the Construction Contract and called upon the Sureties to satisfy their obligations under the performance bond. (Id. P 13). According to the Sureties, Payton Lane and Perkins had maintained a log (the "Log") prior to the default. (Compl. P 75). The Sureties allege that following IDI's default, and in response to their request, Payton Lane and Perkins provided the Log to them and represented that it identified all of the work performed by IDI which was not in compliance with the Construction Contract and which would have [*5] to be corrected. (Id. P 76). According to the Sureties, they relied upon Perkins's representations concerning the Log and its certifications of payments to IDI to negotiate a written takeover agreement with Payton Lane on July 9, 2004 ("the Takeover Agreement"), which provided, *inter alia,* as follows: (1) that the Sureties would complete the work on the Project, as defined therein; (2) that the Construction Contract price would be adjusted to $ 30,317,327, and that the then current unpaid balance of $ 7,400,972, including retainage of $ 2,458,216, would be paid to the Sureties; (3) that the Sureties would be paid for any additional or extra work, as defined therein; (4) that the Sureties would pay Payton Lane $ 4.25 million in consideration for, among other things, Payton Lane releasing the Sureties from all claims that it then had against them, except for latent construction defects, and assigning all of its rights against IDI to them; (5) that Payton Lane represented that it knew of no "condition or requirement

that would be an impediment to completion and approval by HUD of the Project, except as disclosed [therein];" and (6) that the Sureties reserved all claims against [*6] "Payton Lane's professionals," arising from, *inter alia,* design defects that may arise or become known after the date of the Takeover Agreement. (Id. PP 14, 15, 17). The Log was attached to the Takeover Agreement. (Id. PP 16, 77).

The Sureties further allege that prior to their execution of the Takeover Agreement, Perkins certified that IDI had performed over 83% of the base contract work in accordance with the Construction Contract totaling $ 24,782,156 of work, of which sum Payton Lane paid $ 22,323,940 to IDI and held $ 2,458,216 in retainage. (Compl. PP 85, 93). The Sureties allege that after they executed the Takeover Agreement, they determined that IDI had only completed approximately 58% of the base contract work in accordance with the Construction Contract, or a total of $ 17,236,083 of work, of which only $ 15,512,475 should have been paid. (Id. PP 86, 94).

On August 20, 2004, the Sureties and E.W. Howell Co. Inc. ("Howell") entered into a completion contract, pursuant to which Howell was to complete the remaining work on the Project ("the Completion Contract"). (Compl. P 18). After commencing performance, Howell allegedly discovered substantial items of [*7] work performed by IDI which were not in accordance with the Construction Contract and which required corrective work beyond the scope of the work contemplated under the Completion Contract. (Id. P 19). The Sureties allege that Payton Lane and Perkins knew or should have known of the need for the corrective work, but failed to identify it in the Log or to disclose it to the Sureties prior to their execution of the Takeover Agreement. (Id. PP 20, 21). Howell performed the necessary corrective work, for which the Sureties paid it approximately $ 2.3 million dollars. (Id. P 22). Despite due demand, Payton Lane failed to reimburse the Sureties for any of the corrective work. (Id. PP 23-25).

In addition to the corrective work, the Sureties performed work beyond the scope of the Takeover Agreement and Construction Contract which was "specifically directed by Payton Lane pursuant to Construction Change Directives issued by its Architect Perkins," required by design changes made by Perkins, or considered essential to completion of the Project. (Compl. P 26; pgs. 8-10 [Extra Work costs]). Payton Lane failed to seek or obtain the requisite approvals from HUD and PFC and has [*8] refused to pay for any of the additional work, which the Sureties allege totals more than $ 1.25 million dollars. (Id. PP 27-33).

The Sureties further allege that Payton Lane failed to perform work which it agreed to perform, such as instal-

ling entrance way canopies, constructing driveways and installing irrigation systems, and has failed to make decisions and provide timely direction with respect to many items of the additional and corrective work, which has added extra cost and expense to the work performed by the Sureties. (Compl. PP 34-35).

On August 12, 2005, five months after the completion date set forth in the Takeover Agreement, the Sureties allegedly achieved "Substantial Completion" of the remaining work, and, pursuant to the Construction Contract, so advised Payton Lane. (Compl. PP 36-37). On October 10, 2005, the Sureties further advised Payton Lane that, among other things, the remaining work would be completed by October 14, 2005, but that the Sureties would continue to perform punchlist work thereafter. (Id. P 39). On October 14, 2005, Payton Lane advised the Sureties of its intention to terminate the Construction Contract on the grounds that the Sureties [*9] had "abandoned" the Project and that there was still work unperformed by the Sureties. (Id. P 40). The Sureties allege that despite due demand, Payton Lane has failed and refused to pay any portion of the funds due them and that, as a result, they have no obligation to continue work on the Project, notwithstanding that only a few minor punchlist items of work remain to be completed. (Id. PP 43-45). According to the Sureties, the facilities are now occupied and Payton Lane is fully operational, except for various items of work for which Payton Lane is solely responsible. (Id. P 46). According to Payton Lane, the nursing home stands vacant because of construction delays that have now lasted over two-and-a-half (2 1/2) years. (Payton Lane's Memorandum of Law In Support of Its Motion to Dismiss, dated Nov. 23, 2005 ["Payton Mem."], at 1).

B. Procedural Background

The Sureties commenced this action against Payton Lane seeking damages for breach of contract (First and Fifth Claims); quantum meruit (Second Claim); unjust enrichment (Third Claim); delay (Fourth Claim); negligent misrepresentation (Sixth Claim) and overpayment to IDI (Seventh Claim), and against Perkins for [*10] negligent misrepresentation (Sixth Claim) and overpayment to IDI (Seventh Claim) and, as subrogee for Payton Lane, for breach of contract (Eighth Claim).

Payton Lane now moves to dismiss the action as against it on the ground that the Sureties have failed to follow mandatory contractual dispute resolution procedures, or in the alternative, to stay this action pending completion of any such proceedings. Perkins separately moves to dismiss the action as against it on the grounds: (1) that the Sureties cannot state a claim for negligence against it because there is no privity of contract, or functional equivalent of privity, between it and them and,

thus, it owed no duty of care to them; (2) that the complaint fails to state a claim for overpayment to IDI because it fails to set forth any damages resulting therefrom; (3) that since Payton Lane agreed not to assign or transfer any of its contractual rights under the Architectural Contract, the Sureties fail to state a claim for breach of contract as against it; and (4) that the Sureties have no right to subrogation because they voluntarily assumed their obligations under the Takeover Agreement and because they issued an express warranty [*11] that they were familiar with the conditions of the Project at the time of the takeover.

