# EXHIBIT
# 4



**Dormitory Authority
State of New York**

*Gail Hill Gordon, Chair
Maryanne Gridley, Executive Director*

May 30, 2002

Mr. William Pedersen
Kohn Pedersen Fox Associates, P.C.
111 West 57th Street
New York, NY  10009-0118

Re:    **Dormitory Authority of the State of New York Claim
for Damages on the Baruch Academic Complex – Site B**

Dear Mr. Pedersen:

This serves as the Dormitory Authority of the State of New York's ("DASNY") claim for damages resulting from Kohn Pedersen Fox Associates, P.C.'s ("KPF") negligent performance of services required by Agreement No. 6500 1802 3145 ("Agreement") for the Baruch Academic Complex – Site B ("Project").

The principal causes of DASNY's damages are as follows:

1.    KPF's failure to complete its design services in a timely fashion or as otherwise required by the Agreement;

2.    KPF's failure to properly coordinate services and work product provided by its subcontractors, consultants and other members of its design team;

3.    KPF's submission of a deficient structural steel bid package that contained errors and omissions and required numerous modifications to be constructable;

4.    Deficiencies in KPF's design of structural elements of elevator shafts and support beams;

5.    KPF's provision of defective and uncoordinated structural steel and exterior building skin designs;

6.    KPF's failure to coordinate milling and fabrication standards for the steel supporting the skin of the building with the system tolerances; and

*CORPORATE HEADQUARTERS*
515 Broadway
Albany, New York 12207-2964

Tel: 518-257-3000
Fax: 518-257-3100

*NEW YORK OFFICE*
One Penn Plaza, 52nd Floor
New York, New York 10119-0098

Tel: 212-273-5000
Fax: 212-273-5121

*BUFFALO OFFICE*
539 Franklin Street
Buffalo, New York 14202-1109

Tel: 716-884-9780
Fax: 716-884-9787

*WEB*
www.dasny.org

**DASNY_TRAVELERS2 010318**



**Dormitory Authority
State of New York**

Mr. William Pedersen
May 30, 2002
Page 2

7.     KPF's failure to recognize and correct design errors and omissions and otherwise inadequate or negligent responses to errors in its design.

DASNY incurred substantial damages as a consequence of KPF's negligent performance of work required by the Agreement and failure to satisfy the applicable standard of care required of design professionals in the State of New York.

## I.     Project History

### A.     Project Description

The Baruch Academic Complex – Site B is a 785,000 gross square foot, 14 story building located along Lexington Avenue between 24th and 25th Streets in Manhattan that houses The City University of New York's ("CUNY") School of Liberal Arts and Sciences, Business School, Executive Program Division, Recreational and Performance facilities and various student activity areas. DASNY served as CUNY's representative for the design and construction phases of the Project's development. Among its other obligations, DASNY solicited proposals ("RFP") from architect/engineering firms to provide plans and specifications for constructing the Project.

KPF was one of several design firms that responded to the RFP. KPF's proposal was ultimately accepted and DASNY and KPF entered into the Agreement on or about November 20, 1995. The Agreement required KPF to provide specified design services for the fixed-sum of $11,200,000. KPF subsequently developed plans and specifications for the Project.

### B.     KPF's Scope of Work

Article VII of the Agreement required KPF to provide "Programming, Architectural, Engineering and Construction Phase Services for the Construction of the [Project]." In essence, KPF was required to deliver a full spectrum of design professional services in accordance with the Baruch College Master Plan, which was developed in 1986 in response to CUNY's projected long-term need for adequate student, faculty and program spaces. The scope of services included "detailed program development, architectural and engineering design, production of construction documents, cost estimates and construction administration."

DASNY_TRAVELERS2 010319



**Dormitory Authority
State of New York**

Mr. William Pedersen
May 30, 2002
Page 3

Among its other obligations, KPF was required to prepare plans and specifications that did "not result in an estimated construction cost in excess of $168,000,000.00." The Agreement further provides that "the cost to [KPF] for corrections to the Contract Documents necessitated by design errors or omissions shall be part of [KPF's] fee for Original Scope of Services . . . ." While the Agreement permitted KPF to engage design consultants, it made KPF "responsible to [DASNY] for the timely and efficient completion of all services performed by [KPF's design consultants]."

