UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TRAVELERS CASUALTY AND SURETY COMPANY as Administrator for RELIANCE INSURANCE COMPANY,<br><br>         Plaintiff,<br><br>    vs.<br><br>DORMITORY AUTHORITY - STATE OF NEW YORK, TDX CONSTRUCTION CORP. and KOHN PEDERSEN FOX ASSOCIATES, P.C.,<br><br>         Defendants. | Case No. 07-CV-6915 (DLC) |
| DORMITORY AUTHORITY OF THE STATE OF NEW YORK and TDX CONSTRUCTION CORP.,<br><br>         Third-Party Plaintiffs,<br><br>    vs.<br><br>TRATAROS CONSTRUCTION, INC.,<br><br>         Third-Party Defendant. | |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT, KOHN PEDERSEN FOX ASSOCIATES, P.C.'S MOTION TO DISMISS

**Of Counsel and On the Brief,**
JoAnne M. Bonacci, Esq., *Admitted Pro Hac Vice*
Eli J. Rogers, Esq.
DREIFUSS BONACCI & PARKER, LLP
*Attorneys for Plaintiff, Travelers Casualty and Surety Company as
   Administrator for Reliance Insurance Company*
26 Columbia Turnpike, North Entrance
Florham Park, New Jersey 07932
(973) 514-1414

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................... ii

PRELIMINARY STATEMENT ....................................................................................... 1

STATEMENT OF FACTS .............................................................................................. 2

    Procedural History ...................................................................................................... 3

    KPF's Interactions with Trataros ............................................................................... 5

    Cross-Claims of DASNY and TDX against KPF ....................................................... 8

LEGAL ARGUMENT ................................................................................................... 10

  I.  KPF'S MOTION IS BARRED ON JUDICIAL ECONOMY GROUNDS ...................... 10

  II.  KPF'S MOTION SHOULD BE DENIED BECAUSE THE FUNCTIONAL
      EQUIVALENT OF PRIVITY EXISTED BETWEEN KPF AND TRATAROS ............ 13

    A.  Applicable Standards .......................................................................................... 13

    B.  Particular Circumstances of this Project Support a Finding of Functional Equivalent of
       Privity ................................................................................................................. 13

      1. KPF Knew Its Architectural, Engineering and Design Services Would Be Used by
         Bidders for the Particular Purposes of Preparing Bids for the Prime Contracts and for
         Construction of the Project. .......................................................................... 16

      2. Trataros Was Part of a Known, Definable Class of Likely Bidders for Contracts Nos.
         15 and 16, and Subsequently Was Known to KPF as the Winning Bidder for Those
         Contracts ...................................................................................................... 18

      3. Both Before and After the Award of Contracts Nos. 15 and 16, KPF Engaged in
         "Linking Conduct" with Trataros and Trataros' Subcontractors. ................. 21

CONCLUSION .............................................................................................................. 25

i

## TABLE OF AUTHORITIES

**Cases**

American Mfrs. Mut. Ins. Co. v. Payton Lane Nursing Home, 2007 U.S. Dist.
LEXIS 15160, at *18 (E.Dist. N.Y. Feb. 28, 2007) ...................................................... 17

Credit Alliance Corp. v. Arthur Andersen & Co., 65 N.Y. 2d 536, 551 (1985) ..................... 15, 21

Dondi v. Jones, 40 N.Y.2d 8, 15 (1976) ................................................................. 10, 16

ECOR Solutions, Inc. v. Malcolm Pirnie, Inc., 2005 WL 1843253, *6-*8
(N.D.N.Y. July 29, 2005) ........................................................................ 15, 16, 22

Fourth Fed'l Savings Bank v. Nationwide Assocs. Inc., 183 Misc.2d 165
(Sup. Ct., N.Y. Co. 1999) ................................................................................. 10

Friedl v. City of New York, 210 F.3d 79, 83 (2d Cir. 2000) ......................................... 13

IFD Construction Corp. v. Corddry Carpenter Dietz and Zack, 253 A.D.2d 89, 95
(1st Dep't 1999) ..................................................................................... 14, 17

Martin v. Cohoes, 37 N.Y.2d 162, 165 (1975) ............................................................ 10

Mergentime/White v. Metcalf & Eddy of New York, Inc. – Hazen and Sawyer, P.C.,
1993 U.S. Dist. LEXIS 2965 (S. Dist. N.Y. Mar. 11, 1993) ......................................... 20

Northrup Contracting, Inc. v. Village of Bergen, 139 Misc.2d 435, 437-438
(Sup. Ct., Monroe Co. 1986) ............................................................................. 15

Ossining Union Free School District v. Anderson LaRocca Anderson, 73 N.Y.2d 417,
425 (1989) ......................................................................................... 15, 16

Reliance Ins. Co. v. Morris Assocs., P.C., 200 A.D.2d 728, 729 (2d Dep't 1994) ..................... 14

Slocum on Behalf of Nathan A. v. Joseph B., 183 A.D.2d 102, 105 (3d Dep't 1992) ................. 11

Spa Realty Associates v. Springs Associates, 213 A.D.2d 781, 783 (3d Dep't 1995) ................ 11

Synovus Bank of Tampa Bay v. Valley Nat'l Bank, 487 F. Supp. 2d 360, 368
(S.D.N.Y. 2007) ......................................................................................... 14

The Jordan (Bermuda) Investment Co., Ltd. v. Hunter Green Investments Ltd., 205 F.Supp.2d
243, 247 (S.D.N.Y. 2002) ............................................................................. 13

Ultramares v. Touche, 255 N.Y. 170, 182-85 (1931) ................................................... 18

Williams and Sons Erectors, Inc. v. South Carolina Steel Corp., 983 F.2d 1176
(2d Cir. 1993) ......................................................................................... 20

## PRELIMINARY STATEMENT

Defendant Kohn Pedersen Fox Associates, P.C. ("KPF") bring this motion as a second bite at the apple having already been denied once in a related proceeding, when it was denied by the Honorable Harold Baer, Jr. (who these claims were formerly before). Travelers Casualty and Surety Company ("Travelers") respectfully submits, given that the claims at issue, the parties, the relevant law, and the underlying facts are all the same, that KPF's Motion to Dismiss should again be denied. Denial is proper not only on judicial economy grounds, but also because KPF simply cannot establish that the "functional equivalent of privity" did not exist between KPF and Travelers' subrogee/assignor, Trataros Construction, Inc. ("Trataros").

