UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TRAVELERS CASUALTY AND SURETY COMPANY as Administrator for RELIANCE INSURANCE COMPANY,<br><br>          Plaintiff,<br><br>vs.<br><br>DORMITORY AUTHORITY - STATE OF NEW YORK, et al.<br><br>          Defendants. | Case No. 07-CV-6915 (DLC)<br>**ECF CASE** |
| DORMITORY AUTHORITY OF THE STATE OF NEW YORK and TDX CONSTRUCTION CORP.,<br><br>          Third-Party Plaintiffs,<br><br>vs.<br><br>TRATAROS CONSTRUCTION, INC.,<br><br>          Third-Party Defendant. | |
| TRATAROS CONSTRUCTION, INC. and TRAVELERS CASUALTY AND SURETY COMPANY,<br><br>          Fourth-Party Plaintiffs,<br><br>vs.<br><br>CAROLINA CASUALTY INSURANCE COMPANY, et al.<br><br>          Fourth-Party Defendants. | |

---

## MEMORANDUM OF LAW IN OPPOSITION TO FOURTH-PARTY DEFENDANT, UNITED STATES FIRE INSURANCE COMPANY'S MOTION TO DISMISS THE FOURTH-PARTY COMPLAINT

---

**Of Counsel and On the Brief,**
JoAnne M. Bonacci, Esq., *Admitted Pro Hac Vice*
Eli J. Rogers, Esq.
DREIFUSS BONACCI & PARKER, LLP
*Attorneys for Travelers Casualty and Surety
   Company, and Trataros Construction, Inc.*
26 Columbia Turnpike, North Entrance
Florham Park, New Jersey 07932
(973) 514-1414

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... II

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS ........................................................................................ 3

LEGAL ARGUMENT ............................................................................................. 14

   I.  THE THIRD-PARTY CLAIMS IMPLICATE COVERAGE UNDER THE POLICY.... 14

   A.   The Allegations Potentially Satisfy Policy Requirements for Occurrence(s), .............. 14

   II.  COVERAGE FOR DASNY/TDX'S THIRD-PARTY CLAIMS IS NOT BARRED BY THE POLICY'S NOTICE PROVISIONS. ..................................................................... 24

CONCLUSION ....................................................................................................... 29

## <u>TABLE OF AUTHORITIES</u>

**Cases**

Adler & Nielson Co., Inc. v. Insurance Co. of North America, 56 N.Y.2d 540, 542-3 (1982) ....17

American Family Mut. Ins. Co. v. American Girl, Inc., 673 N.W.2d 65, 81-84 (Wis. 2004) ......22

Apache Foam Products v. Continental Ins. Co., 528 N.Y.S.2d 448, 449 (4th Dep't 1988)...........17

Associated Mut. Ins. Co. v. Bader, 805 N.Y.S.2d 275, 277 (Sup. Ct., Sullivan Co. 2005) ..........15

Continental Cas. Co. v. Rapid-American Corp., 80 N.Y.2d 640, 648 (1993)...............................15

Cooper v. Parsky, 140 F.3d 433, 440 (2d Cir. 1998)...............................................................27

Cortland Pump & Equipment Inc. v. Firemen's Insurance Co., 604 N.Y.S.2d 633 (3rd Dep't 1993)...........................................................................................................................................16

DiBlasio v. Novello, 344 F.3d 292, (2d Cir. 2003) ..................................................................27

French v. Assurance Co. of America, 448 F.3d 693, 701 (4th Cir. 2006)...................................20

Frontier Insulation Contractors v. Merchants Mut. Ins. Co., 91 N.Y.2d 169, 176 (1997). ...........21

Hartford Acc. & Indem. Co. v. J.J. Wicks, Inc., 104 A.D.2d 289, 292, 482 N.Y.S.2d 935, 938 (4th Dep't 1984) ....................................................................................................................19, 23

Kason v. City of New York, 373 N.Y.S.2d 456, 459, 83 Misc.2d 810, 812 (Sup. Ct., N.Y. Co. 1975)........................................................................................................................................26

Lauritano v. American Fid. Fire Ins. Co., 162 N.Y.S.2d 530, 557, 3 A.D.2d 564, 568 (1st Dep't 1957)........................................................................................................................................24

Marine Midland Services Corp. v. Samuel Kosoff & Sons, Inc., 400 N.Y.S.2d 959, 962 (4th Dep't 1978)...................................................................................................................................15, 17

Maryland Cas. Co. v. W.R. Grace and Co., 23 F.3d 617, 627 (2d Cir. 1992)..............................16

Merck & Co., Inc. v. Mediplan Health Consulting, Inc., 425 F. Supp. 2d 402, 412 (SDNY 2006)...........................................................................................................................27

Mighty Midgets, Inc. v. Centennial Ins. Co., 47 N.Y. 2d 12, 19 (1979) .......................................24

Morris Park v. National Union Fire Ins. Co. of Pittsburgh, Pa., 822 N.Y.S.2d 616, 618 (2d Dep't 2006) ......................................................................................................................24

National Union Fire Ins. Co. of Pittsburgh, Pa. v. Structural Systems Technology, 964 F.2d 759, 763 (8th Cir. 1992) ...................................................................................................................20

Pozzi Window Co. v. Auto-Owners Ins., 446 F.3d 1178, 1184 (11th Cir. 2006) ..........................20

Reynolds Metal Co. v. Aetna Cas. & Sur. Co., 696 N.Y.S.2d 563, 567 (3d Dep't 1999) ............26

Ryan, Beck & Co. v. Fakih, 268 F. Supp. 210, 230 (EDNY 2003) ...............................28

Saks v. Nicosia Contr. Corp., 625 N.Y.S.2d 758, 759 (3d Dep't 1995)............................15

Security Mutual Ins. Co. v. Acker-Fitzsimmons Corp., 31 N.Y.2d 436, 441 (1972)..............24, 28

Sturges Mfg. Co. v. Utica Mut. Ins. Co., 37 N.Y.2d 69, 72-73 (1975) ............................16

*Travelers Ins. Co. v. Volmar Constr. Co., Inc.*, 752 N.Y.S.2d 286, 288, 300 A.D.2d 40, 42 (1st Dep't 2002)..................................................................................................................26

U.S. Underwriters Ins. Co. v. Falcon Constr. Corp., 2003 WL 22019429 (S.D.N.Y. Aug. 27, 2003)....................................................................................................................25

Uniroyal, Inc. v. Home Ins. Co., 707 F. Supp. 1368, 1381-1382 (E.D.NY. 1988) ......................15

## Treatises

Couch on Ins. § 129.20........................................................................................23

Holmes' Appelman on Insurance § 117.4, 297 (2nd Ed. 2000) ....................................15

Law of Insurance Contract Disputes § 14A.02[d], 14A-10........................................16

## PRELIMINARY STATEMENT

Travelers Casualty and Surety Company ("Travelers") and Trataros Construction, Inc. ("Trataros") submit this Memorandum of Law in opposition to the Rule 12(b)(6) Motion to Dismiss filed by United States Fire Insurance Company ("U.S. Fire"). In effect, movant seeks judgment that no coverage exists under one or more insurance policies issued by U.S. Fire to Trataros (the "Policy") due to alleged late notice and the purportedly preclusive effect of the Policy's terms and conditions. Travelers' and Trataros' fourth-party claims against U.S. Fire are essentially indemnification or "pass-through" claims, arising from third-party and counterclaim allegations made by the Dormitory Authority – State of New York ("DASNY") and TDX Construction Corp. ("TDX"). Because the underlying third-party/counterclaim allegations have not been developed beyond the notice pleading stage, Travelers and Trataros respectfully submit that a determination as to insurance coverage for those claims would be premature.

