# EXHIBIT

# 3

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------------

TRAVELERS CASUALTY AND SURETY COMPANY as

Administrator for RELIANCE INSURANCE

COMPANY,

                         Plaintiff,

           -against-

DORMITORY AUTHORITY-STATE OF NEW YORK, TDX

CONSTRUCTION CORP. and KOHN PEDERSEN FOX

ASSOCIATES, P.C.,

                         Defendants.

Case No. 08-CV-6915 (DLC)


              (CAPTION CONTINUED)

------------------------------------------


                    May 21, 2008

                    10:13 a.m.


         DEPOSITION of CHARLES BARTLETT,

taken by Plaintiff, pursuant to Notice,

held at the offices of DORMITORY AUTHORITY

OF THE STATE OF NEW YORK, One Pennsylvania

Plaza, New York, New York before Wayne

Hock, a Notary Public of the State of New

York.

146

C. Bartlett

1

2 understanding is they did direct Crocetti

3 through Trataros to work overtime.  That

4 may have been a function of the fact that

5 Crocetti didn't provide sufficient

6 staffing.

7      Q.    Now, Mr. Bartlett, since you

8 weren't there at that project time when

9 the work was actually ongoing, where does

10 your understanding come from?

11      A.    Meeting minutes and

12 correspondence as well as claim-related

13 documents.

14           MS. SMITH: As well as?

15           THE WITNESS:  Claim-related

16      documents.

17      Q.    What are you referring to when

18 you speak to claim-related documents?

19      A.    Correspondence from Crocetti to

20 Trataros to the Authority relative to

21 Crocetti's claim and correspondence from

22 Trataros to the Authority relative to

23 Crocetti's claim.

24      Q.    When you refer to Crocetti's

25 claim, can you be more specific for me.

147

C. Bartlett

1

2       A.      Yes.

3               Crocetti submitted a claim to

4  Trataros alleging damages associated with

5  productivity as well as labor and material

6  escalation and extended supervision.  It

7  was -- they alleged they were delayed in

8  starting the project for a year and, for

9  that, labor and material escalated and

10 they were not able to find sufficient

11 staffing to do the work.

12      Q.      And that claim was submitted to

13 DASNY?

14      A.      Ultimately, yes.  First to

15 Trataros.  Trataros then applied their

16 markups and submitted to DASNY.

17      Q.      Do you know at what point in

18 time that was done?

19      A.      I know some of the dates.  The

20 original letter from Crocetti to Trataros

21 was September 27, 2001.  I believe

22 Trataros submitted its letter to DASNY in

23 October of 2001.  I believe those are

24 roughly the time frames.

25      Q.      And was that claim addressed by

148

1                    C. Bartlett

2    DASNY?

3        A.    Could you be more specific in

4    terms of addressed?

5        Q.    What did DASNY do with the

6    claim?

7        A.    We agreed to pay the escalation

8    at that time and afforded $150,000 for

9    that purpose.  We agreed that we would

10   negotiate the claims as it went to

11   productivity at the end of the project.

12   And initially we said we wanted to address

13   Trataros' claim in its entirety.

14   Ultimately we negotiated claim settlements

15   or attempted to negotiate claim

16   settlements directly with some of the

17   subcontractors.

18       Q.    Was that done with Crocetti?

19       A.    Yes.

20       Q.    And what did you negotiate with

21   them?

22       A.    I believe the overall claim

23   settlement was on the order of $250,000.

24   When the $150,000 advance payment is taken

25   away from that, the proposed final

231

                    C. Bartlett
1
2  haven't seen that?
3      A.    I don't recall it.
4      Q.    And it wouldn't be the normal
5  procedure if you had?
6      A.    No, and I'm not sure -- well,
7  are you sure DASNY redacted it?
8          MR. SHAPIRO: If you don't know,
9      you don't know.
10         THE WITNESS:  I don't know.
11         MR. SHAPIRO: If she's got to
12     document that shows something's been
13     redacted, you can comment.
14     Q.    I'm going to show you what's
15  been marked as Exhibit 6, T6, and ask you
16  to take a look at it.
17         MS. BONACCI: To identify it for
18     the record, it's specification 03301
19     and it's entitled Cast-in-Place
20     Concrete Superstructure and Slab on
21     Grade.
22     Q.    Mr. Bartlett, have you seen that
23  specification section?
24     A.    Yes.
25     Q.    Can you tell me which prime

232

C. Bartlett

 1

 2    contract this specification section fell

 3    within?

 4        A.    I believe this is Shroid.

 5        Q.    Was Shroid's prime contract in

 6    connection with Baruch contract nine?

