# EXHIBIT
# 5

ORIGINAL

1

1

2   UNITED STATES DISTRICT COURT

    SOUTHERN DISTRICT OF NEW YORK

3   ------------------------------------------------

4   TRAVELERS CASUALTY AND SURETY COMPANY as

    Administrator for RELIANCE INSURANCE

5   COMPANY,

6                       Plaintiff,

7            -against-

8   DORMITORY AUTHORITY-STATE OF NEW YORK, TDX

    CONSTRUCTION CORP. and KOHN PEDERSEN FOX

9   ASSOCIATES, P.C.,

10                     Defendants.

11   Case No. 08-CV-6915 (DLC)

12

               (CAPTION CONTINUED)

13   ------------------------------------------------

14

                June 19, 2008

15               10:09 a.m.

16

17        DEPOSITION of JOHN SCARPELLINO,

18   taken by Plaintiff, pursuant to Notice,

19   held at the offices of HOLLAND & KNIGHT

20   LLP, 195 Broadway, New York, New York

21   before Wayne Hock, a Notary Public of the

22   State of New York.

23

24

25

32

J. Scarpellino

1    terms "certain reinsured contracts" and

2    "certain reinsured liabilities?"

3              MS. BONACCI: Objection to form.

4         A.    Me?  No, I don't know exactly

5    what that means, but I would say in the

6    purchase of Reliance there must have been

7    something in the agreement between

8    Travelers and Reliance.

9         Q.    So as you sit here today, do you

10   have any knowledge of whether Travelers

11   had any reinsurance obligations with

12   respect to the four bonds that we marked

13   as DASNY Exhibits 2 through 5?

14        A.    No, I don't know.

15             MS. SMITH: I'm sorry, no, I

16   don't know or --

17             THE WITNESS:  No, I don't know.

18             MS. SMITH: Thank you.

19        Q.    Mr. Scarpellino, at any time in

20   your capacity as a bond claims manager

21   with Travelers, have you become aware of

22   allegations of defects in terrazzo

23   flooring at Baruch College?

24        A.    Yeah, I became aware of that.

33

J. Scarpellino

2    Q.    Do you recall when Travelers

3  first learned of those allegations?

4    A.    I believe the first time I've

5  heard about the terrazzo, that there was a

6  problem with the terrazzo, was after my

7  second meeting with Doug Van Vleck, which

8  would have been I believe somewhere around

9  the late fall, early winter of 2003.

10    Q.    And you said that that was your

11  second meeting with Mr. Van Vleck?

12    A.    Yes.

13    Q.    When was your first meeting with

14  Mr. Van Vleck?

15    A.    I believe sometime in the spring

16  of 2003.

17    Q.    Focusing your attention on the

18  first meeting, who else besides you and

19  Mr. Van Vleck was present at that meeting?

20    A.    There was Nick Seminara from

21  Travelers.

22    Q.    Anyone else?

23    A.    Brian Fern, F E R N, from

24  Travelers.  I believe Steve Boiko.

25    That's all I recall at this

34

J. Scarpellino

point.

Q.    Who is Nick Seminara?

A.    Nick Seminara was the -- at the
time I believe he was the vice president
of contract surety claims in Hartford.

Q.    Is Mr. Nick Seminara still
employed by Travelers?

A.    Yes.

Q.    Do you know his current title?

A.    No.

Q.    Is he still working in the
surety bond area?

A.    No.

Q.    Do you know what area he is
working in?

A.    I'm not sure of the exact
location, whether it's claim or legal.

Q.    At that time in the spring of
2003 did you report to Mr. Seminara?

A.    Yes.

Q.    Who is Brian Fern?

A.    Brian Fern is our in-house
engineer.

Q.    And does Mr. Fern still work for

35

J. Scarpellino

2  Travelers?

3      A.      Yes.

4      Q.      And is he still an in-house

5  engineer?

6      A.      Yes.

7      Q.      What was the purpose of the

8  meeting you had with Mr. Van Vleck in the

9  spring of 2003?

10      A.      We had a meeting in order to

11  determine if we were agreeable to collect

12  some contract balances and to -- for

13  contract fifteen and sixteen, for

14  Trataros, and also to see if we could

15  attempt to make a deal to -- on the delay

16  portion of the claims.  I believe we made

17  a recommendation that we would give DASNY

18  a hold harmless, they'd pay us the money

19  for the delay claims, and we in turn will

20  turn around and take care of the subs.

