# EXHIBIT 11

1

2  UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

3  ------------------------------------------

4  TRAVELERS CASUALTY AND SURETY COMPANY as

Administrator for RELIANCE INSURANCE

5  COMPANY,

6                          Plaintiff,

7          -against-

8  DORMITORY AUTHORITY-STATE OF NEW YORK, TDX

CONSTRUCTION CORP. and KOHN PEDERSEN FOX

9  ASSOCIATES, P.C.,

10                         Defendants.

11  Case No. 08-CV-6915 (DLC)

12

              (CAPTION CONTINUED)

13  ------------------------------------------

14

                      June 10, 2008

15                    10:13 a.m.

16

17          DEPOSITION of RAY LEU, taken by

18  Plaintiff, pursuant to Notice, held at the

19  offices of HOLLAND & KNIGHT LLP, 195

20  Broadway, New York, New York before Wayne

21  Hock, a Notary Public of the State of New

22  York.

23

24

25

120

R. Leu

A.      Yes.

        MR. SIMON: Objection to form.

Q.      Yes?

A.      Yes.

Q.      Did TDX inspect the floor
leveling process at the project for
conformance to the contract documents?

A.      Yes.

Q.      Who did that from TDX?

A.      Tony Mockler, Paul Citro.

Q.      Just those two folks?

A.      Yeah, they were our interior
superintendents, assistant
superintendents.

Q.      And then the actual terrazzo
installation, did someone from TDX inspect
that for conformance with the contract
documents?

A.      Yes.

Q.      And who did that?

A.      The same two individuals, Tony
Mockler and Paul Citro.

Q.      Was it TDX's responsibility to
advise the prime contractor if correction

121

R. Leu

2    work was required?

3        A.    Yes.

4        Q.    And who had that from TDX?

5            MR. SHAPIRO: Objection.

6            You can answer.

7        A.    That would be Tony Mockler, Paul

8    Citro, myself if I was made aware of it.

9        Q.    Did TDX notify Trataros as to

10    corrective work with respect to the

11    terrazzo installation?

12       A.    Yes.

13       Q.    And what about notifying

14    Trataros about corrective work with

15    respect to floor leveling?

16       A.    Yes.

17       Q.    Do you know what the corrective

18    work was with respect to the floor

19    leveling?

20       A.    There was areas that were

21    removed and replaced.

22       Q.    This is before terrazzo is

23    installed over the floor leveling?

24       A.    Yes.

25       Q.    Did Trataros remove and replace

122

R. Leu

2  those areas of the floor leveling?

3      A.    Yes.

4      Q.    And with respect to the terrazzo

5  installation, the corrective work that was

6  required, was that done as well?

7      A.    Yes.

8      Q.    And what was the corrective work

9  that was required?

10      A.    Some of the terrazzo was

11  replaced, there was some remedial work

12  that was done, epoxy injections,

13  installing besides epoxy injections and/or

14  fastening down the terrazzo by mechanical

15  means.

16      Q.    With respect to the corrective

17  work on the floor leveling, was that

18  because of what they termed contamination

19  issues?

20      A.    Yes.

21      Q.    And what was the contamination

22  issue?

23      A.    I don't know what was the actual

24  substance that was contaminating it.  We

25  had Dayton Superior out there to take a

123

R. Leu

1    
2    look at the areas that were -- that were

3    deficient and they made a recommendation

4    to remove it and it was removed.

5        Q.    And that was the conclusion at

6    the time, was contamination; correct?

7        A.    By Dayton, yes.

8        Q.    Did TDX agree with that

9    conclusion?

10       A.    Yes.

11            MS. BONACCI: We can do our lunch

12        break now.  It's now 1:00.

13            MR. SHAPIRO: As close to two as

14        we can get?

15            MS. BONACCI: Yes.

16            (Lunch recess taken at 12:58

17        p.m.)

18            (Whereupon Ms. Young left the

19        proceedings)

20            (Whereupon Mr. DeFilippis

21        entered the proceedings)

22

23

24

25

138

```
                            R. Leu
1
2    recommended to DASNY by TDX that this
3    should be done?
4        A.    Yes.
5        Q.    And how did TDX verify that the
6    extra work was being performed?
7              MR. SHAPIRO: Objection.
8              You can answer.
9        A.    There was time and material
10   tickets that were produced.
11       Q.    What would happen, TDX would
12   review the tickets?
13       A.    Yes.
14       Q.    We're finished with that
15   exhibit, too.
16             Did TDX prepare exception
17   reports regarding the preparation of the
18   floor slabs to receive the finished
19   flooring?
20       A.    No.
21       Q.    So you're not aware of any
22   exception reports?
23       A.    I'm not aware of any exception
24   reports.
25       Q.    Relating to the slabs, the
```

139

1                       R. Leu

2    concrete slabs?

