**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

TRAVELERS CASUALTY AND SURETY COMPANY
as Administrator for RELIANCE INSURANCE
COMPANY,

                              Plaintiff,

         vs.

DORMITORY AUTHORITY - STATE OF NEW YORK,
TDX CONSTRUCTION CORP. and KOHN PEDERSEN
FOX ASSOCIATES, P.C.,

                              Defendants.

DORMITORY AUTHORITY OF THE STATE OF NEW
YORK and TDX CONSTRUCTION CORP.,

                    Third-Party Plaintiffs,

         vs.

TRATAROS CONSTRUCTION, INC.,

                    Third-Party Defendant.

TRATAROS CONSTRUCTION, INC. and TRAVELERS
CASUALTY AND SURETY COMPANY,

                    Fourth-Party Plaintiffs,

         vs.

CAROLINA CASUALTY INSURANCE COMPANY;
BARTEC INDUSTRIES INC.; DAYTON SUPERIOR
SPECIALTY CHEMICAL CORP. a/k/a DAYTON
SUPERIOR CORPORATION; SPECIALTY
CONSTRUCTION BRANDS, INC. t/a TEC; KEMPER
CASUALTY INSURANCE COMPANY d/b/a KEMPER
INSURANCE COMPANY; GREAT AMERICAN
INSURANCE COMPANY; NATIONAL UNION FIRE
INSURANCE COMPANY OF PITTSBURGH, PA.;
UNITED STATES FIRE INSURANCE COMPANY;
NORTH AMERICAN SPECIALTY INSURANCE
COMPANY; ALLIED WORLD ASSURANCE
COMPANY (U.S.) INC. f/k/a COMMERCIAL
UNDERWRITERS INSURANCE COMPANY; ZURICH
AMERICAN INSURANCE COMPANY d/b/a ZURICH
INSURANCE COMPANY; OHIO CASUALTY
INSURANCE COMPANY d/b/a OHIO CASUALTY
GROUP; HARLEYSVILLE MUTUAL INSURANCE
COMPANY (a/k/a HARLEYSVILLE INSURANCE

Case No. 07-CV-6915 (DLC)
**ECF CASE**

**COUNTER-STATEMENT OF
MATERIAL FACTS IN
OPPOSITION TO MOTION
FOR SUMMARY JUDGMENT
FILED BY OHIO CASUALTY
INSURANCE COMPANY**

COMPANY,); JOHN DOES 1-20 and XYZ CORPS. 1-19,

                 Fourth-Party Defendants.

KOHN PEDERSEN FOX ASSOCIATES, P.C.,

                 Third-Party Plaintiff,

       vs.

WEIDLINGER ASSOCIATES CONSULTING
ENGINEERS, P.C., CASTRO-BLANCO PISCIONERI
AND ASSOCIATES, ARCHITECTS, P.C.,
ARQUITECTONICA NEW YORK, P.C., COSENTINI
ASSOCIATES, INC., CERMAK, PETERKA PETERSEN,
INC., JORDAN PANEL SYSTEMS CORP., TRATAROS
CONSTRUCTION, INC. and LBL SKYSYSTEMS
(U.S.A.), INC.,

                 Third-Party Defendants.

Plaintiff/Counterclaim Defendant/Fourth-Party Plaintiff, Travelers Casualty and Surety Company ("Travelers") and Third-Party Defendant/Fourth-Party Plaintiff, Trataros Construction, Inc. ("Trataros"), respectfully submit their Counter-Statement of Material Facts in Opposition to the Motion for Summary Judgment brought by Ohio Casualty Insurance Company's ("Ohio Casualty"), pursuant to Local Civil Rule 56.1, responding to Ohio Casualty's Statement of Undisputed Material Facts and setting forth additional material facts.  Pursuant to Local Rule 56.1, the following admissions are made *solely for purposes of the pending motion for Summary Judgment*:

## A.    TRAVELERS' AND TRATAROS' RESPONSE TO OHIO CASUALTY'S STATEMENT OF UNDISPUTED MATERIAL FACTS.

1.    Travelers and Trataros are without knowledge or information as to whether the document attached as Exhibit A to the Affidavit of Christine Hamilton in Support of Ohio Casualty's Motion for Summary Judgment ("Hamilton Aff.") was issued to Bartec Industries, Inc. ("Bartec"), as recited in movant's Paragraph 1.

2.     Travelers and Trataros are without knowledge or information as to whether the document attached as Exhibit B to the Hamilton Aff. was issued to Bartec, as recited in movant's Paragraph 2.

3.     Travelers and Trataros deny Paragraph 3 to the extent that it alleges Exhibit A to the Sharpe Aff. constitutes a full and complete copy of the insurance policies purportedly issued by Ohio Casualty to Crocetti; the submission is not the complete policies. (See, Affidavit of Eli J. Rogers in Opposition to Ohio Casualty's Motion for Summary Judgment, the "Rogers Dec.," Exhs. 37 and 38.)  Otherwise, Travelers and Trataros are without knowledge or information as to whether the document attached as Exhibit A to the Affidavit of Hollie Sharpe in Support of Ohio Casualty's Motion for Summary Judgment ("Sharpe Aff.") was issued to G.M. Crocetti, Inc. ("Crocetti"), as recited in movant's Paragraph 3.

4.     Travelers and Trataros deny Paragraph 4 to the extent that the language quoted therein does not appear to be included in each of the agreements attached to the Hamilton Aff. and Sharpe Aff.  (Cf., Hamilton Aff., Exh. A, p. 11 of 33, § IV, ¶ 2; with, Exh. B thereto, p. 16 of 35, § VI, ¶ F; and, Sharpe Aff., p. 6 of 7, ¶ F.)

5.     Travelers and Trataros deny Paragraph 5 to the extent it alleges/implies that an "underlayment/epoxy terrazzo flooring system" was initially contemplated under Trataros' contracts for the Baruch College, Site B project (the "project"), and/or that Bartec and Crocetti were retained simultaneously by Trataros.  Travelers and Trataros submit that the terms and conditions of Trataros' respective agreements with Crocetti and Bartec speak for themselves. (Rogers Dec., ¶¶ 13-20 and Exhs. 6 & 10.)

