# Exhibit 1

# Part A

08.03.95

BARUCH COLLEGE
SITE "B"
DA# 6500 1802 3145

## AGREEMENT

An Agreement is hereby made by and between the DORMITORY AUTHORITY - State of New York, having its principal office and place of business at 161 Delaware Avenue, Delmar, New York 12054-1398, hereinafter referred to as the OWNER, and KOHN PEDERSEN FOX ASSOCIATES, P.C., whose office is located at 111 West 57th Street, New York, New York 10019, hereinafter referred to as the ARCHITECT; and

WHEREAS, the OWNER has requested the ARCHITECT to Provide Programming, Architectural, Engineering and Construction Phase Services for the Construction of Baruch College - Site "B", approximately 700,000 gsf of academic and administrative facilities, hereinafter referred to as the Project; and

WHEREAS, the OWNER and the ARCHITECT have agreed upon an amount for compensation and a Date of Completion for the Project;

NOW, THEREFORE, the OWNER and the ARCHITECT hereby mutually covenant and agree as follows:

### ARTICLE I: ARCHITECT'S SERVICES

The ARCHITECT's Services shall consist of all the services required by Appendix "A", entitled SCOPE OF SERVICES OF ARCHITECT, which is attached to and made a part hereof.

### ARTICLE II: ADDITIONAL SERVICES

The OWNER reserves the right to direct the ARCHITECT to provide Additional Services and the ARCHITECT shall provide said Additional Services when so directed. Payment for said Additional Services shall be in accordance with Article V.C.

### ARTICLE III: EXTRA WORK

If the ARCHITECT believes that any work it has been directed to perform is beyond the scope of this Agreement and constitutes Extra Work, it shall promptly so notify the OWNER in writing. The OWNER shall determine whether or not the work is in fact beyond the scope of this Agreement and is considered Extra Work. If the OWNER determines that the work is Extra Work, this Agreement shall be modified to equitably reflect the cost of said Extra Work. Payment shall be made in accordance with Article V.C.

### ARTICLE IV: CONSULTANTS

A.    The OWNER may retain a Consultant or Consultants to furnish services throughout the term of this Agreement, and the ARCHITECT shall cooperate with said Consultant or Consultants.

B.    The ARCHITECT may propose and engage Consultants, hereinafter referred to as Approved Design Consultants, to perform portions of the Services required under this Agreement. The OWNER retains the right to disapprove the proposed Consultant and, in such event, the ARCHITECT shall propose another Consultant for that portion of the required Services. The ARCHITECT shall be responsible to the OWNER for the timely and efficient completion of all Services performed by said Approved Design Consultants.

Rev. 6/14/95



Prior to execution of an agreement between the ARCHITECT and proposed Consultant, the ARCHITECT shall submit a copy of the proposed Consultant agreement to the OWNER for approval. The OWNER shall not be liable for payment to the ARCHITECT for any cost incurred under any Consultant agreements unless said approvals are obtained. The fees of any Consultants retained by the ARCHITECT for Services required under Article I shall be deemed covered by the compensation as stipulated in Article V.A.1. The fees of any Consultants retained by the ARCHITECT for services required under Article III shall be paid as outlined in Article V.C.2.

C.    The ARCHITECT shall pay its Consultants the full amount due them from their proportionate share of each requisition for payment submitted by the ARCHITECT and paid by the OWNER. The ARCHITECT shall make said payment no later than fourteen (14) calendar days from receipt of payment from the OWNER.

## ARTICLE V: PROVISION FOR PAYMENT

### MAXIMUM AMOUNT PAYABLE

The OWNER shall pay, and the ARCHITECT agrees to accept, as full compensation for all Services pursuant to this Agreement, the Not to Exceed amount of Eleven Million, Four Hundred and Fifty Thousand and 00/100 Dollars ($11,450,000.00). Appendix "B", entitled SUMMARY OF PAYMENTS, is attached to and made a part hereof.

Payments for Services shall be made monthly in proportion to Services performed and approved by the OWNER. Payments shall be requisitioned on the OWNER's form, PERSONAL SERVICES AGREEMENT REQUISITION with accompanying backup. Only said form shall be used for reimbursement of Services.

A.    ARCHITECT'S SERVICES

1.    Original Scope of Services

The OWNER shall pay, and the ARCHITECT agrees to accept, as compensation for Original Scope of Services pursuant to Appendix "A", which is attached to and made a part hereof, the Not to Exceed amount of Eleven Million, Two Hundred Thousand and 00/100 Dollars ($11,200,000.00).

Compensation at the completion of each Phase of the Project shall equal the proportional amount of the total basic compensation as stated below:

| Phase | Portion of Original Fee |
|---|---|
| Programming | $336,000 LS |
| Pre-schematic | 616,000 LS |
| Schematic | 1,288,000 LS |
| Design Development | 2,464,000 LS |
| Construction Documents | 3,920,000 LS |
| Bidding | 112,000 LS |
| Construction | 2,240,000 LS |
| Post Construction Deliverables | 224,000 LS |

2

B.     REIMBURSABLES

Payment for approved Reimbursables pursuant to Article VI shall be made monthly on the basis of invoices submitted by the ARCHITECT and approved by the OWNER.  Total reimbursement for said Reimbursables shall Not Exceed Two Hundred Fifty Thousand  and 00/100 Dollars ($250,000.00).

C.     ADDITIONAL SERVICES AND EXTRA WORK

Payment for Additional Services and Extra Work shall be on the basis of one of the following methods as determined by the OWNER:

1.     Negotiated Lump Sum; or

2.     Actual Cost.

Actual Cost shall include the following specific items:

a.     Principals at the fixed rate of $90.00 per hour.  The Principals for this Project are:

Greg Clement; William Pedersen;

A. Eugene Kohn; Robert Cioppa

b.     Direct Salary of employees, other than Principals, times a maximum multiple of 2.5.  Multiplier must be supportable by appropriate audit.

Direct Salary as used herein shall be the payroll cost of salaries or wages paid directly to technical employees of the ARCHITECT or Approved Design Consultants employed on the Project, supportable by payroll copy or appropriate audit.

Technical Employees, other than Principals, shall mean employees trained in areas of technical competence, such as architecture, engineering, drafting, survey, and related specialties, but does not include clerical, typing, or stenographic assistance.

c.     Services of Approved Design related Subconsultant(s) pursuant to Article IV, and a markup paid to the ARCHITECT at a maximum of ten (10) percent times the actual direct salary costs of the Design Subconsultant.  This markup is for the ARCHITECTs administrative and coordinating efforts to solicit and contract with new Subconsultants, or for Additional Services work in which the ARCHITECT does not participate; and

d.     Specific Approved Reimbursable Expenses.

ARTICLE VI: REIMBURSABLE EXPENSES

Reimbursable Expenses are in addition to the compensation for the Original Scope of Services and include the actual expenditures supported by detail receipts/documentation made by the ARCHITECT, or the ARCHITECTs Approved Design Consultants, as approved by the OWNER.  Said reimbursement shall be limited to those specific items listed below:

3

A.    transportation and living expenses in connection with out-of-town travel when authorized in advance by the OWNER, and when travel is in excess of fifty (50) miles one way from the CONSULTANT's closest office.  Reimbursement shall be limited to the rates provided herein:

1.    mileage at 28 cents ($0.28) per mile;

2.    meals

|  | NYC Rate* | Upstate Rate |
|---|---|---|
| Breakfast | $ 5.00 | $ 4.00 |
| Lunch | 8.00 | 5.00 |
| Dinner | 35.00 | 25.00 |
| Overnight Incidentals | 3.00 | 2.00 |
| Maximum Per Diem | $51.00 | $36.00 |

\* Also applies to Nassau, Suffolk, Rockland, and Westchester Counties and out-of-state travel

|  | Departure** | Arrival** |
|---|---|---|
| Breakfast | Before  7:00 AM | After 8:00 AM |
| Lunch | Before 11:30 AM | After 2:00 PM |
| Dinner | Before  6:00 PM | After 7:00 PM |

\*\* Departure or Arrival predicated on residence

3.    lodging per receipt to a maximum of $100.00 per night in the New York metropolitan area or $50.00 in upstate New York; and

B.    long-distance telephone calls and telegrams;

C.    fees paid to authorities having jurisdiction over the Project;

D.    reproductions, postage, and handling of drawings, specifications, and other documents for the interim submissions (for OWNER's review and approval provide complete sets of documents, as requested by the OWNER, at the completion of all Phases of the Project.  [Pre-Schematic, Schematic, Design Development, 60% and 100% Construction Documents], EXCLUSION: reproductions for the office use of the A/E and the A/E's Approved Design Consultants;

E.    overtime work requiring higher than regular rates when authorized in advance by the OWNER;

F.    expense of renderings or models for the OWNER's use; and

G.    film and film processing.

## ARTICLE VII: FINAL PAYMENT AND RELEASE

Upon satisfactory completion by the ARCHITECT and acceptance by the OWNER of all Services required pursuant to this Agreement, or all Services performed prior to the termination of said Agreement if so terminated, final payment shall be made to the ARCHITECT.

4

Acceptance by the ARCHITECT of final payment hereunder shall operate as, and shall be, a release to the OWNER from all claims and liability to the ARCHITECT and its successors, legal representatives, and assigns for anything done or furnished under or arising out of the provisions of this Agreement. No payment, final or otherwise, shall release the ARCHITECT from any obligations under this Agreement.

## ARTICLE VIII: COST CONTROL

The ARCHITECT's prepared plans and specifications shall not result in an estimated construction cost in excess of the established budget of One Hundred Sixty-eight Million and 00/100 Dollars ($168,000,000.00).

