# EXHIBIT
# 5

```
 1

 2   UNITED STATES DISTRICT COURT

     SOUTHERN DISTRICT OF NEW YORK

 3   ------------------------------------------------

 4   TRAVELERS CASUALTY AND SURETY COMPANY as

     Administrator for RELIANCE INSURANCE

 5   COMPANY,

 6                        Plaintiff,

 7          -against-

 8   DORMITORY AUTHORITY-STATE OF NEW YORK, TDX

     CONSTRUCTION CORP. and KOHN PEDERSEN FOX

 9   ASSOCIATES, P.C.,

10                        Defendants.

11   Case No. 08-CV-6915 (DLC)

12

                  (CAPTION CONTINUED)

13   ------------------------------------------------

14

                        June 19, 2008

15                      10:09 a.m.

16

17          DEPOSITION of JOHN SCARPELLINO,

18   taken by Plaintiff, pursuant to Notice,

19   held at the offices of HOLLAND & KNIGHT

20   LLP, 195 Broadway, New York, New York

21   before Wayne Hock, a Notary Public of the

22   State of New York.

23

24

25
```

32

J. Scarpellino

1  terms "certain reinsured contracts" and

2  "certain reinsured liabilities?"

3        MS. BONACCI: Objection to form.

4     A.    Me?  No, I don't know exactly

5  what that means, but I would say in the

6  purchase of Reliance there must have been

7  something in the agreement between

8  Travelers and Reliance.

9     Q.    So as you sit here today, do you

10  have any knowledge of whether Travelers

11  had any reinsurance obligations with

12  respect to the four bonds that we marked

13  as DASNY Exhibits 2 through 5?

14     A.    No, I don't know.

15        MS. SMITH: I'm sorry, no, I

16  don't know or --

17        THE WITNESS:  No, I don't know.

18        MS. SMITH: Thank you.

19     Q.    Mr. Scarpellino, at any time in

20  your capacity as a bond claims manager

21  with Travelers, have you become aware of

22  allegations of defects in terrazzo

23  flooring at Baruch College?

24     A.    Yeah, I became aware of that.

33

J. Scarpellino

Q.    Do you recall when Travelers
first learned of those allegations?

A.    I believe the first time I've
heard about the terrazzo, that there was a
problem with the terrazzo, was after my
second meeting with Doug Van Vleck, which
would have been I believe somewhere around
the late fall, early winter of 2003.

Q.    And you said that that was your
second meeting with Mr. Van Vleck?

A.    Yes.

Q.    When was your first meeting with
Mr. Van Vleck?

A.    I believe sometime in the spring
of 2003.

Q.    Focusing your attention on the
first meeting, who else besides you and
Mr. Van Vleck was present at that meeting?

A.    There was Nick Seminara from
Travelers.

Q.    Anyone else?

A.    Brian Fern, F E R N, from
Travelers.  I believe Steve Boiko.

That's all I recall at this

34

J. Scarpellino

2  point.

3     Q.    Who is Nick Seminara?

4     A.    Nick Seminara was the -- at the

5  time I believe he was the vice president

6  of contract surety claims in Hartford.

7     Q.    Is Mr. Nick Seminara still

8  employed by Travelers?

9     A.    Yes.

10     Q.    Do you know his current title?

11     A.    No.

12     Q.    Is he still working in the

13  surety bond area?

14     A.    No.

15     Q.    Do you know what area he is

16  working in?

17     A.    I'm not sure of the exact

18  location, whether it's claim or legal.

19     Q.    At that time in the spring of

20  2003 did you report to Mr. Seminara?

21     A.    Yes.

22     Q.    Who is Brian Fern?

23     A.    Brian Fern is our in-house

24  engineer.

25     Q.    And does Mr. Fern still work for

35

1              J. Scarpellino

2   Travelers?

3       A.     Yes.

4       Q.     And is he still an in-house

5   engineer?

6       A.     Yes.

7       Q.     What was the purpose of the

8   meeting you had with Mr. Van Vleck in the

9   spring of 2003?

10      A.     We had a meeting in order to

11  determine if we were agreeable to collect

12  some contract balances and to -- for

13  contract fifteen and sixteen, for

14  Trataros, and also to see if we could

15  attempt to make a deal to -- on the delay

16  portion of the claims.  I believe we made

17  a recommendation that we would give DASNY

18  a hold harmless, they'd pay us the money

19  for the delay claims, and we in turn will

20  turn around and take care of the subs.

