# EXHIBIT 15

```
                                                              1
 1
 2      UNITED STATES DISTRICT COURT
        SOUTHERN DISTRICT OF NEW YORK
 3      ------------------------------------
 4      TRAVELERS CASUALTY AND SURETY COMPANY as
        Administrator for RELIANCE INSURANCE
 5      COMPANY,
 6                            Plaintiff,
 7             -against-
 8      DORMITORY AUTHORITY-STATE OF NEW YORK, TDX
        CONSTRUCTION CORP. and KOHN PEDERSEN FOX
 9      ASSOCIATES, P.C.,
10                            Defendants.
11      Case No. 08-CV-6915 (DLC)
12
                      (CAPTION CONTINUED)
13      ------------------------------------
14
                           July 8, 2008
15                         10:06 a.m.
16
17           DEPOSITION of NICHOLAS
18      D'AMBROSIO, taken by Plaintiff, pursuant
19      to Notice, held at the offices of
20      HOLLAND & KNIGHT LLP, 195 Broadway, New
21      York, New York before Wayne Hock, a Notary
22      Public of the State of New York.
23
24
25
```

1          N. D'Ambrosio
2     Q.   And what is the job description
3  of a chief project manager?
4     A.   It's to manage multiple
5  projects. It's a program manager on
6  multiple projects that I manage and
7  oversee.
8     Q.   So it's more than one project?
9     A.   Correct.
10    Q.   Are there a set number of
11 projects that you manage?
12    A.   No.
13    Q.   And are there other chief
14 project managers?
15    A.   Yes.
16    Q.   How many chief project managers
17 are there?
18    A.   I don't know.
19    Q.   Did you hold that title
20 throughout the duration of the Baruch
21 project?
22    A.   No.
23    Q.   When was your first involvement
24 with Baruch?
25    A.   From the beginning.

17

1        N. D'Ambrosio
2    Q.    And when you say, "from the
3 beginning," does that include prior to the
4 design phase?
5    A.    Yes.
6    Q.    So before KPF is brought
7 onboard?
8    A.    I don't understand that
9 question.
10   Q.    From the beginning of the
11 project meaning the conceptual beginning
12 of the project with CUNY approaching DASNY
13 to work in connection with it?
14   A.    I wasn't involved with that.
15   Q.    What was your job title at the
16 beginning of the Baruch project?
17   A.    Senior project manager.
18   Q.    And as senior project manager,
19 what were your responsibilities?
20   A.    It was the same as the program
21 manager.
22   Q.    And specifically in connection
23 with Baruch, what were you vested with the
24 responsibility for doing?
25   A.    To manage the process to build

19

N. D'Ambrosio

Q. Was there any point in time where you were working exclusively on Baruch?

A. Yes.

Q. When was that?

A. Probably -- I don't remember, but it's probably when construction started, maybe before that. The other jobs were phasing out so just if you want a date, I don't know what that date is.

Q. When the other projects had phased out and you were working on Baruch, did there come a point in time when you were also managing other projects as well as Baruch?

A. No.

Q. And is there a point in time when you were no longer working on the Baruch project?

A. Yes.

Q. When is that?

A. When we turned the building over to the client.

Q. Was that in 2002?

20

N. D'Ambrosio

1
2  A.    I believe it was 2001.
3  Q.    At that point in time, Mr.
4  D'Ambrosio, what was your next project
5  that you went to?
6  A.    That's when I got promoted to
7  chief and I went into the hospital
8  program.
9  Q.    After the building was turned
10 over, did you have any further involvement
11 in the Baruch project?
12 A.    None whatsoever.
13 Q.    And that would include even
14 meetings with DASNY to discuss the floor?
15 A.    Correct.
16 Q.    Prior to your administrative
17 responsibilities, did you ever perform
18 actual construction work in the field?
19 A.    No.
20 Q.    With respect to the terrazzo and
21 the flooring aspects of the Baruch
22 project, did you have any responsibilities
23 that were particular to that?
24 A.    I'm not sure what that -- the
25 question is.

1  N. D'Ambrosio
2  of its contractual obligations to assist
3  with monitoring KPF's contractual
4  obligations?
5      A.   Not to my knowledge.
6      Q.   And I don't want to
7  mischaracterize what you said, Mr.
8  D'Ambrosio, so just to clarify it, to your
9  knowledge, during the time frame that you
10 were affiliated with the project, you were
11 not aware of any flooring problems?
12     A.   Correct.
13     Q.   To the best of your knowledge,
14 when did KPF first become aware that the
15 floor slabs were out of tolerance, the
16 concrete slabs?
17     A.   I would guess after they were
18 poured.  That makes sense.
19     Q.   And do you know who provided
20 that information to KPF?
21     A.   That probably would have been
22 our CM.
23     Q.   Did you have any -- in
24 connection with Trataros, did you have any
25 interactions with Trataros' subcontractors

