**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

TRAVELERS CASUALTY AND SURETY COMPANY
as Administrator for RELIANCE INSURANCE
COMPANY,

                                        Plaintiff,

        vs.

DORMITORY AUTHORITY - STATE OF NEW YORK,
TDX CONSTRUCTION CORP. and KOHN PEDERSEN
FOX ASSOCIATES, P.C.,

                                        Defendants.

DORMITORY AUTHORITY OF THE STATE OF NEW
YORK and TDX CONSTRUCTION CORP.,

                        Third-Party Plaintiffs,

        vs.

TRATAROS CONSTRUCTION, INC.,

                        Third-Party Defendant.

TRATAROS CONSTRUCTION, INC. and TRAVELERS
CASUALTY AND SURETY COMPANY,

                        Fourth-Party Plaintiffs,

        vs.

CAROLINA CASUALTY INSURANCE COMPANY;
BARTEC INDUSTRIES INC.; DAYTON SUPERIOR
SPECIALTY CHEMICAL CORP. a/k/a DAYTON
SUPERIOR CORPORATION; SPECIALTY
CONSTRUCTION BRANDS, INC. t/a TEC; KEMPER
CASUALTY INSURANCE COMPANY d/b/a KEMPER
INSURANCE COMPANY; GREAT AMERICAN
INSURANCE COMPANY; NATIONAL UNION FIRE
INSURANCE COMPANY OF PITTSBURGH, PA.;
UNITED STATES FIRE INSURANCE COMPANY;
NORTH AMERICAN SPECIALTY INSURANCE
COMPANY; ALLIED WORLD ASSURANCE
COMPANY (U.S.) INC. f/k/a COMMERCIAL
UNDERWRITERS INSURANCE COMPANY; ZURICH
AMERICAN INSURANCE COMPANY d/b/a ZURICH
INSURANCE COMPANY; OHIO CASUALTY
INSURANCE COMPANY d/b/a OHIO CASUALTY
GROUP; HARLEYSVILLE MUTUAL INSURANCE
COMPANY (a/k/a HARLEYSVILLE INSURANCE

Case No. 07-CV-6915 (DLC)
**ECF CASE**

**COUNTER-STATEMENT OF**
**MATERIAL FACTS IN**
**OPPOSITION TO MOTION**
**FOR SUMMARY JUDGMENT**
**FILED BY HARLEYSVILLE**
**INSURANCE COMPANY OF**
**NEW JERSEY**

COMPANY,); JOHN DOES 1-20 and XYZ CORPS. 1-19,

Fourth-Party Defendants.

KOHN PEDERSEN FOX ASSOCIATES, P.C.,

Third-Party Plaintiff,

vs.

WEIDLINGER ASSOCIATES CONSULTING
ENGINEERS, P.C., CASTRO-BLANCO PISCIONERI
AND ASSOCIATES, ARCHITECTS, P.C.,
ARQUITECTONICA NEW YORK, P.C., COSENTINI
ASSOCIATES, INC., CERMAK, PETERKA PETERSEN,
INC., JORDAN PANEL SYSTEMS CORP., TRATAROS
CONSTRUCTION, INC. and LBL SKYSYSTEMS
(U.S.A.), INC.,

Third-Party Defendants.

Plaintiff/Counterclaim Defendant/Fourth-Party Plaintiff, Travelers Casualty and Surety

Company ("Travelers") and Third-Party Defendant/Fourth-Party Plaintiff, Trataros Construction,

Inc. ("Trataros"), respectfully submit their Counter-Statement of Material Facts in Opposition to

the Motion for Summary Judgment brought by Harleysville Insurance Company of New Jersey

("Harleysville"), pursuant to Local Civil Rule 56.1, responding to Harleysville's Statement of

Undisputed Material Facts and setting forth additional material facts.  Pursuant to Local Rule

56.1, the following admissions are made *solely for purposes of the pending motion for Summary*

*Judgment*:

A.    **TRAVELERS' AND TRATAROS' RESPONSE TO HARLEYSVILLE
        STATEMENT OF UNDISPUTED MATERIAL FACTS.**

1.      Travelers and Trataros deny Paragraph 1.  As testified by Trataros' 30(b)(6)

witness, Athena Curis, Trataros was out of business before the date of the referenced letter, and

not only was she no longer an employee of Trataros at that time, but Trataros no longer had any

employees at all.  (Rogers Dec., Exh. 4.)

