# EXHIBIT
# 5

ORIGINAL

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------

TRAVELERS CASUALTY AND SURETY COMPANY as

Administrator for RELIANCE INSURANCE

COMPANY,

                         Plaintiff,

            -against-

DORMITORY AUTHORITY-STATE OF NEW YORK, TDX

CONSTRUCTION CORP. and KOHN PEDERSEN FOX

ASSOCIATES, P.C.,

                         Defendants.

Case No. 08-CV-6915 (DLC)


              (CAPTION CONTINUED)

------------------------------------------------


                         June 19, 2008

                         10:09 a.m.


          DEPOSITION of JOHN SCARPELLINO,

taken by Plaintiff, pursuant to Notice,

held at the offices of HOLLAND & KNIGHT

LLP, 195 Broadway, New York, New York

before Wayne Hock, a Notary Public of the

State of New York.

32

1                    J. Scarpellino

2    terms "certain reinsured contracts" and

3    "certain reinsured liabilities?"

4              MS. BONACCI: Objection to form.

5         A.    Me?  No, I don't know exactly

6    what that means, but I would say in the

7    purchase of Reliance there must have been

8    something in the agreement between

9    Travelers and Reliance.

10        Q.    So as you sit here today, do you

11   have any knowledge of whether Travelers

12   had any reinsurance obligations with

13   respect to the four bonds that we marked

14   as DASNY Exhibits 2 through 5?

15        A.    No, I don't know.

16             MS. SMITH: I'm sorry, no, I

17   don't know or --

18             THE WITNESS:  No, I don't know.

19             MS. SMITH: Thank you.

20        Q.    Mr. Scarpellino, at any time in

21   your capacity as a bond claims manager

22   with Travelers, have you become aware of

23   allegations of defects in terrazzo

24   flooring at Baruch College?

25        A.    Yeah, I became aware of that.

33

J. Scarpellino

2      Q.      Do you recall when Travelers

3    first learned of those allegations?

4      A.      I believe the first time I've

5    heard about the terrazzo, that there was a

6    problem with the terrazzo, was after my

7    second meeting with Doug Van Vleck, which

8    would have been I believe somewhere around

9    the late fall, early winter of 2003.

10     Q.      And you said that that was your

11   second meeting with Mr. Van Vleck?

12     A.      Yes.

13     Q.      When was your first meeting with

14   Mr. Van Vleck?

15     A.      I believe sometime in the spring

16   of 2003.

17     Q.      Focusing your attention on the

18   first meeting, who else besides you and

19   Mr. Van Vleck was present at that meeting?

20     A.      There was Nick Seminara from

21   Travelers.

22     Q.      Anyone else?

23     A.      Brian Fern, F E R N, from

24   Travelers.  I believe Steve Boiko.

25             That's all I recall at this

34

                    J. Scarpellino

1

2    point.

3        Q.    Who is Nick Seminara?

4        A.    Nick Seminara was the -- at the

5    time I believe he was the vice president

6    of contract surety claims in Hartford.

7        Q.    Is Mr. Nick Seminara still

8    employed by Travelers?

9        A.    Yes.

10       Q.    Do you know his current title?

11       A.    No.

12       Q.    Is he still working in the

13   surety bond area?

14       A.    No.

15       Q.    Do you know what area he is

16   working in?

17       A.    I'm not sure of the exact

18   location, whether it's claim or legal.

19       Q.    At that time in the spring of

20   2003 did you report to Mr. Seminara?

21       A.    Yes.

22       Q.    Who is Brian Fern?

23       A.    Brian Fern is our in-house

24   engineer.

25       Q.    And does Mr. Fern still work for

35

                    J. Scarpellino

1

2    Travelers?

3        A.    Yes.

4        Q.    And is he still an in-house

5    engineer?

6        A.    Yes.

7        Q.    What was the purpose of the

8    meeting you had with Mr. Van Vleck in the

9    spring of 2003?

10       A.    We had a meeting in order to

11   determine if we were agreeable to collect

12   some contract balances and to -- for

13   contract fifteen and sixteen, for

14   Trataros, and also to see if we could

15   attempt to make a deal to -- on the delay

16   portion of the claims.  I believe we made

17   a recommendation that we would give DASNY

18   a hold harmless, they'd pay us the money

19   for the delay claims, and we in turn will

20   turn around and take care of the subs.

