# EXHIBIT 11

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------------

TRAVELERS CASUALTY AND SURETY COMPANY as

Administrator for RELIANCE INSURANCE

COMPANY,

                              Plaintiff,

          -against-

DORMITORY AUTHORITY-STATE OF NEW YORK, TDX

CONSTRUCTION CORP. and KOHN PEDERSEN FOX

ASSOCIATES, P.C.,

                              Defendants.

Case No. 08-CV-6915 (DLC)


          (CAPTION CONTINUED)

------------------------------------------


                    June 10, 2008
                    10:13 a.m.


          DEPOSITION of RAY LEU, taken by

Plaintiff, pursuant to Notice, held at the

offices of HOLLAND & KNIGHT LLP, 195

Broadway, New York, New York before Wayne

Hock, a Notary Public of the State of New

York.

120

R. Leu

A.     Yes.

       MR. SIMON: Objection to form.

Q.     Yes?

A.     Yes.

Q.     Did TDX inspect the floor
leveling process at the project for
conformance to the contract documents?

A.     Yes.

Q.     Who did that from TDX?

A.     Tony Mockler, Paul Citro.

Q.     Just those two folks?

A.     Yeah, they were our interior
superintendents, assistant
superintendents.

Q.     And then the actual terrazzo
installation, did someone from TDX inspect
that for conformance with the contract
documents?

A.     Yes.

Q.     And who did that?

A.     The same two individuals, Tony
Mockler and Paul Citro.

Q.     Was it TDX's responsibility to
advise the prime contractor if correction

121

R. Leu

2    work was required?

3        A.    Yes.

4        Q.    And who had that from TDX?

5            MR. SHAPIRO: Objection.

6            You can answer.

7        A.    That would be Tony Mockler, Paul

8    Citro, myself if I was made aware of it.

9        Q.    Did TDX notify Trataros as to

10   corrective work with respect to the

11   terrazzo installation?

12       A.    Yes.

13       Q.    And what about notifying

14   Trataros about corrective work with

15   respect to floor leveling?

16       A.    Yes.

17       Q.    Do you know what the corrective

18   work was with respect to the floor

19   leveling?

20       A.    There was areas that were

21   removed and replaced.

22       Q.    This is before terrazzo is

23   installed over the floor leveling?

24       A.    Yes.

25       Q.    Did Trataros remove and replace

122

                          R. Leu

1

2    those areas of the floor leveling?

3        A.    Yes.

4        Q.    And with respect to the terrazzo

5    installation, the corrective work that was

6    required, was that done as well?

7        A.    Yes.

8        Q.    And what was the corrective work

9    that was required?

10       A.    Some of the terrazzo was

11   replaced, there was some remedial work

12   that was done, epoxy injections,

13   installing besides epoxy injections and/or

14   fastening down the terrazzo by mechanical

15   means.

16       Q.    With respect to the corrective

17   work on the floor leveling, was that

18   because of what they termed contamination

19   issues?

20       A.    Yes.

21       Q.    And what was the contamination

22   issue?

23       A.    I don't know what was the actual

24   substance that was contaminating it.  We

25   had Dayton Superior out there to take a

123

1                        R. Leu

2    look at the areas that were -- that were

3    deficient and they made a recommendation

4    to remove it and it was removed.

5         Q.    And that was the conclusion at

6    the time, was contamination; correct?

7         A.    By Dayton, yes.

8         Q.    Did TDX agree with that

9    conclusion?

10        A.    Yes.

11             MS. BONACCI: We can do our lunch

12        break now.  It's now 1:00.

13             MR. SHAPIRO: As close to two as

14        we can get?

15             MS. BONACCI: Yes.

16             (Lunch recess taken at 12:58

17        p.m.)

18             (Whereupon Ms. Young left the

19        proceedings)

20             (Whereupon Mr. DeFilippis

21        entered the proceedings)

22

23

24

25

138

R. Leu

1

2  recommended to DASNY by TDX that this

3  should be done?

4      A.    Yes.

5      Q.    And how did TDX verify that the

6  extra work was being performed?

7              MR. SHAPIRO: Objection.

8              You can answer.

9      A.    There was time and material

10 tickets that were produced.

11     Q.    What would happen, TDX would

12 review the tickets?

13     A.    Yes.

14     Q.    We're finished with that

15 exhibit, too.

16             Did TDX prepare exception

17 reports regarding the preparation of the

18 floor slabs to receive the finished

19 flooring?

