UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TRAVELERS CASUALTY AND SURETY COMPANY as Administrator for RELIANCE INSURANCE COMPANY,<br><br>         Plaintiff,<br><br>vs.<br><br>DORMITORY AUTHORITY - STATE OF NEW YORK, TDX CONSTRUCTION CORP. and KOHN PEDERSEN FOX ASSOCIATES, P.C.,<br><br>         Defendants. | Case No. 07-CV-6915 (DLC)<br>**ECF CASE** |
| DORMITORY AUTHORITY OF THE STATE OF NEW YORK and TDX CONSTRUCTION CORP.,<br><br>         Third-Party Plaintiffs,<br><br>vs.<br><br>TRATAROS CONSTRUCTION, INC.,<br><br>         Third-Party Defendant. | |
| TRATAROS CONSTRUCTION, INC. and TRAVELERS CASUALTY AND SURETY COMPANY,<br><br>         Fourth-Party Plaintiffs,<br><br>vs.<br><br>CAROLINA CASUALTY INSURANCE COMPANY; BARTEC INDUSTRIES INC.; DAYTON SUPERIOR SPECIALTY CHEMICAL CORP. a/k/a DAYTON SUPERIOR CORPORATION; SPECIALTY CONSTRUCTION BRANDS, INC. t/a TEC; KEMPER CASUALTY INSURANCE COMPANY d/b/a KEMPER INSURANCE COMPANY; GREAT AMERICAN INSURANCE COMPANY; NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA.; UNITED STATES FIRE INSURANCE COMPANY; NORTH AMERICAN SPECIALTY INSURANCE COMPANY; ALLIED WORLD ASSURANCE COMPANY (U.S.) INC. f/k/a COMMERCIAL UNDERWRITERS INSURANCE COMPANY; ZURICH AMERICAN INSURANCE COMPANY d/b/a ZURICH INSURANCE COMPANY; OHIO CASUALTY INSURANCE COMPANY d/b/a OHIO CASUALTY GROUP; HARLEYSVILLE MUTUAL INSURANCE COMPANY (a/k/a HARLEYSVILLE INSURANCE | **COUNTER-STATEMENT OF MATERIAL FACTS IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT FILED BY NORTH AMERICAN SPECIALTY INSURANCE COMPANY** |

| |
|---|
| COMPANY,); JOHN DOES 1-20 and XYZ CORPS. 1-19, |
| Fourth-Party Defendants. |
| KOHN PEDERSEN FOX ASSOCIATES, P.C., |
| Third-Party Plaintiff, |
| vs. |
| WEIDLINGER ASSOCIATES CONSULTING ENGINEERS, P.C., CASTRO-BLANCO PISCIONERI AND ASSOCIATES, ARCHITECTS, P.C., ARQUITECTONICA NEW YORK, P.C., COSENTINI ASSOCIATES, INC., CERMAK, PETERKA PETERSEN, INC., JORDAN PANEL SYSTEMS CORP., TRATAROS CONSTRUCTION, INC. and LBL SKYSYSTEMS (U.S.A.), INC., |
| Third-Party Defendants. |

Plaintiff/Counterclaim Defendant/Fourth-Party Plaintiff, Travelers Casualty and Surety Company ("Travelers") and Third-Party Defendant/Fourth-Party Plaintiff, Trataros Construction, Inc. ("Trataros"), respectfully submit their Counter-Statement of Material Facts in Opposition to the Motion for Summary Judgment brought by North American Specialty Insurance Company and Allied World Assurance Company (U.S.), Inc. ("NAS/Allied"), pursuant to Local Civil Rule 56.1, in response to NAS/Allied's Statement of Undisputed Material Facts and setting forth additional material facts. Pursuant to Local Rule 56.1, the following admissions are made *solely for purposes of the pending motion for Summary Judgment*:

    A.    **TRAVELERS' AND TRATAROS' RESPONSE TO NAS' STATEMENT OF UNDISPUTED MATERIAL FACTS.**

    1.    Travelers and Trataros admit that a certain policy of insurance was issued by Commercial Underwriters Insurance Company to Trataros Construction, Inc. for the policy period of April 1, 1999 to April 1, 2000, the terms of which speak for themselves. (See, Declaration of Eli J. Rogers, the "Rogers Dec.," Exh. 38.) Any allegations contained in paragraph 1 consisted with the terms of said policy is denied.

