**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TRAVELERS CASUALTY AND SURETY COMPANY, *et al.*,<br><br>     Plaintiff,<br>     vs.<br><br>DORMITORY AUTHORITY - STATE OF NEW YORK, *et al.*,<br><br>     Defendants.<br><br>DORMITORY AUTHORITY OF THE STATE OF NEW YORK, *et al.*,<br>     Third-Party Plaintiffs,<br>     vs.<br><br>TRATAROS CONSTRUCTION, INC.,<br>     Third-Party Defendant.<br><br>TRATAROS CONSTRUCTION, INC., *et al.*,<br>     Fourth-Party Plaintiffs,<br>     vs.<br><br>CAROLINA CASUALTY INSURANCE COMPANY, *et al.*,<br>     Fourth-Party Defendants. | Civil Action No. 07-CV-6915 (DLC)<br>**ECF CASE**<br><br><br><br>**DECLARATION OF<br>PAUL M. MCCORMICK, ESQ.<br>IN OPPOSITION TO<br>OHIO CASUALTY GROUP'S<br>MOTION FOR SUMMARY<br>JUDGMENT** |

  **PAUL M. MCCORMICK, ESQ.,** of full age and under penalty of perjury, pursuant to

28 U.S.C. § 1746 and Local Civil Rule 1.10, declares as follows.

   1.  I am an associate with the firm of Dreifuss Bonacci & Parker, LLP, attorneys for

Fourth-Party Plaintiffs Travelers Casualty and Surety Company ("Travelers") and Trataros

Construction, Inc. ("Trataros"), in the above entitled action. This Affidavit in Opposition to the

Motion for Summary Judgment of Fourth-Party Defendant, Ohio Casualty Insurance Company

("Ohio Casualty") is made based upon a review of files in our possession and personal

knowledge where indicated.

2.     The claims at issue in this action were previously the subject of proceedings before the Honorable Harold Baer, U.S.D.J., entitled <u>Travelers Casualty and Surety Company as Administrator for Reliance Insurance Company v. The Dormitory Authority of the State of New York, et al.</u>, Case No. 04-CV-5101 (the "Baer Proceedings").  Relevant to the instant motion, on December 1, 2004, Trataros filed a Fourth-Party Complaint in the Baer Proceedings against various subcontractors and suppliers, including Bartec Industries, Inc. ("Bartec"), seeking damages due to the subcontractors' and suppliers acts and/or omissions, a true and accurate copy of which is attached hereto as **Exhibit 1**.  The Baer Proceedings were discontinued without prejudice in order to pursue resolution of the claims herein through voluntary mediation, which was ultimately unsuccessful.

3.     On or about August 1, 2007, Travelers commenced the within action by filing its Complaint and Jury Demand (the "Complaint"), a true and accurate copy of which is annexed hereto as **Exhibit 2** alleging claims against Defendants, Dormitory Authority- State of New York ("DASNY"), TDX Construction Corp. (TDX), and Kohn Pedersen Fox Associates, P.C. ("KPF").

4.     This action arises from a certain construction project known as Baruch College, Site B, and  specifically, with respect to the insurance coverage issues at issue in this motion  the claims relate to Contract 16 entered into by DASNY as owner and Trataros as general contractor.  See a true and accurate copy deposition exhibit number 20 marked by DASNY in this action is attached hereto as  **Exhibit 3** ;  "Declaration of Mark T. Hall in Support of Motion for Summary Judgment to Dismiss the Fourth-Part Complaint As Against the Fourth-Party Defendant Ohio Casualty Insurance Company" ("Hall Dec.") at Exhibit "A."

5.     Upon information and belief, KPF was the architect.  See a true and accurate copy

of the "Defendant Kohn Pederson Fox Associates, P.C.'s Answer to the Complaint," annexed hereto as **Exhibit 4** at ¶13.

6.     On or about September 28, 2007, DASNY and TDX filed their "Answer of DASNY and TDX with Affirmative Defenses, Counterclaims, and Cross-Claims, a true and accurate copy of which is attached hereto as **Exhibit 5.**

7.     In their responsive pleading, DASNY and TDX asserted certain counterclaims against Travelers seeking, among other things, alleged damages relating to purportedly defective work on the Project performed by Trataros and/or its subcontractors relating to certain alleged defects in the epoxy terrazzo flooring system.  See  a true and accurate copy attach hereto as **Exhibit 5**, ¶¶ 28-34, 57-62.

8.     Subsequently, DASNY and TDX filed their Third-Party Complaint, impleading Trataros and asserting claims that seek, among other things, alleged damages resulting from purportedly defective, substandard and/or otherwise unacceptable work on the Project.  See Hall Dec. at Exhibit "G."

9.     Paragraph 26 of DASNY's and TDX's Third-Party Complaint states, "The work performed by Trataros and its subcontractors failed to satisfy the technical and quality requirements in . . . Contract 16 or accepted industry practices."  See Hall Dec. at Exhibit "G," ¶26.

10.     Paragraph 27 of DASNY's and TDX's Third-Party Complaint states:

> As a result of Trataros and its subcontractors' failure to satisfy the technical and quality control requirements in . . . Contract No. 16 and accepted industry standards, significant portions of Trataros' work were defective, substandard or otherwise unacceptable.  This nonconforming work had to be repaired or replaced at significant expense to DASNY.

See Hall Dec. at Exhibit "G," ¶27.

11.     In pertinent part, paragraph 31 of DASNY's and TDX's Third-Party Complaint

states:

> The epoxy terrazzo that Trataros and Crocetti installed in the
> Project is deteriorating. . . . [T]he expoxy terrazzo is cracking and
> crumbling at the perimeter of the poured area at the zinc divider
> strips over substantial areas of the epoxy terrazzo installation. The
> epoxy terrazzo is delaminating and "blistering" in increasingly
> larger areas.

See Hall Dec. at Exhibit "G," ¶31.

12.     Paragraph 32 of DASNY's and TDX's Third-Party Complaint states, "The failure

of the epoxy terrazzo was caused by defective workmanship and inappropriate materials

provided by Trataros and its subcontractors and suppliers. . . ." See Hall Dec. at Exhibit "G,"

¶32.

13.     Paragraph 33 of DASNY's and TDX's Third-Party Complaint states, "The

remediation of the defective epoxy terrazzo will cause major disruptions to CUNY's operation in

the building and will cost an estimated thirteen million dollars to accomplish." See Hall Dec. at

Exhibit "G," ¶33.

14.     Paragraphs 26-27 and 31-33 are incorporated by reference into all causes of action

in DASNY's and TDX's Third-Party Complaint. See Hall Dec. at Exhibit "G," ¶¶35, 41, 48, 52,

57, 63, 70.

15.     The First, Second, and Third Causes of Action of DASNY's and TDX's Third-

Party Complaint are claims by DASNY against Trataros for contractual indemnification,

common law indemnification, and contribution due, in part, to the negligence of Trataros and its

subcontractors. See Hall Dec. at Exhibit "G" at the First through Third Causes of Action, ¶¶35-

51.

4

16.     The Fifth Cause of Action of DASNY's and TDX's Third-Party Complaint, which incorporates by reference the First, Second, Third, and Fourth Causes of Action, is DASNY's claim against Trataros for construction defects.  See Hall Dec. at Exhibit "G" at the First through Third Causes of Action, ¶¶57-62.

17.     Paragraph 61 of the Fifth Cause of Action of DASNY's and TDX's Third-Party Complaint states, "Trataros materially breached Contract No. 16 by installing epoxy terrazzo flooring that is failing due to construction errors and the use of inappropriate materials by Trataros and its subcontractors and suppliers."  See Hall Dec. at Exhibit "G," ¶61.

18.     The Sixth and Seventh Causes of Action of DASNY's and TDX's Third-Party Complaint, which incorporate by reference the First, Second, Third, Fourth, and Fifth Causes of Action, are TDX's claims for common law indemnification and contribution due to Trataros' and its subcontractors' negligence.  See Hall Dec. at Exhibit "G" at the Sixth through Seventh Causes of Action, ¶¶63-73.

19.     Travelers and Trataros filed their Fourth-Party Complaint on November 14, 2007, and subsequently filed an Amended Fourth-Party Complaint on April 8, 2008.  See Hall Dec. at Exhibit "J."

20.     The Third Count of the Amended Fourth-Party Complaint filed by Travelers and Trataros claims that Trataros was damaged due to the professional and simple negligence of Bartec and, therefore, Trataros is entitled to common-law indemnification, contribution, and exoneration from Bartec.  See Hall Dec. at Exhibit "J," ¶¶78-84.

21.     The Ninth Count of the Amended Fourth-Party Complaint filed by Travelers and Trataros claims, <u>inter alia</u>, that per the Trataros/Bartec subcontract, "Bartec was obligated to obtain insurance coverage naming Trataros and DASNY . . . as "additional insureds."  See Hall

Dec. at Exhibit "J," ¶133.  Moreover, it alleges that Ohio Casualty, among others, issued an insurance policy to Trataros on behalf of Bartec and that, to the extent Ohio Casualty's policy provides coverage, it "shall be subject to a duty to defend and/or indemnify Travelers and/or Trataros." See Hall Dec. at Exhibit "J," ¶¶142-149.

22.    Trataros subcontracted a portion of its work on the project to non-party G.M. Crocetti, Inc. ("Crocetti"), a true and accurate copy of which is annexed hereto as **Exhibit 6**.

23.    The work subcontracted to Crocetti included, *inter alia*, installation of a portion of the Project's epoxy terrazzo flooring system, which began in 2000.  See **Exhibit 6**.

24.    However, the work performed/installed by Crocetti is only the uppermost layer of the Project's terrazzo flooring system, which system also includes construction work performed by Bartec and concrete floor slabs installed by a separate co-prime contractor.  See a true and accurate copy of the purchase order between Trataros and Bartec dated May 12, 2000 (and executed in June of 2000), annexed hereto as **Exhibit 7,** and a true and accurate copy excerpts of deposition testimony of DASNY's witness, Charles Bartlett pages 231-232 annexed hereto as **Exhibit 8**.  Trataros entered into a separate subcontract with Bartec with respect to, *inter alia*, the installation of "floor leveling" (hereinafter also referred to as the "underlayment") over portions of the concrete floor slabs which had been installed by a different prime contractor, namely Shroid.  See Exhibits 7 and 8 above.

