# EXHIBIT 14

225

1

2  UNITED STATES DISTRICT COURT

   SOUTHERN DISTRICT OF NEW YORK

3  ─────────────────────────────────

4  TRAVELERS CASUALTY AND SURETY COMPANY as

   Administrator for RELIANCE INSURANCE

5  COMPANY,

6                          Plaintiff,

7          -against-

8  DORMITORY AUTHORITY-STATE OF NEW YORK, TDX

   CONSTRUCTION CORP. and KOHN PEDERSEN FOX

9  ASSOCIATES, P.C.,

10                         Defendants.

11 Case No. 08-CV-6915 (DLC)

12

           (CAPTION CONTINUED)

13 ─────────────────────────────────

14

                     December 17, 2009

15                   10:21 a.m.

16

17        CONTINUED DEPOSITION of GEOFFREY

18 D. HICHBORN, taken by Defendants, pursuant

19 to Notice, held at the offices of HOLLAND

20 & KNIGHT LLP, 195 Broadway, New York, New

21 York before Wayne Hock, a Notary Public of

22 the State of New York.

23

24

25

302

G. D. Hichborn

1   A.   Yes, I'm there.
2   Q.   The first series of numbers, the
3   first 01 is what you refer to as your
4   basis system?
5   A.   Yes.
6   Q.   When were those numbers applied
7   to a particular sample, before the sample
8   was taken or at some other time?
9   A.   It was my understanding it was
10  contemporaneous with the taking of the
11  sample.
12  Q.   And that would be something that
13  Mr. Spinelli did?
14  A.   Yes.
15  Q.   Now, that particular sample,
16  under the column separation it says no.
17  A.   Correct.
18  Q.   What does that tell us?
19  A.   It means throughout the entire
20  body of the sample that was taken there
21  was no delamination throughout any of the
22  strata.
23  Q.   Reading further to the right
24  where it says, "delam location," it's

303

G. D. Hichborn

1   blank.
2          That's because there were none;
3   there were no delaminations?
4   A.   That's a fair statement.
5   Q.   Would you turn to appendix M
6   which -- do you have that?
7   A.   Yes.
8   Q.   That's Mr. Ray's report?
9   A.   Yes.
10  Q.   And would you turn to page
11  thirty-seven of Mr. Ray's report.
12  A.   Yes.
13  Q.   That's a magnified photo?
14  A.   It is.
15  Q.   Is that the same core sample
16  01-01-03 that we just read about?
17  A.   Yes.
18  Q.   And it says here, "bond failure
19  at arrow."
20  A.   Yes.
21  Q.   Okay.
22         How do you distinguish between a
23  finding of no lamination reported in
24  appendix J with the term "bond failure"

304

G. D. Hichborn

1   that we're looking at now in appendix M?
2   A.   This is what I referred to as an
3   incipient failure, one that has not
4   resulted in delamination, one that has not
5   resulted in the pulling away of the mass
6   of the terrazzo flooring from the concrete
7   substrate.  This is where the concrete
8   itself has broken.  But it's incipient and
9   the floor is still performing fine.
10  Q.   The floor is still performing
11  fine as of what date are we talking about
12  now?
13  A.   As of the time of sampling.
14  When it was sampled, it was sampled
15  intact.
16  Q.   Why don't you go back to your
17  sampling log and tell us when this
18  particular floor sample that was
19  performing fine was taken.  I think that's
20  appendix I.
21  A.   The core was cut from the work
22  on October 27 of 2006.
23  Q.   And was performing adequately at
24  that time?

305

G. D. Hichborn

1   A.   Yes.  The terrazzo was adhered
2   to the concrete substrate such that it had
3   not delaminated.
4   Q.   Would you turn to Mr. Ray's page
5   forty-one, which is another photo.
6   A.   Certainly.
7   Q.   What does that show us?
8   A.   It shows that the top surface of
9   the concrete is distressed and again
10  another incipient delamination within the
11  concrete mass.
12  Q.   Is the condition depicted in
13  figure seventeen, the concrete crumbling
14  at the top, consistent with the surface of
15  the concrete depicted in figure thirteen?
16  A.   I'm sorry, you're going to have
17  to ask another question because I really
18  don't understand what you're asking.
19  Q.   I'm trying to compare the photo
20  in figure seventeen which says, "crumbling
21  at top of concrete" with the photo in
22  figure thirteen which is the example we've
23  been tracking, 01-01-03.  I'm asking
24  whether what you see in the condition of

21  (Pages 302 to 305)

472

## CERTIFICATION BY REPORTER

I, Wayne Hock, a Notary Public of the
State of New York, do hereby certify:

That the testimony in the within
proceeding was held before me at the
aforesaid time and place;

That said witness was duly sworn
before the commencement of the testimony,
and that the testimony was taken
stenographically by me, then transcribed
under my supervision, and that the within
transcript is a true record of the
testimony of said witness.

I further certify that I am not
related to any of the parties to this
action by blood or marriage, that I am not
interested directly or indirectly in the
matter in controversy, nor am I in the
employ of any of the counsel.

IN WITNESS WHEREOF, I have hereunto
set my hand this   21st   day of   December
, 2009.

_Wayne Hock_

------------------------------------

VERITEXT REPORTING COMPANY

212-267-6868                                  516-608-2400

EXHIBIT 15



## Cashin Spinelli & Ferretti, LLC

Surety Consultants and Construction Managers

New York • Connecticut • Pennsylvania • Illinois

April 12, 2009

JoAnne M. Bonacci, Esq.
Dreifuss Bonacci & Parker, LLP
26 Columbia Turnpike
North Entrance
Florham Park, NJ  07932

Re:         Travelers Casualty and Surety Company/Trataros Construction, Inc. vs.
            Dormitory Authority of the State of New York, TDX Construction Corp.
            and Kohn Pedersen Fox Associates, P.C. et. al.

Subject:    Review and Analysis of Report Prepared by Simpson, Gumpertz & Heger,
            Inc., dated March 20, 2009

Dear Ms. Bonacci:

Cashin Spinelli & Ferretti, LLC ("CSF") is in receipt of the report referenced above and offers its response as follows:

1.0     Resumes of Key Personnel

    1.1     The Opinions expressed in this report are those of Michael W. Spinelli, AIA.  The following CSF personnel worked under the supervision of Mr. Spinelli. CSF is being compensated on an hourly basis as indicated per the individuals and categories below, for preparation of this report: [1]

_____

[1] Resumes are attached in CSF No. 13

To the extent that the Conflow underlayment, or any underlayment on the project, was installed or applied incorrectly, the underlayment installer would bear responsibility for the delamination. Trataros did not self-perform this work.

