UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
TRAVELERS CASUALTY AND SURETY COMPANY    :
as Administrator for RELIANCE INSURANCE  :
COMPANY,                                 :
                  Plaintiff,             :
                                         :
          -v-                            :
                                         :          MASTER FILE:
DORMITORY AUTHORITY - STATE OF NEW       :    07 Civ. 6915 (DLC)
YORK, TDX CONSTRUCTION CORP. and KOHN    :
PEDERSEN FOX ASSOCIATES, P.C.,           :
                                         :          OPINION & ORDER
                  Defendants.            :
----------------------------------------:
DORMITORY AUTHORITY OF THE STATE OF NEW  :
YORK and TDX CONSTRUCTION CORP.,         :
                                         :
          Third-Party Plaintiffs,        :
                                         :
          -v-                            :
                                         :
TRATAROS CONSTRUCTION, INC.,             :
                                         :
          Third-Party Defendant.         :
----------------------------------------:
TRATAROS CONSTRUCTION, INC. and          :
TRAVELERS CASUALTY AND SURETY COMPANY,   :
                                         :
          Fourth-Party Plaintiffs,       :
                                         :
          -v-                            :
                                         :
CAROLINA CASUALTY INSURANCE COMPANY;     :
BARTEC INDUSTRIES, INC.; DAYTON          :
SUPERIOR SPECIALTY CHEMICAL CORP. a/k/a  :
DAYTON SUPERIOR CORPORATION; SPECIALTY   :
CONSTRUCTION BRANDS, INC. t/a TEC;       :
KEMPER CASUALTY INSURANCE COMPANY d/b/a  :
KEMPER INSURANCE COMPANY; GREAT          :
AMERICAN INSURANCE COMPANY; NATIONAL     :
UNION FIRE INSURANCE COMPANY OF          :
PITTSBURGH, PA.; UNITED STATES FIRE      :
INSURANCE COMPANY; NORTH AMERICAN        :
SPECIALTY INSURANCE COMPANY; ALLIED      :
WORLD ASSURANCE COMPANY (U.S.) INC.      :

```
f/k/a COMMERCIAL UNDERWRITERS INSURANCE :
COMPANY; ZURICH AMERICAN INSURANCE       :
COMPANY d/b/a ZURICH INSURANCE COMPANY;  :
OHIO CASUALTY INSURANCE COMPANY d/b/a    :
OHIO CASUALTY GROUP; HARLEYSVILLE        :
MUTUAL INSURANCE COMPANY (a/k/a          :
HARLEYSVILLE INSURANCE COMPANY); JOHN    :
DOES 1-20 and XYZ CORPS. 1-19,           :
                                         :
              Fourth-Party Defendants.   :
-----------------------------------------:
KOHN PEDERSEN FOX ASSOCIATES, P.C.,      :
                                         :
              Third-Party Plaintiff,     :
                                         :
        -v-                              :
                                         :
WEIDLINGER ASSOCIATES CONSULTING         :
ENGINEERS, P.C., CASTRO-BLANCO           :
PISCIONERI AND ASSOCIATES, ARCHITECTS,   :
P.C., ARQUITECTONICA NEW YORK, P.C.,     :
COSENTINI ASSOCIATES, INC., CERMAK,      :
PETERKA PETERSEN, INC., JORDAN PANEL     :
SYSTEMS CORP., TRATAROS CONSTRUCTION,    :
INC. and LBL SKYSYSTEMS (U.S.A.), INC.,  :
                                         :
              Third-Party Defendants.    :
-----------------------------------------X
```

APPEARANCES:

For Travelers Casualty and Surety Company and
Trataros Construction, Inc.:
JoAnne M. Bonacci
Paul McCormick
Eli J. Rogers
Dreifuss Bonacci & Parker LLP
26 Columbia Turnpike
Florham Park, NJ 07932

For Assurance Company of America:
Ignatius John Melito
S. Dwight Stephens
Melito & Adolfsen P.C.
233 Broadway
New York, NY 10279

For Harleysville Insurance Company of New Jersey:
Lance J. Kalik
Tracey K. Wishert
Riker Danzig Scherer Hyland & Perretti LLP
Headquarters Plaza
One Speedwell Avenue
Morristown, NJ 07962-1981

For Ohio Casualty Insurance Company:
Mark T. Hall
Morgan Melhuish Abrutyn
651 West Mt. Pleasant Avenue, Suite 200
Livingston, NJ 07039

DENISE COTE, District Judge:

    This complex litigation arises out of the construction of a

785,000 square-foot vertical campus (the "Building") for Baruch

College ("Baruch"), part of the City University of New York

("CUNY"), between 1998 and 2002.[1]  The litigation concerns, <u>inter</u>

<u>alia</u>, the allegedly defective installation of an epoxy terrazzo

flooring system by third-party defendant/fourth-party plaintiff

Trataros Construction Inc. ("Trataros") and Trataros's

subcontractor, fourth-party defendant Bartec Industries, Inc.

("Bartec").  Fourth-party defendants Assurance Company of

America ("Assurance"),[2] Harleysville Mutual Insurance Company

_____

[1] The Building, formally known as the William and Anita Newman
Vertical Campus, is located between 24th and 25th Streets and
Lexington and Third Avenues in Manhattan.  The Building consists
of fourteen above-ground stories, which principally house
academic classrooms and offices, and three below-ground stories,
which include an athletic recreation complex and performing arts
center.

[2] Assurance is also an affiliate of fourth-party defendant Zurich
American Insurance Company d/b/a Zurich Insurance Company.

a/k/a Harleysville Insurance Company ("Harleysville"),[3] and Ohio
Casualty Insurance Company ("Ohio Casualty") (collectively, the
"Insurers") each issued commercial general liability ("CGL")
policies to Bartec covering various time periods relating to
this litigation.  In their fourth-party action, Trataros and
Travelers Casualty and Insurance Company ("Travelers"), acting
as administrator for Reliance Insurance Company ("Reliance") and
asserting claims assigned to it by Trataros,[4] seek a declaration
of coverage against the Insurers on the basis that Trataros is
an additional insured under Bartec's CGL policies.  The Insurers
each move for summary judgment seeking dismissal of Trataros'
and Travelers' fourth-party claims.[5]  For the following reasons,
those motions are granted.

<u>BACKGROUND</u>

The instant litigation has already been the subject of
numerous Opinions by this Court, including, among others,
<u>Travelers Cas. & Sur. Co. v. Dormitory Auth.</u>, No. 07 Civ. 6915

---

[3] Harleysville asserts that it is properly served as
"Harleysville Insurance Company of New Jersey."

[4] Trataros obtained from Reliance certain performance and payment
surety bonds in the aggregate amount of $74,362,000.  Reliance
subsequently entered into an administrative and reinsurance
agreement with Travelers with respect to those surety bonds.
Trataros, in turn, has assigned its affirmative claims and
causes of action relating to this litigation to Travelers.

[5] All further references to Travelers in this Opinion shall be
construed as including Trataros as well.

(DLC), 2008 WL 1882714 (S.D.N.Y. Apr. 25, 2008); Travelers Cas.
& Sur. Co. v. Dormitory Auth., No. 07 Civ. 6915 (DLC), 2008 WL
2567784 (S.D.N.Y. June 25, 2008); and In re G.M. Crocetti, Inc.,
No. 08 Civ. 6239 (DLC), 2008 WL 4601278 (S.D.N.Y. Oct. 15,
2008).  Familiarity with all prior proceedings is assumed, and
only the facts relevant to the pending motions are outlined
herein.  These facts, taken from the parties' evidentiary
submissions on summary judgment, are undisputed or construed in
the light most favorable to Travelers.

