UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------ X
TRAVELERS CASUALTY AND SURETY COMPANY as :
Administrator for RELIANCE INSURANCE       :
COMPANY,                                   :
                      Plaintiff,           :
                                           :
          -v-                              :
                                           :        MASTER FILE:
DORMITORY AUTHORITY - STATE OF NEW YORK,   :   07 Civ. 6915 (DLC)
TDX CONSTRUCTION CORP., and KOHN PEDERSEN  :
FOX ASSOCIATES, P.C.,                      :
                                           :        OPINION & ORDER
                      Defendants.          :
------------------------------------------ :
DORMITORY AUTHORITY OF THE STATE OF NEW    :
YORK and TDX CONSTRUCTION CORP.,           :
                                           :
                 Third-Party Plaintiffs,   :
                                           :
          -v-                              :
                                           :
TRATAROS CONSTRUCTION, INC.,               :
                                           :
                 Third-Party Defendant.    :
------------------------------------------ :
TRATAROS CONSTRUCTION, INC. and TRAVELERS  :
CASUALTY AND SURETY COMPANY,               :
                                           :
                 Fourth-Party Plaintiffs,  :
                                           :
          -v-                              :
                                           :
CAROLINA CASUALTY INSURANCE COMPANY;       :
BARTEC INDUSTRIES, INC.; DAYTON SUPERIOR   :
SPECIALTY CHEMICAL CORP. a/k/a DAYTON      :
SUPERIOR CORPORATION; SPECIALTY            :
CONSTRUCTION BRANDS, INC. t/a TEC; KEMPER  :
CASUALTY INSURANCE COMPANY d/b/a KEMPER    :
INSURANCE COMPANY; GREAT AMERICAN          :
INSURANCE COMPANY; NATIONAL UNION FIRE     :
INSURANCE COMPANY OF PITTSBURGH, PA.;      :
UNITED STATES FIRE INSURANCE COMPANY;      :
NORTH AMERICAN SPECIALTY INSURANCE         :
COMPANY; ALLIED WORLD ASSURANCE COMPANY    :
(U.S.) INC. f/k/a COMMERCIAL UNDERWRITERS  :

```
INSURANCE COMPANY; ZURICH AMERICAN          :
INSURANCE COMPANY d/b/a ZURICH INSURANCE    :
COMPANY; OHIO CASUALTY INSURANCE COMPANY    :
d/b/a OHIO CASUALTY GROUP; HARLEYSVILLE     :
MUTUAL INSURANCE COMPANY (a/k/a             :
HARLEYSVILLE INSURANCE COMPANY); JOHN       :
DOES 1-20; and XYZ CORPS. 1-19,             :
                                            :
            Fourth-Party Defendants.        :
------------------------------------------  :
KOHN PEDERSEN FOX ASSOCIATES, P.C.,         :
                                            :
            Third-Party Plaintiff,          :
                                            :
            -v-                             :
                                            :
WEIDLINGER ASSOCIATES CONSULTING            :
ENGINEERS, P.C.; CASTRO-BLANCO PISCIONERI   :
AND ASSOCIATES, ARCHITECTS, P.C.;           :
ARQUITECTONICA NEW YORK, P.C.; COSENTINI    :
ASSOCIATES, INC.; CERMAK, PETERKA           :
PETERSEN, INC.; JORDAN PANEL SYSTEMS        :
CORP.; TRATAROS CONSTRUCTION, INC.; and     :
LBL SKYSYSTEMS (U.S.A.), INC.,              :
                                            :
            Third-Party Defendants.         :
------------------------------------------ X
```

APPEARANCES:

For Travelers Casualty and Surety Company and
Trataros Construction, Inc.:
JoAnne M. Bonacci
David C. Dreifuss
Eli J. Rogers
Dreifuss Bonacci & Parker LLP
26 Columbia Turnpike
Florham Park, NJ 07932

For TDX Construction Corp.:
Stephen B. Shapiro
Timothy B. Froessel
Holland & Knight LLP
31 West 52nd Street
New York, NY 10019

For Kohn Pedersen Fox Associates, P.C.:
Michael K. De Chiara
David Abramovitz
Zetlin & De Chiara, LLP
801 Second Avenue
New York, NY 10017

DENISE COTE, District Judge:

This complex litigation arises out of the construction of a 785,000 square-foot vertical campus for Baruch College ("Baruch"), part of the City University of New York ("CUNY"), between about 1998 and about 2002 (the "Project").[1] Plaintiff Travelers Casualty & Surety Company ("Travelers"), equitably subrogated to the rights of a prime contractor for the Project, third-party defendant Trataros Construction Inc. ("Trataros"), has brought suit against defendants Kohn Pedersen Fox Associates, P.C. ("KPF") and TDX Construction Corp. ("TDX"), respectively the architect and construction manager for the Project, for economic damages and attorney's fees resulting from KPF's and TDX's allegedly negligent work performance.  KPF and TDX have separately moved for summary judgment to dismiss Travelers' claims against each of them.  For the following reasons, both motions are granted.

---

[1] The completed building, known as the William and Anita Newman Vertical Campus, occupies approximately three-quarters of the city block bounded by East 24th and East 25th Streets and Lexington and Third Avenues in Manhattan.  The building consists of fourteen above-ground stories, which principally house academic classrooms and offices, and three below-ground stories, which include an athletic complex and performing arts center.

BACKGROUND

        The instant litigation has already been the subject of

numerous Opinions by this Court.[2]  Familiarity with all prior

proceedings is assumed, and only the facts relevant to the

pending motions are set forth herein.  These facts, taken from

the parties' evidentiary submissions on summary judgment, are

undisputed or construed in the light most favorable to the

nonmoving party, Travelers.

A.    The Construction Project

        On or about September 14, 1995, defendant Dormitory

Authority - State of New York ("DASNY"),[3] acting on CUNY's behalf

as "owner" of the Project, finalized a contract (the "KPF-DASNY

Contract") whereby KPF was engaged "to Provide Programming,

Architectural, Engineering and Construction Phase Services for

_____

[2] See, e.g., Travelers Cas. & Sur. Co. v. Dormitory Auth., No. 07
Civ. 6915 (DLC), 2008 WL 1882714 (S.D.N.Y. Apr. 25, 2008)
(granting motion to dismiss by fourth-party-defendant Specialty
Construction Brands, Inc. t/a TEC); G.M. Crocetti, Inc. v.
Trataros Constr., Inc. (In re G.M. Crocetti, Inc.), No. 08 Civ.
6239 (DLC), 2008 WL 4601278 (S.D.N.Y. Oct. 15, 2008)
(withdrawing the bankruptcy reference for an adversary
proceeding involving G.M. Crocetti, Inc.).  Many prior Opinions
concern Trataros' fourth-party claims for insurance coverage.
For a description of the procedural history as to the insurance
aspect of this litigation, see Travelers Cas. & Sur. Co. v.
Dormitory Auth., No. 07 Civ. 6915 (DLC), 2010 WL 3001729, at *4-
*5 (S.D.N.Y. July 30, 2010).

[3] In its motion papers, Travelers variously supplies DASNY's full
name as "Dormitory Authority - State of New York" and as
"Dormitory Authority of the State of New York."

the Construction of [the Project]" as enumerated in the contract's "scope-of-services" appendix.  KPF thereby became the Project's chief designer and architect of record.

