```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------- X
TRAVELERS CASUALTY AND SURETY COMPANY as       :
Administrator for RELIANCE INSURANCE COMPANY,  :
                Plaintiff,                     :
                                               :
            -v-                                :
                                               :
DORMITORY AUTHORITY - STATE OF NEW YORK,       :    MASTER FILE:
TDX CONSTRUCTION CORP., and KOHN PEDERSEN      : 07 Civ. 6915 (DLC)
FOX ASSOCIATES, P.C.,                          :
                                               :
                Defendants.                    :    OPINION & ORDER
---------------------------------------------- :
DORMITORY AUTHORITY OF THE STATE OF NEW        :
YORK and TDX CONSTRUCTION CORP.,               :
                                               :
            Third-Party Plaintiffs,            :
                                               :
            -v-                                :
                                               :
TRATAROS CONSTRUCTION, INC.,                   :
                                               :
            Third-Party Defendant.             :
---------------------------------------------- :
TRATAROS CONSTRUCTION, INC. and TRAVELERS      :
CASUALTY AND SURETY COMPANY,                   :
                                               :
            Fourth-Party Plaintiffs,           :
                                               :
            -v-                                :
                                               :
CAROLINA CASUALTY INSURANCE COMPANY; BARTEC    :
INDUSTRIES, INC.; DAYTON SUPERIOR SPECIALTY    :
CHEMICAL CORP. a/k/a DAYTON SUPERIOR           :
CORPORATION; SPECIALTY CONSTRUCTION BRANDS,    :
INC. t/a TEC; KEMPER CASUALTY INSURANCE        :
COMPANY d/b/a KEMPER INSURANCE COMPANY; GREAT  :
AMERICAN INSURANCE COMPANY; NATIONAL UNION     :
FIRE INSURANCE COMPANY OF PITTSBURGH, PA.;     :
UNITED STATES FIRE INSURANCE COMPANY; NORTH    :
AMERICAN SPECIALTY INSURANCE COMPANY; ALLIED   :
WORLD ASSURANCE COMPANY (U.S.) INC. f/k/a      :
COMMERCIAL UNDERWRITERS INSURANCE COMPANY;     :
ZURICH AMERICAN INSURANCE COMPANY d/b/a        :
ZURICH INSURANCE COMPANY; OHIO CASUALTY        :
```

```
INSURANCE COMPANY d/b/a OHIO CASUALTY GROUP;      :
HARLEYSVILLE MUTUAL INSURANCE COMPANY (a/k/a      :
HARLEYSVILLE INSURANCE COMPANY); JOHN DOES 1-     :
20; and XYZ CORPS. 1-19,                          :
                                                  :
                Fourth-Party Defendants.          :
--------------------------------------------- :
KOHN PEDERSEN FOX ASSOCIATES, P.C.,               :
                                                  :
                Third-Party Plaintiff,            :
                                                  :
                -v-                               :
                                                  :
WEIDLINGER ASSOCIATES CONSULTING ENGINEERS,       :
P.C.; CASTRO-BLANCO PISCIONERI AND ASSOCIATES,    :
ARCHITECTS, P.C.; ARQUITECTONICA NEW YORK,        :
P.C.; COSENTINI ASSOCIATES, INC.; CERMAK,         :
PETERKA PETERSEN, INC.; JORDAN PANEL SYSTEMS      :
CORP.; TRATAROS CONSTRUCTION, INC.; and LBL       :
SKYSYSTEMS (U.S.A.), INC.,                         :
                                                  :
                Third-Party Defendants.           :
--------------------------------------------- X
```

APPEARANCES:

For Travelers Casualty and Surety Company and
Trataros Construction, Inc.:
JoAnne M. Bonacci
Eli J. Rogers
Dreifuss Bonacci & Parker, LLP
26 Columbia Turnpike
Florham Park, NJ 07932

For Dormitory Authority of the State of New York:
Stephen B. Shapiro
Timothy B. Froessel
Holland & Knight LLP
31 West 52nd Street
New York, NY 10019

For Carolina Casualty Insurance Company:
Robert Mark Wasko
Kaufman Dolowich Voluck & Gonzo, LLP
226 West 26th Street, 8th Floor
New York, NY 10001

TABLE OF CONTENTS

BACKGROUND....................................................... 5

I.  The DASNY-Trataros Contracts ............................... 5

II. Delays on the Project ...................................... 9

PROCEDURAL HISTORY............................................... 12

DISCUSSION...................................................... 15

I.  Travelers' Claims Against DASNY ........................... 18

  A.  Trataros' Impact Claim.................................. 18

    1.  No-Damages-for-Delay Clauses Under New York Law........ 19
    2.  The Applicability of Corinno Exceptions ............... 24
    3.  Waiver of No-Damages-for-Delay Clause ................. 38

  B.  Subcontractors' Pass-Through Claims..................... 46

    1.  Crocetti's Impact Claims .............................. 50
    2.  Jordan Panel's Extra Work Claim ....................... 55
    3.  Remaining Subcontractors' Impact Claims ............... 61

  C.  Travelers' Bond Losses Claim........................... 68

II. DASNY's Counterclaims Against Travelers ................... 70

  A.  DASNY's Breach-of-Contract Counterclaim................. 70

  B.  DASNY's Performance Bond Counterclaim................... 76

  C.  DASNY's Payment Bond Counterclaim....................... 81

    1.  Payment Bonds Under New York Law ...................... 82
    2.  General Principles of Obligee Standing ................ 85
    3.  Obligee Standing Under New York Law ................... 89
    4.  Application ........................................... 93

CONCLUSION...................................................... 96

DENISE COTE, District Judge:

This complex litigation arises out of the construction of a 785,000 square-foot vertical campus for Baruch College ("Baruch"), part of the City University of New York ("CUNY"), between about 1998 and 2002 (the "Project").[1]  Plaintiff Travelers Casualty & Surety Company ("Travelers") -- the surety to a prime contractor for the Project, Trataros Construction, Inc. ("Trataros") -- has brought suit against the Project's "Owner," the Dormitory Authority - State of New York ("DASNY"),[2] asserting various claims arising out of Trataros' performance of its two prime contracts.  DASNY, in turn, asserts counterclaims against Travelers for breach of those prime contracts and breach of two sets of surety bonds administered by Travelers.

On February 19, 2010, both parties filed motions for summary judgment.  For the following reasons, Travelers' motion is granted in part, and DASNY's motion is granted in its entirety.

---

[1] The completed building, known as the William and Anita Newman Vertical Campus, occupies approximately three-quarters of the city block bounded by East 24th and East 25th Streets and Lexington and Third Avenues in Manhattan.  The building consists of fourteen above-ground stories, which principally house academic classrooms and offices, and three below-ground stories, which include an athletic complex and performing arts center.

[2] DASNY gives its official name as "Dormitory Authority of the State of New York."  DASNY is a public-benefit corporation organized under the Public Authorities Law of the State of New York.  See N.Y. Pub. Auth. Law §§ 1675 et seq.

BACKGROUND

The instant litigation has already been the subject of numerous Opinions by this Court.[3]  Familiarity with all prior proceedings is assumed, and only the facts relevant to the two pending motions are outlined herein.  These facts, taken from the parties' evidentiary submissions, are undisputed unless otherwise noted.

I.   The DASNY-Trataros Contracts

As Owner of the Project, DASNY entered into some thirteen prime contracts for carrying out the substance of the Project's construction work.[4]  Trataros was eventually awarded two of these

---

[3] Most recently, the Court issued two Opinions deciding other sets of summary judgment motions.  See Travelers Cas. & Sur. Co. v. Dormitory Auth., No. 07 Civ. 6915 (DLC), 2010 WL 3199861 (S.D.N.Y. Aug. 11, 2010) (the "August 11 Opinion"), and Travelers Cas. & Sur. Co. v. Dormitory Auth., ___ F. Supp. 2d ___, No. 07 Civ. 6915 (DLC), 2010 WL 3001729 (S.D.N.Y. July 30, 2010) (the "July 30 Opinion").

[4] The Project fell within the terms of the New York Wicks Law, which requires, inter alia, that all public construction projects costing more than a certain monetary threshold must provide for "separate and independent bidding" for three types of work: plumbing and gas fitting; heating, ventilating, and air conditioning; and electric writing and fixtures.  N.Y. State Fin. Law § 135; N.Y. Gen. Mun. Law § 101.  The Project's thirteen prime contracts included the three Wicks Law work categories; the two "general trades" contracts awarded to Trataros; and specialized contracts for site excavation and foundation, structural steel, structural concrete, masonry, ductwork, sprinkler system/standpiping, fire alarm system, and temperature control.  DASNY also entered into an architectural and design services contract with Kohn Pedersen Fox Associates,

prime contracts, known as "Contract 15" and "Contract 16"
(jointly, the "Contracts").  Contracts 15 and 16 were among the
last prime contracts put out to bid and awarded by DASNY on the
Project.

Trataros submitted its bid for Contract 15 on or about
March 19, 1998.  Trataros' bid of $50,222,000 was accepted on
April 22 of that year, and Contract 15 was executed between
DASNY and Trataros on or about April 27.  The scope of work
under Contract 15 included construction of the Project's
windows, exterior curtainwall, exterior metal siding, elevators,
rough carpentry, and ceilings.

Contract 16, in turn, included the interior fit-
out/curtainwall, roofing installation, flooring installation and
finishing, swimming pool, acoustical spray, and miscellaneous
metal work.  Trataros' bid of $24,140,000 was accepted on August
27, 1998, and Contract 16 was executed between DASNY and
Trataros on or about September 1.

Both Contracts incorporated by reference certain "General
Conditions" governing the Project as a whole.  Among many other
things, the General Conditions contain: required
representations, warranties, and guarantees by contractors; a

---

P.C. ("KPF") and a series of three contracts with TDX
Construction Corp. ("TDX") for construction management services.
DASNY's contracts with KPF and TDX are addressed in detail in
the August 11 Opinion, 2010 WL 3199861, at *1-*2.

"time-is-of-the-essence" provision; a clause reserving DASNY's right to suspend the performance of work; a definition of "Extra Work," and an exclusive process for determining additional compensation therefor; a dispute-resolution article; and several risk-allocation provisions, including a clause stipulating that contractors cannot seek "increased costs, charges, expenses or damages of any kind" against DASNY as a result of "any delays or hindrances from any cause whatsoever" relating to the Project (the "no-damages-for-delay clause").

As a condition of being awarded Contracts 15 and 16, Trataros was required to obtain certain surety bonds, including both labor and materials payment bonds (the "Payment Bonds") and performance bonds (the "Performance Bonds").[5]  On or about April 27, 1998, Trataros obtained a Performance Bond and Payment Bond, each in the "penal sum" of $50,222,000, to guarantee its work under Contract 15.  On or about September 1, 1998, Trataros

---

[5] Labor and materials payment bonds (also known as "payment bonds") and performance bonds are types of contractors' bonds frequently utilized in public improvement contracts.  A payment bond "guarantees the owner that all bills for labor and materials contracted for and used by the contractor will be paid by the surety if the contractor defaults."  N.Y. Jur. 2d Bonds § 61; see also Area Masonry, Ltd. v. Dormitory Auth., 407 N.Y.S.2d 279, 280-81 (App. Div. 4th Dep't 1978).  A performance bond, by contrast, is "a bond which guarantees against a breach of contract and usually provides that if the contractor defaults and fails to complete the contract, the surety can itself complete the contract or pay damages up to the limit of the bond."  N.Y. Jur. 2d Bonds § 61; see also U.W. Marx, Inc. v. Mountbatten Sur. Co., Inc., 770 N.Y.S.2d 777, 780-81 (App. Div. 3d Dep't 2004) ("U.W. Marx").

obtained another Performance Bond and Payment Bond, each in the penal sum of $24,140,000, to guarantee its work under Contract 16. The terms and conditions of these two sets of bonds were drafted by DASNY as part of the Project's standard contract documents, and the Performance and Payment Bonds for Contracts 15 and 16 are identical in all material respects.

The issuing surety for both sets of bonds was Reliance Insurance Company ("Reliance"), and both sets of bonds named Trataros as principal and DASNY as obligee. Travelers and Reliance subsequently entered into an agreement, however, granting Travelers a power of attorney to act as administrator for the Project bonds, such that Travelers then became Trataros' surety under both the Performance and Payment Bonds.

In order to carry out its scope of work under Contracts 15 and 16, Trataros hired various subcontractors. Among its many subcontractors were LBL Sky Systems Corporation ("LBL"),[6] Jordan Panel Systems Corp. ("Jordan Panel"),[7] G.M. Crocetti, Inc.

---

[6] Trataros subcontracted with LBL on or about May 8, 1998, for the latter to fabricate and install windows and glazed aluminum curtainwall components included within the scope of Contract 15 for the base price of about $9.3 million.

[7] Trataros subcontracted with Jordan Panel on or about May 12, 1998, for the latter to fabricate and install exterior metal paneling included within the scope of Contract 15 for the base price of about $9.3 million.

("Crocetti"),[8] and Brooklyn Welding Ironworks, Inc. ("Brooklyn Welding")[9] (collectively, the "Subcontractors").   In each of its subcontracts ("the "Subcontracts"), Trataros included a standard "flow-down" or "conduit" provision providing that "[i]n respect of work covered by this Subcontract, and except as expressly modified herein, Subcontractor shall have all rights which contractor has under the Contract Documents, and Subcontractor shall assume all obligations, risks and responsibilities which Contractor has assumed towards Owner in the Contract Documents." Thus, pursuant to the flow-down clause, the General Conditions and other terms of Contracts 15 and 16 also became applicable to the Subcontractors.

## II.  Delays on the Project

The Project, which was designed and built on a "fast-track" basis, did not proceed on schedule.  Contract 15 was originally to be completed by September 1, 2000, while Contract 16 was originally to be completed by November 1, 2000.  On or about

---

[8] Trataros entered into a subcontract with Crocetti for the latter to install epoxy and pre-cast terrazzo and interior stonework within the scope of Contract 16 for the base price of about $3.0 million.  The Crocetti subcontract is dated September 18, 1998, but was actually signed by Crocetti and Trataros on March 29, 1999 and April 21, 1999, respectively.

[9] Trataros subcontracted with Brooklyn Welding on or about September 21, 1998, for the latter to install miscellaneous metal work within the scope of Contract 16 for the base price of $1.65 million.

August 15, 1999, the Project's construction manager, TDX,
provided Trataros with a new construction schedule including a
"late finish" date of September 1, 2001 for Trataros' work under
both Contracts.  Trataros agreed to complete its work within
this new time frame, provided that it did not "encounter future
circumstances causing delays" or "some unforeseen calamity."

On or about April 6, 2001, DASNY executed Change Order No.
GC2-064 ("Change Order GC2-64") to formalize an extension of
time for Trataros' performance of the Contracts until the
aforementioned "late finish" date.[10]  Change Order GC2-64
provided that Trataros' time for completion of Contract 15 would
be extended 365 days, while the time for Contract 16 would be
extended 304 days, thereby mandating a "new contract completion
date for both Contracts of September 1, 2001."  In accordance
with General Conditions § 11.02 (the no-damages-for-delay
clause), however, Change Order GC2-64 did not provide any
additional compensation to Trataros or its subcontractors.

In about July 2001, DASNY received a temporary certificate
of occupancy ("TCO") for the above-ground floors of the Project.
In late August 2001, those fourteen stories opened for the use
of Baruch.  On or about February 1, 2002, DASNY received a TCO

---

[10] Travelers explains that a change order is a "written
authorization provided to a contractor approving a change from
the original plans, specifications or other contract documents."
A change order often authorizes an increase or decrease in
contractor compensation in accordance with the change in work.

for the three basement levels of the Project.  As of about that date, according to the parties' expert witnesses, Trataros' work under Contracts 15 and 16 became "substantially complete."  At or about that time, Baruch began to occupy and use the basement levels.

On or about June 19, 2002, Travelers, Trataros, and several Trataros-affiliated individuals entered into a financing agreement (the "Financing Agreement").  Pursuant to the Financing Agreement, Trataros agreed to deposit all payments it received from any project, whether bonded by Travelers or not, into a joint checking account opened and owned by Travelers in Trataros' name (the "Joint Account").  In turn, to the extent Trataros required additional funding in order to complete its bonded projects or to pay its subcontractors or suppliers, Travelers deposited funds into the Joint Account for Trataros' use.  Nonetheless, at some point between mid-2002 and early 2003, Trataros largely or entirely ceased its business operations.[11]

As a result of various delays, obstacles, and deficiencies -- the responsibility for which is disputed among the parties -- DASNY issued dozens of Change Orders to extend the time for work

---

[11] The parties dispute the exact date.  DASNY asserts that "Trataros went out of business in mid-2002."  While Travelers asserts that Trataros is still an "active corporation," it concedes that "Trataros ceased business operations in Spring 2003."  Trataros has never entered bankruptcy.

and provide extra compensation to various contractors and
subcontractors.   Nevertheless, in many respects, the Project
participants could not reach agreement regarding who should bear
the loss for certain additional costs that were incurred.
Numerous subcontractors and suppliers made demands under
Trataros' Payment Bonds,[12] and at least some of those demands
were not honored.   Litigation ultimately ensued in both state
and federal fora.

PROCEDURAL HISTORY

On August 1, 2007, Travelers commenced this action by
filing a complaint (the "Complaint") asserting, inter alia, four
separately enumerated claims against DASNY.[13]  The first claim,
labeled "Breach of Contract," seeks payment of certain "contract
balances and retainages" allegedly due and owing to Trataros

---

[12] For example, in spring 2003, Crocetti filed a claim with
Travelers under the Contract 16 Payment Bond seeking
compensation for Crocetti's installation of epoxy terrazzo
flooring at the Project.

