UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TRAVELERS CASUALTY AND SURETY COMPANY as Administrator for RELIANCE INSURANCE COMPANY,<br><br>        Plaintiff,<br><br>- against -<br><br>DORMITORY AUTHORITY – STATE OF NEW YORK, TDX CONSTRUCTION CORP., and KOHN PEDERSEN FOX ASSOCIATES, P.C.,<br><br>        Defendants. | Case No. 07 Civ. 6915 (DLC)<br><br>Consolidated with<br>Case No. 08 Civ. 6239 (DLC)<br><br>AFFIDAVIT OF TIMOTHY B. FROESSEL IN OPPOSITION TO MOTION SEEKING SANCTIONS FOR ALLEGED <u>SPOLIATION OF EVIDENCE</u> |
| AND THIRD AND FOURTH PARTY ACTIONS. | |
| In Re:<br>G.M. CROCETTI, INC.,<br><br>        Debtor. | Case No. 08 Civ. 6293 (DLC)<br>(Consolidated Action) |
| G.M. CROCETTI, INC.,<br><br>        Plaintiff,<br><br>- against -<br><br>TRATAROS CONSTRUCTION, INC. and TRAVELERS CASUALTY AND SURETY COMPANY,<br><br>        Defendants. | |
| TRATAROS CONSTRUCTION. INC. and TRAVELERS CASUALTY AND SURETY COMPANY,<br><br>        Third-Party Plaintiffs,<br>- against -<br><br>DORMITORY AUTHORITY - STATE OF NEW YORK, et al.,<br><br>        Third-Party Defendants. | |

STATE OF NEW YORK      )
                       : ss.:
COUNTY OF NEW YORK     )

TIMOTHY B. FROESSEL, being duly sworn, deposes and says:

1. I am an attorney with the law firm of Holland & Knight LLP, attorneys for defendants Dormitory Authority of the State of New York ("DASNY") and TDX Construction Corp. ("TDX") in the above-captioned action. I am fully familiar with the facts set forth below, and submit this affidavit in further support of DASNY's and TDX's opposition to the motion in limine filed by Bartec Industries, Inc. ("Bartec"), Dayton Superior Corporation, G.M. Crocetti, Inc., and Carolina Casualty Insurance Company (collectively the "Moving Parties"), which seeks sanctions pursuant to Fed. R. Civ. P. 37.

2. Ray Leu of TDX was deposed in this action on June 11, 2008. True and correct copies of relevant pages of Mr. Leu's deposition transcript from that date are attached hereto as **Exhibit 1**.

3. Craig Negus of Bartec was deposed in this action on August 12, 2008. True and correct copies of relevant pages of Mr. Negus' deposition transcript from that date are attached hereto as **Exhibit 2**.

4. The "Chop and Fill Survey" discussed during Mr. Leu's deposition was kept with TDX's Project records and was made available during document production to the Moving Parties.

WHEREFORE, it is respectfully requested that the Court enter an order denying the Moving Parties' motion in its entirety, together with other and further relief as the Court may deem just and proper.

_____
TIMOTHY B. FROESSEL

Sworn to before me this
24th day of January, 2011

_____
Notary Public

KAREN HIPPNER
Notary Public, State of New York
No. 01HI6100493
Qualified in Suffolk County
Commission Expires October 20, 20 11

3

# EXHIBIT 1

Case 1:07-cv-06915-DLC   Document 582   Filed 01/24/11   Page 4 of 11

...