II. Discussion

A. Standard

1. Standard of Review

A motion to dismiss for failure to state a claim under Rule 12(b)(6) should be granted only where "it appears beyond a doubt that plaintiff can prove no set of facts in support of his claim that would entitle him to relief." Levitt v. Bear Stearns & Co., 340 F.3d 94, 101 (2d Cir. 2003)(internal quotations and citations omitted). In deciding a motion to dismiss, the Court must liberally construe the claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. See, Cargo Partner AG v. Albatrans, Inc., 352 F.3d 41, 44 (2d Cir. 2003). The court's task "is merely to assess the legal feasability of the complaint, not to assay the weight of the evidence which might be offered in support thereof." Levitt, 340 F.3d at 101 (internal quotations and citations omitted). The issue is not whether a plaintiff will ultimately prevail but whether he or she is entitled to offer evidence to support the claims. See, Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 378 (2d Cir. 1995). [*12] The Court must limit itself to the facts alleged in the complaint, to any documents attached to the complaint as exhibits or incorporated by reference therein, to matters of which judicial notice may be taken, or to documents within plaintiff's possession or of which plaintiffs had knowledge and relied upon in bringing suit. See, Brass v. American Film Technologies, Inc., 987 F.2d 142, 150 (2d Cir. 1993).

B. Payton Lane's Motion

1. Condition Precedent

To state a claim for breach of contract under New York law [2], the complaint must allege (1) the existence of an agreement; (2) that the plaintiff has adequately performed his or her obligations under the agreement; (3) that the defendant failed to perform his or her obligations thereunder; and (4) damages resulting to the plaintiff

from the defendant's nonperformance. See, *24/7 Records, Inc. v. Sony Music Entm't, Inc.,* 429 F.3d 39, 41-42 (2d Cir. 2005); *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.,* 375 F.3d 168, 177 (2d Cir. 2004).

2   The parties appear to agree that New York law applies in this case.

[*13] *Rule 9(c) of the Federal Rules of Civil Procedure* provides as follows:

"In pleading the performance or occurrence of conditions precedent, it is sufficient to aver generally that all conditions precedent have been performed or have occurred. A denial of performance or occurrence shall be made specifically and with particularity."

A general averment of performance of a condition precedent is sufficient to withstand a motion to dismiss. See, e.g. *Ackerley Media Group, Inc. v. Sharp Electronics Corp.,* 170 F.Supp.2d 445, 453 (S.D.N.Y. 2001).

Payton Lane contends that the dispute resolution procedures provided by the Construction Contract, which mandate that all disputes first be submitted in writing to the architect, are conditions precedent to the commencement of any litigation by IDI and that the Sureties, having assumed the obligations of IDI pursuant to the Takeover Agreement, were likewise bound by those conditions precedent. However, the complaint states that "[a]ll conditions precedent, if any, to the commencement of this action have been satisfied or excused" and "all work which the Sureties agreed to perform [*14] has been completed." (Compl. PP 45, 47). Notwithstanding Payton Lane's conclusory contentions to the contrary, those allegations are sufficient to defeat a motion to dismiss at the pleadings stage.

2. Staying the Litigation [3]

3   Neither party has addressed the applicability or inapplicability of *Section 3* of the Federal Arbitration Act, *9 U.S.C. § 3,* ("the FAA") but rather proceed solely on the basis of the court's inherent authority to grant a stay. Accordingly, I will not address the applicability of the FAA to this action, particularly since the Sureties and Perkins were not parties to the original Construction Contract containing the alternative dispute resolution procedures.

Payton Lane requests a stay of this action pending a decision by the architect pursuant to the contractual dis-

pute resolution procedures or pending the completion of the Project and the opening of the nursing home on the grounds that the Sureties will not be prejudiced and the interests of judicial economy would [*15] be served thereby.

"The district court has broad discretion to stay proceedings as an incident to its power to control its own docket." *Clinton v. Jones,* 520 U.S. 681, 706, 117 S.Ct. 1636, 137 L.Ed.2d 945 (1997); see also *WorldCrisa Corp. v. Armstrong,* 129 F.3d 71, 76 (2d Cir. 1997)(recognizing that district courts, whether or not the FAA is applicable, may stay a case pursuant to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel and for litigants). The movant "bears the burden of establishing its need" for a stay. *Clinton,* 520 U.S. at 708, 117 S.Ct. 1636, 137 L. Ed. 2d 945. The factors considered in deciding whether to grant a stay were summarized in Kappel v. Comfort as follows:

(1) the private interests of the plaintiffs in proceeding expeditiously with the civil litigation as balanced against the prejudice to the plaintiffs if delayed; (2) the private interests of and burden on the defendants; (3) the interests of the courts; (4) the interests of persons not parties to the civil litigation; and (5) the public interest.

*914 F.Supp. 1056, 1058 (S.D.N.Y. 1996)* [*16]  (quoting *Volmar Distributors v. New York Post Co., Inc.,* 152 F.R.D. 36, 39 (S.D.N.Y. 1993)). Courts are generally reluctant to stay proceedings out of concern for a plaintiff's right to proceed with its case. *LaSala v. Needham & Co., Inc.,* 399 F.Supp.2d 421, 427 (S.D.N.Y. 2005).

Payton Lane has not satisfied its burden of establishing the need for a stay of this action, particularly since it has not shown that alternative dispute resolution is currently proceeding. Accordingly, Payton Lane's request for a stay is denied.

C. Perkins's Motion

1. Privity and Duty of Care

In their Sixth and Seventh claims, the Sureties seek damages from Perkins based upon its alleged negligent misrepresentations regarding the Log and its negligent certifications leading to a $ 6,811,465 overpayment to IDI. (Id. at 7) [4]. According to the New York Court of Appeals, "recovery may be had for pecuniary loss arising from negligent representations where there is actual privity of contract between the parties or a relationship so close as to approach that of privity." *Ossining Union*

*Free School Dist. v. Anderson LaRocca Anderson, 73 N.Y.2d 417, 424, 541 N.Y.S.2d 335, 539 N.E.2d 91 (1989).* [*17]  See also *Prudential Ins. Co. of America v. Dewey, Ballantine, Bushby, Palmer & Wood, 80 N.Y.2d 377, 382, 590 N.Y.S.2d 831, 605 N.E.2d 318 (1992)* ("[B]efore a party may recover in tort for pecuniary loss sustained as a result of another's negligent misrepresentation, there must be a showing that there was either actual privity of contract between the parties or a relationship so close as to approach that of privity."). It is undisputed that no actual privity of contract exists between the Sureties or their principal, IDI, and Perkins. Accordingly, in order to prevail on their causes of action for negligent misrepresentation and overpayment to IDI against Perkins, the Sureties must demonstrate that IDI's relationship with Perkins "approaches that of privity."

> 4   Since the Sureties' remaining claim against Perkins is brought as subrogee of Payton Lane, which had a contract with Perkins, there is no requirement to show "functional privity" with respect to that claim.