The "Scope of Services of Architect" attached to the Agreement as Appendix 'A' contains the following provisions, which are relevant to the major issues in this Claim:

1.  "F. <u>Construction Documents Phase</u> - These documents, which are composed of copies of all contract drawings and specifications necessary for the construction of the building as described by the approved preliminary documents, *shall be fully coordinated* for bidding by the various Contractors." (emphasis added). Upon 60% and 100% completion of the Construction Documents, "and using [DASNY's] Design Cost Control Manual as a format, provide an estimate of cost based upon a detailed take-off of labor, materials, and equipment: area, volume, and complexity of massing." Also in the Construction Documents Phase, KPF "shall certify to [DASNY] that all Contract Documents have been thoroughly checked for accuracy and for coordination of all their parts and details . . . ." (Emphasis added.)

2.  "G. <u>Bidding and Award of Prime Construction Contracts Phase</u>" requires KPF to "investigate questions posed by bidders relative to bid documents or any other questions, and issue written replies to all bidders in the form of supplemental bulletins, addenda, or bid instructions."

3.  "H. <u>Construction Phase</u>" requires KPF to "review and approve or disapprove all shop drawings and samples submitted by the Contractor for adherence to the intent and requirements of the Contract Documents" and "provide interpretations of Contract Documents and design. [KPF] shall prepare supplemental sketches or details as reasonably necessary to clarify or correct errors in the Contract Documents and clarify field conditions not covered in the contract drawings or specifications."



**Dormitory Authority**
**State of New York**

Mr. William Pedersen
May 30, 2002
Page 4

### C.    Construction Process

Between the spring 1996 and summer 1998, KPF released "scope" packages for fifteen individual trade construction contracts. Based on KPF's release of completed plans and specifications, DASNY ultimately awarded trade contracts according to the following schedule:

| Contract No. | Date | Scope | Contractor |
|---|---|---|---|
| 1 | 5/2/97 | Excavation and Foundations | Urban Foundation / Engineering, LLC |
| 2 | 9/3/97 | Structural Steel | Midwest Steel, Inc. |
| 3 | 11/14/97 | Ductwork | Aabco Sheet Metal Co., Inc. |
| 4 | 2/23/98 | Masonry | Commercial Brick |
| 6 | 4/27/98 | Plumbing | Olympic Plumbing & Heating Corp. |
| 7 | 4/4/98 | Sprinkler/Standpipe | ROY KAY Inc. |
| 9 | 4/28/98 | Superstructure Concrete | Shroid Construction |
| 10 | 5/5/98 | HVAC | ROY KAY Inc. |
| 11 | 4/24/98 | Electrical | L.K. Comstock & Co., Inc. |
| 12 | 7/15/98 | Fire Alarm System | J.H. Electric of NY Inc. |
| 13 | 8/14/98 | Automatic Temperature Controls | Siebe Environmental Controls |
| 15 | 4/23/98 | General Construction No. 1 | Trataros Construction Inc. |
| 16 | 8/27/98 | General Construction No. 2 | Trataros Construction Inc. |

After the bid packages were completed, errors and omissions were discovered in KPF's design. KPF's failure to coordinate its architectural design with the other significant components of the construction documents or oversee the quality and completeness of design work performed by its subcontractors and consultants were also revealed. Therefore, several trade contract design packages contained errors and omissions. Additionally, the lack of coordination resulted in unconstructible elements of the design.

#### 1.    Structural Steel

A significant deficiency that resulted from KPF's breach of care relates to the Project's structural steel design. The above-grade levels of the Project consist of structural steel columns generally on a thirty foot (30') grid supporting steel beams. Metal decking placed on the beams supports approximately six inches (6") of poured-in-place concrete deck. Lecture hall spaces on certain floors require long-span steel trusses that are architecturally integrated into the plan of the floor above each lecture hall. The columns at the exterior perimeter of the Project begin to slope above the sixth floor, following the curved facades.