Law of the case prohibits re-litigating a question already settled by a co-ordinate court. The parties and claims at issue herein were initially before Judge Baer. Those proceedings were voluntarily dismissed upon consent of all parties to pursue settlement through mediation. Yet, long before voluntary dismissal, KPF moved pursuant to Rule 12(b)(6) on the same grounds, Trataros' alleged lack of privity. After full briefing and argument, Judge Baer denied KPF's motion. As KPF presents no new evidence, and the applicable doctrine has long been settled, Travelers submits that KPF's bid for a second bite at the apple should be denied.

Turning to KPF's argument in chief, Travelers contends the movant proceeds from a false premise, namely, that it is only Trataros's purported status, as part of an undefined class whose reliance was merely foreseeable, which underlies Travelers' claim. This is simply incorrect. Under KPF's contract, its work was to be provided to contractors for the particular purposes of preparing bids and guiding their subsequent construction. KPF also knew that Trataros was part of a limited, defined class of likely bidders for the two contracts in question. And, KPF engaged in direct and frequent interactions with Trataros and/or its subcontractors, establishing the necessary "linking conduct."

1

## STATEMENT OF FACTS

Plaintiff Travelers is in the business of writing surety bonds, including payment and performance bonds issued at the request of construction contractors. (Declaration of John Scarpellino, Sr., the "Scarpellino Dec.", ¶ 2-3.)  One such contractor, Trataros, is the principal on two sets of payment and performance bonds administered by Travelers (the "Bonds"), issued in connection with the Project. (Scarpellino Dec., ¶¶ 3, 9-13.)  Trataros appointed Travelers as its attorney-in-fact for the purpose of, inter alia, pursuing Trataros' rights in connection with the Bonds and/or the contracts underlying same.  (Id., ¶ 14.)

Travelers' claims herein arise out of two separate contracts between Trataros and Dormitory Authority – State of New York ("DASNY"), in connection with the Baruch College, Site B project (the "Project").  (Id., ¶ 3, and, Certification of JoAnne M. Bonacci, the "Bonacci Cert.", Exhs. 1-2.)  Trataros' contracts, known as "Contract No. 15" (or "GC-1") and "Contract No. 16" (or "GC-2"), were only two out of thirteen separate co-prime contracts bid out and awarded to various contractors in connection with the Project's construction. (Bonacci Cert., ¶¶ 2-3 and Exhs. 1-2 & Exh. 5, p. 4.)  DASNY also entered into separate contracts with, inter alia, the Project's construction manager, TDX Construction Corp. ("TDX"), and the Project's architect/engineer, KPF.   (Id., Exh. 3, and, movant's Declaration of Peter Catalano, the "Catalano Dec.," Exh B.)

As the Project's architect of record, KPF was primarily responsible for the Project's design documents, including the plans and specifications for the various prime contracts. (Scarpellino Dec., ¶ 8, and, Catalano Dec., Exh. B, pp. A-5 to A-9.)  Under KPF's contract, KPF's professional responsibilities do not simply terminate with the completion of the Project's "design phase."  Rather its duties continued throughout the bidding, construction, and post-

construction phases.  (Catalano Dec., Exh. B, pp. A-8 to A-11, & B-1.) [1]  KPF's contract contemplates that its work product would be furnished, by KPF itself, to bidders for use in preparing bids.  (Id., p. A-8, ¶ F.1.a, requiring KPF to insure its construction documents "shall be fully coordinated **for bidding by the various Contractors**.")  (And, id., p. A-9, ¶ G.1, "[KPF] shall prepare and supply the necessary sets of Contract Documents … for bidding and eventual award of contracts…. [KPF] shall solicit contractor interest to ensure competitive bidding, and shall keep account of and distribute drawings to prospective bidders…," and, ¶ G.2, requiring KPF to "investigate questions posed by bidders relative to bid documents or any other questions.")  KPF's contract obligated it to interact in the field and via correspondence with the prime contractors.  (Id., p.A-9 to A-10, ¶¶ G.2, H.1, H.3, H.5, H.7, & H.10 to H.11, inter alia.)

KPF's contractual obligations were supplemented at least thirty (30) "amendments" to KPF's contract.  At least one such amendment explicitly required KPF to supervise Trataros' construction work.  (See, Bonacci Cert., ¶¶ 17-19 and Exh. 9).  As a result of KPF's contemplated, continuous involvement in bidding and construction phases, KPF interacted directly and frequently with Trataros and its subcontractors and/or suppliers, giving rise to the functional equivalent of privity between Trataros and KPF. (E.g., Bonacci Cert., ¶¶ 36-43 and Exhs. 23-28.)

**Procedural History**

Significantly, Travelers' claims herein were the subject of prior proceedings before the Honorable Harold Baer, Jr., U.S.D.J., captioned as Travelers Casualty and Surety Company as

---

[1]  For example, although KPF implies that its work on the Project was largely, if not entirely, complete before Trataros executed its contracts with DASNY, the last "amendment" to its contract is dated May 7, 2004, **more than six years** after the date of Trataros' Contract No. 15.  (Bonacci Cert., Exhs. 1 and 9.)  At a minimum, KPF's design work on Contracts Nos. 15 and 16 can not be considered to have been completed until after KPF possessed knowledge that Trataros was a likely bidder for said contracts.  (Certification of Eli J. Rogers, the "Rogers Cert.", ¶¶ 2-4, 7-10, and Exhs. A, D-E, & G.)  (And see, Bonacci Cert., ¶¶ 14-15, discussing nearly two hundred (200) change orders issued to Trataros that were allegedly required due to KPF's design errors/omissions.)

<u>Administrator for Reliance v. The Dormitory of the State of New York, et al.</u>, Civil Action No. 04-CV-5101, and commenced on or about June 28, 2004 (the "2004 Proceedings"). (Bonacci Cert., ¶ 21 and Exh. 10.)  Travelers' Complaint and Jury Demand in the 2004 Proceedings (the "Initial Complaint") alleged the same causes of action against the same defendants, and its claims therein arose from the same transactions as the Complaint and Jury Demand filed herein (the "2007 Complaint"). (<u>Cf</u>., <u>id</u>., Exhs. 10 and 11.)  <u>The prior proceedings also encompassed a substantially similar motion to dismiss, filed by KPF upon the same grounds</u>, as well as substantially similar counterclaims, cross-claims, and third-party complaint as those filed by DASNY and TDX herein, except to the extent that DASNY and TDX were represented by separate counsel in the earlier proceedings. (<u>Id</u>., ¶¶ 17-27 and Exhs. 10-21.)