DASNY and TDX advance at least two (2) claims potentially implicating commercial general liability ("CGL") coverage. The more-developed of these claims relates to purported defects in the epoxy terrazzo flooring system partially installed by Trataros' subcontractors, G.M. Crocetti, Inc. and Bartec Industries, Inc. (the "Flooring Claim"). In addition, DASNY and TDX have alleged the existence of other, unspecified construction defects. Contrary to U.S. Fire's claim, neither the Policy's notice provisions, nor the exclusions relied upon by the movant are sufficient to preclude potential coverage for the claims advanced by DASNY and TDX.

As a result of Travelers' and Trataros' good faith investigation of the Flooring Claims, their good faith belief in their respective non-liability for the aforesaid claims, and the need to undertake extensive investigation of the highly technical Flooring Claims, the notice provided to U.S. Fire was reasonable under the circumstances. Impleader of U.S. Fire was necessary as a result of a case management deadline for impleader/joinder set by Judge Baer in the prior

1

proceedings. Thus, despite Travelers' and Trataros' belief in their non-liability, in order to protect their rights of recovery against potentially liable parties, U.S. Fire, among other pertinent insurance carriers, were impleaded into the prior proceedings. Due to the manner in which the proceedings before Judge Baer were dismissed and the relevant claims tolled, this action was required to be re-filed in the same procedural manner as the prior action developed. In light of the foregoing, Travelers and Trataros respectfully submit that U.S. Fire's motion should be denied in its entirety.

## STATEMENT OF FACTS

### *U.S. Fire's Policy*

Movant U.S Fire issued one or more insurance policies to Trataros, including a certain commercial general liability ("CGL") policy bearing Policy No. 5031690768 and renewal numbers 5031312183 and 5031690768 (the "Policy"). (See, Declaration of Eli J. Rogers, dated March 10, 2008, (the "Rogers Dec."), at Exh. D.) (And, Declaration of John P. DeFilippis, submitted in support of U.S. Fire's motion (the "DeFilippis Dec."), Exh. N.) [1] U.S. Fire claims that the Trataros Policy was only in effect from April 1, 1998 until April 1, 1999; in fact, the Trataros Policy appears to have been extended an additional year, and apparently would not have expired until April 1, 2000, according to materials produced by U.S. Fire in the prior proceedings before Judge Baer. (Rogers Dec., Exh. D.) Moreover, documents supporting this apparent extension of the Policy until April 1, 2000 are included in the materials submitted by U.S. Fire for purposes of the present motion. (DeFilippis Dec., Exh. N, first page.)

### *Fourth-Party Claims Against U.S. Fire*

The claims asserted by Travelers and Trataros in their Fourth-Party Complaint are contingent in nature, and generally seek indemnification and/or contribution to the extent that DASNY and/or TDX may recover on the counterclaims and third-party claims against the Fourth-Party Plaintiffs. (See, e.g., Rogers Dec., Exh. A, ¶¶ 63-70.) As against U.S. Fire in particular, Travelers and Trataros seek a declaration of coverage under the Policy, and indemnification/contribution to the extent of any applicable coverage for any damages potentially awarded to DASNY and/or TDX. (See, id., ¶¶ 126, 135, 140-149.)

---

[1] As noted in the Moving Papers, U.S. Fire also issued a certain insurance policy to Crocetti potentially implicated by the claims at issue in this action. Travelers and Trataros have discontinued without prejudice their claims arising from the policy issued by U.S. Fire to Crocetti. Upon information and belief, the Stipulation of Partial Discontinuance between Travelers, Trataros and U.S. Fire was transmitted to the Court by U.S. Fire. (See, DeFilippis Dec., Exh. A.)

**_DASNY's and TDX's Third-Party Claims_**

The claims at issue in this action were previously the subject of proceedings before the Honorable Harold Baer, U.S.D.J., entitled <u>Travelers Casualty and Surety Company as Administrator for Reliance Insurance Company v. The Dormitory Authority of the State of New York, et al.</u>, Case No. 04-CV-5101 (the "Baer Proceedings"). (Rogers Dec., ¶ 9, <u>and</u>, DeFilippis Dec., Exhs. F & J.) The Baer Proceedings were discontinued without prejudice in order to pursue resolution of the claims herein through voluntary mediation. (Rogers Dec., ¶ 15, <u>and</u>, DeFilippis Dec., Exh. J.)

The within action was commenced on or about August 1, 2007, when Travelers filed its Complaint and Jury Demand herein. (Rogers Dec., Exh. A, ¶ 19.)  Subsequently, Defendants DASNY and TDX asserted counterclaims against Travelers for alleged damages relating to purportedly defective work on the Project performed by Trataros and/or its subcontractors, _inter alia_. (<u>Id</u>., Exh. A at ¶ 20.) DASNY/TDX's counterclaims allege that these purported construction defects include, but are not limited to, certain alleged defects in the epoxy terrazzo flooring system. (<u>Id</u>., Exh. A, ¶ 52.)  Trataros did not "self-perform" the installation of the Project's epoxy terrazzo flooring system, but subcontracted the work to its subcontractors, Crocetti and Bartec. (<u>Id</u>., Exh. A, ¶¶ 39-41, 46-49.)

Subsequently, DASNY and TDX filed their Third-Party Complaint, impleading Trataros and asserting claims that seek, _inter alia_, alleged damages resulting from purportedly defective, substandard and/or otherwise unacceptable work on the Project. (Rogers Dec., Exh. A, ¶ 23.) The third-party claims repeat DASNY's and/or TDX's allegations of defects in the Project's epoxy terrazzo flooring system (the "Flooring Claims"), and allude to other, unspecified alleged construction defects n the work performed by Trataros and/or its subcontractors (the "Miscellaneous Defects"). (<u>Id</u>., Exh. A, ¶¶ 54-58.) Without greater specificity, DASNY and

4

TDX appear to attribute approximately $7 Million in damages to the unspecified Miscellaneous Defects, over and above their purported damages on the Flooring Claims. (See, id., Exh. B, ¶ 33, alleging that "[t]he remediation of the … epoxy terrazzo … will cost an estimated thirteen million dollars or more", and, ¶ 62, alleging that DASNY "has suffered damages … exceeding … Twenty Million Dollars" as a result of purported construction defects.)