 7        A.    I'm not sure the contract

 8    number, but it was certainly for Baruch

 9    site B.

10        Q.    Can you tell me if this

11    specification section contains a section

12    regarding flash patching?

13        A.    I don't see a section on flash

14    patching.

15            MR. SHAPIRO: Maybe she can point

16        you to the specific provision.  If you

17        want, I can help.  It's 3.09.  It's

18        Bates reference 284369.

19        A.    3.09 isn't what I would describe

20    as flash patching.  This is for patching

21    and repair of defective concrete, so I

22    don't see anything on flash patching.

23        Q.    So you would not consider 3.09

24    to be flash patching; correct?

25        A.    No.

250

1                    C. Bartlett

2    paper before but I've certainly seen this

3    product information before.

4         Q.      When you say, "this particular

5    piece of paper," do you mean this one that

6    happens to be Bates stamped or the actual

7    technical date that sheet that you're

8    looking at?

9         A.      I mean the one that went to TDX

10   apparently -- this doesn't look like the

11   one that was with the approved submittal

12   but I think it's identical.

13        Q.      Can you tell me, from looking at

14   the exhibit that's been marked as T8, if

15   the product data is consistent with the

16   composition of the specified underlayment

17   in what I just showed you was marked as

18   Exhibit T7?

19             MR. SHAPIRO: Can we have T7

20        back?

21        Q.      Here's T7 (handing).

22        A.      (Reviewing).

23             It's not completely responsive

24   to all the requirements that are listed in

25   T7.  For instance, in T7 it says that the

VERITEXT REPORTING COMPANY

212-267-6868                          516-608-2400

251

                    C. Bartlett

1
2   filler is natural sand.  I'm not sure this
3   says anywhere here that the filler is
4   natural sand.  But it does say that it's a
5   Portland cement-based material, the bond
6   strength is consistent with the
7   requirement, the compressive strength is
8   consistent with the requirements, the
9   additives are open so the fact that it's
10  polymer modified is fine.  So the only
11  thing that I see that would -- that's not
12  addressed by this is the sand is a filler.
13  I have seen the MSDS from this material
14  for this period that said that sand is the
15  filler.
16      Q.    Based on looking at the Conflow
17  technical data, is Conflow's compressive
18  strength consistent with the specification
19  requirement in T7?
20      A.    Yes.
21      Q.    And what about the sheer
22  strength?
23      A.    It doesn't specify sheer
24  strength, unless I'm missing something.
25  It has bond strength.  And then we have

252

C. Bartlett

1

2   bond strength -- the specified is one

3   hundred fifty to two hundred PSI.  The

4   bond strength on the data sheet is two

5   hundred PSI.  And I take that to mean

6   tension, not sheer.

7       Q.    Do you have any knowledge as to

8   how they compare in terms of performance?

9           MR. SHAPIRO: Objection to form.

10          You can answer it if you

11      understand it.

12      A.    How what compares in terms of

13  performance?

14      Q.    Do you have any knowledge how

15  Conflow with the technical data sheet and

16  the application properties that are listed

17  on it would compare with the products that

18  the architect originally had contained in

19  the specification sheet?

20      A.    I really can't speak to that.

21  The material that was supplied wasn't

22  consistent with this data sheet.

23      Q.    Without that, without looking at

24  what was supplied that you believe may not

25  have been consistent to it, do you have --

253

C. Bartlett

1

2      A.      So if Conflow showed up that was

3  consistent with what they advertised,

4  would it compare well with this; is that

5  the question?

6      Q.      Yes.

7      A.      Yes.

8      Q.      And do you have any knowledge

9  with how Conflow compares with the

10  cementitious floor leveling products that

11  were specified in connection with cost?

12          MS. SMITH: With cost?

13      A.      The only Conflow I can speak to

14  -- again, I just want to be clear.  The

15  Conflow that was delivered didn't meet

16  these specifications.  So if we're

17  speaking to a fictitious material that

18  would have met these specifications and

19  how it compares, I can't say.

20      Q.      Pricing, cost.

21      A.      Oh, I don't know, I don't know

22  how it compares to the cost of the two

23  materials.

24      Q.      So you have no idea whether it's

25  an equal cost as what was originally

307

CERTIFICATION BY REPORTER

1

2

3

4    I, Wayne Hock, a Notary Public of the

5    State of New York, do hereby certify:

6    That the testimony in the within

7    proceeding was held before me at the

8    aforesaid time and place;

9    That said witness was duly sworn

10   before the commencement of the testimony,

11   and that the testimony was taken

12   stenographically by me, then transcribed

13   under my supervision, and that the within

14   transcript is a true record of the

15   testimony of said witness.