21  This way we could close out the project.

22      Q.      Was there any mention of

23  terrazzo flooring at that meeting?

24      A.      No, the only mention at that

25  meeting was we had another project with

36

1               J. Scarpellino

2   DASNY which was the Queens College

3   Powdermaker Hall project and he said they

4   were behind on that project.  He said if

5   we escalate, he'll talk again about

6   getting this thing resolved, the delay

7   claim and our contract balances.

8        Q.    Was Trataros working at

9   Powdermaker Hall?

10        A.    He was the contractor on that

11   project.

12        Q.    And Travelers became involved in

13   that project?

14        A.    Travelers was involved in that

15   project.

16        Q.    And was Travelers involved in

17   connection with bonds that had been issued

18   on behalf of Trataros?

19        A.    For Powdermaker Hall?

20        Q.    Yes.

21        A.    I'm not sure if it was a

22   Reliance bond or a Travelers bond, but

23   Travelers was the responsible bonding

24   party for that contract.

25        Q.    Just so I'm clear, I know you

37

1              J. Scarpellino

2  said Travelers was the responsible bonding

3  party, but was the obligor on those bonds

4  Trataros?  Again, I'm talking about

5  Powdermaker.

6       A.    Yes.

7       Q.    The second meeting that you had

8  with Mr. Van Vleck, who was in attendance

9  at that meeting?

10      A.    I believe it was just Mr.

11 Seminara and myself and Mr. Van Vleck and

12 Mr. Boiko.

13      Q.    And to your recollection, Mr.

14 Fern was not at that meeting?

15      A.    No.

16      Q.    What was the purpose of that

17 meeting?

18      A.    Well, I believe we had fairly

19 well got Queens College either behind us

20 or on the right track and we were trying

21 to get additional funds for the Baruch

22 project and that's when he told us that,

23 you know, the offer we had made, as far as

24 a hold harmless agreement for the delay

25 claims, contract balances, and so on, to

38



1          J. Scarpellino

2    the best of my recollection he made us a

3    lowball offer at that point of $8 million

4    and then he informed us that there was a

5    problem with the terrazzo.

6        Q.    And you said that meeting

7    occurred sometime in the fall or early

8    winter of 2003?

9        A.    To the best of my recollection.

10        Q.    Was that the first time that

11    anyone had advised you that there was a

12    potential issue with respect to the

13    terrazzo flooring at Baruch College?

14            MS. BONACCI: Objection to form.

15            MR. FROESSEL: I'm sorry, what's

16        the objection?

17            MS. BONACCI: Anyone.  You mean

18        anyone from DASNY or anyone in total?

19        Q.    Was that meeting in the late

20    fall or early winter of 2003 with Mr. Van

21    Vleck the first time that you learned of

22    allegations of defects in the terrazzo

23    flooring at Baruch College?

24        A.    It was the first time we heard

25    of a major defect.  Prior to that, in

39

1              J. Scarpellino

2  handling the Crocetti claim, we knew that

3  they were doing some punch list and some

4  corrective work on their flooring.

5      Q.    At that second meeting with Mr.

6  Van Vleck, did either you or Mr. Seminara

7  respond in any way to the allegations of

8  defects in the terrazzo flooring?

9      A.    I believe we just requested

10 information as to what was going on out

11 there.

12     Q.    Do you recall whether either you

13 or Mr. Seminara made any statements to

14 DASNY about any cleaning materials that

15 were used on the floor at Baruch College?

16     A.    I specifically don't recall

17 that.

18     Q.    At the time of your first

19 meeting with Mr. Van Vleck in the spring

20 of 2003 was Trataros still in business?

21     A.    I believe Trataros closed its

22 doors sometime in the spring of '03.

23     Q.    How did Travelers become aware

24 that Trataros was ceasing its business?

25     A.    I was on the Trataros case since

75

J. Scarpellino

Q.    What at that time was Travelers
doing to investigate any potential problem
with the terrazzo that was installed at
Baruch College?

A.    We were trying to determine why
the terrazzo at certain points was
cracking, whether or not it was the
concrete substrate, whether or not it was
the underlayment that was underneath the
terrazzo, whether or not it was just a bad
terrazzo job.  We were just trying to get
some information as to what the problem
was.