3         A.     Prior to installation of the

4    floor leveling.

5         Q.     And did TDX prepare an exception

6    report regarding the floor leveling

7    process of the project?

8              MR. SHAPIRO: Objection.

9              You can answer.

10        A.     No, we noticed -- we informed

11   Trataros that there was a problem with

12   some of the underlayment back in early

13   part of '01 and they came down, took a

14   look at it, and gave us a recommendation.

15        Q.     Was there an exception report

16   that was ever prepared regarding that

17   situation?

18             MR. SHAPIRO: Objection.

19             You can answer.

20        A.     I guess a memo to Trataros.

21        Q.     And did TDX ever prepare any

22   exception reports regarding the terrazzo

23   installation at the project?

24        A.     I'm not aware of any.

25        Q.     Did TDX maintain a log of noted

194

1                          R. Leu

2    floor leveling?

3              MR. SHAPIRO: Objection.

4              You can answer.

5      A.      I do not know what the curing

6    time.  I'd have to take a look at the

7    product data sheets.

8      Q.      Mr. Leu, I'm going to show you

9    what's been marked as T8, which is the

10   Conflow product data sheet.  I'm going to

11   ask you if you've seen that document

12   before.

13     A.      Yes.

14     Q.      Did you see it during the

15   project time frame?

16     A.      Yes.

17     Q.      Based on this product data

18   sheet, is Conflow's compressive strength

19   consistent with the requirements of the

20   specification for cementitious floor

21   leveling?  And that's the document that

22   should be in front of you.

23     A.      (Reviewing).

24              MR. SCHRECKINGER: T7?

25              MS. BONACCI: Yes, T7.

195

R. Leu

A.     Can you repeat that question?

MS. BONACCI: Wayne, can you read
it back.

(Whereupon the requested portion
was read back by the reporter)

A.     Yes.

Q.     And with respect to bond
strength, is it consistent with the
requirements of the specification at T7?

MR. SHAPIRO: Objection.

You can answer.

A.     Yes.

Q.     Now I'm going to show you what's
been marked as T38.  It's a material
safety data sheet.

Can you tell me if you've seen
that document before?

A.     Yes.

Q.     Can you tell me if the listed
ingredients are consistent with the
composition of the specified underlayment
in T7, the cementitious floor leveling?

MS. SMITH: Can I hear that
question again, please.

230

## CERTIFICATION BY REPORTER

I, Wayne Hock, a Notary Public of the State of New York, do hereby certify:

That the testimony in the within proceeding was held before me at the aforesaid time and place;

That said witness was duly sworn before the commencement of the testimony, and that the testimony was taken stenographically by me, then transcribed under my supervision, and that the within transcript is a true record of the testimony of said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, that I am not interested directly or indirectly in the matter in controversy, nor am I in the employ of any of the counsel.

IN WITNESS WHEREOF, I have hereunto set my hand this *13th* day of *June* , 2008.

*Wayne Hock*
_____

232

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------

TRAVELERS CASUALTY AND SURETY COMPANY as

Administrator for RELIANCE INSURANCE

COMPANY,

                        Plaintiff,

          -against-

DORMITORY AUTHORITY-STATE OF NEW YORK, TDX

CONSTRUCTION CORP. and KOHN PEDERSEN FOX

ASSOCIATES, P.C.,

                        Defendants.

Case No. 08-CV-6915 (DLC)


               (CAPTION CONTINUED)

------------------------------------------------


                        June 11, 2008

                        10:09 a.m.


          CONTINUED DEPOSITION of RAY LEU,

taken by Plaintiff, pursuant to Notice,

held at the offices of HOLLAND & KNIGHT

LLP, 195 Broadway, New York, New York

before Wayne Hock, a Notary Public of the

State of New York.

302

1                         R. Leu

2   Senior?

3        A.     No, that's Jim Jones, Junior.

4        Q.     So you and Jim Jones, Junior on

5   behalf of TDX negotiated this change

6   order?