6.     Travelers and Trataros deny Paragraph 6.  Travelers and Trataros contest the allegations made in this action by the Dormitory Authority – State of New York ("DASNY")

and/or TDX Construction Corp. ("TDX") alleging defects in the work and/or materials performed/installed by Trataros and/or Trataros' subcontractors, and likewise contest the need to replace said work and/or materials.  Nonetheless, DASNY and/or TDX have alleged construction defects in excess of $20,000,000.00 in this action, purportedly associated with, *inter alia*, the Project's epoxy terrazzo flooring system; in connection with these claims, among others, Travelers and Trataros have asserted Fourth-Party claims for indemnification, contribution, and/or declaratory relief, *inter alia*, against Ohio Casualty and other parties.  (Rogers Dec., ¶ 49 and Exh. 35)

7.    Travelers and Trataros deny Paragraph 7 to the extent that it alleges that "problems with the finished terrazzo floor" manifested in January, 2001.  The evidence cited does not support that conclusion.  (See, Affidavit of Mark T. Hall, the "Hall Aff.," Exh. E, at letter dated January 26, 2001, discussing underlayment rather than finished terrazzo).  Travelers and Trataros further deny Paragraph 7 to the extent that it alleges or implies an unbroken continuum of "problems with the finished terrazzo floor" beginning in January, 2001.  This allegation is not supported by the weight of deposition testimony taken to date from both DASNY and TDX testified that it was an isolated condition that was repaired. (Rogers Dec., Exhs. 3, 11 & 15.)  Moreover, DASNY's project manager from the inception of the project until after building occupancy of floors 1-14 by Baruch College, testified that he was unaware of any problems with the Project's terrazzo floors during his period on the project through September/October 2001. (Rogers Dec., Exh 15 D'Ambrosio, 16:23,17:17, 19:18-20:2; 39:6-40:16;125:3-17)

8.    Travelers and Trataros deny Paragraph 8, except admit that the face of the documents appended as Exhibit E to the Hall Aff. speak for themselves, without adopting the truth or falsity of the matters recited therein.

9.    Travelers and Trataros deny Paragraph 9 to the extent that it characterizes the removal/replacement of "large areas of the completed flooring job" on the identified floors of the Project during the months of February, March and April, 2001.  The evidence cited does not support that conclusion, and it is contrary to the documentary evidence and the weight of deposition testimony taken to date.  (Hall Aff., Exh. F, first six work tickets, and Rogers Dec., ¶23)

10.    Travelers and Trataros admit that DASNY and/or TDX have filed a Third-Party Complaint in this action, the allegations of which speak for themselves.   Travelers and Trataros contest said Third-Party allegations, *inter alia*, asserted in this action.  Subject to and without waiving this denial, Travelers and Trataros deny Paragraph 10 to the extent that it alleges or implies an unbroken continuum of "flooring failure" beginning in January, 2001.  This allegation is not supported by the weight of deposition testimony taken to date.  (Rogers Dec., Exh. 11, Leu 3, 584:22-585:15, and Exh. 15, D'Ambrosio,16:23-17:17; 19:18-20:2; 39:6-40:16; 125:3-17)

11.    Travelers and Trataros deny Paragraph 11 to the extent that it implies the allegations recited therein are of a material nature; in the referenced action, DASNY didn't make any claim or allegations against Trataros relating to the epoxy terrazzo or the underlayment or any defects therein (Rogers Dec., Exhs. 18-22).   Subject to and without waiving this denial, Travelers and Trataros admit the balance of the allegations contained in Paragraph 11.

12.    Travelers and Trataros deny Paragraph 12 to the extent that it implies the allegations recited therein are of a material nature ;in the referenced action, DASNY didn't make

any claim or allegations against Trataros relating to the epoxy terrazzo or the underlayment or any defects therein (Rogers Dec., Exhs 18-22.). Travelers and Trataros further object to Paragraph 12 as being unsupported by admissible evidence, in violation of Local Rule 56.1(d) and Fed R. Civ. P. 56(e).

13. Travelers and Trataros deny Paragraph 13 to the extent that it implies the allegations recited therein are of a material nature or relate to Trataros; in the referenced action, DASNY did not make any claim or allegations against Trataros relating to the epoxy terrazzo or the underlayment or any defects therein (Rogers Dec., Exhs.18-22). Travelers and Trataros further object to Paragraph 13 as being unsupported by admissible evidence, in violation of Local Rule 56.1(d) and Fed R. Civ. P. 56(e).

14. Travelers and Trataros deny Paragraph 14 to the extent that it implies the allegations recited therein are of a material nature. Subject to and without waiving this denial, Travelers and Trataros admit that DASNY filed a Third-Party Complaint against Travelers and Trataros in the action entitled Travelers Casualty and Surety Company, *et al.* v. The Dormitory Authority of the State of New York, *et al.*, Case No. 04-CV-5101 (HB) (the "Baer Action"). As to the balance of allegations contained in Paragraph 14, Travelers and Trataros respond that the allegations set forth in the Third-Party Complaint filed by DASNY in the Baer Action speak for themselves. Travelers and Trataros contested said Third-Party allegations, *inter alia*, asserted in the Baer Action. The Baer Action was voluntarily dismissed by all parties. (See, Rogers Dec., at ¶ 40 and Exh. 29)

15. Travelers and Trataros deny Paragraph 15 to the extent that it implies the allegations recited therein are of a material nature. Travelers and Trataros further object to

Paragraph 15 as being unsupported by admissible evidence, in violation of Local Rule 56.1(d) and Fed R. Civ. P. 56(e).