In the event it is discovered during any Phase that the estimated cost of the Work is in excess of the established budget or the bids received are in excess of the established budget, the ARCHITECT shall revise, at its own cost and expense, all or any part of the plans and specifications necessary to bring the construction cost within the established budget.

## ARTICLE IX: OWNER'S PROCEDURE

The ARCHITECT agrees to comply with all procedural requirements of the OWNER reasonably inferable from the Scope of Services and Scope of Work. In addition, during the Design Phase of this Agreement, the ARCHITECT shall comply with all procedural requirements of the Client and be guided by the requirements of the OWNER's Design Consultant Guide and the OWNER's Drawing Production Guide. Client is herein defined as the entity for whom the OWNER is performing services, including subsidiaries, agents, related corporations, or fiduciaries.

## ARTICLE X: INSURANCE

A.     The ARCHITECT shall procure and shall maintain all of the insurance required under this Article until final acceptance of the Project by the OWNER.

The ARCHITECT shall not commence work under the Agreement (the Project) until the ARCHITECT has obtained all the insurance required under this Article.

The ARCHITECT shall secure:

1.     **Workers' Compensation and Employer's Liability Insurance**

    a.     Statutory Worker's Compensation (including occupational disease)
    b.     Employer's Liability (with a minimum limit of $100,000)
       New York Statutory Endorsement
    c.     Waiver of Subrogation

2.     **New York State Disability Benefit Insurance**

3.     **Commercial General Liability** (CGL) with a combined single limit for Bodily Injury, Personal Injury and Property Damage of at least $2,000,000 per occurrence & aggregate. The limit may be provided through a combination of primary and umbrella/excess liability policies.

5

The coverage shall provide and encompass at least the following:

    a.    Independent Contractors;

    b.    Blanket Written Contractual Liability covering all Indemnity Agreements;

    c.    Products Liability and Completed Operations;

    d.    Endorsement naming the Dormitory Authority of the State of New York and the City University of New York, City University Construction Fund, as Additional Insureds;

    e.    Waiver of Subrogation; and

    f.    Policy or policies must be endorsed to be primary as respects the coverage afforded the Additional Insureds and such policy shall be primary to any other insurance maintained by the Authority. Any other insurance maintained by the OWNER shall be excess of and shall not contribute with the ARCHITECT insurance, regardless of the "other insurance" clause contained in the OWNER's own policy of insurance.

4.    **Commercial Automobile Liability and Property Damage Insurance** covering all owned, leased, hired and non-owned vehicles used in connection with the Work with a combined single limit for Bodily Injury and Property Damage of at least $1,000,000 per occurrence. The limit may be provided through a combination of primary and umbrella/excess liability policies.

5.    **Umbrella and/or Excess Liability policies** used to comply with CGL, and Auto Liability and Employer's Liability limits shown above may be warranted to be in excess of limits provided by primary CGL, Automobile Liability and Employer's Liability, but not excess to other insurance maintained by OWNER.

6.    **Professional Liability Insurance** with a three year extended discovery clause in the amount of $2,000,000 each per occurrence subject to a deductible of not more than $100,000 per claim. Should the deductible be greater than $100,000, the ARCHITECT shall submit a certified audit of the ARCHITECT's financial statement including the auditor's opinion letter and all notes to the audit for the fiscal year immediately preceding this proposed Agreement.

7.    **If Applicable, Asbestos Abatement Professional Liability Insurance** with a limit of $2,000,000. Coverage shall provide and encompass at least the following:

    a.    The ARCHITECT's negligence, errors, or omissions in rendering or failing to render services of an engineering or consulting nature arising out of :

        i.    specifications for product, material or process containing asbestos;

        ii.    failure to advise of or detect the existence or the proportion of asbestos;

        iii.    installation, modification, abatement, replacement or approval of a product, material or process containing asbestos.

    b.    Extended reporting provision of three (3) years.

    c.    Maximum Self-Insured Retention of $100,000.

8.    If applicable, ARCHITECT's involved in the removal, repair, installation and testing of underground petroleum storage tanks as well as those involved in petroleum remediation

6

operations, or ARCHITECT engaged in or performing work and services related to excavation, loading, transporting or unloading of hazardous/contaminated materials, shall provide insurance as follows:

**Environmental Engineers and Consultants Professional Liability Insurance** with a limit of $2,000,000. Coverage shall provide and encompass at least the following:

a. The ARCHITECT's negligent act, errors or omissions in rendering or failing to render services of an engineering or consulting nature arising out of their environmental engineering or consulting.

b. Extended reporting provision of three (3) years.

c. Maximum Self-Insured Retention of $100,000.

B. Two Certificates of Insurance, indicating the Program, must be submitted and approved by the OWNER prior to the commencement of work. Certificates shall provide thirty (30) days written notice prior to the cancellation, non-renewal, or material modification of any policy. Upon request, the ARCHITECT shall furnish the OWNER with certified copies of each policy.

Certificates are to be forwarded to:

Risk Management
Dormitory Authority -- State of New York
161 Delaware Avenue
Delmar, NY  12054

and

Contracts Unit
Dormitory Authority -- State of New York
161 Delaware Avenue
Delmar, NY  12054

Sample forms of the Certificate of Insurance are attached. A Certificate of Insurance, when submitted to the OWNER, constitutes a warranty by the ARCHITECT that the insurance coverage described is in effect for the policy term shown.

Should the ARCHITECT engage a Subconsultant, the same conditions as are applicable to the ARCHITECT under these insurance requirements shall apply to each Subconsultant of every tier. However, the ARCHITECT shall keep these Subconsultant Certificates of Insurance on file, and produce same upon demand by the OWNER.

C. All insurance required to be procured and maintained must be procured from insurance companies licensed to do business in the State of New York and rated at least B+ by A.M. Best and Company, or meet such other requirements as are acceptable to the OWNER.

D. Should the ARCHITECT fail to provide or maintain any insurance required by this contract, the OWNER may, after providing verbal notice to the ARCHITECT, purchase insurance covering the ARCHITECT and charge back such purchase to the ARCHITECT.

7

E.  At any time that the coverage provisions and limits on the policies required herein do not meet the provisions and limits set forth above, the ARCHITECT shall immediately cease work on the Project. The ARCHITECT shall not resume work on the Project until authorized to do so by the OWNER. Any delay or time lost as a result of the ARCHITECT not having insurance required by this Article shall not give rise to a delay claim or any other claim against the OWNER or the client.

F.  Notwithstanding any other provisions in this Article, the OWNER may require the ARCHITECT to provide, at the expense of the Authority, any other form or limit of insurance necessary to secure the interests of the OWNER.

G.  The ARCHITECT shall secure, pay for, and maintain Property Insurance necessary for protection against the loss of owned, borrowed or rented equipment and tools, including any tools owned by employees, and any tools or equipment, owned, borrowed or rented by the ARCHITECT. The equipment to secure and maintain such insurance is solely for the benefit of the ARCHITECT. Failure of the ARCHITECT to secure such insurance or to maintain adequate level of coverage shall not render the Additional Insureds, or their agents and employees responsible for any losses; and, the Additional Insureds, their agents and employees shall have no such liability.

H.  Neither the procurement nor the maintenance of any type of insurance by the OWNER and the ARCHITECT shall in any way be construed or be deemed to limit, discharge, waive or release the ARCHITECT from any of the obligations and risks accepted by the ARCHITECT or to be a limitation on the nature or extent of said obligations and risks.

I.  The ARCHITECT and Subconsultants shall not violate, or permit to be violated, any term or condition of their insurance policies, and shall at all times satisfy the safety requirements of the OWNER and of the insurance companies issuing such policies.

## ARTICLE XI: HOLD HARMLESS

The ARCHITECT hereby agrees to indemnify and hold harmless the OWNER, the Client, or the OWNER's members, officers, employees, or representatives, against all claims arising out of the negligent acts, alleged negligent acts, or failure to act, by the ARCHITECT and shall pay any judgment or expense, including interest, imposed against any of them for personal injury, wrongful death or property damage, and to defend and pay the costs and expenses thereof, any action, proceeding or lawsuit brought against the parties indemnified and held harmless herein.

Upon the conclusion of any such action, proceeding or lawsuit, should a final binding determination of responsibility be made which allocates responsibility to the OWNER, the Client, or the OWNER's members, officers, employees, or representatives, the OWNER agrees that the obligation to indemnify and hold harmless shall not be applicable to the portion of any money judgment for which the OWNER is responsible, and the OWNER agrees to pay the ARCHITECT the percentage of defense costs which the ARCHITECT incurred based upon an apportionment of the OWNER's allocated responsibility.

## ARTICLE XII: OWNER'S RIGHT TO AUDIT AND INSPECT RECORDS

The ARCHITECT shall maintain, and shall keep for a period of six (6) years after the date of Final Acceptance, all records and other data relating to the Project, including records of Consultants and Subconsultants. The OWNER or the OWNER's Representative shall have the right to inspect and audit all records and other data of the ARCHITECT and its Consultants and Subconsultants relating to the Project.

## ARTICLE XIII: ERRORS AND OMISSIONS

The ARCHITECT agrees that the cost to the ARCHITECT for corrections to the Contract Documents necessitated by design errors or omissions shall be part of the ARCHITECT's fee for Original Scope of Services and part of Original Reimbursables as established herein.