21  This way we could close out the project.

22      Q.     Was there any mention of

23  terrazzo flooring at that meeting?

24      A.     No, the only mention at that

25  meeting was we had another project with

36

J. Scarpellino

1  DASNY which was the Queens College

2

3  Powdermaker Hall project and he said they

4  were behind on that project.  He said if

5  we escalate, he'll talk again about

6  getting this thing resolved, the delay

7  claim and our contract balances.

8      Q.    Was Trataros working at

9  Powdermaker Hall?

10     A.    He was the contractor on that

11  project.

12     Q.    And Travelers became involved in

13  that project?

14     A.    Travelers was involved in that

15  project.

16     Q.    And was Travelers involved in

17  connection with bonds that had been issued

18  on behalf of Trataros?

19     A.    For Powdermaker Hall?

20     Q.    Yes.

21     A.    I'm not sure if it was a

22  Reliance bond or a Travelers bond, but

23  Travelers was the responsible bonding

24  party for that contract.

25     Q.    Just so I'm clear, I know you

37

J. Scarpellino

2  said Travelers was the responsible bonding

3  party, but was the obligor on those bonds

4  Trataros?  Again, I'm talking about

5  Powdermaker.

6      A.     Yes.

7      Q.     The second meeting that you had

8  with Mr. Van Vleck, who was in attendance

9  at that meeting?

10     A.     I believe it was just Mr.

11 Seminara and myself and Mr. Van Vleck and

12 Mr. Boiko.

13     Q.     And to your recollection, Mr.

14 Fern was not at that meeting?

15     A.     No.

16     Q.     What was the purpose of that

17 meeting?

18     A.     Well, I believe we had fairly

19 well got Queens College either behind us

20 or on the right track and we were trying

21 to get additional funds for the Baruch

22 project and that's when he told us that,

23 you know, the offer we had made, as far as

24 a hold harmless agreement for the delay

25 claims, contract balances, and so on, to

38

1              J. Scarpellino

2    the best of my recollection he made us a

3    lowball offer at that point of $8 million

4    and then he informed us that there was a

5    problem with the terrazzo.

6        Q.    And you said that meeting

7    occurred sometime in the fall or early

8    winter of 2003?

9        A.    To the best of my recollection.

10       Q.    Was that the first time that

11   anyone had advised you that there was a

12   potential issue with respect to the

13   terrazzo flooring at Baruch College?

14            MS. BONACCI: Objection to form.

15            MR. FROESSEL: I'm sorry, what's

16       the objection?

17            MS. BONACCI: Anyone.  You mean

18       anyone from DASNY or anyone in total?

19       Q.    Was that meeting in the late

20   fall or early winter of 2003 with Mr. Van

21   Vleck the first time that you learned of

22   allegations of defects in the terrazzo

23   flooring at Baruch College?

24       A.    It was the first time we heard

25   of a major defect.  Prior to that, in

39

1                    J. Scarpellino

2    handling the Crocetti claim, we knew that

3    they were doing some punch list and some

4    corrective work on their flooring.

5         Q.    At that second meeting with Mr.

6    Van Vleck, did either you or Mr. Seminara

7    respond in any way to the allegations of

8    defects in the terrazzo flooring?

9         A.    I believe we just requested

10   information as to what was going on out

11   there.

12        Q.    Do you recall whether either you

13   or Mr. Seminara made any statements to

14   DASNY about any cleaning materials that

15   were used on the floor at Baruch College?

16        A.    I specifically don't recall

17   that.

18        Q.    At the time of your first

19   meeting with Mr. Van Vleck in the spring

20   of 2003 was Trataros still in business?

21        A.    I believe Trataros closed its

22   doors sometime in the spring of '03.

23        Q.    How did Travelers become aware

24   that Trataros was ceasing its business?

25        A.    I was on the Trataros case since

75

J. Scarpellino

1    Q.    What at that time was Travelers

2

3    doing to investigate any potential problem

4    with the terrazzo that was installed at

5    Baruch College?

6    A.    We were trying to determine why

7    the terrazzo at certain points was

8    cracking, whether or not it was the

9    concrete substrate, whether or not it was

10   the underlayment that was underneath the

11   terrazzo, whether or not it was just a bad

12   terrazzo job.  We were just trying to get

13   some information as to what the problem

14   was.

15   Q.    What did you do to try to get

16   that information?