VERITEXT REPORTING COMPANY
212-267-6868                                516-608-2400

```
                                                          40
 1               N. D'Ambrosio
 2   in connection with the flooring aspects of
 3   the project?
 4           MR. SHAPIRO:  I'm going to -- I
 5       just want to clarify here.
 6           When you're talking about
 7       flooring problems, I think Mr.
 8       D'Ambrosio was thinking terrazzo
 9       flooring problems.  If you have a
10       different understanding --
11       Q.    I understood you to mean -- just
12   so we both have the same understanding,
13   during the project time frame, you're not
14   aware of any terrazzo issues or terrazzo
15   problems; is that accurate?
16       A.    Correct.
17       Q.    During your involvement with the
18   project, did you have any interactions
19   with Trataros' subcontractors in
20   connection with the flooring portions of
21   the project?
22       A.    No.
23       Q.    And that would include GM
24   Crocetti?
25       A.    Correct.
```

125

1                    N. D'Ambrosio
2      A.     When I left, I was the chief.
3      Q.     In connection with the Baruch
4 project, you were the project manager?
5      A.     Correct.
6      Q.     And you had that job until what,
7 August, September of '01; is that correct?
8      A.     Yeah, somewhere around that.
9      Q.     And you had been the project
10 manager for Baruch continuously up to that
11 point from at least when construction work
12 started?
13     A.     Yes.
14     Q.     Construction work included the
15 work that was done before the Trataros
16 contract?
17     A.     Yes.
18     Q.     Could you briefly give us a
19 brief rundown of exactly the type of
20 activities that you would do as part of
21 your job as construction manager for
22 Baruch.
23     A.     Okay.
24            In hopefully a few words or
25 less, but it's basically the overall

133

N. D'Ambrosio

2  Q. You mentioned McCullough.

3  McCullough is a TDX guy; is that correct?

5  A. McCullough is a construction manager for TDX, yes.

7  Q. When you left the Baruch project in September of '01, how far along was the project at that point?

10  A. The job was occupied.

11  Q. The flooring was in, the finished flooring?

13  A. Yes.

14  Q. What did it look like?

15  A. It looked great.

16  Q. As far as you know when you left, there were no complaints about the finished flooring?

19  A. That is correct.

20  Q. And you, yourself, never observed any terrazzo that looked bad to you as of the time you left?

23  A. No, I did not.

24  Q. What is this camber that we heard about?

```
                                                       213
1                   N. D'Ambrosio
2    -- I can't remember that far -- that date.
3    I can't.
4           Q.    So you have no recollection?
5           A.    No.
6           Q.    To your knowledge, did there
7    come a time when, on behalf of DASNY or
8    TDX, that Trataros was placed on notice
9    that it would be held responsible for
10   problems associated with the terrazzo
11   flooring?
12          A.    Not to my knowledge.
13          MR. SIMON: I've not nothing
14     further.
15          MR. HALL: I have just a couple
16     of quick questions.
17   EXAMINATION BY
18   MR. HALL:
19          Q.    Mr. D'Ambrosio, my name is Mark
20   Hall.  I represent Ohio Casualty Insurance
21   Company.
22                In the late winter/spring of
23   2001, you were the project manager on this
24   job?
25          A.    Late?
```

```
                                                              214
 1                     N. D'Ambrosio
 2        Q.    Late winter/spring of 2001,
 3   February, March, April.
 4        A.    Yes.
 5        Q.    In that capacity, would you have
 6   expected to receive reports of the
 7   terrazzo flooring delaminating?
 8              MR. SHAPIRO: Objection.
 9              You can answer.
10        A.    Would I have -- if it was, yes.
11        Q.    Would you have expected to
12   receive reports that the terrazzo had
13   failed to the point where it had to be
14   removed and replaced?
15              MR. ZICHELLO: Objection to form.
16        Q.    You can answer the question.
17              MR. SHAPIRO: Yes.
18        A.    Yes.
19        Q.    Do you have any personal
20   recollection of receiving any reports in
21   that time frame about the terrazzo
22   failing?
23        A.    No.
24        Q.    Earlier you indicated that,
25   prior to working for DASNY, you spent
```

232

# CERTIFICATION BY REPORTER

I, Wayne Hock, a Notary Public of the State of New York, do hereby certify:

That the testimony in the within proceeding was held before me at the aforesaid time and place;

That said witness was duly sworn before the commencement of the testimony, and that the testimony was taken stenographically by me, then transcribed under my supervision, and that the within transcript is a true record of the testimony of said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, that I am not interested directly or indirectly in the matter in controversy, nor am I in the employ of any of the counsel.

IN WITNESS WHEREOF, I have hereunto set my hand this 11th day of July, 2008.

_Wayne Hock_