2.      Travelers and Trataros deny Paragraph 2 to the extent that it implies that the allegations contained therein are of a material nature.  Subject to and without waiving this denial, Travelers and Trataros submit that the face of the referenced document speaks for itself. (Affidavit of Tracey Wishert, the "Wishert Aff.," Exh. G.)

3.      Travelers and Trataros deny Paragraph 3, to the extent it represents that the particular pleading was filed in 1998.  (Declaration of Eli J. Rogers, the "Rogers Dec.", ¶ 35 & Exh. 25.)

4.      Travelers and Trataros deny Paragraph 4 to the extent that it implies the allegations recited therein are of a material nature.   Subject to and without waiving this denial, Travelers and Trataros admit that on or about December 1, 2004, Travelers and Trataros filed a Fourth-Party Complaint in the action entitled Travelers Casualty and Surety Company, et al. v. The Dormitory Authority of the State of New York, et al., Case No. 04-CV-5101 (the "Baer Action"), the allegations of which speak for themselves. (See, Rogers Declaration "Rogers Dec.," Exh. 26)

5.      Travelers and Trataros deny Paragraph 5 to the extent that it implies the allegations recited therein are of a material nature.   Subject to and without waiving this denial, Travelers and Trataros are without knowledge or information as to when Harleysville was served in the Baer Action.

6.      Travelers and Trataros deny Paragraph 5 to the extent that it implies the allegations recited therein are of a material nature.   Subject to and without waiving this denial, Travelers and Trataros object to this allegation to the extent it is conclusory in nature.

7.    Travelers and Trataros are without knowledge or information as to whether the document attached as Exhibit K to the Wishert Aff. was issued to Bartec, as recited in movant's Paragraph 7.

8.    Travelers and Trataros deny Paragraph 8 to the extent that it implies the allegations recited therein are of a material nature.

**B.    TRAVELERS' AND TRATAROS' STATEMENT OF ADDITIONAL MATERIAL FACTS.**

**Project Owner and the Owner's Project Team**

9.    This action arises out of a construction project known as Baruch College, Site B located at 55 Lexington Avenue, New York, New York (the "Project", frequently referred to in the Project records as "Baruch College, Site B").  (See, Rogers Dec., ¶ 2.)

10.    The Project's "owner" was the Dormitory Authority - State of New York ("DASNY").  (See id.)

11.    Kohn Pederson Fox Associates, P.C. ("KPF") was engaged by DASNY to provide architectural and engineering services for the Project.  (See, Id., ¶ 4.)

12.    Under the terms of KPF's contract with DASNY, KPF was required to provide insurance coverage in connection with its work on the Project, including professional liability insurance with a policy limit of $2,000,000.00 per occurrence. (See, Id., Exh. 1, p. 6, Article X, ¶ 6.)

13.    KPF's contract also contains a provision requiring them to "[r]eview and approve or disapprove all shop drawings and samples submitted by the Contractor for adherence to the intent and requirements of the Contract Documents…."  (See, Id., Exh. 1, Appendix "A" – Scope of Services of architect, p. A.9, ¶ H.1.)

4

14.    TDX Construction Corp. ("TDX") was engaged by DASNY to provide construction management services for the Project. (See, Id., Exh. 2.)

15.    TDX's "Construction Phase" contract obligated TDX to obtain insurance coverage relating to its work on the Project, including a policy for Commercial General Liability ("CGL") coverage, with a minimum combined single policy limit of $5,000,000 per occurrence and aggregate. (See, Id., Exh. 2, p. 4, Article VIII, ¶ 3.)