21   This way we could close out the project.

22       Q.    Was there any mention of

23   terrazzo flooring at that meeting?

24       A.    No, the only mention at that

25   meeting was we had another project with

36

1                    J. Scarpellino

2    DASNY which was the Queens College

3    Powdermaker Hall project and he said they

4    were behind on that project.  He said if

5    we escalate, he'll talk again about

6    getting this thing resolved, the delay

7    claim and our contract balances.

8         Q.    Was Trataros working at

9    Powdermaker Hall?

10        A.    He was the contractor on that

11   project.

12        Q.    And Travelers became involved in

13   that project?

14        A.    Travelers was involved in that

15   project.

16        Q.    And was Travelers involved in

17   connection with bonds that had been issued

18   on behalf of Trataros?

19        A.    For Powdermaker Hall?

20        Q.    Yes.

21        A.    I'm not sure if it was a

22   Reliance bond or a Travelers bond, but

23   Travelers was the responsible bonding

24   party for that contract.

25        Q.    Just so I'm clear, I know you

37

```
 1              J. Scarpellino
 2    said Travelers was the responsible bonding
 3    party, but was the obligor on those bonds
 4    Trataros?  Again, I'm talking about
 5    Powdermaker.
 6         A.    Yes.
 7         Q.    The second meeting that you had
 8    with Mr. Van Vleck, who was in attendance
 9    at that meeting?
10         A.    I believe it was just Mr.
11    Seminara and myself and Mr. Van Vleck and
12    Mr. Boiko.
13         Q.    And to your recollection, Mr.
14    Fern was not at that meeting?
15         A.    No.
16         Q.    What was the purpose of that
17    meeting?
18         A.    Well, I believe we had fairly
19    well got Queens College either behind us
20    or on the right track and we were trying
21    to get additional funds for the Baruch
22    project and that's when he told us that,
23    you know, the offer we had made, as far as
24    a hold harmless agreement for the delay
25    claims, contract balances, and so on, to
```

38

1          J. Scarpellino

2    the best of my recollection he made us a

3    lowball offer at that point of $8 million

4    and then he informed us that there was a

5    problem with the terrazzo.

6        Q.    And you said that meeting

7    occurred sometime in the fall or early

8    winter of 2003?

9        A.    To the best of my recollection.

10       Q.    Was that the first time that

11   anyone had advised you that there was a

12   potential issue with respect to the

13   terrazzo flooring at Baruch College?

14           MS. BONACCI: Objection to form.

15           MR. FROESSEL: I'm sorry, what's

16       the objection?

17           MS. BONACCI: Anyone.  You mean

18       anyone from DASNY or anyone in total?

19       Q.    Was that meeting in the late

20   fall or early winter of 2003 with Mr. Van

21   Vleck the first time that you learned of

22   allegations of defects in the terrazzo

23   flooring at Baruch College?

24       A.    It was the first time we heard

25   of a major defect.  Prior to that, in

39

J. Scarpellino

handling the Crocetti claim, we knew that

they were doing some punch list and some

corrective work on their flooring.

    Q.    At that second meeting with Mr.

Van Vleck, did either you or Mr. Seminara

respond in any way to the allegations of

defects in the terrazzo flooring?

    A.    I believe we just requested

information as to what was going on out

there.

    Q.    Do you recall whether either you

or Mr. Seminara made any statements to

DASNY about any cleaning materials that

were used on the floor at Baruch College?

    A.    I specifically don't recall

that.

    Q.    At the time of your first

meeting with Mr. Van Vleck in the spring

of 2003 was Trataros still in business?

    A.    I believe Trataros closed its

doors sometime in the spring of '03.

    Q.    How did Travelers become aware

that Trataros was ceasing its business?

    A.    I was on the Trataros case since

75

J. Scarpellino

Q.    What at that time was Travelers

doing to investigate any potential problem

with the terrazzo that was installed at

Baruch College?

A.    We were trying to determine why

the terrazzo at certain points was

cracking, whether or not it was the

concrete substrate, whether or not it was

the underlayment that was underneath the

terrazzo, whether or not it was just a bad

terrazzo job.  We were just trying to get

some information as to what the problem

was.

Q.    What did you do to try to get

that information?