20     A.    No.

21     Q.    So you're not aware of any

22 exception reports?

23     A.    I'm not aware of any exception

24 reports.

25     Q.    Relating to the slabs, the

139

1                        R. Leu

2  concrete slabs?

3      A.      Prior to installation of the

4  floor leveling.

5      Q.      And did TDX prepare an exception

6  report regarding the floor leveling

7  process of the project?

8              MR. SHAPIRO: Objection.

9              You can answer.

10     A.      No, we noticed -- we informed

11 Trataros that there was a problem with

12 some of the underlayment back in early

13 part of '01 and they came down, took a

14 look at it, and gave us a recommendation.

15     Q.      Was there an exception report

16 that was ever prepared regarding that

17 situation?

18             MR. SHAPIRO: Objection.

19             You can answer.

20     A.      I guess a memo to Trataros.

21     Q.      And did TDX ever prepare any

22 exception reports regarding the terrazzo

23 installation at the project?

24     A.      I'm not aware of any.

25     Q.      Did TDX maintain a log of noted

194

R. Leu

1
2  floor leveling?

3          MR. SHAPIRO: Objection.

4          You can answer.

5     A.    I do not know what the curing

6  time.  I'd have to take a look at the

7  product data sheets.

8     Q.    Mr. Leu, I'm going to show you

9  what's been marked as T8, which is the

10 Conflow product data sheet.  I'm going to

11 ask you if you've seen that document

12 before.

13    A.    Yes.

14    Q.    Did you see it during the

15 project time frame?

16    A.    Yes.

17    Q.    Based on this product data

18 sheet, is Conflow's compressive strength

19 consistent with the requirements of the

20 specification for cementitious floor

21 leveling?  And that's the document that

22 should be in front of you.

23    A.    (Reviewing).

24          MR. SCHRECKINGER: T7?

25          MS. BONACCI: Yes, T7.

195

                                R. Leu

1

2      A.      Can you repeat that question?

3              MS. BONACCI: Wayne, can you read

4      it back.

5              (Whereupon the requested portion

6      was read back by the reporter)

7      A.      Yes.

8      Q.      And with respect to bond

9   strength, is it consistent with the

10  requirements of the specification at T7?

11             MR. SHAPIRO: Objection.

12             You can answer.

13     A.      Yes.

14     Q.      Now I'm going to show you what's

15  been marked as T38.  It's a material

16  safety data sheet.

17             Can you tell me if you've seen

18  that document before?

19     A.      Yes.

20     Q.      Can you tell me if the listed

21  ingredients are consistent with the

22  composition of the specified underlayment

23  in T7, the cementitious floor leveling?

24             MS. SMITH: Can I hear that

25      question again, please.

230

## CERTIFICATION BY REPORTER

I, Wayne Hock, a Notary Public of the State of New York, do hereby certify:

That the testimony in the within proceeding was held before me at the aforesaid time and place;

That said witness was duly sworn before the commencement of the testimony, and that the testimony was taken stenographically by me, then transcribed under my supervision, and that the within transcript is a true record of the testimony of said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, that I am not interested directly or indirectly in the matter in controversy, nor am I in the employ of any of the counsel.

IN WITNESS WHEREOF, I have hereunto set my hand this _13th_ day of _June_, 2008.

_Wayne Hock_
————————————————————

232

1

2  UNITED STATES DISTRICT COURT

   SOUTHERN DISTRICT OF NEW YORK

3  ------------------------------------------

4  TRAVELERS CASUALTY AND SURETY COMPANY as

   Administrator for RELIANCE INSURANCE

5  COMPANY,

6                          Plaintiff,

7           -against-

8  DORMITORY AUTHORITY-STATE OF NEW YORK, TDX

   CONSTRUCTION CORP. and KOHN PEDERSEN FOX

9  ASSOCIATES, P.C.,

10                         Defendants.

11 Case No. 08-CV-6915 (DLC)

12

          (CAPTION CONTINUED)

13 ------------------------------------------

14

                    June 11, 2008

15                  10:09 a.m.