2. Travelers and Trataros are without knowledge or information as to whether North American Specialty Insurance Company is the successor in interest to Commercial Underwriters Insurance Company, as recited in movants' Paragraph 2.

3. Travelers and Trataros admit that on or about August 4, 2004 DASNY filed a Third-Party Complaint against Travelers and Trataros in an action entitled <u>Travelers Casualty and Surety Company, *et al.* v. The Dormitory Authority of the State of New York, *et al.*</u>, bearing Case No. 04-CV-5101 (HB), (the "Baer Action") as recited in movant's Paragraph 3. Travelers and Tratarros contest the allegations made by the Dormitory Authority of the State of New York ("DASNY") and/or TDX Construction Corp. ("TDX") in the Baer Action and this action, alleging defects in the work and/or materials performed/installed by Trataros and/or Trataros' subcontractors/suppliers, and likewise contest the need to replace such work. Nonetheless, DASNY and/or TDX have alleged the existence of construction defects in excess of $20,000,000.00 in this action, purportedly associated with, *inter alia*, the Project's epoxy terrazzo flooring system. In connection with these claims, among others, Travelers and Trataros have asserted Fourth-Party claims for indemnification, contribution, and/or declaratory relief, inter alia, against NAS/Allied and other parties. (Rogers Dec., Exh.37.)

4. Travelers and Trataros admit that on or about February 17, 2005, Travelers and Trataros filed an Amended Fourth Party Complaint with the Court, impleading Allied World Insurance Company (U.S.) Inc. and a number of other insurance carriers to the Baer Action. Travelers and Trataros submit that the allegations contained therein speak for themselves. (Id., ¶ 39 and Exh. 30.)

5. Travelers and Trataros deny paragraph 5 to the extent that it implies that the allegations recited therein are of material nature. Subject to and without waiving this denial,

Travelers and Trataros are without knowledge or information as to the date on which NAS/Allied may have received knowledge from any other entity regarding the claims asserted in the within action by DASNY and/or TDX. To the extent that the Baer Action was voluntarily dismissed by all the parties thereto, including Allied World Assurance Company (U.S.) Inc. (Id., Par. 39 & Exh. 30.) Travelers and Trataros submit that the dates of notice with regard to the Baer Action are immaterial to the claims for declaratory relief and indemnifications pleaded against NAS relating to DASNY/TDX's allegations in the within action.

6. Travelers and Trataros deny Paragraph 6. Travelers and Trataros contest the conclusory allegations made by NAS/Allied. This allegation is not supported by the weight of document discovery and deposition testimony taken to date from both DASNY and TDX. DASNY has testified that as late as November, 2003, it was still performing investigation as to the causes of and potentially responsible parties for the alleged flooring problems at the Baruch College, Site B Project ("The Project"). The documents purported to be made by TDX and/or DASNY against Trataros do not rise to the level of "claim" as that term is construed under the policy and applicable law.

B.  **TRAVELERS' AND TRATAROS' STATEMENT OF ADDITIONAL MATERIAL FACTS.**

**Project Owner and the Owner's Project Team**

7. This action arises out of a construction project known as Baruch College, Site B located at 55 Lexington Avenue, New York, New York (the "Project", frequently referred to in the Project records as "Baruch College, Site B"). (See, Rogers Dec., ¶ 2.)

8. The Project's "owner" was the Dormitory Authority - State of New York ("DASNY"). (See id.)

4

9.  Kohn Pederson Fox Associates, P.C. ("KPF") was engaged by DASNY to provide architectural and engineering services for the Project. (See, id., ¶ 4.)

10. Under the terms of KPF's contract with DASNY, KPF was required to provide insurance coverage in connection with its work on the Project, including professional liability insurance with a policy limit of $2,000,000.00 per occurrence. (See, id., Exh. 1, p. 6, Article X, ¶ 6.)

11. KPF's contract also contains a provision requiring them to "[r]eview and approve or disapprove all shop drawings and samples submitted by the Contractor for adherence to the intent and requirements of the Contract Documents...." (See, id., Exh. 1, Appendix "A" – Scope of Services of architect, p. A.9, ¶ H.1.)

12. TDX Construction Corp. ("TDX") was engaged by DASNY to provide construction management services for the Project. (See, id., Exh. 2.)

13. TDX's "Construction Phase" contract obligated TDX to obtain insurance coverage relating to its work on the Project, including a policy for Commercial General Liability ("CGL") coverage, with a minimum combined single policy limit of $5,000,000.00 per occurrence and aggregate. (See, id., Exh. 2, p. 4, Article VIII, ¶ 3.)