25.    In connection with the work subcontracted to it by Trataros, Bartec installed the underlayment using a material named Conflow.  Bartec's R. 30(b)(6) witness, Craig Negus, testified that Conspec's Conflow was incorporated into the Project's epoxy terrazzo flooring system. See at true and accurate copy of page 81:11-23 of Craig Negus deposition dated August 12, 2008 attached hereto as **Exhibit 9**.

26.      Conflow was manufactured by Dayton Superior Specialty Chemical Corp. a/k/a Dayton Superior Corporation ("Dayton Superior" or "Conspec"), and was gypsum-based. Dayton Superior's representative testified that Conflow was sold under label's indicating the product was Portland Cement- based and did not indicate that the product contained gypsum. See a true and accurate copy of excerpts of deposition of Charles Holl deposition dated September 12, 2008 at pages 52:4-12; 55:17-23; 79:9-15 as **Exhibit 10** (see also Exhibit 11 at pg 24).

27.      The expert report of Simpson Gumpertz & Heger, retained on DASNY's behalf, notes damage to the terrazzo due in part to the installation of the underlayment and the underlayment itself.  See a true and accurate copy of pages 1, 17, 22-26, 34 of the expert report of Simpson Gumpertz & Heger entitled "Epoxy Terrazzo Flooring Investigation" dated March 20, 2009, annexed hereto as **Exhibit 11**.  In pertinent part, the report states:

> Shortly after the terrazzo was installed, aesthetic defects (i.e., rough texture) were observed in some of the epoxy terrazzo panels. In addition, the corners of some of the panels began to debond and curl, with the epoxy flooring system lifting from the concrete or self-leveling underlayment substrates (in some instances, the underlayment failed cohesively, which also allowed the epoxy terrazzo to lift and curl).  Contractors performed repairs, such as screwing down the corners of the panels, to prevent additional debonding. . . .   After completing these repairs, no significant debonding or lifting was reported for approximately one year, after which debonding and curling of the terrazzo reappeared and was more prevalent on many of the floors.  Some of the epoxy terrazzo panel corners were now cracked and laying loosely in the corner of the panel. . . .
>
> We examined (coring sample) Sample B3. . . .  This sample . . . consists of (from top down) epoxy terrazzo, a gray epoxy membrane, and normal-weight concrete. . . .   Some concrete residue is retained on the bottom side of the membrane. . . .
>
> Epoxy terrazzo flooring systems are by design fully adhered to and supported by the substrate.   Their performance is directly dependent on the quality of the substrate.   Because it is fully adhered, the epoxy terrazzo is restrained and supported by the

substrate.  As the epoxy terrazzo cures and ages, it wants to shrink, but cannot since it is restrained by its bond to the substrate. . . . However, if the substrate is weak, or the bond of the terrazzo is inadequate, shrinkage-induced stress can result in debonding of the epoxy terrazzo system.  Once the epoxy terrazzo debonds, it is no longer restrained and is free to move, resulting in lifting and gaps at the divider strips. . . .

The lack of proper surface preparation of the concrete floor slabs contributed to debonding of the underlayment. . . .  A curing compound was used when the concrete was placed. . . .  Curing compounds generally act as bond breakers, inhibiting the bond of successive materials. . . .  Any curing compound would have been completely removed by the terrazzo contractor if they properly prepared the surface[.] . . .  The curing compound left on the concrete floor slabs by the terrazzo installer due to improper surface preparation weakened the bond of the epoxy terrazzo or underlayment, contributing to the debonding. . . .

Based on our findings, the . . . self-leveling underlayment[] below the epoxy terrazzo system at Baruch College Vertical Campus [is] not strong enough or w[as] inadequately prepared to support or provide a base for the adhered epoxy terrazzo flooring system. . . . The surface of the underlayment was not properly prepared for installation of the epoxy terrazzo system.  We found . . . dirt and debris on the surface of the underlayment. . . .  In addition, the surface of the underlayment had a smooth profile, indicating little or no surface preparation. . . .

Gypsum-based materials are not strong enough to support epoxy terrazzo and are inappropriate materials to use as underlayment with epoxy terrazzo.  Although the Conflow data sheet states that "Conflow is a . . . Portland cement material," our testing  . . . indicate[s] that the product is gypsum-based. . . Our petrographic examination of some of the core samples found settlement of sand particles within the self-leveling underlayment.  Visually we noted that the underlayment is soft, dusty, and light in color.   In Conspec's March 1 2001 letter to Trataros, Conspec notes that the Conflow appeared powdery and loose on the surface under a failed section of terrazzo flooring.   These observations indicate that excess water was used to mix the self-leveling underlayment. Excess water results in a low-cohesive-strength material with a dusty surface that is difficult for the epoxy terrazzo to adhere to. The specifications require the underlayment is to be installed to the manufacturer's instructions. Conspec cautions, "excessive water will  cause  segregation  and  cracking;  reducing  compressive

strength resulting in bond failure."

The data sheets for . . . Conflow by Conspec . . . state[s] that the maximum depth of the material should not exceed 1 in. . . . Some of the core samples have underlayment thickness of up to 1-3/4 in, installed in multiple lifts.  Underlayment can be effectively placed in multiple lifts if installed properly.  If not done properly, installing the product in a number of lifts creates multiple bond lines, and therefore more potential failure planes, within the system.  Crocetti notes in a 26 January 2001 letter to Trataros that they found hollow areas in the self-leveling underlayment prior to installing the epoxy terrazzo, which would indicate that the self-leveling underlayment was not well adhered even before the installation of the epoxy terrazzo.  We observed failure between the lifts of underlayment in . . . the core samples . . . contributing to the weak self-leveling underlayment substrate.  In these samples, we saw dust and laitance at the bond lines between lifts of underlayment, indicating improper mixing and surface preparation. . . .

Curling is defined as the edges of a panel curling up. . . . The majority of the epoxy terrazzo failures at the vertical campus are characterized by the edges of the epoxy terrazzo panels turned up along the panel perimeters while the interior areas of the panels typically remain bonded to the substrate. . . .  Shrinkage of the epoxy terrazzo caused the epoxy terrazzo to curl. . . . The shrinkage of the epoxy terrazzo and subsequent debonding and curling are not the result of defective epoxy terrazzo material or installation, but is typical for epoxy terrazzo installed into weak or poorly prepared substrates. . . .

<u>Based upon our site observations, testing, laboratory analysis, and our review of project documents, we conclude the following:</u>

- <u>Debonding and lifting of the epoxy terrazzo flooring at Baruch College Vertical Campus is widespread and systematic.</u>
- <u>Debonding and lifting of the epoxy terrazzo flooring is the result of improper, weak substrates that were incapable of supporting the adhered epoxy terrazzo floor system.  The following contributed to the improper substrate conditions.</u>
  - <u>The contractor did not properly clean or prepare the . . . surface of the self-leveling underlayment, resulting in reduced adhesion of the epoxy terrazzo.</u>
  - <u>The manufacturer supplied a gypsum-based underlayment material (Conflow by Conspec),</u>

9

which is not strong enough to retrain an epoxy
terrazzo floor system. . . .

o   The contractor did not remove curing compounds,
through proper surface preparation of the concrete
substrate, prior to the installation of the
underlayment or epoxy terrazzo, resulting in
reduced or lack of adhesion.

o   The contractor improperly installed the
underlayment where thickness greater than 1 in.
were necessary, resulting in inherent weak planes
within the system.

o   The contractor used excessive water to mix the
underlayment, resulting in a soft and dusty
underlayment surface. . . .

The epoxy terrazzo flooring . . . must be removed and replaced to
provide a durable and safe condition and meet the intended design.

See **Exhibit 11**.

28.     DASNY's expert subsequently admitted, during the course of his deposition, that

the underlayment, which was prepared and installed by Bartec, subsequently caused damage to

the concrete slab, and that the concrete slab would need to be repaired in areas in which the slab

was damaged.  See a true and accurate copy of excepts of the deposition testimony of DASNY's

expert, Dennis Pinnelle ("Pinnelle Dep.,") annexed hereto as **Exhibit 12**, at  pages 1286-1303.

In discussing the laboratory results of coring samples, DASNY's expert testified as follows:

> Q.     And  when the epoxy terrazzo delaminated, it stripped a
> thin layer of the concrete from the actual floor slab; correct?
> A.     Correct, the report reads, "some concrete residue is retained
> on the bottom side of the resin." . . .
> Q.     And in layman's terms, what's occurred here is damage to -
> -- some damage to the concrete slab?
> A.     Pulled a thin layer of paste off, that's right. . . .
>
> Q.     Do you have any reason to doubt that it's a portion of the
> concrete slab that's adhered to the underside of the epoxy terrazzo?
> A.     No. . . .
> Q.     In an area where the slab has been damaged or harmed . . .
> would that slab have to be repaired in those particular areas where
> that condition would be depicted?

A.    Yes.

See Exhibit 12, Pinnelle Dep. at 1286:24-1287:6; 1288:16-21; 1302:3-7; 1303:16-21. DASNY's expert discussed other coring samples other than the above and arrived at the same conclusion. See Exhibit 12, Pinnelle Dep. at 1286:9-1303:25.

29.    Travelers and Trataros' expert Hichborn Consulting Group noted incipient delaminations occurring in the concrete.  See a true and accurate excerpt from James Ray Report, attached hereto as **Exhibit 13** at page 41, which was disclosed as an attachment to the Findings and Report of Evaluation, Baruch Vertical College- DASNY, Trataros Construction, of Hichborn Consulting Group, dated April 13, 2009. And see,  a true and correct copy of excerpted portions of the expert deposition of Geoffrey Hichborn, attached hereto as **Exhibit 14**, at page 305:13-16, discussing the core pictured on page 41 of the Ray Report. ("[The core] shows that the top surface of the concrete is distressed and again another incipient delamination within the concrete mass.)

30.    Travelers and Trataros retained Cashin Spinelli & Ferretti, LLC, to opine with respect to the flooring failure.  In pertinent part, the report concluded:

> To the extent that the Conflow underlayment, or any underlayment on the project, was installed or applied incorrectly, the underlayment installer would bear responsibility for the delamination. . . .

> To the extent that the underlayment was overwatered the entity that mixed and applied the Conflow underlayment would bear responsibility.  The Conflow was mixed and applied by Bartec. . . .