*Excess Water*

SGH has alleged that excessive water was used to mix the underlayment, resulting in a soft and dusty underlayment surface. [70] SGH further noted that its opinion was based on its visual observations. SGH opined that these visual observations indicate that excessive water was used to mix the underlayment. [71]

To the extent that the underlayment was overwatered the entity that mixed and applied the Conflow underlayment would bear responsibility. The Conflow was mixed and applied by Bartec under a purchase order with Trataros. [72] Trataros did not self-perform this work.

*Spreading of the delaminations*

SGH has alleged that the extent of debonded and lifting epoxy terrazzo is increasing over time due to foot and wheel traffic loads and exposure to expected and routing moisture. [73] SGH acknowledges that it did not survey the entire building. SGH's subsequent survey, which forms the basis of its opinion regarding the spread of the delaminations was even more limited. As a result, CSF does not believe that SGH has demonstrated increased delamination throughout the entire building.

The building has been traveled by hundreds of thousands, if not millions of students and/or faculty since September 2001. Charles Bartlett of DASNY has testified that he is unaware of an unsafe condition currently at the Project. [74] CUNY's representative has stated that he is not aware of any slip-and-falls occurring last year as a result of the

---

[70] SGH Report, p. 24, 34
[71] SGH Report, p.25
[72] T75
[73] SGH Report, p. 34
[74] Bartlett, Terrazzo, p. 463

8. TDX failed to consult with KPF concerning the issuance of GC2-028, nor did it properly evaluate the effects of GC2-028 on other work as required by its agreement with DASNY;

9. TDX directed and performed some of the grinding of the concrete and/or the installation of underlayment in certain areas of the building;

10. To the extent that the work performed by TDX contributed to the failures in the epoxy terrazzo flooring system, TDX and DASNY would be responsible;

11. The sound areas of epoxy terrazzo have been fully adhered for approximately eight years and CSF does not believe that these areas will suddenly delaminate; and

12. DASNY's estimated costs to remove and replace the epoxy terrazzo flooring system are excessive.

With respect to the actions of Bartec:

1. To the extent that it is proven true that Bartec's improper surface preparation of the concrete prior to the placement of the underlayment contributed to the failure of the underlayment, and ultimately areas of the epoxy terrazzo flooring system, Bartec would be responsible;

2. To the extent that it is proven true that Bartec's improper surface preparation of the underlayment prior to the placement of additional layer(s) of underlayment contributed to the failure of the underlayment, and ultimately the failure of areas of the epoxy terrazzo flooring system; and

3. To the extent that it is proven true that Bartec's improper over-watering of the underlayment contributed to the failure of the underlayment and ultimately the failure of the epoxy terrazzo flooring system, Bartec would be responsible.

With respect to the actions of Crocetti:

1. To the extent that it is proven true that Crocetti's improper surface preparation of the concrete contributed to the failure of the epoxy terrazzo flooring system, Crocetti would be responsible;

9.2     DASNY's Remedial Work Estimate

On June 30, 2003, Wayne Markowitz of DASNY advised CUNY and Baruch College officials that the cost of replacement of the terrazzo was $30 – 35/sq. ft and that the cost of removal was $10/sq. ft. Mr. Markowitz's remarks were recorded by TDX during a weekly meeting to review and update various issues. Mr. Markowitz's remarks were also less than two weeks after TDX's preparation of its June 17, 2008 summary of the detailed investigations and analyses of others with regard to the alleged failure(s) to the epoxy terrazzo flooring systems which was sent to Mr. Markowitz's attention. TDX confirmed that it distributed this report in the minutes of the June 30th meeting.

Based on the costs quoted by Mr. Markowitz, the removal and replacement of the entire epoxy terrazzo flooring system would be $3.5 – 4.0 million. In its report, SGH does not explain why these alleged costs would have nearly quadrupled in less than six years. This would be especially relevant in today's depressed construction economy. In order the $4 million estimate to reach DASNY's current costs of $15.9 million, costs would have had to have escalated 26% per year over the last six years. The 26% escalation is already more than double the 12% escalation included in CUNY's estimate, [96] which Max Pizer of CUNY has previously stated probably won't occur in a plummeting economy. [97] DASNY's June 2003 estimate as to the cost to remove and replace the entire terrazzo flooring system is further evidence that SGH's estimate of remedial costs is overstated.

CSF reserves the right to amend this report.

On behalf of Cashin Spinelli & Ferretti, LLC

Michael W. Spinelli, AIA

---

[96] T56
[97] Pizer, Terrazzo, p. 273

EXHIBIT 16



*Exponent Engineering P.C.*

**Investigation of
Terrazzo Flooring Distress
Baruch College Vertical
Campus
One Bernard Baruch Way
New York, New York**

- *The contractor improperly installed the underlayment where thicknesses greater than 1 in. were necessary, resulting in inherent weak planes within the system.*

- *The contractor used excessive water to mix the underlayment, resulting in a soft and dusty underlayment surface."*

Exponent's findings are in agreement with SGH's conclusions that improper cleaning and preparation of the concrete slab and underlayment surfaces and failure to remove curing compounds from the concrete slab contributed to reduced adhesion of the epoxy terrazzo system. Exponent's findings are also in agreement with SGH's conclusions that excessive water was used to mix the underlayment, as indicated by a soft, highly friable layer at the top of the underlayment and aggregate segregation within the underlayment. Exponent also found evidence of improper installation of underlayment where thicknesses greater than 1 inch were necessary.

Exponent agrees that the Conflow supplied to the Vertical Campus was a gypsum-based product, not a portland cement-based product as indicated in the product literature. Regardless of the composition of Conflow, review of correspondence from Crocetti and TEC and information from NTMA indicate that a self-leveling underlayment was not appropriate for use underneath the epoxy terrazzo flooring.

**SGH Conclusion:** *"Typical curing shrinkage of the epoxy terrazzo system created stress that the weak and poorly prepared substrates could not support."*

Shrinkage of epoxy resins during curing to an extent that cannot be supported by a properly prepared substrate is generally not expected. The NTMA indicates that the divider strips in a thin-set terrazzo floor system are aesthetic, unless placed over a break in the substrate (such as a concrete control joint).[6] The American Institute of Architects' Architectural Graphics Standards indicates that, in thin-set terrazzo systems, divider strips need to be placed only in areas where structural cracks can be anticipated.[7]

---

[6] http://www.ntma.com/05_flatness_tolerance.cfm

[7] Ramsey, CG, Sleeper, HR. Architectural Graphic Standards, 10th Ed., JR Hoke, Jr., editor-in-chief, American Institute of Architects, John Wiley & Sons, Inc. New York. 2000. p 538.