A.   The Flooring Installation

     Defendant Dormitory Authority-State of New York ("DASNY")
acted on CUNY's behalf as "owner" of the construction project
("the Project").[6]  In its role as owner, DASNY entered into more
than a dozen prime contracts for the Project's construction
work, two of which -- referred to by the parties as Contract No.
15 and Contract No. 16 -- were awarded to Trataros.  Contract
No. 16, which was awarded on August 27, 1998, included, among
other construction tasks, the installation of epoxy terrazzo
flooring throughout various public spaces within the Building.

     In order to carry out its work under its two prime
contracts, Trataros entered into subcontracts with numerous

_____

[6] Other key participants in the Project included TDX Construction
Corp. ("TDX"), which served as DASNY's construction manager, and
Kohn Pedersen Fox Associates, P.C. ("KPF"), the Project's
designer and architect of record.

entities, including G.M. Crocetti Inc. ("Crocetti").  On September 18, 1998, Trataros contracted with Crocetti for the latter to install, among other things, some portion of the epoxy terrazzo flooring.  This epoxy terrazzo was to be installed on top of the concrete subfloor previously installed by another prime contractor, Shroid Construction Inc.

Due to design or construction errors, some portions of the concrete subfloor were insufficiently level to allow for the installation of the epoxy terrazzo flooring directly on the concrete subfloor.  Accordingly, and with approval from TDX, DASNY issued Change Order No. GC2-028 on or about April 16, 2000 to compensate Trataros for the additional cost of installing a "'self-leveling' floor fill" (the "Underlayment") on top of the concrete subfloor on the third through fourteenth floors of the Building.  The purpose of the Underlayment was to level the concrete subfloor and render it suitable for Crocetti to install the epoxy terrazzo flooring.  Together, the concrete subfloor, Underlayment, and epoxy terrazzo constitute the epoxy terrazzo flooring system (the "Flooring System").

On May 8, 2000, Bartec submitted a written proposal to Trataros to furnish and install the Underlayment in the Building.  On May 12, Trataros accepted Bartec's bid and issued Purchase Order No. 16780 (the "Purchase Order") directing Bartec to "furnish and install 'self leveling' floor fill from the 3rd

floor through the 14th floor in accordance with [the May 8] Bartec Industries, Inc. proposal."[7]  The Purchase Order incorporates numerous terms and conditions, including a requirement that Bartec add Trataros as an additional insured under Bartec's CGL policies.[8]

Bartec began installing the Underlayment in or about July 2000.  The primary material used by Bartec was "Conflow,"[9] a floor-fill compound manufactured by fourth-party defendant Dayton Superior Specialty Chemical Corp. a/k/a Dayton Superior Corporation ("Dayton" or "Conspec").[10]  The Underlayment was installed in varying degrees of thickness, ranging from approximately 1/8 inch to 1-3/4 inches, in order to establish

---

[7] The Purchase Order was signed by Bartec on June 10, 2000 and by Trataros on June 28, 2000.

[8] Specifically, Paragraph 21 of the terms and conditions directs that "[Bartec] shall maintain general liability insurance coverage for bodily injury and property damage in such forms and in such amounts as required by the prime contract"; that "[a]ll insurance policies shall name Owner and [Trataros] as additional insureds"; and that "[c]ertificates of insurance shall be submitted to [Trataros] prior to commencing performance" on the Purchase Order contract.

[9] In its opposition papers to each summary judgment motion, Travelers offers numerous additional statements of material fact regarding the chemical composition and suitability of Conflow, the role that Conflow played in causing flooring damage, and the work and expense involved in remediating the damage.  These proffered facts are not relevant to the question of insurance coverage, however, and the existence of any genuine disputes as to these facts does not affect the Insurers' entitlement to summary judgment.

[10] Conspec is a business unit within Dayton.

the necessary floor elevations.  Thereafter, Crocetti installed the epoxy terrazzo on top of the Underlayment.

By January 2001, problems with the completed Flooring System began to manifest in the Building.  Hollow spots were detected in the Underlayment, and the epoxy terrazzo was not properly binding to the Underlayment.  On January 26, 2001, Crocetti's Terrazzo Manager sent a letter advising Trataros of certain problems that Crocetti had discovered with the Underlayment (the "January 26 Letter").  The January 26 Letter states, in pertinent part:

> On a visit to the jobsite this date [January 26], we have discovered hollow spots in areas being leveled on the eighth floor.
>
> We will not install terrazzo over these areas until they are corrected.
>
> Please check installation procedures being used to install the leveling underlayment to ensure the presence of good bond to concrete substrate.

On February 28, 2001, TDX sent a letter to Trataros ("the February 28 Letter") noting that TDX had observed, on specific floors, "areas where the terrazzo flooring installation has separated from the substrates" and "areas of delamination of the layers of the conflow floor fill."  The February 28 Letter directed Trataros to provide TDX with, inter alia, "[a] survey of the entire terrazzo installation for any other areas of uplift"; "[a] survey of the remaining exposed conflow

installation for delamination"; and the results of a "core sample[]" test that Trataros had just performed.  The February 28 Letter further directed that Trataros should "[a]dvise [TDX] as to the reason for the separation of the terrazzo and the delamination of the conflow"; "[a]dvise [TDX] as to the planned steps to be taken for remediation"; and conduct all remediation "in accordance with manufacturers authorization and A/E [architect's/engineer's] approval."

In late February 2001, a Conspec representative visited the Building to inspect the problems with the Flooring System (the "Flooring Failure").  In a letter from Conspec to Trataros dated March 1, 2001 ("the March 1 Letter"), Conspec referenced two "area[s] of concern" based on its site visits.  First, Conspec identified problems in a "small portion of the lobby area" on the Building's thirteenth floor, where it observed that the "terrazzo flooring has come loose" and that "[t]he area of Conflow that is now exposed exhibits a powdery, loose surface not suitable for any type of flooring material."  The March 1 Letter speculated that "some type of contamination, foreign substance, or environmental condition affected the floor after the material application, thereby compromising the surface," and recommended that "the area be ground back to a solid surface before proceeding with a reapplication of the flooring system."

The "second area of concern" identified by Conspec was "the overall depth to which Conflow can be installed."  Conspec advised that "[its] literature calls for a maximum depth per lift 1 [inch]," while "[s]everal areas on the project will need material installed at a depth many times the 1" allowance" in order to level the flooring.

Throughout February, March, and April 2001, large areas of the Flooring System were repaired.  According to repair tickets submitted by the parties, the areas repaired during this time were on the 5th, 6th, 8th, 11th, and 13th floors.  During these repairs, loose Underlayment and terrazzo were removed, and new Underlayment and terrazzo were installed.