The scope-of-services appendix to the KPF-DASNY Contract includes a detailed catalogue of responsibilities to be undertaken by KPF during various phases of the Project.  With respect to the "Construction Documents Phase" of the Project, the scope-of-services appendix provided, inter alia, that KPF would prepare "contract drawings and specifications" in a manner "fully coordinated for bidding by the various Contractors." With respect to the "Bidding and Award of Prime Construction Contracts Phase" of the Project, the scope-of-services appendix provided that KPF would "prepare and supply the necessary sets of Contract Documents . . . for bidding and eventual award of contracts between [DASNY] and the Contractors"; "keep account of and distribute drawings to prospective bidders"; and "investigate questions posed by bidders relative to bid documents or any other questions, and issue written replies to all bidders in the form of supplemental bulletins, addenda, or bid instructions."  With respect to the "Construction Phase" of the Project, the scope-of-services appendix provided that KPF would, inter alia, "[r]eview and approve or disapprove all shop drawings and samples submitted by the Contractor"; "[r]eview, check, and approve or disapprove all substitutions . . .

submitted by the Contractor"; and "[p]rovide interpretations of Contract Documents and design."  The KPF-DASNY Contract also incorporates DASNY's "Design Consultants Guide," which provides that KPF must produce the "Working Drawings" and "Technical Specifications" that are "necessary to construct the project."[4]

DASNY also entered into three phased contracts with TDX (collectively, the "TDX-DASNY Contracts") for the purpose of engaging TDX as construction manager.  First, in October 1996, TDX contracted with DASNY to provide construction management services in connection with the Project's "Design and Pre Construction Phase."  Second, in May 1997, TDX contracted with DASNY to provide construction management services pertaining to the Project's "Construction Phase."  Finally, in January 1998, TDX contracted with DASNY to provide construction management services in connection with the Project's "General Conditions Work Phase."

As with the KPF-DASNY Contract, the TDX-DASNY Contracts included detailed scope-of-services appendices enumerating

---

[4] The KPF-DASNY Contract also contemplates that KPF could "propose and engage Consultants . . . to perform portions of the Services required under this Agreement."  Pursuant to that provision, KPF hired a number of subconsultants, including Weidlinger Associates Consulting Engineers, P.C.; Castro-Blanco Piscioneri & Associates, Architects, P.C.; Arquitectonica New York, P.C.; Cosentini Associates, Inc.; and Cermak Peterka Petersen, Inc.  KPF brought a third-party complaint against these subcontractors (among others) on February 1, 2008, but all claims associated with that third-party complaint have since been dismissed by stipulation.

dozens of specific responsibilities and tasks to be undertaken by TDX.  In the scope-of-services appendix to the "Construction Phase" contract, for example, TDX was directed, <u>inter alia</u>, to "[s]erve as [DASNY's] chief representative in the field"; "[r]eceive, investigate, and reply to all Prime Contractors' correspondence pertaining to the Construction Work"; "[c]onduct all job progress meetings and job coordination meetings"; "[i]nspect all work daily for quality and conformance to the Contract Documents"; "[a]dvise Prime Contractor(s) of necessary corrective work"; and "[r]eview all shop drawings for coordination of field conditions among the Prime Contractors" and "[r]eturn shop drawings, as necessary, for corrections."

Finally, DASNY entered into thirteen prime contracts, spread among eleven separate contractors, for carrying out the substance of the Project's construction work.[5]  Trataros was ultimately awarded two of these prime contracts, known as

---

[5] The Project fell within the terms of the New York Wicks Law, which requires, <u>inter alia</u>, that all public construction projects costing more than a certain monetary threshold must provide for "separate and independent bidding" for three types of work: plumbing and gas fitting; heating, ventilating, and air conditioning; and electric writing and fixtures.  N.Y. State Fin. Law § 135; N.Y. Gen. Mun. Law § 101.  The monetary threshold was $50,000 until 2008, when the threshold was increased to $3 million for projects occurring in New York County.  The Project's thirteen prime contracts included the three Wicks Law work categories; the two "general trades" contracts awarded to Trataros; and specialized contracts for site excavation and foundation, structural steel, structural concrete, masonry, ductwork, sprinkler system/standpiping, fire alarm system, and temperature control.

"Contract 15" and "Contract 16."  KPF prepared the initial plans and specifications included within the bid packages for Contracts 15 and 16 (the "Bidding Documents"), and also prepared addenda to the Bidding Documents during the pre-bid phase.  For both contracts, TDX maintained a list of "plan holders," who were potential bidders that had obtained copies of the Bidding Documents and addenda.

The Bidding Documents for Contract 15 were made available on February 2, 1998, with the issuance of a "Notice to Bidders." The scope of work under Contract 15 included, inter alia, construction of the exterior walls and windows (known as the "curtainwall"), elevators, and rough carpentry.  On or about March 19, 1998, Trataros submitted a bid for Contract 15 in the amount of $50,222,000.  DASNY and Trataros then entered into a written contract on or about April 27, 1998, by which Trataros agreed to perform the scope of work within Contract 15 for the fixed sum of $50,222,000.  On or about April 27, 1998, Trataros obtained two surety bonds from Reliance Insurance Company ("Reliance")[6] -- a "performance bond" and a "labor and materials

---

[6] Reliance subsequently entered into an agreement with Travelers whereby Reliance granted Travelers a power of attorney to act as administrator for Reliance and reinsurer with respect to Contracts 15 and 16.

payment bond" -- each carrying a penal sum of $50,222,000.[7]  Both bonds named Trataros as principal and DASNY as obligee.

Sometime in early- or mid-1998, the Bidding Documents for Contract 16 were also released to potential bidders.  The scope of work under Contract 16 included, inter alia, the interior fit-out, miscellaneous metal work, roofing installation, and flooring installation and finishing.  As with Contract 15, TDX maintained a list of "plan holders" and ensured that both the Bidding Documents and addenda prepared by KPF were sent to those holders.

On or about June 10, 1998, Trataros submitted a bid in the amount of $24,140,000 for Contract 16.  DASNY and Trataros then

_____

[7] A labor and materials payment bond ("payment bond") is an undertaking by which a surety agrees to compensate sub-contractors and suppliers who have furnished labor or supplies to the surety's "principal" (often a general contractor), but who have not been paid by that principal even after payment was duly demanded.  The surety's aggregate financial liability on the payment bond is limited to the bond's "penal sum."  Payment bonds are required by statute for "public improvement" projects. See N.Y. State Fin. Law § 137 (requiring "a bond guaranteeing prompt payment of moneys due to all persons furnishing labor or materials to the contractor or any subcontractors in the prosecution of the work provided for in such contract").

A performance bond, by contrast, is an undertaking by which a surety agrees to be financially responsible to the owner of a construction project if that surety's principal fails to fulfill its contractual obligations to the owner.  If the owner declares a contractor in default and makes a claim upon that contractor's performance bond, the surety usually has the option of either completing the project itself (by retaining another contractor) or paying the owner its damages, up to the penal sum of the bond.  Unlike with insurance contracts, the surety may recover in indemnity against its principal for any sums paid out under either type of surety bond.

entered into a written contract on or about September 1, 1998, under which Trataros agreed to perform the scope of work within Contract 16 for the fixed sum of $24,140,000.  On or about the same date, Trataros obtained additional performance and payment bonds from Reliance, each in the amount of $24,140,000, and each naming Trataros as principal and DASNY as obligee.

The Project did not proceed on schedule.  As a result of various delays, problems, and deficiencies -- the responsibility for which remains disputed among the parties -- DASNY issued dozens of Change Orders to extend the time for work and provide extra compensation to various contractors.  Nevertheless, in many respects, the Project participants could not reach agreement regarding who should bear the financial responsibility for the extra costs incurred, and litigation ultimately ensued in both state and federal fora.

B.   Procedural History

On August 1, 2007, Travelers commenced this action asserting claims of negligence against KPF and TDX as well as breach-of-contract and subcontractor pass-through claims against DASNY (the "Complaint").[8]  Travelers alleges that both KPF and

_____

[8] This litigation is in its second round in federal court. Travelers previously filed suit in June 2004 against DASNY, TDX, and KPF.  See Travelers Cas. & Ins. Co. v. Dormitory Auth. of the State of N.Y., No. 04 Civ. 5101 (HB).  After about a year of pretrial proceedings and motion practice before the Honorable

TDX "did not properly perform [their] contractual and/or professional responsibilities" during the Project and that "[t]he actions and/or failures to act [by both KPF and TDX] constituted negligence and/or professional negligence" which, in turn, "contributed to the impacts that plagued the Project." Travelers asserts that KPF and TDX each owed a "duty of care to Trataros and/or Trataros' subcontractors/suppliers" based either on those contractors' "status as third-party beneficiaries" of the KPF-DASNY Contract and the TDX-DASNY Contracts, or alternatively, "as a result of the functional equivalent of privity existing" among the parties.  The Complaint seeks not only compensatory and consequential damages from KPF and TDX, but also attorney's fees incurred by Travelers in litigation with third parties.[9]

---

Harold Baer, the case was voluntarily dismissed without prejudice in October 2005 to enable the parties to pursue mediation.  When the mediation failed, Travelers re-filed this litigation, and the case was assigned to this Court.