[13] This litigation is in its second round in federal court.
Travelers previously filed suit in June 2004 against DASNY, TDX,
and KPF.  See Travelers Cas. & Sur. Co. v. Dormitory Auth., No.
04 Civ. 5101 (HB).  After about a year of pretrial proceedings
before the Honorable Harold Baer, the case was voluntarily
dismissed without prejudice in October 2005 in order for the
parties to pursue mediation.  When the mediation failed,
Travelers re-filed this litigation, and the case was reassigned
to this Court.

under Contracts 15 and 16.[14]  The second claim, labeled "Impact Claims of Trataros" (the "Impact Claim"), seeks payment for "additional costs incurred by Trataros" resulting from "delays, lost productivity, inefficiencies, acceleration, cost escalation, and additional work."[15]  The third claim, labeled "Pass Through Claims" (the "Pass-Through Claims"), seeks impact damages suffered by four of Trataros' "subcontractors/ suppliers," with whom Travelers asserts it has concluded liquidating agreements.  The fourth, unlabeled claim (the "Bond Losses Claim"), brought on Travelers' own behalf, seeks to recover "expenses and attorney's fees which Travelers has incurred" in its role as Trataros' surety "as a result of DASNY's [] acts and/or omissions."

On September 28, 2007, DASNY answered Travelers' four claims and interposed three counterclaims (the "Counterclaims") against Travelers in turn.[16]  The first counterclaim (the

---

[14] DASNY does not seek summary judgment on this claim, which thus remains for trial.

[15] Travelers asserts that it brings the first and second claims in its capacity as subrogee to Trataros under the Performance and Payment Bonds and/or as assignee of Trataros' legal claims.

[16] DASNY and TDX also asserted cross-claims against KPF, including breach-of-contract, professional malpractice, contractual indemnification, common-law indemnification, and contribution claims by DASNY and common-law indemnification and contribution claims by TDX.  These cross-claims were dismissed by stipulation on May 13, 2010.

"Payment Bond Counterclaim") asserts that Travelers failed to pay various subcontractors who made claims against Travelers under the Payment Bonds and that, as a result of ensuing state-court litigation, DASNY was compelled to pay the subcontractors instead.  The second counterclaim (the "Breach-of-Contract Counterclaim") asserts that "Trataros breached Contract No. 15 and Contract No. 16[] by virtue of its delayed and defective work" and that Travelers should be held liable for Trataros' breach "[b]y virtue of Travelers' assumption of Trataros' obligations" under the Contracts.  The third counterclaim (the "Performance Bond Counterclaim") asserts that Travelers "wrongfully rejected" DASNY's demand for payment under the Performance Bonds.

On or about February 19, 2010, Travelers and DASNY each filed motions for summary judgment.  DASNY seeks dismissal of the second, third, and fourth claims asserted by Travelers, while Travelers seeks dismissal of all three Counterclaims. Travelers' motion became fully submitted on April 2, and DASNY's motion became fully submitted on April 9.

---

Also on September 28, 2007, DASNY and TDX filed a third-party complaint against Trataros asserting claims for breach of contract, contractual and common-law indemnification, and contribution.  On or about February 19, 2010, Trataros moved for partial summary judgment as to the indemnification and contribution claims.  After DASNY and TDX indicated that they did not oppose the partial motion, those claims were dismissed on June 22, 2010.  DASNY's two third-party breach-of-contract claims against Trataros remain to be tried.

DISCUSSION

Summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  In making this determination, the court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010).

Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set out specific facts showing a genuine issue for trial," and cannot "rely merely on allegations or denials" contained in the pleadings. Fed. R. Civ. P. 56(e); see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted).

Only disputes over material facts -- "facts that might affect the outcome of the suit under the governing law" -- will properly preclude the entry of summary judgment. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>see also</u> <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986) (stating that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").

Almost all of the claims and Counterclaims challenged in these two motions are essentially breach-of-contract claims whose adjudication depends, in part, on contract interpretation.[17]  Under New York law,[18] "[i]t is well settled that a contract is to be construed in accordance with the parties' intent, which is generally discerned from the four corners of the document itself." <u>MHR Capital Partners LP v. Presstek, Inc.</u>, 12 N.Y.3d 640, 645 (2009) ("<u>Presstek</u>").  "[A] written agreement that is complete, clear and unambiguous on its

---

[17] Under New York law, "[t]o establish a <u>prima facie</u> case for breach of contract, a plaintiff must plead and prove: (1) the existence of a contract; (2) a breach of that contract; and (3) damages resulting from the breach." <u>Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank</u>, 392 F.3d 520, 525 (2d Cir. 2004); <u>accord JP Morgan Chase v. J.H. Elec. of N.Y., Inc.</u>, 893 N.Y.S.2d 237, 239 (App. Div. 2d Dep't 2010).

[18] Subject matter jurisdiction over this litigation is founded on diversity of citizenship pursuant to 28 U.S.C. § 1332.  The parties do not dispute that all of the claims asserted by and between Travelers and DASNY are governed by New York law.

face must be enforced according to the plain meaning of its terms." Id. (citation omitted).  The parties do not appear to dispute that each written contract at issue in this litigation contains the full and complete terms of the parties' respective agreements.

"[A] motion for summary judgment may be granted in a contract dispute only when the contractual language on which the moving party's case rests is found to be wholly unambiguous and to convey a definite meaning." Topps Co., Inc. v. Cadbury Stani S.A.I.C., 526 F.3d 63, 68 (2d Cir. 2008).  Thus, "[t]he initial question for the court on a motion for summary judgment with respect to a contract claim is whether the contract is unambiguous with respect to the question disputed by the parties." Cont'l Ins. Co. v. Atl. Cas. Ins. Co., 603 F.3d 169, 180 (2d Cir. 2010) (citation omitted).  "Whether the contract is unambiguous is a question of law for the court." Id. (citation omitted).

"In interpreting a contract under New York law, words and phrases should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 206 (2d Cir. 2005) (citation omitted).  "[A] court should not adopt an interpretation which will operate to leave a provision of a contract without force

and effect." Amaranth LLC v. J.P. Morgan Chase & Co., 888
N.Y.S.2d 489, 493 (App. Div. 1st Dep't 2009) (citation omitted).
"Courts may not by construction add or excise terms, nor distort
the meaning of those used and thereby make a new contract for
the parties under the guise of interpreting the writing."
Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P., 13
N.Y.3d 398, 404 (2009) (citation omitted).

        The foregoing principles reflect the "general rule [that]
'parties should be free to chart their own contractual course'
unless public policy is offended." FCI Grp., Inc. v. City of
N.Y., 862 N.Y.S.2d 352, 356 (App. Div. 1st Dep't 2008) (quoting
Welsbach Elec. Corp. v. MasTec N. Am., Inc., 7 N.Y.3d 624, 629
(2006)).  "If the agreement on its face is reasonably
susceptible of only one meaning, a court is not free to alter
the contract to reflect its personal notions of fairness and
equity." Law Debenture Trust Co. of N.Y. v. Maverick Tube
Corp., 595 F.3d 458, 468 (2d Cir. 2010) (citation omitted).

                I.   Travelers' Claims Against DASNY
A.   Trataros' Impact Claim
        Travelers' second claim, the Impact Claim, is "a claim
against DASNY for impact damages on behalf of Travelers' bonded
principal, Trataros."  The Impact Claim seeks payment for
"additional costs incurred by Trataros" while completing

Contracts 15 and 16 and resulting from "delays, lost productivity, inefficiencies, acceleration, cost escalation, and additional work."  These "additional costs" are alleged in the Complaint to have been caused by, <u>inter alia</u>, "numerous differing site conditions"; "factors beyond the control of Trataros"; "DASNY's failure to take appropriate action to prevent unreasonable impacts to the Project"; "DASNY's failure to provide adequate coordination of the Project"; "DASNY's failure to provide non-defective plans, drawings and specifications"; "DASNY's breach of the implied covenant of good faith and fair dealing implicit in [the] Contracts"; "DASNY's gross negligence in administering the Project"; and DASNY's "active interference with" and/or "obstruction of Trataros' ability to perform [the] Contracts."  Travelers alleges that the foregoing impacts "were uncontemplated by Trataros at the time it bid on the Project" and "led to unreasonable and unforeseeable delays."

    1.   No-Damages-for-Delay Clauses Under New York Law

    DASNY asserts that the Impact Claim is barred by the no-damages-for-delay clause included in the General Conditions, which in turn were incorporated by reference into Contracts 15

and 16.[19]  Section 11.02 of the General Conditions, entitled

"Claims for Delay," provides:

> No claims for increased costs, charges, expenses or
> damages of any kind shall be made by the Contractor
> against the Owner for any delays or hindrances from any
> cause whatsoever; provided that the Owner, in the
> Owner's discretion, may compensate the Contractor for
> any said delays by extending the time for completion of
> the Work as specified in the Contract.

(Emphasis added).

The no-damages-for-delay clause is a type of "exculpatory

clause," and as such, it is "strictly construed against the

party" that relies on it.  Wolff & Munier, Inc. v. Whiting-

Turner Contracting Co., 946 F.2d 1003, 1008 (2d Cir. 1991).

Nonetheless, such a clause "is valid and enforceable and is not

contrary to public policy if the clause and the contract of

which it is a part satisfy the requirements for the validity of

contracts generally.'"  McNamee Constr. Corp. v. City of New

Rochelle, 875 N.Y.S.2d 265, 266 (App. Div. 2d Dep't 2009)

("McNamee") (quoting Corinno Civetta Constr. Corp. v. City of

---

[19] DASNY appears to concede that, absent the no-damages-for-delay
clause, Travelers would have a triable claim for delay damages.
Under New York law, the elements of such a claim include, inter
alia, "'that defendant was responsible for the delay; that these
delays caused delay in completion of the [plaintiff's] contract
(eliminating overlapping or duplication of delays); [and] that
the plaintiff suffered damages as a result of these delays.'"
Helena Assocs., LLC v. EFCO Corp., No. 06 Civ. 861 (PKL), 2008
WL 2117621, at *4 (S.D.N.Y. May 15, 2008) ("Helena Assocs.")
(quoting Manshul Constr. Corp. v. Dormitory Auth., 436 N.Y.S.2d
724, 728 (App. Div. 1st Dep't 1981)); see also Mid-State Precast
Sys. Inc. v. Corbetta Constr. Co. Inc., 608 N.Y.S.2d 546, 548-49
(App. Div. 3d Dep't 1994).

N.Y., 67 N.Y.2d 297, 309 (1986) ("Corinno")); accord U.S. ex
rel. Evergreen Pipeline Constr. Co., Inc. v. Merritt Meridian
Constr. Corp., 95 F.3d 153, 167 (2d Cir. 1996) ("Evergreen").
The parties' inclusion of a no-damages-for-delay clause, which
is "not uncommon in construction contracts," evidences the
contracting parties' "'unmistakable intent' that, as between
th[o]se parties, the contractor rather than the contractee is to
absorb damages occasioned by contractee-caused delay." Kalisch-
Jarcho, Inc. v. City of N.Y., 58 N.Y.2d 377, 384 (1983)
("Kalisch-Jarcho").[20]

The rule that no-damages-for-delay clauses are enforceable
is "not without its exceptions, however, and even exculpatory
language which purports to preclude damages for all delays
resulting from any cause whatsoever are not read literally."
Corinno, 67 N.Y.2d at 309; see also Kalisch-Jarcho, 58 N.Y.2d at
384.  The New York Court of Appeals has enumerated four
exceptions to the general rule that no-damages-for-delay clauses
are to be enforced:

> Generally, even with such a clause, damages may be
> recovered for: (1) delays caused by the contractee's

---

[20] The New York Court of Appeals observed in Kalisch-Jarcho that
"[w]hen inserted at the behest of public agencies, restrained as
these almost always are by limited financial authorizations, the
object of such a clause is not only the usually ascribed
avoidance of 'vexatious' litigation as to whether delays are
reasonable or unreasonable or, for that matter, real or fancied,
but also, hopefully, to discourage dilatoriness itself."
Kalisch-Jarcho, 58 N.Y.2d at 384.

> bad faith or its willful, malicious, or grossly
> negligent conduct, (2) uncontemplated delays, (3)
> delays so unreasonable that they constitute an
> intentional abandonment of the contract by the
> contractee, and (4) delays resulting from the
> contractee's breach of a fundamental obligation of
> the contract.

Corinno, 67 N.Y.2d at 309; see also Commercial Elec.

Contractors, Inc. v. Pavarini Constr. Co., Inc., 856 N.Y.S.2d

46, 47 (App. Div. 1st Dep't 2008) ("Pavarini") (paraphrasing the

Corinno standard).[21]

The defendant bears the "prima facie burden of establishing

that the damages sought by the plaintiff are barred by the no-

damage-for-delay exculpatory clause of the parties' contract."

Maric Mech., Inc. v. Dormitory Auth., 879 N.Y.S.2d 583, 583

(App. Div. 2d Dep't 2009) ("Maric").  Part of the defendant's

required showing is "demonstrating prima facie that none of the

exceptions to the 'damages for delay' clause are present."  Blue

Water Envtl., Inc. v. Inc. Vill. of Bayville, 843 N.Y.S.2d 681,

684 (App. Div. 2d Dep't 2007) ("Blue Water").  Once that prima

facie burden has been met, the burden shifts to the plaintiff to

"raise a triable issue of fact as the applicability of any of

---

[21] Some states also provide for an exception to no-damages-for-
delay clauses based on a contractee's "active interference" with
the contractor's performance.  This exception was rejected by
Kalisch-Jarcho, albeit over strong dissent, and is not included
as one of the four exceptions in Corinno.  See Kalisch-Jarcho,
58 N.Y.2d at 386 (rejecting "active interference" exception);
id. at 387, 387-91 (Wachtler, J., dissenting) (favoring the
exception).

the [Corinno] exceptions to the contractual bar." Maric, 879
N.Y.S.2d at 583; see also Blue Water, 843 N.Y.S.2d at 684.

In proving that one of the Corinno exceptions applies, the
plaintiff bears a "heavy burden." Dart Mech. Corp. v. City of
N.Y., 891 N.Y.S.2d 76, 77 (App. Div. 1st Dep't 2009) ("Dart");
accord Evergreen, 95 F.3d at 167.  For example, a plaintiff may
not rely on evidence that a defendant's conduct was merely
negligent or unreasonable.  The exculpatory clause is
"specifically designed to protect the contractee from claims for
delay damages resulting from its failure of performance in
ordinary, garden variety ways," and thus, "a broad no-damage-
for-delay clause would be meaningless unless it encompassed
within its scope a range of unreasonable as well as reasonable
delays because any other application would permit the exception
to swallow up the general rule."  Corinno, 67 N.Y.2d at 312-13;
see also Evergreen, 95 F.3d at 167.

General Conditions § 11.02 is, like most no-damages-for-
delay clauses, a broadly worded provision.  It prevents recovery
for "damages of any kind . . . for any delays or hindrances from
any cause whatsoever."  Similarly worded clauses have been held
to bar many kinds of damages, no matter how labeled or
characterized by a plaintiff.[22]  In Corinno, the New York Court

---

[22] See Nova Cas. Co. v. Liberty Mut. Ins. Co., 540 F. Supp. 2d
476, 483 (S.D.N.Y. 2008) ("Nova") (concluding that plaintiff's

of Appeals rejected the plaintiffs' attempt to distinguish "[claims] for increased costs in labor, materials, and equipment occurring prior to the expiration of the contract period" from "claims for damages resulting from a delay of the project beyond the scheduled completion date," finding that both were barred by the no-damages-for-delay clause.  Corinno, 67 N.Y.2d at 313. The Court of Appeals observed that "[a]ll delay damage claims seek compensation for increased costs," and concluded that, however the plaintiffs' claims were characterized, "[t]he claims are claims for delay and the exculpatory clause was drafted and included in the contract to bar them."  Id. at 313-14.

    2.   The Applicability of Corinno Exceptions

    In seeking to avoid the no-damages-for-delay clause, Travelers relies principally upon the "uncontemplated delay" exception.  Travelers also contends, in passing, that the "gross negligence" exception applies as well.[23]  Each of these two exceptions is discussed below.[24]

─────────────────────────

"equitable adjustment" claim for "loss of productivity, materials escalation, labor escalation, extended field overhead, and extended equipment rental" was "really just a masked 'damages for delay' claim" and therefore barred); Permis Constr. Corp. v. N.Y. City Hous. Auth., 773 N.Y.S.2d 58, 59 (App. Div. 1st Dep't 2004) ("[R]egardless of the label attached to it, [the contractor's claim] amounts to a delay claim that is barred by the no-damages-for-delay clause of the contract.").

[23] Although Travelers pleads all four Corinno exceptions in its Complaint, Travelers appears to have abandoned on summary

a.   Uncontemplated Delay

The second Corinno exception applies where "'the delays or their causes were not within the contemplation of the parties at the time they entered into the contract.'"  McNamee, 875 N.Y.S.2d at 267 (quoting Corinno, 67 N.Y.2d at 309-10).  The exception is "based on the concept of mutual assent."  Corinno, 67 N.Y.2d at 310.  "It can hardly be presumed . . . that the contractor bargained away his right to bring a claim for damages resulting from delays which the parties did not contemplate at the time" of entering into the contract.  Id.  Therefore, "even broadly worded exculpatory clauses . . . are generally held to encompass only those delays which are reasonably foreseeable, [which] arise from the contractor's work during performance, or which are mentioned in the contract."  Id.; see also Blue Water, 843 N.Y.S.2d at 684 (delays must be "wholly unanticipated" to be actionable (citation omitted)); N. Star Contracting Corp. v. City of N.Y., 611 N.Y.S.2d 11, 12 (App. Div. 1st Dep't 1994) (same).

---

judgment its arguments based on the other two Corinno exceptions.

[24] Carolina Casualty Insurance Company ("Carolina"), the surety to Crocetti, argues in its separate brief opposing summary judgment that there is a further triable question regarding whether the fourth Corinno exception, "breach of a fundamental obligation," applies with respect to Crocetti's impact claims. Because Crocetti's claims are dismissed on other grounds, however, this exception need not be considered.