232

```
 1
 2    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 3    ------------------------------------------
 4    TRAVELERS CASUALTY AND SURETY COMPANY as
      Administrator for RELIANCE INSURANCE
 5    COMPANY,
 6                              Plaintiff,
 7            -against-
 8    DORMITORY AUTHORITY-STATE OF NEW YORK, TDX
      CONSTRUCTION CORP. and KOHN PEDERSEN FOX
 9    ASSOCIATES, P.C.,
10                              Defendants.
11    Case No. 08-CV-6915 (DLC)
12
                     (CAPTION CONTINUED)
13    ------------------------------------------
14
                            June 11, 2008
15                          10:09 a.m.
16
17            CONTINUED DEPOSITION of RAY LEU,
18    taken by Plaintiff, pursuant to Notice,
19    held at the offices of HOLLAND & KNIGHT
20    LLP, 195 Broadway, New York, New York
21    before Wayne Hock, a Notary Public of the
22    State of New York.
23
24
25
```

**425**

1  R. Leu
2  other than those that you just told me
3  about?
4     A.  I don't recall.
5     Q.  You don't recall any other areas
6  other than those three areas that you just
7  told me about of you physically observing
8  delamination?
9     A.  I don't recall subsequently
10 after that what other time frames there
11 were other areas that I observed, areas in
12 the 24th Street turnstile area.
13    Q.  That's down on the ground floor
14 again?
15    A.  Down on the ground floor.
16        There's like a student lounge
17 area on the ground floor right off the
18 24th Street entrance.
19    Q.  Anywhere else?
20    A.  Not that I recall at this
21 moment.
22    Q.  Any in the sub-ground levels?
23        MR. SHAPIRO: The basement
24 levels?
25        MR. PLATEK: Sure. That's

**426**

1  R. Leu
2  sub-ground.
3     A.  I don't recall seeing that.
4     Q.  Any in the levels above the
5  second floor?
6     A.  I don't recall seeing any.
7     Q.  And when you use the term
8  "delamination," what exactly do you mean
9  by that term?
10    A.  I notice a curling of the
11 terrazzo panels from the zinc strip. You
12 could feel some rocking when you step on
13 the edge; you feel some softness.
14    Q.  Now, that first area you
15 described on the second floor south of the
16 escalators, do you know, the terrazzo you
17 observed delaminated, what substrate that
18 was on?
19    A.  No, I do not know.
20    Q.  You don't know if it's Conflow?
21    A.  No, I do not know if it's
22 Conflow.
23    Q.  Do you know if it was Mapacem?
24    A.  No, I do not know at this
25 moment, no.

**427**

1  R. Leu
2     Q.  Do you know if it was on slab?
3     A.  No, I do not know if it was on
4  slab.
5     Q.  Are you aware of anyone who
6  knows the answers to those questions?
7     A.  No.
8     Q.  And the ground floor east
9  corner, do you know if that was on
10 Conflow, that area of delamination?
11    A.  No, not definitively, no.
12    Q.  Do you know if that was on
13 Mapacem?
14    A.  No, it was not on Mapacem.
15    Q.  No, you don't know or --
16    A.  No, it's not on Mapacem.
17    Q.  How do you know that?
18    A.  Because we gave a change order
19 to Crocetti for certain areas to put
20 Mapacem as a change order and that area
21 was not part of the change order.
22    Q.  But the second floor was part of
23 that change order?
24    A.  We did it around the elevator
25 lobbies, I think we may have did some

**428**

1  R. Leu
2  around the escalator landing because those
3  are high traffic areas where we would need
4  a fast setting time, but I do know if it's
5  not on the eastern corner of the ground
6  floor.
7     Q.  Do you know if on that eastern
8  corner the terrazzo was installed on slab?
9     A.  I don't know that definitively.
10    Q.  Do you know anyone who does know
11 the answer as to whether or not that area
12 of delamination of the ground floor east
13 corner was installed on slab or on
14 Conflow?
15    A.  No.
16    Q.  Do you know of any documents
17 that would indicate whether or not that
18 area was installed on slab or Conflow?
19    A.  Yes.
20    Q.  What documents would indicate
21 that?
22    A.  Bartec had produced a survey, a
23 five foot grid survey of the existing
24 conditions on the slabs. Based on that
25 survey, direction was given of where to