A defendant can be held in [*18]  constructive privity for negligent misrepresentation only if the plaintiff shows: "(1) awareness that the reports were to be used for a particular purpose or purposes; (2) reliance by a known party or parties in furtherance of that purpose; and (3) some conduct by the defendants linking them to the party or parties and evincing defendant's understanding of their reliance." *Ossining, 73 N.Y.2d at 425, 541 N.Y.S.2d at 339* (citing *Credit Alliance Corp. v. Arthur Andersen & Co., 65 N.Y.2d 536, 551, 493 N.Y.S.2d 435, 443, 483 N.E.2d 110 (1985)).* The duty of parties in constructive privity is narrowly construed. *Ossining, 73 N.Y.2d at 424, 541 N.Y.S.2d 335.*

The Sureties' allegations fail to sustain a claim for negligent misrepresentation against Perkins as a matter of law. In those New York Court of Appeals cases in which constructive privity was found to exist, the defendants were retained for the specific purpose of making representations to the plaintiffs for them to rely upon before consummating a transaction with the retaining party. See, e.g. *Prudential Ins. Co., 80 N.Y.2d at 385, 590 N.Y.S.2d 831* (finding a duty [*19]  of care where the defendants were aware that "the end and aim" of their representations was to provide information the plaintiff required; the plaintiff's receipt of the information was a condition precedent to closing the transaction; and the information was sent directly to the plaintiff by the defendants); *Ossining, 73 N.Y. 2d at 425, 541 N.Y.S.2d 335* (finding a duty of care where the plaintiff's reliance on the defendants' reports was the very purpose of the defendants' engagement); *Credit Alliance, 65 N.Y.2d 536, 483 N.E.2d 110, 493 N.Y.S.2d 435 (1985)*(finding all of

the criteria for imposing a duty in light of allegations that the defendant was aware that providing its information to the plaintiff was a primary "end and aim" of its conduct); *Glanzer v. Shepard, 233 N.Y. 236, 238-239, 135 N.E. 275 (1922)*(finding a duty notwithstanding the absence of privity because the reliance on the defendant's misrepresentations was "the end and aim of the transaction," and the misrepresentations were made "for the very purpose of inducing action" by the plaintiff). Perkins was retained by Payton Lane, prior even to Payton Lane's retention of IDI, to prepare [*20]  the design and construction documents for the Project, to assist Payton Lane in obtaining bids and awarding contracts for construction of the Project, to administer the Construction Contract, to "endeavor to guard [Payton Lane] against defects and deficiencies in the Work of the Contractor," and to determine the amounts owing to the Contractor. (Architectural Contract Art. 1). Although the complaint alleges that Perkins was aware that the Sureties would rely on the Log and its certifications of payments to IDI in negotiating and entering into the Takeover Agreement, it is clear that Perkins was not retained for the particular purpose of providing a log of non-conforming work and that the Sureties claimed reliance was not "the end and aim" or the particular purpose of Perkins's retention by Payton Lane. See, e.g. *Security Pacific Business Credit, Inc. v. Peat Marwick Main & Co., 79 N.Y.2d 695, 705-706, 586 N.Y.S.2d 87, 597 N.E.2d 1080 (1992)* (finding the allegations insufficient as a matter of law where there was no evidence that the defendant had been retained for the specific purpose of inducing the plaintiff to act; specifically agreed to prepare the information [*21]  for the plaintiff's use; shaped its opinion to meet the needs of the plaintiff or directly supplied its information to the plaintiff) [5]. See also *Williams and Sons Erectors, Inc. v. South Carolina Steel Corp., 983 F.2d 1176, 1183 (2d Cir. 1993)* (applying New York law and finding that the general contractor's allegations against the architect retained to provide preconstruction architectural services and to prepare contract documents to be distributed to prospective bidders, were insufficient as a matter of law); *Mergentime/White v. Metcalf & Eddy, Inc., No. 89 Civ. 7188, 1993 U.S. Dist. LEXIS 2965, 1993 WL 72902, at *5 (S.D.N.Y. Mar. 11, 1993)* (holding that a contractor cannot sue architects for negligent preparation of designs and specifications created for the property owner prior to the contractors successful construction bid). The mere forseeability of the Sureties' use of the Log and certifications of requisitions, even if such information was directly provided to them by Perkins, cannot support a claim of negligent misrepresentation as a matter of law. *Security Pacific, 79 N.Y.2d at 708.* Accordingly, the Sureties' Sixth and Seventh claims against [*22]  Perkins are dismissed. [6]

5  To the extent that *Travelers Cas. & Sur. Co. v. Dormitory Auth. of N.Y.*, No. 04 Civ. 5101, 2005 U.S. Dist. LEXIS 9415, 2005 WL 1177715 (S.D.N.Y. May 19, 2005), ECOR Solutions, Inc. v. Malcolm Pirnie, Inc., No. 1:02CV01103, 2005 U.S. Dist. LEXIS 42993, 2005 WL 1843253 (N.D.N.Y. Jul. 29, 2005); any New York case from a lower court, see, e.g. *Marcellus Construction Co., Inc. v. Village of Broadalbin*, 302 A.D.2d 640, 755 N.Y.S.2d 474 (3rd Dept. 2003); or any other case from a different jurisdiction, is inconsistent, I am not bound by those cases and decline to follow them. Notably, the Sureties have not cited, and I have not found, any New York Court of Appeals case to the contrary.

6  In light of this determination, it is unnecessary to consider the branch of Perkins's motion which seeks dismissal of the Seventh claim for a failure to allege damages.

2. The "No-Assignment" Clause

Perkins alleges, without any legal support, that the Sureties' [*23] breach of contract claim against it should be dismissed because Payton Lane expressly agreed not to assign or transfer any of its rights under the Architectural Contract without Perkins's written consent, which had not been provided. (Architectural Contract, P 8.3). However, the Sureties seek recovery for breach of contract as a subrogee of Payton Lane. As a result of the alleged losses sustained by the Sureties in discharging their performance bond obligations to Payton Lane, the Sureties became subrogated to the rights of their obligee, Payton Lane, against third parties, including Perkins, by operation of law. See, e.g. *Chemical Bank v. Meltzer*, 93 N.Y.2d 296, 304, 690 N.Y.S.2d 489, 712 N.E.2d 656 (1999) (holding that a surety's right of subrogation attaches at the time the surety pledges its obligation to the creditor); 83 C.J.S. Subrogation § 86 (2006) (stating that generally, a surety for a construction contractor compelled to make good the default of its principal acquires an interest in unpaid sums under the contract by subrogation to the rights of, *inter alia*, the principal or owner and will also be subrogated to other rights of, *inter alia*, the [*24] principal or owner). Subrogation is an equitable doctrine, the purpose of which "is to afford a person who pays a debt that is owed primarily by someone else every opportunity to be reimbursed in full." *Chemical Bank*, 93 N.Y.2d at 304, 690 N.Y.S.2d 489.

Contrary to Perkins's contention, "[s]ubrogation is not a transfer of a cause of action." *Liberty Mut. Fire Ins. Co. v. Perricone*, 54 A.D.2d 975, 388 N.Y.S.2d 670 (1st Dept. 1976); see also 83 C.J.S. Subrogation § 86 (2006) (stating that a surety's interest, acquired by subrogation to the rights of the principal or owner, is acquired inde-

pendently of assignment). Accordingly, this branch of Perkins's motion is denied as being entirely without merit.