DASNY_TRAVELERS2 010321



**Dormitory Authority
State of New York**

Mr. William Pedersen
May 30, 2002
Page 5

Under the original program schedule for the Project, the structural steel design prepared by KPF's structural engineering subcontractor, Weidlinger Associates ("Weidlinger"), was scheduled to be complete in May 1997. The structural steel package was to be awarded at the beginning of August 1997. Actual steel erection was scheduled to be substantially complete on July 27, 1998.

The structural steel for the Project was actually put out to bid as part of Contract No. 2 on June 2, 1997. During the bidding period, significant errors and omissions were identified that resulted in a 47-sheet addendum that added approximately 1000 tons of structural steel to the Project. This change forced DASNY to extend the time period for receipt of bids on the structural steel package by approximately one month.

Structural steel erection was scheduled to begin in January, 1998, but did not actually commence until April 6, 1998. This additional three month delay appears to have been caused by (1) KPF/Weidlinger's issuing Bulletins Nos. 3, 4, 5, 6 and 8, and (2) a critical dimensional error in the structural drawings identified while developing shop drawings, which showed that the building footprint would not close dimensionally using the dimensions in the construction documents. The error stemmed from inconsistent dimensions in the Project's column grid between KPF's plan drawings and Weidlinger's plan drawings. This basic error was caused by KPF's failure to coordinate its architectural and structural design and/or exercise the appropriate skill and care in preparing drawings that should be 85% complete in scope for bidding and between 95% and 100% complete for construction.

Other errors and omissions in structural elements of KPF's design were discovered during construction. Structural steel erection was completed in January 1999; approximately five months behind schedule. To date, DASNY has paid approximately $4,232,698.00 in change orders relating to deficiencies in the structural steel and other elements of the design.

KPF was responsible for coordinating the work of its subcontractors and consultants. Therefore, KPF is liable for Weidlinger's failure to exercise the requisite standard of professional care or comply with the contractual obligations set forth in the Agreement. In this regard, KPF failed to (1) comply with the requirement that construction documents *"shall be fully coordinated* for bidding by the various Contractors" and (2) exercise the care, skill and diligence required of a similarly situated design professional. DASNY suffered damages as a result.

DASNY_TRAVELERS2 010322



**Dormitory Authority
State of New York**

Mr. William Pedersen
May 30, 2002
Page 6

KPF also failed to exercise reasonable skill and care in satisfying its obligation to "certify to [DASNY] that all Contract Documents have been thoroughly checked for accuracy and for coordination of all their parts and details . . . ." The sheer number of errors and omissions in the drawings that were issued for bid for Contract No. 2 indicate that KPF and Weidlinger did not fully develop and coordinate the structural steel design before it was released for bids. The large number of RFIs related to structural steel and the scope of the changes that were needed to correct those errors and omissions are further indicia of KPF's breach of its contractual obligations and professional negligence. The types of information requested and the scope of new or changed information that accompanied the design team responses demonstrate the inadequacy of structural documents.

The other significant flaw in the construction documents was the inadequate design of certain structural elements related to the elevators. For example, the divider beams for elevators PE-6 through PE-11 were undersized in the structural drawings. The ensuing field corrections to supplement the divider beams severely distorted the elevator support rails, requiring their replacement. DASNY incurred substantial additional construction costs to correct this deficiency.

2.    <u>The Exterior Skin</u>

The "exterior skin" is that portion of the exterior enclosure of the building above the sixth floor consisting of a faceted, profiled metal panel system ("siding") with both ribbon and punched windows. A major flaw in the exterior skin design was a conflict between the building's structural steel frame and the various exterior systems that attach to the steel frame. This conflict prevented the trade contractor, Jordan Panel Systems ("JPS"), from attaching the exterior skin to the building as contemplated by the Construction Documents.