On or about August 10, 2004, DASNY filed its Answer with Affirmative Defenses, Counterclaim and Cross-Claims ("DASNY's Initial Answer"), in response to the Initial Complaint.  (<u>Id</u>., ¶ 22 & Exh. 12.)  TDX filed its Answer and Jury Demand ("TDX's Initial Answer") in response to the Initial Complaint on or about August 31, 2004.  (<u>Id</u>., ¶ 23 & Exh. 13.)  Subsequently, TDX separately filed its "Cross-Claims … against Defendant Kohn Pedersen Fox Associates, P.C." in the 2004 Proceedings (hereinafter, the "TDX Cross-Claim").  (<u>Id</u>., ¶ 24 & Exh. 14.)  On or about August 4, 2004, DASNY filed a Third-Party Complaint in the 2004 Proceedings ("DASNY's Initial Third-Party Complaint").  (<u>Id</u>., ¶ 25 & Exh. 16.)

In August of 2004, KPF filed its initial motion seeking dismissal of the Initial Complaint. After full briefing and oral argument, Judge Baer denied KPF's motion.  (<u>Id</u>., ¶¶ 26-28 and Exhs. 18 & 19).  During the pendency of its first motion to dismiss, KPF filed its own Third-Party Complaint ("KPF's Third-Party Complaint").  (<u>Id</u>., ¶ 29 & Exh. 21.) Subsequently, under supervision of the Honorable Ronald L. Ellis, U.S.M.J., the parties undertook negotiations to

voluntarily dismiss the 2004 Proceedings and pursue resolution of the claims therein through confidential mediation. (Id., ¶ 30.)  On or about September 16, 2005, the parties reported to Magistrate Judge Ellis that all active parties, except one (not currently impleaded in these proceedings) had "opted-in" to non-binding mediation. (Id., ¶ 31.)  During a court conference before Magistrate Judge Ellis on September 20, 2005, the hold-out party consented to opt-in to mediation. (Id., ¶ 32.)  On September 26, 2005, the parties reported to Magistrate Judge Ellis that all active parties to the 2004 Proceedings had executed an agreement to mediate and toll the applicable statutes of limitation governing the various claims pleaded in that proceeding, and that a Stipulation of Dismissal Without Prejudice had been executed by all active parties. (Id., ¶ 33.)

On or about October 7, 2005, the Clerk of the Court entered a Stipulation of Dismissal Without Prejudice and marked the 2004 Proceedings as closed. (Id., ¶ 34 & Exh. 22.)  Without delving into the details of the confidential mediation, suffice to say that nearly twenty-two months after the 2004 Proceedings were voluntarily dismissed without prejudice, and consistent with the procedures established by the parties for re-filing the litigation, Travelers filed its new Complaint and Jury Demand (the "2007 Complaint") on August 1, 2007. (Id., ¶ 35 & Exh. 11.)

**KPF's Interactions with Trataros**

As alleged in Travelers' Complaint, the Project did not present circumstances where the architect simply drew up a set of plans and specifications, turned them over to the owner for bidding, and washed its hands of the Project, despite KPF's implication to the contrary. (See, Bonacci Cert., Exh. 10, ¶ 47, alleging KPF and others impacted Trataros' performance following award of Contracts Nos. 15 and 16 through a variety of actions and omissions, and, ¶ 48, alleging KPF and others provided inadequate coordination, late and contradictory decision-making, and failed to adequately inspect the Project, inter alia.)  KPF's contract contemplated, and indeed it

so transpired, that KPF would have ongoing professional responsibilities during the bidding, construction, and post-construction phases of the Project. (See, Catalano Dec., Exh. B, pp. A-8 to A-11, & B-1.) As a result of its contractual duties requiring interaction with the various prime contractors, KPF engaged directly and frequently with Trataros and/or its subcontractors, and continued to perform substantive architectural/engineering work long into the construction phase. (See, e.g., Bonacci Cert., ¶¶ 36-43 and Exhs. 23-28.)

For example, KPF was contractually obligated to solicit contractor interest, distribute its contract documents to potential bidders, and maintain lists of the potential bidders who received its contract documents. (Catalano Dec., Exh. B, p. A-9, ¶ G. - "Bidding and Award of Prime Construction Contracts Phase", item 1.) Additionally, KPF was contractually obligated to answer questions posed by potential bidders. (Id., item 2.) In that regard, a "Pre-Bid Conference" for Contract No. 15 was held on February 17, 1998. (Certification of Eli J. Rogers, the "Rogers Cert.", ¶ 2 & Exh. A.) Subsequently, a "Pre-Bid Conference" for Contract No. 16 was held on May 21, 1998. (Rogers Cert., ¶ 8 & Exh. E.)

In the case of both pre-bid conferences, KPF prepared the minutes recording the meeting. KPF's meeting minutes attach attendance sheets recording, inter alia, the names of the contractors that attended the pre-bid conference. Both meetings were attended by Trataros personnel, and by KPF personnel. (Id., ¶¶ 3-4, 6-7.) The minutes for both Pre-Bid Conferences recite answers provided to questions posed by the attending contractors ("planholders"). (Id., Exhs. A & E.) In addition, following the respective pre-bid meetings, KPF issued to the planholders a series of addenda, modifying the contract documents, and responding to questions posed at the Pre-Bid Conferences. (E.g., id., Exh. B, p. "7 of 7") ("Questions submitted by

planholders that were not specifically addressed in this Addendum No. 1 are answered in the Contract Documents.")  (And, id., Exh. F, p. "6 of 6") (reciting to same effect.)

In these addenda transmitted to the planholders, KPF not only responded to the questions raised at the respective pre-bid conferences, but also transmitted new work product to the planholders **after** obtaining the identities of a limited number of specific contractors likely to bid for Contracts Nos. 15 and 16, including Trataros.  (Id., ¶¶ 5-7, 11-12 and Exhs. B-D, F-G.)  In fact, Trataros was one of only three contractors to attend both pre-bid conferences. (Id., ¶¶ 4, 7 and Exhs. B, E.)  The work product transmitted by KPF via the addenda significantly modified the contract documents initially provided to the planholders, including Trataros.  (Id., ¶¶ 5-7, 11-12 and Exhs. B-D, F-G.)  (And, cf., Bonacci Cert., Exh. 10, ¶¶ 43-44) (Alleging inter alia that the co-prime contracts prepared by KPF "contained numerous omissions, defects, and inconsistencies … [requiring] the issuance of numerous addenda….")

On or about February 23, 1998, KPF distributed to a group of known potential bidders, including Trataros, "Addendum No. 1" to Contract No. 15.  Among other things, this addendum added 8 new sections of technical specifications, and added 30 new architectural sketches to Contract No. 15.  (Rogers Cert., ¶ 5 and Exh. B.)  Subsequently, Contract No. 15 was further amended by Addenda Nos. 2 and 3: on or about March 3, 1998, KPF distributed to the known likely bidders, including Trataros, "Addendum No. 2" to Contract No. 15 added 58 architectural sketches to Contract No. 15.  (Id., ¶¶ 6-7.)  KPF distributed Addendum No. 3 to Contract No. 15 to the known likely bidders, including Trataros, on or about March 11, 1998; among other things, this addendum added 39 architectural sketches to Contract No. 15.  (Id., ¶ 7.)