In the prior proceedings before Judge Baer, DASNY filed a Third-Party Complaint which was not joined by TDX. [2] (Id., Exh. C.) Unlike DASNY/TDX's Third-Party Complaint in the within action, the Third-Party Complaint filed by DASNY in the Baer Proceedings does not evidence any significant differential between the alleged damages attributable to "total" construction defects (alleged to be in excess of $6 Million, id., Exh. C, ¶ 60), and the reputed costs for remediating the purported defects in the epoxy terrazzo flooring system (alleged to be "an estimated six million dollars or more," id., Exh. C, ¶ 32.) Thus, there is a marked swing from seemingly token or *de minimis* damages attributable to the alleged Miscellaneous Defects in the Baer Proceedings, to the present implication of $7 Million associated with the same alleged defects. [3]

Despite the significant numbers attached to the Miscellaneous Defects, there is scant detail provided by DASNY and TDX in their present Third-Party Complaint regarding the alleged "other" construction defects. (See, Exh. B, ¶¶ 26-27.) The substance of DASNY/TDX's allegations regarding the Miscellaneous Defects is as follows:

> 26.    The work performed by Trataros <u>and its subcontractors</u> failed to satisfy the technical and quality requirements in Contract No. 15 and Contract No. 16 or accepted

---

[2] DASNY and TDX were represented by separate counsel during the opening stages of the Baer Proceedings.

[3] The allegation of $7 Million in Miscellaneous Defects is one component of a $13 Million total increase in the alleged damages sought for Trataros' purported construction defects. (Cf., id., Exh. C, ¶ 60, alleging $6 Million in purported damages, with, id., Exh. B, ¶ 62, alleging $20 Million in purported damages.)

industry practices.

27.    As a result of Trataros <u>and its subcontractors'</u> failure to satisfy the technical and quality control requirements in Contract No. 15 and Contract No. 16 and accepted industry standards, significant portions of Trataros' work were defective, substandard or otherwise unacceptable. This nonconforming work had to be repaired or replaced at significant expense to DASNY.

28.    In ***addition*** <u>to the construction defects described above,</u> [transition to allegations relating to Flooring Claims.]

(<u>Id</u>.) (Emphasis added.) With the exception of the $7 Million dollar "up-tick" in the purported quantum of damages, the substance of DASNY's and TDX's claim for Miscellaneous Defects in the within action is nearly identical to similar allegations made by DASNY in the Baer Proceedings. (<u>Cf</u>., <u>id</u>. Exh. B, ¶¶ 26-28, <u>with</u>, Exh. C, ¶¶ 25-27.)

In response to these and other allegations set forth in DASNY/TDX's counterclaims and Third-Party Complaint, Travelers and Trataros filed their Fourth-Party Complaint on November 14, 2007. (<u>Id</u>., Exh. A.) The Fourth-Party Complaint alleges claims seeking, *inter alia*, a declaration of coverage under the Policies and indemnification/contribution from U.S. Fire for DASNY's and/or TDX's counterclaims and Third-Party claims. (<u>Id</u>., Exh. A, ¶¶ 122-149 & "Wherefore clause", pp. 29-30.)

The relief that Travelers and Trataros seek against the fourth-party insurance carriers, including U.S. Fire, relates to both the Flooring Claims and DASNY/TDX's as-yet-undeveloped claims for Miscellaneous Defects. (<u>Id</u>., Exh. A, ¶¶ 54-55, 122, 142.) On or about February 11, 2008, U.S. Fire filed its motion to dismiss the Fourth-Party Complaint pursuant to Rule 12(b)(6).

### ***Factual Background***

This action arises from a complex public works construction project "owned" by DASNY and known as Baruch College, Site B (the "Project"). (<u>Id</u>., Exh. A, ¶¶ 30-32.) In its capacity as

owner, DASNY entered into thirteen separate co-prime contracts for the Project's construction work. (Id., Exh. A, ¶ 35.)  DASNY separately awarded two (2) of the thirteen (13) prime contracts to Trataros, known as "Contract No. 15" and "Contract No. 16," respectively. (Id., Exh. A, ¶¶ 36, 38.)

Contract No. 15 was awarded to Trataros on or about April 22, 1998.  (Id., Exh. A, ¶ 37.) Subsequently, Contract No. 16 was awarded to Trataros on or about August 27, 1998.  (Id., Exh. A, ¶ 38.)  Despite its contention to the contrary, U.S. Fire's Policy apparently did not expire until April 1, 2000, nearly two years after the award of Contract No. 15, and approximately nineteen months after the award of Contract No. 16.  Thus, work under both of Trataros' co-prime contracts commenced long before the expiration of U.S Fire's Policy.

Reliance Insurance Company ("Reliance") issued payment and performance bonds to Trataros relating to both Contract No. 15 and Contract No. 16 (the "Bonds").  (Id., Exh. G, ¶¶ 21-22.)  Despite DASNY's and TDX's present allegations of delays and/or construction defects purportedly attributable to Trataros (id., Exh. A, ¶¶ 15-34 ), no action was ever taken to declare Trataros in default under either of its contracts on the Project.  (Id., Exh. E, ¶ 8.)  Likewise, DASNY never asserted a performance bond claim against the Bonds prior to the filing of its Third-Party Complaint in the Baer Proceedings.  (Id., Exh. E, ¶ 9.)  Because Trataros was never defaulted by DASNY, and no performance bond claim was received by Travelers during Trataros' prosecution of its work under Contract No. 15 and/or Contract No. 16, Travelers never became involved in the day-to-day, on-site performance of the work under Trataros' respective prime contracts.  (Id., Exh. E, ¶ 10.)

Upon information and belief, DASNY's and/or TDX's Flooring Claims partially relate to work contracted under Contract No. 16, as well as work contracted by DASNY to prime

contractors other than Trataros. (Id., Exh. A, ¶¶ 38-43, 46-51, 60.)[4] For example, one of the major components of the Project's flooring system, the concrete floor slabs, were installed by a co-prime contractor of DASNY other than Trataros. (Id., Exh. A, ¶ 48.)

With regard to Contract No. 16, Trataros subcontracted a portion of its work thereunder to non-party G.M. Crocetti, Inc. ("Crocetti"). The work subcontracted to Crocetti included, *inter alia*, installation of a portion of the Project's epoxy terrazzo flooring system. (Id., Exh. A, ¶¶ 39-41.) In connection with the work subcontracted to it by Trataros, Crocetti used materials manufactured and/or supplied by Specialty Construction Brands, Inc. t/a TEC ("TEC"). (Id., Exh. A, ¶ 42.) TEC's materials were incorporated into the Project's epoxy terrazzo flooring system. (Id., Exh. A, ¶ 43.)

However, the work performed/installed by Crocetti is only the uppermost layer of the Project's flooring system, which also incorporates construction work performed by Bartec Industries, Inc. ("Bartec"), and concrete floor slabs installed by a separate co-prime contractor. (See, id., Exh. A, ¶¶ 39-49, 60.) Trataros entered into a separate subcontract with Bartec with respect to, *inter alia*, the installation of "floor leveling" over portions of the concrete floor slabs installed by a separate DASNY co-prime contractor. (Id., Exh. A, ¶¶ 46-48.) Bartec's floor leveling work comprises a portion of the Project's epoxy terrazzo flooring system. (Id., Exh. A, ¶ 49.) In connection with the work subcontracted to it by Trataros, Bartec used materials manufactured and/or supplied by Dayton Superior Specialty Chemical Corp. a/k/a Dayton Superior Corporation ("Dayton Superior"). (Id., Exh. A, ¶ 50.) Dayton Superior's materials were incorporated into the Project's epoxy terrazzo flooring system. (Id., Exh. A, ¶ 51.)