16   I further certify that I am not

17   related to any of the parties to this

18   action by blood or marriage, that I am not

19   interested directly or indirectly in the

20   matter in controversy, nor am I in the

21   employ of any of the counsel.

22   IN WITNESS WHEREOF, I have hereunto

23   set my hand this _27th_ day of _MAY_

24   , 2008.

25   _____Wayne Hock_____

309

1

2  UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

3  ------------------------------------------
4  TRAVELERS CASUALTY AND SURETY COMPANY as

Administrator for RELIANCE INSURANCE

5  COMPANY,

6                          Plaintiff,

7        -against-

8  DORMITORY AUTHORITY-STATE OF NEW YORK, TDX

CONSTRUCTION CORP. and KOHN PEDERSEN FOX

9  ASSOCIATES, P.C.,

10                         Defendants.

11 Case No. 08-CV-6915 (DLC)

12

           (CAPTION CONTINUED)

13 ------------------------------------------
14

                     May 22, 2008

15                   10:13 a.m.

16

17        CONTINUED DEPOSITION of CHARLES

18 BARTLETT, taken by Plaintiff, pursuant to

19 Notice, held at the offices of DORMITORY

20 AUTHORITY OF THE STATE OF NEW YORK, One

21 Pennsylvania Plaza, New York, New York

22 before Wayne Hock, a Notary Public of the

23 State of New York.

24

25

382

                    C. Bartlett

1

2   taken against Shroid in connection with

3   the understrength of the concrete?

4              MR. SHAPIRO: Objection.

5              You can answer.

6   A.    No.

7   Q.    I'm going it to show you what's

8   been marked as T29.

9              MS. BONACCI: Just to identify it

10      for the record, it's a change order

11      marked GC2-028.

12  A.    (Reviewing).

13        Okay.

14  Q.    Mr. Bartlett, have you seen the

15  document that's been marked as T29 prior

16  to today?

17  A.    Yes.  However, it may not be the

18  same document.  I may have seen the fully

19  executed document.

20  Q.    That's exactly what I was about

21  to ask you.

22        Did DASNY execute this change

23  order?

24  A.    Yes.

25  Q.    Do you know who executed on

387

1                    C. Bartlett

2    DASNY could not instruct Trataros to

3    proceed with floor leveling?

4              MR. SHAPIRO: Objection.

5              You can answer.

6        A.    Yes, there was a water intrusion

7    -- yes, I believe so.  There was a water

8    intrusion problem in the basement that was

9    ultimately addressed with an interior

10   water collection system.  So perhaps

11   that's the reason the two work items were

12   broken out separately.

13       Q.    And do you have any reason to

14   believe that ultimately underlayment was

15   not installed from the second floor down

16   through the basement levels?

17       A.    No.

18       Q.    If you look at the description

19   of work on the first page, what was the

20   self-leveling floor fill that's specified,

21   if you know?

22       A.    As evidenced by the attached

23   reference documents, starting at Bates

24   stamp 150207, the material would be

25   Conflow.

388

C. Bartlett

1

2    Q.    And do you know if that was the

3    product that was ultimately installed?

4    A.    A product labeled Conflow that

5    was not consistent with these

6    specifications was installed.  If you're

7    asking me if the product specified here

8    was installed, it was not.

9    Q.    A product entitled Conflow, you

10   have an understanding that was installed?

11   A.    Yes.

12   Q.    Correct, that's what I'm asking.

13        Do you know who decided the

14   ordering of the floors that would be

15   leveled?

16        MR. SHAPIRO: Objection.

17        You can answer if you

18   understand.

19   A.    No, I do not.

20   Q.    And do you have any reason to

21   believe that TDX did that?

22   A.    They could have but nothing

23   specific.

24   Q.    I'm going to ask you to look at,

25   within the change order, the Bates number

428

C. Bartlett

1    C. Bartlett

2    Conspec visited the site. Whether or not

3    there was still a concern that Conflow was

4    not an adequate material I can't say.

5    Q.    The revision of the material, is

6    it solely in the food court server area?

7    MR. SHAPIRO: Objection to form.

8    You can answer.

9    A.    In terms of areas that received

10   terrazzo, to the best of my knowledge,

11   yes, other than at one point there were

12   bags of a product called Levelayer 1

13   delivered to the project and the -- I

14   believe Crocetti or perhaps Bartec

15   questioned the manufacturer as to what

16   that product was and there is a letter

17   from Conspec saying that product from

18   Dayton superior is identical to Conflow.

19   Q.    At the time period you're

20   looking at wasn't it DASNY's conclusion

21   that any of the issues were caused by

22   contamination, issues relating to

23   delamination?