Q.    What did you do to try to get
that information?

A.    I believe we were just trying to
get some information, whatever we could,
from Trataros at that time or go through
Trataros' records at that time I should
say because I don't know if Trataros was
around at this time.

Q.    Did there come a time when
Travelers did anything more than just
reviewing Trataros' records and talking to

113

J. Scarpellino

MS. BONACCI: Is that true?
Because your counterclaim asserted $20
million and there have been
representations to the parties at this
table that it includes work that does
not include terrazzo.

MR. FROESSEL: I will limit my
questioning on these affirmative
defenses to anything relating to
terrazzo.

Q.    With respect to DASNY's
counterclaim concerning terrazzo defects,
do you know the factual basis of
Travelers' defense that DASNY lacks
standing to prosecute the counterclaim
against Travelers?

MS. BONACCI: Objection.
To the extent you know.  You can
answer to the extent you know.

A.    As far as the performance bond,
DASNY never terminated Trataros, never put
the surety on notice that there was a
problem with the project, the project was
complete, the project had been in use for

114

1              J. Scarpellino

2    two, three years after completion, DASNY

3    again never put Travelers on notice of any

4    problem, anything wrong with this project

5    or with Trataros' performance on this job.

6    We never had any documentation or any

7    letters at all from DASNY regarding that.

8         Q.    Turning the page to page eight,

9    I'm looking specifically at the thirteenth

10   affirmative defense.

11        A.    What number, I'm sorry?

12        Q.    The thirteenth affirmative

13   defense.

14             With respect to the terrazzo

15   flooring only, do you know the factual

16   basis of the defense that the counterclaim

17   is barred, in whole or in part, by DASNY's

18   failure to provide Trataros with

19   non-defective plans, drawings, and/or

20   technical specifications for the project?

21             MS. BONACCI: Objection.

22             To the extent you know.

23        A.    Again, it's part of the lawsuit

24   and I'll leave that up to counsel.

25        Q.    Going down the page to the

121

1              J. Scarpellino

2         At this point I'll turn it over

3     to any of the counsel that may have

4     questions.

5   EXAMINATION BY

6   MS. RAICUS:

7       Q.    I represent one of the myriad of

8   insurance companies as the fourth-party

9   defendants.

10          To which performance bond are

11  you referring when you testified

12  previously that DASNY was obligated to

13  notify Travelers and did not do so?

14      A.    We're talking about the

15  terrazzo, so the terrazzo was contract

16  sixteen.

17      Q.    Contract sixteen?

18          Who were the parties to that

19  contract?

20      A.    Trataros was the principal.

21  DASNY was the obligee.

22      Q.    Do you specifically recall --

23  and again, you can refer to any of the

24  documents if you want -- do you

25  specifically recall the time period within

122

J. Scarpellino

1  which notice was required to Travelers

2  

3  from DASNY?

4      A.     DASNY never notified Travelers,

5  never defaulted Trataros on the project,

6  and that's part of the way the bond is

7  written, there's a notice provision in

8  there.

9      Q.     I'd like to refer to the exhibit

10  that contains the letter from TDX that

11  refers to the terrazzo flooring.  I

12  believe that's Exhibit 13.  I'm referring

13  to the August 28, 2003 letter from TDX to

14  Trataros.

15          Do you know what the source of

16  TDX's information that's contained in this

17  letter is?

18      A.     I had no idea -- like I said

19  prior, Crocetti had made a payment bond

20  claim.  We were investigating the payment

21  bond claim.  We were informed that there

22  was some punch list, some patching that he

23  was doing on the terrazzo floor in

24  different areas.  We were informed by

25  Crocetti's attorney that basically the

123

J. Scarpellino

1  work was done in accordance with the plans

2  and specs and he wanted payment.  I

3  indicated, until we get the okay that that

4  work was completed, you know, that we

5  would not make any payment.  But we had no

6  idea what was behind this letter.

7      Q.    Now, at some point during the

8  course of this Baruch project, would

9  different aspects of the project be signed

10 off on as complete, such as plumbing, such

11 as electric, such as ceiling?

12     A.    That's what's normally done on a

13 project; correct?