7               MR. SHAPIRO: Objection.

8        A.     Along with Antonio and DASNY and

9   Trataros.

10       Q.     My question is just on behalf of

11  TDX because you didn't negotiate on behalf

12  of the other parties, you would only do

13  that on behalf of TDX; correct?

14              MR. SHAPIRO: Objection.

15       Q.     Based on GC2-028, is Conflow now

16  the specified material for the floor

17  leveling?

18              MR. SHAPIRO: Objection.

19              You can answer.

20              MR. DENNIS: Join.

21       A.     (Reviewing).

22              Yes.

23       Q.     The change order pertains only

24  to floors three to fourteen in the

25  building; is that correct?

346

R. Leu

1

2    ever issued for repair work in connection

3    with contamination.

4        MR. SHAPIRO: Objection. If you

5        recall.

6        A.    We issued a change order for

7    damage to terrazzo due to damages caused

8    by vandalism, broken terrazzo base, damage

9    by unidentified trades, but not

10   contamination.

11       Q.    Was there a situation at the

12   project where the manufacturer came out to

13   look at the product and determined that

14   there was contamination?

15       A.    Yes.

16       Q.    And that related to Conflow?

17       A.    Yes.

18       Q.    Did that contamination create

19   any damage or need for any repair in

20   connection with the Conflow?

21       A.    Yes.

22       Q.    So contamination can require

23   repair work, contamination the likes of

24   what Bartec is referring to in the

25   April 9, 2001 letter?

347

1                          R. Leu

2              MR. SHAPIRO: Objection.

3              MR. FROESSEL: Objection.

4              MR. SHAPIRO: You can answer.

5        A.      We are not paid for a change

6    order to repair the Conflow for that

7    contamination or the flakiness of the

8    Conflow.

9        Q.      You did not do it via change

10   order but you required repairs because of

11   the contamination; correct?

12       A.      It was repaired.

13       Q.      Who repaired it?

14       A.      Trataros/Bartec.

15       Q.      And who directed that the repair

16   occur?

17       A.      It was directed that -- we

18   directed them to make the repair along

19   with Dayton Superior.

20       Q.      You directed, meaning TDX, them

21   to make a repair?

22       A.      Yes.

23       Q.      Dayton Superior wouldn't have

24   the ability to direct them to do work on

25   the project.

349

1                         R. Leu

2   Conflow as well as the terrazzo; no?

3                MR. FROESSEL: Objection.

4        A.      No, to the Conflow.

5        Q.      How long a time period did TDX

6   wait before permitting contractors to work

7   on the underlayment once it was placed?

8                MR. SHAPIRO: Objection.

9                You can answer.

10               MS. SMITH: What's the question?

11       I didn't hear it.

12               MS. BONACCI: Wayne, can you read

13       it back.

14               (Whereupon the requested portion

15       was read back by the reporter)

16               MS. SMITH: Thank you.

17       A.      I don't remember the specific

18  time frame because, in general, Crocetti

19  followed right behind Bartec with their

20  work.

21       Q.      When the upper floors of the

22  school opened in September, '01, do you

23  have knowledge as to whether there were

24  any restrictions on those floors as to

25  areas that the students could not use

350

1                    R. Leu

2    because of the terrazzo flooring

3    situation?

4              MR. SHAPIRO: Objection.

5              You can answer.

6        A.    No, there were no restrictions.

7        Q.    When the school opened for use

8    in September, '01, how many levels of the

9    building were being used by the students?

10       A.    Fourteen levels.

11       Q.    And that would be the ground

12   floor through to fourteen?

13       A.    Yes.

14       Q.    Do you have any knowledge that

15   at that time any levels of the building

16   were not building used due to the terrazzo

17   flooring?

18             MR. SHAPIRO: Objection.  Asked

19        and answered.

20             You can answer.

21       A.    No.

22       Q.    In the year 2001, did DASNY

23   direct TDX to take any remedial actions

24   regarding terrazzo?

25             MR. FROESSEL: Objection.

458

R. Leu

Superior?

A.      No, I did not.

Q.      Do you know if anybody --

MS. SMITH: Strike that.

Q.      Are you able to identify who companies met with Dayton Superior?

A.      No, I do not know.

Q.      Do you know whether TDX met with Dayton Superior?

A.      No, I do not know because there was no minutes taken of the meeting or a sign-in sheet.

Q.      Do you know who would have that information?

A.      Possibly Trataros.

Q.      Is there anybody at TDX that would know that information?

A.      I do not know.

Q.      Now, I understood your testimony to say that there was a problem with delamination and Conflow in the spring of 2000 or 2001?