16.     Travelers and Trataros deny Paragraph 16 to the extent that it implies the allegations recited therein are of a material nature.   Subject to and without waiving this denial, Travelers and Trataros admit that on or about November 24, 2004, Travelers and Trataros filed a Fourth-Party Complaint in the Baer Action, the allegations of which speak for themselves. (Rogers Dec., Exh. 26)

17.     Travelers and Trataros deny Paragraph 17 to the extent that it implies the allegations recited therein are of a material nature.   Travelers and Trataros further object to Paragraph 13 as being unsupported by admissible evidence, in violation of Local Rule 56.1(d) and Fed R. Civ. P. 56(e).   Subject to and without waiving this denial, Travelers and Trataros are without knowledge or information as to the actions allegedly undertaken or not undertaken by Crocetti and Bartec with respect to Ohio Casualty.

18.     Travelers and Trataros deny Paragraph 18 to the extent that it implies the allegations recited therein are of a material nature.   Travelers and Trataros further object to Paragraph 18 as being unsupported by admissible evidence, in violation of Local Rule 56.1(d) and Fed R. Civ. P. 56(e).   Subject to and without waiving this denial, Travelers and Trataros further deny that the Fourth-Party Complaint filed in the Baer Action named Ohio Casualty as a Fourth-Party Defendant.  (See, Hall Aff., Exh. L, and, Rogers Dec., ¶¶ 37 & 39, Exh. 26 & 28)

19.     Travelers and Trataros deny Paragraph 19 to the extent that it implies the allegations recited therein are of a material nature.   Travelers and Trataros further object to Paragraph 19 as being unsupported by admissible evidence, in violation of Local Rule 56.1(d) and Fed R. Civ. P. 56(e).

20.    Travelers and Trataros deny Paragraph 20 to the extent that it implies the allegations recited therein are of a material nature.    Travelers and Trataros further object to Paragraph 20 as being unsupported by admissible evidence, in violation of Local Rule 56.1(d) and Fed R. Civ. P. 56(e).    Notwithstanding these objections, Travelers and Trataros deny that Ohio Casualty answered the Fourth-Party Complaint filed in the Baer Action.    (See, Rogers Dec., ¶¶ 39-40 and Exh. 29.

## B.    TRAVELERS' AND TRATAROS' STATEMENT OF ADDITIONAL MATERIAL FACTS.

### Project Owner and the Owner's Project Team

21.    This action arises out of a construction project known as Baruch College, Site B located at 55 Lexington Avenue, New York, New York (the "Project", frequently referred to in the Project records as "Baruch College, Site B").    (See, Rogers Dec., ¶ 2, and Declaration of Mark T. Hall, "Hall Dec." at Exh. A)

22.    The Project's "owner" was the Dormitory Authority - State of New York ("DASNY").    (See id.)

23.    Kohn Pederson Fox Associates, P.C. ("KPF") was engaged by DASNY to provide architectural and engineering services for the Project.    (Rogers Dec. ¶ 5)

24.    Under the terms of KPF's contract with DASNY, KPF was required to provide insurance coverage in connection with its work on the Project, including professional liability insurance with a policy limit of $2,000,000.00 per occurrence. (See, id., Exh. 1, p. 6, Article X, ¶ 6.)

25.    KPF's contract also contains a provision requiring them to "[r]eview and approve or disapprove all shop drawings and samples submitted by the Contractor for adherence to the

intent and requirements of the Contract Documents…." (See, id., Exh. 1, Appendix "A" – Scope of Services of architect, p. A.9, ¶ H.1)

26.    TDX Construction Corp. ("TDX") was engaged by DASNY to provide construction management services for the Project.  (See, id., Exh. 2)

27.    TDX's "Construction Phase" contract obligated TDX to obtain insurance coverage relating to its work on the Project, including a policy for Commercial General Liability ("CGL") coverage, with a minimum combined single policy limit of $5,000,000 per occurrence and aggregate.  (See, id., Exh. 2, p. 4, Article VIII, ¶ 3.)

28.    KPF's contract also contains provisions requiring them to:

a.)    "[i]nspect all work daily for quality and conformance to the Contract Documents.  Advise Prime Contractor(s) of necessary corrective work.  Inspect materials and equipment prior to installation for conformance to the specifications." (Id., Exh. 1, Appendix "A" – Scope of Services, p. A2, ¶ 5.b);

b.)    "[p]repare periodic "Exception Reports" as required by the Construction Work of the Prime Contractors.  Distribute to the appropriate Contractor(s) for necessary corrective work.  Maintain a log of the noted exception, date issued, and date corrected.  Maintain a photographic record where life safety issues/systems are involved." (Id., Exh. 1, Appendix "A" – Scope of Services, p. A2, ¶ 5.c);

c.)    "[i]nspect the Project jointly with the OWNER and Architect prior to the time the OWNER is to use, occupy, or operate any part or all of the Project, and prepare a list of observed variances and deficiencies in the Construction Work. Distribute the list to the appropriate Prime Contractor(s) for necessary corrective work." (Id., Exh. 1, Appendix "A" – Scope of Services, p. A2, ¶ 5.d);

d.)    "Expedite and coordinate the work of all Prime Contractors." (Id., Exh. 1, Appendix "A" – Scope of Services, p. A2, ¶ 7.a)

29.    DASNY's Rule 30(b)(6) designee testified in this action that DASNY is not satisfied with the inspection services that TDX provided on the Project, in light of the fact that the epoxy terrazzo is allegedly failing throughout the building, a claim which DASNY believes to raise questions about the inspections performed by TDX of that work.  (Id., Exh. 3, Bartlett

Day 3, 612:9-613:10.)  DASNY's Rule 30 (b)(6) designee further testified that to the extent that the underlayment is part of the epoxy terrazzo system, they are not satisfied with TDX's inspection services of that either. (Id. Exh 3, Bartlett Day 3, 663:13-664:21)

## Award of Contract No. 15 and Contract No. 16

30.     Trataros separately entered into two prime contracts with DASNY for the performance of construction work on the Project, known as "Contract No. 15" and "Contract No. 16," respectively. (Id., Exh. 4, Curis  Day 1, 24:5-22, 29:14-18, 32:2-14)

31.     Contract No. 16 was awarded to Trataros by DASNY on or about August 27, 1998.  (Id., Exh. 4, Curis Day 1, 24:5-22) (And see, Hall Aff., Exh. A)