## ARTICLE XIV: TIME OF COMPLETION

The ARCHITECT shall perform Services as expeditiously as is consistent with professional skill and care and the orderly progress of the Work. Prior to the commencement of Design Phase Services, the ARCHITECT shall submit for the OWNER's approval, a schedule for the performance of the ARCHITECT's Services during design and construction and shall include allowances for periods of time required for the OWNER's review and approval of submissions and for approvals of authorities having jurisdiction over the Project. This schedule, when approved by the OWNER, shall not, except for reasonable cause, be exceeded by the ARCHITECT.

The ARCHITECT shall complete all Design Services on or before October 1, 1997, and all project services by October 1, 2000.

## ARTICLE XV: ASSIGNMENT

The ARCHITECT shall not assign the Agreement in whole or in part without prior written consent of the OWNER.

## ARTICLE XVI: APPENDIX "D" ADDITIONAL ITEMS

Attached to and made a part hereof is Appendix "D", entitled ADDITIONAL ITEMS.

IN WITNESS WHEREOF, the OWNER and ARCHITECT have executed this Agreement as of this _____ 14ᵗʰ _____ day of _____ SEPTEMBER _____ 19 95

KOHN PEDERSON FOX ASSOCIATES/P.C.

By _____

Title _____ PRINCIPAL _____


DORMITORY AUTHORITY

By _____

Title _____ Director of Project Management _____

/rk
H/ORIGINAL/ACE
REV. 6/14/95

9

## ACKNOWLEDGMENT OF OFFICER OF OWNER EXECUTING CONTRACT

STATE OF NEW YORK)
COUNTY OF ALBANY ) ss:

On this _10/11_ day of _October_ in the year 19_95_ before me personally came _Douglas VanVleck_, who being by me known and duly sworn, did depose and say that he resides at 28 Furry Rd., Wynantskill, NY 12198 .; that he is the _Sr. Dir. Proj. Mngt._ of the Dormitory Authority, the corporation described in and which executed the above instrument; and that he signed his name thereto by order of the Board of Directors of said corporation.

_Pearl Ellen Rock_
Notary Public

PEARL ELLEN ROCK
Notary Public, State of New York
No. 01R05022790
Qualified in Albany County
Commission Expires Jan. 18, 19_96_

## ACKNOWLEDGMENT, IF A CORPORATION

STATE OF _NEW YORK_)
COUNTY OF _NEW YORK_) ss:

On this _14th_ day of _SEPT._ in the year 19_5_ before me personally came _WILLIAM PEDERSEN_, to me known, who, being by me duly sworn, did depose and say that he resides at _7 W. 81 ST., N.Y., N.Y._; that he is the _PRINCIPAL_ of _KOHN PEDERSEN FOX ASSOC. P.C._ , the corporation described in and which executed the above instrument; and that he signed his name thereto by order of the Board of Directors of said corporation.

_Barbara K Guarrera_
Notary Public

BARBARA K. GUARRERA
Notary Public, State of New York
No. 4989381
Qualified in Putnam County
Commission Expires Dec. 2, 19_95_

## ACKNOWLEDGMENT, IF A PARTNERSHIP

STATE OF _____ )
COUNTY OF_____ ) ss:

On this _____day of_____in the year 19__, before me personally came _____ _____, known to me to be a member of the firm _____ _____ , described in and who executed the foregoing instrument, and he duly acknowledged to me that he executed the same for and in behalf of said firm for the uses and purpose mentioned therein.

_____
Notary Public

## ACKNOWLEDGMENT, IF AN INDIVIDUAL

STATE OF_____)
COUNTY OF _____) ss:

On this_____day of_____in the year 19__, before me personally came _____, known to me to be the person described in and who executed the foregoing instrument and he duly acknowledged that he executed the same.

_____
Notary Public

Rev. 6/14/95

## CERTIFICATION OF NON-SEGREGATED FACILITIES
## AND NON-DISCRIMINATION IN EMPLOYMENT IN NORTHERN IRELAND

The Consultant certifies that the Consultant or its Subconsultant does not, nor shall not, maintain or provide for the employees of such Consultant or Subconsultant any segregated facilities at any establishments, of such Consultant or Subconsultant, and that the Consultant or Subconsultant shall not permit any employees, of such Consultant or Subconsultant, to perform services at any location, under the control of such Consultant or Subconsultant, where segregated facilities are maintained. The Consultant or Subconsultant agrees that a breach of this certification is a violation of the equal opportunity clauses of the Agreement. The Consultant or Subconsultant further agrees that, except in any instance in which the Consultant or Subconsultant has obtained identical certifications from proposed Subconsultants for specific time periods, such Consultants or Subconsultant shall obtain identical certifications from proposed Subconsultants prior to the award of subcontracts exceeding Ten Thousand Dollars ($10,000.00); that such Consultant or Subconsultant shall retain such certifications in the files of such Consultant or Subconsultant.

The Consultant or Subconsultant further stipulates that it, and any individual or legal entity in which the Consultant or Subconsultant holds a ten percent (10%) or greater ownership interest and any such entity that holds such an interest in the Consultant or the Subconsultant, either:

(i)         has no business operations in Northern Ireland; or
(ii)        shall take all lawful steps in good faith to conduct any business operations it has or in which it has such an interest in Northern Ireland in accordance with the MacBride Fair Employment Principles as set forth in Chapter 807 of the Laws of 1992 and shall permit any independent monitoring of its compliance with said Principles.

NOTE: The penalty for making false statements in offers is prescribed in 18 U.S.C. 1001.

(Name and Title of Certifier-Please Type)

(Signature)

9. 14. 95

(Date)

Rev. 6/14/95

# Request for Taxpayer
## Identification Number and Certification

Give this form to
the requester. Do
NOT send to IRS.

Name (if joint name, list first and circle the name of the person or entity whose number you enter in Part I below. See instructions on page 2 if your name has changed.)

Business name (Sole proprietors see instructions on page 1.) If you are exempt from backup withholding, complete this form and enter "EXEMPT" in Part II below.)

**KOHN PEDERSEN FOX ASSOCIATES PC**

Address (number and street)

**111 WEST 57 STREET**

List account number(s) here (optional)

City, state, and ZIP code

**NEW YORK, NY  10019**

## Part I  Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. For individuals, this is your social security number (SSN). For sole proprietors, see the instructions on page 2. For other entities, it is your employer identification number (EIN). If you do not have a number, see How To Obtain a TIN below.

Note: If the account is in more than one name, see the chart on page 2 for guidelines on whose number to enter.

**Social security number**

OR

**Employer identification number**

| 1 | 3 | 2 | 8 | 6 | 2 | 5 | 0 | 4 |

## Part II  For Payees Exempt From Backup Withholding (See Exempt Payees and Payments on page 2)

Requester's name and address (optional)

## Certification.—Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding.

Certification Instructions.—You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because of underreporting interest or dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, the acquisition or abandonment of secured property, contributions to an individual retirement arrangement (IRA), and generally payments other than interest and dividends, you are not required to sign the Certification, but you must provide your correct TIN. (Also see Signing the Certification on page 2.)

Sign Here   Signature ▶ _[signature]_ EXEC. V.P.          Date ▶ 10/13/95

Form W-9 (Rev. 1-93)

Backup Withholding, below, and Exempt Payees and Payments under Specific Instructions, below, if you are an exempt payee.

**Payees and Payments Exempt From Backup Withholding.**—The following is a list of payees exempt from backup withholding and for which no information reporting is required. For interest and dividends, all listed payees are exempt except item (9). For broker transactions, payees listed in (1) through (13) and a person registered under the Investment Advisers Act of 1940 who regularly acts as a broker are exempt. Payments subject to reporting under sections 6041 and 6041A are generally exempt from backup withholding only if made to payees described in items (1) through (7), except a corporation that provides medical and health care services or bills and collects payments for such services is not exempt from backup withholding or information reporting. Only payees described in items (2) through (6) are exempt from backup withholding for barter exchange transactions, patronage dividends, and payments by certain fishing boat operators.

(1) A corporation. (2) An organization exempt from tax under section 501(a), or an IRA, or a custodial account under section 403(b)(7). (3) The United States or any of its agencies or instrumentalities. (4) A state, the District of Columbia, a possession of the United States, or any of their political subdivisions or instrumentalities. (5) A foreign government or any of its political subdivisions, agencies, or instrumentalities. (6) An international organization or any of its agencies or instrumentalities. (7) A foreign central bank of issue. (8) A dealer in securities or commodities required to register in the United States or a possession of the United States. (9) A futures commission merchant registered with the Commodity Futures Trading Commission. (10) A real estate investment trust. (11) An entity registered at all times during the tax year under the Investment Company Act of 1940. (12) A common trust fund operated by a bank under section 584(a). (13) A financial institution. (14) A middleman known in the investment community as a nominee or listed in the most recent publication of the American Society of Corporate Secretaries, Inc., Nominee List. (15) A trust exempt from tax under section 664 or described in section 4947.

Payments of dividends and patronage dividends generally not subject to backup withholding include the following:

- Payments to nonresident aliens subject to withholding under section 1441.
- Payments to partnerships not engaged in a trade or business in the United States and that have at least one nonresident partner.
- Payments of patronage dividends not paid in money.
- Payments made by certain foreign organizations.

Payments of interest generally not subject to backup withholding include the following:

- Payments of interest on obligations issued by individuals.

Note: You may be subject to backup withholding if this interest is $600 or more and is paid in the course of the payer's trade or business and you have not provided your correct TIN to the payer.

- Payments of tax-exempt interest (including exempt-interest dividends under section 852).
- Payments described in section 6049(b)(5) to nonresident aliens.
- Payments on tax-free covenant bonds under section 1451.
- Payments made by certain foreign organizations.
- Mortgage interest paid by you.