17   A.    I believe we were just trying to

18   get some information, whatever we could,

19   from Trataros at that time or go through

20   Trataros' records at that time I should

21   say because I don't know if Trataros was

22   around at this time.

23   Q.    Did there come a time when

24   Travelers did anything more than just

25   reviewing Trataros' records and talking to

113

J. Scarpellino

1

2          MS. BONACCI: Is that true?

3      Because your counterclaim asserted $20

4      million and there have been

5      representations to the parties at this

6      table that it includes work that does

7      not include terrazzo.

8          MR. FROESSEL: I will limit my

9      questioning on these affirmative

10      defenses to anything relating to

11      terrazzo.

12      Q.     With respect to DASNY's

13  counterclaim concerning terrazzo defects,

14  do you know the factual basis of

15  Travelers' defense that DASNY lacks

16  standing to prosecute the counterclaim

17  against Travelers?

18          MS. BONACCI: Objection.

19          To the extent you know.  You can

20      answer to the extent you know.

21      A.     As far as the performance bond,

22  DASNY never terminated Trataros, never put

23  the surety on notice that there was a

24  problem with the project, the project was

25  complete, the project had been in use for

114

1                J. Scarpellino

2    two, three years after completion, DASNY

3    again never put Travelers on notice of any

4    problem, anything wrong with this project

5    or with Trataros' performance on this job.

6    We never had any documentation or any

7    letters at all from DASNY regarding that.

8        Q.    Turning the page to page eight,

9    I'm looking specifically at the thirteenth

10   affirmative defense.

11       A.    What number, I'm sorry?

12       Q.    The thirteenth affirmative

13   defense.

14            With respect to the terrazzo

15   flooring only, do you know the factual

16   basis of the defense that the counterclaim

17   is barred, in whole or in part, by DASNY's

18   failure to provide Trataros with

19   non-defective plans, drawings, and/or

20   technical specifications for the project?

21            MS. BONACCI: Objection.

22            To the extent you know.

23       A.    Again, it's part of the lawsuit

24   and I'll leave that up to counsel.

25       Q.    Going down the page to the

121

1              J. Scarpellino

2         At this point I'll turn it over

3      to any of the counsel that may have

4      questions.

5    EXAMINATION BY

6    MS. RAICUS:

7         Q.    I represent one of the myriad of

8    insurance companies as the fourth-party

9    defendants.

10              To which performance bond are

11   you referring when you testified

12   previously that DASNY was obligated to

13   notify Travelers and did not do so?

14        A.    We're talking about the

15   terrazzo, so the terrazzo was contract

16   sixteen.

17        Q.    Contract sixteen?

18              Who were the parties to that

19   contract?

20        A.    Trataros was the principal.

21   DASNY was the obligee.

22        Q.    Do you specifically recall --

23   and again, you can refer to any of the

24   documents if you want -- do you

25   specifically recall the time period within

122

J. Scarpellino

1  which notice was required to Travelers

2

3  from DASNY?

4      A.    DASNY never notified Travelers,

5  never defaulted Trataros on the project,

6  and that's part of the way the bond is

7  written, there's a notice provision in

8  there.

9      Q.    I'd like to refer to the exhibit

10  that contains the letter from TDX that

11  refers to the terrazzo flooring.  I

12  believe that's Exhibit 13.  I'm referring

13  to the August 28, 2003 letter from TDX to

14  Trataros.

15          Do you know what the source of

16  TDX's information that's contained in this

17  letter is?

18      A.    I had no idea -- like I said

19  prior, Crocetti had made a payment bond

20  claim.  We were investigating the payment

21  bond claim.  We were informed that there

22  was some punch list, some patching that he

23  was doing on the terrazzo floor in

24  different areas.  We were informed by

25  Crocetti's attorney that basically the

123

J. Scarpellino

1  work was done in accordance with the plans

2  and specs and he wanted payment.  I

3  indicated, until we get the okay that that

4  work was completed, you know, that we

5  would not make any payment.  But we had no

6  idea what was behind this letter.

7      Q.    Now, at some point during the

8  course of this Baruch project, would

9  different aspects of the project be signed

10  off on as complete, such as plumbing, such

11  as electric, such as ceiling?

12     A.    That's what's normally done on a

13  project; correct?