16.    KPF's contract also contains provisions requiring them to:

    a.)    "[i]nspect all work daily for quality and conformance to the Contract Documents. Advise Prime Contractor(s) of necessary corrective work. Inspect materials and equipment prior to installation for conformance to the specifications." (Id., Exh. 1, Appendix "A" – Scope of Services, p. A2, ¶ 5.b);

    b.)    "[p]repare periodic "Exception Reports" as required by the Construction Work of the Prime Contractors. Distribute to the appropriate Contractor(s) for necessary corrective work. Maintain a log of the noted exception, date issued, and date corrected. Maintain a photographic record where life safety issues/systems are involved." (Id., Exh. 1, Appendix "A" – Scope of Services, p. A2, ¶ 5.c);

    c.)    "[i]nspect the Project jointly with the OWNER and Architect prior to the time the OWNER is to use, occupy, or operate any part or all of the Project, and prepare a list of observed variances and deficiencies in the Construction Work. Distribute the list to the appropriate Prime Contractor(s) for necessary corrective work." (Id., Exh. 1, Appendix "A" – Scope of Services, p. A2, ¶ 5.d);

    d.)    "Expedite and coordinate the work of all Prime Contractors." (Id., Exh. 1, Appendix "A" – Scope of Services, p. A2, ¶ 7.a).

17.    DASNY's Rule 30(b)(6) designee testified in this action that DASNY is not satisfied with the inspection services that TDX provided on the Project, in light of the fact that the epoxy terrazzo is allegedly failing throughout the building, a claim which DASNY believes to raise questions about the inspections performed by TDX of that work. (Id., Exh. 3.) DASNY's Rule 30 (b)(6) designee further testified that to the extent that the underlayment is part

of the epoxy terrazzo system, they are not satisfied with TDX's inspection services of that either. (Id. Exh 3, Bartlett Day 3).

### Award of Contract No. 15 and Contract No. 16

18.     Trataros separately entered into two prime contracts with DASNY for the performance of construction work on the Project, known as "Contract No. 15" and "Contract No. 16," respectively. (Id., Exh. 4 )

19.     Contract No. 16 was awarded to Trataros by DASNY on or about August 27, 1998. (Id., Exh. 4)

20.     Reliance Insurance Company ("Reliance") issued payment and performance bonds to Trataros relating to Contract No. 16 (the "Bonds").  (Rogers Dec., Exh. 5.)

21.     Subsequently, the Bonds came to be administered by Travelers. (Id., Exh. 5)

### The Crocetti Subcontract

22.     Trataros subcontracted a portion of its work under Contract No. 16 to Crocetti. (Id., Exh. 4)

23.     The scope of work under Crocetti's original subcontract included the work set forth in the Project's technical specifications relating to epoxy terrazzo, pre-cast terrazzo, and interior stonework.

24.     Crocetti's subcontract contained a requirement for insurance coverage naming Trataros and DASNY as additional insureds. (Id., Exh. B, p. 2 of 25, ¶ 5.)  (And see, id., p. 1 of 25, at prefatory language and first whereas clause) (defining Trataros as "Contractor" and DASNY as "Owner").

25.     Additionally, Crocetti's subcontract contained a more detailed Insurance and Indemnification Rider.  (Id., Exh. B, pp. 19 of 25 to 21 of 25.)  Under the terms of this insurance

rider, Crocetti was required to provide CGL coverage with policy limits of $5,000,000. (Id., at p. 19 of 25, ¶ III.)

26.    Crocetti's insurance rider further provides that the additional insured coverage provided to DASNY and Trataros "shall stipulate that this insurance is primary, [and] that any other insurance or self-insurance maintained by Owner and Contractor shall be excess only…." (Id., at p. 20 of 25, ¶ VII.)

### Irregularities in the Project's Structural Concrete

27.    The Project's and therefore DASNY's, structural prime concrete contractor was Shroid Construction, Inc. ("Shroid"). (Rogers Dec. ¶13).

28.    On or about October 13, 1998, TDX received a letter from Shroid advising that the Project's concrete flooring decks on the 8th floor evidenced "inconsistencies in floor flatness," and that the finished concrete on the 2nd and 6th floors did not meet "the [standards for] flatness or level that is required in the contract specifications." Shroid further advised that "[w]e in fact know that these [concrete] decks do not meet ACI tolerances. We can only assume that they will not meet other trades [sic] requirements either." (Rogers Dec., Exh. 6.)