A.    I believe we were just trying to

get some information, whatever we could,

from Trataros at that time or go through

Trataros' records at that time I should

say because I don't know if Trataros was

around at this time.

Q.    Did there come a time when

Travelers did anything more than just

reviewing Trataros' records and talking to

113

J. Scarpellino

1    MS. BONACCI: Is that true?

2    Because your counterclaim asserted $20

3    million and there have been

4    representations to the parties at this

5    table that it includes work that does

6    not include terrazzo.

7    MR. FROESSEL: I will limit my

8    questioning on these affirmative

9    defenses to anything relating to

10   terrazzo.

11   Q.    With respect to DASNY's

12   counterclaim concerning terrazzo defects,

13   do you know the factual basis of

14   Travelers' defense that DASNY lacks

15   standing to prosecute the counterclaim

16   against Travelers?

17   MS. BONACCI: Objection.

18   To the extent you know. You can

19   answer to the extent you know.

20   A.    As far as the performance bond,

21   DASNY never terminated Trataros, never put

22   the surety on notice that there was a

23   problem with the project, the project was

24   complete, the project had been in use for

114

1                    J. Scarpellino

2      two, three years after completion, DASNY

3      again never put Travelers on notice of any

4      problem, anything wrong with this project

5      or with Trataros' performance on this job.

6      We never had any documentation or any

7      letters at all from DASNY regarding that.

8          Q.      Turning the page to page eight,

9      I'm looking specifically at the thirteenth

10     affirmative defense.

11         A.      What number, I'm sorry?

12         Q.      The thirteenth affirmative

13     defense.

14             With respect to the terrazzo

15     flooring only, do you know the factual

16     basis of the defense that the counterclaim

17     is barred, in whole or in part, by DASNY's

18     failure to provide Trataros with

19     non-defective plans, drawings, and/or

20     technical specifications for the project?

21             MS. BONACCI: Objection.

22             To the extent you know.

23         A.      Again, it's part of the lawsuit

24     and I'll leave that up to counsel.

25         Q.      Going down the page to the

121

J. Scarpellino

1        At this point I'll turn it over

2    to any of the counsel that may have

3    questions.

EXAMINATION BY

MS. RAICUS:

Q.    I represent one of the myriad of

insurance companies as the fourth-party

defendants.

To which performance bond are

you referring when you testified

previously that DASNY was obligated to

notify Travelers and did not do so?

A.    We're talking about the

terrazzo, so the terrazzo was contract

sixteen.

Q.    Contract sixteen?

Who were the parties to that

contract?

A.    Trataros was the principal.

DASNY was the obligee.

Q.    Do you specifically recall --

and again, you can refer to any of the

documents if you want -- do you

specifically recall the time period within

122

J. Scarpellino

1  which notice was required to Travelers

2  from DASNY?

3

4      A.    DASNY never notified Travelers,

5  never defaulted Trataros on the project,

6  and that's part of the way the bond is

7  written, there's a notice provision in

8  there.

9      Q.    I'd like to refer to the exhibit

10  that contains the letter from TDX that

11  refers to the terrazzo flooring.    I

12  believe that's Exhibit 13.  I'm referring

13  to the August 28, 2003 letter from TDX to

14  Trataros.

15          Do you know what the source of

16  TDX's information that's contained in this

17  letter is?

18      A.    I had no idea -- like I said

19  prior, Crocetti had made a payment bond

20  claim.  We were investigating the payment

21  bond claim.  We were informed that there

22  was some punch list, some patching that he

23  was doing on the terrazzo floor in

24  different areas.  We were informed by

25  Crocetti's attorney that basically the

123

1                    J. Scarpellino

2    work was done in accordance with the plans

3    and specs and he wanted payment.  I

4    indicated, until we get the okay that that

5    work was completed, you know, that we

6    would not make any payment.  But we had no

7    idea what was behind this letter.

8         Q.    Now, at some point during the

9    course of this Baruch project, would

10    different aspects of the project be signed

11    off on as complete, such as plumbing, such

12    as electric, such as ceiling?

13         A.    That's what's normally done on a

14    project; correct?