16

17        CONTINUED DEPOSITION of RAY LEU,

18 taken by Plaintiff, pursuant to Notice,

19 held at the offices of HOLLAND & KNIGHT

20 LLP, 195 Broadway, New York, New York

21 before Wayne Hock, a Notary Public of the

22 State of New York.

23

24

25

302

```
1                       R. Leu

2   Senior?

3       A.      No, that's Jim Jones, Junior.

4       Q.      So you and Jim Jones, Junior on

5   behalf of TDX negotiated this change

6   order?

7               MR. SHAPIRO: Objection.

8       A.      Along with Antonio and DASNY and

9   Trataros.

10      Q.      My question is just on behalf of

11  TDX because you didn't negotiate on behalf

12  of the other parties, you would only do

13  that on behalf of TDX; correct?

14              MR. SHAPIRO: Objection.

15      Q.      Based on GC2-028, is Conflow now

16  the specified material for the floor

17  leveling?

18              MR. SHAPIRO: Objection.

19              You can answer.

20              MR. DENNIS: Join.

21      A.      (Reviewing).

22              Yes.

23      Q.      The change order pertains only

24  to floors three to fourteen in the

25  building; is that correct?
```

346

R. Leu

1

2    ever issued for repair work in connection

3    with contamination.

4            MR. SHAPIRO: Objection.  If you

5        recall.

6        A.    We issued a change order for

7    damage to terrazzo due to damages caused

8    by vandalism, broken terrazzo base, damage

9    by unidentified trades, but not

10   contamination.

11       Q.    Was there a situation at the

12   project where the manufacturer came out to

13   look at the product and determined that

14   there was contamination?

15       A.    Yes.

16       Q.    And that related to Conflow?

17       A.    Yes.

18       Q.    Did that contamination create

19   any damage or need for any repair in

20   connection with the Conflow?

21       A.    Yes.

22       Q.    So contamination can require

23   repair work, contamination the likes of

24   what Bartec is referring to in the

25   April 9, 2001 letter?

347

R. Leu

2      MR. SHAPIRO: Objection.

3      MR. FROESSEL: Objection.

4      MR. SHAPIRO: You can answer.

5      A.     We are not paid for a change

6  order to repair the Conflow for that

7  contamination or the flakiness of the

8  Conflow.

9      Q.     You did not do it via change

10  order but you required repairs because of

11  the contamination; correct?

12      A.     It was repaired.

13      Q.     Who repaired it?

14      A.     Trataros/Bartec.

15      Q.     And who directed that the repair

16  occur?

17      A.     It was directed that -- we

18  directed them to make the repair along

19  with Dayton Superior.

20      Q.     You directed, meaning TDX, them

21  to make a repair?

22      A.     Yes.

23      Q.     Dayton Superior wouldn't have

24  the ability to direct them to do work on

25  the project.

349

1                           R. Leu

2    Conflow as well as the terrazzo; no?

3                MR. FROESSEL: Objection.

4        A.      No, to the Conflow.

5        Q.      How long a time period did TDX

6    wait before permitting contractors to work

7    on the underlayment once it was placed?

8                MR. SHAPIRO: Objection.

9                You can answer.

10               MS. SMITH: What's the question?

11       I didn't hear it.

12               MS. BONACCI: Wayne, can you read

13       it back.

14               (Whereupon the requested portion

15       was read back by the reporter)

16               MS. SMITH: Thank you.

17       A.      I don't remember the specific

18   time frame because, in general, Crocetti

19   followed right behind Bartec with their

20   work.

21       Q.      When the upper floors of the

22   school opened in September, '01, do you

23   have knowledge as to whether there were

24   any restrictions on those floors as to

25   areas that the students could not use

350

1                          R. Leu

2    because of the terrazzo flooring

3    situation?

4              MR. SHAPIRO: Objection.

5              You can answer.

6        A.    No, there were no restrictions.

7        Q.    When the school opened for use

8    in September, '01, how many levels of the

9    building were being used by the students?

10       A.    Fourteen levels.

11       Q.    And that would be the ground

12   floor through to fourteen?

13       A.    Yes.

14       Q.    Do you have any knowledge that

15   at that time any levels of the building

16   were not building used due to the terrazzo

17   flooring?

18             MR. SHAPIRO: Objection.  Asked

19        and answered.

20             You can answer.

21       A.    No.

22       Q.    In the year 2001, did DASNY

23   direct TDX to take any remedial actions

24   regarding terrazzo?

25             MR. FROESSEL: Objection.

458

                         R. Leu

1

2    Superior?

3         A.    No, I did not.

4         Q.    Do you know if anybody --

5               MS. SMITH: Strike that.

6         Q.    Are you able to identify who

7    companies met with Dayton Superior?

8         A.    No, I do not know.

9         Q.    Do you know whether TDX met with

10   Dayton Superior?

11        A.    No, I do not know because there

12   was no minutes taken of the meeting or a

13   sign-in sheet.