14. KPF's contract also contains provisions requiring them to:

   a.) "[i]nspect all work daily for quality and conformance to the Contract Documents. Advise Prime Contractor(s) of necessary corrective work. Inspect materials and equipment prior to installation for conformance to the specifications." (Id., Exh. 1, Appendix "A" – Scope of Services, p. A2, ¶ 5.b);

   b.) "[p]repare periodic "Exception Reports" as required by the Construction Work of the Prime Contractors. Distribute to the appropriate Contractor(s) for necessary corrective work. Maintain a log of the noted exception, date issued, and date corrected. Maintain a photographic record where life safety issues/systems are involved." (Id., Exh. 1, Appendix "A" – Scope of Services, p. A2, ¶ 5.c);

c.) "[i]nspect the Project jointly with the OWNER and Architect prior to the time the OWNER is to use, occupy, or operate any part or all of the Project, and prepare a list of observed variances and deficiencies in the Construction Work. Distribute the list to the appropriate Prime Contractor(s) for necessary corrective work." (Id., Exh. 1, Appendix "A" – Scope of Services, p. A2, ¶ 5.d);

d.) "Expedite and coordinate the work of all Prime Contractors." (Id., Exh. 1, Appendix "A" – Scope of Services, p. A2, ¶ 7.a).

15.  DASNY's Rule 30(b)(6) designee testified in this action that DASNY is not satisfied with the inspection services that TDX provided on the Project, in light of the fact that the epoxy terrazzo is allegedly failing throughout the building, a claim which DASNY believes to raise questions about the inspections performed by TDX of that work. (Id., Exh. 3) DASNY's Rule 30 (b)(6) designee further testified that to the extent that the underlayment is part of the epoxy terrazzo system, they are not satisfied with TDX's inspection services of that either. (Id. Exh 3).

### Award of Contract No. 15 and Contract No. 16

16.  Trataros separately entered into two prime contracts with DASNY for the performance of construction work on the Project, known as "Contract No. 15" and "Contract No. 16," respectively. (Id., Exh. 4)

17.  Contract No. 16 was awarded to Trataros by DASNY on or about August 27, 1998. (Id., Exh. 39)

18.  Reliance Insurance Company ("Reliance") issued payment and performance bonds to Trataros relating to Contract No. 16 (the "Bonds"). (Scarpellino Dec., ¶3-4)

19.  Subsequently, the Bonds came to be administered by Travelers. (Id.,¶4)

### The Crocetti Subcontract

20.  Trataros subcontracted a portion of its work under Contract No. 16 to Crocetti. (Id., Exh. 4)

21. The scope of work under Crocetti's original subcontract included the work set forth in the Project's technical specifications relating to epoxy terrazzo, pre-cast terrazzo, and interior stonework.

22. Crocetti's subcontract contained a requirement for insurance coverage naming Trataros and DASNY as additional insureds. (Id., Exh. B, p. 2 of 25, ¶ 5.) (And see, id., p. 1 of 25, at prefatory language and first whereas clause) (defining Trataros as "Contractor" and DASNY as "Owner").

23. Additionally, Crocetti's subcontract contained a more detailed Insurance and Indemnification Rider. (Id., Exh. B, pp. 19 of 25 to 21 of 25.) Under the terms of this insurance rider, Crocetti was required to provide CGL coverage with policy limits of $5,000,000. (Id., at p. 19 of 25, ¶ III.)

24. Crocetti's insurance rider further provides that the additional insured coverage provided to DASNY and Trataros "shall stipulate that this insurance is primary, [and] that any other insurance or self-insurance maintained by Owner and Contractor shall be excess only...." (Id., at p. 20 of 25, ¶ VII.)

### Irregularities in the Project's Structural Concrete

25. The Project's and therefore DASNY's, structural prime concrete contractor was Shroid Construction, Inc. ("Shroid"). [CITE]

26. On or about October 13, 1998, TDX received a letter from Shroid advising that the Project's concrete flooring decks on the 8th floor evidenced "inconsistencies in floor flatness," and that the finished concrete on the 2nd and 6th floors did not meet "the [standards for] flatness or level that is required in the contract specifications." Shroid further advised that "[w]e

in fact know that these [concrete] decks do not meet ACI tolerances. We can only assume that they will not meet other trades [sic] requirements either." (Rogers Dec., Exh. 6)

27.     On or about November 3, 1998, TDX forwarded Shroid's letter to KPF, noting, among other things, that upon review the floor heights for the concrete slabs are 2 inches too high in certain areas. TDX notes that "no action will be taken at this time," however "at a later date" the concrete slabs will be evaluated to determine which "areas ... will require remedial action." (Id., Exh. 7.)