> With respect to the actions of Bartec :

> 1.    To the extent that it is proven true that Bartec's improper surface preparation of the concrete prior to the placement of the underlayment contributed to the failure of the underlayment, and ultimately areas of the epoxy terrazzo flooring system, Bartec would be responsible.

11

> 2.     To the extent that it is proven true that Bartec's improper surface preparation of the underlayment prior to the placement of additional layer(s) of underlayment contributed to the failure of the underlayment, and ultimately the failure of areas of the epoxy flooring system; and
>
> 3.     To the extent that it is proven true that Bartec's improper over-watering of the underlayment contributed to the failure of the underlayment and ultimately the failure of the epoxy terrazzo flooring system, Bartec would be responsible. . . .

A true and accurate copy of pages 22 and 31 of Cashin, Spinelli & Ferretti's report dated April 12, 2009 and issued in rebuttal to Simpson Grumpertz and Heger's report is attached hereto as **Exhibit 15**.

31.    Dayton Superior (Conspec) also retained an expert, Exponent, who opined in relevant part as follows:

> Exponent's findings are in agreement with [DASNY's experts'] conclusions that improper cleaning and preparation of the concrete slab and underlayment surfaces and failure to remove curing compounds from the concrete slab contributed to reduced adhesion of the epoxy terrazzo system. Exponent's findings are also in agreement with [DASNY's experts'] conclusions that excessive water was used to mix the underlayment. . . . Exponent also found evidence of improper installation of the underlayment where thickness greater than 1 inch was necessary. . . .
>
> Several factors contributed to the observed delamination of the epoxy terrazzo system . . . including . . . improper installation of the leveling underlayment, and improper preparation of the leveling underlayment to receive the epoxy terrazzo system.

See a true and accurate copy of experts of Exponent report page 20 and 22 attached hereto as **Exhibit 16.**

32.    Bartec's expert stated that poor preparation of the underlayment was a cause of the delamination of the terrazzo. See a true and accurate copy of the report of CTL Group at page 2 attached hereto as **Exhibit 17.** ("Debonding of the epoxy terrazzo system is primarily related to poor surface preparation of the concrete and underlayment surfaces. The substrates

12

were not cleaned or prepared properly to remove dirt or laitance and/or curing compounds resulting in poor bond.")

33.     Craig Negus, the President of Bartec, testified that he visited Baruch College as late as March or April of 2003 and witnessed the delamination of the terrazzo. Attached hereto a true and accurate copy of Craig Negus deposition pages 259:11-266:6 as **Exhibit 18**.

34.     As damages for the alleged failure of the flooring system, DASNY is claiming that the entire flooring system would need to be replaced at a cost of $15,890,000.00. While this contention is clearly in dispute in this litigation, DASNY's expert has stated that such damages include, but are not limited to, the demolition and removal of the existing flooring system at a cost of $1,771,000.00; surface preparation of the concrete slab and repair costs totaling $759,000.00; and floor system installation, including installation of new underlayment; divider strips; cove bases; and epoxy terrazzo, totaling $8,685,375.00. According to DASNY's expert, such damages also include "[m]iscellaneous items[,]" including "[e]nclosures/partitions/HEPA filters, etc" totaling $632,500.00. See attached hereto as **Exhibit 19** a true and accurate copy of an excerpt from the expert report of Dennis Pinnelle dated April 20, 2009 at page 40.

35.     DASNY's     expert     testified     as     to     the     claimed     expenses     for "[e]nclosures/partitions/HEPA filters, etc." as follows:

> Q.     Mr. Pinelle, under number four on your repair cost estimate, you have a line item for enclosures, partitions, HEPA filters, etc. And there's an estimated quantity of eighty-eight thousand square feet with a unit price of five. Can you tell me how you came to that line item. . . .
> A.     This is actually a composite of a number of . . . miscellaneous items. What we tried to do was to condense that down to a square foot cost and relate it back to the terrazzo. That's why you see the cost of $5. It relates to things like providing HEPA filters. . . . [W]e had things like moving kiosks, lights. Some of that is under ["[m]iscellaneous items]."

A true and accurate copy of excerpts of the deposition of Dennis Pinnelle at pages 388:7-389:12 attached hereto as **Exhibit 20**.

36.     DASNY has submitted, during the course of discovery, two accident reports, one for an accident reportedly having occurred on September 29, 2001, and another for an accident reportedly having occurred on January 8, 2009, for accidents allegedly caused by the terrazzo flooring system. A true and accurate copy of these two accident reports are attached hereto as **Exhibit 21 and Exhibit 22** respectively.

37.     A Request for Information, RFI Number 283, dated November 26, 2001, to McCullough from Walter Bartels stated:

> We have experienced, on the B2 level, slab on grade areas,
> cracking in the finished terrazzo.  We are very fearful in the B3
> level because there are saw cuts and extensive cracking of the slab.
> These cracks will telescope through the finished terrazzo.  Please
> review the basement conditions.  You can repair the cracks and
> change the strip pattern to work with expansion of the slabs.
> Please review quickly, we wish to start this area.   Response date
> 11-30-01. Please reference attached memo.

A true and accurate copy of RFI Number 283 is attached hereto as **Exhibit 23.**

38.     The attached memo from Michael Marcolini of Kohn Peterson Fox Associates, the architect, to John McCullough of TDX dated November 30, 2001, stated:

> Per field review . . . KPF agrees that precautionary measures
> should be implemented to eliminate the "telegraphing" of cracks in
> the finished terrazzo. . . .  KPF makes the following
> recommendations.  Large cracks in the concrete slab on grade
> should be repaired.

A true and accurate copy of this memorandum dated November 30, 2001 is attached hereto as **Exhibit 23.**

39.     Work orders and invoices from Crocetti indicate that repairs to the terrazzo were made from November 20, 2001, to February 1, 2002.  See a true and accurate copy of work order

dated November 20, 2001, stating, "repair . . . cut and remove terrazzo floor. . . .;" invoices from Crocetti dated February 2, 2002 (see invoice C10555, stating, "Flash patching in hallway on ground floor"); and work orders dated February 1, 2001, stating, "Repairing hallow [sic] areas on ground floor," attached hereto as **Exhibit 24.**

40.    A change order estimate relating to change order no. GC2-164 and prepared by TDX, dated June 28, 2002, contained charts with dates of floor patching from January 10, 2000, to May 20, 2002. A true and accurate copy of change order no. GC2-164 is attached hereto as **Exhibit 25.**

41.    A change order signed by Trataros on January 17, 2003, from DASNY to Trataros, approved by TDX, stated, "Description of Work: Provide all labor, equipment and material necessary to repair terrazzo flooring system at various locations throughout the building. The work was recorded on a time and material basis." A true and accurate copy of change order no. GC2-150 is attached hereto as **Exhibit 26.**

42.    A letter dated March 7, 2003, from Tom Spinthourakis of TDX to Craig Negus of Bartec states, "[O]bservation of the debonding shows the epoxy membrane separating from the substrate . . . due to failure of . . . Conspec's . . . Conflow. . . This serious matter deserved your full attention. . . ." A true and accurate copy of the March 7, 2003 letter is attached hereto as **Exhibit 27**.

43.    A memo dated August 8, 2003 from Wayne Markowitz of DASNY to McCullough stated:

> [W]e are pleased to enclose, for your review, our request for an amendment to the Construction Management contract. . . . This amendment is for additional services through February 29, 2004, for the following reasons. . . . Extended supervision survey to analyze, remove, and repair the terrazzo flooring. . . .

A true and accurate copy of the August 8, 2003 letter is attached hereto as **Exhibit 28.**

44.     A letter from Ray Leu of TDX to Trataros dated August 28, 2003, states:

> There have been deteriorating and hazardous conditions due to the
> deficiencies of the terrazzo flooring and underlayment installation
> at Baruch College. . . . The flooring deficiencies, which have been
> evident for some time, present unsafe conditions . . . You are
> therefore notified to remove and replace all materials installed
> throughout the building that are covered by terrazzo flooring,
> including underlayments below the terrazzo flooring system.

A true and accurate copy of TDX's August 28, 2003 letter to Trataros is attached hereto as **Exhibit 29.**

45.     A letter dated November 18, 2003, from Christopher Stoddard of KPF to Anil Raut of DASNY stated, "DASNY has requested KPF to study and implement flooring alternatives to remediate failing terrazzo flooring. . . ." A true and accurate copy of the November 18, 2003 letter is attached hereto as **Exhibit 30.**

46.     The Blanket Additional Insured endorsement, ISO Form CG 84 15 07 99, of the commercial general liability insurance policy issued by Ohio Casualty states that additional insureds, such as Trataros, are insured for "liability arising out of: a. Real property you . . . occupy; or b. 'your work' for that additional insured for or by you." (emphasis added). See Hall Dec. at Exhibit H.

47.     The second paragraph of the commercial general liability insurance policy issued by Ohio Casualty (ISO Form CG 00 01 07 98), states, "Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy." (emphasis added). The Declarations show that Bartec is a Named Insured, not Trataros. See Hall Dec. at Exhibit H.

48.     Section II of the commercial general liability insurance policy issued by Ohio Casualty, as well as the Blanket Additional Insured Endorsement, both differentiate between a "Named Insured" and an "insured" or "additional insured."  Paragraphs 1-3 of Section II provide for various "insureds" other than those "Named Insureds" in the declarations, but paragraph 4 of Section II specifically provides for additional "Named Insureds."  Finally, the Blanket Additional Insured endorsement states, "**WHO IS AN INSURED (SECTION II)** is amended to include as an insured any person or organization whom you are required to name as an <u>additional insured</u> on this policy under a written contract or agreement." (emphasis supplied by the policy and added). See Hall Dec. at Exhibit H.

49.     "Your work" in Ohio Casualty's commercial general liability insurance policy includes "a. Work or operations performed by you or on your behalf; and b. Materials, parts or equipment furnished in connection with such work or operations."

50.     The "Known Injury or Damage" Endorsement in Ohio Casualty's commercial general liability insurance policy specifies that it is the knowledge of "any insured under Paragraph 1. of Section II – Who Is An Insured or any employee authorized by <u>you</u> to give or receive notice of any 'occurrence' or claim. . . ." that is germane. See Hall Dec. at Exhibit H.