20



# Conclusions

Exponent investigated the nature and extent of distress to the epoxy terrazzo flooring at the Baruch College Vertical Campus.  Our conclusions are summarized as follows.

- Several factors contributed to the observed delamination of the epoxy terrazzo flooring system at the Vertical Campus, including improper preparation of the concrete floor slabs to receive leveling underlayment or epoxy terrazzo, improper installation of the leveling underlayment, and improper preparation of the leveling underlayment to receive the epoxy terrazzo system.

- The Conflow self-leveling underlayment installed under much of the epoxy terrazzo was gypsum-based, instead of portland cement-based as indicated in the product literature.  Regardless of the composition of Conflow, the specification of a self-leveling underlayment was not recommended by TEC, the manufacturer of the Tuff-Lite epoxy terrazzo system installed at the Vertical Campus, by Crocetti, the epoxy terrazzo installer, or by the NTMA.

- The observed "alligatoring" of the terrazzo appears to be a condition related to the finished surface of the terrazzo and is likely unrelated to the condition of the underlayment.

- The nature and extent of delamination of the terrazzo flooring observed at the Vertical Campus does not require removal and replacement of all the terrazzo in the building.  The delamination of terrazzo on levels B1 and B2 and the first and second floors is extensive and severe enough that all the terrazzo and underlayment on these floors should be removed and replaced. Elsewhere in the building, localized repairs of terrazzo will be sufficient.  Exponent estimates removal and replacement of approximately 32,000 square feet of terrazzo is required.

SF37340.EX2 A0T0 0409 MC01

EXHIBIT 17



**CTL**GROUP

*Building Knowledge. Delivering Results.*   CONSTRUCTION
TECHNOLOGY LABORATORIES

ENGINEERS & CONSTRUCTION
TECHNOLOGY CONSULTANTS

www.CTLGroup.com

April 29, 2009

Jeremy Platek, Esq.
O'Conner Redd  LLP
200 Mamaroneck Avenue
White Plains, NY  10601

R&J Construction v. Bartec Industries, et al
Your File No: D-2938
CTLGroup Project No. 283011

Dear Mr. Platek:

At your request, CTLGroup (CTL) reviewed project documents relating to debonding of epoxy terrazzo flooring at Baruch College located in New York, New York.  The objectives of our work were to review background documents and provide opinions regarding the debonding of the epoxy terrazzo.

## DOCUMENT REVIEW

Provided documents were reviewed to obtain background information which included the following:

- Consultants reports from Testwell Craig dated March 5, 2003; March 25, 2003; and April 15, 2003.

- Consultant reports from Niagara Research Associates regarding March 13, 2003 site visit and letter to dated September 5, 2003 to Crocetti.

- Consultant report from National Terrazzo & Mosaic Association (NTMA) dated April 17, 2003.

- Consultant report from Simpson Gumpertz & Heger (SGH) dated March 20, 2009.

- Tech Data sheet for ConFlow dated June 8,1998, Approved by Architect on April 13, 2000.

- May 31, 2007 Technical Data Sheet for Conflow from Manufacturer's website.

- Technical Data sheet for FlexGuard Epoxy Membrane by TEC.

- Technical Data sheet for Tuff-Lite Epoxy Terrazzo by TEC.

*Main Office* 5400 Old Orchard Road   Skokie, Illinois 60077-1030   Phone 847-965-7500   Fax 847-965-8541
*Northeast Office* 5565 Sterrett Place, Suite 312   Columbia, Maryland 21044-2685   Phone 410-997-0400   Fax 410-997-8480

Mr. Jeremy Platek
CTLGroup Project No. 283011

- Deposition transcript for Bartec Industries employee, Craig Negus.

## OPINIONS

Based on the scope of work performed and information provided, the following opinions are presented:

1. Debonding of the epoxy terrazzo system is widespread, occurring on all floor levels of the building, and is occurring at locations with and without underlayment. The failure pattern indicates that the debonding is not associated with a particular substrate, a particular underlayment, a particular installer, installation time period, or environment within the building at the time of underlayment/epoxy terrazzo application. New areas of debonding have recently (SGH 2009) been documented indicating that failure/debonding of the epoxy terrazzo floor system is continuing.

2. Debonding of the epoxy terrazzo system is primarily related to poor surface preparation of the concrete and underlayment surfaces. The substrates were not cleaned or prepared properly to remove dirt or laitance and/or curing compounds resulting in poor bond.

3. Many of the cores indicated that epoxy terrazzo debonding was occurring at the crack isolation membrane/substrate interface with little to no material adhering to the membrane. This suggests that moisture is a contributing factor to the debonding since the crack isolation membrane is sensitive to moisture.

4. Where epoxy terrazzo debonding is occurring within the underlayment, the inherent weakness of cementitious/gypsum based underlayments and its sensitivity to water is a contributing factor to the debonding. Debonding within the underlayment layer does not by itself indicate improper volume of mix water, poor mixing, or poor installation. Review of evaluation reports shows little evidence to suggest that Conflow was installed incorrectly.

5. Conflow underlayment was submitted and approved by the project team as an appropriate material to level the concrete floor prior to installation of the epoxy terrazzo floor system. The manufacturer knew that Conflow was being used as underlayment for epoxy terrazzo at Baruch College. During evaluation of the epoxy terrazzo debonding after installation was completed it was determined that Conflow is a gypsum based material, contrary to product literature that states it is a poly-modified Portland cement based material. Gypsum-based underlayments degrade when wet. Reports by multiple parties (SGH, NTMA, Niagara) indicates that cementitious/gypsum based underlayment may not be appropriate for use with epoxy terrazzo systems. The NTMA recommends epoxy underlayment be used to level the floor. Thus, the use of an improper underlayment material is likely a contributing factor to the debonding. Currently, the manufacturer's data sheet (dated 5-31-07) states that Conflow is "Not intended as a wearing surface or for use prior to installing high build epoxy or epoxy terrazzo systems".



Mr. Jeremy Platek
CTLGroup Project No. 283011

Page 3 of 3
April 29, 2009

6. Project documents indicate that firms other than Bartec installed Conflow, Mapei Novo/Plan, and an unknown cement based underlayment. The location of underlayment applied by each installer is not known. However, review of the evaluation reports and the failure pattern indicates that the debonding is not associated with a particular installer, installation method, underlayment type, installation time period, or environment within the building at the time of underlayment/epoxy terrazzo application.

We reserve the right to revise, amend, or supplement this report as more information becomes available. We appreciate the opportunity to provide specialized consulting services to O'Conner Redd LLP. If you have any questions or need additional assistance, please call.