The upper floors of the Building opened for use by Baruch on or about August 27, 2001.  Nonetheless, repairs to the Flooring System continued to be made from about November 2001 to about February 2002.  In or about January 2002, Bartec finally completed its installation of the Underlayment at the Project.[11]

---

[11] In its opposition to Assurance's summary judgment motion, Travelers disputes that Bartec completed its work in January 2002, observing that "the last day for floor patching was May 20, 2002."  Travelers relies on TDX's final accounting of the floor-leveling work, which includes work performed by both Bartec (which it misidentifies as "Bartex" and "Bar-tek") and another contractor, DAG Flooring.  The May 20, 2002 date pertains to DAG Flooring, not to Bartec.  Likewise, in its opposition to Harleysville's summary judgment motion, Travelers disputes that Bartec finished its work in January 2002 on the basis that the term "completed" is "vague and undefined." Because Travelers has not presented any evidence contradicting

B.   The Flooring Failure

Various parties to this litigation have produced expert reports regarding the nature, extent, and potential causes of the Flooring Failure.  The experts' findings are inconsistent, and questions of material fact remain for trial regarding the extent of the alleged damage as well as who is responsible for that damage.  Although the question of insurance coverage is a matter of law suitable for review on summary judgment, the coverage inquiry depends in part on the nature and extent of the damage for which coverage is sought.  Therefore, without crediting the testimony of any particular expert(s), the expert reports are considered for their general descriptions of the Flooring Failure that allegedly occurred.

DASNY's expert report, prepared by Simpson Gumpertz & Heger on March 20, 2009 (the "SGH Report"), contains an extensive description of the Flooring Failure.  The SGH Report observes, in part:

> Shortly after the terrazzo was installed, aesthetic
> defects (i.e., a rough texture) were observed in some
> of the epoxy terrazzo panels.  In addition, the
> corners of some of the panels began to debond and
> curl, with the epoxy terrazzo floor system lifting
> from the concrete or self-leveling underlayment

the January 2002 completion date, however, that fact must be deemed admitted.  See, e.g., Duch v. Jakubek, 588 F.3d 757, 764 n.2 (2d Cir. 2009) (deeming a fact admitted pursuant to Fed. R. Civ. P. 56(e)(2) where plaintiff failed to "present[] any evidence contradicting the evidence put forth by defendants").

substrates (in some instances, the underlayment failed
cohesively, which also allowed the epoxy terrazzo to
lift and curl).  Contractors performed repairs, such
as screwing down the corners of the panels, to prevent
additional debonding of the panels and reduce the
potential for trip hazards.

After completing these repairs, no significant
debonding or lifting was reported for approximately
one year, after which debonding and curling of the
terrazzo reappeared and was more prevalent on many of
the floors.

The SGH Report concludes:

Based on our site observations, site testing,
laboratory analysis, and our review of project
documents, we conclude the following:

Debonding and lifting of the epoxy terrazzo
flooring at the Baruch College Vertical Campus is
widespread and systemic. . . .

The extent of debonded and lifting epoxy terrazzo
is increasing over time due to foot and wheel
traffic loads and exposure to expected and
routine moisture.

The epoxy terrazzo flooring and underlayment must
be removed and replaced to provide a durable and
safe condition and meet the intended design.

The SGH Report also observes, with respect to "[coring] sample
B3" taken from the Building, that "[s]ome concrete residue is
retained on the bottom side of the [epoxy] membrane," while "the
top surface of the concrete either has a thin layer of
underlayment in some areas or has been lightly abraded."
Bartec's expert report, prepared by CTLGroup (the "CTL Report"),
similarly concludes that "[d]ebonding of the epoxy terrazzo
system is widespread, occurring on all floor levels of the

building, and is occurring at locations with and without underlayment."

The two expert reports submitted by Travelers -- one prepared by Cashin Spinelli & Ferretti, LLC (the "CSF Report"), and the other prepared by Hichborn Consulting Group (the "HCG Report") -- each criticize the SGH Report as potentially overstating the extent of the Flooring Failure.  Nevertheless, for the purpose of the instant motions, the more extensive findings of Flooring Failure made by the SGH Report will be assumed true for the purposes of determining whether any insurance coverage may potentially be obtained.

## PROCEDURAL HISTORY

On August 1, 2007, Travelers commenced this action asserting breach-of-contract and subcontractor pass-through claims against DASNY and claims of negligence against TDX and KPF.[12]  On September 28, 2007, DASNY and TDX filed a third-party complaint against Trataros (the "Third-Party Complaint") asserting, inter alia, two breach-of-contract claims.  The first

---

[12] This litigation is in its second round in federal court. Travelers previously filed suit in June 2004 against DASNY, TDX, and KPF.  See Travelers Cas. & Ins. Co. v. Dormitory Auth. of the State of N.Y., No. 04 Civ. 5101 (HB) (RLE).  After about a year of pretrial proceedings and motion practice before the Honorable Harold Baer, the case was voluntarily dismissed without prejudice in October 2005 in order to enable the parties to pursue mediation.  When the mediation failed, Travelers refiled this litigation, and the case was reassigned to this Court.

of these claims is for "delays, disruptions and impacts" arising

out of Trataros' alleged "fail[ure] to perform its work" in

accordance with certain "sequences, milestones, and time

periods."  The second claim is for construction defects,

including defective installation of the Flooring System.  In

particular, the Third-Party Complaint alleges:

> The epoxy terrazzo that Trataros and Crocetti
> installed in the Project is deteriorating and is
> otherwise defective.  Among other things, the
> epoxy terrazzo is cracking and crumbling at the
> perimeter of the poured area at the zinc divider
> strips over substantial areas of the epoxy
> terrazzo installation.  The epoxy terrazzo is also
> delaminating and "blistering" in increasingly
> larger areas.

These defects are alleged to have been "caused by defective

workmanship and inappropriate materials provided by Trataros and

its subcontractors and suppliers, who, among other things,"

failed to follow the installation procedures prescribed by the

contract documents and by Conspec, the Conflow manufacturer.

The Third-Party Complaint asserts that "remediation of the

defective epoxy terrazzo" will cost at least $13 million and

that Trataros is "contractually responsible" for both the

Flooring Failure as well as for "all of the costs arising out of

its satisfactory remediation."  The Third-Party Complaint seeks

$20 million on the construction defect claim and a further $8

million on the "delays, disruptions, and impacts" claim.

After several waves of pleadings, on April 8, 2008,
Travelers filed an amended fourth-party complaint against a
subcontractor, two material suppliers, and almost a dozen
insurance companies, including the Insurers (the "Fourth-Party
Complaint").  Travelers' fourth-party claim against the Insurers
seeks "declaratory relief that coverage exists as to [DASNY's
and TDX's] claims" as well as "complete indemnification and/or
compensatory damages, to the full extent of such coverage,
together with counsel fees and costs."[13]

After being impleaded in the fourth-party action, the
Insurers each moved for summary judgment on the grounds that
Trataros had failed to comply with contractual notice-of-claim
deadlines, thereby relieving the Insurers of any obligation to
provide coverage.  In a series of separate Orders, the Court
determined that the CGL policies issued to Bartec by
Harleysville, Ohio Casualty, and Assurance were governed by New
Jersey law.  Because New Jersey law requires a showing of

---

[13] The Fourth-Party Complaint alleges, more specifically:

> If the trier of fact determines that the allegations of
> DASNY and/or TDX have merit, and the trier of fact
> holds Trataros and/or Travelers liable for damages to
> DASNY and/or TDX, then in such event, the damages,
> including but not limited to the cost associated with
> the repair, replacement, and/or loss of use of the
> allegedly damaged and/or impaired property, and the
> cost of repairing or replacing alleged occurrence(s)
> and/or any damages caused by the alleged occurrence(s),
> may be covered in whole or in part by any one or all of
> the insurance policies written by the carriers.

prejudice before an insurance company may deny coverage on late-notice grounds, the Insurers' motions for summary judgment were denied.[14]  See Travelers Cas. & Sur. Co. v. Dormitory Auth., No. 07 Civ. 6915 (DLC), 2008 WL 4861910 (S.D.N.Y. Nov. 5, 2008) (denying Harleysville's motion for summary judgment with respect to its policy issued to Bartec); Travelers Cas. & Sur. Co. v. Dormitory Auth., No. 07 Civ. 6915 (DLC), 2008 WL 5233691 (S.D.N.Y. Dec. 16, 2008) (same for Assurance); Travelers Cas. & Sur. Co. v. Dormitory Auth., No. 07 Civ. 6915 (DLC), Dkt. No. 373 (S.D.N.Y. Dec. 18, 2008) (same for Ohio Casualty).