[9] In its claims against KPF and TDX, which are identical in all material respects, Travelers asserts that it "has standing to assert claims as against KPF [and TDX] either as a result of the assignment from Trataros; equitable subrogation with respect to the rights of claimants, the obligees, and/or the principal; third-party beneficiary rights in connection with [the KPF-DASNY Contract and the TDX-DASNY Contracts], and/or as a party whose connection to KPF [and TDX] is so close as to approach privity." Travelers does not enumerate separate causes of action against KPF and TDX based on the various legal theories under which it sues, but instead asserts a single claim against each.

On October 1, 2007, KPF moved to dismiss the Complaint.
Following briefing by the parties, the motion was denied by
Order of January 24, 2008 (the "January 2008 Order").  The
January 2008 Order indicated that KPF's motion was denied for
"substantially the reasons stated" set forth in Judge Baer's
previous opinion in Travelers Cas. & Ins. Co. v. Dormitory Auth.
of the State of N.Y., No. 04 Civ. 5101 (HB), 2005 WL 1177715
(S.D.N.Y. May 19, 2005) (the "2005 Opinion"), which had also
denied a motion to dismiss filed by KPF.

The parties then proceeded to discovery.  Travelers
produced at least two expert reports relating, at least in part,
to KPF's and TDX's performance during the Project.[10]  First, R.V.
Buric Construction Management Consultants, Inc. ("Buric")
concluded, with respect to KPF, that "[t]he incomplete design by
KPF led to significant and unanticipated RFIs [requests for
information], bulletins, and change orders causing severe
Project delays, disruptions, and prolongation," thereby
"creat[ing] additional work[] or otherwise modify[ing] the
scopes of work[] for the Project's prime contractors."  Buric
observed that KPF's design changes were "ongoing during
construction and were exacerbated by the poor performance of

---

[10] The expert reports' findings are disputed by the parties.
Nevertheless, these expert reports are considered in determining
whether Travelers has proffered evidence showing that there
remains a genuine issue of material fact requiring trial.

KPF." Another expert, Cashin Spinelli & Ferretti ("CSF"), produced a report concluding, <u>inter alia</u>, that the Bidding Documents prepared by KPF were "not thoroughly checked for accuracy" and "not fully coordinated for bidding"; that "KPF's failure to provide clear, coordinated and unambiguous bid documents caused numerous RFI's, Change Orders and delays on the project"; that KPF "failed to provide timely interpretations of its Contract Documents and design," thereby causing delays; that KPF "allowed a non-professional Construction Manger [sic] to review change orders for their effect on design"; that "the abilities of Trataros [and others] to perform their contractual scopes of work were unreasonably and chronically hindered by the style and substance of KPF's professional services"; and that "[DASNY] has acknowledged that KPF's failure to satisfy its contractual obligations and professional standard of care has delayed the project."

Travelers' experts also opined that TDX was negligent in various ways. Buric concluded that "TDX failed to comply with industry standards and its contractual obligations related to the development of Project CPM [critical path method] schedules, coordination of the work, and its review of the design." Likewise, CSF concluded that TDX had "negligently performed" its work during the "preconstruction" phase in a number of ways, including by "recommend[ing] the fast track construction of a

project not suited for such a project delivery methodology"; "fail[ing] to properly develop and coordinate bid packages"; and "fail[ing] to develop schedules that were properly planned and prepared based on flawed or missing logic [sic]." With respect to the Project's later phases, CSF concluded that TDX "failed to review and coordinate all shop drawings among the Prime Contractors"; "failed to expedite and coordinate the Work of all Prime Contractors"; "permitted non-conforming and defective work to be installed on the project"; "failed to expedite and coordinate the progress of the Architect"; "failed to be cognizant of potential delays"; "failed to determine the cause and responsibility for any delays and to take remedial action"; "refused to evaluate requests for extensions of time, claims and/or cost adjustments"; "failed to provide contractors on site with an accurate schedule based on logical, sequential relationships"; and "failed to prepare periodic Exception Reports." CSF also concluded that TDX was "grossly negligent" insofar as it "substituted its judgment for that of the Architect on site in matters as they relate to building design."

On February 19, 2010, KPF and TDX each moved for summary judgment.[11] Travelers filed opposition papers for each motion on March 19, and the motions became fully submitted on April 2.

_____

[11] KPF and TDX also asserted cross-claims against one another in this litigation. These causes of action were dismissed with prejudice by stipulation of the parties on May 13, 2010.

DISCUSSION

Summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  In making this determination, the court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010).

Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set out specific facts showing a genuine issue for trial," and cannot "rely merely on allegations or denials" contained in the pleadings.  Fed. R. Civ. P. 56(e); see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Only disputes over material facts -- "facts that might affect

the outcome of the suit under the governing law" -- will properly preclude the entry of summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (stating that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").

## I.   KPF's Motion

KPF moves for summary judgment to dismiss Travelers' claims in three different respects.  First, KPF argues that Travelers cannot recover for breach of contract because Trataros was neither in privity of contract with KPF, nor was it a third-party beneficiary of the KPF-DASNY Contract.  Second, KPF argues that Travelers cannot recover in tort because Travelers cannot demonstrate that KPF made any negligent misrepresentations to Trataros nor that KPF and Trataros were in a privity-like relationship.  Third, KPF asserts that Travelers cannot recover its "bond losses" from KPF because the Shindler exception to the "American Rule" on attorney's fees does not apply.  Each of these arguments is addressed in turn.

## A.   Breach of Contract: Third-Party Beneficiary

Travelers argues that Trataros and the other prime contractors were intended beneficiaries of the KPF-DASNY

16

Contract and thereby entitled to enforce its terms by recovering damages directly from KPF.  Travelers asserts that its third-party beneficiary status is made "even more compelling[]" by the fact that some 30 amendments to the KPF-DASNY Contract were executed primarily during the time that Trataros actively participated in the Project.

Ordinarily, "[a] non-party to a contract governed by New York law lacks standing to enforce the agreement."[12] Premium Mortg. Corp. v. Equifax, Inc., 583 F.3d 103, 108 (2d Cir. 2009) (per curiam).  A contractual promise can, however, "be enforced by a non-party who is an intended third-party beneficiary of that promise."  Consol. Edison, Inc. v. Ne. Utils., 426 F.3d 524, 527 (2d Cir. 2005).  "It is ancient law in New York that to succeed on a third party beneficiary theory, a non-party must be the intended beneficiary of the contract, not an incidental beneficiary to whom no duty is owed."  Madeira v. Affordable Hous. Found., Inc., 469 F.3d 219, 251 (2d Cir. 2006) (citation omitted).  "A party asserting rights as a third-party beneficiary must establish (1) the existence of a valid and binding contract between other parties, (2) that the contract was intended for his benefit and (3) that the benefit to him is sufficiently immediate, rather than incidental, to indicate the

---

[12] The parties do not dispute that New York law governs the KPF-DASNY Contract or the TDX-DASNY Contracts.

assumption by the contracting parties of a duty to compensate him if the benefit is lost." Id. at 251-52 (citation omitted); see also Subaru Distribs. Corp. v. Subaru of Am., Inc., 425 F.3d 119, 124-25 (2d Cir. 2005) ("Subaru"). While "[a] party need not necessarily be specifically mentioned in a contract to be considered a third-party beneficiary," Newman & Schwartz v. Asplundh Tree Expert Co., Inc., 102 F.3d 660, 663 (2d Cir. 1996), "the parties' intention to benefit the third party must be gleaned from the face of the contract." Levin v. Tiber Holding Corp., 277 F.3d 243, 249 (2d Cir. 2002) (citation omitted).  Although "[a] contractual requirement that the promisor render performance directly to the third party [may] show[] an intent to benefit the third party," Subaru, 425 F.3d at 124, "[c]ontract language referring to third parties as necessary to assist the parties in their performance does not [by itself] show an intent to render performance for the third party's benefit." Id. at 126.