New York courts apply several general principles in determining whether a delay was "uncontemplated."  These principles were summarized recently in Premier-New York, Inc. v. Travelers Prop. Cas. Co., a delay-damages case also arising out of this Project.  Index No. 603043-2003, 2008 WL 2676800 (Sup. Ct. N.Y. County July 8, 2008) ("Premier").  In Premier, Justice Fried explained, first, that "[i]t is not necessary that the contract specifically contemplate the exact occurrences giving rise to the delay; all that is required is that the class of occurrence have been contemplated."  Id. at *13; see also Blau Mech. Corp. v. City of N.Y., 551 N.Y.S.2d 228, 230 (App. Div. 1st Dep't 1990) ("Blau"); Buckley & Co. v. City of N.Y., 505 N.Y.S.2d 140, 142 (App. Div. 1st Dep't 1986) ("Buckley").  Second, where a contract "discusses a potential cause (or class of causes) of delay, subsequent delays arising from that cause are considered to have been contemplated by the parties."  Premier, 2008 WL 2676800, at *13; see Blau, 551 N.Y.S.2d at 229-30; Visconti Corp. v. LaBarge Bros. Co., Inc., 707 N.Y.S.2d 566, 567 (App. Div. 4th Dep't 2000) ("Visconti").  Third, "ordinary, garden variety" poor performance by the contractee is within the contemplation of the parties, Corinno, 67 N.Y.2d at 313, and therefore conduct by a contractee "amount[ing] to nothing more than inept administration or poor planning" does not fall within

the Corinno exceptions.  Pavarini, 856 N.Y.S.2d at 47.[25]  Fourth,

delays resulting from failures of coordination are within the

contemplation of the parties in cases of complex, multi-

contractor litigation.  See Premier, 2008 WL 2676800, at *12;

Gottlieb Contracting, Inc. v. City of N.Y., 446 N.Y.S.2d 311,

312 (App. Div. 1st Dep't 1982).

    DASNY has shown that the damages Travelers seeks in the

Impact Claim are barred by the no-damages-for-delay clause in

the General Conditions, and that none of the Corinno exceptions

applies.  In attempting to create a triable issue of fact,

Travelers relies on the following evidence and arguments.

First, Travelers observes -- relying on the parties' expert

consensus that Trataros' work under the Contracts was

substantially completed by about February 1, 2002, when a TCO

was issued for the Project's three basement levels -- that

_____

[25] See also Blue Water, 843 N.Y.S.2d at 684 (distinguishing
"inept administration" from "willful interference"); Bac-Jat
Contracting, Inc. v. N.Y. City Hous. Auth., 766 N.Y.S.2d 352,
352 (App. Div. 1st Dep't 2003) ("Bac-Jat") (affirming grant of
summary judgment where plaintiff's claim was "tantamount to an
allegation of poor contract administration"); T.J.D. Constr.
Co., Inc. v. City of N.Y., 743 N.Y.S.2d 111, 112 (App. Div. 1st
Dep't 2002) ("T.J.D.") (concluding that "the poor planning and
scheduling of which plaintiff complains 'amounted to no more
than inept administration' within the scope of the no-damages-
for-delay clause" (citation omitted)); S.N. Tannor, Inc. v.
A.F.C. Enters., Inc., 714 N.Y.S.2d 273, 274 (App. Div. 1st Dep't
2000) ("S.N. Tannor") (noting that the "actions by [defendant]
alleged to have caused the complained of delays and [to have]
necessitated extra work amounted to no more than inept
administration and, as such, fall within the subcontract's
exculpatory provisions").

"Contract[s] 15 and 16 were respectively extended 17 months and 15 months longer than anticipated."[26]  Second, Travelers contends that KPF committed numerous "design errors and omissions" throughout the Project, resulting in "prodigious amounts of requests for information ('RFIs')," and that this "professional negligence" was not contemplated by Trataros at the time of bidding.[27]  To support this assertion regarding KPF's negligence, Travelers relies heavily on various accusations made by DASNY in a May 2002 demand letter claiming damages against KPF for the latter's allegedly faulty design work, a letter which Travelers characterizes as constituting an admission by DASNY that KPF was negligent.  Third, Travelers asserts that TDX was also negligent because its "CPM schedules used to manage and coordinate the work of the prime contracts was [sic] inadequate for the size and scope of this project, riddled with logical flaws, and manipulated to maintain artificial deadlines imposed by the owner."  Finally, Travelers apparently relies on the conclusions of Buric and another expert, Cashin Spinelli & Ferretti, LLC

---

[26] For example, the expert report of R.V. Buric Construction Management Consultants, Inc. ("Buric") concludes that the "performance period" for Contract 15 ran for 1,381 calendar days instead of the planned 876, and that Contract 16 ran for 1,255 days instead of the planned 856.

[27] Travelers also contends that "Trataros directly issued over 650 RFIs seeking clarification of the contracts plans [sic] and specifications," and that DASNY and TDX acknowledged that the "amount of RFIs significantly impacted Trataros" through comments contained in change order memoranda prepared by TDX.

("CSF"), that the delays experienced by Trataros could not have been contemplated or foreseen at the time of contracting.[28]

Travelers has failed to demonstrate a triable issue of fact.  Several considerations compel this result.  First, Travelers has failed, with perhaps a single exception discussed below,[29] to describe with any precision what its Impact Claim addresses, much less to present admissible evidence demonstrating who was responsible for any particular category of Impact Claim damages; how that malfeasance damaged Trataros; and how those damages were uncontemplated by the parties at the time of entering into Contracts 15 and 16.  This last point is fatal since the Contracts explicitly contemplated many of the types of delay for which Trataros and its Subcontractors appear to be seeking damages.  Contracts 15 and 16 allocated risk for, and thereby contemplated, many potential sources of delay, including: delays resulting from the acts or omissions of other prime contractors and their subcontractors;[30] delays resulting

---

[28] Travelers also relies on much of the foregoing reasoning to support its Subcontractors' Pass-Through Claims.  The Pass-Through Claims are discussed in Section I.B below.

[29] This exception is the "Girt Tolerance Issue" addressed in Subsection I.B.3 below.

[30] General Conditions § 13.01, entitled "Cooperation with Other Contractors," provides inter alia that "[s]hould the Contractor sustain any damage through any act or omission of any other contractor having a contract with the Owner or through any act or omission of any Subcontractor of said other contractor, the

from the Owner's reasonable "suspension, interruption or delay"
of a contractor's performance;[31] delays resulting from a
contractor's own manpower and supply issues;[32] delays resulting
from limited hoist or elevator availability;[33] and delays
resulting from early occupancy of the Project by the Owner.[34]
Moreover, the bidding documents for Contracts 15 and 16 warned

--------

Contractor shall have no claim against the Owner for said
damage."

[31] General Conditions § 10.04, entitled "Suspension of Work,"
provides that "[t]he Owner may order the Contractor in writing
to suspend, delay or interrupt performance of all or any part of
the Work for a reasonable period of time as the Owner may
determine," and stipulates that "such suspension, interruption
or delay of the performance of the Work . . . shall not increase
the cost of performance of the Work of this Contract."

[32] General Conditions § 5.02, entitled "Representations of
Contractor," provides that the "Contractor represents and
warrants" that it "has the staff, manpower, equipment,
subcontractors, and suppliers available to complete the Work
within the time specified for the contract price."

[33] Section 1500.05(B)(1), included in the Supplemental General
Requirements to both Contracts 15 and 16, provides that "[n]o
claims or extras will be entertained because of limited
availability of the hoists."  Section 1500.06(A)(4), likewise
included in both Supplemental General Requirements, provides
that "[n]o claims or extras will be entertained because of
limited availability of the material elevators for hoisting."
Section 1500.07(A)(5), also in both, provides that "[n]o claims
or extras will be entertained because of limited availability of
the hoist/elevators."

[34] General Conditions § 16.01, entitled "Occupancy Prior to
Acceptance," provides in pertinent part that "[i]f, before,
Construction Completion, the Owner desires Beneficial Occupancy
of the Work, or any part thereof, which is completed or partly
completed, or to place or Install therein equipment and
furnishings, the Owner shall have the right to do so."

Trataros and other prospective bidders to "examine the Contract Documents carefully" and to "inspect[] the Site" prior to bidding.[35]  Thus, insofar as Travelers' "Impact Claim" seeks to recover additional costs relating to the foregoing causes of delay -- bearing in mind that Travelers' asserted bases for seeking delay damages include such vague categories as "numerous differing site conditions" and "factors beyond the control of Trataros" -- those claims were contemplated by the contract and therefore cannot be recovered under the "uncontemplated delay" exception.[36]

Likewise, to the extent that the Impact Claim is actually a request for payment for extra work masquerading as a delay-damages claim, that claim would be foreclosed by the Contracts' requirement that such requests be made through a specific

---

[35] The "Information for Bidders" with Contracts 15 and 16 indicated that "[a]t the time of the opening of bids, each Bidder shall be presumed to have inspected the Site and to have read and to be familiar with all the Contract Documents."

[36] No-damages-for-delay clauses are routinely enforced when contract provisions demonstrate that the causes of delay on which the plaintiff relies in bringing its delay-damage claim were anticipated by the parties.  See, e.g., Dart, 891 N.Y.S.2d at 77; McNamee, 875 N.Y.S.2d at 267; Universal/MMEC, Ltd. v. Dormitory Auth., 856 N.Y.S.2d 560, 561 (App. Div. 1st Dep't 2008) ("Universal/ MMEC"); Pavarini, 856 N.Y.S.2d at 47; Grace Indus., Inc. v. N.Y. City Dep't of Transp., 802 N.Y.S.2d 409, 410 (App. Div. 1st Dep't 2005) ("Grace"); T.J.D., 743 N.Y.S.2d at 111; Visconti, 707 N.Y.S.2d at 567; Burt Welding & Auto. Repair Inc. v. U.W. Marx Inc., 707 N.Y.S.2d 548, 549 (App. Div. 3d Dep't 2000).

process set forth in the General Conditions.  First, § 8.01(A)

of the General Conditions provides:

> Without invalidating the Contract, the Owner may order
> Extra Work or make changes by altering, adding to, or
> deducting from the Work, the Contract consideration
> being adjusted accordingly.  No claims for Extra Work
> shall be allowed unless such Extra Work is ordered in
> writing by the Owner.  No changes in the Work shall be
> made unless such Work is ordered in writing by the
> Owner or Owners [sic] Representative.  If the time for
> completion is affected by this change the revised time
> for completion shall be included in the change order.
> The Owner may order the Contractor to perform the
> Extra Work and proceed under the Dispute Article
> [i.e., Article 11].

(Emphasis added).  In turn, if a contractor wishes to make an

extra-work claim, the contractor must follow the process

specified in General Conditions § 11.01(A).  That Subsection

provides that within "fifteen (15) working days after being

ordered to perform the Work claimed by the Contractor to be

Extra Work," the contractor must give written notice, including

a cost estimate and a formal request for a determination by the

Owner as to whether the claim involves extra work.  Section

11.01(A) further mandates that "[t]he Contractor's failure to

comply with any or all parts of [Article 11] shall be deemed to

be: (1) a conclusive and binding determination . . . that said

order, Work, action or omission does not involve Extra Work" and

"(2) a waiver by the Contractor of all claims for additional

compensation or damages as a result of said order, Work, action

or omission."

32

Second, even where the Contracts did not explicitly discuss the delay-causing "factors" upon which Travelers may be relying, the sources of delay alluded to by Travelers in its briefing were nevertheless clearly within the contemplation of the parties at the time of contracting.  Claims for damages based on "ordinary, garden variety" delays arising from an owner's negligent supervision, a fellow contractor's defective or delayed performance, an architect's slow review of shop drawings, and the like, are all routinely barred by a no-damages-for-delay clause.[37]  Corinno, 67 N.Y.2d at 313.  Thus, the delays for which Trataros may be seeking compensation,

---

[37] See, e.g., Blue Water, 843 N.Y.S.2d at 684 ("foreseeable winter weather" and delays caused by "decisions made by entities specifically mentioned in the contract, to wit, the owner and/or engineer"); Harrison & Burrowes Bridge Constructors, Inc. v. State, 839 N.Y.S.2d 854, 856-57 (App. Div. 3d Dep't 2007) ("cold weather" and "delays in reviewing shop drawings [which] delayed the entire project"); Landis & Gyr Powers, Inc. v. Berley Indus., Inc., 750 N.Y.S.2d 82, 83 (App. Div. 2d Dep't 2002) ("delays allegedly caused by [prime contractor's] mismanagement of the project and failure to compel another subcontractor . . . to timely and properly perform work upon which the plaintiff's work depended," thereby causing 418-day delay); S.N. Tannor, 714 N.Y.S.2d at 274 (contractor's actions "amounted to no more than inept administration and, as such, fall within the subcontract's exculpatory provisions"); Martin Mech. Corp. v. P.J. Carlin Constr. Co., 518 N.Y.S.2d 166, 168 (App. Div. 2d Dep't 1987) (defendants' conduct "merely amounted to bad administration"). But see J.R. Stevenson Corp. v. Westchester County, 493 N.Y.S.2d 819, 824 (App. Div. 2d Dep't 1985) ("[E]vidence indicating that there had been close to 1000 revisions and clarifications to the contract plans coupled with the related evidence regarding alleged misrepresentations regarding ground water conditions, drainage systems and underground electrical lines, raise triable issues of fact which cannot be resolved merely by reference to the motion papers submitted.").

insofar as they are articulated, appear to be unremarkable, foreseeable risks of construction.

Third, any consideration of what was reasonably within the contemplation of the parties at the time of contracting must take into account the commercial context.  Trataros was the last of around a dozen prime contractors to join a complex construction project in the heart of a busy commercial neighborhood in this City, and it did so with full knowledge of the number of other participants involved.  Having been supplied before bidding with all of the Contract Documents -- documents which Trataros was required to review -- Trataros was also well aware that the Project was architecturally "ambitious" (as Travelers alleged in the Complaint).  The fact that design modifications, delays, or other difficulties could arise on such a project would not surprise a prudent bidder.  Cf., e.g., McNamee, 875 N.Y.S.2d at 267 ("experienced excavator[] must have reasonably foreseen the possibility that a utility company would be unable or unwilling to move its underground lines").  By nonetheless submitting bids on those Contracts,[38] Trataros committed itself to acquiring two contractual bundles of rights,

---

[38] Materials included with DASNY's summary judgment papers reveal that, for Contract 15, there were 5 bidders and 35 "plan holders" (i.e., potential bidders).  Trataros, which was awarded Contract 15, had the lowest bid by a margin of approximately $1.3 million.  For Contract 16, there were at least 4 bidders and at least 30 plan holders.  This time, Trataros had only the second-lowest bid, but was nevertheless awarded the Contract.

duties, and risks that, by Trataros' own valuation, were worth approximately $50 million and $24 million respectively.  As a commercially sophisticated actor with extensive experience in the construction industry, Trataros could be expected to review the risk allocation provisions contained in the Contracts (which, as both parties observe, were not unlike those contained in other DASNY contracts) and to have contemplated those provisions carefully in determining the amounts of each bid.  As such, there is no reason not to hold Trataros to its bargain.[39] See Kalisch-Jarcho, 58 N.Y.2d at 384 (noting that no-damages-for-delay clauses are enforceable, "especially when entered into at arm's length by sophisticated contracting parties").

Indeed, New York courts treat with skepticism claims by sophisticated commercial actors that the terms for which they bargained should not be enforced, finding that such an outcome would undermine freedom of contract.[40]  Particularly where complicated, high-dollar value contracts are at issue, courts are skeptical of claims that certain risks were "uncontemplated"

---

[39] As Travelers itself argued to the court in the Premier litigation, "the policy favoring enforcement of the party's bargain is most applicable when the parties are sophisticated business enterprises with substantial experience."

[40] See, e.g., S. Rd. Assocs., LLC v. Int'l Bus. Machs. Corp., 4 N.Y.3d 272, 277 (2005); Oppenheimer & Co., Inc. v. Oppenheim, Appel, Dixon & Co., 86 N.Y.2d 685, 695 (1995) ("Oppenheimer"); Flag Wharf, Inc. v. Merrill Lynch Capital Corp., 836 N.Y.S.2d 406, 406 (App. Div. 1st Dep't 2007).

at the time of contracting.  As Justice Scheinkman observed with respect to another ambitious Manhattan building project:

> The Court is not unmindful that Plaintiff undertook a $61.5 million Contract.  To the extent that the problems complained of under these causes of action were made Plaintiff's problems by the terms of the Contract, Plaintiff agreed to assume them in exchange for the contract price.  To the extent that Plaintiff assumed the problems but is now complaining that the compensation is not sufficient, Plaintiff is bound by the provisions it agreed to.

Century-Maxim Constr. Corp. v. One Bryant Park, LLC, Index No. 24683-2008, 2009 WL 1218895, at *21 (Sup. Ct. Westchester County Apr. 7, 2009).