**Page 429**

```
 1              R. Leu
 2   put Conflow and where are we going to
 3   scarify. And that particular area, I'd
 4   have to take a look at the documents, it's
 5   not an exact science because what we did
 6   on the survey was we just highlighted the
 7   areas where we needed some floor filled to
 8   meet KPF's tolerances. To correlate to
 9   the exact area where it has delaminated, I
10   cannot tell you that.
11       Q.  Who's in possession of that
12   survey?
13       A.  We have it as part of the job
14   documents at site A.
15       Q.  The area in the lobby by the
16   turnstile entrance at 25th Street that you
17   said you observed delamination, are you
18   aware whether or not that terrazzo was
19   installed over Conflow?
20       A.  I do not know that definitively.
21       Q.  Do you know whether it was
22   installed over slab?
23       A.  I do not know that definitively.
24       Q.  Do you know if it was installed
25   over Mapacem?
```

**Page 430**

```
 1              R. Leu
 2       A.  I do not think it was installed
 3   over Mapacem. Again, the change order
 4   does not specify those areas to receive
 5   Mapacem.
 6       Q.  Would that five foot survey
 7   indicate whether or not that area involved
 8   the installation of Conflow?
 9       A.  Possibly.
10       Q.  You're not certain?
11       A.  I'd have to take a look at the
12   survey and determine what direction was
13   given.
14       Q.  And the 24th Street turnstile
15   area where you also saw delamination, are
16   you aware of whether that was over slab?
17       A.  I do not know that.
18       Q.  How about the same question, do
19   you know if it was over Conflow?
20       A.  I do not know that. I'd have to
21   take a look at the survey.
22       Q.  Do you know if it was over
23   Mapacem?
24       A.  The turnstile areas, no, because
25   Mapacem wasn't used in that area.
```

**Page 431**

```
 1              R. Leu
 2       Q.  How about the ground floor
 3   student lounge, do you know if that area
 4   of delamination was installed over
 5   Conflow?
 6       A.  I do not know that.
 7       Q.  Do you know if it was installed
 8   over slab?
 9       A.  I do not know that.
10       Q.  Do you know if it was installed
11   over Mapacem?
12       A.  I'd have to take a look at that
13   change order again and see if that was one
14   of the areas.
15       Q.  Let's go to T50.
16           This is, you earlier testified,
17   was a survey performed by TDX of areas
18   that were sounded and -- and sounded
19   hollow by broomstick sounding; is that
20   correct?
21       A.  That's correct.
22       Q.  It's now 4:07. I could go
23   through each and every one of these
24   circles with you, but I think I'll ask you
25   generally first, if I were to go through
```

**Page 432**

```
 1              R. Leu
 2   each and every one of these circles with
 3   you, would you be able to tell me, as you
 4   sit here today, whether or not the areas
 5   depicted in those circles as being
 6   sounding hollow, whether those were areas
 7   installed over Conflow?
 8       A.  No, I cannot tell you
 9   definitively if they were or not.
10       Q.  Would you be able to tell me if
11   that area was installed over slab?
12       A.  No.
13       Q.  Would you be able to tell me if
14   that area was installed over Mapacem?
15       A.  I'd have to correlate that with
16   the change order to see where Mapacem was
17   played.
18       Q.  And would that five foot survey
19   that was performed by Bartec, would that
20   allow you to tell me whether or not it was
21   installed over slab or Conflow
22   definitively?
23       A.  The survey that was done by
24   Bartec, that was the direction that was
25   given to Trataros and Bartec to install
```

# EXHIBIT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
CASE NO.: 08-CV-6915 (DLC)
-------------------------------------------x
TRAVELERS CASUALTY AND SURETY COMPANY as Administrator for RELIANCE INSURANCE COMPANY,

Plaintiff,

-against-

DORMITORY AUTHORITY-STATE OF NEW YORK, TDX CONSTRUCTION CORP. and KOHN PEDERSON FOX ASSOCIATES, P.C.,

Defendants.

(CAPTION CONTINUED)
-------------------------------------------x

August 12, 2008
10:00 a.m.