3. Warranty

Perkins alleges that the Takeover Agreement specifically provides, *inter alia*, that "the Sureties represent and warrant that they have * * * been to the job site, familiarized themselves with the conditions of the site, and agree that the remaining work as defined in Exhibit A [of the Takeover Agreement] will be performed in accordance with the terms of the [Construction] Contract and this Agreement." (Takeover Agreement, [*25] P 4). According to Perkins, in light of that warranty and the Sureties' involvement with the Project for months prior to the execution of the Takeover Agreement, the Sureties cannot establish that they relied upon any representations made by it in agreeing to the terms of the Takeover Agreement. However, the Takeover Agreement also expressly provides, *inter alia*, that "Payton Lane, by its architect, Perkins * * *, and IDI previously submitted documents outlining the status of the work remaining on the [Construction] Contract, inclusive of known remedial work, and the Sureties, by its consultant, GREYHAWK [North America, LLC], reviewed [those] submissions and prepared the Remaining Scope of Work document attached [thereto] as Exhibit A." (Id. at p. 3). Moreover, the complaint alleges that Perkins provided the Log and represented that it identified all non-conforming work requiring correction and that the Sureties relied thereupon in agreeing to the work to be performed pursuant to the Takeover Agreement (Compl., PP 13, 75-80, 85-86), which allegations are deemed to be true for purposes of this motion to dismiss. Accordingly, Perkins's contention is without merit.

4. [*26] The Sureties were "Volunteers"

Perkins alleges that the Sureties, "in agreeing to the terms of the Takeover Agreement, did so on its own volition and as a 'volunteer,'" and, thus, is not entitled to the right of subrogation. (Perkins' Mem. at 22). According to Perkins, as a surety, the Sureties were obligated to meet their obligations of their performance bond and the failures of their principal (IDI), but were under no obligation to pay for the alleged failure and mistakes of their obligee (Payton Lane) or their obligee's consultant (Perkins). According to Perkins, the Sureties had no right to subrogation or recoupment of any amounts paid stemming from obligations voluntarily undertaken. (Id. at 23). In addition, Perkins contends that the Sureties were not obligated to accept the representations of their obligee's consultant (Perkins) in entering into the Takeover Agreement.

While Perkins is correct that under New York law, a mere volunteer is not entitled to subrogation, see *Perl-*

*mutter v. Timely Toys, Inc., 8 A.D.2d 834, 190 N.Y.S.2d 107, 109 (2d Dept. 1959)*, a party who discharges another's obligation under compulsion or who acts to protect his own rights and [*27] interests is not considered a "volunteer." See *Junior Gallery v. Neptune Orient Line, No. 94 Civ. 4518, 1997 U.S. Dist. LEXIS 499, 1997 WL 26293, at *3 (S.D.N.Y. Jan. 22, 1997); National R. Passenger Corp. v. New York Cent. Mut. Fire Ins. Co., No. 89 Civ. 272, 1991 U.S. Dist. LEXIS 4025, 1991 WL 51128, at *3 (S.D.N.Y. Apr. 2, 1991)*. Moreover, a payment by a surety is not voluntary as long as the obligation is enforceable. 72 C.J.S. Principal and Surety § 264 (2007). The payment of a claim presented by its obligee is sufficient to entitle a surety to subrogation if it is made in good faith and because of the surety's supposed liability on its undertaking. See 63 N.Y.Jur.2d Guaranty and Suretyship § 455 (2006)

It is undisputed that the Sureties' obligations under the performance bond were enforceable and that the Sureties are entitled to reimbursement for their payment of claims for which their principal, IDI, was liable. When the Sureties were called upon by Payton Lane, their obligee, to assume their obligations under the performance bond after the default of their principal, IDI, they did so by negotiating and executing the Takeover Agreement, relying, at least in part, on [*28] the Log and Perkins's certifications of payments. The Takeover Agreement expressly provides that by executing the Agreement, the Sureties were "not assuming any obligations or liabilities beyond those set forth in the [performance] Bonds." (Takeover Agreement, P 3). When the Sureties became aware of the actual extent of the non-conforming work which was not included in the Log, they performed the additional work deemed essential to completing the Project in conformance with the Construction Contract and Takeover Agreement. Accordingly, contrary to Perkins's contention, the Sureties' were discharging their obligations under the performance bond and were not acting as "volunteers." Notably, Perkins does not allege that the Sureties acted in bad faith in discharging its obligations to Payton Lane. Accordingly, this branch of Perkins's motion is denied.

III. Conclusion

For the reasons stated herein, Payton Lane's motion to dismiss is denied in its entirety and Perkins's motion to dismiss is granted to the extent that the Sureties' Sixth and Seventh claims against it are dismissed, and Perkins's motion is otherwise denied.

SO ORDERED

SANDRA J. FEUERSTEIN

United States District [*29]  Judge

Dated: Central Islip, N.Y.

February 28, 2007

LEXSEE 1993 U.S. DIST. LEXIS 2965

**MERGENTIME/WHITE, A JOINT VENTURE OF MERGENTIME CORPORA-
TION AND J.F. WHITE CONTRACTING COMPANY, Plaintiff, v. METCALF &
EDDY OF NEW YORK, INC. - HAZEN AND SAWYER, P.C., A JOINT VEN-
TURE OF METCALF & EDDY OF NEW YORK, INC. AND HAZEN AND
SAWYER, P.C., METCALF & EDDY OF NEW YORK, INC., and HAZEN AND
SAWYER, P.C., Defendants.**

**89 Civ. 7188 (MBM)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK**

*1993 U.S. Dist. LEXIS 2965*

**March 11, 1993, Decided
March 12, 1993, Filed**

**SUBSEQUENT HISTORY:**     [*1]  As Amended
March 21, 1994.

**COUNSEL:** PETER M. KUTIL, ESQ., Jim T. Conlon,
Adam R. Dubow, Sedgwick, Detert, Moran & Arnold,
(Attorneys for Plaintiff), 59 Maiden Lane, 41st Floor,
New York, New York 10038, (212) 422-0202.

PETER W. SIPKINS, ESQ., STEVEN J. WELLS, ESQ.,
CREIGHTON R. MAGID, ESQ., SRI K. SANKARAN,
ESQ., Dorsey & Whitney, (Attorneys for Defendants),
2200 First Bank Place East, Minneapolis, Minnesota
55402, (612) 340-2600. JAMES R. KAHN, ESQ., Dor-
sey & Whitney, (Attorneys for Defendants), 350 Park
Avenue, New York, New York 10022, (212) 415-9200.

**JUDGES:** Mukasey

**OPINION BY:** MICHAEL B. MUKASEY

**OPINION**

    OPINION AND ORDER

    MICHAEL B. MUKASEY, U.S.D.J.

    Plaintiff Mergentime/White ("Mergentime") is a
joint venture of two out-of-state corporations, which
contracted with the City of New York (the "City") to
construct and renovate facilities associated with the Cro-
ton Reservoir, a substantial source of water for the City.
Defendant Metcalf & Eddy of New York, Inc. - Hazen
and Sawyer, P.C. ("MEHS") is a joint venture of two
New York entities, both of which also are sued indivi-

dually. MEHS drafted the plans and specifications for the
project, and later served as project engineer or manager,
also under contract with the City. Jurisdiction is based on
the diverse citizenship of [*2]  the parties.

    Mergentime claims MEHS's plans and specifications
were defective and that as a result Mergentime incurred
substantial costs beyond what it had anticipated in per-
forming the work; it claims also that MEHS repeatedly
recommended disallowance of change orders Mergen-
time submitted to the City, in order to conceal MEHS's
own defective plans, with the result that Mergentime
incurred added costs for the project. In the Revised
Amended Complaint (the "Complaint"), the third itera-
tion of that pleading, plaintiff proffers six separate claims
-- two for negligence, one for fraud, one for tortious in-
terference with contractual relations, one seeking indem-
nification for claims by the City to which Mergentime
claims it will be exposed, and the last based on RICO. [1]
Defendants have moved to dismiss for failure to state a
claim.