To summarize the technical aspects of this issue, the siding is hung from a system of tube steel "girts" typically spanning thirty feet (30') between building columns. There are usually two girts per column bay; one several feet above a given slab and the other several feet below the floor slab above.

The siding system conceptually consists of two primary components; an exterior profiled metal panel and an interior "air barrier" panel. The exterior panel shields the interior panel from

DASNY_TRAVELERS2 010323

ly


**Dormitory Authority
State of New York**

Mr. William Pedersen
May 30, 2002
Page 7

direct exposure to the weather, and provides an architectural finish to the exterior skin. The interior "air barrier" panel provides an air and weather-tight seal for the interior of the building. Rigid insulation is attached to interior face of the "air barrier" panel.

KPF's construction documents failed to reconcile the specified design and erection tolerances for the siding system with the fabrication and erection tolerances for the steel girts. Specification Section 07410 of General Construction Contract No. 15 required JPS to attach the siding system to the steel girts using a very small allowance for connection adjustability. Section 07410 also represented to JPS that the steel girts would be installed to a correspondingly close tolerance.

KPF incorporated the "Standards of Practice" promulgated by the American Institute of Steel Construction ("AISC") into section 07410 but tightened the *erection* tolerance for the girts from the 3/8" allowed in the AISC standard to 3/16". KPF failed to recognize that the AISC standard applied to adjustable connections whereas KPF's drawings required a fixed, non-adjustable connection where the girts attached to the columns. KPF also failed to recognize that the AISC *fabrication* tolerances for the girts allowed a deviation of plus-or-minus 3/8" over the length of a 30' girt. The combination of the non-adjustable girt connection and the allowable AISC fabrication tolerance allowed a maximum possible 3/4" deviation, or "sweep," from the desired siding system erection plane that could not be accommodated by the siding system KPF designed. This inherent conflict in KPF's specification is a design error that ultimately caused significant additional costs, disruption and delays to the manufacture and erection of the exterior skin.

The correction to the girt tolerance conflict was a difficult process. In this regard, the field adjustments to the girts was a lengthy process due to KPF's non-adjustable design of the girt-to-column connection. However, even with the girt adjustments, the sweep allowed by the KPF specification still rendered the KPF design for the siding system unconstructable.

DASNY, KPF, TDX, Gordon H. Smith ("GHS") (KPF's exterior skin consultant), Trataros, and JPS spent the fall and winter of 1998 attempting to solve the tolerance conflict. Although the tolerance conflict clearly resided within KPF's own specifications, KPF was both passive and reticent in identifying design solutions. KPF also adopted defensive positions rather than being proactive – or even responsive – in correcting its negligent design. Disregarding the

DASNY_TRAVELERS2 010324



**Dormitory Authority**
**State of New York**



Mr. William Pedersen
May 30, 200_
Page 8

magnitude of the error in KPF's specifications and KPF's failure to coordinate its design, KPF had an obligation to investigate the issue, cooperate in assessing the problem and identify a solution. KPF failed to satisfy any of these obligations and exacerbated the situation by its intransigence.

The negligent design of the building's exterior skin created significant cost overruns in completing the exterior wall construction. KPF is liable to DASNY for those cost overruns.

## II.    Damages Attributable to KPF's Negligent Design

KPF's failure to satisfy its contractual obligations and professional standard of care caused DASNY to incur substantial additional costs for which KPF is responsible. Based on currently available information, DASNY anticipates that its total damages will be approximately $22,286,000.00. DASNY hereby demands payment from KPF in that amount.

Sincerely,

Douglas M. VanVleck
Managing Director, Construction

DASNY_TRAVELERS2 010325

cc: Nick D'Ambrosio – DASNY
    Michael Kolk – DASNY
    Jay Goldstein – DASNY
    Jeffrey Pohl – DASNY
    Steve Boiko – DASNY
    George Weissman – DASNY
    John J. McCullough - TDX Construction
    Emma Macari AIA – City University of New York
    Joanna Pestka – City University of New York
    File

DASNY_TRAVELERS2 010326