With respect to Contract No. 16, KPF issued only two addenda, however, the number of additional drawings transmitted via these addenda far exceed the hundred-plus sketches

previously added to Contract No. 15. (Cf., id., ¶¶ 5-7, with, id., ¶¶ 11-12.) On or about May 29, 1998, KPF distributed to the known likely bidders, including Trataros, "Addendum No. 1" to Contract No. 16. Among other changes to the contract documents, this addendum added three (3) new sections of technical specifications, and **three hundred and two (302)** new architectural sketches. (Id., ¶ 11.) "Addendum No. 2" to Contract No. 16, transmitted by KPF to the known likely bidders, including Trataros, on or about June 8, 1998, added **two hundred and fifty-two (252)** architectural sketches to Contract No. 16, among other things. (Id., ¶ 12.)

Additionally, during the Project's construction phase, KPF interacted directly with Trataros and/or Trataros' subcontractors, both in the form of direct communications, such as fax or telephone, and in the form of face-to-face interactions. The latter took the form of field testing of elements of the building's façade (id., Exh. 25); meetings to discuss proposed changes to the contract documents (id. ¶ 40 & Exh. 27); necessary modifications to the submittals of Trataros and/or its subcontractors in order to receive approval (id., ¶¶ 38-39 & Exh. 26), and attempts to resolve errors and/or omissions in the contract documents. (Cf., id., ¶¶ 41-42 & Exh. 28, with, id., ¶¶ 7-12 & Exh. 3.) These interactions constitute "linking" conduct, in further support of a finding of the functional equivalent of privity.

### Cross-Claims of DASNY and TDX against KPF

In addition to the causes of action filed by Travelers against KPF, on or about September 28, 2007, DASNY and TDX filed their Answer with Affirmative Defenses, Counterclaims, and Cross-Claims (the "DASNY/TDX Answer"). (See, Bonacci Cert. at Exhibit 14.) The DASNY/TDX Answer sets forth cross-claims against KPF, alleging claims for breach of contract and professional malpractice, as well as counts seeking contribution and/or contractual/common-law indemnification. (Id. at Exhibit 14, ¶¶ 157-205.) (Scarpellino Dec., ¶ 16.)

Among other things, DASNY and TDX allege that KPF, as the Project's architect of record, breached its contractual and professional obligations by submitting "plans, specifications and related design information" in an "[un]timely fashion" and which "contained errors, omissions and defects, and were not fully coordinated." (Bonacci Cert., Exh. 15 at ¶¶ 171-172.) (Scarpellino Dec., ¶ 17.)

DASNY and TDX further allege that KPF was notified of the impacts which the purported design defects were causing the Project; however, "[r]ather than correcting the Design Defects in a professionally competent and timely fashion, KPF … compounded [its] … errors by failing to acknowledge the design and coordination problems and refusing to fully cooperate in offering a solution for their Design Defects." (Bonacci Cert., Exh. 15 at ¶¶ 173-174.) As per DASNY's and TDX's allegations, these alleged design defects and KPF's "failure to acknowledge and correct [them] … in a timely or professionally competent fashion, <u>caused the cost of construction to increase and **significantly delayed, disrupted and impacted the construction** of the Project</u>." (<u>Id</u>. at ¶ 175) (emphasis added). (Scarpellino Dec., ¶ 18.)

DASNY separately alleges that:

> KPF failed to exercise the required standard of care, competence and skill in the completion of its duties as architect of record for the Project. Among other things, KPF improperly and negligently: (1) failed to complete and coordinate the [plans, specifications, and related design information] … (2) failed to properly oversee and perform the professional services that were required to complete [said] … Design Documents, (3) failed to supervise and coordinate the work of its subcontractors and consultants and integrate their work into the Design Documents, (4) refused to acknowledge its Design Defects and/or implement the necessary remedial corrections in a timely or professionally competent fashion, and (5) failed to satisfy other elements of the required standard of care.

(Bonacci Cert., Exh. 15 at ¶ 203.) (Scarpellino Dec., ¶ 19.)

9

## LEGAL ARGUMENT

### I.    KPF'S MOTION IS BARRED ON JUDICIAL ECONOMY GROUNDS

Travelers respectfully submits that this Court should deny KPF's motion based upon considerations of judicial economy and finality.  While "law of the case" rests in the sound discretion of the Court, Travelers proposes that circumstances where the same party, moving **again** for dismissal pursuant to Rule 12(b)(6), on the same grounds as the earlier motion, with respect to the same causes of action, arising from the same transaction(s) previously alleged by the same plaintiff, with the same co-defendants present as before, with no change in applicable law or in the facts submitted to the Court, would more than justify such an exercise of discretion. In light of the highly unusual circumstances of the present motion, Travelers respectfully submits that Judge Baer's Opinion and Order should not be disturbed.  (Bonacci Cert., Exh. 10.)

As the Court of Appeals has stated, absent a statutory exception, "and in order to prevent vexatious and repeated applications on the same point, a motion once fully heard and decided cannot be revived again or renewed" unless the movant obtains leave of "the court or Judge who denied it or if made upon presentation of new facts…."  Dondi v. Jones, 40 N.Y.2d 8, 15 (1976). And see, Fourth Fed'l Savings Bank v. Nationwide Assocs. Inc., 183 Misc.2d 165 (Sup. Ct., N.Y. Co. 1999) ("The law of the case doctrine applies to motions.")  "[A] court should not ordinarily reconsider, disturb or overrule an order in the same action of another court of co-ordinate jurisdiction." Dondi, 40 N.Y.2d at 15.

While the law of case is only "a rule of practice, an articulation of sound policy," when an issue has once [been] judicially determined, that should be the end of the matter as far as Judges and courts of co-ordinate jurisdiction are concerned." Martin v. Cohoes, 37 N.Y.2d 162, 165 (1975).  Law of the case doctrine

> is similar to res judicata in that it concerns the review of decided issues. It is based on judicial economy and provides for consistency, especially where different judges hear parts of the same case.

Spa Realty Associates v. Springs Associates, 213 A.D.2d 781, 783 (3d Dep't 1995). As with res judicata, "strong policy considerations" favor the application of law of the case, such as "consistency in results, the avoidance of vexatious litigation and judicial economy in an overburdened court system." Slocum on Behalf of Nathan A. v. Joseph B., 183 A.D.2d 102, 105 (3d Dep't 1992) (discussing res judicata).