The floor-leveling work which Trataros subcontracted to Bartec was not initially part of

---

[4]   At the present stage of the proceedings, little detail has been pleaded by DASNY and/or TDX regarding the additional alleged construction defects referred to in the Third-Party Complaint.  (Id., Exh. A, ¶¶ 54-55, and, Exh. B, ¶¶ 27-28. )

Trataros' work under Contract No. 16.  Rather, this work was added to Contract No. 16 by DASNY via a change order during the Project's construction phase, (id., Exh. L) as a result of unanticipated irregularities in the slab concrete installed by another prime contractor.  (Id., Exh. I) Significantly, in Trataros' proposal for this additional work, it is explicitly stated that Trataros will "[n]ot [be] responsible for concrete delamination." (Id., Exh. K)  This proposal, including the exclusion for liability associated with delamination, was incorporated into the change order eventually issued by TDX and/or DASNY.(Id., Exh. L)

Upon information and belief, DASNY's Flooring Claims implicate purported continuing and/or incipient property damage arising from the alleged defects in the epoxy terrazzo flooring system. (Id., Exh. A, ¶¶ 60-61 & 142-44.)  Further, the alleged presently-existing, and/or potential, property damage referred to in the Flooring Claims purportedly has, or may be, sustained by one or more elements of the Project, including work constructed by a co-prime contractor other than Trataros, as well as by two of Trataros' subcontractors, and/or the "products" of at least two separate manufacturers. (Id., Exh. A, ¶¶ 39-51, 57, 60-61 & 142-43.) Likewise, the purported property damage relevant to the Flooring Claims may allegedly be caused by one or more of the elements comprising the epoxy terrazzo flooring system. (Id., Exh. A, ¶¶ 57, 60-61, & 142-44.)

As pleaded by DASNY/TDX's Third-Party Complaint, the alleged Miscellaneous Defects claim relates to both Contract No. 15 and Contract No. 16, and implicates potential defects in work performed by unidentified subcontractors of Trataros.  (Id., Exh. A, ¶ 54, and, Exh. B, ¶¶ 25-27.)  Given that at least eleven other prime contractors performed work on the Project, the allegedly defective work is potentially affixed to, dependent upon, integrated with, penetrated by, and/or overlaid with work performed by one or more separate co-prime

contractors other than Trataros.  (Id., Exh. A, ¶ 35; Exh. H, ¶ 38, alleging that in addition to the

thirteen co-prime contracts, DASNY awarded several additional contracts, including separate

contracts to install telecommunications and security systems for the Project; and, Exh. H, ¶ 39,

alleging that construction on the Project began approximately 11 months before Trataros was

awarded Contract No. 15.)  (Cf., id., Exh. A, ¶ 37) (Contract No. 15 awarded on or about April

22, 1998.)  If these allegations are assumed to be true, for purposes of the within motion, the

Policy potentially provides coverage for the Miscellaneous Defects.

### *Investigation of the Flooring Claims*

After Travelers became administrator of the Bonds, Trataros entered into a General

Agreement of Indemnification ("GAI") with Travelers.  This GAI was in addition to the

agreement of indemnity that Trataros, and its individual indemnitors, had granted to Reliance, to

which Travelers succeeded as Reliance's successor-in-interest.  Under the terms of the GAI,

Trataros appointed Travelers as its attorney-in-fact for the purpose of, among other things,

pursuing Trataros' rights in connection with the bonds issued and/or administered by Travelers

on Trataros' behalf.  (Rogers Dec., Exh. E., ¶¶ 6-7 and Exh. 3 thereto.)

Travelers maintains its principal place of business at One Tower Square, 4PB, Hartford,

Connecticut.  The primary claims personnel handling the claims associated with the Bonds,

including Mr. Scarpellino, the affiant, work out of Travelers' Hartford offices.  Trataros' former

principal place of business was located at 664 64th Street, Brooklyn, New York 11220.  (Id., Exh.

E. ¶¶ 11-12.)

In or about the Spring of 2003, Trataros ceased business operations.  At approximately

this same time, Trataros ceased to retain any employees.  (Id., Exh. E. ¶¶ 13-14.)  At the time

DASNY filed its Third-Party Complaint on or about August 4, 2004, Trataros had not operated

as a functioning business, nor maintained any employees, for nearly 14 months. (Scarpellino Aff., ¶¶ 13-14.)

Thus, Travelers essentially had to start from the ground up in developing an understanding of not only the factual background regarding the project history, but also, a technical familiarity with issues relevant to the purported terrazzo flooring defects. (Bonacci Dec., ¶ 3.)  Shortly after service of DASNY's original Third-Party Complaint, Travelers undertook to investigate DASNY's allegations regarding the Flooring Claims.  On or about August 18, 2004, Travelers contacted DASNY, to arrange for a walk-through of the Project in order to inspect the alleged problems with the terrazzo, and to take coring samples. (Bonacci Dec., ¶ 3.)  By the end of August, 2004, Travelers was first able to obtain its initial its coring samples from the Project. Bonacci Dec., ¶¶ 3-4.)

On or about September 24, 2004, Travelers received from Crocetti copies of Crocetti's documents relating to the Project. (Bonacci Dec.¶5.)  Over the course of October and November, 2004, counsel for Travelers continued its preliminary investigations regarding the Flooring Claims. (Id. ¶6.)   As a result of the preliminary investigations conducted by Travelers, on or about November 30, 2004, Trataros and Travelers filed their Fourth-Party Complaint in the Baer Proceedings, impleading a number of parties on a variety of legal theories, including products liability, breach of warranty, breach of contract, and surety law.  Yet the consistent unifying theme linking the disparate theories was that of contingent liability: should it come to pass that DASNY would recover upon its allegations against Trataros, any one or more of the fourth-party defendants may be liable to reimburse Trataros for DASNY's contingent recovery.  (Id., ¶ 7.)

Based upon reviews of Trataros' Project records, and documents obtained from DASNY and KPF in 2004, it became apparent that Trataros' proposal in connection with the floor

leveling work contained potentially exculpatory language, reciting that Trataros was "[n]ot responsible for concrete delamination." (Id., ¶ 8.)   Nevertheless, following the initial fourth-party impleader, at a court conference held in the within action on December 2, 2004, the Honorable Harold Baer, U.S.D.J. entered an Order setting a February 17, 2005 deadline for impleader of additional parties. (Id., ¶ 9.)

In January 2005, following an extensive review of Trataros' project records, counsel for Trataros located a number of insurance certificates in various locations including the Trataros project records, the discovery produced by Crocetti, and discovery produced by DASNY.  It was unclear if the information reflected on these certificates represented correct and/or complete information regarding Trataros' insurance coverage on the Baruch College project.  (Rogers Dec., Exh. F ¶ 2.)  With the Federal Court's deadline for impleader looming, counsel for Trataros contacted Allied North America Insurance Brokerage Corp. of New York ("Allied Brokerage"), an entity identified on several certificates of insurance as a broker for Trataros. (Rogers Dec., Exh. F ¶ 4.)

Upon information and belief, Allied Brokerage was an insurance broker for U.S. Fire, among others.  On January 17, 2005, an individual from Allied contacted counsel for Trataros in reply to an earlier telephone inquiry received by Allied from counsel for Trataros.   Allied advised that counsel for Trataros that, if it had a specific request for information, the request must be sent to Allied via e-mail. (Id., ¶5.)