24   A.    The manufacturer's determination

25   was that an area of the Conflow appeared

429

                        C. Bartlett

 1
 2    to be contaminated and, as a remedial

 3    measure, directed that that be taken out

 4    and repoured.

 5        Q.    You have referenced adequacy of

 6    the product in response to this at this

 7    time frame and I wanted to clarify that.

 8            MR. SHAPIRO: Is your question

 9        does he question the adequacy of the

10        product; is that the clarification

11        you're asking him for?

12            MS. BONACCI: No, he clarified

13        it.  He had stated that and I wanted

14        it clarified, so he just clarified it.

15        Q.    Is hydraulic cement more

16    expensive than self-leveling underlayment?

17        A.    Hydraulic cement can be

18    self-leveling underlayment.

19            MS. BONACCI: Let me clarify that

20        question then.

21        Q.    Is hydraulic cement more

22    expensive than Conflow?

23        A.    Well, Conflow, per the product

24    literature, is a hydraulic cement.

25    Whether the material that Crocetti was

566

1

### CERTIFICATION BY REPORTER

3

4       I, Wayne Hock, a Notary Public of the

5   State of New York, do hereby certify:

6       That the testimony in the within

7   proceeding was held before me at the

8   aforesaid time and place;

9       That said witness was duly sworn

10  before the commencement of the testimony,

11  and that the testimony was taken

12  stenographically by me, then transcribed

13  under my supervision, and that the within

14  transcript is a true record of the

15  testimony of said witness.

16      I further certify that I am not

17  related to any of the parties to this

18  action by blood or marriage, that I am not

19  interested directly or indirectly in the

20  matter in controversy, nor am I in the

21  employ of any of the counsel.

22      IN WITNESS WHEREOF, I have hereunto

23  set my hand this    *27/5*    day of    *MAY*

24  , 2008.

25  _____

VERITEXT REPORTING COMPANY

212-267-6868                              516-608-2400

568

1

2    UNITED STATES DISTRICT COURT

     SOUTHERN DISTRICT OF NEW YORK

3    ----------------------------------------------
4    TRAVELERS CASUALTY AND SURETY COMPANY as

     Administrator for RELIANCE INSURANCE

5    COMPANY,

6                              Plaintiff,

7              -against-

8    DORMITORY AUTHORITY-STATE OF NEW YORK, TDX

     CONSTRUCTION CORP. and KOHN PEDERSEN FOX

9    ASSOCIATES, P.C.,

10                            Defendants.

11   Case No. 08-CV-6915 (DLC)

12

                  (CAPTION CONTINUED)

13   ----------------------------------------------
14

                         July 2, 2008

15                       10:17 a.m.

16

17           CONTINUED DEPOSITION of CHARLES

18   BARTLETT, taken by Plaintiff, pursuant to

19   Notice, held at the offices of HOLLAND &

20   KNIGHT LLP, 195 Broadway, New York, New

21   York before Wayne Hock, a Notary Public of

22   the State of New York.

23

24

25

577

                    C. Bartlett

1

2        A.      Yes.

3        Q.      As far as you are aware, has the

4    school been in operation continuously

5    since it opened?

6        A.      To the best of my knowledge,

7    yes.

8        Q.      And when you went to the school

9    the day before your deposition started --

10             MR. ZICHELLO: Withdrawn.

11       Q.      That's a multistory building?

12       A.      Correct.

13       Q.      Is floor number fourteen the

14   highest floor that has any terrazzo on it?

15       A.      Yes.

16       Q.      When you were at the Baruch

17   building the day before your deposition

18   started, did you examine any of the

19   terrazzo on the fourteenth floor?

20       A.      Yes.

21       Q.      And what did you observe?

22       A.      I observed the condition that's

23   present throughout much of the building,

24   or I believe I observed the condition,

25   where the terrazzo had pulled back from

578

                    C. Bartlett

1

2   the zinc strips.

3       Q.      Anything else?

4       A.      Not that I recall at this time.

5       Q.      The terrazzo flooring is divided

6   into panels?

7       A.      Yes.

8       Q.      What is the approximate size of

9   the panels on the fourteenth floor?

10      A.      I believe -- and again, this may

11  not be completely accurate -- but I

12  believe they're two feet by four feet.

13      Q.      And approximately how many

14  instances, how many panels did you see

15  where you say you saw the edge of the

16  terrazzo pulled back from the divider

17  strips?

18          MR. PLATEK: Throughout the

19      building or just on the fourteenth

20      floor?

21          MR. ZICHELLO: We're on the

22      fourteenth floor at this point.