14     Q.    Was it done on this project?

15     A.    Travelers did not follow this

16 project.  This was a project that Trataros

17 was completing.  We left them alone.  They

18 went on their own to do their thing.  I

19 was involved in handling the other sixteen

20 projects.  This was a project that at the

21 end of the day they were going to be

22 making money on if they ever got paid.  So

23 we didn't follow it.  We never had any

24 notice from DASNY, any notice from TDX,

124

J. Scarpellino

1  any notice from anyone that there was a

2  problem or that they were going to

3  terminate Trataros, default Trataros,

4  whatever.

5  Q.    Now, is this letter from TDX

6  dated August 28, 2003 the first notice

7  that somehow came into the possession of

8  Travelers regarding alleged problems with

9  the terrazzo floor?

10  A.    Again, it was our first notice

11  that there was a problem with the floor,

12  but we had no idea of the extent of the

13  problem or what the situation was.  That's

14  why I wrote the letter to Mr. Wirth

15  indicating what's going on, I received

16  this letter, you know, you're telling me

17  one thing, these guys are telling me that

18  the, you know, the floors have to be

19  replaced.

20  Q.    Now, whatever completion of this

21  project and before litigation, did you

22  ever come to learn that certain aspects of

23  the project were signed off on?

24  A.    The project was complete.  From

125

J. Scarpellino

the first floor to the fourteenth floor

were signed off on in September of '01 and

the bottom three sections, the basement

and the two subbasements, the lower three

levels were signed off on I believe the

end of January or February, '02.

   Q.    And when you say, "signed off

on," are you referring to a physical

document?

   A.    The project was complete, the

certificate of occupancy for the entire

building, the building was in use for

classes beginning on September 1 except

for the lower three floors.  After

January, February, '02, they had use and

occupancy of the entire building.

   Q.    Do you know where such documents

would be located, the certificate of

occupancy, et cetera?

   A.    I'm sure they're in DASNY's

records.

   Q.    Now, again looking at this

letter dated August 28, 2003, in reviewing

this document, can you tell me where the

126

1                    J. Scarpellino

2    alleged terrazzo floor problems were

3    located, meaning were they located on the

4    lower three levels or floors one through

5    fourteen or both or something else?

6              MS. BONACCI: Objection.

7              Go ahead.

8        A.    The letter says what the letter

9    says.  I mean, I got the letter and it

10   just indicates that there's flooring

11   deficiencies, unsafe conditions, and so

12   on.  And then, when we had our second

13   meeting with Van Vleck, that's when he

14   indicated that -- and he made us that

15   lowball offer and indicated that there was

16   a problem with the floor that we started

17   to get more information on it.

18   Apparently, you know -- that's it, that's

19   when we started getting more information

20   on it, after that meeting.

21       Q.    Is Mr. Van Vleck associated with

22   DASNY?

23       A.    He was the head of construction

24   of DASNY.  I'm not sure of his exact

25   title, but he was the top man, I believe.

127

1           J. Scarpellino

2      Q.    Did Mr. Van Vleck ever tell you

3  whether or not there were any Department

4  of Building inspections of the flooring?

5      A.    No, he just indicated -- to the

6  best of my recollection, the only thing he

7  indicated was that there was a problem

8  with the terrazzo flooring and he wasn't

9  -- that basically they weren't going to

10 pay the contract balances and delay claims

11 and so on and they gave us that lowball

12 offer.

13     Q.    Did you keep minutes of either

14 of the meetings that you had with Mr. Van

15 Vleck?

16     A.    Not to my knowledge.

17     Q.    To your knowledge, did Mr. Van

18 Vleck ever report the alleged terrazzo

19 floor problems to the New York City

20 Department of Buildings?

21     A.    I have no idea.

22     Q.    To your knowledge, were any

23 violations issued by the New York City

24 Department of Buildings with respect to

25 the terrazzo flooring?

152

CERTIFICATION BY REPORTER

I, Wayne Hock, a Notary Public of the

State of New York, do hereby certify:

That the testimony in the within

proceeding was held before me at the

aforesaid time and place;

That said witness was duly sworn

before the commencement of the testimony,

and that the testimony was taken

stenographically by me, then transcribed

under my supervision, and that the within

transcript is a true record of the

testimony of said witness.

I further certify that I am not

related to any of the parties to this

action by blood or marriage, that I am not

interested directly or indirectly in the

matter in controversy, nor am I in the

employ of any of the counsel.

IN WITNESS WHEREOF, I have hereunto

set my hand this _24th_ day of _June_

, 2008.

_Wayne Hock_
_____