A.      2001.

Q.      And what was the --

459

1                    R. Leu

2          MS. SMITH: Strike that.

3      Q.    How did you know that there was

4   a problem with the Conflow?

5      A.    Because it was brought to our

6   attention by our field superintendent, one

7   of our field superintendents, and Mr.

8   McCullough wrote a letter to Trataros.

9      Q.    What was it about the field

10  conditions that caused your superintendent

11  to say that there was a problem

12  specifically with the Conflow?

13     A.    They noticed some flakiness of

14  the Conflow.

15     Q.    And this was prior to the

16  terrazzo floor being put down?

17     A.    In that particular area.

18     Q.    And what particular area are we

19  talking about?

20     A.    Again, I'd have to get that

21  memorandum out to see what area was --

22  that we wrote about, that particular

23  memorandum.

24     Q.    Was there any --

25          MS. SMITH: Strike that.

460

R. Leu

1

2      Q.      Do you know if there was any

3  analysis taken of the Conflow at that

4  time?

5      A.      I do not know if there was any

6  analysis taken.

7      Q.      And was there any other time

8  that a problem regarding the Conflow, as

9  it was originally brought to your

10  attention or TDX's attention back in the

11  spring of 2001, did that ever occur again?

12          MR. SHAPIRO: Objection.

13          You can answer.

14      A.      Not that I'm aware of.

15      Q.      Do you know if any pictures were

16  taken during this inspection with Dayton?

17      A.      No, I'm not aware of any.

18      Q.      Now, as I also understand your

19  testimony, as you sit here today you're

20  not able to tell me what areas that there

21  was a delamination or problem with the

22  terrazzo and where Conflow was used; is

23  that correct?

24      A.      That's correct.

25      Q.      Are there any areas that

470

R. Leu

by the college into site B is behind

schedule and that's what I mean by the

project is behind schedule.

    Q.    And the completion date is not

going to be met if things continue to

proceed in the manner which led up to it

being behind schedule; correct?

          MR. SHAPIRO: Objection.

          You can answer if you

understand.

          MS. SMITH: No speaking

objections, please.

    A.    I'm not quite sure I understood

the question.

    Q.    Of course.

          What was the completion date?

    A.    The completion date is September

of '01 for the college to move in.

    Q.    And was the college open on

September of 2001?

    A.    Yes.

    Q.    So in looking at Exhibit T40,

what did TDX do in order to ensure that

the completion date would be met?

471

1                      R. Leu

2      A.       We put contractors, certain

3   contractors on extended work days.

4      Q.       Anything else?

5      A.       We expedited the work of the

6   underlayment for the terrazzo.

7      Q.       When you say that you expedited

8   the work for the underlayment of terrazzo,

9   how do you expedite the work for the

10  underlayment of terrazzo?

11     A.       In some instances, we changed

12  the material to be used.

13     Q.       Was the September, 2001 the

14  original completion date?

15     A.       No, it wasn't.

16     Q.       What was the original completion

17  date?

18     A.       I don't recall.

19     Q.       Was it before or after September

20  of 2001?

21     A.       Before.

22     Q.       And in expediting the work for

23  the underlayment of terrazzo, did you also

24  put pressure on your contractors in order

25  to speed up the job?

476

### CERTIFICATION BY REPORTER

I, Wayne Hock, a Notary Public of the State of New York, do hereby certify:

That the testimony in the within proceeding was held before me at the aforesaid time and place;

That said witness was duly sworn before the commencement of the testimony, and that the testimony was taken stenographically by me, then transcribed under my supervision, and that the within transcript is a true record of the testimony of said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, that I am not interested directly or indirectly in the matter in controversy, nor am I in the employ of any of the counsel.

IN WITNESS WHEREOF, I have hereunto set my hand this _16th_ day of _June_, 2008.

_____Wayne Hock_____

VERITEXT REPORTING COMPANY

212-267-6868                              516-608-2400

472

1

2  UNITED STATES DISTRICT COURT

   SOUTHERN DISTRICT OF NEW YORK

3  ------------------------------------------------

4  TRAVELERS CASUALTY AND SURETY COMPANY as

   Administrator for RELIANCE INSURANCE

5  COMPANY,

6                        Plaintiff,

7           -against-

8  DORMITORY AUTHORITY-STATE OF NEW YORK, TDX

   CONSTRUCTION CORP. and KOHN PEDERSEN FOX

9  ASSOCIATES, P.C.,

10                       Defendants.

11 Case No. 08-CV-6915 (DLC)

12

                 (CAPTION CONTINUED)

13 ------------------------------------------------

14

                     June 20, 2008

15                   10:08 a.m.