32.     Reliance Insurance Company ("Reliance") issued payment and performance bonds to Trataros relating to Contract No. 16 (the "Bonds").   (See Declaration of John Scarpellino, Sr., the "Scarpellino Dec." at ¶¶ 3 and 4)

33.     Subsequently, the Bonds came to be administered by Travelers. (Id.)

## The Crocetti Subcontract

34.     Trataros subcontracted a portion of its work under Contract No. 16 to Crocetti. (Id., Exh. 4, Curis Day 1, 39:23-40:9) (And see, Hall Aff., Exh. B)

35.     The scope of work under Crocetti's original subcontract included the work set forth in the Project's technical specifications relating to epoxy terrazzo, pre-cast terrazzo, and interior stonework.  (Hall Aff., Exh. B, p. 16 of 25)

36.     Crocetti's subcontract contained a requirement for insurance coverage naming Trataros and DASNY as additional insureds. (Id., Exh. B, p. 2 of 25, ¶ 5.) (And see, id., p. 1 of

25, at prefatory language and first whereas clause) (defining Trataros as "Contractor" and DASNY as "Owner")

37.     Additionally, Crocetti's subcontract contained a more detailed Insurance and Indemnification Rider. (Id., Exh. B, pp. 19 of 25 to 21 of 25.) Under the terms of this insurance rider, Crocetti was required to provide CGL coverage with policy limits of $5,000,000. (Id., at p. 19 of 25, ¶ III)

38.     Crocetti's insurance rider further provides that the additional insured coverage provided to DASNY and Trataros "shall stipulate that this insurance is primary, [and] that any other insurance or self-insurance maintained by Owner and Contractor shall be excess only…." (Id., at p. 20 of 25, ¶ VII)

### Irregularities in the Project's Structural Concrete

39.     The Project's and therefore DASNY's structural prime concrete contractor was Shroid Construction, Inc. ("Shroid"). (Rogers Dec., Exh. 3, Bartlett day 1, 231:14-232:9)

40.     On or about October 7, 1998, TDX received a letter from Shroid advising that the Project's concrete flooring decks on the 8th floor evidenced "inconsistencies in floor flatness," and that the finished concrete on the 2nd and 6th floors did not meet "the [standards for] flatness or level that is required in the contract specifications." Shroid further advised that "[w]e in fact know that these [concrete] decks do not meet ACI tolerances. We can only assume that they will not meet other trades [sic] requirements either." (Rogers Dec., Exh. 6)

41.     On or about November 3, 1998, TDX forwarded Shroid's letter to KPF, noting, among other things, that upon review the floor heights for the concrete slabs are 2 inches too high in certain areas. TDX notes that "no action will be taken at this time," however "at a later

date" the concrete slabs will be evaluated to determine which "areas … will require remedial action."  (Id., Exh. 7)

42.     Approximately nine (9) months later, on or about August 5, 1999, Trataros wrote to TDX, stating that the uneven concrete floor slabs need to be leveled out before the epoxy terrazzo is installed.  (Id., Exh. 8)

43.     Approximately three (3) months later, on or about November 8, 1999, KPF issued a memorandum regarding the tolerances necessary for three types of floor finishes, including epoxy terrazzo.  KPF directed that "[w]here slabs are beyond these tolerances, flash patch material should be used to level the slabs prior to finish installation."  (Id., Exh. 9)

### The Floor-Leveling Change Order

44.     Subsequently, DASNY issued a change order to Contract No. 16, GC2-028, adding the "installation of 'self leveling' floor fill" to that contract.  The "Change Order Memorandum" prepared by TDX and incorporated as part of the change order recites that "[t]his additional work is necessary due to the camber in the steel not coming out in the loading of the structure… This created irregular contours in the flatness of the [concrete] slab."  (Id., Exh. 10, and cf., ¶ 13 and Exh. 6)

45.     The "Change Order Memorandum" prepared by TDX and incorporated as part of the change order further recites "TDX has reviewed this change order and finds it to be fair and reasonable and recommends its approval.  It is our recommendation that the cost should be appropriated as a design omission."(Id., Exh. 10)

46.     Change Order GC2-028 incorporated Trataros' proposal for the floor leveling work, which included a list of exclusions, including the statement that Trataros was "[n]ot responsible for concrete delamination."  (Id., Exh. 10)

47.    Change Order GC2-028 also incorporated KPF's memo dated November 8, 1999, and a product catalogue sheet for a self-leveling underlayment material known as Conflow. (Id., Exh. 9)

48.    DASNY's Rule 30(b)(6) designee has admitted that inclusion of the Conflow product data sheet into the change order incorporated that material into Trataros' Contract No. 16 for use with the floor leveling work. (Rogers Dec., Exh 3, Bartlett, Day 2, 387:28-25)

49.    TDX's Rule 30 (b)(6) designee admitted that pursuant to the floor leveling change order, Conflow was the specified material for floor leveling. (Rogers Dec., Exh 11, Leu  Day 2 302:15-22)

50.    Subsequently, KPF approved the use of Conflow as a self-leveling underlayment in connection with the "floor leveling change order," i.e., Change Order GC2-028.  (Id., Exh. 12)

51.    On or about June 28, 2000, Trataros executed a purchase order with Bartec for the installation of "'self leveling' floor fill" at the Project. (Hall Aff., Exh. D)

52.    Bartec's purchase order includes a provision requiring it to "maintain general liability insurance coverage for bodily injury and property damage,' and further requires that "[a]ll insurance policies shall name Owner [DASNY] and TCI [Trataros] as additional insureds." (Id., Exh. D, p. 2, ¶ 21)

### Resolution of Alleged Flooring Problems During Project

53.    On or about January 26, 2001, Crocetti drafted a letter to Trataros alleging that Crocetti had "discovered hollow spots in areas being leveled on the eighth floor." (Id., Exh. E.)