Payments that are not subject to information reporting are also not subject to backup withholding. For details, see sections 6041, 6041A(a), 6042, 6044, 6045, 6049, 6050A, and 6050N, and their regulations.

## Penalties

**Failure To Furnish TIN.**—If you fail to furnish your correct TIN to a requester, you are subject to a penalty of $50 for each such failure unless your failure is due to reasonable cause and not to willful neglect.

**Civil Penalty for False Information With Respect to Withholding.**—If you make a false statement with no reasonable basis that results in no backup withholding, you are subject to a $500 penalty.

**Criminal Penalty for Falsifying Information.**—Willfully falsifying certifications or affirmations may subject you to criminal penalties including fines and/or imprisonment.

**Misuse of TINs.**—If the requester discloses or uses TINs in violation of Federal law, the requester may be subject to civil and criminal penalties.

## Specific Instructions

**Name.**—If you are an individual, you must generally provide the name shown on your social security card. However, if you have changed your last name, for instance, due to marriage, without informing the Social Security Administration of the name change, please enter your first name, the last name shown on your social security card, and your new last name.

If you are a sole proprietor, you must furnish your individual name and either your SSN or EIN. You may also enter your business name or "doing business as" name on the business name line. Enter your name(s) as shown on your social security card or as it was used to apply for your EIN on Form SS-4.

**Signing the Certification.**—

1. **Interest, Dividend, and Barter Exchange Accounts Opened Before 1984 and Broker Accounts Considered Active During 1983.** You are required to furnish your correct TIN, but you are not required to sign the certification.

2. **Interest, Dividend, Broker, and Barter Exchange Accounts Opened After 1983 and Broker Accounts Considered Inactive During 1983.** You must sign the certification or backup withholding will apply. If you are subject to backup withholding and you are merely providing your correct TIN to the requester, you must cross out item 2 in the certification before signing the form.

3. **Real Estate Transactions.** You must sign the certification. You may cross out item 2 of the certification.

4. **Other Payments.** You are required to furnish your correct TIN, but you are not required to sign the certification unless you have been notified of an incorrect TIN. Other payments include payments made in the course of the requester's trade or business for rents, royalties, goods (other than bills for merchandise), medical and health care services, payments to a nonemployee for services (including attorney and accounting fees), and payments to certain fishing boat crew members.

5. **Mortgage Interest Paid by You, Acquisition or Abandonment of Secured Property, or IRA Contributions.** You are required to furnish your correct TIN, but you are not required to sign the certification.

6. **Exempt Payees and Payments.** If you are exempt from backup withholding, you should complete this form to avoid possible erroneous

backup withholding. Enter your correct TIN in Part I, write "EXEMPT" in the block in Part II, and sign and date the form. If you are a nonresident alien or foreign entity not subject to backup withholding, give the requester a completed Form W-8, Certificate of Foreign Status.

7. **TIN "Applied for."** Follow the instructions under How To Obtain a TIN, on page 1, and sign and date this form.

**Signature.**—For a joint account, only the person whose TIN is shown in Part I should sign.

**Privacy Act Notice.**—Section 6109 requires you to furnish your correct TIN to persons who must file information returns with the IRS to report interest, dividends, and certain other income paid to you, mortgage interest you paid, the acquisition or abandonment of secured property, or contributions you made to an IRA. The IRS uses the numbers for identification purposes and to help verify the accuracy of your tax return. You must provide your TIN whether or not you are required to file a tax return. Payers must generally withhold 31% of taxable interest, dividend, and certain other payments to a payee who does not furnish a TIN to a payer. Certain penalties may also apply.

## What Name and Number To Give the Requester

| For this type of account: | Give name and SSN of: |
|---|---|
| 1. Individual | The individual |
| 2. Two or more individuals (joint account) | The actual owner of the account or, if combined funds, the first individual on the account [1] |
| 3. Custodian account of a minor (Uniform Gift to Minors Act) | The minor [2] |
| 4. a. The usual revocable savings trust (grantor is also trustee) | The grantor-trustee [1] |
| b. So-called trust account that is not a legal or valid trust under state law | The actual owner [1] |
| 5. Sole proprietorship | The owner [3] |

| For this type of account: | Give name and EIN of: |
|---|---|
| 6. Sole proprietorship | The owner [3] |
| 7. A valid trust, estate, or pension trust | Legal entity [4] |
| 8. Corporate | The corporation |
| 9. Association, club, religious, charitable, educational, or other tax-exempt organization | The organization |
| 10. Partnership | The partnership |
| 11. A broker or registered nominee | The broker or nominee |
| 12. Account with the Department of Agriculture in the name of a public entity (such as a state or local government, school district, or prison) that receives agricultural program payments | The public entity |

[1] List first and circle the name of the person whose number you furnish.

[2] Circle the minor's name and furnish the minor's SSN.

[3] Show your individual name. You may also enter your business name. You may use your SSN or EIN.

[4] List first and circle the name of the legal trust, estate, or pension trust. (Do not furnish the TIN of the personal representative or trustee unless the legal entity itself is not designated in the account title.)

Note: If no name is circled when there is more than one name, the number will be considered to be that of the first name listed.

APPENDIX "A"

SCOPE OF SERVICES OF ARCHITECT

AGREEMENT BETWEEN

DORMITORY AUTHORITY - STATE OF NEW YORK

AND

KOHN PEDERSEN FOX ASSOCIATES, P.C.

ARCHITECT'S SERVICES

The OWNER has requested the ARCHITECT to provide Programming Architectural, Engineering and Construction Phase Supervision Services for the Construction of Baruch College - Site "B". All work shall be completed in accordance with the program requirements furnished to the ARCHITECT prior to Design and shall be completed to the satisfaction of the OWNER. The ARCHITECT shall, as part of his duties, explore the use of recycled products in the Design wherever feasible and practical. Consideration should be given, but not be limited to, the following criteria: code compliance, aesthetics, cost, maintainability, life cycle, availability and lead times.

I.    Original Scope of Services

Location and Description

The building will be an "as of right development" with 416,000 net assignable square feet on a site area of approximately 66,000 square feet. The site (known as Site "B") is bounded by Lexington Avenue on the west, 25th Street on the North, 24th Street on the south and extends approximately 335 feet to the east from Lexington Avenue.

Scope

The Project consists of a new building on Site B of approximately 700,000 gross square feet. The building will contain classrooms, faculty and departmental offices, student services, dining facilities, athletic facilities, theater and lecture halls and provision for a student campus space, all as outlined in Appendix A-1 - Summary of Baruch Site "B" Program.

The Scope of Services includes detailed program development, architectural and engineering design, production of construction documents, cost estimates and construction administration. The initial phase of the Architect's services will be the development of a detailed space program produced from structures interviews with appropriate college staff and faculty. The program and planning process will include evaluation of the most effective space utilization to meet the space requirements within the constraints of the project budget and maximum net assignable area.

Code Compliance

The design must comply with all applicable state, New York City and ADA codes. A New York City Certificate of Occupancy is to be obtained at completion.

II    Basic Services

    A.    OWNER Supplied Information

        1.    The Program of Requirements to be utilized in the development of the ARCHITECT's design.

        2.    Copies of all available plans of existing buildings, if applicable.

        3.    Site survey which shall provide a full description of the site along with all necessary information relative to existing facilities. The ARCHITECT shall review and approve this survey for content and completeness, but shall not be responsible for its accuracy.

        4.    The OWNER shall provide the ARCHITECT with such soil bearing and subsurface investigation and analysis as the ARCHITECT may require. The ARCHITECT shall review and approve the analysis for content and completeness, but shall not be responsible for the accuracy of the analysis.

        5.    The OWNER shall provide the ARCHITECT with a complete listing of all applicable Group I, II, III, IV, and existing items to be relocated including dimensions, weights, energy consumption, and power requirements.

    B.    Programming

    The ARCHITECT shall develop Detailed Facility Program for the Construction of Baruch College - Site "B". This programming effort shall accomplish the following objectives:

        1.    development of a detailed space program for each activity;

        2.    identify relationships among spaces and activities;

        3.    establish priorities for design and construction;

        4.    cost estimate.

    In the development of the required Detailed Facility Program the ARCHITECT shall perform the following specific tasks:

        1.    Provide an orientation to the programming committees designated for the Project outlining the objectives of the programming effort and identifying the methodology involved.

        2.    Schedule interviews with the designated key staff for each activity, to establish and confirm net space allocations, adjacency requirements, preliminary listing of equipment needs, preliminary user HVAC comfort criteria and preliminary user lighting needs.

        3.    Assemble information gathered into a Preliminary Program for review and evaluation by the College and City University. The Preliminary Program shall illustrate relationships between activities, list requirements for individual spaces, identify problems and alternatives in space and activity relationships, and list priorities with an analysis of trade-offs and alternatives.

        4.    Incorporate review comments on the Preliminary Program received for the College and City University into a final Detailed Facility Program.

     5.     Attend review meetings scheduled by the College and/or the City University of New York.

     6.     Assemble, print and distribute ten (10) copies of the final report with the cost of printing and distribution being a part of the reimbursable allowance.