14     Q.    Was it done on this project?

15     A.    Travelers did not follow this

16  project.  This was a project that Trataros

17  was completing.  We left them alone.  They

18  went on their own to do their thing.  I

19  was involved in handling the other sixteen

20  projects.  This was a project that at the

21  end of the day they were going to be

22  making money on if they ever got paid.  So

23  we didn't follow it.  We never had any

24  notice from DASNY, any notice from TDX,

124

J. Scarpellino

1  any notice from anyone that there was a

2  problem or that they were going to

3  terminate Trataros, default Trataros,

4  whatever.

5  Q.     Now, is this letter from TDX

6  dated August 28, 2003 the first notice

7  that somehow came into the possession of

8  Travelers regarding alleged problems with

9  the terrazzo floor?

10  A.     Again, it was our first notice

11  that there was a problem with the floor,

12  but we had no idea of the extent of the

13  problem or what the situation was.  That's

14  why I wrote the letter to Mr. Wirth

15  indicating what's going on, I received

16  this letter, you know, you're telling me

17  one thing, these guys are telling me that

18  the, you know, the floors have to be

19  replaced.

20  Q.     Now, whatever completion of this

21  project and before litigation, did you

22  ever come to learn that certain aspects of

23  the project were signed off on?

24  A.     The project was complete.  From

125

J. Scarpellino

1   the first floor to the fourteenth floor

2   were signed off on in September of '01 and

3   the bottom three sections, the basement

4   and the two subbasements, the lower three

5   levels were signed off on I believe the

6   end of January or February, '02.

7       Q.    And when you say, "signed off

8   on," are you referring to a physical

9   document?

10      A.    The project was complete, the

11  certificate of occupancy for the entire

12  building, the building was in use for

13  classes beginning on September 1 except

14  for the lower three floors.  After

15  January, February, '02, they had use and

16  occupancy of the entire building.

17      Q.    Do you know where such documents

18  would be located, the certificate of

19  occupancy, et cetera?

20      A.    I'm sure they're in DASNY's

21  records.

22      Q.    Now, again looking at this

23  letter dated August 28, 2003, in reviewing

24  this document, can you tell me where the

126

1                    J. Scarpellino

2      alleged terrazzo floor problems were

3      located, meaning were they located on the

4      lower three levels or floors one through

5      fourteen or both or something else?

6               MS. BONACCI: Objection.

7               Go ahead.

8          A.     The letter says what the letter

9      says.  I mean, I got the letter and it

10     just indicates that there's flooring

11     deficiencies, unsafe conditions, and so

12     on.  And then, when we had our second

13     meeting with Van Vleck, that's when he

14     indicated that -- and he made us that

15     lowball offer and indicated that there was

16     a problem with the floor that we started

17     to get more information on it.

18     Apparently, you know -- that's it, that's

19     when we started getting more information

20     on it, after that meeting.

21         Q.     Is Mr. Van Vleck associated with

22     DASNY?

23         A.     He was the head of construction

24     of DASNY.  I'm not sure of his exact

25     title, but he was the top man, I believe.

127

J. Scarpellino

Q.    Did Mr. Van Vleck ever tell you
whether or not there were any Department
of Building inspections of the flooring?

A.    No, he just indicated -- to the
best of my recollection, the only thing he
indicated was that there was a problem
with the terrazzo flooring and he wasn't
-- that basically they weren't going to
pay the contract balances and delay claims
and so on and they gave us that lowball
offer.

Q.    Did you keep minutes of either
of the meetings that you had with Mr. Van
Vleck?

A.    Not to my knowledge.

Q.    To your knowledge, did Mr. Van
Vleck ever report the alleged terrazzo
floor problems to the New York City
Department of Buildings?

A.    I have no idea.

Q.    To your knowledge, were any
violations issued by the New York City
Department of Buildings with respect to
the terrazzo flooring?

152

## CERTIFICATION BY REPORTER

I, Wayne Hock, a Notary Public of the

State of New York, do hereby certify:

That the testimony in the within

proceeding was held before me at the

aforesaid time and place;

That said witness was duly sworn

before the commencement of the testimony,

and that the testimony was taken

stenographically by me, then transcribed

under my supervision, and that the within

transcript is a true record of the

testimony of said witness.

I further certify that I am not

related to any of the parties to this

action by blood or marriage, that I am not

interested directly or indirectly in the

matter in controversy, nor am I in the

employ of any of the counsel.

IN WITNESS WHEREOF, I have hereunto

set my hand this *24th* day of *June*

, 2008.

_Wayne Hock_
_____