29.    On or about November 3, 1998, TDX forwarded Shroid's letter to KPF, noting, among other things, that upon review the floor heights for the concrete slabs are 2 inches too high in certain areas. TDX notes that "no action will be taken at this time," however "at a later date" the concrete slabs will be evaluated to determine which "areas … will require remedial action." (Id., Exh. 7.)

30.    Approximately nine (9) months later, on or about August 5, 1999, Trataros wrote to TDX, stating that the uneven concrete floor slabs need to be leveled out before the epoxy terrazzo is installed. (Id., Exh. 8.)

31.     Approximately three (3) months later, on or about November 8, 1999, KPF issued a memorandum regarding the tolerances necessary for three types of floor finishes, including epoxy terrazzo.   KPF directed that "[w]here slabs are beyond these tolerances, flash patch material should be used to level the slabs prior to finish installation." (Id., Exh. 9.)

**The Floor-Leveling Change Order**

32.     Subsequently, DASNY issued a change order to Contract No. 16, GC2-028, adding the "installation of 'self leveling' floor fill" to that contract.   The "Change Order Memorandum" prepared by TDX and incorporated as part of the change order recites that "[t]his additional work is necessary due to the camber in the steel not coming out in the loading of the structure… This created irregular contours in the flatness of the [concrete] slab." (Id., Exh. 10, and cf., Exh. 10.)

33.     The "Change Order Memorandum" prepared by TDX and incorporated as part of the change order further recites "TDX has reviewed this change order and finds it to be fair and reasonable and recommends its approval.   It is our recommendation that the cost should be appropriated as a design omission."(Id., Exh. 10)

34.     Change Order GC2-028 incorporated Trataros' proposal for the floor leveling work, which included a list of exclusions, including the statement that Trataros was "[n]ot responsible for concrete delamination." (Id., Exh. 10.)

35.     Change Order GC2-028 also incorporated KPF's memo dated November 8, 1999, and a product catalogue sheet for a self-leveling underlayment material known as Conflow. (Id., Exh. 9.)

36.     DASNY's Rule 30(b)(6) designee has admitted that inclusion of the Conflow product data sheet into the change order incorporated that material into Trataros' Contract No. 16 for use with the floor leveling work. (Rogers Dec., Exh 3).

37.     TDX's Rule 30 (b)(6) designee admitted that pursuant to the floor leveling change order, Conflow was the specified material for floor leveling. (Rogers Dec., Exh 11.)

38.     Subsequently, KPF approved the use of Conflow as a self-leveling underlayment in connection with the "floor leveling change order," i.e., Change Order GC2-028. (Id., Exh. 12.)

39.     On or about June 28, 2000, Trataros executed a purchase order with Bartec for the installation of "'self leveling' floor fill" at the Project.

40.     Bartec's purchase order includes a provision requiring it to maintain general liability insurance for bodily injury and property damage, and further requires that all such policies shall name DASNY and Trataros as additional insureds.

**Resolution of Alleged Flooring Problems During Project**

41.     On or about February 28, 2001, TDX wrote to Trataros alleging that it had observed areas of delamination in the 13th floor elevator lobby and in the underlayment on the 6th floor. (Rogers Dec. Exh. 11)

42.     Subsequently, Trataros contacted Conspec Marketing & Manufacturing Co., Inc. ("Conspec"), Dayton Superior's predecessor-in-interest, regarding the purported separation and debonding. On or about March 1, 2001, Conspec wrote to Trataros, acknowledging a site visit to the Project held "last Tuesday." Conspec observed that "[t]he terrazzo flooring has come loose in a *small portion* of the lobby area" on the 13th floor, and that the Conflow in that area appeared to have been contaminated by some "foreign substance, or environmental condition," as the

Conflow exhibited an unusual "powdery, loose surface." Conspec recommended grinding back the underlayment "to a solid surface before proceeding with a reapplication of the flooring system." (Rogers Dec., Exh. 13) (emphasis added).

43.    On or about March 7, 2001, Trataros wrote to DASNY enclosing Conspec's findings, as well as the testing lab's findings regarding the core samples taken by Trataros. Trataros further noted that, following its survey of the installed terrazzo, the only area exhibiting separation between the terrazzo and underlayment had been found to be on the 13th floor, and that no additional areas of debonding Conflow had been found. Trataros further noted that "[i]t is the concessive or [sic] all parties that the delaminating of the terrazzo was due to the contamination of the last lift of Conflow." (Id.)