15         Q.    Was it done on this project?

16         A.    Travelers did not follow this

17    project.  This was a project that Trataros

18    was completing.  We left them alone.  They

19    went on their own to do their thing.  I

20    was involved in handling the other sixteen

21    projects.  This was a project that at the

22    end of the day they were going to be

23    making money on if they ever got paid.  So

24    we didn't follow it.  We never had any

25    notice from DASNY, any notice from TDX,

124

1                    J. Scarpellino

2    any notice from anyone that there was a

3    problem or that they were going to

4    terminate Trataros, default Trataros,

5    whatever.

6        Q.    Now, is this letter from TDX

7    dated August 28, 2003 the first notice

8    that somehow came into the possession of

9    Travelers regarding alleged problems with

10   the terrazzo floor?

11       A.    Again, it was our first notice

12   that there was a problem with the floor,

13   but we had no idea of the extent of the

14   problem or what the situation was.  That's

15   why I wrote the letter to Mr. Wirth

16   indicating what's going on, I received

17   this letter, you know, you're telling me

18   one thing, these guys are telling me that

19   the, you know, the floors have to be

20   replaced.

21       Q.    Now, whatever completion of this

22   project and before litigation, did you

23   ever come to learn that certain aspects of

24   the project were signed off on?

25       A.    The project was complete.  From

125

J. Scarpellino

the first floor to the fourteenth floor

were signed off on in September of '01 and

the bottom three sections, the basement

and the two subbasements, the lower three

levels were signed off on I believe the

end of January or February, '02.

    Q.    And when you say, "signed off

on," are you referring to a physical

document?

    A.    The project was complete, the

certificate of occupancy for the entire

building, the building was in use for

classes beginning on September 1 except

for the lower three floors.  After

January, February, '02, they had use and

occupancy of the entire building.

    Q.    Do you know where such documents

would be located, the certificate of

occupancy, et cetera?

    A.    I'm sure they're in DASNY's

records.

    Q.    Now, again looking at this

letter dated August 28, 2003, in reviewing

this document, can you tell me where the

126

J. Scarpellino

1  alleged terrazzo floor problems were

2  located, meaning were they located on the

3  lower three levels or floors one through

4  fourteen or both or something else?

5          MS. BONACCI: Objection.

6          Go ahead.

7     A.     The letter says what the letter

8  says. I mean, I got the letter and it

9  just indicates that there's flooring

10  deficiencies, unsafe conditions, and so

11  on. And then, when we had our second

12  meeting with Van Vleck, that's when he

13  indicated that -- and he made us that

14  lowball offer and indicated that there was

15  a problem with the floor that we started

16  to get more information on it.

17  Apparently, you know -- that's it, that's

18  when we started getting more information

19  on it, after that meeting.

20     Q.     Is Mr. Van Vleck associated with

21  DASNY?

22     A.     He was the head of construction

23  of DASNY. I'm not sure of his exact

24  title, but he was the top man, I believe.

127

1              J. Scarpellino

2        Q.    Did Mr. Van Vleck ever tell you

3    whether or not there were any Department

4    of Building inspections of the flooring?

5        A.    No, he just indicated -- to the

6    best of my recollection, the only thing he

7    indicated was that there was a problem

8    with the terrazzo flooring and he wasn't

9    -- that basically they weren't going to

10   pay the contract balances and delay claims

11   and so on and they gave us that lowball

12   offer.

13       Q.    Did you keep minutes of either

14   of the meetings that you had with Mr. Van

15   Vleck?

16       A.    Not to my knowledge.

17       Q.    To your knowledge, did Mr. Van

18   Vleck ever report the alleged terrazzo

19   floor problems to the New York City

20   Department of Buildings?

21       A.    I have no idea.

22       Q.    To your knowledge, were any

23   violations issued by the New York City

24   Department of Buildings with respect to

25   the terrazzo flooring?

152

# CERTIFICATION BY REPORTER

I, Wayne Hock, a Notary Public of the
State of New York, do hereby certify:

That the testimony in the within
proceeding was held before me at the
aforesaid time and place;

That said witness was duly sworn
before the commencement of the testimony,
and that the testimony was taken
stenographically by me, then transcribed
under my supervision, and that the within
transcript is a true record of the
testimony of said witness.

I further certify that I am not
related to any of the parties to this
action by blood or marriage, that I am not
interested directly or indirectly in the
matter in controversy, nor am I in the
employ of any of the counsel.

IN WITNESS WHEREOF, I have hereunto
set my hand this _24th_ day of _June_
, 2008.

_Wayne Hock_
------------------------------