14        Q.    Do you know who would have that

15   information?

16        A.    Possibly Trataros.

17        Q.    Is there anybody at TDX that

18   would know that information?

19        A.    I do not know.

20        Q.    Now, I understood your testimony

21   to say that there was a problem with

22   delamination and Conflow in the spring of

23   2000 or 2001?

24        A.    2001.

25        Q.    And what was the --

459

1                    R. Leu

2              MS. SMITH: Strike that.

3        Q.    How did you know that there was

4    a problem with the Conflow?

5        A.    Because it was brought to our

6    attention by our field superintendent, one

7    of our field superintendents, and Mr.

8    McCullough wrote a letter to Trataros.

9        Q.    What was it about the field

10   conditions that caused your superintendent

11   to say that there was a problem

12   specifically with the Conflow?

13       A.    They noticed some flakiness of

14   the Conflow.

15       Q.    And this was prior to the

16   terrazzo floor being put down?

17       A.    In that particular area.

18       Q.    And what particular area are we

19   talking about?

20       A.    Again, I'd have to get that

21   memorandum out to see what area was --

22   that we wrote about, that particular

23   memorandum.

24       Q.    Was there any --

25              MS. SMITH: Strike that.

460

R. Leu

Q.    Do you know if there was any
analysis taken of the Conflow at that
time?

A.    I do not know if there was any
analysis taken.

Q.    And was there any other time
that a problem regarding the Conflow, as
it was originally brought to your
attention or TDX's attention back in the
spring of 2001, did that ever occur again?

       MR. SHAPIRO: Objection.

       You can answer.

A.    Not that I'm aware of.

Q.    Do you know if any pictures were
taken during this inspection with Dayton?

A.    No, I'm not aware of any.

Q.    Now, as I also understand your
testimony, as you sit here today you're
not able to tell me what areas that there
was a delamination or problem with the
terrazzo and where Conflow was used; is
that correct?

A.    That's correct.

Q.    Are there any areas that

470

R. Leu

1

2  by the college into site B is behind

3  schedule and that's what I mean by the

4  project is behind schedule.

5      Q.    And the completion date is not

6  going to be met if things continue to

7  proceed in the manner which led up to it

8  being behind schedule; correct?

9          MR. SHAPIRO: Objection.

10          You can answer if you

11      understand.

12          MS. SMITH: No speaking

13      objections, please.

14      A.    I'm not quite sure I understood

15  the question.

16      Q.    Of course.

17          What was the completion date?

18      A.    The completion date is September

19  of '01 for the college to move in.

20      Q.    And was the college open on

21  September of 2001?

22      A.    Yes.

23      Q.    So in looking at Exhibit T40,

24  what did TDX do in order to ensure that

25  the completion date would be met?

471

R. Leu

1

2      A.      We put contractors, certain

3  contractors on extended work days.

4      Q.      Anything else?

5      A.      We expedited the work of the

6  underlayment for the terrazzo.

7      Q.      When you say that you expedited

8  the work for the underlayment of terrazzo,

9  how do you expedite the work for the

10  underlayment of terrazzo?

11      A.      In some instances, we changed

12  the material to be used.

13      Q.      Was the September, 2001 the

14  original completion date?

15      A.      No, it wasn't.

16      Q.      What was the original completion

17  date?

18      A.      I don't recall.

19      Q.      Was it before or after September

20  of 2001?

21      A.      Before.

22      Q.      And in expediting the work for

23  the underlayment of terrazzo, did you also

24  put pressure on your contractors in order

25  to speed up the job?

476

# CERTIFICATION BY REPORTER

I, Wayne Hock, a Notary Public of the
State of New York, do hereby certify:

That the testimony in the within
proceeding was held before me at the
aforesaid time and place;

That said witness was duly sworn
before the commencement of the testimony,
and that the testimony was taken
stenographically by me, then transcribed
under my supervision, and that the within
transcript is a true record of the
testimony of said witness.

I further certify that I am not
related to any of the parties to this
action by blood or marriage, that I am not
interested directly or indirectly in the
matter in controversy, nor am I in the
employ of any of the counsel.

IN WITNESS WHEREOF, I have hereunto
set my hand this    16th    day of June
, 2008.

_____ Wayne Hock _____

472

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------

TRAVELERS CASUALTY AND SURETY COMPANY as

Administrator for RELIANCE INSURANCE

COMPANY,

                              Plaintiff,

            -against-

DORMITORY AUTHORITY-STATE OF NEW YORK, TDX

CONSTRUCTION CORP. and KOHN PEDERSEN FOX

ASSOCIATES, P.C.,

                              Defendants.