28.     Approximately nine (9) months later, on or about August 5, 1999, Trataros wrote to TDX, stating that the uneven concrete floor slabs need to be leveled out before the epoxy terrazzo is installed. (Id., Exh. 8.)

29.     Approximately three (3) months later, on or about November 8, 1999, KPF issued a memorandum regarding the tolerances necessary for three types of floor finishes, including epoxy terrazzo. KPF directed that "[w]here slabs are beyond these tolerances, flash patch material should be used to level the slabs prior to finish installation." (Id., Exh. 9)

### The Floor-Leveling Change Order

30.     Subsequently, DASNY issued a change order to Contract No. 16, GC2-028, adding the "installation of 'self leveling' floor fill" to that contract. The "Change Order Memorandum" prepared by TDX and incorporated as part of the change order recites that "[t]his additional work is necessary due to the camber in the steel not coming out in the loading of the structure... This created irregular contours in the flatness of the [concrete] slab." (Id., Exh. 10)

31.     The "Change Order Memorandum" prepared by TDX and incorporated as part of the change order further recites "TDX has reviewed this change order and finds it to be fair and

reasonable and recommends its approval. It is our recommendation that the cost should be appropriated as a design omission."(Id., Exh. 10)

32. Change Order GC2-028 incorporated Trataros' proposal for the floor leveling work, which included a list of exclusions, including the statement that Trataros was "[n]ot responsible for concrete delamination." (Id., Exh. 10.)

33. Change Order GC2-028 also incorporated KPF's memo dated November 8, 1999, and a product catalogue sheet for a self-leveling underlayment material known as Conflow. (Id., Exh. 10.)

34. DASNYs Rule 30(b)(6) designee has admitted that inclusion of the Conflow product data sheet into the change order incorporated that material into Trataros' Contract No. 16 for use with the floor leveling work. (Rogers Dec., Exh. 3)

35. TDX's Rule 30 (b)(6) designee admitted that pursuant to the floor leveling change order, Conflow was the specified material for floor leveling. (Rogers Dec., Exh. 11)

36. Subsequently, KPF approved the use of Conflow as a self-leveling underlayment in connection with the "floor leveling change order," i.e., Change Order GC2-028. (Id., Exh. 12)

37. On or about June 28, 2000, Trataros executed a purchase order with Bartec for the installation of "'self leveling' floor fill" at the Project.

38. Bartec's purchase order includes a provision requiring it to "maintain general liability insurance coverage for bodily injury and property damage,' and further requires that "[a]ll insurance policies shall name Owner [DASNY] and TCI [Trataros] as additional insureds." (Id., Exh. D, p. 2, ¶ 21.)

9

**Resolution of Alleged Flooring Problems During Project**

39. On or about January 26, 2001, Crocetti drafted a letter to Trataros alleging that Crocetti had "discovered hollow spots in areas being leveled on the eighth floor." (Id., Exh. E.)

40. On or about March 9, 2001, Crocetti performed work on the 8th floor "remov[ing] loose underlayment and install[ing] new underlayment." Apparently, the "hollow spots" mentioned in Crocetti's January 26, 2001 letter were corrected in a single day. (Id., Exh. F) (only one ticket referencing work performed on the 8th floor).

41. On or about February 28, 2001, TDX wrote to Trataros alleging that it had observed "areas [in the 13th floor elevator lobby] where the terrazzo flooring installation has separated from substrates." TDX also asserted that areas of the Conflow underlayment on the 6th floor appeared to have "delaminated." The letter requests a survey of the installed terrazzo, and a separate survey of the exposed areas of Conflow. TDX further notes that Trataros has taken core samples of the finished terrazzo, and requests to be provided with the results of Trataros' findings relative to those samples. (Id., Exh. E.)