51.     Attached hereto as **Exhibit 31** are true copies of excerpts of the deposition testimony of Trataros' witness, Athena Curis, taken on July 24, 2008.

52.     Attached hereto as **Exhibit 32** are true copies of excerpts of the deposition testimony of Trataros' witness, Athena Curis taken on July 25, 2008.

53.     Attached hereto as **Exhibit 33** are true copies of excerpts of the deposition testimony of TDX's witness, Ray Leu, taken on June 20, 2008.

54.    Attached hereto as **Exhibit 34** is a true copy of the DASNY News Press Release, "Baruch College's 'Vertical Campus' Opens," dated August 27, 2001, stating that the Vertical Campus opened on same date.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. I am aware that if any of the foregoing statements are willfully false, I am subject to punishment.

Paul M. McCormick (PMM-0669)
Dreifuss, Bonacci & Parker, LLP
Five Penn Plaza, 23rd Floor
New York, New York 10119
-and-
26 Columbia Turnpike, North Entrance
Florham Park, New Jersey 07932
(973) 514-1414

Dated: March 19, 2010March 19, 2010
Florham Park, New Jersey

EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TRAVELERS CASUALTY AND SURETY COMPANY as Administrator for RELIANCE INSURANCE COMPANY, | Civil Action No.: 04 Civ. 5101 (HB) |
| Plaintiff, | |
| vs | |
| THE DORMITORY AUTHORITY OF THE STATE OF NEW YORK, TDX CONSTRUCTION CORP. and KOHN, PEDERSON, FOX & ASSOCIATES, P.C., | **FOURTH-PARTY COMPLAINT** |
| | **and** |
| Defendants. | **CROSS-CLAIM AGAINST KPF** |
| DORMITORY AUTHORITY OF THE STATE OF NEW YORK, | |
| Third-Party Plaintiff, | |
| vs | |
| TRATAROS CONSTRUCTION, INC. and TRAVELERS CASUALTY AND SURETY COMPANY, | |
| Third-Party Defendants | |
| TRATAROS CONSTRUCTION, INC. and TRAVELERS CASUALTY AND SURETY COMPANY, | |
| Fourth-Party Plaintiffs, | |
| vs | |
| G.M. CROCETTI, INC., CAROLINA CASUALTY INSURANCE COMPANY, BARTEC INDUSTRIES INC., DAYTON SUPERIOR SPECIALTY CHEMICAL CORP., SPECIALTY CONSTRUCTION BRANDS, INC. t/a TEC, JOHN DOES 1-20, and XYZ CORPS. 1-20, | |
| Fourth-Party Defendants. | |

**FOURTH-PARTY COMPLAINT**

Fourth-Party Plaintiffs, Trataros Construction, Inc. and Travelers Casualty and Surety Company, by their attorneys, Dreifuss Bonacci & Parker, LLP, as and for their Fourth-Party Complaint against Fourth-Party Defendants, G.M. Crocetti, Inc., Carolina Casualty Insurance Company, Bartec Industries Inc., Dayton Superior Specialty Chemical Corp., Specialty Construction Brands, Inc. t/a TEC, John Does 1-20, and XYZ Corps. 1-20 alleges:

*Parties, Jurisdiction, and Venue*

1.      Travelers Casualty and Surety Company (hereinafter "Travelers") is incorporated in the State of Connecticut and its principal place of business is situated at One Tower Square, 4PB, Hartford, Connecticut.

2.      Trataros Construction, Inc. (hereinafter "Trataros") was a corporation organized and existing under the laws of the State of New York.  At all times relevant to this Fourth-Party Complaint, Trataros' principal place of business was located at 664 64th Street, Brooklyn, New York.

3.      Upon information and belief, G.M. Crocetti, Inc. (hereinafter "Crocetti") is incorporated in the State of New York with its principal place of business located at 3960 Merritt Avenue, Bronx, New York, 10466.

4.      Upon information and belief, Carolina Casualty Insurance Company (hereinafter "Carolina Casualty") is incorporated in the State of Florida with its principal place of business located at 4600 Touchton Road East, Building 100, Suite 400, Jacksonville, Florida, 32246.

5.      Upon information and belief, Bartec Industries Inc. (hereinafter "Bartec") is incorporated in the State of New Jersey with its principal place of business located at 453 Main Street, Little Falls, New Jersey, 07424.

6.      Upon information and belief, Dayton Superior Specialty Chemical Corp.

2

(hereinafter "Dayton") is incorporated in the State of Kansas with its principal place of business located at 7777 Washington Village Drive, Suite 130, Dayton, Ohio 45459 and was formerly known as Conspec Marketing & Manufacturing Co., Inc.

7.       Upon information and belief, Specialty Construction Brands, Inc. t/a TEC (hereinafter "TEC") is incorporated in the State of Minnesota with its principal place of business located at 601 Campus Drive, No. C-7, Arlington Heights, Illinois 60006.

8.       The Court has jurisdiction over this Fourth-Party action pursuant to 28 U.S.C. § 1367(a).

9.       This Court is the proper venue for this Fourth-Party action under 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

### *Procedural Background Antecedent to this Fourth-Party Complaint*

10.      On or about June 28, 2004, Plaintiff, Travelers Casualty & Surety Company as Administrator for Reliance Insurance Company brought an action in this Court against Defendants, The Dormitory Authority of the State of New York (hereinafter, "DASNY"), TDX Construction Corp. and Kohn, Pederson, Fox & Associates, P.C., which included claims for Trataros' entire contract balance and retainage, excessive costs caused by unreasonable delays and disruptions on the project, and professional negligence in connection with the preparation for and management of the project.

11.      On or about August 4, 2004, DASNY filed a Third-Party action against Travelers and Trataros seeking among other things, damages allegedly suffered as a result of delays or disruptions caused in whole or in part by Trataros and/or its subcontractors on the project, as well as for alleged construction defects surrounding the installation of epoxy terrazzo.

12.      DASNY alleges in this litigation that "[t]he work performed by Trataros and its

3

subcontractors failed to satisfy the technical and quality requirements in Contract No. 15 and Contract No. 16 or accepted industry practices".

13.    DASNY further alleges that '[a]s a result of Trataros and subcontractors' failure to satisfy the technical and quality control requirements in Contract No. 15 and Contract No. 16 and accepted industry standards, significant portions of Trataros' work were defective, substandard, or otherwise unacceptable.  This nonconforming work had to be repaired or replaced at significant expense to DASNY".

14.    Specifically, DASNY singles out the epoxy terrazzo as having "begun to deteriorate and is otherwise defective".

15.    DASNY further alleges that '[t]he failure of the epoxy terrazzo was caused by defective workmanship by Trataros and its subcontractors, who, among other things, failed to properly prepare and install the material according to either the contract documents or the manufacturer's prescribed procedures".

16.    As a result, DASNY is seeking between $6,000,000.00 and $10,000,000.00 in damages against Travelers and Trataros.

<u>*Facts Common to All Counts of this Fourth-Party Complaint*</u>

17.    On or about September 18, 1998, Crocetti entered into a subcontract with Trataros in the amount of $3,008,000.00 for that portion of Trataros' Contract No. 16 relating to, among other things, interior stonework, precast terrazzo, and epoxy terrazzo.

18.    Carolina Casualty issued a Subcontract Performance Bond and Subcontract Labor Bond Material Payment Bond (No.: 075641) on Crocetti's behalf and in favor of Trataros relating to the subcontract in the amount of $3,008,000.00.

19.    Crocetti delivered the Carolina Casualty bonds to Trataros as a condition to entering into the subcontract.

4

20.     On or about May 12, 2000, Bartec entered into a subcontract with Trataros for that portion of Trataros' contract with DASNY relating to floor leveling including the furnishing and installation of underlayment material upon which epoxy terrazzo would be installed.

21.     Upon information and belief, Bartec used an underlayment material known as "Conflow", manufactured and supplied to Bartec by Dayton.

22.     Upon information and belief, "Conflow" was used by Bartec in preparing the areas designated to receive epoxy terrazzo flooring.

23.     Upon information and belief, Crocetti installed an epoxy terrazzo system manufactured by TEC consisting of, among other things, an epoxy membrane called "FlexGuard" and a flooring material called "Tuff-Lite 5".

*First Count*
*(Breach of Subcontracts—Indemnification & Exoneration against Crocetti and Bartec)*

24.     Travelers and Trataros repeat and reallege each and every allegation set forth above in this Fourth-Party Complaint as though set forth at length herein.

25.     Crocetti installed the epoxy terrazzo flooring system.

26.     Bartec prepared the concrete and underlayment upon which the epoxy terrazzo flooring would rest.

27.     If the trier of fact determines that DASNY's allegations (set forth more fully above concerning allegedly substandard work by Trataros' subcontractors, particularly work relating to the epoxy terrazzo) have merit, and Travelers and/or Trataros suffer a loss thereby, then Crocetti and/or Bartec breached their respective subcontracts to Trataros.

28.     In the event that DASNY succeeds in prosecuting its claim against Travelers and/or Trataros for the alleged defective workmanship involving the epoxy terrazzo and/or any other defective workmanship complained of by DASNY in this litigation, then Crocetti and/or

5

Bartec shall be liable to Travelers and/or Trataros for any loss that Travelers and/or Trataros may suffer as a result, to the extent that Crocetti and/or Bartec proximately caused the loss to Travelers and/or Trataros.

29.    The loss that Travelers and/or Trataros may suffer and for which Crocetti and/or Bartec would be liable could take the form of, but would not be limited to, the following:   a judgment against Travelers and/or Trataros in favor of DASNY, a set-off in favor of DASNY with respect to money owed to Travelers and/or Trataros, or some diminution in the value of Travelers' and/or Trataros' claims against any party to this litigation or defenses thereto as a result of Crocetti's and/or Bartec's failure to perform properly under their respective subcontracts.

30.    In the event that Crocetti and/or Bartec are liable to Travelers and/or Trataros, then Travelers and/or Trataros are also entitled to exoneration, in which case Crocetti and/or Bartec would be required to relieve Travelers and/or Trataros from any burden of liability to DASNY to the extent that the liability to DASNY was proximately caused by Crocetti and/or Bartec.

31.    Travelers, as surety for Trataros, has the right to maintain the claims set forth in this Count against Crocetti and/or Bartec by way of equitable subrogation and/or legal assignment from Trataros.