Sincerely,

**CTLGROUP**

*Terry J. Willems*

Terry J. Willems
Senior Materials Scientist
Structural Evaluation Group

TWillems@CTLGroup.com
Phone: (847) 972-3234

**CTL**GROUP
Pushing Knowledge. Delivering Results.        www.CTLGroup.com

EXHIBIT 18

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

CASE NO.: 08-CV-6915 (DLC)

----------------------------------------------x

TRAVELERS CASUALTY AND SURETY COMPANY

as Administrator for RELIANCE INSURANCE

COMPANY,

                    Plaintiff,

     -against-


DORMITORY AUTHORITY-STATE OF NEW YORK,

TDX CONSTRUCTION CORP. and KOHN PEDERSON

FOX ASSOCIATES, P.C.,


                    Defendants.

     (CAPTION CONTINUED)

----------------------------------------------x

                    August 12, 2008

                    10:00 a.m.



          DEPOSITION of CRAIG NEGUS,

held at the offices of Holland & Knight,

195 Broadway, New York, New York, before Eileen

Mulvenna, CSR/RMR, Certified Shorthand Reporter,

Registered Merit Reporter and Notary Public of

the State of New York.

258

Craig Negus

1      A.    Portions of the corridors.
2      Q.    I think you testified that Bartec
3  finished its work in January of 2002; is that
4  correct?
5      A.    Yes.
6      Q.    At the time that you left the site,
7  was it your understanding that the work had been
8  completed to the satisfaction of Trataros?
9      A.    Yes.
10     Q.    After that, after Bartec left the
11  site, did there come a time when you became aware
12  of issues again with the terrazzo flooring?
13         MR. PLATEK:  Could you read that
14  back.
15         (Record read.)
16         MR. PLATEK:  You can answer.
17     A.    I didn't become --
18         THE WITNESS:  Can I answer?
19         MR. PLATEK:  Yes.
20     A.    I didn't become aware of any problem
21  for -- I believe it was 14 months.  It was
22  memorialized by a letter that I -- was written by
23  Tommy Spinothoroukis informing me of a problem.
24     Q.    You said 14 months.  That's

259

Craig Negus

1  approximately, if I'm doing my math right, March
2  of '03?
3      A.    Right.
4      Q.    Do you recall more specifically what
5  the contents of the letter said?
6      A.    That an area of terrazzo was -- was
7  delaminating and that I should come to the site
8  and observe the terrazzo and the condition of the
9  underlayment.
10     Q.    And did you go to the site after
11  receiving that letter?
12     A.    Yes.
13     Q.    Do you know when?
14     A.    No.
15     Q.    Can you approximate?
16     A.    Within a week.
17     Q.    Was anyone else there when you went
18  to the site to observe the terrazzo and the
19  underlayment?
20     A.    I can't recall specifically who.
21  There were other people there.
22     Q.    Was Mr. Spinothoroukis there?
23     A.    Yes.
24     Q.    What did you observe about the

260

Craig Negus

1  condition of the floor on that visit -- actually,
2  strike that.
3         What did you observe about the
4  conditions of the terrazzo on that visit?
5      A.    The first time I saw it?
6      Q.    Uh-huh, yes.
7      A.    One or two slabs of terrazzo, 2 by
8  4, were bonded to the underlayment in the middle,
9  and the corners of those slabs were delaminated
10  and curved up.
11     Q.    Do you recall where in the building
12  you observed this?
13     A.    There were two areas.  I believe it
14  was the 1st floor and the 2nd floor.
15     Q.    Can you give me an estimate as to
16  how large the size of an area each of these were?
17     A.    The panels were 2-foot by 4-foot,
18  the terrazzo panels.
19     Q.    Was there just one panel on each of
20  those floors?
21     A.    Two.  Two that I saw.
22     Q.    Two panels in each of the different
23  areas or two panels total?
24     A.    Two panels total.

261

Craig Negus

1      (Discussion off the record.)
2  BY MS. WISHERT:
3      Q.    Do you recall having any discussions
4  with Mr. Spinothoroukis or anybody else from
5  Trataros at that time about the conditions you
6  were observing?
7      A.    Not that specific evening.
8      Q.    At some point in the future, did you
9  have conversations with someone --
10     A.    Yes.
11     Q.    When?
12     A.    I'd say about a month later.
13     Q.    Who did you speak to?
14     A.    Approximately.
15         I spoke to him, Tommy
16  Spinothoroukis.
17     Q.    Can you describe what the contents
18  of that discussion were?
19     A.    I asked him how big he thought the
20  problem was, in other words, square footage.
21     Q.    What was his response?
22     A.    He said about 2,000 square feet.
23     Q.    Did either you or Mr. Spinothoroukis
24  make a suggestion as to how to address those

262

Craig Negus

```
 1            Craig Negus
 2   2,000 square feet?
 3           MR. PLATEK:  Object to form.
 4       A.   This is 2,000 square feet of problem
 5   terrazzo at this point.  So it had very little to
 6   do with me, in my opinion, at that time.
 7       Q.   Was there any discussion about what
 8   to do -- even if it wasn't what Bartec would need
 9   to do, just more generally about how they can fix
10   the 2,000 square feet that was coming up?
11       A.   At that time, I had noticed that
12   they were already taking some actions.
13       Q.   And what action were they taking at
14   that point to --
15       A.   Screwing the panels down on the
16   corners.  Other areas, they were trying to inject
17   or pour in epoxy.
18       Q.   Just to clarify, when you say
19   "they," who are you referring to?
20       A.   TDX and possibly Crocetti.  I never
21   saw Crocetti there, but I know -- I believe they
22   were involved.
23       Q.   Did you actually see TDX either
24   screwing down the panels or pouring in epoxy, or
25   did you --
```

263

Craig Negus

```
 1            Craig Negus
 2       A.   No.  I could see where they had done
 3   it.
 4       Q.   When you say that you could see that
 5   the screwing work had been done, did you observe
 6   this when you were originally there in response
 7   to Mr. Spinothoroukis' letter?
 8       A.   No, no.  Approximately -- I only saw
 9   a couple of panels when I responded to his
10   request in his letter for me to come and give it
11   my attention.
12       Q.   Right.
13       A.   I think he used the word "urgent
14   attention."
15       Q.   So a month later when you said you
16   had spoke --
17       A.   Approximately a month later, I --
18           MR. PLATEK:  Wait until she
19   finishes.
20       A.   Okay.  I'm sorry.
21       Q.   When you spoke to him a month later,
22   was it on-site again?
23       A.   Yes.
24       Q.   Do you recall if anybody else was
25   there at that second inspection?
```