On February 19, 2010, Harleysville, Ohio Casualty, and Assurance each again moved for summary judgment, this time asserting that Trataros is not entitled to insurance coverage on various other grounds.  These motions became fully submitted on April 2, 2010.

---

[14] By contrast, New York law does not require a showing of prejudice before an insurer can deny coverage based on late notice.  Accordingly, several fourth-party defendants who issued insurance policies to Trataros governed by New York law were successful in obtaining dismissal of Travelers' fourth-party complaint on late-notice grounds.  See Travelers Cas. & Ins. Co. v. Dormitory Auth., No. 07 Civ. 6915 (DLC), 2008 WL 2567784 (S.D.N.Y. June 25, 2008) (U.S. Fire Insurance Company); Travelers Cas. & Ins. Co. v. Dormitory Auth., No. 07 Civ. 6915 (DLC), 2008 WL 4755622 (S.D.N.Y. Oct. 29, 2008) (Great American Insurance Company); Travelers Cas. & Ins. Co. v. Dormitory Auth., No. 07 Civ. 6915 (DLC), 2008 WL 4833103 (S.D.N.Y. Nov. 3, 2008) (National Union Fire Insurance Company of Pittsburgh).

DISCUSSION

Summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In making this determination, the court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010).

Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set out specific facts showing a genuine issue for trial," and cannot "rely merely on allegations or denials" contained in the pleadings. Fed. R. Civ. P. 56(e); see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Only disputes over material facts -- "facts that might affect

17

the outcome of the suit under the governing law" -- will properly preclude the entry of summary judgment.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>see also</u> <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986) (stating that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").

Each of these three motions concerns the interpretation of insurance policies governed by New Jersey law.  "An insurance policy is a contract that will be enforced as written when its terms are clear in order that the expectations of the parties will be fulfilled."  <u>Flomerfelt v. Cardiello</u>, __ A.2d __, __, 2010 WL 2671573, at *3 (N.J. July 7, 2010) ("<u>Flomerfelt</u>").  "In considering the meaning of an insurance policy," the court must "interpret the language according to its plain and ordinary meaning."  <u>Id.</u> (citation omitted).  "If the terms are not clear, but instead are ambiguous, they are construed against the insurer and in favor of the insured, in order to give effect to the insured's reasonable expectations."  <u>Id.</u> at *4; <u>see also</u> <u>Royal Ins. Co. of Am. v. KSI Trading Corp.</u>, 563 F.3d 68, 73-74 (3d Cir. 2009) ("<u>KSI</u>") (describing New Jersey law on interpreting ambiguities in insurance contracts); <u>President v. Jenkins</u>, 180 N.J. 550, 563 (2004) (noting that the reasonable-

expectations doctrine "applie[s] to all forms of insurance contracts," including commercial liability policies).

Where the terms of an insurance policy are ambiguous, the presumption in favor of the insured applies "even if a close reading might yield a different outcome or if a painstaking analysis would have alerted the insured that there would be no coverage." Flomerfelt, 2010 WL 2671573, at *4 (citation omitted).[15]  Nevertheless, "when considering ambiguities and construing a policy, courts cannot write for the insured a better policy of insurance than the one purchased." Id. (citation omitted); see also Shotmeyer v. N.J. Realty Title Ins. Co., 195 N.J. 72, 82-83 (2008) ("[C]ourts must guard against rewriting policies in favor of the insured under the guise of interpreting a contract's reasonable terms."); Progressive Cas. Ins. Co. v. Hurley, 166 N.J. 260, 273-74 (2001) ("[O]nly genuine interpretational difficulties will implicate the doctrine that requires ambiguities to be construed favorably to the insured."). "The language in the policy 'underscores the basic notion that the premium paid by the insured does not buy coverage for all damage but only for that type of damage

---

[15] But see Benjamin Moore & Co. v. Aetna Cas. & Sur. Co., 179 N.J. 87, 102 (2004) (explaining that while any doubts are "ordinarily resolved in favor of the insured," "[a]n exception to that rule exists for sophisticated commercial entities that do not suffer from the same inadequacies as the ordinary unschooled policyholder and that have participated in the drafting of the insurance contract").

provided for in the policy.'"  Hardy ex rel. Dowdell v. Abdul-
Matin, 198 N.J. 95, 102 (2009) (quoting Weedo v. Stone-E-Brick,
Inc., 81 N.J. 233, 237 (1979)).

I.   Harleysville Policy

Harleysville issued Contractors Business Owners Policy No.
CB-8E8397 to Bartec for consecutive one-year policy periods
beginning in May 26, 2002 (the "Harleysville Policy").  Included
with the Harleysville Policy is Additional Insured Endorsement
Form # CG-7167 (ed. 01/95) (the "Harleysville Endorsement").
The Harleysville Endorsement provides, in pertinent part:

> WHO IS AN INSURED (Section II) is amended to include
> as an additional insured any general contractor,
> subcontractor or owner whom you are required to add as
> an additional insured on this policy under a written
> or oral construction contract or agreement where a
> certificate of insurance showing that person or
> organization as an additional insured has been issued
> and received by "us" prior to the date of loss.  The
> written or oral contract or agreement . . . must be:
>
> (a)  currently in effect or becoming effective during
>      the term of this policy; and
>
> (b)  executed prior to the "occurrence" resulting in
>      "bodily injury," "property damage," "personal
>      injury" or "advertising injury."

(Emphasis added).  Harleysville moves for summary judgment on
the basis that, inter alia, Trataros does not qualify as an
"additional insured" under Bartec's policy because no
certificate of insurance showing Trataros as an additional

insured was issued and received by Harleysville prior to the date of loss.

Trataros has failed to adduce any evidence that would satisfy this contractual condition precedent.  Indeed, it is undisputed that no certificate of insurance was ever issued to Trataros or received by Harleysville.[16]  Because this condition precedent was not satisfied, Trataros is not an "insured" within the meaning of Section II of the Harleysville Policy.  As such, Travelers cannot obtain coverage or a defense from Harleysville for the claims asserted against Trataros by DASNY and TDX.

Travelers makes two arguments for why Harleysville should provide coverage notwithstanding the fact that no certificate of insurance was issued.  First, Travelers asserts that because "Harleysville has fully participated in the litigation since

---

[16] In its Local Rule 56.1 Statement, Harleysville reports that "Harleysville never received a Certificate of Insurance naming Trataros as an additional insured on the Harleysville Policy" and that "[t]he insurance agent for the Harleysville Policy, the Wharton Group, never issued a Certificate of Insurance naming Trataros as an additional insured on the Harleysville Policy." Harleysville relies for these statements on declarations submitted by Matthew Day, Construction Defect Litigation Specialist at Harleysville, and Phyllis Walsh, Department Manager of the Wharton Group.  In its opposition Local Rule 56.1 Statement, Travelers purports to dispute these facts.  It observes that "Travelers and Trataros do not have personal knowledge of the Wharton Group" and asserts that "Bartec was contractually required to provide insurance in connection with its work on the project," citing the terms of the Purchase Order.  Those statements do not, however, create an issue of material fact as to whether any certificate of insurance was issued.  Accordingly, Harleysville's above-quoted statements must be deemed admitted by Travelers.

early 2005" and "has been fully able to investigate and study the floor" at the Building, Harleysville has suffered no prejudice from Trataros's failure to proffer a certificate of insurance.  This argument is without merit.  Travelers has cited no authority for the proposition that this type of condition precedent in an insurance contract may be disregarded under New Jersey law simply on the grounds the insurance company was given the opportunity to participate in "discovery and depositions."