Travelers' third-party-beneficiary theory cannot succeed. Travelers has not raised any material question of fact concerning whether KPF and DASNY intended to benefit Trataros by concluding the KPF-DASNY Contract or by executing the several dozen amendments thereto.  While the KPF-DASNY Contract contemplates that KPF would be required to coordinate and produce the Bidding Documents, which may have ultimately been

relied upon by Trataros in tendering its bids for Contracts 15 and 16, the KPF-DASNY Contract in no way suggests that the purpose of those contractual provisions was to confer a benefit upon Trataros, as opposed to giving Trataros that which was "necessary to assist [it] in [its own] performance."[13]  Id. Indeed, "'the ordinary construction contract -- i.e., one which does not expressly state that the intention of the contracting parties is to benefit a third party -- does not give third parties who contract with the promisee [i.e., owner] the right to enforce the latter's contract with another.'"  Perron v. Hendrickson/Scalamandre/Posillico (TV), 725 N.Y.S.2d 662, 664 (App. Div. 2d Dep't 2001) (quoting Port Chester Elec. Constr. Corp. v. Atlas, 40 N.Y.2d 652, 655 (1976) ("Port Chester")).  As such, insofar as Travelers purports to state a claim for breach of contract against KPF, that claim must be dismissed.[14]

---

[13] Indeed, the Project's contract documents, prepared by DASNY, reflect that the parties knew how to create a third-party-beneficiary relationship if they so intended.  Certain "General Conditions" incorporated by reference into Contracts 15 and 16 provide that "[i]t is understood that the Client is an intended third party beneficiary of the Contract for the purposes of recovering any damages caused by the Contractor."  The term "Client" is defined under the General Conditions as the entity for whom DASNY is "performing services," i.e., CUNY.  By contrast, although "Contractors" are also referenced throughout the contract documents, there is no similar indication that Contractors are intended beneficiaries of the contracts.

[14] The cases cited by Travelers do not support its position. Travelers relies upon Marcellus Constr. Co., Inc. v. Village of Broadalbin, 755 N.Y.S.2d 474 (App. Div. 3d Dep't 2003)

B.   Tort: Negligent Misrepresentation

Travelers also seeks to recover Trataros' economic losses from KPF on a "negligence and/or professional negligence" theory.  KPF has responded by seeking summary judgment on this aspect of Travelers' claim based on two related arguments.  First, KPF argues that New York's "economic loss doctrine" prevents recovery of pecuniary damages by Trataros in the absence of contractual privity or proof of a special duty of care owed to it by KPF.  Second, KPF asserts that the sole exception to the economic loss doctrine -- a claim for negligent misrepresentation under a "functional equivalent of privity" theory -- is not applicable in these circumstances.

    1.   Legal Standards

KPF is correct that the economic loss doctrine applies as a general matter to bar Travelers' recovery against KPF.  New York's economic loss doctrine is a jurisprudential principle that a plaintiff cannot recover in tort for purely economic losses caused by the defendant's negligence.  See, e.g., 532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc., 711

_____

("Marcellus"), and Reliance Ins. Co. v. Morris Assocs., P.C., 607 N.Y.S.2d 106 (App. Div. 2d Dep't 1994) ("Morris"), each of which concerned construction projects requiring engineers to furnish information to third-party contractors.  Neither case held, nor otherwise implied, that the contractors at issue qualified as third-party beneficiaries under the respective owner-engineer contracts.

N.Y.S.2d 391, 393 (App. Div. 1st Dep't 2000) ("Finlandia I"),
rev'd, 96 N.Y.2d 280, 289 (2001) ("Finlandia II").  Under this
principle, the defendant is not liable to a plaintiff for the
latter's economic loss unless there exists "a special
relationship that requires the defendant to protect against the
risk of harm to plaintiff."[15]   Finlandia II, 96 N.Y.2d at 289.

This principle is justified on several grounds.  First, to
the extent that a plaintiff claiming economic damages is seeking
to recover the loss of an expectancy interest created by
contract in the first instance, the doctrine channels the
dispute into a breach-of-contract action, in keeping with the
nature of the interest that the plaintiff claims has been

---

[15] New York courts appear to disagree whether the term "economic
loss rule" should apply outside the context in which it first
emerged, namely, product-liability suits against manufacturers.
See N.Y. Methodist Hosp. v. Carrier Corp., 892 N.Y.S.2d 110,
111-12 (App. Div. 2d Dep't 2009) (setting forth and discussing
the "economic loss doctrine" in the products-liability realm).
Some courts characterize the economic loss rule as "extend[ing]
beyond" the products-liability context and "limit[ing]" the
liability of providers of services as well as providers of
products," including specifically in construction litigation.
Bristol-Myers Squibb, Indus. Div. v. Delta Star, Inc., 620
N.Y.S.2d 196, 199 (App. Div. 4th Dep't 1994) ("Bristol-Myers").
The New York Court of Appeals has admonished, however, that the
"economic loss rule" should not be used outside of the product-
liability context, and that a "duty"-based analysis should be
applied instead.  Finlandia II, 96 N.Y.2d at 288 & n.1.  As
demonstrated by the court's holding in that case, however, the
decision as to which terminology to use appears to be of little
practical importance, and courts routinely overlook the formal
distinction.  See, e.g., Hydro Investors, Inc. v. Trafalgar
Power Inc., 227 F.3d 8, 16 (2d Cir. 2000) ("Hydro Investors")
(describing Finlandia II as "hav[ing] applied the economic loss
rule" to bar plaintiff's recovery).

damaged.  "[C]ourts have applied the economic loss rule to prevent the recovery of damages that are inappropriate because they actually lie in the nature of breach of contract as opposed to tort."  Hydro Investors, 227 F.3d at 16; see also Finlandia I, 711 N.Y.S.2d at 393-94 (noting that the effect of the economic loss rule is "that a claimant suffering purely financial losses is restricted to an action in contract for the benefit of its bargain"); Bristol-Myers, 620 N.Y.S.2d at 198-99 ("The economic loss rule reflects the principle that damages arising from the failure of the bargained-for consideration to meet the expectations of the parties are recoverable in contract, not tort.").  Where, as here, Travelers is essentially bringing suit against KPF because Contracts 15 and 16 were not as profitable as Trataros had expected, the economic loss doctrine requires that Travelers seek its remedy through a breach-of-contract action against its counterparty, DASNY, rather than against parties with whom Trataros did not enter into contract.[16]  Moreover, by preventing the encroachment of tort law into the domain of contract, the economic loss doctrine protects parties' abilities to allocate risk by mutual agreement and thereby form reliable expectations about their potential

---

[16] Indeed, Travelers has asserted multiple breach-of-contract claims against DASNY in this litigation.

financial exposure with respect to the duties and liabilities that they have contractually assumed.[17]

Second, to the extent that "economic loss" is difficult to quantify, but also a highly foreseeable outcome of negligence in the commercial context, the economic loss doctrine reflects a policy interest in protecting defendants from disproportionate, and potentially limitless, liability.  "[R]elying solely on foreseeability to define the extent of liability in cases involving economic loss, while generally effective, could result in some instances in liability so great that, as a matter of policy, courts would be reluctant to impose it."  Hydro Investors, 227 F.3d at 16 (citation omitted).  As a result, to avoid "crushing exposure" to suits by countless parties who have suffered economic loss, New York courts have concluded that "[a]bsent a duty running directly to the injured person there can be no liability in damages, however careless the conduct or foreseeable the harm."  Finlandia II, 96 N.Y.2d at 289.

---

[17] These principles do not necessarily absolve an architect, engineer, or construction manager (collectively, "design professionals") of all liability in tort where their poor performance causes damage to construction contractors.  If a contractor brings a breach-of-contract claim against the owner, the owner can in turn seek indemnification or contribution from the design professional to the extent that the latter caused the losses for which the contractor has sued.  Indeed, DASNY asserted cross-claims for indemnification and contribution against KPF and TDX in this litigation, but those claims were dismissed at the request of the parties.