Finally, Travelers cannot achieve a triable claim based solely on its experts' conclusions that the delays were "unreasonable" or could not have been contemplated by Trataros at the time of contracting.  "An expert's report is not a talisman against summary judgment."  In re Omnicom Grp., Inc. Sec. Litig., 597 F.3d 501, 512 (2d Cir. 2010) (citation omitted).  "Although the [expert] reports must be construed in the non-moving party's favor, if the admissible evidence is insufficient to permit a rational juror to find in favor of the plaintiff, the court remains free to . . . grant summary judgment for defendant."  Id. Having failed to tender other admissible evidence to raise a question of fact that the delays were uncontemplated by the parties, the opinions expressed in the CSF and Buric expert reports that the "[t]he numerous delays experienced by Trataros

could not have been foreseen when Trataros entered into its
Contract(s)" and that "the impacts were of a nature and duration
that no contractor could have reasonably foreseen or discovered
at the time the contracts were signed" are insufficient to raise
any question of fact.  Accordingly, Travelers has failed to
present evidence to create a triable issue of fact as to the
"uncontemplated delay" exception.

      b.   Gross Negligence

Travelers also appears to contend that the no-damages-for-
delay clause may not be enforced because Trataros' damages were
"caused by [DASNY's] bad faith or its willful, malicious, or
grossly negligent conduct."  Corinno, 67 N.Y.2d at 309.  "More
pointedly, an exculpatory clause is unenforceable when, in
contravention of acceptable notions of morality, the misconduct
for which it would grant immunity smacks of intentional
wrongdoing."  Kalisch-Jarcho, 58 N.Y.2d at 385; see also A.H.A.
Gen. Constr., Inc. v. N.Y. City Hous. Auth., 92 N.Y.2d 20, 31
(1998) ("A.H.A.").  Conduct that "betokens a reckless
indifference to the rights of others" constitutes "gross
negligence" for the purposes of this exception.  Kalisch-Jarcho,
58 N.Y.2d at 385.

Travelers has failed to adduce evidence raising a triable
issue of fact as to whether DASNY was grossly negligent.

Travelers has tendered evidence indicative of, at worst, ordinary negligence.  Delays arising out of "no more than ordinary negligence at most" are barred by a no-damages-for-delay clause.  Obremski v. Image Bank, Inc., 816 N.Y.S.2d 448, 450 (App. Div. 1st Dep't 2006); see also Teddy Giannopulos Gen. Contractors, Inc. v. N.Y. City Hous. Auth., 688 N.Y.S.2d 536, 537 (App. Div. 1st Dep't 1999).

    3.   Waiver of No-Damages-for-Delay Clause

    Travelers asserts that, even if none of the Corinno exceptions applies, DASNY has nonetheless waived its right to enforce the no-damages-for-delay clause.  "Contractual rights may be waived if they are knowingly, voluntarily and intentionally abandoned."  Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P., 7 N.Y.3d 96, 104 (2006) ("Portfolio Advisors").  "[W]aiver of a contractual right 'may be established by affirmative conduct or by failure to act so as to evince an intent not to claim a purported advantage . . . and must be based on a clear manifestation of intent to relinquish a contractual protection.'"  Natale v. Ernst, 881 N.Y.S.2d 232, 233 (App. Div. 3d Dep't 2009) (quoting Portfolio Advisors, 7 N.Y.3d at 104); accord Capitol Records, Inc. v. Naxos of Am., Inc., 372 F.3d 471, 482 (2d Cir. 2004).  "A waiver is not created by negligence, oversight, or thoughtlessness, and cannot

38

be inferred from mere silence.  Rather, there must be proof that
there was a voluntary and intentional relinquishment of a known
and otherwise enforceable right." Golfo v. Kycia Assocs., Inc.,
845 N.Y.S.2d 122, 124 (App. Div. 2d Dep't 2007) (citation
omitted).  Moreover, for the parties' conduct to amount to a
waiver, "it 'must not otherwise be compatible with the agreement
as written,'" and "'the conduct of the parties must evidence an
indisputable mutual departure from the written agreement.'"
Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 783 (2d
Cir. 2003) (quoting Rose v. Spa Realty Assocs., 42 N.Y.2d 338,
344, 346 (1977)).  "[T]he existence of an intent to waive a
contractual right generally presents a question of fact."
Natale, 881 N.Y.S.2d at 233; accord Portfolio Advisors, 7 N.Y.3d
at 104.  Because the effect of waiver is to "relinquish a
contractual protection," however, "waiver should not be lightly
presumed." Portfolio Advisors, 7 N.Y.3d at 104 (citation
omitted).

    Travelers' waiver argument depends upon the following
assertions.  First, Travelers argues that "DASNY's conduct in
executing and paying a number of change orders in payment of
delay and impact costs served to waive the exculpatory clauses."
Travelers contends that DASNY's payments to Trataros included
"change orders [constituting] explicit settlements of delay
claims asserted by a number of Trataros' subcontractors" as well

as "change orders compensating Trataros for extra costs incurred
as a result of Project delays."  Travelers asserts that DASNY
executed and paid at least twelve change orders constituting
settlements of delay claims asserted by Trataros'
subcontractors.[41]  Travelers observes that each of the change
orders was accompanied by a memorandum from TDX indicating,
inter alia, that "[a]ppropriate consideration will be made at a
future date, in accordance with contractual obligations for any
time impact to the contract and costs associated with same."
Travelers also points to several "supplementary worksheets"
prepared by DASNY as part of its change-order evaluation process
indicating that DASNY "assumed responsibility" for a given
percentage of the delay experienced by each subcontractor.[42]  As
a result, Travelers contends that "compensation for delay was
not only the primary motive for the issuing of the change
orders, but an ongoing basis for potential reimbursement."
Travelers also observes that DASNY executed at least six change
orders to settle delay claims made by other prime contractors.

---

[41] These change orders were issued as to Crocetti in November
2001 (the "Crocetti Change Order"); AMMFE Inc. in August 2002;
Stretchwall Installations, Inc., Shroid Construction, Inc., DAG
Floors, Inc., Mometal, Inc., Component Assembly System, Inc.,
L&L Painting Inc., and Klepp Wood Flooring Corp. in September
2003; Ace Elevator Co., Inc. and Constructamax, Inc. in February
2004; and R&J Construction Corp. in February 2005.  The amounts
of these change order payments ranged from less than $4,000 to
more than $1 million.

[42] These percentages range from 32% to 75%.

Travelers' waiver argument cannot succeed.  Travelers overlooks that all but one of the twelve change orders upon which it relies include express reservations by DASNY of its contractual rights.[43]  In particular, these eleven change orders provide, in pertinent part:

> This change order is <u>issued pursuant to Article 11 of the Contract</u>.  Neither this Change Order nor the extension of time for performance granted hereunder constitutes an admission by DASNY that it is responsible for any delays or hindrances to work under the Contract.  <u>No claims for</u> increased costs, changes, expenses, or <u>damages of any kind shall be made by the Contractor against DASNY for any delays or hindrances from any cause whatsoever</u>, including but not limited to any delays or hindrances contemplated by this Change Order.  <u>DASNY reserves its rights to rely on and enforce the terms of the contract and New York law in connection with this Change Order</u>.  DASNY further reserves its right to independently assess and allocate responsibility for delay to the Contract.

---

[43] Unlike the eleven other change orders, the Crocetti Change Order does not contain an explicit reservation of rights or otherwise signal DASNY's continued reliance on Article 11 of the General Conditions.  Rather, the Crocetti Change Order states on its face that it is "an advance allocation of funds, for the anticipated settlement, of the sub contractor's (Crocetti) delay claim."  The Crocetti Change Order indicates that "[t]he advance payment pertains to the escalation portion only," and that "[t]he lost productivity portion shall be addressed at a later date."  Because Crocetti's delay claim must be dismissed on other grounds, however, it need not be decided whether a triable issue of fact exists regarding whether DASNY waived its rights vis-à-vis Crocetti.

(Emphasis added).[44]   (Article 11, entitled "Disputes," is the section of the General Conditions which, <u>inter alia</u>, governs claims for extra work and which contains the no-damages-for-delay clause.)   Moreover, even the accompanying TDX memoranda state that "<u>[a]ny time impact</u> to the contract or any costs associated with an extension of time to the contract <u>is not acknowledged</u> and <u>has not been determined</u> at this time," and that "[a]ppropriate consideration will be made at a future date, <u>in accordance with contractual obligations</u> for any time impact to the contract and costs associated with same" (emphasis added). The change orders' express invocation and reservation of DASNY's Article 11 rights shows that DASNY's conduct was not "'a clear manifestation of intent to relinquish a contractual protection,'" <u>Natale</u>, 881 N.Y.S.2d at 233 (quoting <u>Portfolio Advisors</u>, 7 N.Y.3d at 104).   A party does not make "ma[k]e the conscious choice" to waive its rights by explicitly reserving its power to enforce them.   <u>Mooney v. City of N.Y.</u>, 219 F.3d 123, 131 (2d Cir. 2000) (citation omitted); <u>see also, e.g.</u>, <u>225 Fifth Ave. Retail, L.L.C. v. 225 5th L.L.C.</u>, Index No. 601659-

---

[44] Change Order GC2-64 -- the order extending Trataros' time for completion on Contracts 15 and 16 until September 1, 2001 -- also affirmed that it was "being issued pursuant to Article 11 Disputes, Section 11.02 Claims for Delay" and mandated that "[n]o claims for increased costs, changes, expenses or damages of any kind shall be made by Trataros against DASNY for any delays or hindrances from any cause whatsoever, including but not limited to any delays or hindrances contemplated by this change order."

2007, 2009 WL 2208336, at *10 (Sup. Ct. N.Y. County July 7, 2009) (reservation-of-rights statement negated any possible inference of waiver based on parties' course of conduct).

Second, Trataros itself waived whatever rights it has to seek delay damages from DASNY with respect to the disputes for which DASNY has already executed a change order settlement.  By signing each change order and accepting payment, Trataros explicitly agreed to "release and forever discharge [DASNY] from any and all actions, causes of action, claims and demands whatsoever . . . in any way arising out of this change."[45]  Cf. Nova, 540 F. Supp. 2d at 481 (contractor waived its right to seek additional damages from DASNY by virtue of the "clear and unambiguous" printed release contained in prior change orders executed by DASNY and accepted by the contractor); Northgate Elec. Corp. v. Barr & Barr, Inc., 877 N.Y.S.2d 36, 37 (App. Div. 1st Dep't 2009) (plaintiff's delay-damage claim "barred by the release clause" contained in "global change order").  Thus,

---

[45] On one of the twelve change orders executed by DASNY -- Change Order GC2-147, which settled a claim brought on behalf of Trataros' subcontractor AMMFE Inc. -- there is an asterisked note accompanying Trataros' signature stating: "See Trataros proposal which includes a statement regarding reservation of rights for add. cost + time extension."  Trataros' letter proposal, in turn, states that Trataros would "not withstanding the release . . . reserve[] its rights concerning any such impact, as well as its right to seek an appropriated [sic] extension of time."  The other eleven change orders, by contrast, do not reference on their face any reservation of rights by Trataros.

these change orders not only reserved DASNY's right to rely on the no-damages-for-delay clause but also constitute a waiver of Trataros' right to seek damages arising from the conditions addressed in the change order.

The worksheets prepared by DASNY also do not raise a triable question of waiver.  Travelers relies on a certain line entry in each worksheet which reads, "DASNY assumed responsibility," followed by a particular percentage value.  For example, on Change Order GC2-201, which settled a claim made by DAG Floors, Inc., the worksheet indicates that "DASNY [a]ssumed [r]esponsibility" for 66% of the delay.  Nonetheless, DASNY's recognition, as a <u>factual</u> matter, that it played a role in causing delay is not equivalent to an admission of a <u>legal</u> obligation to compensate Trataros for those delays.  Indeed, the very purpose of a no-damages-for-delay clause is to bar damages even where the factual cause of delay is, undisputedly, the owner.  <u>See, e.g.</u>, <u>Evergreen</u>, 95 F.3d at 167 ("Lest the exceptions swallow the rule, delay clauses proscribe damages for a broad range of both reasonable and unreasonable delays.").  DASNY's internal worksheets simply do not indicate an intent on the part of Travelers to forgo its contractual rights, and the language of the change orders themselves shows the opposite.

The cases upon which Travelers relies do not compel a different result.  Travelers relies heavily on <u>Plato General</u>

44

Construction Corp./EMCO Tech Construction Corp., JV. LLC v. Dormitory Authority of the State of New York ("Plato"), a recent case in which the Brooklyn Supreme Court found that a triable question of fact existed regarding whether DASNY waived a no-damages-for-delay clause identical in its terms to the one at issue in this litigation. Plato, Index No. 9446-2005, 2008 WL 5073190, at *11 (Sup. Ct. Kings County Dec. 2, 2008). Plato is at odds with the precedent cited above and is neither binding nor persuasive in its analysis. It will not be followed.

Travelers' claim is also not salvaged by its reliance on Eldor Contracting Corp. v. County of Nassau, 775 N.Y.S.2d 556 (App. Div. 2d Dep't 2004) ("Eldor").[46] In Eldor, the Appellate Division expressed its conclusion that "[t]he plaintiff adduced sufficient evidence from which a jury could reasonably conclude that the County waived th[e] [no-damages-for-delay] clause." Id. at 557. The Eldor court did not, however, discuss the evidence upon which it relied in making that determination. The bare holding of another court that a no-damages-for-delay clause might have been waived does not necessarily compel the same

---

[46] Travelers also cites Williams & Sons Erectors, Inc. v. S.C. Steel Corp., 983 F.2d 1176 (2d Cir. 1993), but that case is inapposite. Williams & Sons concerned the question of whether a no-damages-for-delay clause was ambiguous, given the existence of a conflicting provision in the contract, and not the question of whether the clause had been waived. Id. at 1183-84.

result on different facts.  As such, Travelers' Impact Claim
against DASNY must be dismissed.

B.   Subcontractors' Pass-Through Claims

       DASNY also seeks dismissal of the third count of the
Complaint, the Pass-Through Claims, which Travelers
characterizes as claims for "impact damages against DASNY on
behalf of Trataros' subcontractors."  Travelers identifies these
subcontractors as LBL, Jordan Panel, Crocetti, and Brooklyn
Welding.  Travelers asserts that it has admitted contingent
liability to the Subcontractors by concluding separate
liquidating agreements with LBL, Jordan Panel, and Brooklyn
Welding[47] and by incorporating a liquidating agreement into
Crocetti's subcontract itself.

       The general rule under New York law is that even where an
owner causes delay that injures a subcontractor,
"[s]ubcontractors, lacking privity of contract, are precluded
from bringing suit against the owners directly."  Bovis Lend
Lease LMB Inc. v. GCT Venture, Inc., 728 N.Y.S.2d 25, 27 (App.
Div. 1st Dep't 2001) ("Bovis").  Furthermore, "absent a
contractual commitment to the contrary, a prime contractor is
not responsible for delays that its subcontractors may incur

---

[47] Trataros and Travelers jointly concluded liquidating
agreements with LBL, Jordan Panel, and Brooklyn Welding on or
about, respectively, June 30, 2004; June 8, 2004 (as amended on
July 14, 2004); and February 23, 2005.

unless those delays are caused by some agency or circumstance under the prime contractor's direction or control." Triangle Sheet Metal Works, Inc. v. James H. Merritt & Co., 79 N.Y.2d 801, 802 (1991) ("Triangle"); accord Thalle Constr. Co., Inc. v. Whiting-Turner Contracting Co., Inc., 39 F.3d 412, 418 (2d Cir. 1994).  Not only may the subcontractor not sue the general contractor directly, but the general contractor typically may not sue the owner on the subcontractor's behalf, because "[g]eneral contractors on a construction project which have sustained no injury may not bring suit on behalf of a subcontractor for additional costs caused by the owner's delays." Bovis, 728 N.Y.S.2d at 27; see also Barry, Bette & Led Duke Inc. v. State, 669 N.Y.S.2d 741, 743 (App. Div. 3d Dep't 1998) ("Barry").  Taken together, these principles would seem to leave a subcontractor who sustains damage from purely owner-caused delay without any legal recourse.

New York law has, however, created a safety valve in the form of a "liquidating agreement," which is a contractual device specifically designed to overcome the aforementioned "legal impediments" to an injured party's recovery. Bovis, 728 N.Y.S.2d at 27.  Liquidating agreements are written agreements by which an intermediary (for example, a general contractor) admits liability to an injured contractual counterparty (for example, a subcontractor) and then agrees to pursue a claim for

damages on behalf of that injured counterparty against a different, responsible party with whom the intermediary is also in privity (for example, an owner).[48]  "The courts of New York and other jurisdictions recognize liquidating agreements as a valid mechanism for bridging the privity gap between owners and subcontractors who sustain damages as the result of the others' actions."  N. Moore St. Developers, LLC v. Meltzer/Mandl Architects, P.C., 799 N.Y.S.2d 485, 488 (App. Div. 1st Dep't 2005) ("N. Moore St.") (footnote omitted).

To be valid, liquidating agreements must meet certain requirements.  "Liquidating agreements [under New York law] have

---

[48] While the example given above is an "upstream" claim by a subcontractor against an owner passing through a general contractor, liquidating agreements may just as readily be used to facilitate "downstream" claims -- such as claims by an owner through a general contractor against a subcontractor -- or lateral claims -- such as claims by a general contractor through an owner against a design professional.  See Menorah Home & Hosp. for the Aged & Infirm v. Fireman's Fund Ins. Co., No. 04-CV-3172 (FB)(CLP), 2007 WL 1109079, at *2 (E.D.N.Y. 2007) ("Menorah") (observing that the "classifications" as to who is the "damaged party," the "intermediary," and the "responsible party" will "vary from case to case").  At least one treatise has noted that the requirement that a contractor confess liability to its subcontractor for the owner's conduct is curious given Triangle's holding that there can be no liability to admit in the first place.  N.Y. Constr. Law Manual §§ 3:22-3:23 (2d ed. 2006); see Triangle, 79 N.Y.2d at 802.  Nevertheless, courts uphold liquidating agreements even where the intermediary appears to have played no role in causing damage to the injured party.  See Bovis, 728 N.Y.S.2d at 28 (finding "no apparent reason why [a general contractor] could not have assumed liability" through a liquidating agreement, notwithstanding the subcontract's no-damages-for-delay clause barring such liability).

three basic elements: (1) the imposition of liability upon the
general contractor for the subcontractor's increased costs,
thereby providing the general contractor with a basis for legal
action against the owner; (2) a liquidation of liability in the
amount of the general contractor's recovery against the owner;
and, (3) a provision that provides for the 'pass-through' of
that recovery to the subcontractor." Bovis, 728 N.Y.S.2d at 27;
see also N. Moore St., 799 N.Y.S.2d at 489; Barry, 669 N.Y.S.2d
at 743.  A liquidating agreement must "satisf[y] all three
elements," N. Moore St., 799 N.Y.S.2d at 489, and must represent
"'an actual contractual commitment'" by the parties, although
this commitment "'need not take any particular form.'" Helena
Assocs., 2008 WL 2117621, at *9 (quoting Barry, 669 N.Y.S.2d at
743).  Liquidating agreements "may be memorialized in the
subcontract or in a separate written agreement and may be
assembled from several documents executed over a period of
years." N. Moore St., 799 N.Y.S.2d at 490 (citation omitted).
Nevertheless, "only an express -- as opposed to implied --
contractual undertaking to pass through a claim recovery gives
rise to a liquidating agreement." Id. "Absent a showing of
actual contractual liability [running from the prime contractor
to the subcontractor], there can be no liquidating agreement."
Barry, 669 N.Y.S.2d at 744; see also H. Sand & Co., Inc. v.
Airtemp Corp., 934 F.2d 450, 456 (2d Cir. 1991) (noting in this

49

context that "a party may not sue another for its liability to a third party when that liability is merely speculative").