DEPOSITION of CRAIG NEGUS, held at the offices of Holland & Knight, 195 Broadway, New York, New York, before Eileen Mulvenna, CSR/RMR, Certified Shorthand Reporter, Registered Merit Reporter and Notary Public of the State of New York.

**Page 46**

```
 1                  Craig Negus
 2      A.    Ray Leu.
 3      Q.    Was anyone from Trataros involved in
 4  that process?
 5      A.    Ramesh.
 6      Q.    So after you shot elevations on one
 7  or two floors, you or someone from Bartec would
 8  record that on a floor plan; correct?
 9      A.    Yes, or a straight piece of paper.
10      Q.    Okay.  And what was the information
11  you recorded?  Was it strictly numbers or --
12      A.    Fractions.  In terms of depth,
13  correct.
14      Q.    Did it contain any -- withdrawn.
15            You said some of it was recorded on
16  a straight piece of paper?
17      A.    Yes.
18      Q.    On that piece of paper, did you
19  indicate any column lines or other indicia to
20  show where in the building the measurement was?
21      A.    Yes.
22      Q.    How did you do that?
23      A.    Titled it.
24      Q.    Did you use column lines?
25      A.    No.  If I was close to a column
```

**Page 47**

```
 1                  Craig Negus
 2  line, I would identify the column; but most of
 3  the time, just identified so everybody knew where
 4  it was on the piece of paper.
 5      Q.    Can you describe for me what that
 6  might say.
 7      A.    I'd identify a bathroom, the
 8  corridor that they sent me to by number, area, or
 9  off elevator number, elevator shaft number, or
10  whatever.
11      Q.    Once you recorded the information,
12  who would you take it to?
13      A.    I would take it back to Trataros,
14  particularly Ramesh.
15      Q.    And to your knowledge, what did
16  Ramesh then do with the information?
17      A.    Had a meeting with Ray Leu.
18      Q.    Would you be present at those
19  meetings?
20      A.    Yes.
21      Q.    Do you recall anyone other than Ray
22  Leu or Ramesh being present at those meetings?
23      A.    Occasionally Walter Bartels.
24      Q.    And can you -- what typically would
25  be the nature of the discussion at those
```

**Page 48**

```
 1                  Craig Negus
 2  meetings?
 3      A.    The amount of correction needed.
 4      Q.    Did Trataros participate in those --
 5  I'll withdraw that.
 6            Did Ramesh participate in those
 7  discussions?
 8      A.    Yes.
 9      Q.    The instances where Mr. Bartels was
10  present, did he participate in those discussions?
11      A.    Yes.
12      Q.    And did Mr. Leu participate in those
13  discussions?
14      A.    Yes.  He had final say.
15      Q.    And as a result of those meetings,
16  what would then transpire?
17      A.    I would be directed to correct the
18  floor for levelness.
19      Q.    As a result of those meetings, were
20  any documents created from the survey data that
21  you had recorded?
22            MR. PLATEK:  By whom?
23            MR. FROESSEL:  Anyone.
24      A.    Yes.
25      Q.    Can you describe that for me.
```

**Page 49**

```
 1                  Craig Negus
 2      A.    There was a set of plans, as my work
 3  proceeded, where it was marked where I had
 4  corrected the floor.
 5      Q.    Was this -- was that something that
 6  was done after the surveying process was
 7  complete?
 8      A.    No, it was done after -- after their
 9  decision on what to do, it was marked.
10      Q.    Do you know if that was done
11  after -- if that -- withdrawn.
12            Do you know if that document was
13  created after the self-leveling underlayment was
14  installed?
15      A.    Sometimes.  And sometimes before.
16      Q.    Who created that document?
17            MS. BONACCI:  Objection to form.
18            MR. FROESSEL:  Actually, I'll
19  withdraw the question.
20      Q.    Can you describe for me what the
21  document looked like.
22      A.    It was a set of drawings.
23      Q.    Floor plans?
24      A.    Yes.
25      Q.    To your knowledge, was it a set of
```