        1   For the sake of brevity, paragraphs of the
        complaint are referred to simply by "P" and the
        paragraph number, without designating the doc-
        ument.

    Notwithstanding that a similar motion addressed
[*3]  to a previous version of the Complaint was denied,
I find it apparent now, and perhaps should have before,
that plaintiff can prove no set of facts that would entitle it
to relief from MEHS as to any claim in the Complaint
save the fourth. *Conley v. Gibson, 355 U.S. 41, 45-46
(1957).* Accordingly, for the reasons set forth below, the

motion is granted dismissing all claims but the fourth, as to which the motion is denied.[2]

> 2    It bears mention that the considerable time and effort spent already in this litigation will not be wasted because plaintiff has sued the City based on the same facts, and the City in turn has impleaded MEHS, in an action styled *Mergentime/White* v. *City of New York,* 92 Civ. 8450, with the result that all interested parties now are joined and the interests more appropriately aligned, so that the question of who if anyone was at fault may be fully explored and resolved. As set forth below, the fourth claim in this action will be consolidated for all purposes with the claims in the newly filed action.

[*4]  I.

A. *The Contracts*

The facts set forth below are drawn from the allegations in the Complaint, which also incorporates by reference the contracts among the parties. In October 1981 MEHS agreed with the City in Contract No. CRO 170 to draw up plans and specifications for a two-phase construction project at the Croton Reservoir. The first phase, to be awarded in Contract No. CRO 186, covered removal of water from the construction site (known as dewatering) through use of a cofferdam -- a temporary structure designed to keep water away from interfering with construction of the new gate house -- and otherwise, other site preparation, and construction of the substructure for a new gate house at the Croton Reservoir, as well as renovation of other reservoir structures. The second phase, to be awarded in Contract No. CRO-187A,[3] covered construction and installation of the new gate house with attendant mechanical equipment, and renovation of other reservoir structures. (PP 10-12)

> 3    Contract No. CRO 187A covered the portions of second phase work other than electrical, plumbing, and heating, ventilating and air conditioning. The latter portions were covered b y a separate contract not at issue here.

[*5]  As a result of its separate low bids, Mergentime was awarded and contracted to perform both phases in June 1985 and June 1987, respectively. (PP 20-21, 25-26) In November 1986, between the construction bids on the two phases, MEHS bid on and was awarded Contract No. CRO-188, whereby MEHS was to act as project engineer or manager, providing various supervisory, advisory and design services. These services included design drawings and review of invoices submitted to the City by Mergentime. (P 24)

As noted above, the terms of all four contracts are incorporated by reference into the Complaint. (PP 10, 21, 24, 26)

Both the CRO-170 and the CRO-188 contracts between the City and MEHS, relating to the preparation of plans and specifications for bidders and MEHS's services as project engineer, respectively, provide that nothing in the contract "shall be construed to give any person other than the City and [MEHS] any legal or equitable right, remedy or claim . ., except as may otherwise be provided in this Contract; but it shall be held for the sole and exclusive benefit of the City and [MEHS]." (Kahn Aff. Ex. E Art. XVI, Ex. F Art. 13) The CRO-170 contract provides that the services of [*6]  MEHS are performed "pursuant to the direction and to the satisfaction of the [City's] Commissioner [of Environmental Protection]." (Kahn Aff. Ex. E Art. I(N)) The CRO-188 contract provides that MEHS

> will endeavor to safeguard the City against defects and deficiencies in the work and that [it] will use reasonable care and reasonable power of observation and detection in determining that the work conforms to the Construction Contract Documents.

*(Id.* Task 3, p.SR-16)

The CRO-186 contract between Mergentime and the City, relating to the first phase of the work, notes that the "drawings, reports and other information can be examined at [MEHS's] office," but then includes the following clause:

> No representation is made that the information contained in any Report, or on the drawings, or any other information is correct or complete. [Mergentime] is directed to satisfy [itself] as to the accuracy, completeness or relevance of the information available.

(Kahn Aff. Ex. J GC .23)

B. *The Claims*

Mergentime's six claims are contained in a Revised Amended Complaint dated May 15, 1992. The first claim alleges that the plans, drawings and specifications MEHS drew "were [*7]  grossly inadequate and at variance with acceptable engineering practices in that they did not fairly represent the conditions actually encountered at the construction site nor call for the proper materials and

methods which necessarily had to be and continue to be employed in the construction of the Project." (Complaint P 35) The second claim alleges that MEHS was negligent in overseeing the construction, to the detriment of Mergentime, whose work was delayed, impeded and increased as a result. (PP 38-47)

The third claim charges fraud. It alleges that MEHS was aware that its plans, drawings and specifications were inadequate as charged in the first claim, and then acted in its capacity as project engineer to conceal such inadequacy by failure to disclose (PP 90, 97), by changing shop drawings and then directing plaintiff to perform pursuant to the changed drawings (PP 91, 98-99), by wrongfully refusing to recommend to the City issuance of change orders (presumably with concomitant additional payments to Mergentime) (PP 92, 100), by misrepresenting to the City the reason for Mergentime's requested changes and misinvoicing the City for change order work and design work (PP 93, 94, [*8] 96, 101-03, 105), and by misrepresenting to the City the accuracy of historical drawings (PP 95, 104-05).

The Complaint then describes 17 separate categories of facts relating to the work, which facts were allegedly misrepresented by MEHS, presumably by one or more of the means referred to in paragraphs 90-105. (PP 107-216) Among the categories of allegedly misrepresented facts are those relating to the cofferdam. Plaintiff alleges that the misrepresentations with respect to the cofferdam, in particular the geological features of the site where the cofferdam was to be constructed, generated plaintiff's largest loss in connection with the project. (PP 168-193)

The details of these alleged misrepresentations in these 17 categories are not important for current purposes. All save one involve either poor design or geotechnical measurement of the site in the initial stages and concealment of these inadequacies from the City either through outright misrepresentations or through delay (PP 192-95) or delegating the work to Mergentime. (PP 200-03) The sole exception to this pattern relates to design of the chlorine system; here, plaintiff alleges simply that MEHS made changes to the system [*9] and misrepresented to the City the reason for such changes. (PP 196-98)

As to six of these 17 categories, it is impossible to discern from the Complaint that Mergentime suffered any damage. (PP 192-210) For example, the Complaint alleges that MEHS sought to delay a procedure known as "lock-off" for as long as possible so as to permit MEHS to change its incomplete designs and avoid City scrutiny. (PP 192-95) The complaint alleges further that MEHS mistakenly located a fuel oil vault under an active roadway, and then misrepresented to the City that changes

necessitated by the need to protect equipment in that vault were due to field conditions, with the result that MEHS's error would have been exposed had Mergentime not devised a no-cost solution to the problem. (PP 200-03) Although the injury to Mergentime from certain of these categories of alleged misrepresentations is not apparent, Mergentime alleges it suffered $ 40 million in damages and asks three times that amount as punitive damages.