Here, the procedural history between the parties, and a comparison of the relevant pleadings, bears out that this action, while technically "new" insofar as it bears a different civil action number than the 2004 Proceedings, is actually only continuation of the same dispute between the same parties. Indeed, more than just the caption is nearly identical. (E.g., cf., Bonacci Cert., Exh. 16, with, Exh. 17; and, cf., Exh. 12, ¶¶ 81-92, with, Exh. 15, ¶¶ 122-132.)

As in the 2004 Proceedings, Travelers alleges here that it has standing to sue as a result of its subrogation to the rights of Trataros, a contractor that was awarded two contracts on the Project. (Cf., id., Exh. 12, ¶¶ 17-23, and Exh. 15, ¶¶ 9-15.) As in the 2004 Proceedings, Travelers has alleged six counts, seeking the contract balance/retainage due on Contracts Nos. 15 and 16, impact damages, compensation for pass-through claims of Trataros' subcontractors, compensation for Travelers' own bond losses, and claims against TDX and KPF, respectively. (Cf., id., Exh. 12, ¶¶ 49-93, with, Exh. 15, ¶¶ 16-56.) And, as in the 2004 Proceedings, KPF has brought a Rule 12(b)(6) motion seeking dismissal of the complaint on lack of privity grounds.

Judge Baer's decision analyzed each prong of the Ossining test, finding that the particular circumstances of the case established a functional equivalent of privity between KPF and Trataros. (Id., Exh. 20.) KPF's knowledge that the contract documents it was preparing for

11

DASNY would be utilized by contractors, such as Trataros, to construct the Project, was found sufficient to satisfy the "particular purpose" requirement. (Id., Exh. 20, pp. 7-8.)  Judge Baer held that the "reliance by a known party" factor was met, because KPF was required to solicit interested bidders, to maintain lists of the prospective bidders to whom its plans were distributed, and because its work performed during the construction phase constituted ongoing design services on which Trataros relied, essentially in "real time". (Id., Exh. 20, p. 9.)  Finally, Judge Baer found that the evidence of KPF's interactions with, and oversight of, Trataros during the construction phase satisfied the "linking" conduct criteria.  (Id., Exh. 20, pp. 10-11.)

Following denial of KPF's motion, the 2004 Proceedings continued for some time. However, ultimately, in the hope of resolving their disputes short of trial, the parties to the 2004 Proceedings unanimously and voluntarily consented to dismiss that action without prejudice, in order to pursue mediation. (Id., ¶¶ 30-34.)   Consistent with the joint decision to enter mediation, and under the supervision of Magistrate Judge Ellis, the parties unanimously entered into an agreement which, inter alia, tolled the applicable statutes of limitation in the event mediation fell through and the resumption of litigation was necessary. (Id., ¶¶ 31-33.)  Without divulging any confidential information regarding the mediation, subsequently, Travelers filed its Complaint and Jury Demand, commencing this action on August 1, 2007.  (Id., ¶ 35.)

Given that the current proceedings are essentially only a continuation of the 2004 Proceedings in a different forum, and thus analogous to one, continuous action, Travelers submits that the law of the case should be applicable to KPF's present motion.  In light of the policy interests favoring judicial economy and finality, we respectfully submit that KPF's motion should be denied.

## II.    KPF'S MOTION SHOULD BE DENIED BECAUSE THE FUNCTIONAL EQUIVALENT OF PRIVITY EXISTED BETWEEN KPF AND TRATAROS

### A.    Applicable Standards

Quite simply, the facts support Travelers' allegation that a relationship functionally equivalent to privity existed between KPF and Trataros.  Therefore, KPF cannot demonstrate Travelers' categorical inability to prove its claims, as KPF is required to do.  It is respectfully submitted that KPF's latest Rule 12(b)(6) motion to dismiss should be denied for that reason alone.

In order to prevail under Rule 12(b)(6), the movant must rule out any possibility that the plaintiff could maintain an action against the moving party.  Dismissal is appropriate "only if 'it appears *beyond doubt* that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" Friedl v. City of New York, 210 F.3d 79, 83 (2d Cir. 2000) (emphasis added).  The movant's burden is only increased by the requirement that a complaint must be construed "in the light most favorable to plaintiff", such that all allegations in the complaint are accepted as true. The Jordan (Bermuda) Investment Co., Ltd. v. Hunter Green Investments Ltd., 205 F.Supp.2d 243, 247 (S.D.N.Y. 2002).  Further, all reasonable inferences are construed in favor of the plaintiff.  Friedl, 210 F. 3d at 83.  In light of this, Travelers respectfully submits that KPF's motion falls far short of the requisite standard.

### B.    Particular Circumstances of this Project Support a Finding of Functional Equivalent of Privity

As alluded to above, this Project presented the particular circumstances which would support a finding that the functional equivalent of privity existed between KPF and Trataros.  Contrary to the tenor of KPF's Moving Brief, Travelers' argument is not particularly novel.  In fact, aside from Judge Baer's explicit finding that the Project's particular circumstances could support a relationship of this sort (Bonacci Cert., Exh. 20), several Departments of the New York

13

Appellate Division have upheld equivalent findings under similar circumstances.  See, IFD Construction Corp. v. Corddry Carpenter Dietz and Zack, 253 A.D.2d 89, 95 (1st Dep't 1999); Reliance Ins. Co. v. Morris Assocs., P.C., 200 A.D.2d 728, 729 (2d Dep't 1994).  KPF's Moving Brief ignores those decisions that are most applicable, misconstrues the pertinent aspects of less-apt decisions, and otherwise relies upon cases that are inapposite or distinguishable. [2]

In fact, KPF's construction of the constructive privity theory is so cramped, virtually no plaintiff will ever be able to recover under it.  For the sake of clarity, Travelers sets forth the actual language of the three factor Ossining test here, if only to demonstrate its essential simplicity, contrary to the arbitrary and largely subjective array of admonitions and codicils which KPF "interprets" from the case law:

> [T]he following [are the] criteria for liability: (1) awareness that the [professional's work product] … were to be used for a particular purpose or purposes; (2) reliance by a known party or parties in furtherance of that purpose; and (3) some conduct by the defendants linking them to the party or parties and evincing defendant's understanding of their reliance.

---

[2]   This is true not only with respect to KPF's argument regarding "constructive privity" doctrine, but also with respect to its third-party beneficiary argument.  KPF reads into the case law a requirement that a party claiming third-party beneficiary status must be identified by name in the relevant contract; reputedly the absence of such an explicit identification alone justifies dismissal.  (Moving Brief, p. 7) (KPF's contract "contains no language … indicating [intent] … to benefit Trataros, its subcontractors or Travelers.")  Unfortunately, the decision cited by KPF for this proposition actually states the exact opposite: "[T]he third-party beneficiary **does not have to establish that it is explicitly mentioned in the contract**, [however] New York law requires that the parties' intent to benefit a third-party must be shown on the face of the contract."  Synovus Bank of Tampa Bay v. Valley Nat'l Bank, 487 F. Supp. 2d 360, 368 (S.D.N.Y. 2007) (emphasis added).  No doubt, KPF's omission of the first clause of this sentence was inadvertent.