On January 22, 2005, counsel for Trataros wrote to Allied via e-mail, requesting copies of the insurance certificates and policies issued to Trataros for the years 1999 to 2002. (Id., ¶6.) After receiving no reply from Allied, counsel for Trataros wrote a follow-up e-mail on February 4, 2005, inquiring as to the status of the requested policy information on Trataros.  Allied replied

that records needed to be pulled from storage, and that this may take approximately a week. (*Id.*, ¶7.)

With the impleader deadline only a short time away, Travelers and Trataros saw no other alternative but to proceed with preparing the Amended Fourth-Party Complaint asserting claims against the insurers with the best information that counsel had at the time. (Bonacci Decl., ¶ 10.) As with the original Fourth-Party Complaint, Travelers' and Trataros' allegations against the insurers are fundamentally concerned with the insurers' contingent liability including latent defect (Id. ¶10).

## LEGAL ARGUMENT

As argued in the Baer Proceedings, the notice provided by Travelers and Trataros to U.S. Fire was entirely reasonable under the total circumstances. These circumstances include, a good faith belief that the insured was not liable for the Third-Party claims alleged by DASNY (and now, alleged by DASNY/TDX), including little reason to conclude that insurance coverage existed; an insured that closed its doors at least fourteen (14) months before DASNY served its original Third-Party Complaint; the lack of employees on the insured's payroll (indeed, the lack of a payroll on the part of the insured); the need to conduct a good faith investigation of DASNY's third-party claims relating to a highly technical, fact-intensive issue where the available information was often contradictory; and the lack of information relating to coverage. Even if notice is found to have been dilatory, any purported lateness is excused by the good faith investigation undertaken by Travelers and the good faith belief in non-liability.

Likewise, the Policy exclusions invoked by U.S. Fire are not applicable to the Flooring Claims and Miscellaneous Defect claims alleged herein. At this juncture, there is no reason to conclude the claims alleged by DASNY/TDX do not satisfy the injury-in-fact requirement, or the Policy's definitions for an occurrence and property damage. Thus, Travelers and Trataros respectfully submit that U.S. Fire's Rule 12(b)(6) Motion to Dismiss should be denied in its entirety.

## I. THE THIRD-PARTY CLAIMS IMPLICATE COVERAGE UNDER THE POLICY.

### A. The Allegations Potentially Satisfy Policy Requirements for Occurrence(s), Property Damage, and the Injury/ies-in-Fact Trigger.

Under U.S. Fire's Policy, coverage exists for "property damage" caused by an "occurrence". The Policy defines an occurrence as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Rogers Dec., Exh. D,

at CGL Coverage Form, p. 12 of 13) (emphasis added). The term "occurrence" was adopted by the insurance industry in the 1960's to clarify that the scope of coverage was broader than the ordinary connotation of the word "accident," so long as the event was not intentional. See, Continental Cas. Co. v. Rapid-American Corp., 80 N.Y.2d 640, 648 (1993). And see, 16 Eric Mills Holmes, Holmes' Appelman on Insurance § 117.4, 297 (2nd Ed. 2000). To qualify as an "occurrence," the unintended event is not required to be of a sudden or violent nature. Continental Cas., 80 N.Y. at 648. In a CGL context, an accident simply "means an event which takes place without one's foresight or expectation." Black's Law Dictionary 15 (7th Ed. 1999), and see, Saks v. Nicosia Contr. Corp., 625 N.Y.S.2d 758, 759 (3d Dep't 1995).[5] To the extent the Policy's definition of "occurrence" is partially ambiguous, it should be construed against movant. Uniroyal, Inc. v. Home Ins. Co., 707 F. Supp. 1368, 1381-1382 (E.D.NY. 1988).

There is no inherent prohibition upon CGL coverage for occurrences that give rise to claims for breach of contract. To the contrary, New York law has long recognized that insurance coverage can be found for damages partially arising from breach of contract. Marine Midland Services Corp. v. Samuel Kosoff & Sons, Inc., 400 N.Y.S.2d 959, 962 (4th Dep't 1978) (when a construction product integrated into a larger system proves to be defective, it causes damage to the building as a whole). The only limitations of that nature are the specific exclusions contained in the policy itself. But see, Associated Mut. Ins. Co. v. Bader, 805 N.Y.S.2d 275, 277 (Sup. Ct., Sullivan Co. 2005) (Exclusionary provisions in insurance policies are to be construed narrowly.) Where an exclusion is not applicable, losses sounding partially in breach of contract can be covered under a CGL policy. See, e.g., Cortland Pump & Equipment Inc. v. Firemen's Insurance

---

[5] Likewise, the Policy provides an extremely broad definition of "property damage": "Physical damage to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it…. [and] Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the 'occurrence' that caused it." (Rogers Dec., Exh. D, CGL Coverage Form, p. 13 of 13.)

Co., 604 N.Y.S.2d 633 (3rd Dep't 1993). And see, 2 Jeffrey W. Stempel, Law of Insurance Contract Disputes § 14A.02[d], 14A-10.

Most relevantly, New York law recognizes that merely the installation of inherently defective construction products, **in and of itself**, constitutes an occurrence within the scope of CGL policy coverage. Maryland Cas. Co. v. W.R. Grace and Co., 23 F.3d 617, 627 (2d Cir. 1992); Marine Midland, 400 N.Y.S.2d at 962 (4th Dep't 1978). While the Maryland Casualty decision involved the installation of materials containing asbestos, its underlying justification is applicable outside that context. Indeed, the reasoning underlying Maryland Casualty's holding was that, in other contexts, "the New York Court of Appeals [has] held that incorporation of a defective product into another product inflicts property damage." Maryland Cas., 23 F.3d at 627 (citing, Sturges Mfg. Co. v. Utica Mut. Ins. Co., 37 N.Y.2d 69, 72-73 (1975), and Marine Midland, 400 N.Y.S.2d at 768-69, among others.) When a defective product "is integrated into a larger entity…, [that] is considered harm to the entity [as a whole] to the extent that the market value is reduced in excess of the value of the defective" item. Sturges, 37 N.Y.2d at 72-73.

Assuming as true the allegations of DASNY/TDX's Third-Party Complaint and the Fourth-Party Complaint, two separate, purportedly-defective products were potentially installed into the Project's epoxy terrazzo flooring system. (Rogers Dec., Exh. A, ¶ 41-51, 56-57.) This alone should be sufficient to constitute an occurrence under the Policy. Cf., Marine Midland, 400 N.Y.S.2d at 962 (Insurer required to defend insured where defective component merely caused diminution in building's monetary value). Further, as recognized by the Second Circuit, not only does installation of defective construction materials constitute an occurrence, but also such installation causes "damage-in-fact and triggers the insurance coverage in effect at that

16

time." <u>Maryland Cas.</u>, 23 F.3d at 627.  (Cf., Moving Brief, at p. 21, alleging there is no injury-in-fact to trigger coverage.)