23      A.      I didn't keep any record of

24  that. As I recall, I saw several

25  instances of that condition but I didn't

579

C. Bartlett

2  take any note of how many I observed.

3  Certainly I didn't survey the entire

4  floor.

5      Q.    What's your best recollection

6  approximately; was it every two, was it

7  every panel, was it half of them?

8      A.    I would say a number of them.  I

9  wouldn't want to put a number to it.  I

10 don't exactly remember.

11     Q.    You can't do any better than

12 that?

13     A.    No.

14     Q.    Did you examine each and every

15 floor from thirteen down to let's say the

16 third floor?

17     A.    No.

18     Q.    Which floors did you examine and

19 which did you not examine?

20     A.    I went to one of the basement

21 levels --

22     Q.    Excuse me, my question is only

23 down to the third floor at this point.

24         Is that clear to you?

25     A.    So your question is between

580

1              C. Bartlett

2    three and thirteen?

3        Q.    Between three and thirteen,

4    which did you look at and which did you

5    not look at?

6        A.    As I recall, we walked from

7    three to eight and then went to maybe

8    twelve and fourteen.

9        Q.    And what can you tell us you saw

10   on twelve?

11       A.    Again, I don't recall the

12   specific instances of each floor.  What I

13   did observe is that, on virtually every

14   floor, there seemed to be evidence of the

15   terrazzo panels having shrunk and pulled

16   back from the zinc strips.  In some cases,

17   it was much worse and the floor was

18   actively failing.  In other cases, the

19   terrazzo was still bonded but it appeared

20   to have pulled back.

21           MR. PLATEK: I move to strike

22      that answer as nonresponsive.

23       Q.    You say every floor.

24           You didn't look at every floor;

25   isn't that what you've told us?

581

1                    C. Bartlett

2        A.      That's correct.

3        Q.      So you're only speaking to the

4    floors you've looked at?

5        A.      Correct.

6        Q.      The floors you did not look at,

7    is there some reason you did not go to

8    those floors?

9        A.      Just in the interest of time.  I

10   was wanting to get a general look at the

11   building.

12       Q.      Have you finished your answer?

13       A.      Yes.

14       Q.      Now, on the twelfth floor, can

15   you give us an approximation of how many

16   instances you say you saw where the

17   terrazzo had separated from the divider

18   strips?

19       A.      No.  Again, there were several

20   areas.  We have retained an expert who's

21   performed a detailed survey.  They would

22   be better prepared to answer that

23   question.

24       Q.      Was this expert with you on that

25   occasion?

582

C. Bartlett

1

2      A.      No.

3      Q.      Is it Mr. or Ms. Raut?

4      A.      Mister.

5      Q.      Did Mr. Raut point out anything

6    to you on the fourteenth floor?

7      A.      Not that I recall.

8      Q.      And other than what you've

9    described so far, did you see any other

10   terrazzo on the twelfth floor that looked

11   unsatisfactory to you?

12     A.      Not that I recall specifically,

13   no.  As I say, I saw there was failing

14   terrazzo on a number of floors.  I don't

15   recollect the exact location.  I saw the

16   panels having pulled back from the strips

17   on virtually every floor I inspected, but

18   I didn't take any records as to how many

19   instances.  In general, it was a

20   qualitative review on my part, not

21   quantitative.

22     Q.      And what do you mean by actively

23   failing?

24     A.      Where the terrazzo had actually

25   separated from the underlayment and was

583

1                    C. Bartlett

2   curling up at the corners.

3       Q.    And you saw that on the twelfth

4   floor?

5       A.    I didn't say that.  I said I

6   didn't recall exactly where -- maybe I

7   just need to clarify.

8            I don't remember precisely which

9   floors I observed that condition on other

10  than the first floor lobby where there was

11  quite a bit of failed terrazzo.

12      Q.    So your best recollection today

13  is on the twelfth floor you say you saw

14  this condition where the terrazzo had

15  separated from the divider strips; is that

16  an accurate statement?

17      A.    Correct.

18      Q.    What about the other floors from

19  three -- was it three to eight?

20      A.    Yes.

21      Q.    Tell us what you saw on those

22  floors that looked to you unsatisfactory.

23            MR. FROESSEL: I object to the

24      form.

25            You can answer.

584

C. Bartlett

A.    In some cases, the terrazzo had actively failed -- and again, I don't recollect exactly on what floors the terrazzo had separated -- but on virtually all of the floors I inspected, there appeared to be evidence of the terrazzo having separated from the zinc strips.

Q.    Any other condition that you saw on floors three to eight on that occasion?

A.    There was some alligatoring of the finish.  There appeared to be some cases where the colored chips in the terrazzo were not evenly distributed or there didn't seem to be any color chips, but there was not a lot of that.