16

17        CONTINUED DEPOSITION of RAY LEU,

18 taken by Plaintiff, pursuant to Notice,

19 held at the offices of HOLLAND & KNIGHT

20 LLP, 195 Broadway, New York, New York

21 before Wayne Hock, a Notary Public of the

22 State of New York.

23

24

25

530

R. Leu

1

2   with relation to the underlayment or

3   installation of the terrazzo flooring

4   prior to July, 2000?

5          MR. FROESSEL: Objection.

6          You can answer.

7   A.     No.

8   Q.     And does your testimony apply to

9   levels B1, B2, and B3 as well as the other

10  levels of the Baruch College project?

11         MR. FROESSEL: Objection.

12         You can answer.

13  A.     Yes.

14         MS. RAICUS: Thank you.  No more

15      questions.

16         MR. MILLER: I'd like to have

17      these marked as T71 and T72.  T71 is

18      going to be documents with Bates

19      numbers CR 1184 through CR 1188 and

20      the next one's going to be T72.  It's

21      going to be CR 0920 through CR 0952.

22         (Whereupon, a facsimile dated

23      March 8, 2001 was marked Exhibit T71

24      for identification.)

25         (Whereupon, a letter dated

531

1           R. Leu

2      August 28, 2003 was marked Exhibit T72

3      for identification.)

4  EXAMINATION BY

5  MR. MILLER:

6      Q.    If you look at page CR 1187,

7  last time we were together you were asked

8  some questions about notification of

9  Trataros in the spring of 2001 about

10  problems with delamination and Conflow.

11  We didn't have the benefit of having that

12  notification with us at the time.

13          My question is going to be

14  whether or not the letter dated

15  February 28, 2001 that appears at Bates

16  pages CR 1187 and 188 is that notification

17  referred to in your prior testimony.

18          MR. FROESSEL: Objection to the

19      form.

20          You can answer.

21  A.      Yes.

22      Q.    Let me direct your attention to

23  T72.

24          I believe your prior testimony

25  had also been -- do you want to take a

584

R. Leu

we're pouring one inch thick, I'd like to

know what is the added dead weight to see

if there's any structural concerns.  This

is the conversation that I had with Dan

from Conspec.

Q.    And was it a long conversation?

A.    It was a fairly short

conversation.

Q.    When you were done with that

conversation, you were comfortable with

how you were going to proceed in

connection with the project?

A.    Yes.

Q.    Do you have knowledge if KPF had

contacted the manufacturer at any point in

time in connection with the Baruch

project?

MR. FROESSEL: Objection to the

form.

A.    I do not know.

Q.    There's an Exhibit T71 that got

marked today by Mr. Miller.  I'm going to

show it to you so you can take another

look through it, but I just have one

585

                              R. Leu

1  question.

2          Mr. Miller was showing you this

3  document and asking you about a time frame

4  of notifying Trataros regarding a problem

5  with an aspect of the terrazzo.

6          At this point in time -- my

7  question to you is very simple.

8          This problem was concluded this

9  was a contamination issue.  Was it not

10 rectified?

11     A.    Yes.

12     Q.    So it was fixed, remedied to

13 TDX's satisfaction at that point in time?

14     A.    Yes.

15     Q.    Mr. Platek was asking you some

16 questions regarding contractors walking on

17 the terrazzo and the underlayment.

18         Can you tell me, were other

19 contractors scheduled to follow behind the

20 floor finishes?

21     A.    No.  There may have been some

22 work that they had not finished but it

23 definitely was not scheduled to be done

24 afterwards.  Various trades, including

608

## CERTIFICATION BY REPORTER

I, Wayne Hock, a Notary Public of the State of New York, do hereby certify:

That the testimony in the within proceeding was held before me at the aforesaid time and place;

That said witness was duly sworn before the commencement of the testimony, and that the testimony was taken stenographically by me, then transcribed under my supervision, and that the within transcript is a true record of the testimony of said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, that I am not interested directly or indirectly in the matter in controversy, nor am I in the employ of any of the counsel.

IN WITNESS WHEREOF, I have hereunto set my hand this    25th    day of    June , 2008.

_____