54.    On or about March 9, 2001, Crocetti performed work on the 8th floor "remov[ing] loose underlayment and install[ing] new underlayment."    Apparently, the "hollow spots"

mentioned in Crocetti's January 26, 2001 letter were corrected in a single day. (Id., Exh. F) (only one ticket referencing work performed on the 8th floor)

55.      On or about February 28, 2001, TDX wrote to Trataros alleging that it had observed "areas [in the 13th floor elevator lobby] where the terrazzo flooring installation has separated from substrates." TDX also asserted that areas of the Conflow underlayment on the 6th floor appeared to have "delaminated." The letter requests a survey of the installed terrazzo, and a separate survey of the exposed areas of Conflow. TDX further notes that Trataros has taken core samples of the finished terrazzo, and requests to be provided with the results of Trataros' findings relative to those samples. (Id., Exh. E.)

56.      Subsequently, Trataros contacted Conspec Marketing & Manufacturing Co., Inc. ("Conspec"), Dayton Superior's predecessor-in-interest, regarding the purported separation and debonding. On or about March 1, 2001, Conspec wrote to Trataros, acknowledging a site visit to the Project held "last Tuesday." Conspec observed that "[t]he terrazzo flooring has come loose *in a small portion of the lobby area*" on the 13th floor, and that the Conflow in that area appeared to have been contaminated by some "foreign substance, or environmental condition," as the Conflow exhibited an unusual "powdery, loose surface." Conspec recommended grinding back the underlayment "to a solid surface before proceeding with a reapplication of the flooring system." (Rogers Dec., Exh. 13) (emphasis added).

57.      On or about March 7, 2001, Trataros wrote to DASNY enclosing Conspec's findings, as well as the testing lab's findings regarding the core samples taken by Trataros. Trataros further noted that, following its survey of the installed terrazzo, the only area exhibiting separation between the terrazzo and underlayment had been found to be on the 13th floor, and that no additional areas of debonding Conflow had been found. Trataros further noted that "[i]t

is the concessive or [sic] all parties that the delaminating of the terrazzo was due to the contamination of the last lift of Conflow." (Id.)

58. On or about March 8, 2001, Crocetti began performing corrective work in the 13th floor lobby; this work apparently was concluded within 6 working days. (Hall Aff., Exh. F, first six work tickets, all of which indicate "Floor/Level: 13" and bearing the "Date[s] Work Performed" 3/8/01, 3/9/01, 3/12/01, 3/13/01, 3/15/01, and 3/16/01)

59. Corrective work for the alleged condition in the Conflow installed in the 6th floor lobby area appears to have been performed in two days. (Id., Exh. F, fourth work ticket from last)

60. Two of the Crocetti work tickets appended to the Hall Affidavit pre-date the corrective work undertaken in March, 2001. (See, id., Exh. F, final two work tickets, dated 2/27/01 and 2/28/01, respectively)

61. Ray Leu, TDX's 30(b)(6) designee for the terrazzo phase of depositions in this action, acknowledged that during the Project there were incidences where the Conflow became contaminated and was repaired. (Rogers Dec., Exh. 11, Leu 2, 346:11-349:4)

62. Mr. Leu further testified that the alleged problems identified in Exh. 14 (marked at deposition as Exhibit T-71) were remedied to TDX's satisfaction. (Rogers Dec., Exh. 11, Leu 3, 584:22-585:15)

63. Nicholas D'Ambrosio, DASNY's Project Manager on the Project from its beginning until approximately September/October, 2001, testified that he was unaware of any problems with the Project's terrazzo floors occurring during his period on the Project. (Rogers Dec., Exh. 15, D'Ambrosio,16:23-17:17; 19:18-20:2; 39:6-40:16; 125:3-17)

64.     Mr. D'Ambrosio further testified that as of September, 2001, the Project was occupied, the finished terrazzo had been installed, and "[i]t looked great."  To Mr. D'Ambrosio's knowledge, there were no complaints about the terrazzo floor finishes at that point in time.  He further testified, confirming that he never observed "any terrazzo that looked bad" up to the point he left the Project.  (Id., 133:7-23)

65.     Mr. D'Ambrosio further testified that to his knowledge, there never came a time when Trataros was placed on notice by DASNY that Trataros would be held responsible for problems associated with the terrazzo flooring. (Id., 213:6-12)

66.     Mr. D'Ambrosio further testified that if there had been "reports that the terrazzo had failed to the point where it had to be removed and replaced," he would have expected to receive such reports, and that he had no recollection of receiving any such reports during "late winter/spring of 2001" particularly including the months of February, March and April, 2001. (Id., 213:22-214:23)

67.     In addition to the floor leveling work performed by Bartec pursuant to its purchase order, Crocetti performed certain underlayment work pursuant to separate change orders, including Change Order GC2-202.  (Id., Exh. 16) (reciting that the change order relates to "all labor … and material necessary to install hydraulic cement base in areas left out by the underlayment subcontractor … due to accelerating work schedule in order to open the building on the college target date of August 27, 2001.")

68.     The work performed by Crocetti pursuant to Change Order GC2-202 included the installation of underlayment in "areas around elevators" and/or "at elevators." (Id., Exh. 16, at Crocetti work tickets dated 3/1/01, 3/2/01, and 3/12/01)

69.    Two of the Crocetti work tickets appended to the Hall Affidavit appear on the face of the documents to likewise relate to installation of underlayment at elevators and escalators, and do not appear to relate to corrective work. (Hall Aff., Exh.F, at Crocetti work tickets dated June 6, 2001 and June 7, 2001, respectively)

70.    Subsequent to TDX's May 13, 2002 letter refusing to issue a change order for corrective work to the terrazzo (Hall Aff., Exh. M), DASNY actually issued a change order to Trataros, compensating the costs for "all labor, equipment and material necessary to repairs to the project's terrazzo flooring system.

71.    DASNY also issued to Trataros Change Order GC2-182, compensating "all labor, equipment and material necessary to repair damaged terrazzo base caused by unidentified trades and to repair cracks in the existing floor slab in the B-3 level prior to the installation of the terrazzo floor." This change order was signed by DASNY in December, 2002. (Id., Exh. 17)

### The R&J Action

72.    In connection with its work on the Project, Trataros engaged R&J Construction Corp. ("R&J") as a subcontractor. (Id., Exh. 18, R&J Subcontract)

73.    On or about November 20, 2002, DASNY received two notices of mechanic's liens, filed by R&J in connection with the Project.