     7.     Participate in meetings and follow-up interviews with users as necessry.

C.     <u>Pre-schematic Phase</u>

The ARCHITECT shall:

     1.     develop a series of alternate solutions that explore a full range of building and site development possibilities including alternative mechanical, electrical, and structural considerations;

     2.     establish a basic Project strategy by addressing critical relationships between program elements;

     3.     using the OWNER's <u>Design Cost Control Manual</u> as a format, provide an estimate based upon measurement of physical characteristics: area, volume, and complexity of massing. Cost based upon experience.  This submission should include an allocation of budget by major "Construction Systems Groupings" as outlined on pages PS-1 through PS-7 of the Manual;

     4.     select in consort with the OWNER, the overall solution, or combination of solutions which best address the needs of the OWNER; and

     5.     develop the selected solution into a full Schematic Design.

D.     <u>Schematic Phase</u>

The ARCHITECT shall submit drawings and description for:

     1.     Location Plan - showing the Project location at a scale of 100' - 1";

     2.     Site Plan - shall include location of building or buildings in relation to the immediate area around it, all existing and/or proposed necessary utility lines, grading, and site improvement, lighting, walks, roads and parking, and basic topography to the extent of existing information;

     3.     Floor Plan (1/16th" scale minimum) - shall include all required spaces, doors, windows, stairs, square footages, planned occupancies, exits, and major items of fixed equipment, and illustrating reasonable compatibility with routings of mechanical and electrical services;

     4.     program space numbers shall be used to identify programmed spaces. Programmed and actual areas shall be indicated on the plans;

     5.     Sections (1/16th" scale minimum) - shall include major cuts in two directions for all structures with basic vertical dimensions;

     6.     Elevations - all elevations at 1/16th" scale minimum;

     7.     flow diagram to show circulation.  Stair, corridor, and exit count figures to show compliance with New York City Building Code;

8.    general description of Project indicating use, ARCHITECTural concept, conformance to requirements, zoning, lot coverage, codes followed, material and methods of construction, toilet and exit calculations, heating and air conditioning systems, and security systems;

9.    using the OWNER's Design Cost Control Manual as a format, provide an estimate based upon measurement of physical characteristics: area, volume, and complexity of massing. Cost based upon in-place unit costs. Provide detail estimate by major "Construction Systems Groupings" as outlined on pages S-1 through S-7 and Systems Classifications Sheets SCS-1 through SCS-12 of the Manual;

10.    outline specifications for site development, ARCHITECTural, structural, mechanical, plumbing, electrical, and site utilities;

11.    the ARCHITECT shall provide minutes of all meetings and reports of all reviews and comments received from others. Meetings shall be held on a bi-weekly basis; and

12.    renderings, models (other than working models), or other special items as required by the OWNER. Requested rendering or models shall be reimbursed pursuant to ARTICLE VI.

The Design Development Phase shall not be started until authorized by the OWNER in writing.

E.    Design Development Phase

1.    This Phase shall consist of the development of the approved schematic scheme, including the mechanical, electrical, and other systems required for the facility, as well as recommendations for bidding packages, order of construction, and timing. During this Phase, all design criteria and solutions shall be established and developed within the program requirements and budget as established by the OWNER.

2.    The final product of this Phase of design shall include at least the items below and shall reflect all design decisions for all trades.

a.    Cover Sheet - Include name of Project, location, campus, and the Dormitory Authority as OWNER.

b.    Site Plan - Similar to Item 2. of Schematic Phase above, with more complete and detailed information including property to be conveyed to the OWNER, all utility lines, drainage, lighting, planting, walks and driveways, means of ingress and egress from public street to the site and existing and proposed contours, and indicating demolition required, if any.

c.    Typical Floor Plans at 1/8" scale (or otherwise as approved by OWNER) - showing arrangements of any applicable Groups I, II, and III furniture and equipment and noting room finishes, lighting, and mechanical equipment locations, based on furniture and equipment schedules to be provided by the OWNER. Programmed and actual areas shall be entered on the plans for all spaces and all programmed spaces shall contain Program Space Numbers.

d.    1/8" scale sections through the building.

e.    Elevations at 1/8" scale - to be rendered in pencil or other approved technique, indicating all materials.

f.    Detailed Wall Sections at 3/4" or larger scale - typical wall section, and special wall sections required.

-A4-

g.  Plans and Sections indicating the mechanical, electrical, and structural systems, routings, clearances, general sizes, etc., with system diagrams and controls.

h.  Preliminary specifications for site development, ARCHITECTural, structural, mechanical, plumbing, electric, and site utilities.  Describe at least the following items as a minimum:  (Economic justification reports shall be included where deemed essential by the OWNER.)

(1)  soil conditions (including Test Boring report);
(2)  footings and foundations;
(3)  superstructure (type of construction);
(4)  exterior walls and trim or features;
(5)  interior walls and partitions;
(6)  room finishes, all surfaces;
(7)  floor construction;
(8)  roof construction;
(9)  stair construction and finish;
(10)  windows;
(11)  doors:
   (a)  exterior; and
   (b)  interior;
(12)  acoustical treatment (type and where used);
(13)  heating system, radiation, and controls, including  design criteria;
(14)  ventilating system including design criteria and scope;
(15)  electrical  work,  including  design  criteria,  source  and capacity/demand report:
   (a)  service;
   (b)  lighting fixtures, types;
   (c)  power system, demand and distribution;
   (d)  provide a brief description of electrical  equipment items to be included in the Project;
   (e)  signal and alarm system; and
   (f)  special requirements for computer equipment;
(16)  plumbing:
   (a)  pipe materials, all services;
   (b)  fixtures, all types;
   (c)  source and disposal systems; and
   (d)  treatment, pumping or other special requirements;
(17)  security and life safety systems (as required);
(18)  other work, if in construction contracts, such as kitchen equipment; and
(19)  OWNER furnished equipment.

i.  Upon 100% Design Development Document Completion, and using the OWNER's Design Cost Control Manual as a format, provide an estimate of cost based upon a detailed take-off of labor materials, and equipment: area, volume, and complexity of massing.  Estimate to be summarized by major "Construction Systems Groupings" as outlined on pages DD-1 through DD-8 and Systems Classifications Sheets SCS-1 through SCS-12 of the Manual.

j.  The ARCHITECT shall provide minutes of all meetings and reports of all reviews and comments received from others.  Meetings shall be held on a bi-weekly basis.

-A5-

3.    The ARCHITECT shall be responsible for indicating, on its preliminary drawings and listing in its outline specifications, all applicable furniture and equipment (Groups I and II) for each room in the assignable areas and provide information for space and utilities requirements.

This list shall be supplemented by a listing of items for non-assignable areas such as directory board, display cases for lobby and corridors, janitorial equipment, etc.

The items of furniture and equipment to be included in the construction contracts and for which the ARCHITECT shall provide complete plans and specifications suitable for securing competitive bids for such equipment are indicated in the CSI Specifications as Group I and Group II and shall consist of the following items:

Group I are those items included in the CSI Division 10 (Specialties), which are items permanently connected and designed as integral parts of the building:

### Group I - Division 10

| | |
|---|---|
| 10100 Chalkboard & Tackboard | 10610 Office Cubicles |
| 10150 Compartments & Cubicles | 10620 Folding Gates |
| 10170 Toilet/Shower Compartments | 10620 Retractable Partitions |
| 10270 Access Flooring | 10620 Coiling Partitions |
| 10400 Identifying Devices | 10620 Folding Partitions |
| 10410 Directory/Bulletin Boards | 10670 Storage Shelving |
| 10420 Plaques | 10700 Sun Control Devices |
| 10500 Lockers | 10750 Telephone Enclosures |
| 10550 Postal Specialties | 10800 Toilet/Bath Accessories |
| 10601 Mesh Partitions | 10900 Wardrobe Specialties |
| 10610 Demountable Partitions | |

Group II are those items included in CSI Division 11 (Special Equipment) and CSI Division 13 (Special Construction). It also includes matching or associated items, even if movable. Items connected to building services or the structure itself, for which design characteristics must be coordinated with the various mechanical trades, shall consist of the following, to the extent required for the Project:

### Group II - Division 11

| | |
|---|---|
| 11180 Darkroom Equipment | 11500 Gymnasium Equipment |
| 11300 Educational Equipment | 11600 Laboratory Equipment |
| 11310 Arts & Crafts Equipment | 11630 Laundry Equipment |
| 11320 Audio-Visual Aids | 11650 Library Equipment |
| 11330 Language Laboratories | 11670 Bookstacks |
| 11350 Vocational Shop Equipment | 11680 Charging Counters |
| 11400 Food Service Equipment | 11700 Medical Equipment |
| 11420 Cooking Equipment | 11710 Dental Equipment |
| 11430 Dishwashing Equipment | 11760 Radiology Equipment |
| 11450 Food Preparation Table | 11800 Large Computer Equipment |
| 11460 Food Serving Units | & Related Accessories |
| 11460 Unit Kitchens | 11970 State Equipment |

-A6-

Also, included in Group II, are sections of CSI Division 12 (Furnishings) as identified below:

Group II - Division 12

| | | | |
|---|---|---|---|
| 12501 | Blinds and Shades | 12700 | Fixed Seating |
| 12503 | Drapery Tracks | 12710 | Fixed Auditorium Seating |
| 12670 | Carpets and Mats | 12730 | Stadium Seating |

Group II - Division 13 - Special Construction

| | | | |
|---|---|---|---|
| 13100 | Audiometric Room | 13330 | Greenhouse |
| 13200 | Broadcasting Studios | 13450 | Insulated Room |
| 13250 | Radiation Protection | 13650 | Prefabricated Structures |
| 13300 | Conservatory | 13800 | Storage Vault |

The items of Furniture and Equipment applicable, for which the OWNER or Interior Designer shall be responsible, for selecting are indicated in the CSI Specifications as Group III and Group IV and shall consist of the following items:

Group III are movable items not requiring installation but occupying floor space:

a. desks;
b. chairs;
c. files;
d. cabinets;
e. mimeograph machine;
f. draperies and curtains;
g. carpet in special areas (not included in General Construction Contract); and
h. plug-in refrigerators.