44.    Ray Leu, TDX's 30(b)(6) designee for the terrazzo phase of depositions in this action, acknowledged that during the Project there were incidences where the Conflow became contaminated and was repaired. (Rogers Dec., Exh. 11.)

45.    Mr. Leu further testified that the alleged problems of contamination/delamination occurring in early 2001 were remedied to TDX's satisfaction. (Rogers Dec., Exh. 11.)

46.    Nicholas D'Ambrosio, DASNY's Project Manager on the Project from its beginning until approximately September/October, 2001, testified that he was unaware of any problems with the Project's terrazzo floors occurring during his period on the Project. (Rogers Dec., Exh. 15.)

47.    Mr. D'Ambrosio further testified that as of September, 2001, the Project was occupied, the finished terrazzo had been installed, and "[i]t looked great." To Mr. D'Ambrosio's knowledge, there were no complaints about the terrazzo floor finishes at that point in time. He

further testified, confirming that he never observed "any terrazzo that looked bad" up to the point he left the Project. (Id., 133:7-23.)

48.     Mr. D'Ambrosio further testified that to his knowledge, there never came a time when Trataros was placed on notice by DASNY that Trataros would be held responsible for problems associated with the terrazzo flooring. (Id., 213:6-12.)

49.     Mr. D'Ambrosio further testified that if there had been "reports that the terrazzo had failed to the point where it had to be removed and replaced," he would have expected to receive such reports, and that he had no recollection of receiving any such reports during "late winter/spring of 2001" particularly including the months of February, March and April, 2001. (Id., 213:22-214:23.)

50.     In addition to the floor leveling work performed by Bartec pursuant to its purchase order, Crocetti performed certain underlayment work pursuant to separate change orders, including Change Order GC2-202. (Id., Exh. 16) (reciting that the change order relates to "all labor … and material necessary to install hydraulic cement base in areas left out by the underlayment subcontractor … due to accelerating work schedule in order to open the building on the college target date of August 27, 2001.")

51.     The work performed by Crocetti pursuant to Change Order GC2-202 included the installation of underlayment in "areas around elevators" and/or "at elevators." (Id., Exh. 16, at Crocetti work tickets dated 3/1/01, 3/2/01, and 3/12/01).

52.     DASNY also issued to Trataros Change Order GC2-182, compensating "all labor, equipment and material necessary to repair damaged terrazzo base caused by unidentified trades and to repair cracks in the existing floor slab in the B-3 level prior to the installation of the terrazzo floor." This change order was signed by DASNY in December, 2002. (Id., Exh. 17.)

**The R&J Action**

53.     In connection with its work on the Project, Trataros engaged R&J Construction Corp. ("R&J") as a subcontractor. (Id., Exh. 18.)

54.     On or about November 20, 2002, DASNY received two notices of mechanic's liens, filed by R&J in connection with the Project.

55.     Subsequently, R&J commenced an action in the Supreme Court of the State of New York, New York County, on or about July 18, 2003.  R&J asserted no claim against Trataros, DASNY, Crocetti or Bartec in connection with any purported defects in the Project's epoxy terrazzo and/or underlayment. (Id.)

56.     Likewise, when DASNY filed its responsive pleadings in the R&J action, DASNY did not assert any claims, nor even allegations alluding to, the purported defects in the Project's epoxy terrazzo and/or underlayment. (Rogers Dec., Exhs. 21 & 22.)

57.     Subsequently, R&J's claims were compromised by DASNY, and its Complaint was dismissed. (Id., Exh. 23)

**The Baer Action**

58.     On or about June 28, 2004, Travelers commenced an action entitled Travelers Casualty and Surety Company as Administrator for Reliance Insurance Company v. The Dormitory Authority of the State of New York, et al., Case No. 04-CV-5101 (the "Baer Action"), by filing its Complaint and Jury Demand with the United States District Court for the Southern District of New York (the "Southern District").  This action was assigned to the Honorable Harold Baer, Jr., U.S.D.J. (Id., Exh. 24.)