Case No. 08-CV-6915 (DLC)


                (CAPTION CONTINUED)

-----------------------------------------------


                      June 20, 2008

                      10:08 a.m.


          CONTINUED DEPOSITION of RAY LEU,

taken by Plaintiff, pursuant to Notice,

held at the offices of HOLLAND & KNIGHT

LLP, 195 Broadway, New York, New York

before Wayne Hock, a Notary Public of the

State of New York.

530

R. Leu

1
2   with relation to the underlayment or
3   installation of the terrazzo flooring
4   prior to July, 2000?
5           MR. FROESSEL: Objection.
6           You can answer.
7       A.    No.
8       Q.    And does your testimony apply to
9   levels B1, B2, and B3 as well as the other
10  levels of the Baruch College project?
11          MR. FROESSEL: Objection.
12          You can answer.
13      A.    Yes.
14          MS. RAICUS: Thank you.  No more
15      questions.
16          MR. MILLER: I'd like to have
17      these marked as T71 and T72.  T71 is
18      going to be documents with Bates
19      numbers CR 1184 through CR 1188 and
20      the next one's going to be T72.  It's
21      going to be CR 0920 through CR 0952.
22          (Whereupon, a facsimile dated
23      March 8, 2001 was marked Exhibit T71
24      for identification.)
25          (Whereupon, a letter dated

531

1                        R. Leu

2          August 28, 2003 was marked Exhibit T72

3          for identification.)

4    EXAMINATION BY

5    MR. MILLER:

6          Q.      If you look at page CR 1187,

7    last time we were together you were asked

8    some questions about notification of

9    Trataros in the spring of 2001 about

10   problems with delamination and Conflow.

11   We didn't have the benefit of having that

12   notification with us at the time.

13              My question is going to be

14   whether or not the letter dated

15   February 28, 2001 that appears at Bates

16   pages CR 1187 and 188 is that notification

17   referred to in your prior testimony.

18              MR. FROESSEL: Objection to the

19       form.

20              You can answer.

21   A.      Yes.

22       Q.      Let me direct your attention to

23   T72.

24              I believe your prior testimony

25   had also been -- do you want to take a

584

R. Leu

we're pouring one inch thick, I'd like to

know what is the added dead weight to see

if there's any structural concerns.  This

is the conversation that I had with Dan

from Conspec.

Q.    And was it a long conversation?

A.    It was a fairly short

conversation.

Q.    When you were done with that

conversation, you were comfortable with

how you were going to proceed in

connection with the project?

A.    Yes.

Q.    Do you have knowledge if KPF had

contacted the manufacturer at any point in

time in connection with the Baruch

project?

        MR. FROESSEL: Objection to the

    form.

A.    I do not know.

Q.    There's an Exhibit T71 that got

marked today by Mr. Miller.  I'm going to

show it to you so you can take another

look through it, but I just have one

585

R. Leu

1  question.

2          Mr. Miller was showing you this

3  document and asking you about a time frame

4  of notifying Trataros regarding a problem

5  with an aspect of the terrazzo.

6          At this point in time -- my

7  question to you is very simple.

8          This problem was concluded this

9  was a contamination issue.  Was it not

10  rectified?

11      A.    Yes.

12      Q.    So it was fixed, remedied to

13  TDX's satisfaction at that point in time?

14      A.    Yes.

15      Q.    Mr. Platek was asking you some

16  questions regarding contractors walking on

17  the terrazzo and the underlayment.

18          Can you tell me, were other

19  contractors scheduled to follow behind the

20  floor finishes?

21      A.    No.  There may have been some

22  work that they had not finished but it

23  definitely was not scheduled to be done

24  afterwards.  Various trades, including

608

## CERTIFICATION BY REPORTER

I, Wayne Hock, a Notary Public of the State of New York, do hereby certify:

That the testimony in the within proceeding was held before me at the aforesaid time and place;

That said witness was duly sworn before the commencement of the testimony, and that the testimony was taken stenographically by me, then transcribed under my supervision, and that the within transcript is a true record of the testimony of said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, that I am not interested directly or indirectly in the matter in controversy, nor am I in the employ of any of the counsel.

IN WITNESS WHEREOF, I have hereunto set my hand this _25th_ day of _June_, 2008.

_Wayne Hock_

-----------------------------------------