42. Subsequently, Trataros contacted Conspec Marketing & Manufacturing Co., Inc. ("Conspec"), Dayton Superior's predecessor-in-interest, regarding the purported separation and debonding. On or about March 1, 2001, Conspec wrote to Trataros, acknowledging a site visit to the Project held "last Tuesday." Conspec observed that "[t]he terrazzo flooring has come loose in a *small portion* of the lobby area" on the 13th floor, and that the Conflow in that area appeared to have been contaminated by some "foreign substance, or environmental condition," as the Conflow exhibited an unusual "powdery, loose surface." Conspec recommended grinding back the underlayment "to a solid surface before proceeding with a reapplication of the flooring system." (Rogers Dec., Exh. 13) (emphasis added).

43. On or about March 7, 2001, Trataros wrote to DASNY enclosing Conspec's findings, as well as the testing lab's findings regarding the core samples taken by Trataros. Trataros further noted that, following its survey of the installed terrazzo, the only area exhibiting separation between the terrazzo and underlayment had been found to be on the 13th floor, and that no additional areas of debonding Conflow had been found. Trataros further noted that "[i]t is the concessive or [sic] all parties that the delaminating of the terrazzo was due to the contamination of the last lift of Conflow." (Id.)

44. Ray Leu, TDX's 30(b)(6) designee for the terrazzo phase of depositions in this action, acknowledged that during the Project there were incidences where the Conflow became contaminated and was repaired. (Rogers Dec., Exh. 11)

45. Mr. Leu further testified that the alleged delamination problems, identified in the February, 2001 correspondence identified in his testimony as an "exception report", were remedied to TDX's satisfaction. (Rogers Dec., Exh. 11)

46. Nicholas D'Ambrosio, DASNY's Project Manager on the Project from its beginning until approximately September/October, 2001, testified that he was unaware of any problems with the Project's terrazzo floors occurring during his period on the Project. (Rogers Dec., Exh. 15.)

47. Mr. D'Ambrosio further testified that as of September, 2001, the Project was occupied, the finished terrazzo had been installed, and "[i]t looked great." To Mr. D'Ambrosio's knowledge, there were no complaints about the terrazzo floor finishes at that point in time. He further testified, confirming that he never observed "any terrazzo that looked bad" up to the point he left the Project. (Id.)

48. Mr. D'Ambrosio further testified that to his knowledge, there never came a time when Trataros was placed on notice by DASNY that Trataros would be held responsible for problems associated with the terrazzo flooring. (Id.)

49. Mr. D'Ambrosio further testified that if there had been "reports that the terrazzo had failed to the point where it had to be removed and replaced," he would have expected to receive such reports, and that he had no recollection of receiving any such reports during "late winter/spring of 2001" particularly including the months of February, March and April, 2001. (Id.)

50. In addition to the floor leveling work performed by Bartec pursuant to its purchase order, Crocetti performed certain underlayment work pursuant to separate change orders, including Change Order GC2-202. (Id., Exh. 16) (reciting that the change order relates to "all labor ... and material necessary to install hydraulic cement base in areas left out by the underlayment subcontractor ... due to accelerating work schedule in order to open the building on the college target date of August 27, 2001.")

51. The work performed by Crocetti pursuant to Change Order GC2-202 included the installation of underlayment in "areas around elevators" and/or "at elevators." (Id., Exh. 16, at Crocetti work tickets dated 3/1/01, 3/2/01, and 3/12/01).

**The R&J Action**

52. In connection with its work on the Project, Trataros engaged R&J Construction Corp. ("R&J") as a subcontractor. (Id., Exh. 18)

53. On or about November 20, 2002, DASNY received two notices of mechanic's liens, filed by R&J in connection with the Project. (Id., Exh. 19 and 20)

54. Subsequently, R&J commenced an action in the Supreme Court of the State of New York, New York County, on or about July 18, 2003. Likewise, when DASNY filed its responsive pleadings in the R&J action, DASNY did not assert any claims, nor even allegations alluding to, the purported defects in the Project's epoxy terrazzo and/or underlayment. (Rogers Dec., Exhs. 21 & 22)

55. Subsequently, R&J's claims were compromised by DASNY, and its Complaint was dismissed. (Id., Exh. 23)

**The Baer Action**

56. On or about June 28, 2004, Travelers commenced an action entitled <u>Travelers Casualty and Surety Company as Administrator for Reliance Insurance Company v. The Dormitory Authority of the State of New York</u>, *et al.*, Case No. 04-CV-5101 (the "Baer Action"), by filing its Complaint and Jury Demand with the United States District Court for the Southern District of New York (the "Southern District"). This action was assigned to the Honorable Harold Baer, Jr., U.S.D.J. (Id., Exh. 24)