32.    Travelers and Trataros are entitled to assert the claims set forth in this Count even if those claims are contingent on certain events and/or are not ripe.

### Second Count
*(Performance Bond Claim against Crocetti and Carolina Casualty by Trataros alone)*

33.    Travelers and Trataros repeat and reallege each and every allegation set forth above in this Fourth-Party Complaint as though same were set forth at length herein.

6

34.    One of the Carolina Casualty bonds, called the Subcontract Performance Bond Form A, entitles Trataros to make a claim against the bond if Crocetti fails to promptly and faithfully perform its subcontract with Trataros.

35.    If the trier of fact determines that DASNY's allegations (set forth more fully above concerning substandard work by Trataros' subcontractors, particularly work relating to the epoxy terrazzo) have merit, and Travelers and/or Trataros suffer a loss thereby, then Crocetti failed to promptly and faithfully perform its subcontract with Trataros.

36.    In that event, Trataros will have a valid claim against Crocetti and Carolina Casualty jointly and severally under the Subcontract Performance Bond for any damages to Trataros proximately caused by Crocetti's failure to faithfully perform its subcontract with Trataros.

<em>Third Count</em><br>
<em>(Performance Bond Claim against Crocetti and Carolina Casualty</em><br>
<em>by Travelers)</em>

37.    Travelers and Trataros repeat and reallege each and every allegation set forth above in this Fourth-Party Complaint as though same were set forth at length herein.

38.    Travelers, as surety for Trataros, has and/or may suffer losses in connection with this litigation that were proximately caused by Crocetti and/or Bartec.

39.    Travelers is equitably subrogated to the rights of Trataros, and is entitled to exercise those rights that Trataros had or may have had to pursue Crocetti and/or Carolina Casualty under the Subcontract Performance Bond.

40.    Furthermore, Travelers has or will receive an assignment from Trataros that will give Travelers legal rights to maintain an action against Crocetti and/or Carolina Casualty either in Trataros' name or in Travelers' own name.

41.    On the basis of equitable subrogation, Travelers has the equitable right to

7

maintain an action against Crocetti and Carolina Casualty under the Subcontract Performance Bond. Travelers currently has, or presently will have, legal rights against Crocetti and/or Carolina Casualty as a result of the assignment from Trataros.

42.     If the trier of fact determines that DASNY's allegations (set forth more fully above concerning substandard work by Trataros' subcontractors, particularly work relating to the epoxy terrazzo) have merit, and Travelers suffers a loss thereby, then Crocetti failed to promptly and faithfully perform its subcontract with Trataros.

43.     In that event, Travelers will have a valid claim against Crocetti and Carolina Casualty jointly and severally under the Subcontract Performance Bond for any loss suffered by Travelers proximately caused by Crocetti's failure to faithfully perform its subcontract with Trataros.

*Fourth Count*
*(Professional Negligence—Indemnification, Contribution, & Exoneration*
*against Crocetti and Bartec)*

44.     Travelers and Trataros repeat and reallege each and every allegation set forth above in this Fourth-Party Complaint as though same were set forth at length herein.

45.     In the alternative to a breach of contract, if the trier of fact determines that DASNY's allegations (set forth more fully above concerning substandard work by Trataros' subcontractors) have merit, and Travelers and/or Trataros suffer a loss thereby, then it will have occurred as a result of the acts or omissions of Crocetti including but not limited to the following:     (a) negligently choosing inappropriate materials for use on the project; (b) negligently failing to inspect the materials used on the project; and/or (c) negligently applying/installing the materials used on the project.

46.     If the trier of fact determines that DASNY's allegations (set forth more fully above concerning substandard work by Trataros' subcontractors) have merit, and Travelers

8

and/or Trataros suffer a loss thereby, then it will have occurred as a result of the acts or omissions of Bartec including but not limited to the following: (a) negligently choosing inappropriate materials for use on the project; (b) negligently failing to inspect the materials used on the project; and (c) negligently applying/installing the materials used on the project.

47.    In the event that DASNY succeeds in prosecuting its claims against Travelers and/or Trataros for the alleged defective workmanship involving the epoxy terrazzo and/or any other defective workmanship complained of by DASNY in this litigation, then Crocetti and/or Bartec shall be liable to Travelers and/or Trataros for any loss that Travelers and/or Trataros may suffer as a result, to the extent that Crocetti and/or Bartec proximately caused the loss to Travelers and/or Trataros.

48.    The loss that Travelers and/or Trataros may suffer and for which Crocetti and/or Bartec could be liable could take the form of, but would not be limited to, the following: a judgment against Travelers and/or Trataros in favor of DASNY, a set-off in favor of DASNY with respect to money owed to Travelers and/or Trataros, or some diminution in the value of Travelers' and/or Trataros' claims against any party to this litigation or defenses thereto as a result of Crocetti's and/or Bartec's negligence.

49.    In the event that Crocetti and/or Bartec are liable to Travelers and/or Trataros, then Travelers and/or Trataros are entitled to exoneration, in which case Crocetti and/or Bartec would be required to relieve Travelers and/or Trataros from any burden of liability to DASNY to the extent that the liability to DASNY was proximately caused by Crocetti and/or Bartec.

50.    Travelers, as surety for Trataros, has the right to maintain the claims set forth in this Count against Crocetti and/or Bartec by way of equitable subrogation and/or legal assignment from Trataros.

51.     Travelers and Trataros are entitled to assert the claims set forth in this Count even if those claims are contingent on certain events and/or are not ripe.

### Fifth Count
(Negligence, Breach of Contract, Breach of Warranty - Indemnification, Contribution & Exoneration against Dayton and TEC)

52.     Travelers and Trataros repeat and reallege each and every allegation set forth above in this Fourth-Party Complaint as though same were set forth at length herein.

53.     If the trier of fact determines that DASNY's allegations (set forth more fully above concerning substandard work by Trataros' subcontractors) have merit, and Travelers and/or Trataros suffer a loss thereby, then it will have occurred as a result of the acts or omissions of Dayton including but not limited to the following:  (a) negligently manufacturing and supplying materials used in the installation of epoxy terrazzo on the project such that the materials were defective and/or not proper for their intended use which was known or should have been known to Dayton; (b) negligently failing to inspect the materials for defects prior to their shipment for use on the project; and/or (c) breaching its contract with Bartec and/or any applicable warranties, express or implied, to supply a material that was suitable for use on this project.

54.     If the trier of fact determines that DASNY's allegations (set forth more fully above concerning substandard work by Trataros' subcontractors) have merit, and Travelers and/or Trataros suffer a loss thereby, then it will have occurred as a result of the acts or omissions of TEC including but not limited to the following:  (a) negligently manufacturing the epoxy terrazzo system for incorporation into the project given that the system was defective and/or not proper for its intended use which was known or should have been known to TEC; (b) negligently failing to inspect the epoxy terrazzo system for defects prior to their shipment for use on the project; and/or (c) breaching any applicable warranties, express or implied, to supply a

material that was suitable for its intended use or suitable for use on this project.

55.     In the event that DASNY succeeds in prosecuting its claims against Travelers and/or Trataros for the alleged defective workmanship involving the epoxy terrazzo and/or any other defective workmanship complained of by DASNY in this litigation, then Dayton and/or TEC shall be liable to Travelers and/or Trataros for any loss that Travelers and/or Trataros may suffer as a result, to the extent that Dayton and/or TEC proximately caused the loss to Travelers and/or Trataros.

56.     The loss that Travelers and/or Trataros may suffer and for which Dayton and/or TEC would be liable could take the form of, but would not be limited to, the following:  a judgment against Travelers and/or Trataros in favor of DASNY, a set-off in favor of DASNY with respect to money owed to Travelers and/or Trataros, or some diminution in the value of Travelers' and/or Trataros' claims against any party to this litigation or defenses thereto as a result of Dayton and/or TEC's breach or negligence.

57.     In the event that Dayton and/or TEC are liable to Travelers and/or Trataros, then Travelers and/or Trataros are entitled to exoneration, in which case Dayton and/or TEC would be required to relieve Travelers and/or Trataros from any burden of liability to DASNY to the extent that the liability to DASNY was proximately caused by Dayton and/or TEC.

58.     Travelers, as surety for Trataros, has the right to maintain the claims set forth in this Count against Dayton and/or TEC by way of equitable subrogation and/or legal assignment from Trataros.

59.     Travelers and Trataros are entitled to assert the claims set forth in this Count even if those claims are contingent on certain events and/or are not ripe.

*Sixth Count*
*(Breach of Subcontracts, Professional Negligence, and/or Simple Negligence—Indemnification,*

11

*Contribution & Exoneration against John Does 1-20 and XYZ Corps. 1-20)*

60.     Travelers and Trataros repeat and reallege each and every allegation set forth above in this Fourth-Party Complaint as though same were set forth at length herein.

61.     John Does 1-20 and XYZ Corps. 1-20 were subcontractors to Trataros, suppliers to Trataros, subcontractors to subcontractors of Trataros, suppliers to subcontractors of Trataros, or some other person or entity who were at the project at issue in this litigation.

62.     Given that DASNY did not identify all of the subcontractors of Trataros it alleges performed work that did not conform to the project contracts, specifications, plans, construction industry standards of good workmanship, and/or government codes/regulations, Travelers and Trataros are not able to ascertain at this time the identity of John Does 1-20 and XYZ Corps. 1-20.

63.     If the trier of fact determines that DASNY's allegations (set forth more fully above concerning substandard work by Trataros' subcontractors) have merit, and Travelers and/or Trataros suffer a loss thereby, then John Does 1-20 and/or XYZ Corps. 1-20 breached their respective subcontracts or other agreements that they entered into in connection with the project at issue in this litigation.

64.     In the event that DASNY succeeds in prosecuting its claim against Travelers and/or Trataros for the alleged defective workmanship and/or materials, John Does 1-20 and/or XYZ Corps. 1-20 shall be liable to Travelers and/or Trataros for any loss that Travelers and/or Trataros may suffer as a result to the extent that John Does 1-20 and/or XYZ Corps. 1-20 proximately caused the loss to Travelers and/or Trataros.