264

Craig Negus

```
 1            Craig Negus
 2       A.   The labor foreman and a couple of
 3   laborers working for TDX.  I don't recall who
 4   they were.
 5       Q.   At the second inspection, were there
 6   more than just the two panels coming up on the
 7   edges that you had observed the first time you
 8   had been there?
 9       A.   I had seen areas where they
10   evidently had sawed with a power saw, circular
11   saw, patches of the floor out, meaning the
12   floor -- the terrazzo and the underlayment.
13       Q.   Were these small areas that had been
14   sawed out or --
15       A.   Approximately 6 inches by a foot or
16   a foot by a foot, 9 by 18.  Random -- random
17   cuts, whatever they could get out.
18       Q.   Did you talk to Mr. Spinothoroukis
19   about those sawed-out areas at all?
20       A.   Yes.
21       Q.   What did he tell you about them?
22       A.   He said they were delaminated.
23       Q.   Did he tell you why they had sawed
24   them out, if someone had suggested that as a way
25   to deal with those delaminating areas?
```

265

Craig Negus

```
 1            Craig Negus
 2       A.   I don't recall.
 3       Q.   Going back, when you were there for
 4   the first inspection in response to the letter,
 5   did you do a walk-through of all of the floors of
 6   the building, or did Mr. Spinothoroukis take you
 7   specifically to the two areas where --
 8       A.   Not that night.  Not that night.
 9       Q.   You did when you walked through a
10   month later?
11       A.   Yes.
12       Q.   Just to be clear, did you observe
13   delaminating areas on more than just the first
14   and second floors on that complete walk-through
15   of the building?
16       A.   I went back a third time
17   unannounced, approximately three or four days
18   later after that one-month meeting.  That's when
19   I did a walk-through.
20       Q.   So does that mean you do not do a
21   full walk-through at the one-month meeting site
22   inspection?
23       A.   No.
24       Q.   Were you alone on that third visit?
25       A.   Uh-huh.
```

67  (Pages 262 to 265)

266

Craig Negus

1      MR. PLATEK:  Yes?
2   A.   Yes. I'm sorry.
3   Q.   Did you make any notes about your
4   observations on any of the three visits that you
5   made to the site?
6   A.   No.
7   Q.   Have you been back to the site to --
8   at all since that third visit that you took?
9   A.   Several times.
10  Q.   When was the next time after your
11  third visit to the site a few days after the
12  one-month visit?
13  A.   Two or three weeks.
14  Q.   So we don't have to go through every
15  single time if there's going to be a lot of them,
16  did you go back somewhat regularly to observe the
17  Baruch site after that point?
18  A.   I went back the first time
19  unannounced after the -- the one-month
20  approximate time to see how they were taking out
21  the so-called delaminated areas.  And when they
22  saw cut the small areas, they would take a chisel
23  and hammer to get it out and get out -- to get
24  what out, they were getting the epoxy terrazzo
25

267

Craig Negus

1   off and getting some underlayment.  Some of it
2   was bonded.
3   Q.   At any point, did they ask Bartec to
4   come back and redo any of this work?
5   A.   No.
6   Q.   Did anyone from Trataros or TDX ever
7   indicate to you that they felt that the
8   underlayment was to blame for the delamination
9   problem?
10          MR. FROESSEL:  Objection to the
11  form.
12          MS. SMITH:  Objection.
13          MS. WISHERT:  Let me clarify that.
14  Q.   Did anyone ever indicate to you,
15  between the time when you received the letter
16  from Mr. Spinothoroukis and up to the
17  one-month-later visit, that the delamination
18  problems that they were observing, they felt
19  Bartec's underlayment was in part to blame for
20  that?
21  A.   Yes.
22  Q.   Do you recall a specific
23  conversation to that effect?
24  A.   No.
25

268

Craig Negus

1   Q.   So where did you get that
2   impression?  And was it from TDX -- let me go
3   back.
4          Was it from TDX or from Trataros
5   that you --
6   A.   It was from Spinothoroukis, who is
7   now working for TDX.  At that point, he was
8   working for TDX.
9   Q.   Did Mr. Spinothoroukis say something
10  in particular to you or -- strike that.
11          What gave you the impression from
12  him that he was blaming Bartec in part for the
13  delamination problems that they were experiencing
14  at the Baruch project?
15  A.   He had tapped out the floor, found
16  hollow spots in the terrazzo -- or on the
17  terrazzo and said that some of it was caused by
18  the delamination of the underlayment.
19  Q.   Did he express to you why he felt
20  that the hollow spots were related to the
21  delamination of the underlayment versus
22  delamination of the underlayment from the
23  concrete or some other problem with the terrazzo
24  flooring?
25

269

Craig Negus

1          MR. PLATEK:  Object to form.
2          MR. FROESSEL:  Objection to the
3   form.
4   Q.   Do you understand the question?
5   A.   He made a statement that it -- in
6   his opinion, it was the underlayment, too.
7   Q.   You say "it was the underlayment,
8   too." Did he express that there were other --
9   A.   Terrazzo.
10  Q.   -- issues that he thought had caused
11  the delamination problem other than the
12  underlayment?
13  A.   Terrazzo.
14  Q.   What did he say about the terrazzo?
15  A.   That was the bonding, too.
16  Q.   Did he give you any specific basis
17  for why he understood that -- strike that.
18          Was it your understanding that he
19  was just making a general conclusion that the
20  floor was delaminating and, therefore, the
21  terrazzo and the underlayment people must be at
22  fault, or was there some sort of specific
23  information that caused him to believe that both
24  were potentially an issue related to the
25

68  (Pages 266 to 269)

294

STATE OF NEW YORK      )

                       ss:

COUNTY OF NEW YORK     )


            I, Eileen Mulvenna, Notary Public

within and for the State of New York, do hereby

certify:


            That I reported the proceedings in

the within entitled matter, and that the within

transcript is a true record of said proceedings.


            I further certify that I am not

related to any of the parties to the action by

blood or marriage, and that I am in no way

interested in the outcome of this matter.


            IN WITNESS WHEREOF, I have hereunto

set my hand this 14th day of August, 2008.