Second, Travelers asserts that the Harleysville Endorsement is ambiguous and therefore must be construed strictly against Harleysville.  Although it does not explain why it believes the Harleysville Endorsement is ambiguous, it cites a New York case, Erie Ins. Group v. Nat'l Grange Mut. Ins. Co., 883 N.Y.S.2d 601 (App. Div. 3d Dep't 2009) ("Erie"), in which the Appellate Division concluded in dicta that a similarly phrased policy was ambiguous.[17]  Analogizing to Erie, Travelers' theory of ambiguity

---

[17] The Erie court stated:

> A portion of the insurance policy issued by [the insurer] to [the plaintiff] stated, "Each of the following is added as an Additional Insured . . . [a]ny general contractor, subcontractor or owner for whom you are required to add as an additional insured on this policy under a written construction contract or agreement where a certificate of insurance showing that person or organization as an additional insured has been issued and received by [the insurer] prior to the time of loss."  This provision is ambiguous.  One possible reading of the provision is that the construction contract or agreement to list someone as an additional

apparently requires construing the phrase, "where a certificate
of insurance showing that person or organization as an
additional insured has been issued..." (the "Phrase"), as
pertaining only to the word "agreement" rather than to the
entire sentence.  Such an interpretation of the Phrase would
mean that Trataros could qualify as an additional insured in one
of two ways: either (1) under "a written or oral construction
contract" concluded between Trataros and Bartec or (2) under
"[an] agreement where a certificate of insurance has been
issued."[18]

---

> insured must be in writing, and a certificate of
> insurance listing that person or organization must be
> issued and received by [the insurer] prior to the loss-
> inducing incident.  The provision could also be read as
> containing two alternate ways of including a person or
> organization as an additional insured: if a written
> construction contract so requires, regardless of whether
> [the insurer] is ever notified; or if any agreement --
> oral or written -- so requires and a certificate of
> insurance listing that person or organization is
> received by [the insurer] prior to the loss-inducing
> incident.

883 N.Y.S.2d at 603.  The court concluded, however, that the
insured was not entitled to coverage under either
interpretation.  As such, the court did not resort to the rule
of strict construction against the insurer, and the above
discussion is <u>dicta</u>.

[18] The contractual language in the Harleysville Endorsement,
while similar to that in <u>Erie</u>, is not the same.  Where the
policy at issue in <u>Erie</u> used the phrase "under a written
construction contract or agreement," the Harleysville Policy
uses the phrase "under a written <u>or oral</u> construction contract
or agreement" (emphasis added).

The Harleysville Endorsement is not ambiguous.  The only natural construction of the Endorsement is to regard "written or oral construction contract or agreement" as a single unit of meaning, not as two separate units comprising "written or oral construction contract" and "agreement" respectively.[19]  This understanding is confirmed by the fact that "contract or agreement" is used elsewhere in the Harleysville Policy as a single semantic unit.  The Phrase thus serves to qualify, and create a condition precedent upon, the grant of additional-insured coverage contained in the preceding portion of the sentence.

Further, Travelers' reliance on the doctrine of strict construction against the insurer is misplaced.  A court may not engage in semantic gymnastics in order to create ambiguity and construe a policy against the insurer.  "New Jersey caselaw does not require that [the court] credit every conceivable

---

[19] The Court observes, however, that some differently worded insurance policies do present two alternative means of qualifying as an additional insured, only one of which requires issuance or receipt of a certificate of insurance.  See, e.g., York Int'l Group v. Cincinnati Ins. Co., Civil Action No. 06-4778, 2007 WL 2667984, at *6 (E.D. Pa. Sept. 5, 2007) (describing a policy in which an "additional insured" was "any person or organization which [the named insured] is obligated to add as an additional insured pursuant to '[a] written contract or agreement' or '[a]n oral agreement or contract where a certificate of insurance showing that person or organization as an additional insured has been issued.'" (emphasis added)).  As this example illustrates, where the policy provides two avenues for the creation of an additional insured, those alternatives are clearly distinguished.

deconstruction of contractual language, but rather instructs that the doctrine of ambiguity should be invoked only to resolve genuine ambiguities, not artificial ambiguities created by semantical ingenuity." KSI, 563 F.3d at 73 (citation omitted); see also Flomerfelt, 2010 WL 2671573, at *4 (noting that "a court should not engage in a strained construction to support the imposition of liability" on an insurer (citation omitted)); Villa v. Short, 195 N.J. 15, 26 (2008) ("We will not search for ambiguities where there are none."); Polarome Int'l, Inc. v. Greenwich Ins. Co., 404 N.J. Super. 241, 259 (App. Div. 2008) ("Polarome") ("[A]n ambiguity does not arise simply because the parties have offered two conflicting interpretations.").[20] Because the Harleysville Endorsement lacks any "genuine ambiguities," Travelers' claims against Harleysville must be dismissed.

Even if Trataros qualified as an "additional insured," however, it would still not be entitled to coverage under the Harleysville Policy.  The Harleysville Endorsement provides, in pertinent part:

---

[20] But cf. Homesite Ins. Co. v. Hindman, 413 N.J. Super. 41, 46 (App. Div. 2010) ("Courts should examine whether more precise policy language, if chosen by the insurance company, would have 'put the matter beyond reasonable question.'" (quoting Doto v. Russo, 140 N.J. 544, 557 (1995)); Auto Lenders Acceptance Corp. v. Gentilini Ford, Inc., 181 N.J. 245, 270 (2004) (applying the Doto maxim to hold that "had [the insurer] wanted to ensure that coverage under this policy would be limited . . . it could have done so" by using a more precise term).

> The insurance provided to the additional insured is limited as follows:
>
> (a)  The additional insured is covered for its vicarious liability for the acts or omissions of the named insured <u>which arise from the named insured's ongoing construction operations</u>.  The additional insured is not covered for liability due to its independent acts or for any supervision of "your work" or the work of any other person or organization . . . .

(Emphasis added).  Bartec ceased its work installing the Underlayment on Trataros' behalf no later than January 2002, some four months before the Harleysville Policy took effect. While Travelers argues that the "continuous trigger" doctrine should be applied, that doctrine concerns the unrelated question of determining when "property damage" occurs, not whether construction operations by the named insured are "ongoing." <u>See generally</u> <u>Polarome</u>, 404 N.J. Super. at 260-69 (discussing scope of the "continuous trigger" doctrine).  For this additional reason, Travelers' claims against Harleysville must be dismissed.[21]

---

[21] Because at least two independent reasons have been identified why Trataros may not recover under the Harleysville Policy, it is unnecessary to determine whether Harleysville would also succeed under its other theories, including that Trataros is not covered with respect to its own "independent negligence" or that coverage is barred under the "ongoing operations," "your product," and "impaired property" business risk exclusions.