A limited exception to New York's barrier against recovery
of economic loss exists, however, for claims of negligent
misrepresentation.[18]  Nevertheless, "before a party may recover
in tort for pecuniary loss sustained as a result of another's
negligent misrepresentations there must be a showing that there
was either actual privity of contract between the parties or a
relationship so close as to approach that of privity."  Parrott
v. Coopers & Lybrand, L.L.P., 95 N.Y.2d 479, 483 (2000)
("Parrott II") (citation omitted); see also Ossining Union Free

_____

[18] The elements of negligent misrepresentation under New York law
are:

> (1) the defendant had a duty, as a result of a special
> relationship, to give correct information; (2) the
> defendant made a false representation that he or she
> should have known was incorrect; (3) the information
> supplied in the representation was known by the
> defendant to be desired by the plaintiff for a serious
> purpose; (4) the plaintiff intended to rely and act
> upon it; and (5) the plaintiff reasonably relied on it
> to his or her detriment.

Hydro Investors, 227 F.3d at 20; see also Dallas Aerospace, Inc.
v. CIS Air Corp., 352 F.3d 775, 788 (2d Cir. 2003); J.A.O.
Acquisition Corp. v. Stavitsky, 8 N.Y.3d 144, 148 (2007).
Alternatively stated, a defendant is liable "where there is
carelessness in imparting words upon which others were expected
to rely and upon which they did act or failed to act to their
damage," provided that "such information" was "expressed
directly, with knowledge or notice that it will be acted upon,
to one to whom the author is bound by some relation of duty,
arising out of contract or otherwise, to act with care if he
acts at all."  AUSA Life Ins. Co. v. Ernst & Young, 206 F.3d
202, 208 (2d Cir. 2000) (quoting White v. Guarente, 43 N.Y.2d
356, 363-64 (1977)).  To be actionable, the "alleged
misrepresentation must be factual in nature and not promissory
or relating to future events that might never come to fruition."
Hydro Investors, 227 F.3d at 20-21.

Sch. Dist. v. Anderson LaRocca Anderson, 73 N.Y.2d 417, 424

(1989) ("Ossining").  This type of relationship is also referred

to as the "functional equivalent of privity."  Parrott II, 95

N.Y.2d at 482.

     Insofar as Travelers alleges in the Complaint that "the

functional equivalent of privity exist[ed] between [Trataros]

and KPF," Travelers has indicated that its "negligence and/or

professional negligence" claim is one for negligent

misrepresentation.  To demonstrate the existence of the

"functional equivalent of privity" sufficient to maintain a

negligent misrepresentation claim, Travelers must satisfy a

"tripartite standard."  Id.  First, it must show "an awareness

by the maker of the statement [i.e., KPF] that it is to be used

for a particular purpose."  Id. at 484 (citation omitted).

Second, it must demonstrate "reliance by a known party on the

statement in furtherance of that purpose."  Id. (citation

omitted); see also Sec. Investor Prot. Corp. v. BDO Seidman,

LLP, 222 F.3d 63, 79 (2d Cir. 2000) ("SIPC") (describing this

prong as "requir[ing] fulfillment of two distinct factors": that

a plaintiff is "one of a specific, identifiable class of

persons" and that the defendant "knew [the plaintiff] would

rely" on its statement).  Third, Travelers must adduce "some

conduct by the maker of the statement linking it to the relying

party and evincing its understanding of that reliance."  Parrott

II, 95 N.Y.2d at 484 (citation omitted).  These three criteria,
taken jointly, require Travelers to demonstrate "a clearly
defined set of circumstances which bespeak a close relationship
premised on knowing reliance."  Id.; see also MS P'ship v. Wal-
Mart Stores, Inc., 741 N.Y.S.2d 793, 794 (App. Div. 4th Dep't
2002) ("For defendant to be liable, reliance by plaintiff upon
the representation must be 'the end and aim of the transaction',
rather than an 'indirect or collateral' consequence of it."
(citation omitted)).[19]

     As it is a limited exception to the general rule against
recovery of economic loss, the tripartite standard is applied
strictly by New York courts, and a plaintiff pursuing a
negligent misrepresentation claim faces a "heavy burden."  SIPC,
222 F.3d at 73; see also Sec. Pac. Bus. Credit, Inc. v. Peat
Marwick Main & Co., 79 N.Y.2d 695, 702 (1992) ("SPBCI")
(professionals may "incur liability to injured third parties who
rely on their work," but only "[i]n 'carefully circumscribed'
instances" (citation omitted)); Sykes v. RFD Third Ave. 1

---

[19] The tripartite standard was originally developed and applied
with respect to negligent misrepresentation claims against
accountants.  See Credit Alliance Corp. v. Arthur Andersen &
Co., 65 N.Y.2d 536, 551 (1985) ("Credit Alliance") (formulating
the original standard).  It has subsequently been extended to
"appl[y] equally in cases involving other professions," however,
including design professionals.  Parrott II, 95 N.Y.2d at 483;
see also Ossining, 73 N.Y.2d at 425 ("[T]here is no reason for
excepting from [the tripartite standard] defendants other than
accountants who fall within the narrow circumstances we have
delineated.").

<u>Assocs., LLC</u>, 884 N.Y.S.2d 745, 747 (App. Div. 1st Dep't 2009)
("The New York Court of Appeals takes a rather cautious approach
to determining whether a relationship necessary to support a
claim for negligent misrepresentation exists.").  Although the
tripartite standard "'permit[s] some flexibility in the
application of the doctrine of privity,'" the New York Court of
Appeals "did not intend to depart from its prior decisions
requiring 'the practical equivalent of privity.'"  <u>Williams &
Sons Erectors, Inc. v. S.C. Steel Corp.</u>, 983 F.2d 1176, 1182 (2d
Cir. 1993) ("<u>Williams & Sons</u>") (quoting <u>Credit Alliance</u>, 65
N.Y.2d at 554); <u>see also</u> <u>Parrott I</u>, 702 N.Y.S.2d at 44
(observing that the three-part test "does not represent a
departure from traditional modes of analyzing such privity-based
liability").

     Indeed, although other jurisdictions have adopted the
"lower threshold" established by the Restatement (2d) of Torts
for proving a claim of negligent misrepresentation, <u>Williams &
Sons</u>, 983 F.2d at 1181, New York continues to "narrowly
define[]" the "ambit of duty created by privity and
relationships so close as to approach that of privity."  <u>Id.</u> at
1182; <u>see also</u> <u>SPBCI</u>, 79 N.Y.2d at 708, 719 (Hancock, J.,
dissenting) (describing New York's privity rule as "the
country's most exacting, followed by only a few jurisdictions");
<u>Ossining</u>, 73 N.Y.2d at 424 ("We have defined this duty narrowly,

27

more narrowly than other jurisdictions."); <u>Sykes</u>, 884 N.Y.S.2d
at 751.  Not only does New York not permit recovery of economic
loss on the basis that a plaintiff was "foreseeable," but the
New York Court of Appeals has repeatedly "'rejected even a
somewhat narrower rule that would permit recovery where the
reliant party or class of parties was actually known or
foreseen' but the individual defendant's conduct did not link it
to that third party." <u>Parrott II</u>, 95 N.Y.2d at 485 (quoting
<u>Ossining</u>, 73 N.Y.2d at 425).  "In negligent misrepresentation
cases especially, what is objective foreseeable injury may be
vast and unbounded, wholly disproportionate to a defendant's
undertaking or wrongdoing. . . . It is our belief that
imposition of such broad liability is unwise as a matter of
policy or, at the very least, a matter for legislative rather
than judicial reform." <u>Ossining</u>, 73 N.Y.2d at 421, 425
(citation omitted); <u>see also</u> <u>SIPC</u>, 222 F.3d at 74 ("This strict
limitation on the class of potential plaintiffs represents a
policy determination by the New York courts that [professionals]
will not, merely by contracting with a particular client, expose
themselves 'to a liability in an indeterminate amount for an
indeterminate time to an indeterminate class.'" (quoting
<u>Ultramares Corp. v. Touche</u>, 255 N.Y. 170, 179 (1931)); <u>Parrott</u>
<u>II</u>, 95 N.Y.2d at 483.