### 1.   Crocetti's Impact Claims

Carolina, as assignee of the legal claims of Crocetti,[49] seeks impact damages against DASNY totaling nearly half a million dollars.[50]   DASNY asserts that Travelers may not bring claims on behalf of Crocetti because no valid liquidating agreement exists between Trataros and Crocetti.   Travelers opposes, arguing that all three required elements of a liquidating agreement are present in the Trataros-Crocetti Subcontract.   Carolina has also made separate submissions opposing DASNY's motion for summary judgment.

In arguing that a liquidating agreement exists between Trataros and Crocetti, Travelers and Carolina both rely on three different passages contained in the Trataros-Crocetti

---

[49] On April 26, 1999, Carolina issued a payment bond and performance bond on behalf of Crocetti guaranteeing the Trataros-Crocetti Subcontract.   Crocetti filed for Chapter 11 bankruptcy on or about February 8, 2007.   Prior to filing for bankruptcy, Crocetti assigned to Carolina all of its contract payment and delay-damage claims arising out of the Project.

[50] Specifically, Crocetti seeks loss of productivity in the amount of $369,000.00; premium time in the amount of $31,291.96; labor and materials escalation in the amount of $26,000.00; and extended overhead in the amount of $17,779.12, for a grand total of $444,071.08.   Crocetti has also asserted fourth-party counterclaims against Trataros and Travelers; Carolina indicates that the damages sought on the counterclaims are $333,257.01 in an unpaid contract balance and $123,763.56 in extra work.

Subcontract.  None of these provisions constitutes an express
admission of liability by Trataros to Crocetti.  First,
Paragraph 6(d) provides:

> Should the Subcontractor's performance of this
> Subcontract be delayed, impacted or disrupted by any
> acts of the Contractor [Trataros], other
> subcontractors, or the Contractor's suppliers, or
> delayed, impacted or disrupted by any acts or causes
> which would entitle Contractor to an extension of time
> under the Contract Documents, the Subcontractor shall
> receive an equitable extension of time for the
> performance of this Subcontract, but shall not be
> entitled to any increase in the Subcontract Price or
> to damages or additional compensation as a consequence
> of such delays[,] impacts, disruptions, or
> acceleration resulting therefrom unless the Owner is
> liable and pays Contractor for such delays, impacts,
> disruptions, or acceleration.  Contractor will pay the
> Subcontractor the amount allowed and paid by the Owner
> for the Subcontractor's delay, impact, disruption or
> acceleration.  Within five (5) days after the
> commencement of any delay, impact or disruption, or
> acceleration caused by Contractor, other
> subcontractors, or the Contractor's suppliers, the
> Subcontractor shall notify Contractor in writing
> stating full details of the cause of the alleged
> delay, impact, disruption or disruptions or
> acceleration for which the Owner [sic] is responsible
> in sufficient time so that its claim may be timely
> processed against the Owner [sic].

(Emphasis added).  Second, Paragraph 7(b) provides:

> Subcontractor shall submit in writing any claims for
> adjustment in the price, schedule or other provisions
> of the Subcontract claimed by Subcontractor for
> changes directed by Owner, or for damages for which
> the Owners [sic] liable, or as a result of
> deficiencies or discrepancies in the Contract
> Documents, to Contractor in time to allow Contractor
> to comply with the applicable provisions of the
> Contract Documents.  Contractor shall process said
> claims in the manner provided by and according to the
> provisions of the Contract Documents so as to protect

<u>the interests of Subcontractor and others including
Contractor</u>.  Subcontract adjustments shall be made
only to the extent that Contractor receives relief
from or must grant relief to Owner.  Further, each
Subcontract adjustment shall be equal in laid [sic]
Subcontractor's allocable share of any adjustment in
Contractor's contract with owner. . . .

(Emphasis added).  Finally, Paragraph 9(a) provides:

In case of any dispute between Contractor and Subcon-
tractor, due to any action of Owner or involving the
Contract Documents, Subcontractor agrees to be bound
to the same extent that Contractor is bound to Owner,
by the terms of the Contract Documents . . . . In case
of such dispute, Subcontractor will comply with all
provisions of the Contract Documents allowing a
reasonable time for contractor to analyze and forward
to Owner any required communications or documentation.
<u>Contractor will, at its option (1) present to Owner,
in Contractor's name, or (2) authorize Subcontractor
to present to Owner, in Contractor's name, all of
Subcontractor's claims and answer Owner's claims
involving Subcontractor's Work, whenever Contractor is
permitted to do so by the terms of the Contract
Documents.  IF [sic] such dispute is prosecuted or
defended by Contractor</u>, Subcontractor agrees to
furnish all documents, statements, witnesses, and
other information required, and to pay or reimburse
Contractor for all costs, including attorneys' fees,
incurred in connection therewith. . . .

(Emphasis added).[51]  Carolina and Travelers assert that

Paragraph 6(d) constitutes an admission and "liquidat[ion]"

of liability by Trataros to Crocetti, and that the other two

paragraphs "provide a mechanism for the 'pass-through' to

Crocetti" of any recovery made by Trataros and/or "a method

for the Subcontractor to make claims [against the Owner] and

---

[51] Crocetti's Subcontract is a pre-printed form document prepared
by Trataros, but contains various strikethrough edits where the
parties bargained to change or omit specific terms.

for the Contractor to prosecute such claims in its own name
on behalf of the Subcontractors."

Travelers has not demonstrated that it has legal standing
to assert claims on Crocetti's behalf.  As noted, the critical
element missing is an admission of liability by Trataros (or
Travelers) to Crocetti.  Although Paragraph 6(d) of the
Subcontract does suggest a "pass-through" of any damages
recovered from DASNY by Trataros to Crocetti, that clause does
not "impose[] liability upon the general contractor for the
subcontractor's increased costs."  Barry, 669 N.Y.S.2d at 743.
Instead, Paragraph 6(d) provides only that Crocetti "shall not
be entitled to" any damages "unless the Owner is liable and pays
Contractor."[52]  Similarly, Paragraph 7(b) and Paragraph 9(a)
reflect conditional obligations on the part of Trataros.  In
Paragraph 7(b), Trataros merely agrees to "process [any] claims"
made by Crocetti "for damages for which the Owners [sic] liable"
in accordance with the Contract Documents.  Likewise, in
Paragraph 9(a), Trataros covenants that, if Crocetti wishes to
assert a claim against DASNY, Trataros would -- at its own
option -- determine whether to assert that claim in its own

---

[52] By contrast, Travelers' and Trataros' liquidating agreements
with LBL and Jordan Panel stipulate, respectively, that "SURETY
and/or CONTRACTOR, acknowledges liability to SUBCONTRACTOR for
SUBCONTRACTOR's claims and does hereby liquidate such liability
as hereinafter provided"; and that "SURETY concedes liability
for subcontractor's claims, and agrees to pursue . . . recovery
of same from the Owner" (emphasis added).

name.  This conditionality is made clear by the introductory

phrase -- "IF such dispute is prosecuted or defended by

Contractor" -- within the final sentence of the excerpt above.[53]

Carolina argues, in opposition, that the Trataros-Crocetti

"may not be artfully written," but that it nonetheless "provides

that the Subcontractor is entitled to such impact damages as the

Contractor may receive from the owner for the impact to

Crocetti."  That may be so, but a contractual entitlement to

funds received by a counterparty from a third party is not the

same as an acknowledgment of liability.[54]

Carolina also argues that an implicit admission of

liability should be sufficient, relying on Cayuga Construction

Corp. v. United States, No. 91 Civ. 4883 (JFK), 1992 WL 233888,

at *3 (S.D.N.Y. Sept. 9, 1992) ("Cayuga").  To the extent Cayuga

overlooked the requirement under New York law that an "express

---

[53] It is noteworthy that Trataros' Subcontracts with LBL, Jordan
Panel, and Brooklyn Welding contain substantially the same three
paragraphs as in the Crocetti Subcontract.  Travelers does not,
however, contend that those provisions suffice as liquidating
agreements with respect to LBL, Jordan Panel, and Brooklyn
Welding.

[54] Courts routinely dismiss pass-through claims in the absence of
an admission of liability creating a liquidating agreement.
See, e.g., Helena Assocs., 2008 WL 2117621, at *10; Honeywell,
Inc. v. J.P. Maguire Co., Inc., No. 93 Civ. 5253 (HBP), 2000 WL
307398, at *12-*13 (S.D.N.Y. Mar. 23, 2000); Port Chester Elec.
Constr. Corp. v. HBE Corp., No. 86 Civ. 4617 (NG), 1995 WL 7974,
at *2 (S.D.N.Y. Jan. 10, 1995); I.T.R.I. Masonry Corp. v. State,
801 N.Y.S.2d 396, 397 (App. Div. 2d Dep't 2005); Barry, 669
N.Y.S.2d at 743-44; Mars Assocs., Inc. v. N.Y. City Educ.
Constr. Fund, 513 N.Y.S.2d 125, 134 (App. Div. 1st Dep't 1987).

-- as opposed to implied -- contractual undertaking" is required to create a liquidating agreement, see N. Moore St., 799 N.Y.S.2d at 490, that decision is not persuasive authority.  In any event, in Cayuga, the court was considering a motion to dismiss based on the statute of limitations.  Cayuga, 1992 WL 233888, at *3.  It therefore addressed whether an implicit admission of liability was sufficient to toll the statute, not whether a liquidating agreement sufficed to create legal standing in the general contractor.[55]

In sum, Travelers lacks standing to assert impact claims on Crocetti's behalf, and this aspect of the Pass-Through Claims must be dismissed.  Accordingly, the court need not consider the parties' other arguments concerning the legal merit of Crocetti's impact claims or of the possible legal defenses thereto.

2.   Jordan Panel's Extra Work Claim

Jordan Panel, through Travelers, seeks payment for extra work related to "differing site conditions encountered during Jordan Panel's work at the Project's east-facing exterior facade" (the "Extra Work Claim").  Specifically, due to problems

---

[55] Carolina also relies on Schiavone Construction Co., Inc. v. Triborough Bridge & Tunnel Authority, 619 N.Y.S.2d 117, 118 (App. Div. 2d Dep't 1994), but that case did not concern the question of whether an "implicit" admission of liability would suffice.

with the masonry tolerances on the Project's east elevation, Jordan Panel asserts that it incurred substantial additional costs in order to affix its paneling to the masonry.

DASNY contends that Jordan Panel failed to comply with a condition precedent present in the General Conditions, which were incorporated into Jordan Panel's subcontract by reference. "[A] condition precedent is 'an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises.'" Presstek, 12 N.Y.3d at 645 (quoting Oppenheimer, 86 N.Y.2d at 690). "Whether a condition precedent exists under the terms of a contract is a matter of law for the court to decide." Mullany v. Munchkin Enters., Ltd., 893 N.Y.S.2d 714, 717 (App. Div. 3d Dep't 2010). "A contractual duty ordinarily will not be construed as a condition precedent absent clear language showing that the parties intended to make it a condition." Id. at 717-18 (citation omitted). A court may "interpret doubtful language as embodying a promise or constructive condition rather than an express condition" in order to reduce "the risk of forfeiture by the obligee," but this option "cannot be employed if the occurrence of the event as a condition is expressed in unmistakable language."[56] Oppenheimer, 86 N.Y.2d at 691

---

[56] "Forfeiture" is defined as "the denial of compensation that results when the obligee loses its right to the agreed exchange

(citation omitted).  If the court determines that an express
condition precedent exists, it must "enforce the will of the
parties unless to do so will violate public policy," even if the
court "may regret the harshness of such a condition."  <u>Id.</u>
(citation omitted).  "Express conditions must be literally
performed; substantial performance will not suffice."  <u>Presstek</u>,
12 N.Y.3d at 645.  Indeed, public policy favors strict
enforcement.  As explained by the New York Court of Appeals:

> Strong public policy considerations favor scrutiny of
> claims of bad faith when offered by contractors to
> excuse noncompliance with notice and reporting
> requirements in public contracts.  These provisions,
> common in public works projects, provide public
> agencies with timely notice of deviations from
> budgeted expenditures or of any supposed malfeasance,
> and allow them to take early steps to avoid extra or
> unnecessary expense, make any necessary adjustments,
> mitigate damages and avoid the waste of public funds.
> Such provisions are important both to the public fisc
> and to the integrity of the bidding process.

<u>A.H.A.</u>, 92 N.Y.2d at 33-34.

The contract term at issue is General Conditions § 11.01,
entitled "Claims for Extra Work."  Section 11.01 provides:

A.   <u>If the Contractor claims that any Work which the
     Contractor has been ordered to perform will be
     Extra Work</u>, or that any action or omission of the
     Owner is contrary to the terms and provisions of
     the Contract and will require the Contractor to
     perform Extra Work <u>the Contractor shall</u>:

     1.   Promptly comply with said order.

---

after it has relied substantially, as by preparation or
performance on the expectation of that exchange."  <u>Oppenheimer</u>,
86 N.Y.2d at 692 n.2 (citation omitted).

    2.   <u>File with the Owner within fifteen (15) working days</u> after being ordered to perform the Work claimed by the Contractor to be Extra Work or within fifteen (15) working days after commencing performance of the Work, whichever date shall be earlier, or within fifteen (15) working days after the said action or omission on the part of the Owner occurred, <u>a written notice of the basis of the Contractor's claim, including estimated cost, and request for a determination thereof</u>.

    3.   Proceed diligently, pending and subsequent to the determination of the Owner with respect to any said disputed matter, with the performance of the Work in accordance with all instructions of the Owner.

B.   No claim for Extra Work shall be allowed unless the same was done pursuant to a written order of the Owner.  <u>The Contractor's failure to comply with any or all parts of this Article shall be deemed to be</u>:

    1.   a conclusive and binding determination on the part of the Contractor that said order, Work, action or omission does not involve Extra Work and is not contrary to the terms and provisions of the Contract[.]

    2.   <u>a waiver by the Contractor of all claims for additional compensation or damages as a result of said order, Work, action or omission</u>.

(Emphasis added).

Section 11.01 constitutes an unambiguous condition precedent to any recovery for extra-work claims and is enforceable as an express condition under New York law.  The language of § 11.01(B)(2) clearly mandates that a contractor's

failure to follow the process set forth in § 11.01(A) will result in "a waiver by the Contractor of all claims for additional compensation or damages" resulting from the work in question.

In opposition, Travelers does not dispute that Jordan Panel failed to fully comply with the notice requirement of § 11.01(A)(2).  Instead, Travelers argues that "[t]he factual record evidences ample notice provided by Trataros and Jordan Panel" and that such notice is sufficient to satisfy "New York's doctrine of substantial compliance with notice provisions." Travelers cites two cases, Whitmyer Bros., Inc. v. State of N.Y., 406 N.Y.S.2d 617 (App. Div. 3d Dep't 1978) ("Whitmyer"), and Huff Enters., Inc. v. Triborough Bridge & Tunnel Auth., 595 N.Y.S.2d 178 (App. Div. 1st Dep't 1993) ("Huff"), for the proposition that "when a public owner has been made aware of the contractor's claim that extra work beyond the scope of the contract was being performed, the State has been precluded from insisting upon strict compliance with the notice provisions."

Actual notice or substantial compliance does not suffice. Under New York law, "[e]xpress conditions precedent, which are those agreed to and imposed by the parties themselves, must be literally performed." Klewin Bldg. Co., Inc. v. Heritage Plumbing & Heating, Inc., 840 N.Y.S.2d 144, 145 (App. Div. 2d Dep't 2007) (citation omitted); see also Mezzacappa Bros., Inc.

59

v. City of N.Y., 815 N.Y.S.2d 549, 550 (App. Div. 1st Dep't
2006) ("Mezzacappa"). Huff states that "New York case law
recognizes that prompt, written notice requirements in public
works contracts serve salutary purposes, and merit strict
enforcement." Huff, 595 N.Y.S.2d at 181 (citation omitted).[57]
New York courts regularly dismiss lawsuits where it is apparent
that a contractor seeking extra payment on a contract failed to
comply strictly with contractual notice requirements.[58]

Whitmyer also does not save the Extra Work claim.[59] That

---

[57] Contrary to what Travelers implies, Huff did not hold that
actual notice could excuse strict compliance with contract
terms. Rather, Huff held that the trial court erred by
declining to grant summary judgment for the defendant in a case
where the plaintiff had failed to comply with a strict
contractual notice provision. 595 N.Y.S.2d at 179-81.