**Page 138**

Craig Negus

```
 2  drawings?
 3      A.  No, I don't.
 4      Q.  Did you ever -- did you ever see
 5  anyone writing on that set of drawings that had
 6  the elevations written on it?
 7      A.  I don't recall whether I ever saw
 8  the actual transfer of my numbers onto that and
 9  by who, but it was transferred.
10      Q.  Did you ever -- the set of floor
11  plans that had the elevations written onto it,
12  did you ever see that in TDX's possession?
13      A.  I don't recall.
14      Q.  Did you ever see it in Trataros'
15  possession?
16      A.  Yes.
17      Q.  Do you recall who from Trataros you
18  saw in possession of that document?
19      A.  The answer again would be everybody.
20      Q.  Are you aware of any as-built
21  drawing showing the locations where Bartec
22  installed Conflow at Baruch College?
23          MR. PLATEK:  As opposed to the plans
24  that he's already testified to?
25          MR. FROESSEL:  He talked about a
```

**Page 139**

Craig Negus

```
 2  before-the-fact set of drawings.
 3          MR. PLATEK:  No, I don't --
 4          MR. FROESSEL:  I'm talking about an
 5  as-built.
 6          MR. PLATEK:  I don't -- I don't
 7  think that's what his testimony was, but
 8  I'll allow him to answer that question.
 9          MS. SMITH:  Note my objection to
10  that.
11          MS. WISHERT:  Join as well.
12      A.  "As-built" as meaning after the
13  fact?
14      Q.  Yes.
15      A.  After the work was done?
16      Q.  Uh-huh.
17      A.  Yes.
18      Q.  Who prepared that drawing?
19          MR. PLATEK:  Objection.
20          MR. FROESSEL:  I'll withdraw the
21  question.
22      Q.  Is that the same drawing we're
23  talking about with the colors?
24      A.  Yes.
25      Q.  And all of that -- all of those
```

**Page 140**

Craig Negus

```
 2  colors were added after the fact, you're saying?
 3      A.  I believe so.
 4      Q.  What's the basis of your belief that
 5  the colors were added to the drawing after the
 6  Conflow was in place or the underlayment was in
 7  place?
 8      A.  Because it was neat.  It didn't have
 9  elevations on it.
10      Q.  Is that the document you said you
11  saw Mr. Leu making markings on?
12      A.  I never saw Mr. Leu making markings
13  on them.  I don't know who did that.
14      Q.  Okay.
15      A.  I don't know who was the recorder.
16  It could have been him, but I'm not -- you asked
17  me before did I physically saw [sic] Mr. Leu
18  write.  I never did.
19      Q.  Okay.  Did you ever have any
20  interaction with anyone from G.M. Crocetti while
21  you were working at Baruch College?
22      A.  No.
23          I have to add to that.  I'm wrong.
24          I had some limited interaction with
25  the foreman about covering the underlayment too
```

**Page 141**

Craig Negus

```
 2  soon.  And it was a little bit out of line and I
 3  went right to Trataros with it.
 4      Q.  Okay.  Just to clarify that, did you
 5  feel that Crocetti was covering Bartec's
 6  underlayment too soon?
 7      A.  Yes.
 8      Q.  What were they covering it with?
 9      A.  The terrazzo system.  Sorry about
10  that.
11      Q.  Do you recall who the -- who the
12  Crocetti foreman was you spoke to?
13      A.  I don't know -- I don't remember --
14  remember his name.
15      Q.  And you said you went and you
16  complained to Trataros about that?
17      A.  Right, that's correct.  Yes.
18      Q.  Who at Trataros did you go to with
19  that complaint?
20      A.  Everybody again.
21      Q.  Do you recall what the response was
22  that you got, if any?
23      A.  They made sure from that point on
24  that he understood he had to wait seven days.
25      Q.  Okay.
```