Plaintiff's fourth claim incorporates by reference the first claim for negligence in preparing the design specifications, that portion of the third claim for fraud which alleges that MEHS knew [*10] the specifications were inadequate, and the sixth claim based on RICO, and states that by concealing the inadequacy of its plans and specifications and forcing plaintiff to do extra work, MEHS "has willfully interfered with, and is continuing to interfere with, the contracts between the City and Mergentime/White." (P 221) Mergentime seeks the same relief here as in its fraud claim -- $ 40 million in compensatory damages and $ 120 million in punitive damages.

Plaintiff's fifth claim seeks indemnity for unspecified liquidated damages to which Mergentime may be exposed under its contracts with the City.

The sixth claim purports to be based on three sections of the RICO statute: 18 U.S.C. § 1962(a), which bars investment of income derived from racketeering activity in an enterprise which affects interstate commerce; 18 U.S.C. § 1962(c), which bars conduct of an enterprise through a pattern of racketeering activity; and 18 U.S.C. § 1962(d), which bars conspiracy to violate the other subdivisions of Section 1962. Section 1964(c) of Title 18 permits any person injured in his trade [*11] or business as a result of a violation of any portion of Section 1962 to seek treble damages, costs and fees. The Complaint defines joint venture MEHS as the "enterprise" under the statute, and the corporate and partnership components of MEHS as the actors who received income derived from alleged racketeering activity and invested that income in the joint venture.

The alleged "pattern" of racketeering under the statute is said in the Complaint to consist of seven types of allegedly dishonest conduct involving: misrepresentations to the City as to conditions at the site, misinvoicing the City for various categories of work, and performing work under one provision of the contract that is properly allocable to another, so as to conceal shortcomings in defendants' performance. (PP 235-260)

The Complaint then charges that this allegedly unlawful course of conduct violated the Hobbs Act, 18 U.S.C. § 1951, because defendants allegedly obstructed interstate commerce by obtaining property, presumably

payment from the City, under color of official right in that defendants acted "in their official capacity as construction manager for and advisor to the [*12] City of New York, [and] placed the blame and responsibility for the consequences of various construction problems on the Plaintiff when such construction problems were, in fact, caused by the Defendants' own design failures . . . ." (P 265) In addition, the course of conduct described in paragraphs 235-260 is alleged to violate federal mail and wire fraud statutes, 18 U.S.C. §§ 1341 & 1343, because defendants caused various documents to be mailed between and among themselves, the City and plaintiff, and caused telephone conversations to occur, allegedly in aid of a racketeering scheme. (PP 261-273) As to this claim as well, Mergentime seeks $ 120 million in damages.

II.

The parties agree that their relationships are governed by the law of New York, where the various contracts were entered into and are being performed. The rule in New York with respect to negligent misstatements by professionals is that an entity claiming to have been injured by such misstatements can recover damages from those professionals only if the entity is either in contractual privity with the offending professionals, or in a relationship approaching privity. The test, [*13] formulated in *Credit Alliance Corp. v. Arthur Andersen & Co., 65 N.Y.2d 536, 493 N.Y.S.2d 435, 483 N.E.2d 110 (1985),* is:

> (1) the [professionals] must have been aware that the [statements] were to be used for a particular purpose or purposes; (2) in the furtherance of which a known party or parties was intended to rely; and (3) there must have been some conduct on the part of the [professionals] linking them to that party or parties, which evinces the [professionals'] understanding of that party or parties' reliance.

*Id. at 551.*

That test was applied in *Ossining Union Free Sch. Dist. v. Anderson, 73 N.Y.2d 417, 541 N.Y.S.2d 335, 539 N.E.2d 91 (1989),* to permit a school district to sue the consulting engineers hired by the architects the school district retained to evaluate its school buildings. One building was closed on the recommendation of those engineers, which allegedly resulted from a negligent evaluation. The lawsuit was allowed, however, only because it was alleged that the engineers "undertook their work in the knowledge that it was for the school district alone," *id. at 425,* had direct contact with [*14] the

school district and billed the school district directly, *id. at 426,* and "allegedly rendered their reports with the objective of thereby shaping *this plaintiff's* conduct . . . ." *Id.* (emphasis added).

By contrast, however, when architectural professionals create designs and specifications used as the basis for a bid and later performance by a contractor, are retained by the property owner at a time when they do not know who the successful bidder will be, and render their services to the property owner -- all of which factors were present here -- the contractor who then claims that those designs and specifications were prepared negligently cannot sue those architectural professionals. Thus, in *Williams and Sons Erectors, Inc. v. South Carolina Steel Corp., 983 F.2d 1176 (2d Cir. 1993),* the Court sustained dismissal of a claim by a contractor, Mars-Normel, against an architect, Gruzen Samton Steinglass. The Court held that Gruzen was acting as a representative of the property owner, and that even a pre-bid meeting with Mars-Normel and other bidders was insufficient to turn Gruzen's relationship with Mars-Normel [*15] into the functional equivalent of privity. *Id.,* slip op. at 8031.

Here, it is plain from both the contracts and the Complaint that with respect to plaintiff's first claim, relating to MEHS's allegedly negligent preparation of design and bid documents, there were no statements made by MEHS to plaintiff that were not made to potential bidders at large. In these circumstances, plaintiff is barred for the same reason that prevented Mars-Normel from pursuing its negligence claim against Gruzen in *Williams, supra.*

With respect to plaintiff's second claim -- based on MEHS's allegedly negligent oversight of the construction as project manager -- it is also plain from the contracts and the Complaint that any statements by MEHS were made to the City and not to Mergentime, and that the City relied on MEHS in passing on invoices, change orders and the like. Mergentime's second claim does not purport to arise from any statements whatever to Mergentime. Rather, Mergentime seeks to recover based on its assertion that MEHS made negligent statements to the City which the City acted on, and that the City's action in turn harmed Mergentime. Plaintiff has presented no authority to support such [*16] a claim, and the strictures of *Credit Alliance* and *Ossining* would appear to rule it out *a fortiori,* there having been no suggestion in the Complaint of reliance by Mergentime.

The agreements between the City and MEHS confirm that they were intended to create no duty to any third party, and the agreements between the City and Mergentime disclaim any representation that information in drawings or elsewhere is complete, and recite plain-

tiff's obligation to verify the accuracy of information. (Kahn Aff. Ex. J GC.23) Notably, those contracts are incorporated by reference into the Complaint. A document incorporated by reference in a pleading will override any characterization of that document or its legal consequences in that pleading. *See In re First Chicago Securities Litigation, 769 F. Supp. 1444, 1450 (N.D. Ill. 1991)* (citing cases).

Plaintiff has argued that the language in the contracts between the City and MEHS confining to the contracting parties the obligations created by those contracts is undercut by inclusion of the cofferdam within the scope of the project. That structure was temporary, plaintiff argues, and designed only to further [*17] other work on the project. Accordingly, plaintiff reasons, it could not have been intended to benefit the City, and the cited language in the contracts is incorrect.