Travelers' responds that the clauses of KPF's scope of work (Catalano Dec., Exh. B, "Appendix 'A'") are more than sufficient at this stage to support its allegation that KPF's contract was intended to benefit the various contractors who would be awarded prime contracts on the Project.  In particular, this intent to benefit the class of prime contractors is seen in the sections providing that KPF's work product was required to be "fully coordinated for bidding by the various contractors"; and obligating KPF to "investigate questions posed by bidders relative to bid documents or any other questions, and issue written replies to all bidders in the form of supplemental bulletins, addenda, or bid instructions"; "[r]eview and approve or disapprove all shop drawings and samples submitted by the Contractor; "[r]eview, check, and approve or disapprove all substitutions and 'or equal' products … submitted by the Contractor"; "[p]rovide interpretations of Contract documents and design," among others.  (Id., pp.A-8 to A-10, ¶¶ F.1, G.2, and H.1 to H.3.)

Ossining Union Free School District v. Anderson LaRocca Anderson, 73 N.Y.2d 417, 425 (1989) (quoting, Credit Alliance Corp. v. Arthur Andersen & Co., 65 N.Y. 2d 536, 551 (1985).

Travelers does grant that, in comparison with the foreseeability tests sometimes applied in other jurisdictions, the Ossining test is comparatively "narrower"; however, that does not mean the test is applied with hostility to a plaintiff's claims. E.g., ECOR Solutions, Inc. v. Malcolm Pirnie, Inc., 2005 WL 1843253, *6-*8 (N.D.N.Y. July 29, 2005) (all three factors of Ossining/Credit Alliance test were established in contractor's professional malpractice claim against architect),[3] and, Northrup Contracting, Inc. v. Village of Bergen, 139 Misc.2d 435, 437-438 (Sup. Ct., Monroe Co. 1986) (all three factors of Credit Alliance test were satisfied by subcontractor's professional negligence claim against design group, requiring denial of motion to dismiss on lack of privity grounds).

As the Reliance, IFD Construction, ECOR Solutions, and Northrup decisions indicate, the doctrine of "functional equivalent of privity" is not an illusory one. See, e.g., Reliance, 200 A.D.2d at 729 (surety subrogated to the rights of its principal plead allegations sufficient to state a claim that constructive privity existed between its principal and engineering firm that developed designs and specifications for project).

The Reliance decision found that the following allegations relating to the relationship between the surety's principal, Omega Construction Company, Inc. ("Omega"), and the design professional, Morris Associates, P.C. ("Morris"), satisfied the three Ossining factors. First, Morris was "aware that one of the purposes of its design plans was to assist construction companies in preparing their bids for the project". Second, Morris "knew that Omega was part of a definable class which would rely on the plans", satisfying the requirement of reliance by a

---

[3] As the ECOR Solutions decision involved a plaintiff/contractor's motion for partial summary judgment, rather than a 12(b)(6) motion to dismiss, the court ultimately denied partial summary judgment due to the existence of disputed material facts. ECOR Solutions, 2005 WL 1843253 at *9-*10.

known party.  Third, there was conduct between Omega and Morris "evincing the defendant's understanding that Omega had, in fact, relied upon the plans in preparing its bid."  <u>Reliance</u>, 607 N.Y.S.2d at 107-108 (citations omitted).

Similarly, the <u>IFD Construction</u> decision affirmed the trial court's finding that bidders on construction contract enjoyed the functional equivalent of privity with project's design engineers "inasmuch as the engineers were aware of the purpose of their design plans and that [the contractor who was awarded the contract] was part of a definable class that would rely on the bid documents."  <u>IFD Construction</u>, 253 A.D.2d at 95.  Thus, New York case law does not support KPF's assertion that a blanket prohibition exists upon third-party negligence claims against design professionals.  Indeed, under the particular circumstances of the Project at issue here, the <u>Ossining</u> test is satisfied, as in <u>Reliance</u>, <u>IFD Construction</u>, <u>ECOR Solutions</u>, and <u>Northrup</u>.

> **1.    KPF Knew Its Architectural, Engineering and Design Services Would Be Used by Bidders for the Particular Purposes of Preparing Bids for the Prime Contracts and for Construction of the Project.**

As an initial matter, KPF possessed knowledge that its professional work would be used for the particular purpose of preparing bids for the co-prime contracts and for the actual construction of the Project.  <u>See</u>, <u>Ossining</u>, 73 N.Y.2d at 425 (defendant must have possessed "awareness that the reports were to be used for a particular purpose or purposes.")  When a design professional knows that its work will be incorporated into the final bid package for a construction contract, that knowledge satisfies the first <u>Ossining</u> prong.  <u>Marcellus</u>, 302 A.D.2d at 476.  As stated by the Eastern District of New York, in those cases where "constructive privity was found to exist, the defendants were retained for the specific purpose of making representations to the plaintiffs for them to rely upon before consummating a transaction with the

16

retaining party." <u>American Mfrs. Mut. Ins. Co. v. Payton Lane Nursing Home</u>, 2007 U.S. Dist. LEXIS 15160, at \*18 (E.Dist. N.Y. Feb. 28, 2007).

Here, DASNY engaged KPF to prepare, inter alia, "all drawings and specifications necessary for the construction of the building" for the specific purpose of distributing them to prospective bidders before DASNY consummated a transaction, namely, contract formation with the respective lowest responsible bidder. (Catalano Dec., Exh. B, pp. A8 to A9, ¶¶ F.1.a & G.) KPF claims this was not a particular purpose of its contract, begging the question: What **<u>other</u>** use did they anticipate for design documents required to be "fully coordinated for bidding by the various Contractors" and subsequently "distribute[d] to prospective bidders"? (<u>Id</u>., ¶¶ F.1.a & G.1.) The contract documents were not some academic exercise intended for DASNY's eyes only; they were intended for use in building.  (<u>E.g.</u>, <u>id</u>., p. A9, ¶ H.1, requiring KPF to review contractor shop drawings and samples "for adherence to the … Contract Documents," <u>and</u>, ¶ H.3, requiring KPF to "[p]rovide interpretations of Contract Documents and design.")