In addition, the installation of these purportedly defective materials allegedly caused physical damage to the epoxy terrazzo flooring system, including work installed by at least one co-prime contractor other than Trataros.  (Rogers Dec., Exh. A, ¶ 60.)  By extension, physical damage was sustained by the building as a whole.  More than 20 years ago, the New York Court of Appeals recognized that coverage should be imposed under analogous circumstances.  <u>Adler & Nielson Co., Inc. v. Insurance Co. of North America</u>, 56 N.Y.2d 540, 542-3 (1982) (permitting recovery for consequential repair work following failure of subcontractor's defective work).

In <u>Adler</u>, defects in a subcontractor's work lead to a partial rupture in a building's exterior façade system, causing damage to adjacent, "other" work incorporated into the façade. <u>Adler</u>, 56 N.Y.2d at 542-3 (1982).  The <u>Adler</u> Court recognized that while a CGL policy may exclude coverage "for damage to [the insured's] ... own work product" the damage which the insured "caused ... to the work product of others" is not excluded."  <u>Id.</u>, 542.  <u>And see</u>, <u>Apache Foam Products v. Continental Ins. Co.</u>, 528 N.Y.S.2d 448, 449 (4th Dep't 1988) (gases escaping from insulation installed in roofing system caused a blistering effect that damaged the vapor barriers and roof membranes); <u>Marine Midland Services Corp. v. Samuel Kosoff & Sons, Inc.</u>, 400 N.Y.S.2d 959, 962 (4th Dep't 1978) (when a construction product integrated into a larger system proves to be defective, it causes damage to the building as a whole).  Therefore, New York courts recognize that insurance coverage may exists for consequential damages arising from a defective product incorporated into a larger system.

Although U.S. Fire focuses almost exclusively upon the Flooring Claims, nothing in the Fourth-Party Complaint limits Travelers' and Trataros' insurance coverage claim in such a

manner.  Likewise, the Policy contains no limitation which restricts available coverage to work performed by Bartec and/or Crocetti.  In both the within action and the proceedings before Judge Baer, DASNY and TDX have alleged the existence of purportedly defective construction in addition to the subject of the Flooring Claims.  Significantly, Trataros was never defaulted by DASNY under either Contract No. 15 or Contract No. 16, and no performance bond claim was made by DASNY prior to the filing of its Third-Party Complaint in the Baer Proceedings.  Thus, neither Travelers nor Trataros had reason to anticipate a claim relating to purported "other" construction defects.  Indeed, to the extent that the alleged damages associated with the Miscellaneous Defects were initially minimal, and has since escalated to $7 Million, the assertion that the notice provided in 2005 was somehow irremediably prejudicial to the movant's rights rings false.  If anything, it is DASNY and TDX's failure to provide even the slightest amplification as to the nature of the purported Miscellaneous Defects which is causing significant prejudice, not only to U.S. Fire and the carriers, but to Travelers' and Trataros' ability to defend against DASNY's and TDX's claims.

To the extent that DASNY's and TDX's allegations regarding purported Miscellaneous Defects simply have not been developed at this stage of the proceedings, it is far too early to posit (as U.S. Fire attempts to) that as a matter of law no coverage exists for those purported defects.  It cannot be contested that Trataros commenced work under Contract No. 15 and Contract No. 16 long before the expiration of U.S Fire's Policy.  (Rogers Dec., Exh. A, ¶¶ 37-38.)  (Trataros' prime contracts were awarded on April 22, 1998 and August 27, 1998, respectively.)  Further, more than 11 other prime contractors performed work on the Project, not including additional contractors for installation of telecommunications and security systems, *inter alia*.  (Id., Exh. A, ¶ 35, & Exh. H, ¶ 38-39.)  Until the particulars of the alleged

Miscellaneous Defects are made known to the Fourth-Party Plaintiffs, it is impossible to say which of Trataros subcontractors performed the particular work, whether the alleged defects caused damage to "other" property installed by other co-primes, or even when the particular part of the Project was put to its intended use. (Id., Exh. D, at CGL Coverage Form, p. 12 of 13, "Products-completed operations hazard") (providing, in pertinent part, that "your work" will be deemed completed for purposes of the policy "[w]hen that part of the work ... has been put to its intended use by any person or organization other than another contractor or subcontractor....")

Thus, U.S. Fire's contention that, among other things, no coverage can exist for the Miscellaneous Defects because no part of Trataros' work could have been "completed," within the meaning of the Policy, is pure speculation. (Moving Brief, p. 19-20.) And see, Hartford Acc. & Indem. Co. v. J.J. Wicks, Inc., 104 A.D.2d 289, 292, 482 N.Y.S.2d 935, 938 (4th Dep't 1984) (As long as the particular work has been put to its intended use, that work is "completed" within the meaning of the products-completed operations hazard, even if the balance of the contract is not otherwise fully-performed.) In light of the foregoing, Travelers and Trataros respectfully submit that U.S. Fire's motion to dismiss should be denied in its entirety.

**B.    The So-Called Faulty Workmanship Exclusions Do Not Bar Coverage.**

U.S. Fire invokes two policy exclusions which it claims exclude coverage for the property damage alleged by DASNY and TDX because those exclusions are intended to remove coverage for "faulty workmanship". While that may be the **general** intent behind these exclusions, it is equally obvious from the Policy's explicit language, and relevant authorities, that certain business risks are covered under the standard CGL policy, including the Policy at issue here. U.S. Fire broadly over generalizes when it claims that CGL coverage is never available for

"faulty" or "defective" workmanship.  See, e.g., Adler, 56 N.Y.2d at 542-3; Apache Foam Products, 528 N.Y.S.2d at 449.

The significant inquiry is not whether the work is defective, but **by whom** the defective work was performed.  Coverage for property damage arising out of a subcontractor's work on behalf of the insured is designed into the standard CGL policy.  See, French v. Assurance Co. of America, 448 F.3d 693, 701 (4th Cir. 2006) (The "subcontractor exception" was incorporated into the CGL form policy in order to extend "liability coverage ... to the insured's completed work when the damage arose out of work performed by a subcontractor.")  And see, Pozzi Window Co. v. Auto-Owners Ins., 446 F.3d 1178, 1184 (11th Cir. 2006); National Union Fire Ins. Co. of Pittsburgh, Pa. v. Structural Systems Technology, 964 F.2d 759, 763 (8th Cir. 1992).

**1.    Exclusion j(6) is Not Applicable to Bar Coverage.**

Exclusion j(6), one of the two "faulty workmanship" exclusions invoked by U.S. Fire, is expressly modified to restore coverage for property damage to work performed by a subcontractor that falls within the completed operations hazard.  This clause of the Policy provides that no coverage exists for

> "[p]roperty damage" to [t]hat particular part of <u>any</u> property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

(Emphasis added.)  This exclusion (hereinafter "Exclusion j(6)") is shortly followed by an exception which partially alleviates the strictures imposed:

> Paragraph (6) [Exclusion j(6)] ... does not apply to "property damage" included in the "products-completed operations hazard" [a term which the policies define in a separate section].

(Rogers Dec., Exh.D, CGL Coverage Form, p. "3 of 13" through "4 of 13".) [6]

The "products-completed operations hazard" defined to include "all ... 'property damage' ... arising out of 'your work' except ... [w]ork that has not yet been completed...." (Id., p. "12 of 13.")   The same clause of the Policy provides that the relevant work will be considered completed, *inter alia*, "[w]hen that part of the work ... has been put to its intended use by any person or organization other than another contractor or subcontractor...." (Id., p. "12 of 13.") The pertinent term "your work" is defined to include "[w]ork or operations performed by you or on your behalf; and [m]aterials ... furnished in connection with such work or operations." (Id., p. "13 of 13.")