Q.    Any other conditions that you saw on floors three to eight that you regard as unsatisfactory?

A.    Not that I recall, no.

Q.    Did you -- now, again, by active failing, you mean curling up as opposed to merely separating; is that what you're telling us?

A.    Yes.

587

C. Bartlett

1

2  second floor that you regarded as

3  unsatisfactory terrazzo?

4      A.    Areas where the terrazzo had

5  begun to fail and also areas where the

6  panels had pulled back from the zinc

7  strips and also raised edges, that's

8  really where it's failing.

9      Q.    When you say begun to fail and

10 also where it pulled back from the zinc

11 strips, what do you mean by begun to fail

12 as opposed to pulling back from the zinc

13 strips?

14     A.    Where it's beginning to fail,

15 it's actually separated from the

16 underlayment; it sounds hollow.  Sometimes

17 you can step on a panel and it will move

18 up and down is what I mean by begun to

19 fail.

20     Q.    So on the second floor -- did

21 you see any alligatoring on the second

22 floor?

23     A.    I may have.

24     Q.    And you saw instances on the

25 second floor where you say the terrazzo

605

C. Bartlett

1

2  preparation of their cost estimate.

3       Q.      When you say your expert, you

4  don't mean TDX; do you?

5       A.      No, I mean Simpson Gumpertz and

6  Heger.

7       Q.      Were Simpson Gumpertz and Heger

8  retained at the time TDX presented this

9  document, the TDX estimate, August of '03?

10      A.      No.

11      Q.      As of August of '03 when TDX

12  typed up this estimate, as far as you

13  know, was there any backup material

14  prepared or compiled; surveys, takeoffs,

15  union costs, any of the things you

16  mentioned, did they exist as of the TDX

17  August of '03 survey?

18      A.      I can't say.

19      Q.      Who would you ask if you wanted

20  to find out?

21      A.      TDX.

22      Q.      Has the Dormitory Authority

23  spent any money to repair or replace

24  terrazzo as of today?

25      A.      No.

606

C. Bartlett

MR. FROESSEL: Objection to form.

You can answer.

Q.    Has the Dormitory Authority
entered into any contracts for the repair
or replacement of any of the terrazzo
flooring as of today?

A.    No.

Q.    Has the Dormitory Authority
obtained any price quotes from anyone to
do repairs or replacement of any terrazzo?

MR. FROESSEL: Objection to form.

You can answer.

A.    No, other than our expert
contacted a terrazzo installation firm to
get unit costs for the purpose of
preparing their estimate.

Q.    And do you know what the firm or
firms were, who they contacted?

A.    I don't recall.

Q.    If any repairs or replacements
are done, would they be paid for initially
by DASNY or by CUNY?

A.    I think that would depend on the
scope of the repair that was carried out.

612

C. Bartlett

1

2    extent one was asserted.

3        Q.    In connection with the terrazzo

4    at this building, is the Dormitory

5    Authority satisfied with the inspection

6    services that had been performed by the

7    architects from KPF firm?

8        A.    Yes.

9        Q.    And also in connection with the

10    terrazzo, is the Dormitory Authority

11    satisfied with the inspection services

12    that were provided by TDX?

13        A.    No.

14        Q.    In what respects do you feel

15    that they were not satisfactory, the TDX

16    services?

17        A.    You asked if they were

18    satisfied.  I can't say that we are.  On

19    the other hand, I'm not sure, not having

20    been with the Authority or observed the

21    work, what TDX would have been able to see

22    in regards to the deficiencies of the

23    terrazzo.  I just wasn't there.  Perhaps

24    their inspection efforts were satisfactory

25    and the issues at hand were not readily

613

C. Bartlett

2  observable.  I wasn't there.

3      Q.    Well, then what do you base your

4  statement on that you don't think the

5  Dormitory Authority is satisfied?

6      A.    The terrazzo's failing

7  throughout the building.

8      Q.    And you feel that raises

9  questions about TDX's inspections?

10      A.    Yes.

11      Q.    What about the self-leveling

12  underlayment?  Is the Dormitory Authority

13  satisfied with the architect's, KPF's

14  services in connection with the

15  self-leveling underlayment?

16      A.    Yes.

17      Q.    What about TDX, is the Dormitory

18  Authority satisfied with everything TDX

19  had to do or did with respect to the

20  underlayment?

21      A.    Yes.

22      Q.    Now, in connection with your

23  work at your cost control unit, I think

24  you told us that you had occasion to meet

25  with some people from the Crocetti

655

C. Bartlett

1

2    it wasn't intended to be, surface prep

3    would have removed it.