74.    Subsequently, R&J commenced an action in the Supreme Court of the State of New York, New York County, on or about July 18, 2003. R&J alleged causes of action for, *inter alia*, allegedly unpaid subcontract balance, a delay claim, breach of subcontract, and lien foreclosure. (Hall Aff., Exh. H.) It was in connection with its lien foreclosure causes of action that R&J named Bartec and Crocetti, among other subcontractors of Trataros, as defendants. (See, id., at ¶¶ 78-84 and 112-118)

75.     R&J asserted no claim against Trataros, DASNY, Crocetti or Bartec in connection with any purported defects in the Project's epoxy terrazzo and/or underlayment. (Id.)

76.     Likewise, when DASNY filed its responsive pleadings in the R&J action, DASNY did not assert any claims, nor even allegations alluding to, the purported defects in the Project's epoxy terrazzo and/or underlayment. (Rogers Dec., Exhs. 21 & 22)

77.     Subsequently, R&J's claims were compromised by DASNY, and its Complaint was dismissed. (Id., Exh. 23)

**The Baer Action**

78.     On or about June 28, 2004, Travelers commenced an action entitled Travelers Casualty and Surety Company as Administrator for Reliance Insurance Company v. The Dormitory Authority of the State of New York, et al., Case No. 04-CV-5101 (the "Baer Action"), by filing its Complaint and Jury Demand with the United States District Court for the Southern District of New York (the "Southern District").   This action was assigned to the Honorable Harold Baer, Jr., U.S.D.J. (Id., Exh. 24)

79.     On or about August 4, 2004, DASNY filed a Third-Party Complaint in the Baer Action, alleging claims against Travelers and Trataros.  (Id., Exh. 25)

80.     On or about December 1, 2004, Travelers and Trataros filed their Fourth-Party Complaint in the Baer Action, impleading Crocetti, Bartec, and Dayton Superior, among others, on theories of indemnification and contribution, inter alia.  (Id., Exh. 26)

81.     One day later, on December 2, 2004, the Honorable Harold Baer, Jr., U.S.D.J. entered a Scheduling Order, setting a deadline of February 17, 2001 for joinder of additional parties. (Id., Exh. 27)

82.     In light of the filing deadline, on February 17, 2005, Travelers and Trataros filed their Amended Fourth-Party Complaint in the Baer Action, impleading Ohio Casualty and a number of other insurance carriers. (Id., Exh. 28)

83.     Subsequently, the Baer Action was voluntarily dismissed, upon the consent of all parties, including Ohio Casualty and the other insurance carriers. (Id., Exh. 30)

### The Within Action

84.     Following dismissal, the parties engaged in confidential non-binding mediation. After the close of the mediation, pursuant to the tolling agreement Travelers commenced the within action by filing its Complaint and Jury Demand with the Southern District, on August 1, 2007. (Id., Exh. 31)

85.     At the time of Travelers' filing, it marked the action as related to the prior Baer Action.  The Clerk referred the issue to Judge Baer for decision as to whether the two actions were related.  (Id., Exh. 32)

86.     On or about August 14, 2007, Judge Baer declined the within action as "not similar," and the case was returned to the Clerk's Office for assignment.  (Id., Exh. 32)

87.     On or about September 28, 2007, DASNY and TDX filed their "Answer of DASNY and TDX with Affirmative Defenses, Counterclaims, and Cross-Claims" (hereinafter, the "DASNY/TDX Answer"). (Id., Exh. 33)

88.     On or about September 28, 2007, DASNY and TDX filed their Third-Party Complaint, impleading Trataros into the within action. The Third-Party Complaint was not entered on the Court's ECF system until October 2, 2007. (Id., Exh. 34)

89.     On October 1, 2007, Counsel for Travelers and Trataros received a hard-copy of the Third-Party Complaint, under cover of a letter from counsel for DASNY and TDX requesting

that Trataros execute a Waiver of Service of Summons.  That <u>same day</u>, Travelers and Trataros transmitted copies of the Third-Party Complaint and the DASNY/TDX Answer to the various carriers via Federal Express. (<u>Id.</u>, Exh. 35)

90.    In response to the claims alleged in the present action by DASNY and TDX in their Third-Party Complaint, and in their respective counterclaims, Travelers and Trataros filed their Fourth-Party Complaint on November 14, 2007.  Travelers' and Trataros' Fourth-Party Complaint impleaded Ohio Casualty, among others.  The timing of Travelers' and Trataros' Fourth-Party filing was within the period of tolling established between the parties during the mediation proceeding.  (<u>Id.</u>, Exh. 37)

91.    On November 14, 2007, Travelers and Trataros transmitted to all named Fourth-Party Defendants, including the various fourth-party insurance carriers with the exception of NAS which was not a party at the time, copies of the Fourth-Party Summonses, prior pleadings filed to date, and copies of other pertinent documents. (<u>Id.</u>, Exh. 36)

### Ohio Casualty's Policies

92.    During the pendency of the Baer Action, Ohio Casualty produced to Travelers and Trataros a copy of the excess policies purportedly issued to Crocetti by Ohio Casualty. (<u>Id.</u>, Exh. 38 & 39)

93.    The Contractor's Liability Policy bearing policy no. BHO (02) 52 84 96 21 issued to Bartec (the "Primary Bartec Policy") identifies the New Jersey Named Insured & Mailing Address as follows:

> Bartec Industries
> Rencon Corp
> PO Box 356
> Little Falls, NJ 07424-0356

(Hamilton Aff., Exh. A, p. 1 of 33)

94.      In its Fourth Party Answer filed in the within action, Bartec has admitted that it is a New Jersey Corporation, with its principal place of business located at 453 Main Street, Little Falls, New Jersey 07424. (Rogers Dec., Exh. 40, ¶4 and cf., Exh. 37, at ¶4)

95.      The Policy Declarations for Commercial Umbrella Policy No. BXO (02) 52 84 96 21 (the Bartec Excess Policy") likewise utilizes the same Little Falls, New Jersey address for its named insureds, Bartec and Rencon Corp.  (Id., Exh. B, p. 1 of 35)

96.      The Primary Bartec Policy identifies as New Jersey Insurance Agent with the "[Insurance] Agent's Name & Address, in pertinent part, as

> Wharton Lyon & Lyon
> 101 S. Livingston Ave
> Livingston, NJ 07039-3008

(Id., Exh. A, p. 1 of 33)

97.      The first Policy Declarations page for the Primary Bartec Policy recites that it was issued on June 8, 2001 at the "New Jersey Branch Office."  (Id.)