Group IV are movable items not occupying floor space but requiring utilities:

a. electric typewriters;
b. microscopes;
c. calculating machines;
d. portable projectors;
e. tape machines;
f. audio-visual equipment;
g. microfilm readers;
h. postage meters; and
i. small computer units and related accessories.

The OWNER or Interior Designer will provide a furniture and equipment list for such items to be provided in the building. The ARCHITECT shall review the list to confirm, where appropriate, that the furniture and equipment will fit in the spaces intended. The ARCHITECT shall consult with the OWNER concerning furniture types, colors, and finishes.

4.      For City University of New York (CUNY) projects and the Art Acquisition Program, the ARCHITECT, as part of Original Scope of Services, shall participate as a non-voting member of the Art Selection Committee by attending meetings, providing advice, and by recommending and designing suitable settings, all as described in the OWNER'S Art Acquisition Program Procedures.

5.      Upon completion of the final cost estimate for each Phase of design, the ARCHITECT will schedule a meeting with the OWNER, Client, and Consultants to reconcile this estimate.

-A7-

In the event of discrepancies in the cost estimate, additional meetings will be scheduled as required to resolve these discrepancies.

6. The Construction Document Phase shall not be started until authorized by the OWNER in writing.

F. <u>Construction Documents Phase</u>

1. a. These documents, which are composed of copies of all contract drawings and specifications necessary for the construction of the building as described by the approved preliminary documents, shall be fully coordinated for bidding by the various Contractors.

They shall include all engineering drawings, plot plans, all floor plans, sections, elevations, details, soil exploration data, schedules, and other data required to obtain complete bids.

b. The ARCHITECT, if so directed by the OWNER, shall also obtain a schedule of State minimum wage rates for various classifications of labor employed on the Project.

c. Notice to Bidders, Information For Bidders, Supplemental Information for Bidders, Form of Bid, Form of Bid Bond, Contract, Labor and Material Payment Bond, Performance Bond, General Conditions, General Requirements, and any Addenda shall be provided by the OWNER. The ARCHITECT shall prepare its documents in conformity with these.

2. Construction Document Completion

a. Upon 60% Construction Document Completion, and using the OWNER's <u>Design Cost Control Manual</u> as a format, provide an estimate of cost based upon a detailed take-off of labor, materials, and equipment: area, volume, and complexity of massing. Estimate to be summarized by major "Construction Systems Groupings" as outlined on pages 60CD-1 through 60CD- 8, and Systems Classifications Sheets SCS-1 through SCS-12 of the Manual.

At this Phase of Design Documents, the (CONSULTANT/ CONSULTANT/ENGINEER) shall submit to the OWNER in addition to the System estimate as outlined previously, an estimate formatted as outlined by the Construction Specifications Institute (CSI).

The Construction Specifications Institute (CSI) estimate shall provide quantities, unit costs for material, equipment, and labor units for the installation of the materials, and wage rates (to include base rate, insurances, taxes, and fringes) for the installation of the material and equipment.

b. Upon 100% Construction Document Completion, provide estimates in the same detail, same summary, and same formats required at 60% Completion.

3. The ARCHITECT shall review the furniture and equipment lists to confirm that the furniture and equipment will fit in the spaces intended. The ARCHITECT shall consult with the OWNER concerning furniture types, colors, and finishes.

4. Documents shall include specifications for Testing Services, as required by the OWNER. These Services shall be provided by an approved laboratory or engineer through a direct contract with the OWNER.

5. Upon completion of documents, the ARCHITECT shall certify to the OWNER that all Contract Documents have been thoroughly checked for accuracy and for the coordination of all their parts and details and conformity to all applicable laws, ordinances, and codes. The ARCHITECT

-A8-

shall obtain Fire Department, Building Department and Highway Department approval where and when required, and shall perform all work necessary to obtain a Certificate(s) of Occupancy.

      6.    The ARCHITECT shall provide minutes of all meetings and reports of all reviews and comments received from others. Meetings shall be scheduled on a bi-weekly basis.

G.    <u>Bidding and Award of Prime Construction Contracts Phase</u>

      1.    The ARCHITECT shall prepare and supply the necessary sets of Contract Documents (The printing contractor may be designated by the OWNER) for bidding and eventual award of contracts between the OWNER and the Contractors for approximately ten (10) separate contract packages. The ARCHITECT shall solicit contractor interest to ensure competitive bidding, and shall keep account of and distribute drawings to prospective bidders, and furnish the OWNER with reports on same.

      2.    The ARCHITECT shall investigate questions posed by bidders relative to bid documents or any other questions, and issue written replies to all bidders in the form of supplemental bulletins, addenda, or bid instructions.

      3.    The ARCHITECT shall be present at bid openings.

      4.    The ARCHITECT shall assist the OWNER in reviewing and analyzing bids, including any investigation that may be required of qualifications and capabilities of low bidders, to determine that the low bidder is fully responsible for all bid requirements, and make recommendations to OWNER as to the award of contract.

H.    <u>Construction Phase</u>

      1.    Review and approve or disapprove all shop drawings and samples submitted by the Contractor for adherence to the intent and requirements of the Contract Documents. The ARCHITECT will not be responsible for expediting shop drawing submissions from Contractors. All submittals shall be reviewed promptly and completely. All submittals shall be acted upon within twelve (12) working days from their receipt unless longer periods of time are warranted for specific components of the work.

      2.    Review, check, and approve or disapprove all substitutions and "or equal" products, equipment, and/or materials submitted by the Contractor.

      3.    Provide interpretations of Contract Documents and design. The ARCHITECT shall prepare supplemental sketches or details as reasonably necessary to clarify or correct errors in the Contract Documents and clarify field conditions not covered in the contract drawings or specifications. All sketches shall be consecutively numbered, dated, and referenced to applicable contract docments.

      4.    Review all field orders and change orders for their effect on design criteria only and make recommendations to the OWNER. The ARCHITECT shall not be responsible for the economic evaluation, accounting, and processing of change orders.

      5.    Attend regular job progress meetings as required by the OWNER.

      6.    Check and approve or disapprove test procedures and review test results and make appropriate recommendations to the OWNER.

      7.    Inspect on a bi-weekly basis, or as required by the OWNER, the Work in progress to determine compliance with the requirements of the contract drawings and specifications or approved shop drawings. A report shall be issued detailing the inspection.

The term "inspect", as used herein, shall mean the periodic visual observations of construction work for the purpose of ascertaining that the Work is in compliance with the Contract Documents and consistent with the design intent.

8.      Prepare punchlists at substantial completion and at Final Completion of the Work.

-      Preparation of the punchlist at substantial completion shall be a list of all remaining items of Work to be completed and the value of each.

Preparation of the final punchlist will be made with the OWNER, or the OWNER's Representative to determine if the intent of the contract has been met. All independent lists will be incorporated into the final punchlist and given to the Contractor to complete or to correct the items as required.

9.      Approve the testing and inspection labs and/or engineers selected by the OWNER.

10.      Inspect the Project between Thirty (30) and Forty-Five (45) days prior to the time the OWNER is to take over, use, occupy, operate, or accept any part or all of the Project.

11.      Upon completion of each prime contract, make a final inspection of the Work and upon completion of each Phase of Work, represent to the OWNER, in writing, that the Work is complete and in accordance with the Contract Documents, to the best of the ARCHITECT's professional judgment, information, and belief, and ready for acceptance by the OWNER. Upon completion of the Project, the ARCHITECT shall represent to the OWNER, in writing, that the building is complete and acceptable for use.

12.      The ARCHITECT shall prepare and deliver, prior to final acceptance of any identified phase of construction, prior to the completion of its Project Work, complete comprehensive descriptions of all mechanical and electrical systems, as to their functions and sequences of operation in accordance with the 1991 ASHRAE Applications Handbook, Chapter 35.2, "Documentation", or later revision.

The description shall include information provided by the contractor(s), construction manager,(if applicable), ARCHITECT and Consultants as follows:

a.      complete wiring diagrams of all mechanical and electrical systems, such as fire alarm, communication systems, motor controls, supervisory control panel, temperature controls, maintenance and replacement schedules, etc.;

b.      complete description of all mechanical and electrical systems as to the proper operation and maintenance of same, including such items as checklists, maintenance and replacement schedules, equipment list, nameplate data, etc. Documentation shall be developed in accordance with the 1991 ASHRAE Applications Handbook, Chapter 35.2, "Documentation", or later revision.

c.      catalog cuts and shop drawings of all electrical and mechanical systems and equipment, such as switchboards, panels, pumps, air conditioning equipment, fans, airhandling equipment, coils, heating equipment, ductwork, etc.;

     d.     complete valve charts of all mechanical systems, such as cooling, heating, and plumbing. These charts shall indicate location and function of each main valve in respective systems;

     e.     the ARCHITECT shall review and approve or disapprove all as-built drawings submitted consistent with the ARCHITECT's responsibility to provide periodic inspections of the Work. The ARCHITECT and its engineers shall incorporate all changes and as-built information on a reproducible set of drawings and electronic file which shall be provided to the OWNER upon completion of the Work. Electronic files shall be developed in accordance with the OWNER's <u>Drawing Production Guide</u>.

     f.     all available manufacturer's catalogs, specifications, and installation procedures and replacement partslist for building equipment and ARCHITECTural products installed under the Project specifications.