59.    On or about August 4, 2004, DASNY filed a Third-Party Complaint in the Baer Action, alleging claims against Travelers and Trataros.  (Id., Exh. 25.)

60.    On or about December 1, 2004, Travelers and Trataros filed their Fourth-Party Complaint in the Baer Action, impleading Crocetti, Bartec, and Dayton Superior, among others, on theories of indemnification and contribution, *inter alia*.  (Id., Exh. 26.)

61.    One day later, on December 2, 2004, the Honorable Harold Baer, Jr., U.S.D.J. entered a Scheduling Order, setting a deadline of February 17, 2005 for joinder of additional parties. (Id., Exh. 27.)

62.    In light of the filing deadline, on February 17, 2005, Travelers and Trataros filed their Amended Fourth-Party Complaint in the Baer Action, impleading Harleysville and a number of other insurance carriers. (Id., Exh. 26.)

63.    Subsequently, the Baer Action was voluntarily dismissed, upon the consent of all parties, including Ohio Casualty and the other insurance carriers. (Id., Exh. 30.)

**The Within Action**

64.    Following dismissal, the parties engaged in confidential non-binding mediation. After the close of the mediation, pursuant to the tolling agreement Travelers commenced the within action by filing its Complaint and Jury Demand with the Southern District, on August 1, 2007. (Id., Exh. 31.)

65.    At the time of Travelers' filing, it marked the action as related to the prior Baer Action.  The Clerk referred the issue to Judge Baer for decision as to whether the two actions were related.  (Id., Exh. 32.)

66.    On or about August 14, 2007, Judge Baer declined the within action as "not similar", and the case was returned to the Clerk's Office for assignment.  (Id., Exh. 32.)

67.     On or about September 28, 2007, DASNY and TDX filed their "Answer of DASNY and TDX with Affirmative Defenses, Counterclaims, and Cross-Claims" (hereinafter, the "DASNY/TDX Answer"). (Id., Exh. 33.)

68.     On or about September 28, 2007, DASNY and TDX filed their Third-Party Complaint, impleading Trataros into the within action. The Third-Party Complaint was not entered on the Court's ECF system until October 2, 2007. (Id., Exh. 34.)

69.     On October 1, 2007, Counsel for Travelers and Trataros received a hard-copy of the Third-Party Complaint, under cover of a letter from counsel for DASNY and TDX requesting that Trataros execute a Waiver of Service of Summons. That same day, Travelers and Trataros transmitted copies of the Third-Party Complaint and the DASNY/TDX Answer to the various carriers via Federal Express. (Id., Exh. 35.)

70.     In response to the claims alleged in the present action by DASNY and TDX in their Third-Party Complaint, and in their respective counterclaims, Travelers and Trataros filed their Fourth-Party Complaint on November 14, 2007.  Travelers' and Trataros' Fourth-Party Complaint impleaded Harleysville, among others.  The timing of Travelers' and Trataros' Fourth-Party filing was within the period of tolling established between the parties during the mediation proceeding.  (Id., Exh. 36.)

71.     On November 14, 2007, Travelers and Trataros transmitted to all named Fourth-Party Defendants, including the various fourth-party insurance carriers with the exception of NAS which was not a party at the time, copies of the Fourth-Party Summonses, prior pleadings filed to date, and copies of other pertinent documents. (Id., Exh 37.)

**Harleysville Policies**

14

72.    During the pendency of the Baer Action, Harleysville produced to Travelers and Trataros a copy of the excess policy purportedly issued to Bartec by Harleysville. (Id., Exh. 38.)

73.    Harleysville issued Contractor's Business Owners Policy Number CB-8E8397 to Bartec (the "Primary Bartec Policy") and the policy identifies the New Jersey Named Insured & Mailing Address as follows:

> Bartec Industries
> Rencon Corp
> PO Box 715
> New Providence, NJ 07974

(Rogers Dec.Exh. 38)

74.    In its Fourth Party Answer filed in the within action, Bartec has admitted that it is a New Jersey Corporation, with its principal place of business located at 453 Main Street, Little Falls, New Jersey 07424. (See Exh.40, ¶4 and cf., Exh. 37, at ¶4).