57. On or about August 4, 2004, DASNY filed a Third-Party Complaint in the Baer Action, alleging claims against Travelers and Trataros. (Id., Exh. 25)

58. On or about December 1, 2004, Travelers and Trataros filed their Fourth-Party Complaint in the Baer Action, impleading Crocetti, Bartec, and Dayton Superior, among others, on theories of indemnification and contribution, *inter alia*. (Id., Exh. 26)

59. One day later, on December 2, 2004, the Honorable Harold Baer, Jr., U.S.D.J. entered a Scheduling Order, setting a deadline of February 17, 2001 for joinder of additional parties. (Id., Exh. 27)

60. In light of the filing deadline, on February 17, 2005, Travelers and Trataros filed their Amended Fourth-Party Complaint in the Baer Action, impleading Allied World Assurance Company (U.S.), Inc. ("Allied") and a number of other insurance carriers. (Id., Exh. 28)

61. Subsequently, the Baer Action was voluntarily dismissed, upon the consent of all parties, including Allied and the other insurance carriers. (Id., Exh. 30.)

**The Within Action**

62. Following dismissal, the parties engaged in confidential non-binding mediation. After the close of the mediation, pursuant to the tolling agreement Travelers commenced the within action by filing its Complaint and Jury Demand with the Southern District, on August 1, 2007. (Id., Exh. 31)

63. At the time of Travelers' filing, it marked the action as related to the prior Baer Action. The Clerk referred the issue to Judge Baer for decision as to whether the two actions were related. (Id., Exh. 32)

64. On or about August 14, 2007, Judge Baer declined the within action as "not similar", and the case was returned to the Clerk's Office for assignment. (Id., Exh. 32)

65. On or about September 28, 2007, DASNY and TDX filed their "Answer of DASNY and TDX with Affirmative Defenses, Counterclaims, and Cross-Claims" (hereinafter, the "DASNY/TDX Answer"). (Id., Exh. 33)

66. On or about September 28, 2007, DASNY and TDX filed their Third-Party Complaint, impleading Trataros into the within action. The Third-Party Complaint was not entered on the Court's ECF system until October 2, 2007. (Id., Exh. 34)

67. On October 1, 2007, Counsel for Travelers and Trataros received a hard-copy of the Third-Party Complaint, under cover of a letter from counsel for DASNY and TDX requesting

that Trataros execute a Waiver of Service of Summons. That <u>same day</u>, Travelers and Trataros transmitted copies of the Third-Party Complaint and the DASNY/TDX Answer to the various carriers via Federal Express. (<u>Id</u>., Exh. 35)

68.  In response to the claims alleged in the present action by DASNY and TDX in their Third-Party Complaint, and in their respective counterclaims, Travelers and Trataros filed their Fourth-Party Complaint on November 14, 2007. Travelers' and Trataros' Fourth-Party Complaint impleaded NAS/Allied, among others. The timing of Travelers' and Trataros' Fourth-Party filing was within the period of tolling established between the parties during the mediation proceeding. (<u>Id</u>., Exh. 37)

69.  On November 14, 2007, Travelers and Trataros transmitted to all named Fourth-Party Defendants, including the various fourth-party insurance carriers with the exception of NAS which was not a party at the time, copies of the Fourth-Party Summonses, prior pleadings filed to date, and copies of other pertinent documents. (<u>Id</u>., Exh. 36)

**NAS' Policies**

70.  During the pendency of the Baer Action, Allied produced to Travelers and Trataros a copy of the primary policy issued to Trataros by Commercial Underwriters Insurance Co. (<u>Id</u>., Exh. 38.)

71.  As of July 2, 2008, DASNY has not spent any money to repair or replace terrazzo Nor has DASNY entered into any contracts for the repair or replace of the terrazzo flooring system. (Rogers Dec. Exh. 3)

72.  NAS through its counsel, had fully participated in discovery and depositions in the within matter. (Rogers Dec.¶51)

Dated:    Florham Park, New Jersey
            September 12, 2008

                                          Respectfully submitted,
                                          **DREIFUSS BONACCI & PARKER, LLP**
                                          *Attorneys for Travelers Casualty and Surety Co.*
                                          *and Trataros Construction, Inc.*

                                          By:      /S/
                                                    Eli J. Rogers (ER:6564)
                                        26 Columbia Turnpike, North Entrance
                                        Florham Park, New Jersey 07932
                                        (973) 514-1414