65.     The loss that Travelers and/or Trataros may suffer and for which John Does 1-20 and/or XYZ Corps. 1-20 would be liable could take the form of, but would not be limited to, the following:  a judgment against Travelers and/or Trataros in favor of DASNY, a set-off in favor

12

of DASNY with respect to money owed to Travelers and/or Trataros, or some diminution in the value of Travelers' and/or Trataros' claims against any party to this litigation or defenses thereto as a result of John Does 1-20's and/or XYZ Corps. 1-20's negligence or breach.

66.     In the event that John Does 1-20 and/or XYZ Corps. 1-20 are liable to Travelers and/or Trataros, then Travelers and/or Trataros are entitled to exoneration, in which case John Does 1-20 and/or XYZ Corps. 1-20 would be required to relieve Travelers and/or Trataros from any burden of liability to DASNY to the extent that the liability to DASNY was proximately caused by John Does 1-20 and/or XYZ Corps. 1-20.

67.     Travelers, as surety for Trataros, has the right to maintain the claims set forth in this Count against John Does 1-20 and/or XYZ Corps. 1-20 by way of equitable subrogation and/or legal assignment from Trataros.

68.     Travelers and Trataros are entitled to assert the claims set forth in this Count even if those claims are contingent on certain events and/or are not ripe.

**WHEREFORE**, Fourth-Party Plaintiffs, Trataros Construction, Inc. and Travelers Casualty and Surety Company demand judgment against the Fourth-Party Defendants, G.M. Crocetti, Inc., Carolina Casualty Insurance Company, Bartec Industries Inc., Dayton Superior Specialty Chemical Corp., Specialty Construction Brands, Inc. t/a TEC, John Does 1-20, and XYZ Corps. 1-20 with the following relief:

a.     On the First Count, against Crocetti and Bartec for breach of contract, complete indemnification, and exoneration for all damages, including consequential damages, in an amount to be determined together with attorneys fees, costs, and any other relief that the Court deems just and equitable;

b.     On the Second Count, against Crocetti and Carolina Casualty under the

Subcontract Performance Bond for all damages, including consequential damages, in an amount to be determined together with attorneys fees, costs, and any other relief that the Court deems just and equitable;

      c.      On the Third Count, against Crocetti and Carolina Casualty under the Subcontract Performance Bond for all damages, including consequential damages, in an amount to be determined together with attorneys fees, costs, and any other relief that the Court deems just and equitable;

      d.      On the Fourth Count, against Crocetti and Bartec on the grounds of professional negligence, or in the alternative simple negligence, for complete indemnification, contribution, and exoneration for all damages, including consequential damages, in an amount to be determined together with attorneys fees, costs, and any other relief that the Court deems just and equitable;

      e.      On the Fifth Count, against Dayton and TEC for complete indemnification, contribution, and exoneration for all damages, including consequential damages, in an amount to be determined together with attorneys fees, costs, and any other relief that the Court deems just and equitable;

      f.      On the Sixth Count, against John Does 1-20 and XYZ Corps. 1-20 for breach of contract, professional negligence and/or simple negligence, indemnification, contribution, and exoneration for all damages, including consequential damages, in an amount to be determined together with attorneys fees, costs, and any other relief that the Court deems just and equitable.

14

## CROSSCLAIM AGAINST DEFENDANT KPF

Fourth-Party Plaintiffs, Trataros Construction, Inc. and Travelers Casualty and Surety Company, by its attorneys, Dreifuss Bonacci & Parker, LLP, as and for their Crossclaim against Defendant, Kohn Pederson Fox Associates, P.C. allege:

### *Parties, Jurisdiction, and Venue*

1.     Travelers Casualty and Surety Company (hereinafter "Travelers") is incorporated in the State of Connecticut and its principal place of business is situated at One Tower Square, 4PB, Hartford Connecticut.

2.     Trataros Construction, Inc. (hereinafter "Trataros") was at all relevant times a corporation organized and existing under the laws of the State of New York with its principal place of business located at 664 64th Street, Brooklyn, New York.

3.     Upon information and belief, Defendant Kohn Pederson Fox Associates, P.C. (hereinafter "KPF") is a professional corporation organized and existing under the laws of the State of New York, with its principal place of business located at 111 East 57th Street, New York, New York.

4.     The Court has jurisdiction over this Fourth-Party action pursuant to 28 U.S.C. § 1367(a).

5.     This Court is the proper venue for this Fourth-Party action under 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

### *First Count*
*(Indemnification and Exoneration)*

6.      Travelers and Trataros repeat and reallege each and every allegation set forth above in this Crossclaim, as well as Paragraphs 1 through 16 of the Fourth-Party Complaint, as though same were set forth at length herein.

7.      On or about August 2, 2004, DASNY answered the Complaint and filed a crossclaim against KPF alleging breach of contract and professional negligence in connection with KPF's work as the project architect.

8.      If the trier of fact determines that DASNY's allegations against KPF have merit, and Travelers suffers a loss thereby, then KPF shall be liable to Travelers and/or Trataros to the extent that Travelers' and/or Trataros' loss was proximately caused by KPF.

9.      Travelers is or may be equitably subrogated to the rights of DASNY and/or Trataros such that Travelers would have the right to maintain this crossclaim against KPF in its own name.

10.     In the event that KPF is liable to Travelers and/or Trataros, then Travelers and/or Trataros are entitled to exoneration, in which case KPF would be required to relieve Travelers and/or Trataros from any burden of liability to DASNY to the extent that the liability to DASNY was proximately caused by KPF.

11.     Travelers and/or Trataros are entitled to assert the claims set forth in this Count even if those claims are contingent on certain events and/or are not ripe.

**WHEREFORE**, Fourth-Party Plaintiffs/Crossclaimants, Trataros Construction, Inc. and Travelers Casualty and Surety Company demand judgment against the Crossclaim Defendant, Kohn Pederson Fox Associates, P.C. with the following relief:

a.      For breach of contract and/or professional negligence, complete indemnification, contribution, and exoneration for all damages, including consequential, in an amount to be

determined together with attorneys fees, costs, and any other relief that the Court deems just and

equitable.

Respectfully submitted,

**DREIFUSS BONACCI & PARKER, LLP**


By: _____/S/_____

Guido Weber (GW:1692)
*Attorneys for Fourth-Party Plaintiffs, Trataros
Construction, Inc. and Travelers Casualty and
Surety Company*
One Penn Plaza, 38th Floor
New York, New York  10119
                    *and*
26 Columbia Turnpike
North Entrance
Florham Park, New Jersey  07932
973-514-1414
***Please respond to New Jersey office***

Dated: November 30, 2004

TO:    Thomas V. Giordano, Esq.
       Zetlin & DeChiara, LLP
       801 Second Avenue
       New York, New York 10017
       *Attorneys for Defendant,*
         *Kohn, Pederson, Fox & Associates, P.C.*

       Stephen B. Shapiro, Esq.
       Holland & Knight, LLP
       195 Broadway
       New York, New York 10007
       *Attorneys for Defendant,*
         *Dormitory Authority of the State of New York*

       Gary L. Rubin, Esq.
       Mazur, Carp & Rubin, P.C.
       1250 Broadway, 38th Floor
       New York, New York 10001
       *Attorneys for Defendant,*
         *TDX Construction Corp.*

G:\Clients\Travelers\Trataros\DASNY\Fourth-Party Complaint.doc

EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TRAVELERS CASUALTY AND SURETY COMPANY as Administrator for RELIANCE INSURANCE COMPANY, | Civil Action No.: |
| Plaintiff, | **07 CV 6915** |
| vs. | **COMPLAINT and JURY DEMAND** |
| DORMITORY AUTHORITY - STATE OF NEW YORK, TDX CONSTRUCTION CORP., and KOHN PEDERSEN FOX ASSOCIATES, P.C., | |
| Defendants. | |

Plaintiff, Travelers Casualty and Surety Company as Administrator for Reliance Insurance Company (hereinafter "Plaintiff"), by and through its attorneys, Dreifuss Bonacci & Parker, LLP, as and for its Complaint and Jury Demand against the Defendants, Dormitory Authority - State of New York, TDX Construction Corp. and Kohn Pedersen Fox Associates, P.C., alleges as follows:

## JURISDICTION AND VENUE

1.     Travelers Casualty and Surety Company (hereinafter "Travelers") is incorporated in the State of Connecticut with its principal place of business located at One Tower Square, 4PB, Hartford, Connecticut.

2.     Reliance Insurance Company (hereinafter "Reliance") is incorporated in the Commonwealth of Pennsylvania with its principal place of business located in Philadelphia, Pennsylvania.

3.      Defendant, Dormitory Authority - State of New York (hereinafter "DASNY"), is a public benefit corporation of the State of New York, with a principal place of business located at 515 Broadway, Albany, New York.

4.      Defendant, TDX Construction Corp. (hereinafter "TDX"), is a New York corporation with its principal place of business located at 345 Seventh Avenue, New York, New York.

5.      Defendant, Kohn Pedersen Fox Associates, P.C. (hereinafter "KPF") is a professional corporation of the State of New York with its principal place of business located at 111 West 57th Street, New York, New York.

6.      The matter in controversy, exclusive of interest, costs and attorney's fees, exceeds $75,000.00.

7.      This Court has jurisdiction based upon diversity of citizenship pursuant to 28 U.S.C. § 1332(a).

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) as the defendants are believed to be located in this District and the matter in controversy took place in this District.

## ALLEGATIONS COMMON TO ALL COUNTS

9.      This action arises from a public works construction project known as Baruch College, Site B, a/k/a the Baruch College Vertical Campus, a/k/a the Baruch Academic Complex, a/k/a the William & Anita Newman Vertical Campus (the "Project").

10.     The Project involved the design, site preparation, excavation, and construction of a 785,000 square foot mixed-use structure, with three below-grade levels and 14 above-grade stories, occupying approximately ¾ of the city block bounded between 24th and 25th Streets and Lexington and Third Avenues in Manhattan.

2

### *The Parties*

11.     DASNY was the "owner" of the Project.

12.     Upon information and belief, DASNY's client(s) were the City University of New York and/or Baruch College.

13.     DASNY engaged Defendant KPF as the architect of record for the Project.

14.     DASNY engaged Defendant TDX as the construction manager for the Project.

15.     Upon information and belief, TDX served as the "Owner's representative" in connection with this Project, and was designated by DASNY, and operated in fact, as DASNY's authorized agent with respect to the Project.