*Eileen Mulvenna*

_____

            Eileen Mulvenna, CSR/RMR

EXHIBIT 19



# Epoxy Terrazzo Flooring Investigation

Baruch College Vertical Campus
The City University of New York
New York, NY
20 March 2009

SGH Project 040095.02

**SIMPSON GUMPERTZ & HEGER**

Engineering of Structures
and Building Enclosures

## 10.    REPAIR COST ESTIMATE[1]

| Work Item | Estimated Quantity[2] | Unit | Unit Price | Bare Cost | Cost (with GC and O/P)[3] |
|---|---|---|---|---|---|
| **1. Demolition** | | | | | |
| Remove existing floor system. | 88,000 | SF | 14 | $ 1,232,000 | $ 1,771,000 |
| **2. Surface Preparation** | | | | | |
| Shot-blast and clean existing slabs. | 88,000 | SF | 1 | $ 88,000 | $ 126,500 |
| Treat cracks and joints. | 8,000 | LF | 55 | $ 440,000 | $ 632,500 |
| **3. Floor System Installation** | | | | | |
| Underlayment. [4] | 66,000 | SF | 22 | $ 1,452,000 | $ 2,087,250 |
| Divider strips. | 60,000 | LF | 5 | $ 300,000 | $ 431,250 |
| Cove bases. | 14,000 | LF | 55 | $ 770,000 | $ 1,106,875 |
| Epoxy terrazzo. | 88,000 | SF | 40 | $ 3,520,000 | $ 5,060,000 |
| **4. Miscellaneous Items** | | | | | |
| Enclosures/partitions/HEPA filters, etc. | 88,000 | SF | 5 | $ 440,000 | $ 632,500 |
| Repair to interior finishes. | 14,000 | LF | 33 | $ 462,000 | $ 664,125 |
| **Subtotal** | | | | | $ 12,512,000 |
| Design and Construction Administration | 5% | | | | $ 625,600 |
| Construction Contigency | 15% | | | | $ 1,876,800 |
| Permits, Fees, Expeditor | 5% | | | | $ 625,600 |
| Quality Control and Testing | | | | | $ 250,000 |
| **Total** | | | | $ | 15,890,000 |
| **Total Cost per Square Foot** | | | | $ | 181 |

**Notes:**

[1] Work will have to be done in phases as use of building does not allow a complete shutdown.  See 30 Jan 2006 remedial work package for the phasing we assumed based on the schedule and use of the spaces.  This cost estimate reflects the scope of work and is not a detailed cost estimate.  We have not determined exact quantities of materials needed or received any contractor quotes in developing this estimate.  The numbers provided reflect the value of the scope of work based on our experience and industry guidelines (e.g., R.S. Means, etc.) and can be used for general budgeting purposes.

[2] Quantity take-offs based on AutoCAD drawings provided by CUNY.

[3] Assumed General Conditions (GC).        25%
   Assumed Overhead and Profit (O/P).      15%

[4] Assume average of 3/4 in. thick underlayment over 75% of floor area.

**Other Notes:**
• This cost estimate assumes a local staging and storage area will be available during construction.
• Unit prices are based on current material and labor costs and do not reflect the possible impact of inflation over the duration of construction.
• This cost estimate does not include possible costs associated with removal and reinstallation of special equipment located on the floor, such as ATMs, computer kiosks, benches, etc.
• This cost estimate does not include fees associated with the investigation and litigation of the existing terrazzo floor.

I:\BOS\Projects\2004\040095.02-LEGL\WP\002ERHopps-R-040095.02.ptl.doc



SIMPSON GUMPERTZ & HEGER

Engineering of Structures
and Building Enclosures

20 March 2009

Stephen B. Shapiro, Esq.
HOLLAND & KNIGHT LLP
2099 Pennsylvania Avenue NW
Washington, DC  20006

Timothy B. Froessel, Esq.
HOLLAND & KNIGHT LLP
195 Broadway
New York, NY  10007

Project 040095.02 --  Epoxy Terrazzo Flooring Investigation, Baruch College Vertical Campus,
The City University of New York, New York, NY

Dear Mr. Shapiro and Mr. Froessel:

As you requested, we investigated the epoxy terrazzo flooring at the above-named building.
Our investigation includes on-site testing and laboratory analysis as well as a review of
consultant reports and project documents.  This report contains a discussion of our findings to
date, our conclusions, our recommendations for remedial work, and a construction cost
estimate.  We reserve the right to conduct a supplementary investigation and publish a
supplemental report at a later date if necessary.

Sincerely yours,

Dennis J. Pinelle, Principal
Pinelle Construction Sciences, LLC
I:\BOS\Projects\2004\040095.02-LEGL\WP\002ERHopps-L-040095.02.ptf.doc

Emily R. Hopps, Staff II – Building Technology
Simpson Gumpertz & Heger Inc.

Reviewed and Approved By,

Peter E. Nelson, Senior Principal
Simpson Gumpertz & Heger Inc.

STATE OF NEW YORK
PETER E. NELSON
No. 085694
LICENSED PROFESSIONAL ENGINEER

It is a violation of the law for any person,
unless he is acting under the direction of
a licensed professional engineer or land
surveyor, to alter an item in any way.

Encls.

SIMPSON GUMPERTZ & HEGER INC.
41 Seyon Street, Building 1, Suite 500
Waltham, Massachusetts 02453
main: 781.907.9000  fax: 781.907.9009
www.sgh.com

Boston
Los Angeles
New York
San Francisco
Washington, DC

EXHIBIT 20

369

1

2 UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

3 ------------------------------------------------

4 TRAVELERS CASUALTY AND SURETY COMPANY as

Administrator for RELIANCE INSURANCE

5 COMPANY,

6                                Plaintiff,

7           -against-

8 DORMITORY AUTHORITY-STATE OF NEW YORK, TDX

CONSTRUCTION CORP. and KOHN PEDERSEN FOX

9 ASSOCIATES, P.C.,

10                               Defendants.

11 Case No. 08-CV-6915 (DLC)

12

               (CAPTION CONTINUED)

13 ------------------------------------------------

14

                       November 13, 2009

15                     9:17 a.m.

16

17           CONTINUED DEPOSITION of DENNIS

18 J. PINELLE, taken by Plaintiff, pursuant

19 to Notice, held at the offices of HOLLAND

20 & KNIGHT LLP, 195 Broadway, New York, New

21 York before Wayne Hock, a Notary Public of

22 the State of New York.