II.   Ohio Casualty Policy

Ohio Casualty issued two policies to Bartec, each of which was valid between May 26, 2001 and May 26, 2002: a primary "contractors liability" insurance policy (No. BHO 52849621) and a "commercial umbrella" policy (No. BXO 52849621) (jointly, the "Ohio Casualty Policy").  The Ohio Casualty Policy is accompanied by an endorsement entitled "General Liability Master Pak for Artisan Contractors," Form CG 84 15 07 99 (07/99), which includes a "blanket additional insured" provision (the "Ohio Casualty Endorsement").

In moving for summary judgment, Ohio Casualty asserts, inter alia, that the damage for which Travelers seeks coverage was "known" by Trataros prior to the policy period and is thereby excluded from coverage by a known-injury-or-damage amendment accompanying the Ohio Casualty Policy (the "Known-Injury Amendment").  The Known-Injury Amendment provides, in pertinent part:

AMENDMENT OF INSURING AGREEMENT --

KNOWN INJURY OR DAMAGE

. . .

Paragraph 1. Insuring Agreement of Section I --
Coverage A -- Bodily Injury and Property Damage
Liability is replaced by the following:

1.   Insuring Agreement

a.  <u>We will pay those sums that the insured</u>
    <u>becomes legally obligated to pay as damages</u>
    <u>because of</u> "bodily injury" or "<u>property</u>
    <u>damage</u>" to which this insurance applies.  We
    will have the right and duty to defend the
    insured against any "suit" seeking those
    damages. . . .

b.  <u>This insurance applies to "bodily injury"</u>
    <u>and "property damage" only if</u>:

    (1)  The "bodily injury" or "property
         damage" is caused by an "occurrence"
         that takes place in the "coverage
         territory";

    (2)  <u>The "bodily injury" or "property</u>
         <u>damage" occurs during the policy</u>
         <u>period</u>; and

    (3)  <u>Prior to the policy period, no insured</u>
         listed under Paragraph 1. of Section II
         -- Who Is An Insured and no "employee"
         authorized by you to give or receive
         notice of an "occurrence" or claim,
         <u>knew that the "bodily injury" or</u>
         <u>"property damage" had occurred, in</u>
         <u>whole or in part.  If such a listed</u>
         <u>insured or authorized "employee" knew</u>,
         prior to the policy period, that the
         "bodily injury" or "property damage"
         occurred, <u>then any continuation, change</u>
         <u>or resumption of such "bodily injury"</u>
         <u>or "property damage" during or after</u>
         <u>the policy period will be deemed to</u>
         <u>have been known prior to the policy</u>
         <u>period</u>.

.  .  .

d.  <u>"Bodily injury" or "property damage" will be</u>
    <u>deemed to have been known to have occurred</u>
    <u>at the earliest time</u> when any insured listed
    under Paragraph 1. of Section II -- Who Is
    An Insured or any "employee" authorized by
    you to give or receive notice of an
    "occurrence" or claim:

      (1)   Reports all, or any part, of the
              "bodily injury" or "property damage" to
              us or any other insurer;

      (2)   Receives a written or verbal demand or
              claim for damages because of the
              "bodily injury" or "property damage";
              or

      (3)   <u>Becomes aware by any other means that</u>
              <u>"bodily injury" or "property damage"</u>
              <u>has occurred or has begun to occur.</u>

(Emphasis added).  It follows from the foregoing policy

provisions that, if an insured party became aware by "any . . .

means" that "property damage" had "occurred or ha[d] begun to

occur" prior to the inception of the "policy period," then that

insured may not seek coverage for that property damage, even if

such damage "continu[es], change[s] or resum[es]" during the

policy period.

    Because Trataros became aware prior to the beginning of the

policy period that damage to the Flooring System had occurred or

had begun to occur, Trataros cannot seek coverage for the

Flooring Failure under the terms of the Ohio Casualty Policy.

The undisputed facts reveal that Trataros was put on formal

written notice of this damage through the February 28 Letter in

which TDX advised Trataros of "areas where the terrazzo flooring

installation has separated from the substrates" and "areas of

delamination of layers of the conflow floor fill."[22]  Indeed,
remediation and repair of this damage occurred in earnest
throughout February, March, and April 2001 preceding the start
date of the Ohio Casualty Policy.  To the extent that the
Flooring Failure continued or worsened during the one-year
policy period beginning on May 26, 2001, Travelers may not
recover for that damage because "any continuation, change or
resumption of such . . . 'property damage'" is not covered under
the Ohio Casualty Policy.

Travelers makes three arguments in opposition.  First, it
argues that the Known-Injury Amendment relates only to what
Bartec, not Trataros, knew, because any references to "you" in
the Ohio Casualty Policy refer to the named insured (Bartec)
rather than to the additional insureds.  This argument cannot
succeed.  The Known-Injury Amendment indicates that coverage is
provided only if "no insured listed under Paragraph 1. of
Section II -- Who is an Insured" knew of the property damage.
Section II, in turn, was amended to include Trataros pursuant to
the "blanket additional insured" provision contained within the
Ohio Casualty Endorsement.[23]  As such, Trataros constitutes an

_____

[22] Trataros also received, one month earlier, the January 26
Letter from Crocetti advising Trataros of "hollow spots" in the
Underlayment.

[23] The Ohio Casualty Endorsement provides, in pertinent part,
that "WHO IS AN INSURED (Section II) is amended to include as an

insured whose knowledge affects the application of the Known-Injury Amendment.

Second, Travelers argues that the Known-Injury Amendment in the Ohio Casualty Policy should be construed in accordance with the "known-risk" or "known-loss" doctrine under New Jersey law. Travelers argues, citing Columbus Farmers Market, LLC v. Farm Family Casualty Insurance Co., Civil No. 05-2087, 2006 WL 3761987 (D.N.J. Dec. 21, 2006), that the known-loss doctrine does not bar liability for mere knowledge of events that might hypothetically or potentially create liability in the future, but instead, bars coverage "only when the legal liability of the insured is a certainty." Id. at *10 (quoting Pittston Co. Ultramar Am. Ltd. v. Allianz Ins. Co., 124 F.3d 508, 518 (3d Cir. 1997)).

This argument, too, cannot succeed. As discussed and construed in Columbus Farmers Market, LLC, the known-loss doctrine is a "common law concept" that courts read into insurance policies in order to prevent an insured from recovering for loss or damage that the insured already knew about at the time it procured insurance. Id. The doctrine reflects, in essence, a public policy judgment that a party should not be able to purchase insurance to cover losses that

insured any person or organization whom you are required to name as an additional insured on this policy under a written contract or agreement."

31

one has already incurred.  The known-loss doctrine applies in
the <u>absence</u> of a known-injury-or-damage provision in the
contract itself.  The Ohio Casualty Policy, by contrast,
contains an explicit known-injury-or-damage endorsement.  As
such, the known-loss doctrine does not apply here, and at any
rate, cannot be used to defeat the unambiguous contrary intent
of the parties as reflected in the policy language itself.