This strictness finds particular application with respect to the test's second prong: whether the plaintiff is "known" to the defendant.  "To qualify as [a] 'known part[y]' under New York law," a plaintiff must belong to "'a known group possessed of vested rights, marked by a definable limit and made up of certain components.'"  SIPC, 222 F.3d at 74 (quoting White, 43 N.Y.2d at 361).  In other words, a professional owes a duty only where the plaintiff is "part of an identifiable, particularized group rather than a 'faceless or unresolved class of persons.'"  Id. (quoting White, 43 N.Y.2d at 363).  To be liable, the defendant "must have known" at the time the statements were made "that the particular plaintiff[] bringing the action would rely on its representations."  Id. at 75.

   2.   Application

   Travelers has failed to adduce sufficient proof showing that the functional equivalent of privity existed between Trataros and KPF such as would enable Travelers to have a triable claim for negligent misrepresentation.  Several considerations compel this result.

   First, Travelers has not identified a single specific misrepresentation made by KPF and upon which Trataros reasonably relied to its detriment.  In particular, as KPF observes, Travelers has not offered any evidence even colorably suggestive

of misrepresentations made by KPF after the date on which Trataros joined the Project.[20]  Rather, Travelers relies only on its experts' opinions that KPF "failed to exercise its professional standard of care" in various respects, as summarized in the factual background above.  An omission, however, does not constitute a negligent misrepresentation, and New York courts have not extended the "functional equivalent of privity" exception to cover passive acts of negligence.[21] Travelers may not rest on its allegation that KPF and Trataros were in a near-privity relationship during a period of time that KPF exhibited "poor performance," because a tort claim under the tripartite standard requires evidence of specific misrepresentations, not a generalized showing of negligence.

Second, assuming _arguendo_ that a material question of fact existed as to whether the KPF-DASNY Contract or the Bidding Documents contained affirmative, actionable misrepresentations

---

[20] Neither the Complaint nor Travelers' opposition to KPF's motion for summary judgment identifies any specific misrepresentations made by KPF.  KPF appears to concede, however, that Travelers _would_ have a claim sufficient for trial _if_ the "functional equivalent of privity" existed between Trataros and KPF at two times: (1) when the KPF-DASNY Contract was concluded or (2) when the Bidding Documents were issued.

[21] New York courts have also refused to allow a third party to recover for breach-of-contract under a "functional equivalent of privity" theory.  _See, e.g._, _Hamlet at Willow Creek Dev't Co., LLC v. Ne. Land Dev't Corp._, 878 N.Y.S.2d 97, 112 (App. Div. 2d Dep't 2009) (rejecting plaintiff's attempt to apply the tripartite standard to a contract claim because plaintiff's claim "[was] not premised upon a negligent misrepresentation").

on which Trataros reasonably relied to its detriment, Travelers
has failed to adduce any evidence demonstrating that Trataros
was "known" to KPF at those times.  With respect to the Bidding
Documents, Travelers has not unearthed any evidence during
discovery to show that Trataros was anything to KPF other than
one of multiple potential bidders for Contracts 15 and 16.  In
other words, Trataros was merely "part of an 'indeterminate
class of persons who, presently or in the future, might act in
reliance'" on KPF's plans.  Marcellus, 755 N.Y.S.2d at 476
(quoting IT Corp. v. Ecology & Envtl. Eng'g, P.C., 713 N.Y.S.2d
633, 636 (App. Div. 4th Dep't 2000) ("IT Corp.")); see also
Sykes, 884 N.Y.S.2d at 749 (no functional equivalent of privity
where defendant "would only have been aware in the most general
way that some buyer would rely on [defendant's] information");
IT Corp., 713 N.Y.S.2d at 636 ("Plaintiff cannot be considered a
'known party' merely because it was a potential bidder.").[22]

    Other courts considering similar factual circumstances --
namely, claims by construction contractors against design
professionals for negligent misrepresentation -- regularly
conclude that a contractor's reliance on design professionals'

---

[22] Because Travelers fails on the second prong of the tripartite
standard, the Court need not decide whether the first or third
prongs were satisfied.  See Parrott I, 702 N.Y.S.2d at 44
("Evidentiary proof . . . must be offered in support of all
three criteria in order to warrant trial.  As with a three-
legged table, remove one prop, and the entire structure must
fall." (citation omitted)).

planning documents in the course of making a bid does not
constitute the functional equivalent of privity under New York
law.  Judge Mukasey's discussion of this fact pattern is
instructive:

> The [tripartite] test was applied in [Ossining] to
> permit a school district to sue the consulting
> engineers hired by the architects the school district
> retained to evaluate its school buildings.  One
> building was closed on the recommendation of those
> engineers, which allegedly resulted from a negligent
> evaluation.  The lawsuit was allowed, however, only
> because it was alleged that the engineers "undertook
> their work in the knowledge that it was for the school
> district alone," had direct contact with the school
> district and billed the school district directly, and
> allegedly rendered their reports with the objective of
> thereby shaping this plaintiff's conduct.
>
> By contrast, however, when architectural professionals
> create designs and specifications used as the basis
> for a bid and later performance by a contractor, are
> retained by the property owner at a time when they do
> not know who the successful bidder will be, and render
> their services to the property owner -- all of which
> factors were present here -- the contractor who then
> claims that those designs and specifications were
> prepared negligently cannot sue those architectural
> professionals.

Mergentime/White v. Metcalf & Eddy of N.Y., Inc., No. 89 Civ.

7188 (MBM), 1993 WL 72902, at *4-*5 (S.D.N.Y. Mar. 11, 1993)

("Mergentime") (citation omitted).  In reaching this conclusion,

Mergentime relied on the Second Circuit's then-recent decision

in Williams & Sons, which also concerned a contractor's

allegation that an architect made negligent misstatements in its

bidding documents.  The court held that the dissemination of the

32

bidding documents to the contractor, even when coupled with the
parties' attendance at a "pre-bid meeting at which [the
architect] answered prospective bidders' questions about the
plan documents," did not suggest that the functional equivalent
of privity existed.   Williams & Sons, 983 F.2d at 1183; cf.
Mergentime, 1993 WL 72902, at *5 (observing that "there were no
statements made by [defendant] to plaintiff that were not made
to potential bidders at large").   Many other cases involving
this general fact pattern have reached the same result.[23]

---

[23] Cases finding no functional equivalent of privity include, in
reverse chronological order: Sykes, 884 N.Y.S.2d at 746
(reversing the trial court's denial of motion to dismiss filed
by engineer defendant, who allegedly negligently supplied
"information regarding the mechanical systems for the building
for use in the offering plan," because "plaintiffs have failed
to allege that they were known to defendant at the time of the
alleged misrepresentation and have failed to allege some conduct
on the part of defendant linking it to plaintiffs"); Bri-Den
Constr. Co., Inc. v. Kapell & Kostow Architects, P.C., 867
N.Y.S.2d 437, 438 (App. Div. 1st Dep't 2008) (plaintiff, as a
member of a "class composed of prequalified bidders" relying on
defendants' "plans and specifications," failed to state a claim
because "the prequalified bidders were simply not 'known' at the
time of the complained-of conduct"); Am. Mfrs. Mut. Ins. Co. v.
Payton Lane Nursing Home, Inc., No. CV-5-5155 (SJF), 2007 WL
674691, at *5-*6 (E.D.N.Y. Feb. 28, 2007) ("Payton Lane")
(granting motion to dismiss a negligent misrepresentation claim
because the defendant architect did not prepare design and
construction documents for the "particular purpose" of making
representations to the contractor's Sureties; "[t]he mere
foreseeability of the Sureties' use of the Log and
certifications," even if those materials "were directly provided
to them by [the defendant]," did not constitute the functional
equivalent of privity); Marcellus, 755 N.Y.S.2d at 476
(reversing denial of summary judgment and concluding that
contractor's reliance on engineering firm's "design of the
project," which was included in "the final bid package for all

Although New York courts have not proven entirely consistent in
this respect, all of the New York cases located by this Court
that would tend to support Travelers' position involved rulings
on motions to dismiss, <u>not</u> on summary judgment.[24]  As such, a

_____

interested construction bidders," was too attenuated to satisfy
the second or third prongs of the tripartite standard);
<u>Mergentime</u>, 1993 WL 72902, at *4-*5 (described above); <u>Williams
& Sons</u>, 983 F.2d at 1183 (described above); <u>Mannix Indus., Inc.
v. Antonucci</u>, 594 N.Y.S.2d 327, 328-29 (App. Div. 2d Dep't 1993)
(no functional equivalent of privity between a plaintiff
contractor, hired by the owner to install windows in four
buildings, and the defendant architects and engineers, who were
hired by the owner to "administer" the contractor's contract).