[58] See Perini Corp. v. City of N.Y., 18 F. Supp. 2d 287, 293
(S.D.N.Y. 1998) (collecting cases); Dart, 891 N.Y.S.2d at 77;
Fahs Rolston Paving Corp. v. County of Chemung, 841 N.Y.S.2d
404, 406-07 (App. Div. 3d Dep't 2007); Mezzacappa, 815 N.Y.S.2d
at 549; Grace, 802 N.Y.S.2d at 410; Bac-Jat, 766 N.Y.S.2d at
352; Morelli Masons, Inc. v. Peter Scalamandre & Sons, Inc., 742
N.Y.S.2d 6, 7 (App. Div. 1st Dep't 2002); Pettinelli Elec. Co.,
Inc. v. Bd. of Educ. of City of N.Y., 641 N.Y.S.2d 535, 536
(App. Div. 1st Dep't 1996); Huff, 595 N.Y.S.2d at 181. But see
Abax, Inc. v. Lehrer McGovern Bovis, Inc., 778 N.Y.S.2d 149, 150
(App. Div. 1st Dep't 2004) ("Abax"); G. De Vincentis & Son
Constr., Inc. v. City of Oneonta, 759 N.Y.S.2d 216, 218 (App.
Div. 3d Dep't 2003) ("Vincentis"); Whitmyer, 406 N.Y.S.2d at
619; Amadeus, Inc. v. State of N.Y., 320 N.Y.S.2d 677, 682 (App.
Div. 3d Dep't 1971) ("Amadeus").

[59] It also appears that the contract notice provision in Whitmyer
was less strict than that at issue here. In Whitmyer, the court
paraphrased the contract's notice requirement as "provid[ing]
that if the contractor were of the opinion that if any of the
work ordered to be done were extra work, or if it were in

1978 case belongs to a divergent line of decisions -- see Abax, 778 N.Y.S.2d at 150; Vincentis, 759 N.Y.S.2d at 218; Amadeus, 320 N.Y.S.2d at 682 -- that do not accurately reflect the current state of the law.  Even insofar as that line of cases might remain authority for a very narrow exception in "situations where there is an extensive record of timely written correspondence and contact between the contractor and agency," Vincentis, 759 N.Y.S.2d at 218 (emphasis added), that exception would not be met here.  While Travelers asserts that "Jordan Panel initiated a dialogue with TDX well within the fifteen-day time period" following certain extra-work orders given orally on April 28, 2000 and in writing on May 5, 2000, Travelers has not cited any evidence in either its brief or Local Rule 56.1 statement that would support that naked assertion.[60] Accordingly, the Extra Work Claim must be dismissed.

   3.   Remaining Subcontractors' Impact Claims

   With respect to the Pass-Through Claims of the remaining

---

violation of the contract, the contractor should promptly notify the superintendent in writing of such objections."  406 N.Y.S.2d at 619.  The court did not indicate that the contract specified that a failure to provide notice would constitute a waiver, as does General Condition § 11.01(B)(2).

[60] In particular, Travelers asserts without evidence that this "dialogue" included "a detailed compilation of worksite conditions that required immediate action in order to avoid affecting Jordan Panel's work," and that "[t]hese items were presented and reviewed at a meeting between the parties which was held within the contractually allotted time."

Subcontractors -- Brooklyn Welding, LBL, and Jordan Panel[61] --
DASNY apparently concedes that valid liquidating agreements were
concluded for each Subcontractor and that any conditions
precedent were satisfied.  Nevertheless, DASNY asserts that
summary judgment must be granted as to the remaining Pass-
Through Claims for other reasons.

First, the Subcontracts each provide that the
"Subcontractor shall assume all obligations, <u>risks</u> and
responsibilities which Contractor has assumed towards Owner in
the Contract Documents" (emphasis added).  Those Contract
Documents include Contracts 15 and/or 16 as well as the General
Conditions, which in turn contain the no-damages-for-delay
clause.  Thus, DASNY asserts that the no-damages-for-delay
clause bars not only Trataros from recovering delay damages, but
also the Subcontractors.

Second, DASNY observes that each Subcontract includes
further restrictions on the Subcontractors' ability to seek
delay or impact damages from Trataros.  Paragraph 6(a) of each
Subcontract states:

> Subcontractor will proceed with the Work in a prompt
> and diligent manner, in accordance with Contractor's
> schedule, as reasonably amended from time to time.
> TIME IS OF THE ESSENCE.  Subcontractor shall be
> entitled to additional compensation for compliance
> with schedule amendments only to the extent, if any,

---

[61] Aside from the Extra Work claim, Travelers is also bringing
delay-damage claims on behalf of Jordan Panel.

that the Contract Documents entitle Contractor to
reimbursement.

Paragraph 6(d) further provides:

> Should the Subcontractor's performance of this
> Subcontract be delayed, impacted or disrupted by any
> acts of the Contractor, other subcontractors, or the
> Contractor's suppliers, or delayed, impacted or
> disrupted by any acts or causes which would entitle
> Contractor to an extension of time under the Contract
> Documents, the Subcontractor shall receive an
> equitable extension of time for the performance of
> this Subcontract, but shall not be entitled to any
> increase in the Subcontract Price or to damages or
> additional compensation as a consequence of such
> delays[,] impacts, disruptions, or acceleration
> resulting therefrom unless the Owner is liable and
> pays Contractor for such delays, impacts, disruptions,
> or acceleration.  Contractor will pay the
> Subcontractor the amount allowed and paid by the Owner
> for the Subcontractor's delay, impact, disruption or
> acceleration.

(Emphasis added).  A contract appendix, made a part of each

Subcontract, provides:

> The Subcontractor has visited and carefully examined
> the project site and is familiar with the existing
> conditions and difficulties that may affect the
> execution of own work . . . . The Subcontractor is
> cautioned that due to the location of this job he may
> encounter certain areas of special coordination
> involving traffic congestion, building access,
> security requirements, material delivery, etc.  It is
> understood that the Subcontractor is aware of these
> conditions and that the Subcontractor will not attempt
> to seek additional monies for hardships that may arise
> due to his having to take special measures and
> precautions regarding the same.

(Emphasis added).  Finally, each Subcontract provides that

"[t]he Subcontractor understands that work of this trade may not

be continuous and that he may be required to work out of

sequence and/or leave a portion of work out due to coordination at the direction of the General Contractor," and that "there shall be no charges for 'comeback time' or out of sequence work."

The no-damages-for-delay clause in Contracts 15 and 16, as well as the various other Subcontract conditions outlined above, apply to bar the Subcontractors' damage claims against DASNY. In another lawsuit arising out of this Project, the Appellate Division held that General Conditions § 11.02 applied to subcontractors' delay claims against DASNY.  See Universal/MMEC, 856 N.Y.S.2d at 561.  Indeed, Travelers, sued in its capacity as surety to Trataros, successfully obtained dismissal of a state-court lawsuit by a roofing subcontractor based on the Paragraph 6(d) no-damages-for-delay provision.  See Premier, 2008 WL 2676800, at *4-*5.  The reasoning applied in the other two Project lawsuits, Universal/MMEC and Premier, also governs here.

Travelers makes two main arguments in opposition.  First, Travelers relies on the same assertions that it made with respect to the Impact Claim by Trataros, including that the "uncontemplated delay" or "gross negligence" exceptions apply and/or that DASNY waived the no-damages-for-delay clause through its conduct.  In particular, Travelers asserts that, because Jordan Panel repeatedly warned TDX and KPF about certain design flaws to no avail, DASNY's supposed acquiescence thereafter

64

"rises to the level of gross negligence and reckless indifference" and precludes enforcement of the no-damages-for-delay clause with respect to claims by Jordan Panel and LBL.

Travelers' evidence is as follows.  First, Travelers relies on findings made by a DASNY expert, Warner Construction Consultants ("Warner"), that KPF or its subconsultants were responsible for a 187-day delay to the start of Jordan Panel's and LBL's work on the Project's exterior.  Warner found that this delay "was caused by the extended period of time taken to resolve a design conflict between the specified milling, fabrication, and erection tolerances for the tubular structural steel girts and the exterior metal panel and glazing systems" (the "Girt Tolerance Issue").  Warner opined that the Girt Tolerance Issue "made it impossible to build the exterior walls as shown in the plans and specifications."  Travelers also relies on evidence from another DASNY expert, Wiss, Janney, Elstner Associates, Inc. ("WJE"), who opined that KPF's and its subconsultants' "fail[ures] to properly coordinate the specified tolerances for the profiled metal panel system with the specified tolerances for the supporting structural steel girts" constituted professional negligence.  Travelers contends that KPF's "malpractice" with respect to the Girt Tolerance Issue "alone constitute[s] sufficient grounds to deny DASNY's motion."  Nevertheless, Travelers also asserts that the Girt Tolerance

Issue is "merely the tip of the iceberg with respect to the impacts to Contract 15 and 16."[62]

Travelers' argument that the no-damages-for-delay clause does not apply is without merit.  The factual evidence tendered by Travelers simply does not rise to the level of creating a triable issue as to whether the delays suffered by the Subcontractors were "uncontemplated."  Corinno, 67 N.Y.2d at 309.[63]  Likewise, neither Warner's and WJE's expert opinions regarding KPF's negligent design, nor Travelers' evidence that Jordan Panel "repeatedly highlighted [the Girt Tolerance Issue] in correspondence and meetings" with TDX and KPF, amounts to evidence of conduct that "smacks of intentional wrongdoing," suggests a "sinister intention," or "betokens a reckless indifference to the rights of others."  Kalisch-Jarcho, 58 N.Y.2d at 385; see also A.H.A., 92 N.Y.2d at 31.  Thus, Travelers has also failed to show that DASNY's handling of the Girt Tolerance Issue raises a triable question with respect to

---

[62] The rest of the "iceberg," as it were, is never described with any specificity, but is discussed in the context of Trataros' Impact Claim in Section I.A.2 above.

[63] For example, Travelers appears to ascribe some of the blame for the tolerance problems encountered by Jordan Panel at the Project's east elevation to the masonry prime contractor.  But General Conditions § 13.01 clearly contemplates the possibility that contractors could "sustain [] damage" as a result of "an[] act or omission of [an]other contractor," and that clause explicitly allocates the risk of such damage to contractors by providing that "the Contractor shall have no claim against the Owner for said damage."

the "gross negligence" exception.  Finally, contrary to
Travelers' implied assertions, the fact that Trataros was
contractually required to rely upon KPF's plans and
specifications is not, standing alone, a defense to enforcement
of the no-damages-for-delay clause.

Travelers' second, broader argument opposing summary
judgment on the Pass-Through Claims is that the "exculpatory
clauses contained in Trataros' subcontracts" can no longer be
enforced.  Travelers contends that by concluding a liquidating
agreement with each of the Subcontractors, Travelers admitted
liability and thereby "waiv[ed] the subcontract provisions on
which DASNY relies," such that the no-damages-for-delay clause
does not apply.  This argument is without merit.[64]  Even if the
admission of liability by Travelers or Trataros to the
Subcontractors represented a waiver of all rights held by
Trataros (and Travelers) under the Subcontracts, it cannot waive
DASNY's rights or defenses under Contracts 15 and 16, which are
separate contracts.  Insofar as the Subcontractors' rights of
recovery under the Pass-Through Claims necessarily rely upon
Trataros' rights under Contracts 15 and 16, DASNY is entitled to
assert the no-damages-for-delay clause of those Contracts

---

[64] With respect to Crocetti, Travelers' argument is wholly
illogical.  The "liquidating agreement" that Trataros claims was
concluded with Crocetti is contained in the very Subcontract
whose no-damage provisions Travelers is now claiming were waived
by virtue of concluding the liquidating agreement.

against Travelers, the Subcontractors, or whoever else might be standing in Trataros' shoes.  As such, the Pass-Through Claims must be dismissed.

C.   Travelers' Bond Losses Claim

Finally, DASNY also seeks dismissal of Travelers' Bond Losses Claim.  Although that claim is inartfully pleaded in the Complaint, Travelers explains in its opposition to DASNY's motion that the claim seeks to recover "[s]ubstantial attorneys fees and expenses [that] were incurred in the defense of the prior law suits which involved subcontractors suing both Travelers and Trataros . . . seeking to recover damages due to delay based on negligence and/or of breaches in connection with the Project and/or DASNY's failure to make payment."[65]  These "prior law suits" were, apparently, lawsuits brought by subcontractors seeking relief under the Payment Bonds. Travelers' claim is based on the exception to the American Rule recognized in Shindler v. Lamb, 211 N.Y.S.2d 762 (Sup. Ct. N.Y. County 1959), which provides that "[i]f, through the wrongful act of his present adversary, a person is involved in earlier

---

[65] Both Travelers and DASNY purport to incorporate by reference various arguments made in briefing on other motions.  Travelers' arguments regarding the Bond Losses Claim are actually contained in its opposition to KPF's motion for summary judgment. Travelers also sought to recover its "bond losses" from KPF and TDX, but those claims were dismissed.  See August 11 Opinion, 2010 WL 3199861, at *13, *15.

litigation with a third person in bringing or defending an action to protect his interests, he is entitled to recover the reasonable value of attorneys' fees and other expenses thereby suffered or incurred." Id. at 765; accord Goldberg v. Mallinckrodt, Inc., 792 F.2d 305, 309 (2d Cir. 1986).

Travelers' Bond Losses Claim cannot succeed because it is barred by exculpatory language in the Payment Bonds. Paragraph 2 of each Payment Bond provides:

> The above named Principal and Surety hereby jointly and severally agree with the Owner that every claimant as herein defined, who has not been paid in full before the expiration of a period of ninety (90) days after the date on which the last of such claimant's work or labor was done or performed, or materials were furnished by such claimant, may sue on this bond for the use of such claimant, prosecute the suit to final judgment for such sum or sums as may be justly due claimant, and have execution thereon. The Owner shall not be liable for the payment of any costs or expenses of any such suit.

(Emphasis added). The language above clearly provides that DASNY "shall not be liable for the payment of any costs or expenses" resulting from the litigation underlying the Payment Bond claims. Travelers does not proffer any authority suggesting that this provision should not be enforced in accordance with its clear and unambiguous terms. Accordingly, the Bond Losses Claim is dismissed.

II.  DASNY's Counterclaims Against Travelers

Travelers, while opposing summary judgment on its own claims against DASNY, seeks summary judgment in its favor with respect to DASNY's three Counterclaims against it.  For the following reasons, two of the Counterclaims are dismissed, while the third requires trial.

A.  DASNY's Breach-of-Contract Counterclaim

DASNY's second counterclaim, the Breach-of-Contract Counterclaim, asserts that Travelers is liable for Trataros' alleged breaches of Contracts 15 and 16 "[b]y virtue of Travelers' assumption of Trataros' obligations" under those Contracts.  Travelers seeks dismissal of this counterclaim, asserting that Travelers did not "assume" Trataros' contractual obligations and therefore cannot be liable on those Contracts.

"'It goes without saying that a contract cannot bind a nonparty.'" Davis v. Blige, 505 F.3d 90, 103 (2d Cir. 2007) (quoting EEOC v. Waffle House, Inc., 534 U.S. 279, 294 (2002)). "As a general rule, privity or its equivalent remains the predicate for imposing liability for nonperformance of contractual obligations." Smith v. Fitzsimmons, 584 N.Y.S.2d 692, 695 (App. Div. 4th Dep't 1992).  An exception to this rule exists, however, where a non-party "manifests an intent to be bound by the contract," Horsehead Indus., Inc. v.

70

Metallgesellschaft AG, 657 N.Y.S.2d 632, 633 (App. Div. 1st
Dep't 1997) ("Horsehead"), for instance, by "accept[ing] the
written agreement and [] act[ing] upon it."  Argo Marine Sys.,
Inc. v. Camar Corp., 755 F.2d 1006, 1011 (2d Cir. 1985)
(citation omitted).

　　　DASNY does not dispute that Travelers never entered into a
"takeover agreement" with Trataros and DASNY with respect to the
Project.[66]  DASNY's theory that Travelers "assumed" the Contracts
depends instead on the Financing Agreement concluded between
Travelers and Trataros on or about June 19, 2002.  Pursuant to
the Financing Agreement, Travelers provided financing to
Trataros while also imposing certain conditions on Trataros'
business.[67]  Among other things, according to DASNY, Travelers
required Trataros to deposit all funds it received from any
project (not just the Project) into the Joint Account created by
Travelers.  No funds could be paid out of the Joint Account
without the signature of a Travelers representative.  DASNY

---

[66] "Takeover agreements" are contracts in which a surety
explicitly assumes the performance obligations of its principal
under the latter's contract with the obligee.  See, e.g., Kemper
Ins. Cos. v. State, 892 N.Y.S.2d 596, 597-98 (App. Div. 3d Dep't
2009); In re Int'l Fid. Ins. Co., 653 N.Y.S.2d 729, 730 (App.
Div. 3d Dep't 1997).  Takeover agreements generally occur after
an obligee has declared a contractor in default under a
performance bond, thereby triggering a surety's obligation to
complete the contract.