Plaintiff's constricted reasoning itself is incorrect. Simply because the cofferdam was a temporary structure does not mean it was not there to further the City's ultimate interest in the project -- namely, the successful renovation of the Croton reservoir. Constructing the cofferdam was a necessary step to achieve that goal, just as erecting a scaffold on this or that portion of the project, or setting up a storage or construction shed, may have been necessary to further and complete the work. Portions of the project cannot be torn from their context and analyzed to determine whether, standing alone, they constitute a finished segment of the project.

Plaintiff's remedy, which it has recognized belatedly, is to sue the City for what the City did or failed to do based on what plaintiff claims was the bad advice the City received from MEHS; the City, as it has done, then can seek indemnity from MEHS by filing a third-party claim.

For the above reasons, the first and second claims are dismissed.

III.

To state a claim [*18] for fraud under the law of New York, a plaintiff must allege facts that establish each of five elements: a representation of a material fact, falsity of that representation, defendant's knowledge that the statement was false, reliance, and resulting damage. *Mallis v. Bankers Trust Co., 615 F.2d 68, 80 (2d Cir. 1980), cert. denied, 449 U.S. 1123 (1981)*. Because plaintiff is not the party to whom the representation in question was made, it must "establish that [it] relied upon [the misrepresentation] to [its] detriment, and that the defendants intended the misrepresentation to be conveyed to [it]." *Peerless Mills, Inc. v. American Tel. & Tel. Co., 527 F.2d 445, 450 (2d Cir. 1975)* (citing cases).

By those standards, Mergentime's fraud claim is insufficient.

Virtually the entire claim, with one exception of little significance discussed below, is based on representations MEHS made to the City, not to Mergentime. To the extent Mergentime seeks to convert those representations into statements to Mergentime by alleging, for example, that "by signing and sealing the Contract Drawings, the [*19] Defendants were representing, warranting and certifying to their completeness, conformability and constructability," (P 33), those allegations are specifically undone by the contracts themselves which, as noted above, are incorporated by reference in the Complaint. Thus, contracts CRO-186 and 187A, between Mergentime and the City, provide:

> No representation is made that the information contained in any Report, or on the drawings, or any other information is correct or complete. The Contractor [Mergentime] is directed to satisfy himself as to the accuracy, completeness or relevance of the information available.

(Kahn Aff. Ex. J GC .23)

Plaintiff notes that this disclaimer does not apply to the cofferdam drawings. Perhaps not, but under the contract law of New York, no representation of the sort alleged by Mergentime will be inferred even in the absence of a disclaimer such as the one included in Mergentime's contracts with the City. *Milau Assoc., Inc. v. North Avenue Dev. Corp., 42 N.Y.2d 482, 486 (1977); see Sears, Roebuck & Co. v. Enco Assoc., Inc., 43 N.Y.2d 389, 398 (1977)*. If no such representation will be inferred to permit a contract claim, there is no reason to permit such an inference to be used to justify a fraud claim.

[*20] To the extent Mergentime is alleging that the City relied on MEHS's representation with resulting injury to Mergentime, such allegations cannot give rise to a fraud claim in New York, as Judge Conner held in *Shaw v. Rolex Watch, U.S.A., Inc., 673 F. Supp. 674, 682 (S.D.N.Y. 1987)* (citing cases).

The one document in the Complaint alleged to contain representations to Mergentime is a letter dated January 26, 1988. (PP 160-161) According to the Complaint, that letter stated falsely that the engineer had allowed for certain contingencies relating to construction of the cofferdam. However, the Complaint does not say that Mergentime relied on those statements, or whether and how it was injured as a result. Accordingly, that letter cannot provide the basis for a fraud claim bottomed on New York law.

IV.

Plaintiff's fourth claim, for tortious interference with contractual relations (PP 220-222), may have somewhat more merit, although that merit does not leap from the pages of the Complaint. After incorporating by reference its first [*21] claim for negligent misrepresentations relating to the design and bid documents, and its RICO claims, of which more later, Mergentime alleges that by covering up the inadequacies in the documents and directing it to perform "extra, unanticipated, additional and out of sequence work, which has resulted in substantial delays and disruptions to the contract work," MEHS "has willfully interfered with . . . the contracts between the City and" Mergentime. (P 221)

The four elements necessary to a claim for tortious interference with an existing contract are: (1) a valid contract between plaintiff and another party; (2) defendant's knowledge of the contract; (3) defendant's intentional procurement of breach of that contract by the other party; and (4) damages. *Israel v. Wood Dolson Co., 1 N.Y.2d 116, 120, 151 N.Y.S.2d 1, 5, 134 N.E.2d 97 (1956).* The first two elements are pleaded adequately. Although much of the allegedly negligent conduct incorporated by reference in this claim occurred before any contract existed between the City and Mergentime, the alleged concealment and related conduct occurred after there were contracts between the City and Mergentime. [*22] It is also apparent from the facts pleaded in the relevant paragraphs of the Complaint that MEHS was aware of those contracts.

With respect to the third element, although the Complaint alleges a good deal of intentionally dishonest conduct by MEHS, nowhere does it allege specifically that the City breached its contract with Mergentime as a result. Oddly, Mergentime has stated in its brief that the City did breach the relevant contracts by not paying Mergentime. Now this happened as a result of what MEHS allegedly did is difficult to discern from the Complaint, although it does contain such glimmers as the following:

255. The Defendants repeatedly provided the City with false and misleading information regarding Change Order Requests as reflected in paragraphs "106" to "213" above.

The referenced paragraphs contain the recital of misinformation allegedly purveyed by MEHS in the 17 categories of work referred to in the discussion of plaintiff's fraud claim. (See pp. 5-6 above) Although, as mentioned, this is the third iteration of the Complaint, the standard for dismissal is whether, on the allegations in the Complaint, plaintiff can prove any set of facts that would entitle [*23] it to relief. *Conley v. Gibson, supra.* By that standard, if Mergentime can prove that as a result of MEHS's alleged misrepresentations the City did not pay it for work done under proposed change orders, to which payment Mergentime otherwise would have been entitled, that would appear to satisfy both the third element -- breach by the City -- and the fourth element -- resulting damages. Because plaintiff has pleaded that MEHS engaged in conduct that had the necessary result of causing such a breach, and because the Complaint makes it apparent that MEHS was aware of the contracts in question, plaintiff has pleaded adequately that MEHS intended to cause the breach.

To the extent MEHS relies on *Turner Constr. Co. v. Mertin E. Segal & Co., Inc.,* slip op. No. 13763/91 (Sup. Ct. N.Y. Co. May 29, 1992), for the proposition that malice or ill will is necessary to a claim for tortious interference with an existing contract, that reliance is misplaced. A showing of malice is necessary to establish a claim for tortious interference with prospective economic advantage, *i.e.,* for tortious interference with a relationship that has not yet ripened into [*24] a contract. *See, e.g., Hammerhead Enters., Inc. v. Brezenoff, 551 F. Supp. 1360, 1369 (S.D.N.Y. 1982), aff'd, 707 F.2d 33 (2d Cir.), cert. denied, 464 U.S. 892 (1983).* However, with respect to interference with a contract already in existence, "it is settled that malice in the sense of spite or ill will is not the gist of such an action." *Hornstein v. Podwitz, 254 N.Y. 443, 447-48, 173 N.E. 674, 675 (1930)* (citation omitted).