In <u>Reliance</u>, the Appellate Division upheld a denial of the engineering firm's motion to dismiss, finding, inter alia, that the "particular purpose" requirement had been satisfied.  The defendant in <u>Reliance</u> was hired by the project owner to prepare the designs and specifications for construction, and to supervise construction. <u>Reliance</u>, 607 N.Y.S.2d at 107.  The Court held that "defendant was aware that one of the purposes of its design was to assist construction companies in preparing their bids for the project." <u>Id</u>.  <u>And see</u>, <u>IFD Construction</u>, 685 N.Y.S.2d at 671 & 673 (Engineering firms retained by owner to prepare contract drawings, plans and specifications were aware their work product would be used for the particular purpose of distribution to prospective bidders for use in preparing their bids.)

Here, KPF's contract is structured so the design phase (as planned) culminated in the creation of 10 separate co-prime bid packages. (Catalano Dec., Exh. B, p. A9, ¶ G.1.)  These bid packages governed the winning bidder's work.  Given this, KPF was "aware --indeed, could not possibly have failed to be aware-- that the substance of the [individual bid packages it] … furnished would be transmitted to and relied upon by" the eventual winning bidder.  Ossining, 73 N.Y.2d at 425.  In fact, KPF was contractually responsible for transmitting bid packages to bidders.  Thus, creation of plans and specifications for use by bidders "was the very purpose of [KPF's] … engagement." Id.

> 2.    **Trataros Was Part of a Known, Definable Class of Likely Bidders for Contracts Nos. 15 and 16, and Subsequently Was Known to KPF as the Winning Bidder for Those Contracts**

As to the second Ossining factor, KPF had actual knowledge Trataros was a likely bidder for Contracts Nos. 15 and 16, and continued performing design work on both contracts after learning Trataros was a likely bidder.  In fact, even after Trataros was awarded its contracts, KPF continued providing A/E services on the Project. Cf., ECOR Solutions, 2005 WL 1843253 * 8.

The Ossining Court stated the second element of the constructive privity test as requiring "reliance by a known party or parties in furtherance of" the particular purpose.  Ossining, 73 N.Y.2d at 425.  However, the New York Court of Appeals has alternately defined the inquiry as whether the professional work was distributed to a "fixed, definable and contemplated group whose conduct was to be governed" by the professional work product.  White v. Guarente, 43 N.Y.2d 356, 362 (1977).  And see, Ultramares v. Touche, 255 N.Y. 170, 182-85 (1931).

In the construction context, the New York Appellate Division has previously held that a contractor relying upon a design professional's work product can be considered to be within a known, "definable class which would rely on the plans."  Reliance, 200 A.D.2d at 729. And see,

18

IFD Construction, 253 A.D.2d at 95. (The trial court "correctly found that … IFD was part of a definable class that would rely on the bid documents.)

Similarly, the ECOR Solutions decision found that a successful bidder on a construction contract was a "known party," based on facts paralleling those of this action.  That Court held that "the mere fact that the plaintiff is a potential bidder" is not sufficient by itself, however,

> the record demonstrates that (1) defendants prepared documents recording … that, among other bidders, plaintiff obtained copies of the contact documents for purposes of bidding on the project; (2) defendants prepared documentation recording … that, among other bidders, plaintiff attended two pre-bid site inspections and conferences; (3) before plaintiff submitted its bid, defendants directly conveyed Addendum No. 1 and Addendum No. 2 to plaintiff.

ECOR Solutions, 2005 WL 1843253 * 8.  In light of those circumstances, the Court concluded that the "known party" element of the Ossning/Credit Alliance test had been satisfied.  Id.

Here, KPF was also contractually responsible for recording the potential bidders to whom it distributed its bid packages. (Catalano Dec., Exh. B, p. A9, ¶ G.1.)  Also, KPF recorded the fact of Trataros' attendance at two pre-bid conferences, held for Contract No. 15 and Contract No. 16.  (Rogers Aff., Exhs. A & E.)  Finally, after KPF possessed these materials recording Trataros' interest in Contracts Nos. 15 and 16, KPF issued a series of five addenda directly to the potential bidders, including Trataros.  (Id., Exhs. B-D & F-G.)  Three of these addenda were issued in connection with Contract No. 15, and two were issued for Contract No. 16.  (Id., ¶¶ 5-7, 11-12 & exhibits thereto.)  Under either contract, the respective addenda represented substantial amounts of architectural/engineering work performed and issued after obtaining actual knowledge of Trataros' interest in the contracts. (Id.) Finally, as discussed below, KPF continued to perform substantial architectural/engineering work following award of Trataros' contracts.

19

In connection with this element, KPF relies on the <u>Williams and Sons</u> and <u>Mergentime</u> decisions, in which the respective courts held that the design professionals in question were not in constructive privity with the plaintiff/contractor. <u>Williams and Sons Erectors, Inc. v. South Carolina Steel Corp.</u>, 983 F.2d 1176 (2d Cir. 1993); <u>Mergentime/White v. Metcalf & Eddy of New York, Inc. – Hazen and Sawyer, P.C.</u>, 1993 U.S. Dist. LEXIS 2965 (S. Dist. N.Y. Mar. 11, 1993).    However, both decisions are distinguishable to the extent that neither presents circumstances where the defendant forwarded addenda to the prospective bidders following the pre-bid meetings, and neither plaintiff appears to have established any "linking" conduct, as required by the third <u>Ossining</u> element.    <u>Williams and Sons</u>, 983 F.2d at 1184 (noting that plaintiff's interaction with architect at pre-bid meeting was the only "isolated contact" between the two parties); Mergentime, 1993 U.S. Dist. LEXIS 2965 *15 ("it is … plain" that during the construction phase, the allegedly negligent statements made by the defendant actually "were made to the City and not to" the contractor.)    Conversely, the instant action presents evidence of substantial linking conduct between Trataros and/or its subcontractors, and KPF.

<u>Williams and Sons</u> is further distinguished to the extent the defendant architect was apparently acting as the owner's representative with respect to the project at issue.    By contrast, KPF was **not** designated as the owner's representative on the Project. (<u>See</u>, Rogers Aff., Exh. A, p.1, and Exh. E, p.1) (providing that TDX is the owner's representative for Contracts Nos. 15 and 16, respectively).    (<u>And see</u>, Catalano Aff., Exh. B, p. D5, ¶ 13) (stating, in pertinent part, that "[t]he relationship created by this agreement between the OWNER and ARCHITECT is one of independent ARCHITECT and it is in no way to be construed as creating any agency relationship … <u>nor is it to be construed as, **in any way or under any circumstances**, creating or appointing the ARCHITECT as an agent of the OWNER **for any purpose whatsoever**.</u>")

Given the striking parallels to the <u>ECOR Solutions</u> decision, and the significant dissimilarities to the <u>Williams and Sons</u> and <u>Mergentime</u> decisions, Plaintiff respectfully submits that KPF cannot conclusively establish Travelers' inability to prove its subrogee was a known party in satisfaction of the second <u>Ossining</u> element.