Thus, if Trataros' work (or the relevant portions subject to DASNY's and/or TDX's claims) was "completed" [7] consistent with the Policy's definition, then the Policy provides coverage for "any property" that must be restored, repaired or replaced because the insured's work "was incorrectly performed on it". (Id., Exclusion j(6), p. "3 of 13.")

Exclusion j(6) must be read together with a subsequent exclusion, lettered as sub-paragraph l, to the extent of property damage to the contractor's self-performed work:

> l.   Damage to Your Work
>
> This insurance does not apply to "[p]roperty damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".
>
> This exclusion does **not** apply if the damaged work or the work out of which the damage arises **was performed on your behalf by a subcontractor**.

---

[6]  The structure of this exclusion is common to the CGL policies.  "The 1986 ISO CGL Policies ... are structured such that express exclusions ... limit an initial grant of coverage.  Then exceptions to [the] exclusions ... restore otherwise excluded coverage." French, 448 F.3d at 706.

[7] "[C]ompleted-operations insurance covers the risk of loss for ... property damage that arises out of the insured's operations, if those losses occur after the operations have been completed and away from the insured's premises." Frontier Insulation Contractors v. Merchants Mut. Ins. Co., 91 N.Y.2d 169, 176 (1997).

(Id., Exh. D, CGL Coverage Form, p. "4 of 13") (emphasis added).  Thus, this exclusion (hereinafter, the "Your Work Exclusion") contains a specific exemption for property damage sustained by work performed by the Trataros' subcontractors.  The subcontractor exception contemplates that even property damage arising out of the subcontractor's work itself, or any part of it, will be reimbursable.  See, American Family Mut. Ins. Co. v. American Girl, Inc., 673 N.W.2d 65, 81-84 (Wis. 2004) (Due to applicability of the product-completed operations hazard and the subcontractor exception, Exclusion j(6) did not exclude recovery for costs of repair/replacement of property damaged as result of subcontractor's defective work.)

Therefore, any work performed by a Trataros subcontractor which is the subject of DASNY's and/or TDX's third-party allegations and/or counterclaims potentially falls within the coverage provided by the Policy.  For example, the work relative to the Flooring Claims was not self-performed by Trataros, but was performed by Trataros' subcontractors, Crocetti and Bartec. (Rogers Dec., Exh. A, ¶¶ 39-41, 46-49.)  Therefore, coverage potentially exists under the Policy for the Flooring Claims as a result of the pertinent exceptions to Exclusion j(6).  Given the lack of specifics pleaded by DASNY and TDX regarding the alleged Miscellaneous Defects, there is no colorable basis to conclude that coverage cannot exist.  Exclusion j(5) is similarly unavailing.

### 2.    Exclusion j(5) is Not Applicable to Bar Coverage.

The second so-called "Faulty Workmanship" exclusion relied upon by U.S. Fire ("Exclusion j(5)") provides that coverage is not available for

> "[p]roperty damage" to [t]hat particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf **are performing operations**, if the "property damage" arises out of those operations.

(Emphasis added.)

Exclusion j(5) only applies to property damage which occurs <u>before</u> the insured's work is completed, that is, damage which occurs while "operations" are still being performed.  9A Couch on Ins. § 129.20.  "Both of these exclusions [Exclusion j(5) and Exclusion j(6)] are "limited in their application by both time and scope."  <u>Id</u>.  Any other construction would render significant portions of the policy nugatory, including the exception to Exclusion j(6) and the subcontractor exception to the "Your Work" Exclusion.  So long as the work is put to its intended use, even if this is "before the operations to be performed by the insured have been completed under the first two definitions" provided in the products-completed operations hazard, then the particular item "is considered complete under the intended use definition."  <u>Hartford Acc. & Indem. Co. v. J.J. Wicks, Inc.</u>, 104 A.D.2d 289, 292, 482 N.Y.S.2d 935, 938 (4th Dep't 1984).  "The other two definitions of completed operations do not have to be satisfied…."  <u>Id</u>. (<u>And</u> <u>see</u>, Rogers Dec., Exh. D, CGL Coverage Form, p. 12 of 13, "Products-completed operations hazard") (emphasis added).  If one of the disjunctive definitions of completed operations has been reached, Exclusions j(5) and j(6) are no longer applicable to exclude coverage for the property damage.

Given the inapplicability of the "Faulty Workmanship" exclusions invoked by U.S. Fire, and that the allegations of the Fourth-Party Complaint and Third-Party Complaint support theories under which the Policy may provide coverage, Travelers and Trataros submit that dismissal would be improper.  Assuming that DASNY and TDX meet their burdens of proof, the fourth-party pass-through claims potentially satisfy the Policy's requirements for property damage, occurrence(s), and injury/ies-in-fact.  In light of the potential coverage for the claims asserted against Travelers and Trataros by the Third-Party Plaintiffs, it is respectfully submitted that dismissal of the Fourth-Party Complaint would be premature and prejudicial to the rights of indemnity of Travelers and Trataros.

## II. COVERAGE FOR DASNY/TDX'S THIRD-PARTY CLAIMS IS NOT BARRED BY THE POLICY'S NOTICE PROVISIONS.

### A.    Travelers and Trataros Provided Reasonable Notice to the Carriers

U.S. Fire dramatically overstates the obligations imposed upon Travelers and Trataros by the Policy's notice requirements.  Requirements to provide notice "as soon as practicable" are construed as merely requiring that notice be given within a reasonable time under all the circumstances.  Security Mutual Ins. Co. v. Acker-Fitzsimmons Corp., 31 N.Y.2d 436, 441 (1972).  Notice requirements contained in insurance policies "are to be liberally construed in favor of the insured."  Morris Park v. National Union Fire Ins. Co. of Pittsburgh, Pa., 822 N.Y.S.2d 616, 618 (2d Dep't 2006).  In that light, courts have ruled that "as soon as practicable" does **not** "connote an ironbound requirement that notice be 'immediate' or even 'prompt', relative as even those concepts are."  Mighty Midgets, Inc. v. Centennial Ins. Co., 47 N.Y. 2d 12, 19 (1979).  "[T]here is no inflexible test of reasonableness" for notice, rather, the question is "heavily dependent on the factual contexts in which [it] arises...."  Id.

> [T]he phrase "as soon as practicable" is an elastic one, not to be defined in a vacuum.... [C]ompliance ... [is not] measured simply by how long it was before written notification came forth.  More crucial [is] the reason it took the time it did....  [T]he provision ... call[s] for a determination of what was reasonable.

Id.

As Travelers and Trataros have stated previously, under all the facts and circumstances of this case, the notice provided to the insurance carriers was entirely reasonable.  The passage of time alone is not sufficient to make a delay in providing notice unreasonable.  Lauritano v. American Fid. Fire Ins. Co., 162 N.Y.S.2d 530, 557, 3 A.D.2d 564, 568 (1st Dep't 1957).  "Promptness is relative and measured by circumstance."  Id.