4        Q.      Was there any point in time

5    where the surface prep of the surface

6    beneath the terrazzo was altered on this

7    project?

8        A.      The requirement for surface

9    prep?

10       Q.      Right.

11       A.      I don't believe it was ever

12   altered.

13       Q.      I'm not going to go through

14   every floor with you, but on your most

15   recent inspection of the building, May 20,

16   2008, is it fair to say that you saw

17   terrazzo failure, what you've defined as

18   terrazzo failure, on every floor that you

19   went to?

20       A.      I didn't see terrazzo failure on

21   every floor.  I saw the defect in the

22   flooring that will ultimately lead to

23   failure on every floor.  And on some

24   floors I saw actual failing terrazzo.

25       Q.      How many floors -- you went to

656

C. Bartlett

1    the fourteenth floor, the twelfth floor,

2    three through eight, so far we've got

3    eight floors?

4        A.    Actually it's one through eight.

5        Q.    So ten floors.

6              And you went to B3?

7        A.    That's my recollection.

8        Q.    So that's eleven floors?

9        A.    Correct.

10       Q.    Of those eleven floors that you

11   went to, how many of them had no failure

12   as you've defined it?

13       A.    I don't recall.

14       Q.    But there were some that did not

15   actually have any failure; is that

16   correct, as you've defined it?

17       A.    Correct.

18       Q.    Would you characterize any of

19   the floors being in worse shape than

20   others?

21       A.    Yes.

22       Q.    Which ones were in worse shape

23   than others?

24       A.    The one that I most clearly

663

C. Bartlett

1

2      A.      I believe they were retained by

3  Holland and Knight.

4      Q.      Any other expert reports that

5  you reviewed in that litigation?

6      A.      None that I recall now.

7      Q.      Earlier you stated that DASNY

8  was not satisfied with TDX's services with

9  regard to the terrazzo installation.

10             Do you recall giving that

11 testimony?

12     A.      Yes.

13     Q.      And earlier you testified that

14 DASNY was satisfied with TDX with regard

15 to the underlayment installation.

16             Do you recall giving that

17 testimony?

18     A.      Yes.

19     Q.      Can you explain to me why

20 DASNY --

21             MR. PLATEK: Strike that.

22     Q.      And you stated that DASNY was

23 not satisfied with TDX's services for,

24 among other reasons, that the terrazzo was

25 failing; is that correct?

664

C. Bartlett

2    A.    Correct.

3    Q.    Is it DASNY's allegation that

4    the underlayment also failed on this

5    project?

6    A.    Yes.

7    Q.    Can you explain to me then why

8    DASNY is satisfied with TDX's services

9    with regard to underlayment installation?

10    A.    Perhaps you should clarify the

11    issue.  I may have misspoken.  You know,

12    we're generally not satisfied that the

13    terrazzo system is failing so I guess, to

14    the extent that underlayment's part of

15    that, I would say we're generally not

16    satisfied with that either.  But I have no

17    specific information in regards to any

18    deficiency in TDX's inspection efforts.

19    But it would be difficult to say we're

20    satisfied when the terrazzo is failing

21    throughout the building.

22    MR. PLATEK: Could you read that

23    back, please.

24    (Whereupon the requested portion

25    was read back by the reporter)

665

C. Bartlett

1

2      Q.      What were TDX's inspection

3   efforts with regards to underlayment

4   installation?

5      A.      It would be no different than

6   their inspection efforts relative -- their

7   inspection obligations for the rest of the

8   project.

9      Q.      Can you tell me -- can you

10  answer my question, please, what were

11  their inspection efforts with regards to

12  underlayment installation?

13     A.      I believe their contract called

14  for daily inspection of the work and the

15  issuance of periodic exception reports.

16  But again I would need to look at the

17  specifics of their contract.

18     Q.      Have you seen any periodic

19  inspection reports from TDX with regards

20  to Bartec's scarification of the concrete

21  slab?

22     A.      No.

23     Q.      Have you seen any periodic

24  exception reports from TDX with regards to

25  Bartec's mixing of the underlayment?

666

                    C. Bartlett

1

2        A.      Indirectly, yes.

3        Q.      What do you mean by that?

4        A.      There was a letter that TDX

5    issued in February, 2001 noting that the

6    terrazzo -- and again, I believe it was

7    delaminating or coming off the floor; I'm

8    not specific as to the -- my memory is not

9    specific as to the exact language.  And at

10   that time they directed Trataros to do a

11   survey of the building and prepare a

12   report as to remedial action, if I

13   recollect that correctly.  It didn't

14   specifically go to mixing; only the

15   failure of the underlayment.