98.      The Bartec Excess Policy also identifies Wharton Lyon & Lyon of Livingston, New Jersey as the "agent" for the policy and recites that it was issued at the "New Jersey Branch Office," on or about June 11, 2001.  (Id., Exh. B, p. 1 of 35)

99.      The third Policy Declarations page of the Primary Bartec Policy identifies one (1) "Covered Location," namely, 435 Main Street, Little Falls, NJ 07424.  (Id., Exh. A, p. 3 of 33)

100.     The same page lists under the heading "Hazards" the following: "State: New Jersey." (Id.)

101.     The Primary Bartec Policy contains a "Blanket Additional Insured" endorsement, which provides in pertinent part, that Section II - "Who Is An Insured" of the policy's Commercial General Liability Coverage Form (the "CGL Form"), is amended to include as an

insured any person or organization whom you are required to name as an additional insured on

this policy under a written contract or agreement." The same endorsement further provides that

"[a]ny coverage provided [to an additional insured] hereunder shall be excess over any other

valid and collectible insurance available to the additional insured whether primary, excess,

contingent or on any other basis unless a contract specifically requires that this insurance be

primary or you request that it apply on a primary basis." (Id., p. 22 of 33 & 23 of 33)

102.    The Primary Bartec Policy further provides, in pertinent part, that the insurance

provided under the CGL Form "applies to … 'property damage' only if the … 'property damage'

is caused by an 'occurrence' that takes place in the 'coverage territory.'" (Id., p. 5 of 33)

103.    The term "coverage territory is defined under the CGL Form as:

    a.    The United States of America (including its territories and
          possessions), Puerto Rico and Canada;
    b.    International waters or airspace…;
    c.    All parts of the world [under several conditions]…

(Id., p. 13 of 33)

104.    The Primary Bartec Policy contains two endorsements entitled "New Jersey

Changes – Loss Information," and "New Jersey Aggregate Limits Notification," respectively.

(Id., pp. 19 of 33 and 20 of 33)

105.    Further, the Primary Bartec Policy contains an endorsement entitled "New Jersey

Changes – Cancellation and Nonrenewal." This endorsement explicitly references New Jersey

law as being applicable to and/or governing the insured's and insurer's rights under the policy.

(Id., p. 31 of 33, at ¶ A) ("Pursuant to New Jersey law, this policy cannot be cancelled or

nonrenewed for any underwriting reason or guideline which is arbitrary, capricious or unfairly

discriminatory…"). (And, id., at ¶ B.2.a.(1)(b)) ("Existence of a moral hazard, as defined in

N.J.A.C. 11:1-20.2(f) as follows [et cetera].")

106. The Bartec Excess Policy contains a similar endorsement entitled "New Jersey Changes – Cancellation and Nonrenewal", which likewise contains separate clauses stating that: "Pursuant to New Jersey law, this policy cannot be cancelled or nonrenewed for any underwriting reason or guideline which is arbitrary, capricious or unfairly discriminatory…," and defining the term "moral hazard" in accord with N.J.A.C. 11:1-20.2(f).  (Id., Exh. B., p. 25 of 35)

107. As of July 2, 2008, DASNY has not spent any money to repair or replace terrazzo nor has DASNY entered into any contracts for the repair or replace of the terrazzo flooring system. (Rogers Dec., Exh. 3, Bartlett day 3, 605:22-606:8)

108. Ohio Casualty through its counsel, had fully participated in discovery and depositions in the within matter. (Rogers Dec.¶ 53)

### DASNY's/TDX's Flooring Claim Allegations

109. DASNY's 30b(6) witness, Charles Bartlett, testified that there are two stages to the alleged terrazzo problems; in one state, the terrazzo panels allegedly shrink and pull back from the zone strips which divide the panels, the alleged second stage occurs when the terrazzo allegedly separates from the underlayment but is otherwise still "bonded." (Rogers Dec., Exh. 3, Bartlett day 3, 580:9-20; 582:22-583:2, 584:21-25;587:9-19)

110. Mr. Bartlett testified that not all the floors he inspected had floor failure. (Rogers Dec., Exh. 3, Bartlett day 3, 656:11-18)

111. Mr. Bartlett testified that he was able to see the purported shrinkage of the terrazzo through visual inspection. (Rogers Dec., Exh. 3, Bartlett day 3, generally, 577:3-584:25; 655:26-656:14)

112. Mr. Bartlett testified that did not examine each floor. (Rogers Dec, Exh. 3, Bartlett day 3, 579:14-580:8;655:13)

113.    Mr. Bartlett testified that he is unable to say how many "problem" panels he saw on each floor. (Rogers Dec., Exh. 3, Bartlett day 3, e.g. 578:8-579:13;580:9-580:12, 581:14-20;583:8-11)

114.    Mr. Bartlett testified that DASNY has spent no money on repairs/replacement of the epoxy terrazzo and not contracts entered into for repair/replacement of same.(Rogers Dec., Exh. 3, Bartlett day 3, 605:22-606:8)

115.    Mr. Bartlett testified that DASNY is dissatisfied with TDX's construction management services in relation to the terrazzo and underlayment installed at the Project.(Rogers Dec., Exh. 3, Bartlett day 3, 612:9-613:10;663:7-664:21)

116.    Mr. Bartlett testified that DASNY alleges underlayment is failing as well as the terrazzo. (Rogers Dec., Exh. 3, Bartlett day 3, 663:22-664:6)