     All the above items are to be catalogued, indexed, and organized in accordance with the 1991 ASHRAE Applications Handbook, Chapter 35.2, "Documentation", or later revision.

     13.     RECYCLED PRODUCTS REPORT. At the closeout of each Contract, the ARCHITECT shall supply the OWNER or OWNER's Representative with a list of all recycled materials specified and actually provided.

     14.     Inspect the Project, as provided in the contracts of the various prime and Subcontractors, ten (10) to thirty (30) days prior to the end of the one-year guarantee period.

     15.     All Phases. The ARCHITECT shall supply the OWNER and the OWNER's Representative (when requested) with a copy of all correspondence, reports, comments, transmittals, requests, acted-upon shop drawings, and other submittals, and all other information relating to the contract.

     16.     Prior to final payment, review and approve or disapprove all necessary guarantees and equipment operating and maintenance manuals submitted by the Contractor and confirm that they are consistent with the requirements of the Contract Documents.

     17.     The ARCHITECT shall assist the Owner, or the Owner's representative, in the application for the and the obtaining of a final Certificate of Occupancy, forms or filings required by the Building Department (required to be prepared by the ARCHITECT) or to be provided by the ARCHITECT.

APPENDIX "A-1"

BARUCH COLLEGE SITE B - PROJECT SCOPE

The Baruch College Master Plan was developed in response to the College's projected long-term need for adequate student, faculty and program spaces and was approved in 1986. The Master Plan provides for a two phase construction implementation plan on two sites across the street from one another near the existing campus. Phase one on Site A provides for library; media, computer and conference cneter; and administrative offices and was opened in August 1994.

The next project is Phase two consisting of a new building on Site B of approximately 700,000 gross square feet. The building will contain classrooms, faculty and departmental offices, student services, dining facilities, athletic facilities, theater and lecture halls and provision for a student campus space. Attached in a summary of the Baruch Site B program.

The scope of services includes detailed program development, architectural and engineering design, production of construction documents, cost estimates and construction administration.

The building will be an "as of right development" with 416,000 net assignable square feet on a site area of approximately 66,000 square feet. The site is bounded by Lexington Avenue of the west, 25th street on the north, 24th street on the South and extends approximately 335 feet to the East from Lexington Avenue. The site is immediately across 25th Street from the newly opened Site A building.

REVISED
SUMMARY OF BARUCH SITE B PROGRAM

| Department | Previous Site B Program | January 1994 |
|---|---|---|
| **School of B.P.A.** | | |
| Office of Dean | 11,770 | |
| Placement Service | 2,780 | |
| Cornell-Baruch | 1,310 | |
| | | |
| Departments | | |
| Accountancy | 7,870 | |
| Econ. & Fla. | 10,240 | |
| Hlth Care Admin. | 1,850 | |
| Law | 3,240 | |
| Management | 9,495 | |
| Marketing | 8,610 | |
| Public Admin. | 3,630 | |
| Stat. & C.I.S. | 16,570 | |
| | | |
| **School of L.A.S.** | | |
| Office of Dean | | |
| | | |
| Departments | | |
| Art | 16,440 | |
| Comp. Ed/SEEK | 10,570 | |
| English | 13,885 | |
| English (Journ.) | 5,680 | |
| Mathematics | 12,575 | |
| Music | 10,060 | |
| Pol. Science | 2,440 | |
| Speech | 13,520 | |
| | | |
| **School of Education** | | |
| Office of Dean | 2,730 | |
| Education | 12,275 | |
| Physical Ed. | 56,900 | (8,400) = 48,500 |
| | | |
| Provost | | |
| Cont. Studies | 2,500 | |
| Ph.D. Programs | 1,620 | |
| Library | | |
| Grad. Res. Ctr. | 3,495 | |
| A/V Services | 6,855 | |
| | | |
| VP/Stud. Serv. & Ctr. | 64,175 | |
| Decentr. Serv. | 115 | |
| Burser | 440 | |
| Graphic Arts/Rep | 4,320 | |
| B & G Related | 6,385 | |
| Security | 2,010 | |

Clean Type Space
| | | |
|---|---|---|
| CR's/LH's | 66,325 | 8,400 = 74,725 |
| Auditorium | 11,895 | |

| | |
|---|---|
| Faculty/Stud. Svcs. | 8,475 |
| Food Svcs. | 3,750 |

| | | |
|---|---|---|
| Total Program (NASF) | 416,800 | 416,800 |

| | | |
|---|---|---|
| GSF (net to gross 1:1.71) | 712,730 | 712,730 |

APPENDIX "B"

SUMMARY OF PAYMENTS

MAXIMUM AMOUNT PAYABLE                                    $11,450,000 NTE

A.    ARCHITECT's SERVICES                                 $11,200,000 NTE

     1.    Original Scope of Services

| | | |
|---|---|---|
| Programming | $ 336,000 | LS |
| Pre-schematics | 616,000 | LS |
| Schematic | 1,288,000 | LS |
| Design Development | 2,464,000 | LS |
| Construction Documents | 3,920,000 | LS |
| Bidding | 112,000 | LS |
| Construction | 2,240,000 | LS |
| Post Construction Deliverables | 224,000 | LS |

B.    REIMBURSABLES                                          250,000 NTE


     Payments for Services shall be made monthly in proportion to Services performed and approved by the OWNER.   Payments shall be requisitioned on the OWNER's form, PERSONAL SERVICES AGREEMENT REQUISITION, with accompanying backup.   Only said form shall be used for reimbursement of Services.


NTE = Not to Exceed
LS= Lump Sum

APPENDIX "D"
ADDITIONAL ITEMS

1.     LABOR LAW PROVISIONS

    a.     It is hereby agreed that all applicable provisions of the Labor Law of the State of New York shall be carried out in performance of the Work.

    b.     The ARCHITECT specifically agrees, as required by Labor Law, Sections 220 and 220-d as amended, that:

        (1)     no laborer, workmen, or mechanic, in the employ of the ARCHITECT, SUBCONSULTANT, or other person doing or contracting to do the whole or any part of the work contemplated by this Agreement shall be permitted or required to work more than eight (8) hours in any one (1) calendar day or more than five (5) days in any one week, except in the emergencies set forth in the Labor Law;

        (2)     the wages paid for legal day's work shall be not less than the prevailing rate of wages as defined by law;

        (3)     the minimum hourly rate of wages to be paid shall be not less than that stated in this Agreement and shall be designated by the Industrial Commissioner of the State of New York; and

        (4)     the ARCHITECT and every SUBCONSULTANT shall post in a prominent and accessible place on the Site, a legible statement of all minimum wage rates and supplements to be paid or provided for the various classes of laborers and mechanics to be engaged in the Work and all deductions, if any, required by law to be made from unpaid wages actually earned by the laborers and mechanics so engaged.

    c.     The minimum wage rates, if any, herein specified for apprentices shall apply only to persons working with the tools of the trade which said persons are learning under the direct supervision of journeyman mechanics. Except as otherwise required by law, the number of apprentices in each trade or occupation employed by the ARCHITECT or any SUBCONSULTANT shall not exceed the number submitted by the applicable standards of the New York State Department of Labor, or, in the absence of said standards, the number permitted under the usual practice prevailing between the unions and the employer's association of the respective trades or occupations.

    d.     All employees of the ARCHITECT and each SUBCONSULTANT shall be paid in accordance with the provisions of the Labor Law. All payments shall be made in cash, except a payment may be made by check upon a certificate of the Industrial Commissioner of the State of New York. Certified payroll copies shall be provided to the OWNER upon request.

    e.     The ARCHITECT agrees that, in case of underpayment of wages to any worker engaged in the Work by the ARCHITECT or any SUBCONSULTANT, the OWNER shall withhold from the ARCHITECT, out of payments due, an amount sufficient to pay said worker the difference between the wages required to be paid under this Agreement and rates actually paid said worker for the total number of hours worked and that the OWNER may disburse said amount so withheld by the OWNER for and on account of the ARCHITECT to the employees to whom said amount is due. The ARCHITECT further agrees that the amount to be withheld pursuant to this paragraph may be in addition to the percentages to be retained by the OWNER pursuant to other provisions of this Agreement.

    f.     Pursuant to subdivision 3 of section 220 and section 220-d of the Labor Law this Agreement may be forfeited and no sum paid for any work done thereunder on a second conviction for willfully paying less than:

        (1)     the stipulated wage scale as set forth in Labor Law; Section 220, subdivision 3, as amended, or

        (2)     less than the stipulated minimum hourly wage scale as specified in Labor Law, Section 220-d, as amended.

    g.     The ARCHITECT specifically agrees, as required by the Labor Law, Section 220-e, as amended, that:

D1

     (1)    in the hiring of employees for the performance of work under this Agreement or any subcontract hereunder, or for the manufacture, sale, or distribution of materials, equipment, or supplies hereunder, but limited to operation performed within the territorial limits of the State of New York, no ARCHITECT, nor any person acting on behalf of said ARCHITECT or SUBCONSULTANT, shall by reason of race, creed, color, sex, or national origin discriminate against any citizen of the State of New York who is qualified and available to perform the work to which the employment relates;

     (2)    no , ARCHITECT, nor any person on behalf of said ARCHITECT or SUBCONSULTANT shall, in any manner, discriminate against or intimidate any employee hired for the performance of work under this Agreement on account of race, creed, color, sex, or national origin;

     (3)    there may be deducted from the amount payable to the ARCHITECT, by the OWNER under this Agreement, a penalty of Fifty and 00/100 Dollars ($50.00) for each person for each calendar day during which such person was discriminated against or intimidated in violation of the terms of this Agreement; and

     (4)    this Agreement may be canceled or terminated by the OWNER and all money due or to become due hereunder may be forfeited for a second or any subsequent violation of the terms or conditions of this section of this Agreement.

h.    The ARCHITECT specifically agrees:

     (1)    that the ARCHITECT will certify its payrolls and keep these certified records on site and available, and provide copies to the OWNER upon request.