75.    The Policy Declarations for Contractor's Business Owners Policy CB 8E8397 uses a different New Jersey address for Bartec: P.O. Box 715, New Providence, NJ 07974 (Id., Exh. 38.)

76.    The Primary Bartec Policy identifies as the Insurance Agent with the "[Insurance] Agent's Name & Address, in pertinent part, as Wharton/Atlantic, and gives a New Jersey telephone number.
(Id., Exh. 38.)

77.    The renewal certification for the policy Bartec Policy recites that it was issued on May 26, 2003." (Id.)

78.    The second Policy Declarations page of the policy identifies one (1) "Covered Location," namely, 435 Main Street, Little Falls, NJ 07424.  (Id., Exh. A, p. 3 of 33.)

79.    The same page lists under the heading "Hazards" the following: "State: New Jersey." (Id.)

80.    The policy contains an "Additional Insured Endorsement Construction Contracts" endorsement, which provides in pertinent part, that Section II - "Who Is An Insured" of the policy's Commercial General Liability Coverage Form (the "CGL Form"), is amended to include as an insured "any general contractor subcontractor or owner whom you are required to add as an additional insured on this policy under a written or oral construction contract or agreement...." The same endorsement further provides that "[a]ny coverage provided [to an additional insured] hereunder shall be excess over other valid and collectible insurance available to the additional insured whether that other insurance is primary, excess, contingent or provided on any other basis" (Id.)

81.    The policy further provides, in pertinent part, that the insurance provided under the CGL Form "applies only ...to... 'property damage'...that is caused by an 'occurrence'; The "occurrence" must that take place in the 'coverage territory.'" (Id., p. 23.)

82.    The term "coverage territory" is defined under the CGL Form as:

    a.    The United States of America (including its territories and possessions), Puerto Rico and Canada;
    b.    International waters or airspace...;
    c.    All parts of the world [under several conditions]...

(Id.32.)

83.    The policy contains two endorsements entitled "New Jersey Auto/Mobile Equipment and Nonowned Watercraft," "New Jersey Changes Business Liability Coverage," and "New Jersey Changes-Lead Contamination Liability"

84.    Further, the Primary Bartec Policy contains an endorsement entitled "New Jersey Changes – Cancellation and Nonrenewal." This endorsement explicitly references New Jersey

law as being applicable to and/or governing the insured's and insurer's rights under the policy. (Id., p. 31 of 33, at ¶ A) ("Pursuant to New Jersey law, this policy cannot be cancelled or nonrenewed for any underwriting reason or guideline which is arbitrary, capricious or unfairly discriminatory..."). (And, id., at ¶ B.2.a.(1)(b)) ("Existence of a moral hazard, as defined in N.J.A.C. 11:1-20.2(f) as follows [et cetera].")

85.     As of July 2, 2008, DASNY has not spent any money to repair or replace terrazzo Nor has DASNY entered into any contracts for the repair or replace of the terrazzo flooring system. (Bartlett day 3 605:22-606:8)

86.     Harleysville through its counsel, had fully participated in discovery and depositions in the within matter. (Rogers Dec.¶52).

87.     DASNY Rule 30b (6) witness, Charles Bartlett prepared an internal report analyzing the alleged terrazzo flooring problems, for distribution to DASNY, on or about November 5, 2003.(Id. ¶57.)

88.     Pursuant to the General Conditions of Contract No. 16, any notice to Trataros from DASNY "relative to any part of the Contract shall be in writing and ...mailed to the Contractor at the last address given by the contractor....(Id. ¶59.)

89.     The New York State Assembly recently enacted Bill Number A11541 and which was subsequently signed into law, amending Section 3420 of the New York Insurance Law. (Id. ¶54 & Exhs. 40-41.)

Dated:      Florham Park, New Jersey
            September 12, 2008

                                    Respectfully submitted,
                                    **DREIFUSS BONACCI & PARKER, LLP**
                                    *Attorneys for Travelers Casualty and Surety Co.*
                                    *and Trataros Construction, Inc.*


                                    By:      _____/S/_____
                                             Eli J. Rogers (ER:6564)
                                    26 Columbia Turnpike, North Entrance
                                    Florham Park, New Jersey 07932
                                    (973) 514-1414