16.     DASNY also entered into thirteen separate co-prime contracts in connection with the Project's construction work.  DASNY awarded two such co-prime contracts to Trataros Construction, Inc. ("Trataros") as the lowest responsible bidder.

17.     On or about April 22, 1998, DASNY entered into a certain prime contract with Trataros in the amount of $50,222,000.00, said contract being known as "Package No. 1 – General Construction Work, Contract No. 15 at Baruch College, Site B, DA# 6500 1802 2176" (hereinafter "Contract No. 15").

18.     As a prerequisite to being awarding the contract, Trataros was required to and did procure performance and payment bonds with a penal sum of $50,222,000.00 naming DASNY as the obligee and Trataros as the principal.

19.     On or about August 27, 1998, DASNY entered into a separate co-prime contract with Trataros in the amount of $24,140,000.00, said contract being known as "General Construction #2, - Contract #16 at Baruch College – Site B, DA # 6500 1802 2178, JDE# 61506" (hereinafter, "Contract No. 16").

3

20.     As a prerequisite to being awarded the contract, Trataros was required to and did procure performance and payment bonds with a penal sum of $24,140,000.00 naming DASNY as the obligee and Trataros as the principal.

21.     Trataros procured these bonds from Reliance, which at the time was engaged in the business of writing surety bonds at the request, and on behalf, of contractors conducting business in the State of New York. With respect to Contract No. 15 and Contract No. 16, Trataros obtained a separate and distinct set of performance and payment bonds from Reliance with respect to each contract.

22.     Travelers, which also engages in the business of writing surety bonds at the request of and on behalf of contractors conducting business in the State of New York, entered into an agreement with Reliance wherein Reliance granted Travelers a Power of Attorney to act as administrator for Reliance and as a reinsurer with respect to certain reinsured contracts and reinsured liabilities, including the contracts and liabilities relevant to this Complaint. Travelers is the real party in interest since it is the entity which has suffered, and/or in the future may suffer, the losses pursued in this matter.

23.     Trataros has assigned its affirmative claims and causes of action arising from the Project to Travelers.

24.     The impact claims of certain Trataros' subcontractors who allege that they have incurred damages resulting from, *inter alia*, extra work, inefficiencies, lost productivity, escalation costs, and individual and/or cumulative impacts caused by the actions, breaches and/or negligence of the Defendants in connection with the Project, have been liquidated in favor of Travelers and/or its subrogor Trataros, pursuant to the terms of their respective subcontracts with

4

Trataros and/or individual liquidating agreements entered into by and between Travelers and said subcontractors.

### *The Project*

25.     Architecturally, the Project incorporated a number of ambitious design elements, including interlocking atria in the interior spaces, multiple land uses within the building, a complex curvilinear façade, and a variety of façade materials including glass curtainwall, masonry, and aluminum paneling.

26.     The Project's construction work was split up among thirteen separate co-prime contracts.  At various points in the Project's design phase, the number of anticipated co-prime contracts fluctuated, at one point numbering as many as seventeen (17) anticipated construction contracts.

27.     Several of the final co-prime contracts were eventually bid out by DASNY as omnibus packages, incorporating work initially designated for other co-prime contracts.

28.     In addition to the work initially intended for Contract No. 15, Contract No. 15 also incorporated the work for former Contract No. 5 (exterior paneling, windows and "curtainwall") and Contract No. 14 (elevator and escalator).

29.     Contract No. 16 incorporated not only the work originally anticipated to be performed under that contract, but also the work for Contracts Nos. 8 (swimming pool) and 17 (roofing systems).

30.     The contract documents, drawings, and technical specifications for the Project were prepared under a compressed design schedule, and the co-prime contracts were bid out on a "fast track" basis, such that certain bid packages were being bid upon and awarded (and construction being commenced under same) before the contracts for related work had been

completed by the architect.   Likewise, the Project's planned construction schedule was compressed, with very little margin for slippage in the completion dates.

31.     The compressed and/or accelerated design phase resulted in numerous design omissions and/or defects.   The plans, specifications, and/or drawings generated by KPF for the various co-prime contracts (the "design documents").

32.     In certain cases, the deficiencies in the design documents manifested themselves as discrepancies as between the several bid packages, such that two (or more) prime contractors performing related or dependent work would be required to rely upon conflicting criteria, such that the work of said co-prime contractors was not compatible.

33.     The numerous defects and/or omissions in the design documents resulted in significant impacts to the performance of the co-prime contracts, including Contracts Nos. 15 and 16.

34.     The Project's construction phase was further hampered by the failure of DASNY, TDX and/or KPF (the "Owner Team") to adequately coordinate, control, and/or manage construction.

35.     The Owner Team severely impacted the Project by providing insufficient supervision and inspection of the installed work, inadequate construction scheduling, and dilatory resolution of issues of design/engineering, *inter alia*.

36.     The conflicting pressures of public construction, ambitious architecture, compressed design and construction phases, fast-track bidding, thirteen co-prime contracts, together with the inadequate supervision and coordination provided by the Owner Team, KPF's flawed and defective work product (including design work performed during the construction phase and after award of Contracts Nos. 15 and 16), as well as the Owner Team's intransigent

uncooperativeness and lack of accountability, all combined to create significant impacts on the Project, which severely affected not only Trataros and its subcontractors/suppliers, but nearly every co-prime contractor on the Project.

37.      As the Project's owner, DASNY was the sole entity to enjoy privity of contract with each of the following, *inter alia*, the architect/engineer of record, KPF; the Project's construction manager, TDX; and each of the thirteen co-prime contractors.

38.      Upon information and belief, DASNY also entered into separate contracts with additional entities engaged to perform and/or provide, *inter alia*, asbestos abatement, demolition, furniture and equipment, telecommunications, and security systems for the Project.

39.      DASNY competitively bid the various co-prime contracts for construction of the Project. The Project's excavation and foundation work was bid out as "Contract No. 1", and was the first co-prime construction contract awarded for the Project.  Upon information and belief, DASNY awarded Contract No. 1 on or about May 2, 1997, nearly a year before Contract No. 15 was awarded to Trataros, and more than fifteen months before Trataros was awarded Contract No. 16.

40.      Upon information and belief, although demolition and asbestos activities had preceded it under separate contract(s), construction activities began under Contract No. 1 on or about May 22, 1997.

41.      While the construction phase continued, the various co-prime contractors encountered numerous impacts, including significant problems associated with the structural steel prime contract ("Contract No. 2").

7

42.    One of the prime contracts (Contract No. 5) was placed out for competitive bidding, however, DASNY received no responsive bids and determined to incorporate the scope of work for this contract into Contract No. 15.

43.    Additional impacts to the Project arose from dilatory finalization, bidding, and award of the various co-prime contracts.

44.    The various co-prime contracts contained numerous omissions, defects, and inconsistencies in the contract documents, drawings, and specifications; these led to the issuance of numerous addenda, bulletins, notices of direction, change orders, and requests for information in order to attempt to resolve the design issues.

45.    The excessive amounts of changes, "clarifications", revisions, amendments, reversals, additions, and directives imposed upon the Project generally, and Contracts Nos. 15 and 16 specifically, caused significant cumulative impact upon Trataros, and/or its subcontractors/suppliers.

46.    All these problems (in addition to impacts associated with the factors outlined in Paragraphs 25-38 & 41-45 ) began affecting the Project even before Contracts Nos. 15 and 16 were awarded, yet Trataros was impacted by these problems insofar as much of the work under its separate co-prime contracts was dependent upon the timely and proper completion of the design work and predecessor construction activities.

47.    Even following the award of Trataros' two separate co-prime contracts, the Project continued to be hampered by the problems of mounting inefficiencies associated with the problems identified in Paragraphs 25-38 & 41-46.

48.    The Owner Team further exacerbated the impacts upon Trataros and/or its subcontractors/suppliers by providing inadequate coordination of the various co-prime

8

contractors, late and contradictory decision-making, failure to adequately inspect the work of other co-primes, failure to maintain accurate and adequate construction schedules, among other things.

## FIRST COUNT
### (Breach of Contract)

49.     Travelers repeats and realleges each and every allegation contained in the previous paragraphs of this Complaint and Jury Demand as if set forth herein in their entirety.

50.     Despite the aforesaid impacts discussed above, Trataros has completed both of its co-prime contracts with DASNY.

51.     For approximately five years, the Vertical Campus building has been fully occupied and utilized by Baruch College and is fully operational.

52.     Trataros was never defaulted by DASNY with respect to Contract No. 15, nor with respect to Contract No. 16.

53.     Despite this, Trataros has not been paid the entire contract balances and retainages due to it under either of its co-prime contracts. DASY currently owes Trataros approximately $4,000,000 in contract balances and retainage on Contracts No. 15 and 16, plus interest, costs, attorney's fees and expenses.

54.     Travelers, as administrator for the bonds issued by Reliance, is equitably subrogated to the rights of Trataros, which rights have also been assigned to Travelers by Trataros.

55.     Request has been made for payment from DASNY, but DASNY has failed to make said payment.

**WHEREFORE,** Plaintiff hereby requests judgment against DASNY for:

a.      Compensatory damages;

9

b.      Costs;

c.      Attorney's fees and expenses;

d.      Interest; and

e.      Such other relief as the Court deems just and proper.

## SECOND COUNT
### (Impact Claims of Trataros)

56.     Travelers repeats and realleges each and every allegation contained in the previous paragraphs of this Complaint and Jury Demand as if set forth herein in their entirety.

57.     Trataros provided formal notification to DASNY of its intent to submit a claim for additional costs incurred by Trataros and its subcontractors while completing the work on Contracts Nos. 15 and 16 via letters dated June 7, 2001, September 7, 2001 and October 22, 2001, *inter alia*.

58.     As a result of the various unforeseeable impacts discussed above, Trataros incurred significant costs and expenses, performed additional work outside its original scope(s) of work under Contracts Nos. 15 and 16, and was obstructed and/or interfered with in its respective performance of Contracts Nos. 15 and 16.