23

24

25

386

D. J. Pinelle

1
2  with piling the epoxy terrazzo
3  estimate for this sheet, repair cost
4  sheet estimate, page forty, and to
5  provide those notes, documents, or
6  anything along those lines that you're
7  able to locate to Mr. Froessel.
8      Mr. Froessel, I'm requesting a
9  copy of that.
10     MR. FROESSEL: We'll take it
11 under advisement.
12     Q.   Mr. Pinelle, in going through
13 the documents that you reviewed and in
14 speaking with the witnesses that you
15 talked to in connection with the report
16 that you issued, did you ask any of them
17 or note any documents of impact damages to
18 the cove bases or the terrazzo as a result
19 of the walk-through that would have
20 occurred, the final walk-through?
21     MR. FROESSEL: Objection to form.
22 You can answer.
23     A.   We saw letters to that effect,
24 yes. I don't know if they came from the
25 actual final walk-through as a result of

387

D. J. Pinelle

1
2  that, but there were letters to the effect
3  that there's lifting and debonding of the
4  epoxy terrazzo in the building.
5      Q.   I'm not speaking about lifting
6  or debonding. I'm speaking about any form
7  of impact damages. For example,
8  something's chipped on level three
9  hypothetically and someone's walking
10 through the building and they would have
11 noticed that and marked it down somewhere.
12     A.   The only thing I saw that would
13 be along those lines was there were some
14 -- I don't remember if there were memos or
15 actual letters but there's some documents
16 by -- I'm trying to remember if it was
17 both Bartec and Crocetti that, while they
18 were working in the area, other trades are
19 were coming in and damaging the material.
20 I don't know if the thirteenth floor was
21 actually called out in one of them. They
22 made some notations and that's the reason
23 they wrote these letters, that there was
24 some damages from the other trades, what
25 you would call wear and tear or impact

388

D. J. Pinelle

1
2  damage.
3      MR. PLATEK: Could you read the
4  question back, please.
5      (Whereupon the requested portion
6  was read back by the reporter)
7      Q.   Mr. Pinelle, under number four
8  on your repair cost estimate, you have a
9  line item for enclosures, partitions, HEPA
10 filters, et cetera. And there's an
11 estimated quantity of eighty-eight
12 thousand square feet with a unit price of
13 five.
14     Can you tell me how you came to
15 that line item.
16     A.   This is a -- I believe we talked
17 a little bit about this yesterday. This
18 is actually a composite of a number of, as
19 the heading says, miscellaneous items.
20 What we tried to do was try to condense
21 that down to a square foot cost and relate
22 it back to the terrazzo. That's why you
23 see the cost of $5. It relates to things
24 like providing HEPA filters. You don't do
25 that on a square foot cost, but we lumped

389

D. J. Pinelle

1
2  it into this item here. The manufacturer
3  we talked to, he seemed to have some
4  experience with that on some jobs and he
5  says they usually do run it on a square
6  foot basis like that just to give you a
7  cost estimate to give you an idea what
8  that will cost. He was one of the sources
9  for that, helping us to get to that number.
10 But we had things like moving kiosks,
11 lights. Some of that I think is in this
12 first line under number four.
13     Q.   Is the breakout of that on the
14 spreadsheet that I had asked you to
15 produce yesterday?
16     A.   That is, yes.
17     Q.   When you're speaking of the HEPA
18 filters, you're talking about renting
19 them?
20     A.   That's ways and means of the
21 contractor. They might own, they might
22 rent them. I don't know.
23     Q.   And normally, when you're
24 estimating something like that, are there
25 a certain amount of filters that you would

6  (Pages 386 to 389)



**VERITEXT REPORTING COMPANY**

212-267-6868                    516-608-2400

682

## CERTIFICATION BY REPORTER

I, Wayne Hock, a Notary Public of the
State of New York, do hereby certify:

That the testimony in the within
proceeding was held before me at the
aforesaid time and place;

That said witness was duly sworn
before the commencement of the testimony,
and that the testimony was taken
stenographically by me, then transcribed
under my supervision, and that the within
transcript is a true record of the
testimony of said witness.

I further certify that I am not
related to any of the parties to this
action by blood or marriage, that I am not
interested directly or indirectly in the
matter in controversy, nor am I in the
employ of any of the counsel.

IN WITNESS WHEREOF, I have hereunto
set my hand this      16ᵗʰ      day of  November
, 2009.

_Wayne Hock_

_____

EXHIBIT 21



**TDX** CONSTRUCTION CORPORATION

Baruch College Field Office  137 East 25th Street  6th Floor, New York, NY 10010

## *ACCIDENT REPORT*

| | |
|---|---|
| *TO:* | John J. McCullough |
| *FROM:* | Frank Muhlbach |
| *DATE:* | October 3, 2001 |
| *RE:* | **Baruch College - Site "B"**<br>Accident: September 29, 2001 |

---

| | | |
|---|---|---|
| Injured Party: | John Nolan<br>29 Dawson Drive<br>Valley Stream, NY 11581 | SS# 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 |
| Employed By: | LK Comstock – Prime Contractor | |
| Location of Accident: | 55 Lexington Avenue | |
| Facts of Accident: | It was reported to TDX that Mr. John Nolan of LK Comstock had an accident on Saturday, September 29, 2001 in the B-2 level. | |
| | Mr. Nolan stated that he was walking across the floor at approximately 8:30 am, when he slipped on the wet floor leveling material used by Bartec. | |
| | He stated that there were two (2) wet areas on the entire floor, B-2 level, which were poured Friday evening, which caused him to fall and land on his right hip, arm and wrist. | |



EXHIBIT

T83

7/8/08  WH

TDX safety asked the general contractor, Trataros, to place barricades and signs, when the area being poured and material is wet.


FM/kdl
Cc:     N. D'Ambrosio
        A. Neidle
        F. Muhlbach

Accident Report John Nolan

ADR C-2     ACCIDENT REPORT

contractor code number **093**

check if death required

| ADR reference number | ADR carrier/case number | date of injury **SEPT 29 2001** | social security number **115 48 8893** |

| name **CONSTOCK & CO, INC** | employer's address **46-60 55TH AVE, MASPETH NY 11378** | employer's fax number **718/361-0182** |

| **ELECTRICAL EMPLOYERS SELF-INSURANCE SAFETY PLAN** | **158-11 HARRY VAN ARSDALE JR. AVENUE FLUSHING, N.Y. 11365-3095** | employer's phone number **718/361-8685** |

| injured employee's name **JOHN NOLAN** | injured employee's address **29 DAWSON DR.** | injured employee's phone number **(516) 791 6847** |

| address where accident occurred | borough | was accident on employer's premises? (yes) (no) | was employee paid in full for the day? (yes) (no) |

| time of accident **5:35** AM PM | sex M | age **46** | occupation **ELEC** | average weekly wages **1155.00** | total earnings in previous 52 wks. | apprentice ( ) other than X |

| nature of injury and body part affected **WRIST (RIGHT)** | did injured obtain medical care? (yes) (no) X | if yes, through Magnacare? (yes) (no) | return to work (yes) (no) date |

what was employee doing when injured    *WALKING*

how did injury occur?