Third, Travelers argues that the Known-Injury Amendment is
an "unlawful attempt to abrogate the 'continuous trigger'
doctrine" and should be struck from the Ohio Casualty Policy.
Travelers relies on <u>Spaulding Composites Co., Inc. v. Aetna</u>
<u>Casualty & Insurance Co.</u>, 176 N.J. 25 (2003) ("<u>Spaulding</u>"), a
case in which the New Jersey Supreme Court refused to enforce a
"non-cumulation clause" in an insurance contract on the grounds
that it was repugnant to public policy.  <u>Id.</u> at 42-44.  The
struck clause, however, was not a known-injury-or-damage
exclusion, but rather, a "limit of liability" clause providing
that the insurer would construe "all <u>personal injury</u> and
<u>property damage</u> arising out of continuous or repeated exposure
to substantially the same general conditions" as "arising out of
one occurrence."  <u>Id.</u> at 29.  The Known-Injury Amendment
contained in the Ohio Casualty Policy, by contrast, deals not
with the determination of when or how many "occurrences" have
happened, but rather, the insureds' knowledge at the time the

insurance policy was purchased.  As such, <u>Spaulding</u> does not support Travelers' argument.[24]  Because the Known-Injury Amendment bars its claims for coverage, Travelers' claims against Ohio Casualty must be dismissed, and it is unnecessary to reach Ohio Casualty's other asserted grounds for dismissal.

### III. Assurance Policy

Assurance was Bartec's CGL insurer for six consecutive annual periods between May 26, 1995 and May 26, 2001.  The policy issued by Assurance, denominated Policy No. CFP 26465766 (the "Assurance Policy"), was a Specialty Contractor's Policy including both CGL and umbrella liability coverage.  The CGL coverage form included within the Assurance Policy, ISO standard form "760204 Ed. 6-96," includes as an "insured":[25]

---

[24] Aside from <u>Spaulding</u>, Travelers also cites two out-of-state authorities: <u>Quanta Indem. Co. v. Davis Homes, LLC</u>, 606 F. Supp. 2d 941 (S.D. Ind. 2009) ("<u>Quanta</u>") and <u>Montrose Chem. Corp. of Cal. v. Admiral Ins. Co.</u>, 10 Cal. 4th 645 (1995) ("<u>Montrose</u>"). Neither case assists Travelers.  <u>Quanta</u> held that a "'known claim' exclusion" was "neither ambiguous nor contrary to public policy" and applied that clause to bar coverage.  606 F. Supp. 2d at 947.  <u>Montrose</u> is inapposite because it concerns the statutory known-loss doctrine under California law, not an express contractual policy exclusion.  Indeed, <u>Montrose</u> warns against conflating cases dealing with the implied or statutory known-loss rule and "case[s] involv[ing] interpretation of an express exclusionary clause" contained within an insurance contract.  10 Cal. 4th at 691 (emphasis omitted).

[25] Unlike the Harleysville and Ohio Casualty Policies, the Assurance Policy makes Trataros an insured by operation of the coverage form itself rather than through an endorsement.

Any person or organization other than an architect, engineer or surveyor, which requires in a "work contract" that such person or organization be made an insured under this policy.  However, such person or organization shall be an insured only with respect to covered "bodily injury", "property damage", "personal injury" and "advertising injury" which results from "your work" under that "work contract".

The Assurance Policy further provides:

The coverage afforded to such person or organization does not apply to "bodily injury" or "property damage" occurring after the earliest of the following times:

(1)   When "your work" under the "work contract" (other than service, maintenance or repairs) has been completed.

(2)   When that portion of "your work" under the "work contract" out of which any injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

(3)   When our coverage for you under this policy or a renewal of this policy terminates and is not continued by other insurance provided by us.

It is undisputed that Trataros became an "insured" within the meaning of the Assurance Policy on June 28, 2000, when the Purchase Order became fully executed.  Therefore, in order for Travelers to recover from Assurance, the claimed damage would have to have occurred between June 28, 2000 and May 26, 2001, the date that the Assurance Policy expired.

Like the other two Insurers, Assurance moves for summary judgment on various grounds, including, inter alia, that certain

34

exclusions contained in the Assurance Policy bar coverage.
Assuming without deciding that claims of defective workmanship
may constitute an "occurrence" resulting in "property damage,"[26]
and thus that those claims fall within the Assurance Policy's
general grant of coverage, this Opinion considers whether three
"business-risk exclusions" relied upon by Assurance on summary
judgment would bar some or all of the coverage that would
otherwise obtain.

"Exclusionary clauses are presumptively valid and are
enforced if they are specific, plain, clear, prominent, and not
contrary to public policy."  Flomerfelt, 2010 WL 2671573, at *4
(citation omitted); see also Nav-Its, Inc. v. Selective Ins. Co.

---

[26] All three Insurers assert that faulty workmanship causing
damage to a contractor's own work product cannot, as a matter of
law, constitute an "occurrence" resulting in "property damage"
as those terms are defined in their respective CGL policies.
All three Insurers rely on a recent case of the New Jersey
Appellate Division which supports that general conclusion.  See
Firemen's Ins. Co. of Newark v. Nat'l Union Fire Ins. Co., 387
N.J. Super. 434 (App. Div. 2006).  Numerous state supreme courts
have considered this question in recent years, with the results
falling into two opposite camps.  See Lyerla v. AMCO Ins. Co.,
536 F.3d 684, 689 n.2 (7th Cir. 2008) (collecting state
appellate cases); Gen. Sec'y Indem. Co. of Ariz. v. Mtn. States
Mut. Cas. Co., 205 P.3d 529, 535 (Colo. App. 2009) (same); see
also 9A Couch on Insurance §§ 129:3-129:6; 4 Bruner & O'Connor
on Construction Law §§ 11:67-11:90.  The New Jersey Supreme
Court has not yet spoken on this question.  See Pa. Nat'l Mut.
Cas. Ins. Co. v. Parkshore Dev. Corp., Civil No. 07-1331
(RBK/JS), 2009 WL 1737032 (D.N.J. June 17, 2009) (observing that
"the New Jersey Supreme Court has not ruled on when, if ever,
faulty workmanship could constitute an occurrence").  Because
these motions may be decided on other grounds, this Opinion does
not address that question.

of Am., 183 N.J. 110, 119 (2005).  Exclusions "must be narrowly construed," and "the burden is on the insurer to bring the case within the exclusion."  Flomerfelt, 2010 WL 2671573, at *4 (citation omitted).  "[I]f there is more than one possible interpretation" of the policy exclusion, "courts apply the meaning that supports coverage rather than the one that limits it."  Id.  Nevertheless, "courts must be careful not to disregard the clear import and intent of a policy's exclusion," id. (citation omitted), and "far-fetched interpretation[s] of a policy exclusion will [not] be sufficient to create an ambiguity requiring coverage."  Id. (citation omitted).  Ultimately, "courts must evaluate whether, utilizing a fair interpretation of the language, [the policy exclusion] is ambiguous."  Id.

Assurance asserts that three exclusions -- Exclusion j(5), Exclusion j(6), and Exclusion m -- combine to bar coverage.  The terms of these exclusions, as provided in the Assurance Policy, are as follows:

2. Exclusions.

This insurance does not apply to:

. . .

j.   Damage to Property

"Property damage" to:

. . .

36

>     (5)   That particular part of real property on
>           which you or any contractors or
>           subcontractors working directly or
>           indirectly on your behalf are performing
>           operations, if the "property damage" arises
>           out of those operations; or
>
>     (6)   That particular part of any property that
>           must be restored, repaired or replaced
>           because "your work" was incorrectly
>           performed on it.
>
>     . . .
>
>     Paragraph (6) of this exclusion does not apply to
>     "property damage" included in the "products-
>     completed operations hazard".[27]
>
> . . .
>
> m.    Damage to Impaired Property or Property Not
>       Physically Injured
>
>     "Property damage" to "impaired property" or
>     property that has not been physically injured,
>     arising out of:
>
>     (1)   A defect, deficiency, inadequacy or
>           dangerous condition in "your product" or
>           "your work"; or

---

[27] Although Exclusion j(6) does not exclude coverage with respect to damage falling within the "products-completed operations hazard," there is a separate exclusion, Exclusion *l*, that does apply to such damage.  Exclusion *l* bars coverage for "'[p]roperty damage' arising out of 'your work' arising out of it or any part of it and included in the 'products-completed operations hazard.'"  Based on the definition of "products-completed operations hazard" -- pursuant to which an insured's work is "deemed completed" upon the occurrence of any of three separate events -- it does not appear that Bartec's work was "completed" at any point prior to the end of the Assurance Policy period. Nevertheless, to the extent that it could be shown that Bartec's work was "completed" at any point during the Assurance Policy period within the meaning of the "products-completed operations hazard," Exclusion *l* would apply to bar coverage for any property damage occurring during that time.