[24] Cases finding that a "functional equivalent of privity" theory
was sufficiently pled at the motion-to-dismiss stage include, in
reverse chronological order: <u>Samuels v. Fradkoff</u>, 832 N.Y.S.2d
499, 499 (App. Div. 1st Dep't 2007) (plaintiff stated claim
where defendants were allegedly "aware that the purpose of their
architectural services was for plaintiff's renovation project
and that their drawings, plans and recommendations would be used
by plaintiff for the project"); 2005 Opinion, 2005 WL 1177715,
at *4-*8; <u>IFD Constr. Corp. v. Corddry Carpenter Dietz & Zack</u>,
685 N.Y.S.2d 670, 673 (App. Div. 1st Dep't 1999) (contractor
sufficiently pled its claim "inasmuch as the engineers were
aware of the purpose of their design plans and that [the
contractor] was part of a definable class that would rely on the
bid documents"); <u>Pile Found. Constr. Co., Inc. v. Berger, Lehman
Assocs., P.C.</u>, 676 N.Y.S.2d 664, 665 (App. Div. 2d Dep't 1998)
(trial court "properly declined to dismiss" general contractor's
claim against engineers, where contractor relied on project
design and "bid documents" prepared by engineers); <u>Morris</u>, 607
N.Y.S.2d at 107-08 (reversing the trial court's dismissal and
holding that contractor sufficiently pled that it was in near-
privity with engineer defendant, where "one of the purposes of
its design plans was to assist construction companies in
preparing their bids for the project"; where "defendant knew
that [plaintiff] was part of a definable class which would rely
on the plans"; and where "there was conduct . . . evincing the
defendant's understanding that [plaintiff] had, in fact, relied
on the plans in preparing its bid"); <u>Northrup Contracting, Inc.
v. Vill. of Bergen</u>, 527 N.Y.S.2d 670, 671 (Sup. Ct. Monroe Cnty.

consideration of the case law only reinforces the conclusion that Travelers has not demonstrated that any triable question of fact exists as to Travelers' allegation that Trataros was in the "functional equivalent of privity" with KPF.

Travelers makes several arguments in opposition.  First, Travelers relies on this Court's previous denial of KPF's motion to dismiss the Complaint in the January 2008 Order.  That Order in turn relied on the 2005 Opinion denying KPF's motion to dismiss in the first round of this litigation before Judge Baer. While acknowledging the different standards of review governing Rule 12(b)(6) and Rule 56 motions, Travelers argues that "Judge Baer's ruling . . . was based in large part upon the contract by and between DASNY and KPF," and asserts that discovery has not changed the meaning of that contractual language.  Travelers further contends that the 2005 Opinion and January 2008 Order constitute "collateral estoppel" or "law of the case" barring this Court's consideration of KPF's summary judgment motion.

These arguments are flawed.  The fact that a party has successfully stated a claim in the first instance does not mean that that claim merits trial, even if the court construed and relied upon contractual language in denying the defendant's

---

1986) (denying motion to dismiss, where contractor's complaint sufficiently alleged "knowing and intended reliance" on engineer's "drawings, plans and specifications"), rev'd in part on other grounds, 514 N.Y.S.2d 306 (App. Div. 4th Dep't 1987).

motion to dismiss.  Summary judgment is warranted where --
whatever the abstract sufficiency of the complaint under Rule
12(b)(6) standards -- the party opposing summary judgment cannot
demonstrate that "a genuine issue for trial" exists even after
all reasonable factual inferences and ambiguities are resolved
in its favor.  Fed. R. Civ. P. 56(e); see Dickerson v.
Napolitano, 604 F.3d at 740.  Here, notwithstanding the fact
that Travelers plausibly alleged that KPF made negligent
misrepresentations to Trataros in the context of a near-privity
relationship, Travelers has not tendered evidence that any
specific misrepresentations were actually made during any phase
of the Project in which the relationship between Trataros and
KPF approached that of privity.

Second, Travelers argues that this Court, in applying the
tripartite standard, should consider the relationship between
Trataros and KPF throughout the life of the Project.  Travelers
argues that KPF's motion for summary judgment "intentionally
avoids numerous critical facts and attempts to limit this
Court's consideration of KPF's full involvement with this
Project."  In particular, Travelers observes that "KPF and DASNY
entered into 30 amendments to the KPF Contract, most of which
increase KPF's scope of work and were executed after Trataros
was selected as prime contractor"; that "KPF was still
performing design work while construction activities were

36

proceeding"; that KPF "responded to many of the requests for information from the contractors and/or subcontractors," of which there more than 3,500 throughout the Project; that "KPF reviewed numerous shop drawings that were submitted by the prime contractors"; and that, as part of the fast-track design process, "there were very extensive communication and interaction between KPF on the one hand and Trataros and its subcontractors on the other," including KPF's attendance at "dozens of meetings" with TDX and various prime contractors, including Trataros.

These arguments are without merit. Even if the "very extensive communication" between KPF and Trataros during the active phase of construction constituted "linking conduct" under the third prong of the tripartite standard, or amounted to evidence that Trataros was a "known party" under the second prong, Trataros has not identified any contemporaneous misstatements on which it relied to its detriment. While Travelers criticizes KPF for "limit[ing] focus to its original contract and/or its original design," Travelers supplies no evidence in support of taking a broader view. Accordingly, Travelers' tort claims against KPF must be dismissed.[25]

---

[25] KPF's challenges to Travelers' apportionment of damages need not be considered, as none of Travelers' legal theories survive summary judgment.

C.    Travelers' "Bond Loss" Claim

Finally, KPF moves for summary judgment with respect to Travelers' claim that KPF is liable for certain "bond losses" sustained by Travelers, principally the attorneys' fees that Travelers incurred in prior litigation with various subcontractors involved in the Project.  Travelers seeks these fees under the "Shindler exception," which provides that "[i]f, through the wrongful act of his present adversary, a person is involved in earlier litigation with a third person in bringing or defending an action to protect his interests, he is entitled to recover the reasonable value of attorneys' fees and other expenses thereby suffered or incurred."  Shindler v. Lamb, 211 N.Y.S.2d 762, 765 (Sup. Ct. N.Y. Cnty. 1959); see also Hermann v. Bahrami, 654 N.Y.S.2d 158, 159 (App. Div. 2d Dep't 1997) (describing Shindler as a "well-recognized exception to the general rule" on attorney's fees); Restatement (2d) of Torts § 914(2) (permitting recovery of "attorney's fees and other expenditures" incurred in third-party litigation where the plaintiff "through the tort of another has been required to act in the protection of his interests by bringing or defending [the earlier] action").  The "wrongful act" requirement of the Shindler exception may be satisfied by prevailing either on a breach-of-contract or tort claim.  See, e.g., Ingersoll Milling Mach. Co. v. M/V Bodena, 829 F.2d 293, 309 (2d Cir. 1987)

(breach of contract); In re Emergency Beacon Corp., 48 B.R. 341, 351 (S.D.N.Y. 1985) (collecting cases).  Attorney's fees incurred in prior litigation may only be recovered, however, if they were "the natural and necessary consequences of the defendant's acts."  Coopers & Lybrand v. Levitt, 384 N.Y.S.2d 804, 807 (App. Div. 1st Dep't 1976).  Moreover, the exception also "does not apply," or is at least "very doubtful," when "both parties were parties in the prior litigation."  Goldberg v. Mallinckrodt, Inc., 792 F.2d 305, 309 (2d Cir. 1986).