[67] The parties dispute whether the funding provided by Travelers
to Trataros pursuant to the Financing Agreement was "limited,"
as Travelers asserts, or "significant," as DASNY asserts.

further asserts that Travelers' role in investigating problems
with the epoxy terrazzo flooring at the Project "evidence[d] a
course of conduct whereby Trataros and Travelers agreed that
Travelers would take over Trataros' obligations."[68]

The fact that Travelers and Trataros entered into the
Financing Agreement does not raise a triable issue of fact as to
whether Travelers assumed Trataros' obligations under the
Contracts.  Courts facing similar fact patterns have held that a
surety's provision of financing to its contractor principal does
not expand the surety's obligations to the obligee beyond the
penal sum of the bond or, absent compliance with conditions
precedent in the bond, make the surety liable for performance of
the principal's contracts.  See U.S. ex rel. Maris Equip. Co.,
Inc. v. Morganti, Inc., 163 F. Supp. 2d 174, 193-95 (E.D.N.Y.
2001) ("Morganti"); John G. Lambros Co., Inc. v. Aetna Cas. &
Sur. Co., 468 F. Supp. 624, 628 (S.D.N.Y. 1979) ("Lambros").  In
Lambros, Judge Weinfeld observed that "[i]t is not unusual for
either a surety or secured creditor . . . to become intimately
involved in the debtor's financial affairs," and "[s]uch
involvement does not 'merge' the identities of the creditor and
debtor . . . nor does it expose the creditor to contract
liability on obligations of its debtor other than those it has

---

[68] For a description of the alleged flooring failure, see July 30
Opinion, __ F. Supp. 2d at __, 2010 WL 3001729, at *2-*4.

agreed to assume." <u>Lambros</u>, 468 F. Supp. at 628 (citation
omitted).  Thus, "even when a surety advances large sums of
money to the contractor and becomes 'intimately involved' in the
contractor's financial affairs, the surety will not, without
more, face exposure beyond the parameters of its bond."[69]
<u>Morganti</u>, 163 F. Supp. 2d at 194 (quoting <u>Lambros</u>, 468 F. Supp.
at 628).[70]

    DASNY also asserts that it can recover for breach of
contract because "New York law clearly allows for the imposition
of liability on a corporation that completely controlled and
dominated another corporation for the liabilities of that other
corporation, thereby causing an injury to a third party."  This
argument invokes a theory of "piercing the corporate veil" or
"alter ego" liability.  <u>See, e.g.</u>, <u>Babitt v. Citibank, N.A. (In
re Vebeliunas)</u>, 332 F.3d 85, 90-92 (2d Cir. 2003) (discussing

---

[69] Nor does DASNY's allegation that "[a]fter Trataros went out of
business, Travelers took actions to give the impression that
Trataros was still in existence," suggest in any way that
Travelers outwardly "manifest[ed] an intent to be bound" by
Trataros' obligations under Contracts 15 and 16.  <u>Horsehead</u>, 657
N.Y.S.2d at 633.

[70] DASNY attempts to distinguish <u>Lambros</u> and <u>Morganti</u> by
asserting that it has "presented a large volume of facts . . .
that demonstrate that the relationship between Travelers and
Trataros went far beyond the Financing Agreement."  DASNY has
not, however, pointed to evidence that raises a question of fact
whether Travelers manifested an intention to be bound by, or
that it otherwise assumed, Trataros' legal obligations under
Contracts 15 and 16.  Instead, this evidence is relevant, if at
all, to DASNY's unpleaded alter-ego claim.

New York law on alter-ego liability); accord Morris v. N.Y. State Dep't of Taxation & Fin., 82 N.Y.2d 135, 140-42 (1993).

DASNY may not resist summary judgment by relying on an alter-ego theory.  As a threshold matter, DASNY did not plead its alter-ego theory in its Counterclaims nor interpose it as an affirmative defense, and DASNY has also never sought leave to amend its pleadings to assert it.  "[T]he central purpose of a complaint is to provide the [opposing party] with notice of the claims asserted against it."  Greenidge v. Allstate Ins. Co., 446 F.3d 356, 361 (2d Cir. 2006).  Because DASNY did not give notice of this claim to Travelers in its pleadings, DASNY may not raise it for the first time in opposing Travelers' motion for summary judgment.[71]  "Simply put, summary judgment is not a procedural second chance to flesh out inadequate pleadings." Fleming v. Lind-Waldock & Co., 922 F.2d 20, 24 (1st Cir. 1990).

Second, even if DASNY were to move for leave to amend its Counterclaims, the motion would now be denied.  The cut-off for amendment of pleadings, established by the Court as required by

---

[71] DASNY's allegation that Travelers "assumed" the Contracts does not suffice as notice to Travelers that DASNY would rely on an alter-ego theory.  See, e.g., Scully v. US WATS, Inc., 238 F.3d 497, 515 (3d Cir. 2001) (issue of alter-ego liability not properly before the court where "plaintiffs never raised an alter ego liability theory in the initial pleadings or at any point during pretrial proceedings").  Moreover, as Travelers observes, DASNY's pleadings do not contain any words or phrases that would invoke even obliquely an argument that Travelers dominated or controlled Trataros' corporate form.

the Federal Rules of Civil Procedure, was February 1, 2008.[72]
Under Rule 16, "[a] schedule may be modified only for good cause
and with the judge's consent."  Fed. R. Civ. P. 16; <u>see also</u>
<u>Presbyterian Church of Sudan v. Talisman Energy, Inc.</u>, 582 F.3d
244, 267 (2d Cir. 2009).  Aside from "good cause," the district
court may also consider "in the exercise of its discretion under
Rule 16(b) . . . other relevant factors including, in
particular, whether allowing the amendment of the pleading at
this stage of the litigation will prejudice defendants."
<u>Kassner</u>, 496 F.3d at 244.  "Undue prejudice arises," <u>inter alia</u>,
"when an amendment comes on the eve of trial and would result in
new problems of proof" or when it would "require the opponent to
expend significant additional resources to conduct discovery and
prepare for trial."  <u>Ruotolo v. City of N.Y.</u>, 514 F.3d 184, 192
(2d Cir. 2008) (citation omitted); <u>see also</u> O'Hara v. Weeks
<u>Marine, Inc.</u>, 294 F.3d 55, 70 (2d Cir. 2002); <u>Monahan v. N.Y.</u>
<u>City Dep't of Corr.</u>, 214 F.3d 275, 284 (2d Cir. 2000).

    DASNY has not explained its failure to plead the alter-ego
claim, nor has it attempted to demonstrate the existence of
diligence supporting "good cause" for permitting those claims to

---

[72] Under the Federal Rules, the mandatory Rule 16 scheduling
order "<u>must</u> limit the time to join other parties [and] amend the
pleadings."  Fed. R. Civ. P. 16(b)(3)(A) (emphasis added).  Rule
16 is thus designed to "assure[] that at some point both the
parties and the pleadings will be fixed."  <u>Kassner v. 2d Ave.</u>
<u>Deli. Inc.</u>, 496 F.3d 229, 243 (2d Cir. 2007) (citation omitted).

be asserted now.[73]  Moreover, to permit DASNY leave to amend and

plead an alter-ego claim at this juncture -- on the eve of

trial, following several years of costly fact and expert

discovery[74] -- would, as Travelers observes, cause it substantial

prejudice.  Accordingly, DASNY may not pursue its alter-ego

theory in this case, and the Breach-of-Contract Counterclaim

must be dismissed.

B.   DASNY's Performance Bond Counterclaim

        The third counterclaim, the Performance Bond Counterclaim,

asserts that Travelers "wrongfully rejected" DASNY's demand for

payment under the Performance Bonds.  Travelers responds that

the Performance Bond Counterclaim must be dismissed because

DASNY has failed to comply with the conditions precedent to

Travelers' obligations under the Performance Bonds.

        "In New York, a bond is a contract[,] and [a court]

therefore 'look[s] to standard principles of contract

interpretation to determine the rights and obligations of a

surety under a bond.'"  Arch Ins. Co. v. Precision Stone, Inc.,

---

[73] With respect to the question of DASNY's diligence, Travelers
observes that, as of April 2010, DASNY had been in possession of
the evidence relied upon to support its alter-ego claim for at
least 14 months, but did not act during that time to pursue
amendment.

[74] Non-expert fact discovery ended in early 2009.  In a reply
declaration, Travelers' counsel attests that, since February
2008, the parties have taken 76 days of fact and expert witness
depositions and exchanged 26 expert reports.

584 F.3d 33, 39 n.4 (2d Cir. 2009) ("Arch") (quoting U.S. Fid. &
Guar. Co. v. Braspetro Oil Servs. Co., 369 F.3d 34, 51 (2d Cir.
2004) ("Braspetro")); see also Walter Concrete Constr. Corp. v.
Lederle Labs., 99 N.Y.2d 603, 605 (2003) ("Walter Concrete").
"Surety bonds, like all contracts, are to be fairly construed so
as to effectuate the intent of the parties as it has been
expressed in the terms of the contract." Arch, 584 F.3d at 39
n.4 (citation omitted); accord Gillies v. Nat'l Fire Ins. Co. of
Hartford, 867 N.Y.S.2d 295, 296 (App. Div. 4th Dep't 2008).
"Where the terms are unambiguous, interpretation of the surety
bond is a question of law." Caravousanos v. Kings County Hosp.,
904 N.Y.S.2d 444, 446 (App. Div. 2d Dep't 2010) (citation
omitted).

Surety bonds issued by commercial surety companies are not
construed strictly. "[W]hile the liability of a surety cannot
be extended beyond the plain and explicit language of the
contract, a surety is not entitled to any particular tenderness
in the interpretation of the language of his contract."
Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill
Lynch, Pierce, Fenner & Smith Inc., 188 F.3d 31, 34 (2d Cir.
1999) (citation omitted). "[T]he status of a 'favorite of the
law' once enjoyed by the surety, at a time when most suretyship
obligations were uncompensated, is clearly a thing of the past."
Braspetro, 369 F.3d at 51 (citation omitted). Indeed, "[w]here

a compensated surety has assured a standard form of bond, it is to be interpreted liberally, and all ambiguities are to be resolved in favor of those for whose benefit the bond is given." Rich v. N. Am. Specialty Ins. Co., 809 N.Y.S.2d 68, 69 (App. Div. 1st Dep't 2006) (citation omitted).[75]

"'[B]efore a surety's obligations under a bond can mature, the obligee must comply with any conditions precedent.'" Elm Haven Constr. Ltd. P'ship v. Neri Constr. LLC, 376 F.3d 96, 100 (2d Cir. 2004) ("Elm Haven") (quoting Braspetro, 369 F.3d at 51). Here, the Performance Bonds contain several conditions precedent to Travelers' obligations under the Bonds. The Performance Bonds for Contracts 15 and 16, issued using form language prepared by DASNY, each provide:

> 2.   If there is no Owner default, the Surety's obligation under this Bond shall arise after:
>
>> 2.1   The Owner has notified the Contractor, the Surety [sic] at its address described in Paragraph 8. below that the Owner is considering declaring a Contractor in default.

---

[75] Travelers' repeated invocation of the "strictissimi juris" standard is inappropriate. "The rule of strictissimi juris is not rigidly to be applied in the case of a compensated surety on a construction contract under . . . New York law." Hunt v. Bankers & Shippers Ins. Co. of N.Y., 400 N.Y.S.2d 645, 647 (App. Div. 4th Dep't 1977). It is for an "uncompensated surety" that the bond obligation "is construed strictissimi juris in the surety's favor." Madison Ave. Leasehold, LLC v. Madison Bentley Assocs. LLC, 811 N.Y.S.2d 47, 59 (App. Div. 1st Dep't 2006) (citation omitted).

2.2 The Owner has declared a Contractor in
default and formally terminated the
Contractor's right to complete the Contract.

2.3 The Owner has agreed to pay the Balance of
the Contract Price to the Surety in
accordance with the terms of the Contract or
to a Contractor selected to perform the
Contract in accordance with the terms of the
Contract with the Owner.

(Emphasis added).  The above three paragraphs are common

conditions of performance bonds which, as Travelers observes,

resemble the conditions included in the standard American

Institute of Architects 312 ("AIA 312") Performance Bond.  See

Braspetro, 369 F.3d at 41; Walter Concrete, 99 N.Y.2d at 605

(noting that the AIA-312 bond requires "a declaration of default"

before the surety is liable, while the AIA-311 bond does not);

120 Greenwich Dev. Assocs., LLC v. Reliance Ins. Co., No. 01 Civ.

8219 (PKL), 2004 WL 1277998, at *1, *12 (S.D.N.Y. June 8, 2004)

("120 Greenwich") (interpreting an AIA-312 bond and determining

that it contains express conditions precedent); see also N.Y.

Jur. 2d Bonds §§ 44, 105 (discussing conditions precedent within

surety bonds).

DASNY does not dispute that it never declared Trataros in

default with respect to either Contract 15 or Contract 16.[76]  The

conditions precedent of the Performance Bonds are set forth in

---

[76] It is also undisputed that DASNY never terminated Contract 15
or Contract 16 through the processes provided by General
Conditions § 10.01 ("Termination for Cause") or § 10.02
("Termination for Convenience of Owner").

"unmistakable language of condition," and as "express conditions," they "must be literally performed."  Presstek, 12 N.Y.3d at 645 (citation omitted).  Accordingly, having failed to comply with the conditions precedent, DASNY may not compel Travelers to act under the Performance Bonds.  Cf., e.g., Elm Haven, 376 F.3d at 100; 120 Greenwich, 2004 WL 1277998, at *13; 153 Hudson Dev., LLC v. DiNunno, 778 N.Y.S.2d 482, 483 (App. Div. 1st Dep't 2004).

In opposition, DASNY argues that "Travelers may not escape liability to DASNY . . . by relying upon an alleged failure by DASNY to satisfy conditions precedent when Travelers itself caused the alleged failure."  While it is true that "a party cannot insist upon a condition precedent, when its non-performance has been caused by himself," A.H.A., 92 N.Y.2d at 31 (citation omitted), DASNY has not tendered any evidence to show that Travelers caused DASNY to fail to comply with the Performance Bonds' notice provisions.  Moreover, to the extent that DASNY indicates that the basis for its equitable argument was "discussed at length" in the section of its brief devoted to the Breach-of-Contract Counterclaim, DASNY may not rely on its unpleaded alter-ego theory in order to excuse its noncompliance with the bonds' conditions precedent.  Accordingly, DASNY's Performance Bond counterclaim is dismissed.

C.   DASNY's Payment Bond Counterclaim

The first counterclaim, and the final one to be addressed in this Opinion, alleges that Travelers breached its obligations under the Payment Bonds to compensate various subcontractors whom Trataros failed to pay.  DASNY further contends that some of Trataros' subcontractors filed mechanics' liens on the Project and subsequently sued DASNY to foreclose on those liens, with the result that DASNY was compelled through a settlement process accompanying that litigation to make payments that should have been made by Travelers.

A payment bond is an undertaking whereby a surety guarantees to an obligee that all bills for labor and materials contracted for, and actually used by the contractor, will be paid by the surety if the contractor defaults.  N.Y. Jur. 2d Bonds § 61.  Payment bonds "work like insurance policies designed to guarantee payment to the general contractors' suppliers, employees and subcontractors."  Quantum Corp. Funding, Ltd. v. Westway Indus., Inc., 4 N.Y.3d 211, 214 (2005) ("Quantum").

Travelers seeks summary judgment on the theory that DASNY is not a proper "claimant" under the Payment Bonds and that DASNY lacks standing to assert a claim for their breach.  The Payment Bonds accompanying Contracts 15 and 16 provide:

    1.    <u>A claimant is defined as one having a direct Contract with the Principal or with a Subcontractor of the Principal for labor, material, or both</u>, used or reasonably required for use in the performance of the Contract . . . .

    2.    The above named Principal and Surety hereby jointly and severally agree with the Owner that <u>every claimant as herein defined</u>, who has not been paid in full before the expiration of a period of ninety (90) days after the date on which the last of such claimant's work or labor was done or performed, or materials were furnished by such claimant, <u>may sue on this bond for the use of such claimant</u>, prosecute the suit to final judgment for such sum or sums as may be justly due claimant, and have execution thereon. The Owner shall not be liable for the payment of any costs or expenses of any such suit.

(Emphasis added).  Travelers further contends that any payments made by DASNY to subcontractors were made voluntarily, such that DASNY cannot avail itself of the doctrine of equitable subrogation to seek reimbursement from Travelers.

The Payment Bonds issued in connection with Contracts 15 and 16 were "statutory" bonds required by New York law.  A consideration of the Payment Bond Counterclaim requires an understanding of the purpose of statutory payment bonds as well as an examination of when, if ever, an owner-obligee has legal standing to sue for damages under such bonds.

    1.    Payment Bonds Under New York Law

New York State Finance Law § 137 provides that, for any "contract for the prosecution of a public improvement for . . .

a public benefit corporation," a condition to the approval of such contract is "a bond guaranteeing prompt payment of moneys due to all persons furnishing labor or materials to the contractor or any subcontractors in the prosecution of the work provided for in such contract."  N.Y. State Fin. Law § 137(1).[77]  Therefore, "issuance of a labor and material payment bond is mandatory on public improvement projects for, inter alia, public benefit corporations such as [] DASNY."  Harsco, 752 N.Y.S.2d at 62.  "A bond on a public improvement project . . . is deemed issued pursuant to Section 137 and subject to its provisions even where, as here, it does not specifically refer to the State Finance Law."  Morin v. Empiyah & Co., LLC, 389 F. Supp. 2d 506, 512 n.7 (S.D.N.Y. 2005); accord A.C. Legnetto Const., Inc. v. Hartford Fire Ins. Co., 92 N.Y.2d 275, 278 (1998).

---

[77] New York State Finance Law § 137 was first passed in 1938, Quantum, 4 N.Y.3d at 215, and was "modeled on the Federal Miller Act [of 1935], which requires a prime contractor on a Federal project to furnish a bond to insure payment to those who supply labor and material for the project."  Harsco Corp. v. Gripon Const. Corp., 752 N.Y.S.2d 59, 63 (App. Div. 2d Dep't 2002) ("Harsco").  The Miller Act in turn was intended to "provide[] an alternative remedy to the mechanic's lien," which is a remedy not available under federal projects "because a lien cannot attach to [federal] government property."  Id.  In New York, however, mechanics' liens are available to subcontractors on public improvement projects, and thus § 137 is not the sole remedy available for unpaid subcontractors and suppliers.  See N.Y. Lien Law § 5.

Section 137 also provides a private right of action to subcontractors and suppliers on public improvement projects who are not promptly paid by the hiring contractor:

> Every person who has furnished labor or material, to the contractor or to a subcontractor of the contractor, in the prosecution of the work provided for in the contract and who has not been paid in full therefor before the expiration of a period of ninety days after the day on which the last of the labor was performed or material was furnished by him for which the claim is made, shall have the right to sue on such payment bond in his own name for the amount, or the balance thereof, unpaid at the time of commencement of the action. . . .