Plaintiff's brief is innocent of any authority to support the award of punitive damages in connection with such a claim, nor has independent research disclosed such authority. Accordingly, the demand for punitive damages in connection with this claim is stricken.

V.

Mergentime has not sought to defend its indemnity claim, which in any event appears to be premature. The City has not asserted any claim against Mergentime for which MEHS should provide indemnity, much less established such a claim. Accordingly, that claim is dismissed.

VI.

That brings us to the RICO claim. As noted above beginning on page 7, Mergentime [*25] has alleged that the two entities that combined to form MEHS received income from racketeering activity and invested that income in the joint venture, that the two entities conspired with one another to violate the racketeering statute, and

1993 U.S. Dist. LEXIS 2965, *

that they conducted the activities of the joint venture, MEHS, through a pattern of racketeering activity. The racketeering activity is said to have included violations of the Hobbs Act, *18 U.S.C. § 1951*, in that defendants obtained property, presumably payment from the City, under color of official right because defendants acted "in their official capacity as construction manager for and advisor to the City of New York, [and] placed the blame and responsibility for the consequences of various construction problems on the Plaintiff when such construction problems were, in fact, caused by the Defendants' own design failures . . . ." (P 265) In addition, the entities that comprise MEHS are alleged to have violated the mail and wire fraud statutes, *16 U.S.C. §§ 1341* and *1343*, by causing various documents to be mailed between and among themselves, the City and Mergentime, and [*26] causing telephone calls to occur, allegedly in aid of a racketeering scheme.

MEHS has attacked the RICO claim on a broad front, and certain of the allegations are certainly vulnerable. For example, the claim that MEHS committed extortion when it allegedly gave the City bad advice is facially insufficient; MEHS did not obtain property from the City under color of official right and it did not obtain property from Mergentime at all. *See United States v. Rastelli, 551 F.2d 902, 904-05 (2d Cir.), cert. denied, 434 U.S. 831 (1977)*.

But the fundamental flaw in the RICO claim is that Mergentime does not have standing to bring it. In *Holmes v. Sec. Investor Protection Corp., 117 L. Ed. 2d 532, 112 S. Ct. 1311 (1992)*, the Supreme Court held that none but a directly injured party may sue under RICO, and applied the same standard that governs the Clayton Act. *112 S. Ct. at 1319-21.* In that case, the Supreme Court rejected a claim by the Securities Investor protection Corporation ("SIPC") that it should be allowed to sue, in behalf of brokerage firm customers, the perpetrators of a [*27] fraud on those brokerage firms, which firms in turn became insolvent and unable to pay the customers' claims. The Court reasoned as follows:

If the nonpurchasing customers were allowed to sue, the district court would first need to determine the extent to which their inability to collect from the broker-dealers was the result of the alleged conspiracy to manipulate, as opposed to, say, the broker-dealers' poor business practices or their failures to anticipate developments in the financial markers. Assuming that an appropriate assessment of factual causation could be made out, the district court would then have to find some way to apportion the possible re-

spective recoveries by the broker-dealers and the customers, who would otherwise each be entitled to recover the full treble damages. Finally, the law would be shouldering these difficulties despite the fact that those directly injured, the broker-dealers, could be counted on to bring suit for the law's vindication.

*Id. at 1320.*

That reasoning applies here, if not in equal measure, then at least closely enough to be controlling. It is the City not MEHS that has failed to approve change order [*28] requests and to increase compensation to Mergentime. Permitting Mergentime to sue MEHS would require an assessment in each case of the extent to which it was advice from MEHS or concealment of facts by MEHS, and not the City's own judgment, that resulted in rejection of Mergentime's requests. Moreover, if MEHS was engaged in a RICO fraud, as MEHS contends, the City was injured as well in that it was both denied the value of what it paid for MEHS's services and possibly forced to accept a project that is of lower quality and value than what it bargained for. Thus, the City too would have such a claim against MEHS, and the fact-finder would be required to assume the burden of apportioning treble damages between competing claimants. This burden would have to be undertaken even though the City, by hypothesis (i) denied services for which it paid, and (ii) injured as a result, could be relied upon to sue. Indeed, the City has filed a third-party action against MEHS in the action Mergentime initiated against the City.

The only discernible difference worthy of note between *Holmes* and this case is that the damage to the City is not measured the same way as the damage to Mergentime, whereas [*29] the damage to SIPC and the damage to the broker-dealers in *Holmes* both were measured, or at least controlled in the first instance, by the measure of damage to the customers of the broker-dealers. Thus if the City sues it will not necessarily be seeking the same damages Mergentime seeks. However, the problems of proof and allocation outlined by the Court in *Holmes* remain, and the City's damages could overlap those sought by Mergentime to the extent the City seeks to recover the profit margin it would have to pay a contractor to correct conditions that went uncorrected when MEHS failed to approve change orders.

Mergentime relies on *County of Suffolk v. Long Island Lighting Co., 907 F.2d 1295 (2d Cir. 1990) ("LILCO")*, but nothing in that case contradicts the result reached here. In that case, the Court of Appeals held that plaintiff had standing to sue under RICO based on alle-

gations that the defendant utility had made misrepresentations to a rate-making body, the Public Service Commission ("PSC"), which caused that body to raise plaintiff's utility rates. However, in that case, the PSC suffered no monetary damage whatever, and there were [*30] consequently no problems of proof and damage allocation of the sort presented here and in *Holmes*. Moreover, *LILCO* w as decided before *Holmes* and necessarily is limited by it.

The papers in this case were submitted before the Court of Appeals decided *Standardbred Owners Ass'n v. Roosevelt Raceway Assoc., No. 92-6703, 1993 U.S. App. LEXIS 2034* (2d Cir. Feb. 8, 1993), but neither does that case conflict with the result here. In that case, horse owners were held to have standing to sue under RICO to recover for misrepresentations in connection with the purchase and closure of a harness racing track. However, the misrepresentations in question were made to the plaintiffs, not to any third party, and it was for damage based on misrepresentations to them that plaintiffs sought to recover. The opinion takes pains to note that "representations were made to plaintiffs," slip op. at 1320, that there was a "pattern of direct misrepresentations to plaintiffs," *id. at 1323*, and that "defendants fraudulently induced plaintiffs to take actions and make expenditures that would result in their financial injury.

Plaintiffs' complaint seeking recovery for these [*31] injuries reads in tort, not in contract." *Id.* When the opinion speaks of plaintiff's injuries as "'reasonably foreseeable or anticipated,'" *id. at 1321* (quoting *Hecht v. Commerce Clearing House, Inc., 897 F.2d 21 (2d Cir. 1990)*, that observation appears in a discussion of proximate cause, not a discussion of standing.

Because plaintiff lacks standing to assert its RICO claim, that claim is dismissed.

* * *

To summarize, the motion to dismiss the Complaint is denied as to the fourth claim, but in all other respects is granted. Plaintiff will serve a final amended complaint restating the fourth claim in accordance with this opinion, by April 9, 1993. The fourth claim will be consolidated for all purposes with the claims in *Mergentime/White* v. *City of New York*, 92 Civ. 8450.

SO ORDERED:

Michael B. Mukasey

U.S. District Judge

Dated: New York, New York

March 11, 1993