> **3.    Both Before and After the Award of Contracts Nos. 15 and 16, KPF Engaged in "Linking Conduct" with Trataros and Trataros' Subcontractors.**

Finally, the interactions between KPF and Trataros during the bidding and construction phases demonstrate linking conduct between KPF and Trataros, including but not limited to direct communications between KPF and Trataros' subcontractors, whether via telephone or fax transmittal; meetings between KPF, Trataros, and/or Trataros' subcontractors on various construction issues, including meetings resulting in design revisions by KPF; attendance/supervision of construction "mock-ups".

As formulated by the <u>Ossining</u> decision, this element of the test requires "some conduct by the defendants linking them to the party or parties and evincing defendant's understanding of their reliance."  <u>See</u>, <u>Ossining</u>, 73 N.Y.2d at 425.  The "linking conduct" standard "permit[s] some flexibility in the application of the doctrine" and permits "a somewhat wider group of potential plaintiffs to whom a defendant may be liable than does 'the end and aim of the transaction' standard, which KPF attempts to invoke.  <u>Williams and Sons</u>, 983 F.2d at 1182. Where parties engage in "direct communications and personal meetings" the result is "a nexus between them sufficiently approaching privity … to permit the" non-contracting party a cause of action against the professional.  Credit Alliance Corp. v. Arthur Andersen & Co., 65 N.Y.2d 536 (1985).

In <u>ECOR Solutions</u>, the court found that the interactions between the plaintiff/contractor and defendant/design professionals were sufficient to establish the necessary "linkage" between the plaintiff-contractor and defendant-design professional.  <u>ECOR Solutions</u>, 2005 WL 1843253, *7.  <u>And</u> <u>see</u>, <u>Reliance</u>, 200 A.D.2d at 729 (holding that the facts of the case satisfied the third <u>Ossining</u> prong).

The interactions relied upon in <u>ECOR</u> included two pre-bid meetings attended by both the contractor and the design professional, two addenda to the bid package issued by the defendant before bids were submitted, and an inquiry by the defendant regarding the contractor's bid. <u>ECOR Solutions</u>, 2005 WL 1843253, * 7.  The court further noted that the contractor's position

> is further strengthened by the fact that <u>defendants' involvement with the project did not end with the preparation of the contract documents</u>. Rather, defendants remained in the project in a very direct and significant way for its full duration.…  <u>[T]he parties' direct communications and personal meetings</u> demonstrate existence of conduct sufficient to link defendants with plaintiff and evince defendants' understanding of plaintiff's reliance on their work product.

<u>Id</u>. (Emphasis added.)

Here, the facts support a finding that "linking" conduct existed between KPF and Trataros.  As previously discussed, Trataros attended a pre-bid meeting with respect to each of its contracts with DASNY; KPF attended both meetings and maintained records that Trataros was one of the attendees.  Additionally, KPF distributed minutes of pre-bid conferences to the potential bidders, thereby answering their questions; KPF also issued five addenda to Contracts 15 and 16 <u>after</u> the pre-bid conferences and <u>before</u> the contracts were awarded.  Further, KPF's professional services continued well into the construction phase.

Pursuant to its scope of work under the KPF Contract, during the Project's construction phase, KPF was required to perform the following tasks, among other things,

1.  Review and approve or disapprove all shop drawings and samples submitted by the Contractor[s] for adherence to the intent and requirements of the Contract Documents….

2.  Review, check, and approve or disapprove all substitutions and "or equal" products, equipment, and/or materials submitted by the Contractor.

3.  Provide interpretations of Contract Documents and design. The ARCHITECT shall prepare supplemental sketches or details as reasonably necessary to clarify or correct errors in the Contract Documents and clarify field conditions not covered in the contract drawings or specifications.    All sketches shall be consecutively numbered, dated, and referenced to applicable contract documents.

4.  Review all field orders and change orders for their effect on design criteria only and make recommendations to the OWNER….

5.  Attend regular job progress meetings as required by the OWNER.

6.  Check and approve or disapprove test procedures and review test results and make appropriate recommendations to the OWNER.

7.  Inspect on a bi-weekly basis, or as required by the OWNER, the Work in progress to determine compliance with the requirements of the contract drawings and specifications or approved shop drawings….

    The term "inspect", as used herein, shall mean the periodic visual observations of construction work for the purpose of ascertaining that the Work is in compliance with the Contract Documents and consistent with the design intent.

8.  Prepare punchlists at substantial completion and at Final Completion of the Work.

    Preparation of the punchlist will be made with the OWNER, or the OWNER's Representative to determine if the intent of the contract has been met….

    …

10. Inspect the Project between Thirty (30) and Forty-Five (45) days prior to the time the OWNER is to take over, use, occupy, operate, or accept any part or all of the Project.

23

> 11.    Upon completion of each prime contract, make a final inspection of the Work and upon completion of each Phase of Work, represent to the OWNER, in writing, that the Work is complete and in accordance with the Contract Documents ….

(Catalano Dec., Exh. B, pp. A9 to A10.)   Thus, at contract formation KPF should have anticipated that it would have a significant, ongoing role during construction.  Direct interactions with contractors were a foregone conclusion, given the requirements that KPF attend job progress meetings and perform bi-weekly inspections of the construction site, among other things.   Additionally, the contract terms indicate the contractors are required to perform their work in accord with the "Contract Documents" and the "design intent". Thus, the contractors' work was dependent on KPF's contract interpretations, supplemental drawings, review of field orders and change orders, and review of shop drawings and submittals.

Finally, the near-privity relationship between KPF and Trataros is demonstrated by the numerous direct interactions between KPF and Trataros and/or its subcontractors.  During the construction phase, these interactions took the form of direct communications, either by fax or phone (Bonacci Cert., ¶ 36 and Exhs. 23-24), and also personal meetings, either at testing facilities or on site. (Id., ¶¶ 37-42 and Exhs. 25-28.)  Thus, KPF's conduct linked itself, and its professional services, to Trataros, and provided it with an understanding of Trataros' reliance. As all three elements of the Ossining test can be satisfied under the Project's particular circumstances, Travelers respectfully submits that KPF's motion should be denied.

## CONCLUSION

For the foregoing reasons, and those adduced in the certifications and declaration submitted by Travelers, Travelers respectfully requests that KPF's Motion to Dismiss be denied in its entirety.

Dated:    Florham Park, NJ        Respectfully submitted,
           October 17, 2007        **DREIFUSS BONACCI & PARKER, LLP**

                                  By:        /S/
                                         Eli J. Rogers (ER:6564)