Good faith efforts to investigate a claim and obtain necessary insurance information are considered when making a determination whether the notice was reasonable. See, U.S. Underwriters Ins. Co. v. Falcon Constr. Corp., 2003 WL 22019429 (S.D.N.Y. Aug. 27, 2003) (Investigation over the course of 12 months prior to transmitting notice to insurer was reasonable where additional insured's investigation was conducted in good faith). As noted in the Baer Proceedings, as Trataros' attorney-in-fact and on its own behalf, Travelers had to undertake extensive investigation of the third-party claims asserted by DASNY, and the potential liabilities to Travelers and/or Trataros in connection with those claims.

Indeed, contrary to U.S. Fire's unsupported assertion that "this is not a case where Trataros had a good faith belief of non-liability," the facts are exactly the opposite, as supported by the documentary evidence and discussed below. It should be noted that the Fourth-Party Plaintiffs possessed a good faith belief that Trataros was not potentially liable for the Flooring Claims.

If the concepts of reasonableness and "practicability" are to have any meaning at all, then surely they will accommodate circumstances where the initial "occurrence" has been apparently corrected and attributed to entirely different causal events; the insured subsequently ceased business operations and dismissed all its employees; and the insured's subrogee had no knowledge of the initial occurrence, no reason to anticipate that the project owner intended to assert an adverse claim concerning the alleged defects, no reason to suspect that coverage for any such claim existed, and no information concerning the identities of the various carriers. Under all the circumstances, the notice provided was reasonable and within the policies' respective requirements.

**B.    Travelers' and Trataros' Good Faith Belief in Non-liability and Non-Coverage Excuses Any Alleged Late Notice**

In addition, Travelers and Trataros possessed good faith, reasonable beliefs that no coverage existed under the applicable policy provisions and that Trataros was not liable for the flooring delamination. These beliefs of non-coverage and non-liability were predicated upon Trataros' initial investigation of the delamination problems.

New York has "adopt[ed] … a broad doctrine of reasonable excuse for noncompliance" in order to permit "scrutiny of the seriousness of the noncompliance and all the surrounding circumstances." Kason v. City of New York, 373 N.Y.S.2d 456, 460 (Sup. Ct., N.Y. Co. 1975). When an excuse or explanation is offered for delay in furnishing notice, the reasonableness of the delay and the sufficiency of the excuse are matters to be determined at trial. Travelers Ins. Co. v. Volmar Constr. Co., Inc., 752 N.Y.S.2d 286, 288, 300 A.D.2d 40, 42 (1st Dep't 2002).

For example, an insured's good faith belief in non-liability may excuse a delay in notifying an insurer of an occurrence or potential claim, when the insured's belief is reasonable under all the circumstances. Security Mutual, 31 N.Y.2d at 441. Likewise, a good faith belief that coverage for an occurrence does not exist under a policy may excuse late notice. Reynolds Metal Co. v. Aetna Cas. & Sur. Co., 696 N.Y.S.2d 563, 567 (3d Dep't 1999).

In Reynolds, the plaintiff/insured testified that, based on "his reading of the 'owned property' exclusions contained in [his] … policies, he did not believe there was any insurance coverage…. The claims manual of Travelers and also the deposition testimony of their claims handlers lend support to that belief." Id. The court held that this was sufficient to raise a material question of fact as to whether the plaintiff had held a good faith belief in non-coverage. Id., 567-568.

The floor-leveling work which Trataros subcontracted to Bartec was not initially part of Trataros' work under Contract No. 16. Rather, this work was added to Contract No. 16, by

DASNY, via a change order during the Project's construction phase, as a result of unanticipated irregularities in the slab concrete installed by another prime contractor. In response to the concrete irregularities, he Project's architect, KPF, directed that "flash patch material" was to be used to level the floor slabs in preparation for installation of the epoxy terrazzo. Following receipt of a Trataros' proposal for this additional work, it is explicitly stated that Trataros will "[n]ot [be] responsible for concrete delamination." This proposal, including the exclusion for liability associated with delamination, was incorporated into the change order eventually issued by TDX and/or DASNY. Thus, neither Travelers nor Trataros had any reason to believe they faced potential liability for the Flooring Claims.

### C.    Fact Questions Are Not Proper for Resolution Under the 12(b)(6) Standard.

U.S. Fire's defenses are not ripe for disposition at this stage of the proceedings because the grounds for its motion are extremely fact-intensive, and therefore inappropriate for disposition under the standards applicable to a Rule 12(b)(6) motion. Motions under Rule 12(b)(6) are intended to evaluate the sufficiency of the challenged pleading only. Cooper v. Parsky, 140 F.3d 433, 440 (2d Cir. 1998) ("The task of the court in ruling on a Rule 12(b)(6) motion is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.")

In general, fact-intensive analyses are not properly resolved on a motion to dismiss. See, DiBlasio v. Novello, 344 F.3d 292, (2d Cir. 2003) ("[A] disputed issue of fact … is inappropriate to consider in the context of a Rule 12(b)(6) motion.") And, Merck & Co., Inc. v. Mediplan Health Consulting, Inc., 425 F. Supp. 2d 402, 412 (SDNY 2006) (declining to delve into fact-intensive inquiry on a 12(b)(6) motion, in context of trademark infringement action.) A motion court should not endeavor to make factual findings and legal conclusions without benefit of a full

factual record. <u>Merck</u>, 425 F. Supp. 2d at 412.    Where the record has not been sufficiently developed with respect to the movant's grounds for dismissal, the plaintiff should be allowed to conduct further discovery on the issue. <u>Ryan, Beck & Co. v. Fakih</u>, 268 F. Supp. 210, 230 (EDNY 2003) (declining to dismiss complaint due to purported absence of successor liability).

Specifically, reasonableness of notice under the Policy is a factually intensive matter that is inappropriate for resolution at this stage of the proceedings.    The Policy's notice provisions state that notice of an occurrence must be provided "as soon as practicable," and notice of an action must be provided "immediately." (Rogers Dec., Exh. D, at "CGL Coverage Form" p. "8 of 13.")  As noted above, despite the categorical tenor of the quoted language, such requirements are construed as merely requiring that notice be given within a reasonable time under all the circumstances.    <u>Security Mutual Ins. Co. v. Acker-Fitzsimmons Corp.</u>, 31 N.Y.2d 436, 441 (1972); and [need case for "immediately"]  In that regard, the New York Court of Appeals has noted that reasonableness of notice is "heavily dependent on the factual contexts in which [it] arises...." <u>Mighty Midgets</u>, 47 N.Y. 2d at 19.  Given the factual matters adduced by Travelers and Trataros with respect to the reasonableness of notice provided, we respectfully submit that US Fire's Motion to Dismiss is not appropriate for disposition, and therefore should be denied.

## CONCLUSION

For the foregoing reasons, and those adduced in the opposing declaration submitted herewith, Travelers and Trataros respectfully request that the Court deny U.S. Fire's Motion to Dismiss in its entirety.

Dated:      Florham Park, New Jersey          Respectfully submitted,
            March 10, 2008                    **DREIFUSS BONACCI & PARKER, LLP**


            By:      _____/S/_____
                     Eli J. Rogers (ER:6564)