16       Q.      Are the procedures for mixing a

17   gypsum-based compound different than

18   mixing a cementitious-based compound?

19       A.      I couldn't say.

20       Q.      Do you recall what the findings

21   were with regard to the terrazzo

22   delaminating in the 2001 letter or what

23   specific physical observations were made

24   with regard to that delamination?

25              MR. ZICHELLO: By the witness,

671

C. Bartlett

2   observations does that denote to you, Mr.

3   Bartlett?

4       A.      Delamination.

5       Q.      And are you aware whether or not

6   that delamination that's noted could have

7   occurred for other reasons other than

8   improper mixture of the Conflow?

9       A.      It could.

10      Q.      Delamination could occur, if I'm

11  not mistaken, as a result of the

12  application of a contaminant; isn't that

13  correct?

14      A.      It could.

15      Q.      And delamination could occur

16  because terrazzo is installed over

17  underlayment before the underlayment is

18  given time to properly cure; is that

19  correct?

20      A.      Again, I'm not an expert on the

21  behavior of gypsum and what would cause it

22  to delaminate or not delaminate, but

23  perhaps that could be a factor.

24      Q.      So an improper chemical compound

25  could lead to delamination of Conflow;

672

                              C. Bartlett

1
2    correct?

3        A.    That could potentially could.    I

4    don't know if it would.

5        Q.    Let's assume that the Conflow

6    were, in fact, a cementitious compound.

7              Could the installation of

8    terrazzo above it before it had fully

9    cured, could that lead to delamination?

10       A.    It could.  I don't know.

11       Q.    How about improper protection of

12   the Conflow prior to installation of the

13   terrazzo?

14       A.    As leading to --

15       Q.    Delamination.

16       A.    I wouldn't think so.

17       Q.    How about if other trades or

18   anyone were to walk across the terrazzo

19   prior to the installation of the terrazzo

20   -- over the underlayment prior to the

21   installation of the terrazzo, could that

22   lead to delamination?

23       A.    I wouldn't think so.  But again,

24   I'm not an expert in the behavior of

25   gypsum.

735

C. Bartlett

2  point that you've taken the courses?

3      A.     No, long prior to that.

4      Q.     So you had the structural

5  engineering knowledge when you issued this

6  report on November 5, 2003; is that

7  accurate?

8      A.     Yes.

9      Q.     Now, the camber you were

10  attributing at that time to KPF.

11          What else were you attributing

12  at that time to KPF as it related to the

13  flooring system?

14      A.     They had signed off on a

15  material that was not appropriate as an

16  underlayment for terrazzo flooring.

17          What I've since learned is that

18  self-leveling cementitious underlayments

19  are frequently used as underlayment for

20  terrazzo flooring.  I should say our

21  expert has informed me that those

22  materials are frequently used.

23      Q.     Hold one second there.

24          You say they're frequently used

25  for terrazzo flooring.

736

                    C. Bartlett
1
2           Are they frequently used for a
3    thin set epoxy terrazzo flooring?
4        A.    That's what our expert has told
5    me.
6        Q.    Go on.
7        A.    Again, some of my thinking as to
8    the inappropriateness of the underlayment
9    had to do with the concern that it was
10   soft and dissolved readily in water.  That
11   wouldn't be inappropriate material.  At
12   the time I had no way of knowing that it
13   was not, in fact, a cementitious material,
14   it was gypsum.
15       Q.    When you're saying it was soft
16   and dissolved in water, where did that
17   belief come from?
18       A.    It's actually in the report.  I
19   believe that was from Niagra Consulting.
20       Q.    I think we're having a small
21   miscommunication, so I want to clarify.
22           It was my understanding that you
23   knew prior to -- your interpretation was
24   that it was not an appropriate material
25   because it was soft and dissolved in

756

1

## CERTIFICATION BY REPORTER

2

3

4        I, Wayne Hock, a Notary Public of the

5    State of New York, do hereby certify:

6        That the testimony in the within

7    proceeding was held before me at the

8    aforesaid time and place;

9        That said witness was duly sworn

10   before the commencement of the testimony,

11   and that the testimony was taken

12   stenographically by me, then transcribed

13   under my supervision, and that the within

14   transcript is a true record of the

15   testimony of said witness.

16       I further certify that I am not

17   related to any of the parties to this

18   action by blood or marriage, that I am not

19   interested directly or indirectly in the

20   matter in controversy, nor am I in the

21   employ of any of the counsel.

22       IN WITNESS WHEREOF, I have hereunto

23   set my hand this   8th   day of   July

24   , 2008.

25   _____

VERITEXT REPORTING COMPANY

212-267-6868                                516-608-2400