117.    Mr. Bartlett TDX's contract called for daily inspection of the contractors' work on the project and periodic. (Rogers Dec., Exh. 3, Bartlett day 3, 665:2-67)

118.    Mr. Bartlett testified that the February 28, 2001 letter to Trataros regarding terrazzo was an exception report. (Rogers Dec., Exh. 3, Bartlett day 3, 665:23-666:15)

119.    Mr. Bartlett testified that the Conflow which was installed at the project was either defective or mislabeled by the manufacturer, Conspec. (Rogers Dec., Exh. 3, Bartlett day 1, 250:13-253:19; Bartlett day 2, 387:18-388:11; Bartlett day 3, 671:10-672:25 &735:11-736:19)

120.    Mr. Bartlett testified that DASNY paid $150,000 to Crocetti in payment of an escalation/delay claim advanced by Crocetti and passed-through to DASNY by Trataros on Crocetti's behalf. (Rogers Dec., Exh. 3, Bartlett day 1, 146:17-148:19)

121.    Mr. Bartlett testified that at a certain point during the Project, Conflow's manufacturer determine that a portion of the installed Conflow needed to be "taken out and repoured" due to apparent contamination. (Rogers Dec., Exh. 3, Bartlett day 2, 428:19-429:4)

122.    TDX's 30b(6) witness, Ray Leu testified that as part of TDX's responsibility to notify contractors to perform corrective work, Trataros was notified to perform corrective work on the floor leveling materials due to contamination issues. (Rogers Dec., Exh. 11, Leu day 1, 120:24-123:10)

123.    Mr. Leu testified at the that TDX prepared an exception report with respect to the alleged contamination issues with the Conflow in early 2001.(Rogers Dec., Exh. 11, Leu day 1, 139:5-14;530:16-531:21)

124.    Mr. Leu testified the manufacturer's product information for Conflow satisfies the Project's technical specifications for cementitious floor leveling products. (Rogers Dec., Exh. 11, Leu day 1, 194:8-196:12.)

125.    Mr. Leu testified that the Project opened to the use by students in September, 1001 without any restrictions on the use of the floors. (Rogers Dec., Exh. 11, Leu day 2, 349:21-350:21;470:17-471:21)

126.    Mr. Leu testified that the alleged problems with contamination in February were corrected to TDX's satisfaction. (Rogers Dec. Exh. 11, Leu day 3, 530:16-531:21;584:22-585:15)

127.    Trataros' 30(b)(6) designee, Athena Curis, testified that Trataros had been out of business since late 2002/early 2003 and from that point had no employees.  (Rogers Dec., Exh. 4, Curis, 11:17-19;12:2-4;12:24-13:18;18:24-19:8)

**Travelers' Investigation**

128.    The first actual claim that Travelers received from DASNY with respect to the alleged defects in the Project's epoxy terrazzo flooring system was the Third-Party Complaint filed by DASNY in the Action that had been pending before Judge Baer, entitled <u>Travelers Casualty and Surety Company, et al. v. The Dormitory Authority of the State of new York, et al.</u> bearing Case No. 04-cv-5101 (the "Baer Action"). As to claims made directly against Trataros with respect to the alleged flooring problems, Travelers is not aware of any such claim having been made by DASNY in advance of the Third-Party Complaint filed in the Baer Action. (Scarpellino Dec., ¶ 5.)

129.    Following receipt of DASNY's claim, Travelers conducted an investigation into the merits of DASNY's allegations and the potential exposure of Travelers and/or Trataros. Travelers conducted as thorough an investigation as it could under the circumstances (the Baer action was dismissed before any depositions were conducted) and we concluded that there was no liability on the part of Trataros or Travelers. In that regard, there was an issue with the work performed by a prior contractor. Possible causes of the alleged cracking of the terrazzo in certain areas included possible problems with the concrete, the underlayment or the terrazzo itself. (<u>Id.</u>, ¶ 6.)

130.    With respect to the insurance coverage issue, it bears noting that it was Trataros who was either a Named Insured or additional insured under the policies issued by the fourth-party defendant insurance carriers. Travelers as surety, was not named additional insured. However, Trataros had been out of business for over a year at the time that DASNY filed its Third-Party Complaint in the Baer Action, and had no employees. (<u>Id.</u>, ¶ 7.)

131.    Without divulging privileged attorney-client communications and attorney work product, not only did we believe that neither Travelers nor Trataros had exposure for the claims based upon our investigation, but Travelers did not believe that potential coverage may exist for the allegations raised in DASNY's Third Party Complaint, particularly because those allegations are generally couched in terms of alleged defects in Trataros' and/or Crocetti's workmanship on the Project. (<u>Id</u>., ¶ 8.)

132.    It was Travelers' general understanding that commercial general liability ("CGL") polices exclude coverage for defects in a contractor's own work.   CGL policies contain numerous technical exclusions "hazards", and exceptions.   Based on the limited information available to Travelers at the time, it could not be said whether and which exceptions to the general rule of non-coverage might apply under the facts of this case. (<u>Id</u>., ¶ 9.)

133.    As the Baer Action got underway, Travelers started to review and compile Project records from Trataros (at least hundreds of thousands of pages of documents were received) as well as from other parties that comprise over 1,000,000 pages relating to this matter. (<u>Id</u>., ¶ 10.)

134.    As a result of Judge Baer's ordered deadline for adding parties, Travelers impleaded those carriers for whom we ultimately (shortly before the deadline) found some proof of insurance. (<u>Id</u>., ¶ 11.)

Dated:    Florham Park, New Jersey
          September 12, 2008

                                  Respectfully submitted,
                                  **DREIFUSS BONACCI & PARKER, LLP**
                                  ***Attorneys for Travelers Casualty and Surety Co.***
                                  ***and Trataros Construction, Inc.***

                                  By:  _____/S/_____
                                       Eli J. Rogers (ER:6564)
                                       26 Columbia Turnpike, North Entrance
                                       Florham Park, New Jersey 07932
                                       (973) 514-1414