     (2)    that, as part of the required posting of wage schedules, the ARCHITECT will display on the jobsite, in a conspicuous place, posters and wallet size cards supplied by the Department of Labor which inform employees of their entitlement to receive prevailing wages and supplements as determined by the Department of Labor.

     (3)    that the ARCHITECT will provide each worker with a written notice informing the worker of the prevailing wage requirements for the job. The notice shall contain a simple statement or declaration for the worker's signature, which the ARCHITECT shall obtain, attesting to the fact that the worker was given this information. Records must be maintained on site and made available, and copied to the OWNER upon request.

2.    <u>NONDISCRIMINATION</u>

During the performance of this Agreement, the ARCHITECT agrees as follows:

a.    The ARCHITECT will not discriminate against any employees or applicant for employment because of race, creed, color, sex, national origin, age, disability, or marital status.

b.    If directed to do so by the Commissioner of Human Rights, the ARCHITECT will send to each labor union or representative of workers with which the ARCHITECT has or is bound by a collective bargaining or other agreement or understanding, a notice, to be provided by the State Commissioner of Human Rights, advising said labor union or representative of the ARCHITECT's agreement under clauses a. through g. (hereinafter called "nondiscrimination clauses"). If the ARCHITECT was directed to do so by the contracting agency as part of the bid or negotiation of this Agreement, the ARCHITECT shall request said labor union or representative to furnish a written statement that said labor union or representative will not discriminate because of race, creed, color, sex, national origin, age, disability, or marital status, and that said labor union or representative will cooperate, within the limits of its legal and contractual authority, in the implementation of the policy and provisions of these nondiscrimination clauses and that it consents and agrees that recruitment, employment, and the terms and conditions of employment under this Agreement shall be in accordance with the purposes and provisions of these nondiscrimination clauses. If said labor union or representative fails or refuses to comply with said request that it furnish such a statement, the ARCHITECT shall promptly notify the State Commissioner of Human Rights of said failure or refusal.

c.    If directed to do so by the Commissioner of Human Rights, the ARCHITECT will post and keep posted in conspicuous places, available to employees and applicants for employment, notices to be provided by the State Commissioner of Human Rights setting forth the substance of the provisions of clauses a. and b. and such provisions of the State's laws against discrimination as the State Commissioner of Human Rights shall determine.

D2

d. The ARCHITECT will state, in all solicitations or advertisements for employees placed by or on behalf of the ARCHITECT, that all qualified applicants will be afforded equal employment opportunities without discrimination because of race, creed, color, sex, national origin, age, disability, or marital status.

e. The ARCHITECT will comply with the provisions of Sections 290-299 of the Executive Law and with the Civil Rights Laws, will furnish all information and reports deemed necessary by the State Commissioner of Human Rights under these nondiscrimination clauses and said sections of the Executive Law, and will permit access to the ARCHITECT's books, records, and accounts by the State Commissioner of Human Rights, the Attorney General, and the Industrial Commissioner for the purpose of investigation to ascertain compliance with these nondiscrimination clauses and said sections of the Executive Law and Civil Rights Laws.

f. This Agreement may be forthwith canceled, terminated, or suspended in whole or in part, by the contracting agency upon the basis of a finding made by the State Commissioner of Human Rights that the ARCHITECT has not complied with these nondiscrimination clauses, and the ARCHITECT may be declared ineligible for future contracts made by or on behalf of the State or public authority or agency of the State, until the ARCHITECT satisfies the State Commissioner of Human Rights that the ARCHITECT has established and is carrying out a program in conformity with the provisions of these nondiscrimination clauses. Said finding shall be made by the State Commissioner of Human Rights after conciliation efforts by the Commissioner have failed to achieve compliance with these nondiscrimination clauses and after a verified complaint has been filed with the Commissioner, notice thereof has been given to the ARCHITECT, and an opportunity has been afforded the ARCHITECT to be heard publicly in accordance with the Executive Law. Said sanctions may be imposed and remedies invoked independently of or in addition to sanctions and remedies otherwise provided by law.

g. The ARCHITECT will include the provisions of clauses a. through f. in every subcontract or purchase order in such a manner that said provisions will be binding upon each SUBCONSULTANT or vendor as to operations to be performed within the State of New York. The ARCHITECT will take such action in enforcing said provisions of said subcontract or purchase order as the State Commissioner of Human Rights or the contracting agency may direct, including sanctions or remedies for non-compliance. If the ARCHITECT becomes involved in or is threatened with litigation with a SUBCONSULTANT or vendor as a result of said direction by the State Commissioner of Human Rights or the contracting agency, the ARCHITECT shall promptly so notify the Attorney General, requesting the Attorney General to intervene and protect the interests of the State of New York.

3.     PROVISIONS REQUIRED BY LAW DEEMED INSERTED

Each and every provision of law and clause required by law to be inserted into this Agreement shall be deemed to be inserted herein and this Agreement shall read and shall be enforced as though so included.

4.     COMPLIANCE WITH LAWS, RULES, AND REGULATIONS

The ARCHITECT shall comply fully with all applicable laws, rules, and regulations.

5.     CONTRACT DEEMED EXECUTORY

The ARCHITECT agrees that this Agreement shall be deemed executory to the extent of moneys available and that no liability shall be incurred by the OWNER beyond the moneys available therefor.

6.     OWNERSHIP OF DOCUMENTS

Original drawings and specifications will become the property of the OWNER, and the ARCHITECT may not use the drawings and specifications for any purpose not relating to the Project without the OWNER's consent. The ARCHITECT may retain such reproductions of drawings and specifications as the ARCHITECT may reasonably require. Upon completion of the Work or any early termination of this Agreement under Item 8., the ARCHITECT will promptly furnish the OWNER with the complete set of original record prints. All such original drawings and specifications shall become the property of the OWNER who may use them, without the ARCHITECT's permission, for any proper purpose including, but not limited to, additions to or completion of the Project.

7.   TERMINATION

Termination for Cause

In the event that any provision of the Contract is violated by the ARCHITECT or by any SUBCONSULTANT, the OWNER may serve written notice upon the ARCHITECT and upon the ARCHITECT's surety, if any, of the OWNER's intention to terminate the Contract; such notice shall contain the reasons for the intention to terminate the Contract upon a date specified by the OWNER. If the violation or delay shall not cease or arrangements satisfactory to the OWNER shall not be made, the Contract shall terminate upon the date so specified by the OWNER. In the event of any such termination, the OWNER may take over the Work and prosecute same to completion by Contract or otherwise for the account and at the expense of the ARCHITECT, and the ARCHITECT and ARCHITECT's surety shall be liable to the OWNER for all costs occasioned the OWNER thereby. In the event of such termination the OWNER may take possession of and may utilize such materials, appliances, and plant as may be on the Site and necessary or useful in completing the Work.

Termination for Convenience

The OWNER, at any time, may terminate this Contract in whole or in part. Any such termination shall be effected by mailing or delivering to the ARCHITECT a written notice of termination specifying the extent to which performance of Work under this Contract is terminated and the date upon which said termination becomes effective. Upon receipt of the notice of termination, the ARCHITECT shall act promptly to minimize the expenses resulting from said termination. The OWNER shall pay the ARCHITECT the costs actually incurred by the ARCHITECT including any fee earned up to the effective date of said termination, but in no event shall the ARCHITECT be entitled to compensation in excess of the total consideration of this Contract. In the event of said termination, the OWNER may take over the Work and prosecute same to completion by contract or otherwise and may take possession of and may utilize such materials, appliances, and plant as may be on the site and necessary or useful to complete the Work.

8.   SUSPENSION OR ALTERATION

a.   The OWNER may order the ARCHITECT in writing to suspend, delay, or interrupt performance of all or any part or the Work for a reasonable period of time as the OWNER may determine. The order shall contain the reason or reasons for issuance which may include, but shall not be limited to, the following: latent field conditions, substantial program revisions, acquisition of rights-of-way or real property, financial crisis, labor disputes, civil unrest, or Acts of God.

b.   Upon receipt of a suspension order, the ARCHITECT shall, as soon as practicable, cease performance of the Work as ordered and take immediate affirmative measures to protect such Work from loss or damage.

c.   The ARCHITECT specifically agrees that such suspension, interruption, or delay of the performance of the Work pursuant to this Item shall not increase the cost of performance of the Work of this Agreement.

d.   Time of Completion of the Work may be extended to such time as the OWNER determines shall compensate for the time lost by the suspension, interruption, or delay, such determination to be set forth in writing.

9.   LAWS OF THE STATE OF NEW YORK

This Agreement shall be governed by the Laws of the State of New York.

10.   CODES

Unless otherwise directed by the OWNER, the ARCHITECT shall comply with all applicable codes and regulations required by law. Without limiting the generality of the foregoing, compliance with codes and regulations shall include, but shall not be limited to, those of the following which are applicable:

a.   Administrative Codes
b.   the Zoning Resolutions
c.   the State Building Code, NYS Uniform Fire Prevention and Building Code, latest edition
d.   Local Zoning Ordinances