59.     Trataros was impacted by numerous differing site conditions; factors beyond the control of Trataros causing, *inter alia*, delays, lost productivity, inefficiencies, acceleration, cost escalation, and additional work; DASNY's failure to take appropriate action to prevent unreasonable impacts to the Project; DASNY's failure to provide adequate coordination of the Project; DASNY's failure to provide non-defective plans, drawings and specifications; DASNY's breach of the implied covenant of good faith and fair dealing implicit in Contracts Nos. 15 and 16; DASNY's gross negligence in administering the Project; DASNY's active

10

interference with Trataros' ability to perform Contracts Nos. 15 and 16; and/or DASNY's obstruction of Trataros' ability to perform Contracts Nos. 15 and 16, among other things.

60.    Travelers, in its capacity as surety for Trataros, is equitably subrogated to Trataros' impact claims as well as its rights to the contract funds held by DASNY. Trataros' rights in its impact claims, and/or its entitlement to the funds that should be paid pursuant to said claims, have been assigned to Travelers.

61.    The impacts discussed above, in part and/or cumulatively, were uncontemplated by Trataros at the time it bid on the Project.

62.    The impacts discussed above, in part and/or cumulatively, led to unreasonable and unforeseeable delays, said delays being attributable to breach(es) by DASNY and/or the Owner Team of fundamental contractual obligation(s).

63.    The impacts discussed above, in part and/or cumulatively, were caused by the gross negligence of DASNY and/or its representatives.

64.    The impacts discussed above, in part and/or cumulatively were so unreasonable and of such magnitude as to constitute an intentional abandonment of Contracts Nos. 15 and 16 by DASNY.

65.    DASNY has acknowledged responsibility for at least some of the impacts set forth above by offering to pay, and/or making payment to, some subcontractors of Trataros for the impact of such conditions.

66.    In addition, DASNY has paid certain change orders compensating Trataros and/or certain of Trataros' subcontractors/suppliers for costs/expenses arising from some of the aforesaid impacts and/or delays.

67.     Travelers is entitled to payment far in excess of $5,000,000 (together with interest, costs, attorney's fees, and expenses), as a result of the damages sustained by Trataros caused by the impacts attributable to DASNY and/or its representatives.

**WHEREFORE**, Plaintiff hereby requests judgment against DASNY for:

a.      Compensatory damages;

b.      Costs;

c.      Attorney's fees and expenses;

d.      Interest;

e.      Costs; and

f.      Such other relief as the Court deems just and proper.

## THIRD COUNT
### (Pass Through Claims)

68.     Plaintiff, Travelers, repeats and realleges each and every allegation contained in the above paragraphs of this Complaint and Jury Demand as if set forth herein in their entirety.

69.     Trataros also advised the owner that its subcontractors/suppliers had submitted impact claims and/or were in the process of preparing such claims for which DASNY would be liable, totaling in excess of $20,000,000.00. DASNY was provided with notice of said claims in and around 2002.

70.     DASNY, being aware of its ultimate liability, made partial payments to several of Trataros' subcontractors/suppliers and/or entered into settlements with said subcontractors/suppliers in connection with the aforesaid pass-through impact claims. In addition, DASNY agreed to pay certain of the pass-through impact claims but failed to do so.

12

71.     DASNY also engaged in discussions with certain additional subcontractors/suppliers of Trataros, with regard to their respective pass-through impact claims, but was not able to reach an amicable agreement regarding same.

72.     DASNY is liable to pay for the pass-through impact claims which it agreed to pay to the extent it has not already done so.

73.     DASNY is also liable to pay Travelers for the damages incurred by any of Trataros' unpaid pass-through impact claimants who were adversely impacted by the unforeseen site conditions, design flaws, inadequate coordination, and other problems attributable to the actions, breaches and/or negligence of DASNY and/or its representatives. Upon information and belief, these claims currently far exceed $15,000,000.00.

74.     DASNY should be held liable to pay all of Trataros' subcontractors/suppliers the amounts which DASNY previously agreed to pay in compromise of their respective claims, and/or those portions of said pass-though impact claims for which Trataros or Travelers would be liable as a result of the acts and/or omissions of the Owner Team, including but not limited to numerous differing site conditions, factors beyond the control of Trataros causing impacts and/or delays, DASNY's failure to take appropriate action, and its provision of defective, incomplete and/or inaccurate contract documents.

75.     Travelers is entitled to said relief pursuant to its rights of equitable subrogation and an assignment by Trataros to Travelers. Further, at least three of said subcontractors have liquidated their pass-through impact claims with Travelers via liquidating agreements, and remaining subcontractors have done so through their subcontract agreements.

76.     Travelers will serve as an intermediary with respect to these pass-through impact claims, and will pay the appropriate subcontractor/supplier pursuant to the terms of the

13

respective subcontracts and/or liquidating agreements, less Travelers' costs in connection with obtaining recovery of same.

**WHEREFORE**, Plaintiff hereby requests judgment against DASNY for:

    a.      The total amount of all such claims;

    b.      Attorney's fees and expenses;

    c.      Interest;

    d.      Costs;

    e.      Such other relief as the Court deems just and proper.

## FOURTH COUNT

77.    Plaintiff, Travelers repeats and realleges each and every allegation contained in the above paragraphs of the Complaint and Jury Demand as if set forth herein in their entirety.

78.    Travelers, in its capacity as surety for Trataros, itself incurred losses of no less than $3,000,000. A substantial portion of Travelers' losses are attributable to the acts and/or omissions of DASNY, and/or entities with whom DASNY enjoyed privity of contract and over whom DASNY possessed the ability/authority/responsibility to control said parties' actions, including but not limited to KPF, TDX, and the various co-prime contractors.

79.    Travelers is entitled to recover from DASNY such amount of Travelers' own losses as is attributable to DASNY's acts and/or omissions, including but not limited to any expenses and attorney's fees which Travelers has incurred and/or will incur in defending claims brought against Travelers and/or its principal, Trataros, as a result of DASNY's said acts and/or omissions.

**WHEREFORE**, Plaintiff hereby requests judgment against DASNY for:

    a.      Compensatory damages;

b.      Consequential and incidental damages;

c.      Attorney's fees and expenses;

d.      Interest;

e.      Costs;

f.      Such other relief as the Court deems just and proper.

## FIFTH COUNT

80.     Plaintiff, Travelers, repeats and realleges each and every allegation contained in the above paragraphs of this Complaint and Jury Demand as if set forth herein in their entirety.

81.     DASNY engaged Defendant TDX as Construction Manager for the Project.

82.     TDX did not properly perform its contractual and/or professional responsibilities as Construction Manager.   TDX owed a duty of care to Trataros and/or Trataros' subcontractors/suppliers arising from their status as third-party beneficiaries of the contracts between TDX and DASNY, and/or as a result of the functional equivalent of privity existing between same and TDX.  Rather than helping alleviate and/or limit the impacts identified above, TDX contributed to the impacts that plagued the Project.

83.     The actions and/or failures to act of TDX constituted negligence and/or professional negligence.

84.     The negligence and/or professional negligence of defendant TDX contributed in a material respect to the damages incurred by Travelers, Trataros and/or Trataros' subcontractors/suppliers resulting from the impacts discussed above.

85.     Travelers has standing to assert claims as against TDX either as a result of the assignment from Trataros; equitable subrogation with respect to the rights of claimants, the

obligees, and/or the principal; third-party beneficiary rights in connection with TDX's contracts with DASNY, and/or as a party whose connection to TDX is so close as to approach privity.

86.    Defendant, TDX is liable to Travelers for the damages incurred by Travelers and by Trataros as well as the damages incurred by the subcontractors and/or suppliers of Trataros, including but not limited to the damages associated with the impacts discussed above and such expenses and attorney's fees that Travelers may incur as a result of defending claims brought against Travelers and/or its principal as a result of the acts, omissions, negligence, and/or professional negligence of TDX.

**WHEREFORE**, Plaintiff hereby requests judgment against TDX Corp for:

a.      Compensatory damages;

b.      Consequential and incidental damages;

c.      Attorney's fees and expenses;

d.      Interest;

e.      Costs;

f.      Such other relief as the Court deems just and proper.

## SIXTH COUNT

87.    Plaintiff, Travelers, repeats and realleges each and every allegation contained in the above paragraphs of this Complaint and Jury Demand as if set forth herein in their entirety.

88.    DASNY engaged Defendant KPF as architect/engineer of record for the Project.

89.    KPF did not properly perform its contractual and/or professional responsibilities as the Project's architect/engineer.  KPF owed a duty of care to Trataros and/or Trataros' subcontractors/suppliers arising from their status as third-party beneficiaries of the contracts between KPF and DASNY, and/or as a result of the functional equivalent of privity existing

16

between same and KPF. Rather than helping alleviate and/or limit the impacts identified above, KPF contributed to the impacts that plagued the Project.

90.    The actions and/or failures to act of KPF constituted negligence and/or professional negligence.

91.    The negligence and/or professional negligence of defendant KPF contributed in a material respect to the damages incurred by Travelers, Trataros and/or Trataros' subcontractors/suppliers resulting from the impacts discussed above.

92.    Travelers has standing to assert claims as against KPF either as a result of the assignment from Trataros; equitable subrogation with respect to the rights of claimants, the obligees, and/or the principal; third-party beneficiary rights in connection with KPF's contracts with DASNY, and/or as a party whose connection to KPF is so close as to approach privity.

93.    Defendant KPF is liable to Travelers for the damages incurred by Travelers and by Trataros as well as the damages incurred by the subcontractors and/or suppliers of Trataros, including but not limited to the damages associated with the impacts discussed above and such expenses and attorney's fees that Travelers may incur as a result of defending claims brought against Travelers and/or its principal as a result of the acts, omissions, negligence, and/or professional negligence of KPF.

**WHEREFORE**, Plaintiff hereby requests judgment against Defendant KPF for:

a.    Compensatory damages;

b.    Consequential and incidental damages;

c.    Attorney's fees and expenses;

d.    Interest;

e.    Costs;

f.    Such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

The Plaintiff, Travelers Casualty and Surety Company, hereby demands trial by jury as to all issues in the above matter.

Respectfully submitted,
DREIFUSS BONACCI & PARKER, LLP

By: *Eli Rogers*

ELI J. ROGERS (ER-6564)
*Attorneys for Plaintiff,*
*Travelers Casualty and Surety Company as*
*Administrator for Reliance Insurance Company*
One Penn Plaza, 36th Floor
New York, New York 10119
      *and*
26 Columbia Turnpike
North Entrance
Florham Park, New Jersey 07932
973-514-1414
*Please respond to New Jersey office.*

18