*WHILE WALKING ACROSS FLOOR SLIPPED AND FELL BACKWARDS*

means and/or item that was being used when accident occurred:
- scaffold
- ladder
- power tools
- hydraulic tools
- hammer / chisel
- pliers / wrench
- hacksaw / knife
- hickel
- any power type saw
- other tools
- specify

Describe in full detail how the accident occurred. Relate the events which led up to this injury or illness and what the injured was doing at the time of this accident

*CONTRACTOR USING LEVELING COMPOUND ON FLOOR B-2 THE NIGHT BEFORE I SLIPPED. THERE WERE TWO AREAS NOT YET DRY. WHILE I WAS WALKING ACROSS FLOOR I SLIPPED IN ONE WET AREA.*

means and/or condition involved:
- debris
- fluids
- stairs
- planking
- raised floor
- oil / grease
- excavation / trenching
- mud
- ice
- water
- motor vehicle

*Leveling Compound*

means and/or applicable types

**NO** Was the injured working with anyone at the time of the injury?
Was anyone OTHER than the co-worker present at the time of the injury?
**NO** Did anyone witness the accident?

Please answer the following appropriately. (YES OR NO)

**NO** Did an ambulance or police come to the jobsite?

**NO** Did the injured stop working immediately?

**NO** Did the injury cause lost time beyond the day or shift of the injury?

**NO** Was the first treatment emergency care, directly from the jobsite?

**NO** Was the first treating physician chosen by the injured employee?

**NO** Were you aware of any pre-existing medical condition the injured employee had prior to the accident?

Please answer ALL questions:
Is the injured employee a Supervisor? **YES**
How long was the injured employee employed at this jobsite? **10 MONTHS**

What shift did injury occur on? (Check one
X   Day shift............(approx. 8 am to 4 pm)
___ Evening shift........(approx. 4 pm to midnight)
___ Graveyard shift.....(approx. midnight to 8 am)

Was the accident on regular shift _____ overtime **O.T. SATURDAY**
How many hours worked that day prior to the accident? **1 HR**
How many overtime hours worked since the accident prior to the injury? **5**

Time and date foreman or employer first knew of injury   **9   45** AM PM   **9-29-0**

Date of this report   **9-29-01**

Signed by   ___signature___   Official Title **FOREMAN**

# ELECTRICAL EMPLOYERS' SELF INSURANCE SAFETY PLAN
## 158-11 HARRY VAN ARSDALE JR. AVENUE
### FLUSHING, NY 11365

## FOREMAN'S 24 HOUR INCIDENT REPORT

THIS REPORT MUST BE FAXED TO EESISP AT (718) 591-0533 WITHIN 24 HOURS OF THE INCIDENT
OR WITHIN 24 HOURS OF THE KNOWLEDGE THE INCIDENT HAS OCCURRED

EMPLOYER __L.K. Comstock__

INJURED EMPLOYEE __John Nolan__    SS# __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__

DATE OF INCIDENT __9-29-01__    TIME __8:30 AM__

LOCATION OF INCIDENT __Baruch College, 25th St. N.Y.C.   B-2 Level__

DESCRIPTION OF INCIDENT __While walking across floor slipped__
__and fell.__

PART OF THE BODY THAT WAS INVOLVED __Right Wrist & Arm__

WAS MEDICAL CARE OBTAINED? __No__    WHERE? _____

FOREMAN (SUBFOREMAN) __John Nolan__    SS# __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__

FOREMAN'S JOB PHONE OR BEEPER #
(DO NOT FURNISH CONTRACTOR'S OFFICE PHONE #) __(1-212) 779-4485__

GENERAL FOREMAN __Phil Rainone__    SS# __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__

GENERAL FOREMAN'S PHONE OR BEEPER #
(DO NOT FURNISH CONTRACTOR'S OFFICE PHONE #) __(1212) 779-4485__

DATE OF REPORT __9-29-01__

INSTRUCTIONS:
1. ASSIST THE INJURED EMPLOYEE. IF IMMEDIATE MEDICAL CARE IS REQUIRED:
　　A. CALL 911 FOR MEDICAL ASSISTANCE.
　　B. CONTACT MAGNACOMP NURSE AT (888) 33-NURSE.
2. REPORT THE INCIDENT TO YOUR EMPLOYER IMMEDIATELY.
3. SUPERVISOR'S INVESTIGATION:
　　A. INVESTIGATE ALL SERIOUS INJURIES.
　　B. TAKE PICTURES OF THE ACCIDENT SCENE, IF PRACTICAL.
　　C. DEVELOP FURTHER NOTES ON THE INCIDENT THAT CAN BE PROVIDED TO THE EESISP
　　　　SAFETY DIRECTOR OR INVESTIGATOR.

THIS FORM DOES NOT REPLACE THE ADR C-2 WHICH MUST BE COMPLETED IN
FULL AND FILED WITH EESISP. IF NOT FILED WITHIN 24 HOURS - THE EMPLOYER IS
SUBJECT TO PENALTY.

UMSTOCK                          be investigated to determine cause and means of preventing recurrence.

| ...ION/BRANCH/DEPARTMENT | | | DATE OF ACCIDENT 4-29-01 | TIME 830 AM PM | DATE ACCIDENT REPORTED 9-29 |

## PERSON INJURED

| NAME 4N NOLAN | JOB TITLE JOURNEYMAN SUBL FOREMAN | NATURE OF INJURY SPRIAN RT. WRIST |
| PART OF BODY INJURED RIGHT HAND | TYPE OF ACCIDENT SLIP + FALL | EQUIPMENT, OBJECT OR SUBSTANCE CAUSING INJURY FLOOR LEVELING COMPOUND |

## PROPERTY DAMAGED

| PROPERTY | ESTIMATED REPLACEMENT COST | PERSON IN CONTROL |
| DESCRIPTION OF DAMAGE | | EQUIPMENT, OBJECT OR SUBSTANCE CAUSING DAMAGE |

## DESCRIPTION

DESCRIBE HOW THE ACCIDENT OCCURRED (Use diagram if necessary)

WHILE WALKING ACROSS FLOOR THERE WAS A WET PATCH IN THE FLOOR LEVELING COMPOUND WHICH WAS POURED THE NIGHT BEFORE BY BARTEC CONTRACTING AS I WALKED I SLIPPED AND FELL LANDING ON MY RIGHT HIP + RIGHT ARM + WRIST.

## ANALYSIS

| WHAT WERE THE UNSAFE ACTS? NONE | WHAT WERE THE HAZARDOUS CONDITIONS? THERE WAS NO SIGNS OR CAUTION TAPE USED TO MARK THE AREA. |

COULD THE ACCIDENT RECUR   —   OFTEN ☐          OCCASIONALLY ☒          RARE ☐
WOULD A RECURRENCE BE   —   VERY SEVERE ☐          SERIOUS ☐          MINOR ☐

## CORRECTIVE ACTION   NOTIFIED General Contractor

ACTION TO BE TAKEN:

ACTION ALREADY TAKEN:  General Contractor Blocked Off Wet Areas