(2)   A delay or failure by you or anyone acting
      on your behalf to perform a contract or
      agreement in accordance with its terms.

This exclusion does not apply to the loss of use
of other property arising out of sudden and
accidental physical injury to "your product" or
"your work" after it has been put to its intended
use.

These exclusions include various terms defined in Section V of the Assurance Policy.  "Property damage" includes both "[p]hysical injury to tangible property, including all resulting loss of use of that property" and "loss of use of tangible property that is not physically injured."  "Your work" is defined as including, in pertinent part, "[w]ork or operations performed by you or on your behalf" and "[m]aterials, parts or equipment furnished in connection with such work or operations." "Impaired property" is "tangible property, other than 'your product' or 'your work', that cannot be used or is less useful because," inter alia, "[i]t incorporates 'your product' or 'your work' that is known or thought to be defective, deficient, inadequate or dangerous," provided that "such property can be restored to use by [] [t]he repair, replacement, adjustment or removal of 'your product' or 'your work.'"

The first two exclusions, Exclusions j(5) and j(6), relate to property damage arising out of the named insured's work but occurring before the named insured has completed its work.

Exclusion j(5) bars coverage only for damage to real property occurring during "ongoing operations,"[28] while Exclusion j(6) bars coverage for damage to any type of property, if that damage resulted from faulty work, but only where the damage is not included in the "products-completed operations hazard."  The third exclusion, Exclusion m, bars coverage for a particular type of "property damage" -- damage to "'impaired property' or property that has not been physically injured," including loss-of-use and delay damage -- without regard to when that damage occurred.

These three exclusions, jointly read, are fatal to Travelers' coverage claim.  Travelers seeks coverage for alleged "property damage" to "that particular part" of property which (1) Bartec was then "performing operations" upon, and/or which (2) "must be restored, repaired, or replaced" because Bartec's work was "incorrectly performed on it."  The alleged damage to the concrete subfloor, Underlayment, and epoxy terrazzo on the third through fourteenth floors where Bartec worked falls squarely within the meaning of "property damage" to "[t]hat

---

[28] "Ongoing operations" is not a defined term under the Assurance Policy.  At least one state supreme court has stressed, however, that phrase should not be read so narrowly as to "appl[y] only at the moment an insured is intentionally touching the real property that is the object of his work."  Columbia Mut. Ins. Co. v. Schauf, 967 S.W.2d 74, 79 (Mo. 1998).

particular part" of the Building.[29]   Second, to the extent that

Travelers seeks coverage for damage (including loss-of-use and

delay damage) to impaired or not-physically-injured property,

---

[29] The Assurance Policy does not define the phrase "that
particular part."  Courts have noted some interpretive
difficulties in applying the concept.  "Although it may be
possible to define the scope of the instant exclusion in the
abstract . . . . buildings can be divided into so many parts
that attempting to determine which part or parts are the subject
of the insured's operations can produce several reasonable
conclusions."  Schauf, 967 S.W.2d at 80.  Nevertheless, in the
case at bar, the only reasonable interpretation of "that
particular part" would include the Flooring System.  See, e.g.,
Mid-Continent Cas. Co. v. JHP Dev., Inc., 557 F.3d 207, 217 (5th
Cir. 2009) ("that particular part" included "exterior finishes"
and "retaining walls," but not "interior portions of the
condominiums," where the contractor's failure to water-seal the
building exterior caused damage to the "interior drywall, stud
framing, electrical wiring, and wood flooring"); Amerisure Mut.
Ins. Co. v. Am. Cutting & Drilling Co., Inc., No. 08-60967-Civ,
2009 WL 700246, at *5-*6 (S.D. Fla. Mar. 17, 2009) (where a
contractor was hired to "chip" plumbing access holes into
concrete floors, "that particular part" included the entire
concrete floors, including steel cables encased therein, in the
areas of the condominium project where contractor was working);
Transp. Ins. Co. v. Piedmont Constr. Group, LLC, 686 S.E.2d 824,
827 (Ga. App. 2009) ("that particular part" included the room
and plumbing on which the insured subcontractor was working, but
not the entire building); Bituminous Cas. Corp. v. Kenway
Contracting, Inc., 240 S.W.3d 633, 641-42 (Ky. 2007) ("that
particular part" included the carport that the contractor was
hired to demolish, but not the entire home to which carport was
attached); Schauf, 967 S.W.2d at 81 ("that particular part"
included the kitchen cabinets on which the contractor was
working when the fire started, but not the whole house).  Some
courts have, however, given the phrase an even more exclusionary
interpretation.  See, e.g., Grinnell Mut. Reins. Co. v. Lynne,
686 N.W.2d 118, 127-28 (N.D. 2004) ("that particular part"
included the entire house, not just the foundation on which the
contractor was working); William Crawford, Inc. v. Travelers
Ins. Co., 838 F. Supp. 157, 158-59 (S.D.N.Y. 1993) ("that
particular part" included the entire apartment that the
contractor had been hired to renovate).

that damage is excluded from coverage because it arises from "[a] defect, deficiency, [or] inadequacy" in Bartec's work and/or from "delay or failure [by Bartec] to perform a contract or agreement in accordance with its terms."  As such, no coverage is available for Travelers for any of the alleged Flooring Failure occurring between June 2000 and May 2001, when the Assurance Policy expired.[30]

Travelers argues in opposition that, at a minimum, there exists a genuine issue of material fact regarding the scope of the business-risk exclusions because the defective installation of the Conflow may have also damaged either the concrete subfloor or the epoxy terrazzo.  This argument is without merit for reasons already discussed above.  Exclusion j(5) excludes "property damage" not merely to the Underlayment, but rather, to "that particular part of real property" on which Bartec was contemporaneously performing operations: the Flooring System. Likewise, Exclusion j(6) excludes "property damage" to "that particular part of any property" that must be "restored, repaired, or replaced" because Bartec's work was "incorrectly performed on it."  Exclusion m excludes "property damage" to any "impaired property" arising out of "defect[s], deficienc[ies], inadequac[ies], or dangerous condition[s]" in Bartec's work.  In

---

[30] Any damage occurring after May 26, 2001 is not covered by Assurance Policy because it falls outside the policy period.

sum, these provisions exclude not only damage to Bartec's work, but also many kinds of closely related damage, including all of the damages alleged in the Third-Party Complaint for which Travelers seeks coverage, defense, and/or indemnification.  As such, Travelers' claims against Assurance must be dismissed.

## CONCLUSION

The February 19, 2010 motions for summary judgment by Harleysville, Assurance, and Ohio Casualty are granted. Harleysville, Assurance, and Ohio Casualty are dismissed as parties from this litigation.

SO ORDERED:

Dated:   New York, New York
         July 30, 2010

                                    _____
                                        DENISE COTE
                                    United States District Judge

42