Travelers cannot recover its attorney's fees or other bond losses from KPF.  Because Trataros was not a third-party beneficiary of the KPF-DASNY Contract, and because KPF is not liable in tort to Trataros for the latter's economic losses, KPF has not committed any "wrongful conduct" that would support the application of the Shindler exception.  In opposing KPF's motion, Travelers has identified no other predicate legal claim that could support the invocation of Shindler.  As such, this final aspect of Travelers' claim must also be dismissed.[26]

## II.  TDX's Motion

Travelers asserts an identical claim against TDX, and TDX in turn seeks summary judgment on principally the same three grounds as KPF.  Namely, TDX argues that Trataros was not a

---

[26] It need not be decided whether Travelers' Shindler claim is deficient in any other respect identified by KPF's motion.

third-party beneficiary of the TDX-DASNY Contracts; that
Trataros was not in a relationship functionally equivalent to
privity with DASNY; and that Travelers cannot recover its
attorney's fees under the Shindler exception.  For the same
reasons set forth above in discussing KPF's motion, Travelers'
claims against TDX must also fail.

A.   Breach of Contract: Third-Party Beneficiary

Travelers cannot show that TDX and DASNY intended that
Trataros be a third-party beneficiary of their agreement.  The
passages cited by Travelers from the TDX-DASNY Contracts in
opposing TDX's motion only amount to "[c]ontract language
referring to third parties as necessary to assist th[ose]
parties in their performance."  Subaru, 425 F.3d at 126; see
also Port Chester, 40 N.Y.2d at 655 ("[T]he ordinary
construction contract . . . does not give third parties who
contract with the promisee the right to enforce the latter's
contract with another.").  As such, to the extent Travelers
purports to state a claim for breach of contract against TDX,
that claim is dismissed.

B.   Tort: Negligent Misrepresentation

Travelers also cannot recover its economic losses in tort
from TDX.  First, to the extent that Travelers asserts that the
scope-of-services appendices contained within the TDX-DASNY

Contracts included negligent misrepresentations, Travelers

cannot demonstrate that the functional equivalent of privity

existed between Trataros and TDX at that time, because Trataros

was not then a "known party" to TDX within the meaning of the

tripartite standard.  See Parrott II, 95 N.Y.2d at 484

(requiring that the plaintiff demonstrate "reliance by a known

party on the statement in furtherance of that purpose."

(citation omitted)).  Second, assuming arguendo that a material

question of fact exists concerning whether TDX and Trataros were

in a near-privity relationship during the active construction

phase of the Project, Travelers has not identified any

misstatements made by TDX to Trataros during that time and upon

which Trataros reasonably relied to its detriment.  To the

extent that Travelers instead relies upon expert evidence that

TDX negligently performed its work under the TDX-DASNY Contracts

during the active construction phase, Travelers cannot recover

because the law does not permit a stranger to a contract to sue

a contracting party for negligent contract performance.[27]

Travelers has thus failed to raise a triable issue of fact as to

---

[27] Although Travelers cites dicta from Glanzer v. Shepard, 233
N.Y. 236 (1922), stating that the defendants in that case were
held liable to the non-contracting plaintiff "not merely for
careless words, but for the careless performance of a service,"
id. at 241 (citation omitted), Travelers has identified no clear
authority in which a non-contracting plaintiff was permitted to
recover in tort for economic losses caused by a defendant's
negligent performance of its contract with another party.

whether TDX breached any tort duty to Trataros.

In opposition, Travelers argues that New York law "recognize[s] a non-contracting party's right to sue a professional in tort for economic damages" and that the economic loss doctrine does not prohibit such claims.  Travelers further observes that "TDX holds itself out to the public as a professional entity" and argues that TDX therefore constitutes a "professional" subject to liability for malpractice.[28]

Insofar as Travelers contends that a malpractice cause of action would relieve it from having to demonstrate either privity with TDX or a near-privity relationship coupled with a negligent misrepresentation, Travelers' reliance is misplaced. "Under New York law, professional malpractice is a species of negligence."  Hydro Investors, 227 F.3d at 15 (citation omitted).  In order to establish a prima facie case of negligence under New York law, a plaintiff must show, among

---

[28] Travelers cites various cases and other authorities for the uncontroversial proposition that a construction manager is a professional subject to liability in malpractice, including CH2M Hill, Inc. v. Herman, 192 F.3d 711, 719-20 (7th Cir. 1999); Sweeney Co. of Md. v. Eng'rs-Constructors, Inc., 823 F.2d 805, 808-09 (4th Cir. 1987); Travelers Indem. Co. of Ill. v. 28 E. 70th St. Constr. Co., Inc., 296 F. Supp. 2d 476, 482-83 (S.D.N.Y. 2003) ("28 E. 70th St."); Manhattanville Coll. v. James John Romeo Consulting Eng'r, P.C., 774 N.Y.S.2d 542, 546 (App. Div. 2d Dep't 2004); Reiner v. Dormitory Auth. of State of N.Y., 699 N.Y.S.2d 65, 66-67 (App. Div. 2d Dep't 1999); James McKinney & Son, Inc. v. Lake Placid 1980 Olympic Games, Inc., 461 N.Y.S.2d 483, 486 (App. Div. 3d Dep't 1983); and N.Y. Educ. Law §§ 7301, 7306.

other things, "the existence of a duty flowing from defendant to plaintiff" and a "breach of this duty." Integrated Waste Servs., Inc. v. Akzo Nobel Salt, Inc., 113 F.3d 296, 299 (2d Cir. 1996) (citation omitted); see also Guest v. Hansen, 603 F.3d 15, 21 (2d Cir. 2010) (New York law); Mojica v. Gannett Co., Inc., 897 N.Y.S.2d 212, 214 (App. Div. 2d Dep't 2010). Travelers has not demonstrated that TDX owed any professional duty of care to Trataros. Moreover, Travelers may not rely on the "functional equivalent of privity" exception, because as discussed above, that exception only applies to legal claims based on a negligent misrepresentation.[29]

The legal authorities that Travelers cites in support of its position are inapplicable. For example, Travelers cites Hydro Investors for the proposition that New York law permits a non-contracting party to bring a professional malpractice suit for recovery of economic damages. What Hydro Investors says, however, is that economic loss should be "recover[able] in the limited class of cases involving liability for the violation of a professional duty." 227 F.3d at 18 (emphasis added).

---

[29] Travelers asserts that TDX's position is "the height of absurdity" because it would give construction managers "carte blanche to perform professional malpractice without any need to answer for repercussions of its tortious conduct." Travelers ignores the fact that a professional who commits malpractice may indeed be held liable, in tort, to any party to whom the professional owes a duty of care. Travelers has simply failed to demonstrate that Trataros was owed any such duty by TDX.

Travelers has not demonstrated that any such duty to Trataros was violated.  Likewise, Travelers cites a variety of other cases for the proposition that "[p]rofessionals . . . may be subject to tort liability for failure to exercise reasonable care, irrespective of their contractual duties."  Sommer v. Fed. Signal Corp., 79 N.Y.2d 540, 551 (1992).  Those cases, however, all involved circumstances in which a party in privity of contract with the professional sought to bring lawsuits asserting tort and breach-of-contract claims simultaneously.[30] Accordingly, Travelers' tort claims against TDX must fail, and TDX's other asserted grounds for dismissal need not be considered.

C.   Travelers' "Bond Loss" Claim

Finally, because Travelers' other claims against TDX cannot succeed as a matter of law, and because Travelers has identified no other "wrongful act" committed by TDX against Travelers, see Shindler, 211 N.Y.S.2d at 765, Travelers may not recover under the Shindler exception.  Accordingly, this claim against TDX must also be dismissed, and TDX's remaining arguments concerning

---

[30] These cases are Sommer, 79 N.Y.2d at 551-52; 17 Vista Fee Assocs. v. Teachers Ins. & Annuity Ass'n of Am., 693 N.Y.S.2d 554, 559-60 (App. Div. 1st Dep't 1999); Robinson Redev. Co. v. Anderson, 547 N.Y.S.2d 458, 460 (App. Div. 3d Dep't 1989); 28 E. 70th St., 296 F. Supp. 2d at 482-83.

the inapplicability of the Shindler exception need not be

considered.

## CONCLUSION

TDX's and KPF's February 19, 2010 motions for summary

judgment are granted.

SO ORDERED:

Dated:    New York, New York
           August 11, 2010

DENISE COTE
United States District Judge

45