N.Y. State Fin. Law § 137(3).  The statute provides a one-year statute of limitations for any "action on a payment bond furnished pursuant to this section," which begins to run on "the date on which final payment under the claimant's subcontract became due."[78]  N.Y. State Fin. Law § 137(4)(b).

Courts have identified at least two main purposes for the statutory bonding requirement.  First, it evidences a legislative intent to benefit and protect subcontractors and suppliers.  See Spanos Painting Contractors, Inc. v. Union Bldg. & Constr. Corp., 334 F.2d 457, 459 (2d Cir. 1964); Quantum, 4 N.Y.3d at 216; Davidson Pipe Supply Co., Inc. v. Wyoming County Indus. Dev. Agency, 85 N.Y.2d 281, 285 (1995); Harsco, 752 N.Y.S.2d at 62.  Second, § 137 protects the State, as owner, as

---

[78] Travelers does not contend that the Payment Bond claim is untimely.

well.  Acknowledging that the "interests protected by
performance bonds are very different from those protected by
payment bonds," the Second Circuit noted that "the utility of a
payment bond" is the role it plays in helping "maintain[] the
[owner's] property free of any mechanics' liens by unpaid
materialmen, suppliers, or laborers."  Braspetro, 369 F.3d at
69; see also HNC Realty Co. v. Bay View Tower Apts., Inc., 409
N.Y.S.2d 774, 779 (App. Div. 2d Dep't 1978).  The New York Court
of Appeals likewise observed that "[a]n additional purpose" of §
137 at the time of its enactment was to "reduce the cost of
state projects by encouraging lower-cost bids from contractors."
Quantum, 4 N.Y.3d at 215; see also N.Y. Constr. Law Manual §
8:32 (describing the purpose of payment bonds as "protect[ing]
the obligee against the claims of unpaid parties" as well as
"facilitat[ing] payment for labor done and materials furnished
for an improvement").

        2.   General Principles of Obligee Standing

    Before turning to the resolution of the Payment Bond claim
under New York law, it is useful to review relevant common law
principles.  In the traditional scenario -- wherein a general
contractor is required to procure a payment bond to satisfy
payment claims for labor or materials supplied by the general
contractor's subcontractors -- the project's owner is the

obligee (the "owner-obligee").[79]  Despite assuming this special status, however, the owner-obligee may generally not recover damages from the surety under the payment bond, as the bond is intended to provide payment to persons supplying labor and material to the contractor, not to provide a financial recovery to the owner-obligee.  Numerous courts have denied recovery to an owner-obligee under a payment bond, or at least observed that "the caselaw generally disfavors" such a suit.  Fed. Ins. Co. v. Me. Yankee Atomic Power Co., 183 F. Supp. 2d 76, 81 (D. Me. 2001) ("Maine Yankee") (collecting cases).  Indeed, even where an owner-obligee itself purchases labor and materials in order to complete a contract after a contractor's default, the obligee may not make a claim upon the contractor's payment bond in order to recover those costs, because the obligee is not a subcontractor or supplier within the meaning of the payment bond.  See 11 Couch on Insurance § 165:15.

Nonetheless, an owner-obligee is not always foreclosed from claiming against a surety under a payment bond.  The fact pattern at bar -- with DASNY seeking what is, essentially, indemnification from Travelers for payments it made to Trataros' subcontractors, after Travelers refused to pay them, and after

---

[79] "[A] surety bond creates a three-party relationship, in which the surety becomes liable for the principal's debt or duty to the third party obligee."  Nat'l Am. Ins. Co. v. United States, 498 F.3d 1301, 1304 (Fed. Cir. 2007) (citation omitted).

some of those subcontractors asserted mechanics' liens against
DASNY -- is one in which some courts have permitted recovery by
obligees under a payment bond.   See, e.g., Hayle Floor Covering,
Inc. v. First Minn. Constr. Co., 253 N.W.2d 809, 813-14 (Minn.
1977); Tropic Builders, Ltd. v. United States, 475 P.2d 362, 366
(Haw. 1970); Maine Yankee, 183 F. Supp. 2d at 86.   Treatises
that have considered the question of obligee standing under
payment bonds have also endorsed the obligee's right of recovery
in situations like those at issue here.   "[T]he obligee has no
right [on a payment bond] with respect to the claims of laborers
and materialmen, unless, through payment, he has become
subrogated to their claims."  11 Couch on Insurance § 165:14
(emphasis added); see also id. § 165:24.   Indeed, Couch
concludes that "where a . . . [payment bond] claimant who is not
paid files a mechanics' lien attaching to the owner's property,
the bond implies an obligation on the part of the surety to
indemnify the owner so that the property will be free of the
lien."  Id. § 165:14 (emphasis added); see also 17 Am. Jur. 2d
Contractor's Bonds § 10 (same).   Bruner & O'Connor concludes
that "[t]he class of protected persons under a payment bond
excludes the owner, even though the owner is named as the
nominal bond obligee, [as well as] co-prime contractors and
lenders, unless they are assignees of the claims of otherwise
protected claimants."  3 Bruner & O'Connor on Construction Law §

8:163 (emphasis added); see also id. (collecting cases finding the existence of "equitable" assignments).

Even those courts that deny recovery to an obligee seeking remuneration under a payment bond often observe that the outcome depended, in part, on the fact that exceptional circumstances did not exist.  In Elm Haven, the Second Circuit, applying Connecticut law, held that summary judgment was "properly granted against [the obligee] on its Payment Bond claim" because the obligee was neither a "claimant" under the bond, nor "was [it] assigned the rights of any claimant."  Elm Haven, 376 F.3d at 101.  Similarly, in a recent case in Massachusetts, the court denied an owner-obligee's claim against a payment bond surety, but distinguished the foregoing treatise authorities by observing "[t]here [was] no evidence or claim of subrogation presented in this case."  American Mfrs. Mut. Ins. Co. v. Sherborn Meadows, LLC, No. 07-11711-DPW, 2008 WL 5396479, at *6 (D. Mass. Dec. 22, 2008).  As a final example, in Goodbys Creek, LLC v. Arch Insurance Co. ("Goodbys"), the court rejected an owner-obligee's payment bond claim because the obligee had not shown that it had been forced to pay any of the subcontractors.[80]

---

[80] The obligee's theory of harm in Goodbys was not that the surety had failed to pay subcontractors under the payment bond, but rather, that the surety had "wrongfully paid" every subcontractor who made a claim against the payment bond." Goodbys, 2008 WL 2950112, at *2 (emphasis added).

Goodbys, No. 07-cv-947-J-33HTS, 2008 WL 2950112, at *3 (M.D. Fla. July 31, 2008).

    3.   Obligee Standing Under New York Law

    With the foregoing principles in mind, the Court turns to consider the question under New York law.  "[The] role [of] a federal court sitting in diversity is not to adopt innovative theories that may distort established state law."  Runner v. N.Y. Stock Exch., Inc., 568 F.3d 383, 386 (2d Cir. 2009) (citation omitted).  Where a federal court encounters an issue that has not yet been decided by the relevant state's law, the court "must carefully predict how the state's highest court would resolve the uncertainties that [the court has] identified."  Id. (citation omitted).  "In making this prediction, [the court] give[s] the fullest weight to pronouncements of the state's highest court while giving proper regard to relevant rulings of the state's lower courts."  Id. (citation omitted).

    There are several reasons to conclude that New York law would recognize the standing of an owner-obligee to sue under a payment bond employing a subrogation theory.  First, New York law recognizes a "broad" doctrine of equitable subrogation. Broadway Houston Mack Dev., LLC v. Kohl, 897 N.Y.S.2d 505, 506 (App. Div. 2d Dep't 2010) ("Broadway").  The doctrine of

subrogation applies "'to cases where a party is compelled to pay
the debt of a third person to protect his own rights, or to save
his own property.'"  Id. (quoting Gerseta Corp. v. Equitable
Trust Co. of N.Y., 241 N.Y. 418, 426 (1926)).  The purpose of
subrogation is "to shift a debt or obligation to a party who
more properly should be accountable in order to prevent unjust
enrichment and an unfair result." Hytko v. Hennessey, 879
N.Y.S.2d 595, 600 (App. Div. 3d Dep't 2009); see also Allstate
Ins. Co. v. Mazzola, 175 F.3d 255, 258 (2d Cir. 1999).

     Second, the New York Court of Appeals recently concluded
that a subcontractor who is otherwise entitled to recover under
a statutory payment bond may lawfully assign its rights under
that bond to a third party, who may then collect directly from
the surety.  The New York Court of Appeals, observing that § 137
is "silent . . . on who may sue on [a statutory payment] bond,"
nevertheless held that § 137 "allows subcontractors' assignees
to recover payment from bond sureties." Quantum, 4 N.Y.3d at
214.  The Court of Appeals thereby rejected the theory that
§ 137, by identifying a specific class of beneficiaries, had
intended that the interests of those class members be non-
transferrable.  Id. at 217.  The court noted it was "comforted
in this conclusion by the continued successful functioning of
public works and the surety market in those jurisdictions that
have maintained long-standing rules allowing for [payment bond

claim] assignments." Id. at 218 n.5; see also 3 Bruner &
O'Connor on Construction Law § 8:177 (discussing assignment of
payment bond rights).

Third, a recent New York case litigated before Suffolk
County Supreme Court and the Second Department suggests that New
York law is amenable to a subrogation-based recovery in
circumstances comparable to those at issue here, even though
that case denied recovery to the owner-obligee. In Broadway,
the owner-obligee -- who had already made all required payments
to its prime contractor -- also made certain additional payments
to the prime contractor's subcontractors. See Broadway, 870
N.Y.S.2d 748 (Sup. Ct. Suffolk County 2008) (trial court
decision); Broadway, 897 N.Y.S.2d 505 (appellate decision). The
owner-obligee then sued the surety to recover those payments,
contending that the surety should have compensated the unpaid
subcontractors under the payment bond in the first instance.
The trial court concluded on the facts of that case that the
owner-obligee was not actually "under a legal compulsion to pay
the subcontractors to avoid mechanics' liens" and thus, that the
owner-obligee did not have standing under the doctrine of
equitable subrogation. 870 N.Y.S.2d at 754, 756. Among other
things, while the subcontractors had threatened to file
mechanics' liens, they had not yet done so. Id. at 750-51. On
appeal, the Appellate Division upheld the Supreme Court's

reasoning, ruling that "the party seeking subrogation must show
that the act is not merely helpful but necessary to the
protection of its interests." Broadway, 897 N.Y.S.2d at 506.
In rendering their decisions, neither court suggested the
existence of any per se bar to recovery by the owner-obligee
based merely on the fact that it was the obligee of the payment
bond.  See also Hamlet at Willow Creek Dev. Co., LLC v. Ne. Land
Dev. Corp., 878 N.Y.S.2d 97, 112 (App. Div. 2d Dep't 2009)
("Hamlet") (permitting recovery based on "novel" argument by a
putative subrogee to the rights of a performance bond obligee
against both the principal and surety).

Finally, allowing the owner-obligee in the appropriate
circumstances to recover under an equitable subrogation theory
against a payment bond surety would support one of the purposes
of State Finance Law § 137, namely, "'protect[ing] the equity of
the owner in his property against the claims of unpaid
creditors.'"  Braspetro, 369 F.3d at 69 (quoting HNC Realty Co.,
409 N.Y.S.2d at 779).  Indeed, the rationale underlying the
decision of the New York Court of Appeals in Quantum, in which
the court permitted assignment of payment bond claims on the
basis that such a result would serve the statutory purpose of
§ 137, applies a fortiori where it is the owner-obligee, rather

than a third-party factoring company, seeking to enforce the
terms of the payment bond.[81]

4.   Application

Given the foregoing conclusions of law, DASNY's status as
"obligee" under the Payment Bond does not, in itself, prevent
DASNY from recovering from Travelers for the latter's alleged
breaches of the Payment Bond.  Instead, the relevant inquiry is
whether DASNY can successfully show that it has satisfied the
criteria for equitable subrogation.[82]  The doctrine of equitable
subrogation

> is broad enough to include every instance in which one
> party pays a debt for which another is primarily
> answerable and which in equity and good conscience
> should have been discharged by the latter, so long as
> the payment was made either under compulsion or for
> the protection of some interest of the party making

[81] In seeking summary judgment, Travelers argues that "if DASNY
intended to assert a claim against Travelers relating to
Trataros' purported failures to pay its subcontractors, its
proper remedy was to declare Trataros in default of its
contracts and bring a claim under the performance bonds"
(emphasis omitted).  Although this argument appears intuitive,
it ignores the fact that performance bonds and payment bonds
protect against different risks.  Because a contractor might
fully perform on its contract with the owner, while
simultaneously failing to pay its subcontractors, it does not
necessarily follow that an owner could seek redress under a
performance bond for the contractor's failure to pay its
subcontractors.  Indeed, Travelers has not tendered evidence
that DASNY would have been able to recover its subcontractor-
payment losses this way.

[82] DASNY asserts that its right to recovery against Travelers on
the Payment Bond Claim is based on "[its] ability to subrogate
the rights of Trataros' subcontractors under the Payment Bonds."

the payment, and in discharge of an existing
liability.

Hamlet, 878 N.Y.S.2d at 105-06 (quoting Gerseta Corp., 241 N.Y.

at 425-26); see also Broadway, 897 N.Y.S.2d at 506.[83]

Applying the foregoing principles to this case, Travelers

has failed to carry its burden of demonstrating as a matter of

law that DASNY is precluded from recovering under the Payment

Bonds.  Although Travelers asserts that "any alleged payments

from DASNY directly to Trataros' subcontractors or suppliers

were made as a volunteer,"[84] it has not submitted evidence to

---

[83] Although here the doctrine of equitable subrogation is being
used to assert claims against a payment bond surety, more
commonly, subrogation is used by a surety.  See, e.g., RLI Ins.
Co. v. N.Y. State Dep't of Labor, 97 N.Y.2d 256, 264-65 (2002)
(discussing surety's ability to subrogate to the rights of the
subcontractors whom it compensates under a payment bond).

[84] The cases Travelers relies on to support this proposition are
inapposite.  See Chi. Title Ins. Co. v. Eynard, 377 N.Y.S.2d
895, 896-97 (App. Div. 1st Dep't 1975) (buyer's title insurance
company could not recover against the seller the costs of paying
off a federal tax lien on seller's former property, because the
seller's quitclaim deed contained no warranties and thus, seller
was not liable for the amount of the lien); Auto Dealers'
Discount Corp. v. Budd, 272 N.Y.S. 893, 894 (App. Div. 4th Dep't
1934) (per curiam) (plaintiff that voluntarily paid automobile
storage charges incurred by the f could not invoke subrogation
to recover against the sheriff).  Likewise, Travelers' reliance
on Novak & Co., Inc. v. Travelers Indemnity Co. for the
proposition that, in Travelers' words, "attempts to expand the
scope of a surety's payment bond to purported third-party
beneficiaries have been rejected by New York courts" is
misplaced.  See Novak & Co., Inc., 392 N.Y.S.2d 901, 903-06
(App. Div. 2d Dep't 1977) (considering the viability of third-
party beneficiary claims under surety bonds).  "Third-party
beneficiary" and "equitable subrogee" are distinct legal
statuses requiring different factual proofs.  Finally, Travelers

establish that fact.  In contrast, DASNY has tendered evidence
showing that several subcontractors filed notices of mechanics'
liens on the Project;[85] that those subcontractors subsequently
initiated various lawsuits against DASNY in New York state court
to foreclose on those liens; and that DASNY was ordered by the
court to participate in a settlement process in an effort to
resolve all outstanding subcontractor payment claims.  DASNY has
submitted the complaints from three of those actions with its
summary judgment materials.[86]  See LBL Skysystems Corp. v.
Trataros Constr., Inc., Index No. 21024-2003 (Sup. Ct. Kings
County); Universal Servs. Grp., Ltd. v. Trataros Constr., Inc.,
Index No. 111651-2003 (Sup. Ct. N.Y. County); R&J Constr. Corp.
v. Trataros Constr., Inc., Index No. 113225-2003 (Sup. Ct. N.Y.

---

cites law for the proposition that a party which settles before
trial cannot later seek contribution from another party.  See
Merchants Bank of N.Y. v. Credit Suisse Bank, 585 F. Supp. 304,
310 (S.D.N.Y. 1984).  DASNY is not, however, claiming
contribution, but rather seeking to vindicate, as equitable
subrogee, the subcontractors' Payment Bond rights.

[85] DASNY's and Travelers' summary judgment materials include,
inter alia, notices of two mechanics' liens filed by LBL, each
dated June 6, 2002, in the amounts of $1,029,531.58 and
$158,953.87; a notice of mechanics' lien filed by Universal
Services Group, Ltd. dated October 8, 2002 in the amount of
$128,700.00; and a notice of mechanics' lien filed by R&J
Construction Corp. dated November 18, 2002 in the amount of
$2,397,163.00.

[86] The referenced LBL action could not be located in the state
court records.  LBL did, however, also file a lawsuit in New
York County against DASNY, Trataros, and others in 2004.  See
LBL Skysystems Corp. v. Trataros Constr., Inc., Index No.
401484-2004 (Sup. Ct. N.Y. County).

County).  Accordingly, because DASNY may be able to recover

damages on its Payment Bond Claim under an equitable subrogation

theory, and because Travelers has not demonstrated that such a

theory is clearly untenable on these facts, Travelers' motion

for summary judgment as to this claim is denied.

## CONCLUSION

Travelers' February 19, 2010 motion for summary judgment is

granted in part.  The Breach-of-Contract Counterclaim and

Performance Bond Counterclaim are both dismissed, while the

Payment Bond Counterclaim survives.  DASNY's February 19, 2010

motion for summary judgment is granted in its entirety.  A

separate scheduling Order accompanies this Opinion.

SO ORDERED:

Dated:     New York, New York
           August 26, 2010

                                    _____
                                    DENISE COTE
                                    United States District Judge

96